ACCEPTED
15-25-00221-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
11/26/2025 2:05 PM
CHRISTOPHER A. PRINE
CLERK

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
11/26/2025 2:45:49 PM
CHRISTOPHER A. PRINE
Clerk

No. _____

_____

# IN THE FIFTEENTH COURT OF APPEALS
## AUSTIN, TEXAS

_____

*In re* The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and the Highland Santa Barbara Foundation, Inc.,

*Relators*

_____

Original Proceeding Arising From the
Business Court of the State of Texas, First Division
Cause No. 25-BC01B-0027
Honorable William Whitehill, Judge of the Texas Business Court

_____

## PETITION FOR WRIT OF MANDAMUS

_____

**MᴄCᴀʀᴛʏ Lᴀᴡ PLLC**
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street, Suite 400
Austin, Texas 78701
512-827-2902

**DUANE MORRIS LLP**
Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Benjamin L. Warden
State Bar No. 24115926
bwarden@duanemorris.com
200 Crescent Court, Suite 900
Dallas, Texas 75201
(214) 257-7213 -Telephone

*Counsel for Relators*
Oral Argument Requested

# Identity of Parties and Counsel

RELATORS:          The Highland Dallas Foundation, Inc., The
                   Highland Kansas City Foundation, Inc. and
                   The Highland Santa Barbara Foundation, Inc.

COUNSEL FOR        MCCARTY LAW PLLC
RELATORS:
                   Darren L. McCarty
                   State Bar No. 24007631
                   darren@mccartylawpllc.com
                   316 West 12th Street, Suite 400
                   Austin, Texas 78701
                   512-817-2902

                   -and-

                   DUANE MORRIS LLP

                   Craig M. Warner
                   State Bar No. 24084158
                   cmwarner@duanemorris.com
                   Joseph M. Cox
                   State Bar No. 04950200
                   jmcox@duanemorris.com
                   Benjamin L. Warden
                   State Bar No. 24115926
                   bwarden@duanemorris.com
                   200 Crescent Court, Suite 900
                   Dallas, Texas 75201
                   (214) 257-7213 -Telephone
                   (214) 292-8442 -Facsimile


RESPONDENT:        The Honorable Bill Whitehill
                   Texas Business Courts—Dallas, Division 1B
                   8080 Park Lane, Suite 500
                   Dallas, Texas 75231
                   BCDivision1B@txcourts.gov

i

REAL PARTIES IN INTEREST: Mark Patrick, DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC, and CDH GP, Ltd.

COUNSEL FOR REAL PARTIES IN INTEREST: CARRINGTON, COLEMAN, SLOMAN, BLUMENTHAL, LLP

**Brian P. Shaw**
Texas Bar No. 24053473
Email: bshaw@ccsb.com
**Monica E. Gaudioso**
Texas Bar No. 24084570
Email: mgaudioso@ccsb.com
**Brent M. Rubin**
Texas Bar No. 24086834
Email: brubin@ccsb.com
**Joshua D. Kipp**
Texas Bar No. 24078793
Email: jkipp@ccsb.com
**Andrea C. Reed**
Texas Bar No. 24121791
Email: areed@ccsb.com
**Emily H. Owen**
Texas Bar No. 24116865
Email: eowen@ccsb.com
901 Main Street, Suite 5500
Dallas, Texas 75202
(214) 855-3000 – Telephone
(214) 580-2641 – Facsimile

ii

## Table of Contents

**Page**

Identity of Parties and Counsel ...................................................................i

Index of Authorities......................................................................................v

Statement Regarding Mandamus Record................................................. 1

Statement of the Case .................................................................................2

Statement of Jurisdiction.............................................................................3

Issue Presented ............................................................................................3

Statement of Facts .......................................................................................4

Procedural History ..................................................................................... 18

Argument.....................................................................................................23

    I.    An Incorrect Mandatory Joinder is an Abuse of
        Discretion .........................................................................................24

        A.    Mandamus Standard. ........................................24

        B.    The Trial Court Misinterpreted Cayman
                Law and Erroneously Found that all the
                Charities' Claims are Derivative in Nature. ...... 25

                (i)    The Charities possess direct breach of
                        fiduciary duty claims against
                        Defendants under Cayman law. ................25

                (ii)    The Charities' fraud claims are direct,
                        not derivative. ...........................................42

    II.    The Record Does Not Support Abatement Under Rule
        39. ....................................................................................................49

        A.    Standard under Rule 39 .....................................49

B.     The Defendants Failed to Show that
       "Complete Relief" between the Actual
       Existing Parties Cannot be had...........................50

III.   Mandamus is Warranted Because the Charities Lack
       an Effective Appellate Remedy.............................54

Conclusion and Prayer ........................................................57

Rule 52.3(J) Certification....................................................59

Certificate of Compliance....................................................59

Certificate of Service .........................................................60

# Index of Authorities

**Page(s)**

CASES

*Clear Lake City Water Auth. v. Clear Lake Utilities Co.*
549 S.W.2d 385 (Tex. 1977) ................................................................. 51

*Cooper v. Tex. Gulf Indus., Inc.*
513 S.W.2d 200 (Tex. 1974) ................................................................. 51

*Doty v. Davidson*
No. 04-20-00583-CV, 2022 WL 2334547 (Tex. App.—San Antonio
June 29, 2022, pet. denied) ................................................................. 41

*Ebert v. Gustin*
No. 4:15-CV-00225-O, 2016 WL 11663145
(N.D. Tex. Dec. 2, 2016) ....................................................................... 44

*Feiner Family Tr. v. VBI Corp.*
No. 07 CIV. 1914 (RPP), 2007 WL 2615448
(S.D.N.Y. Sept. 11, 2007) ............................................... 32-34, 37, 47-48

*Field v. Volkswagenwerk AG*
26 F.2d 293 (3d Cir. 1980) .................................................................. 52

*Heard v. Moore*
101 S.W.3d 726 (Tex. App.—Texarkana 2003, pet. denied) .............. 52

*In re Austin Hous. Fin. Corp.*
No. 03-22-00091-CV, 2022 WL 2960796 (Tex. App.—Austin July 27,
2022, orig. proceeding) (mem. op.) ........................... 23-25, 50-51, 54-55

*In re Baldridge*
No. 04-16-00011-CV, 2016 WL 1128236 (Tex. App.—San Antonio,
Mar. 23, 2016, orig. proceeding) ......................................................... 55

*In re Benge*
No. 13-18-00283-CV, 2018 WL 3233867 (Tex. App.—Corpus Christi,
July 3, 2018, orig. proceeding) ............................................................ 56

*In re Boyaki*
   587 S.W.3d 479 (Tex. App.—El Paso 2019, no pet.)...........................54

*In re Cencom Cable Income Partners, L.P.*
   No. C.A. 14634, 2000 WL 130629 (Del. Ch. Jan. 27, 2000) ...............36

*In re Corcoran*
   401 S.W.3d 136 (Tex. App.—Houston [14th Dist.] 2011, orig.
   proceeding) ...................................................................... 25, 50, 55

*In re Harbinger Capital Partners Funds Investor Litigation*
   No. 12 Civ. 1244 (AJN), 2013 WL 5441754
   (S.D.N.Y. Sept. 30, 2013),
   .................................................................... 34-36, 42, 44-45

*In re Occidental W. Tex. Overthrust, Inc.*
   626 S.W.3d 395 (Tex. App.—El Paso 2021, orig. proceeding)...... 25, 49

*In re PHC, Inc. S'holder Litig.*
   No. CIV.A. 11-11049-GAO, 2012 WL 1195995 (D. Mass. Mar. 30,
   2012)................................................................................................45

*In re Prudential Ins. Co. of Am.*
   148 S.W.3d 124 (Tex. 2004) (orig. proceeding)..................................55

*In re Shulman*
   544 S.W.3d 861 (Tex. App.—Houston [14th Dist.] 2017, orig.
   proceeding)........................................................................................55

*Kodiak Res., Inc. v. Smith*
   361 S.W.3d 246 (Tex. App.—Beaumont 2012, no pet.) ....................51

*Matter of Tr. A & Tr. C Established Under Bernard L. & Jeannette
   Fenenbock Living Tr. Agreement*
   690 S.W.3d 80 (Tex. 2024) ...............................................................49

*McBeth v. Porges*
   171 F.Supp.3d 216 (S.D.N.Y. 2016)..................................................36

*McCarthy v. George*
   618 S.W.2d 762 (Tex. 1981) ..............................................................51

*Mills v. Mills*
(1938) 60 CLR 150................................................................28

*Ortiz v. A.N.P., Inc.*
10-CV-917, 2010 WL 3702595 (S.D. Tex. Sept. 15, 2010).............50-51

*Payan v. Cont'l Tire N. Am., Inc.*
232 F.R.D. 587 (S.D. Tex. 2005) .......................................50

*Peskin v. Anderson*
[2001] 1 B.C.L.C. 372..............................................33-34, 48

*Residues Treatment & Trading Co Ltd v Southern Resources Ltd*
(1988) 6 ACLC 1160 ...........................................................28

*Sanson v. Allstate Tex. Lloyds*
No. 4:17-cv-00733, 2018 WL 3630136 (E.D. Tex. 2018)..........50, 53-54

*Sherman v. Triton Energy Corp.*
124 S.W.3d 272 (Tex. App.—Dallas 2003, pet. denied)....................43

*Strasenburgh v. Straubmuller*
683 A.2d 818 (N.J. 1996) .................................................45

*Tianrui (Int'l) Holding Co. Ltd. v. China Shanshui Cement Grp. Ltd.*
[2024] UKPC 36. ........................................................ passim

*Trapnell v. Hunter*
785 S.W.2d 426 (Tex. App.-Corpus Christi, 1990, orig. proceeding) . 56

*Wingate v. Hajdik*
795 S.W.2d 717 (Tex. 1990) ...........................................43

*Wise v. SR Dallas, LLC*
436 S.W.3d 402 (Tex. App.—Dallas 2014, no pet.) .........................47

## STATUTES

Tex. Bus. Org. Code § 1.102 ...........................................23, 26

Tex. Gov't Code § 22.220(d)(3) ............................................3

Tex. Gov't Code § 22.221(b)................................................3

Tex. Gov't Code § 25A.007(a) ...................................................... 3

**OTHER AUTHORITIES**

FED. R. CIV. P. 19 ..................................................................... 51

TEX. R. CIV. P. 39 ............................................................ passim

## Statement Regarding Mandamus Record

Relators are separately filing a sworn mandamus record in support of this petition for writ of mandamus. Tex. R. App. P. 52.7(a)(1). References to the mandamus record, which is consecutively paginated, are in the form "(MR [Page#])." Selected materials from the mandamus record are attached in the Appendix to this petition as required or appropriate. Tex. R. App. P. 52.3(k). References to exhibits in the Appendix are in the form "(App. [Page#])."

## Statement of the Case

| | |
|---|---|
| *Nature of Case* | This case involves $270 million in charitable funds. The Highland Dallas Foundation, Inc., and two other charities sued Mark Patrick and entities controlled by him for breach of fiduciary duty, common law fraud, fraud by non-disclosure, conversion, and unjust enrichment, seeking a receivership and constructive trust, among other remedies. |
| *Court* | Hon. William Whitehill<br>Texas Business Courts—Dallas, Division 1B |
| *Action from which Relators seek relief* | Relators seek relief from Respondent's September 18, 2025, order abating the underlying case pursuant to Texas Rule of Civil Procedure 39, and Respondent's October 31, 2025 order explaining the abatement and denying relator's motion for reconsideration. |

2

## Statement of Jurisdiction

This Court has jurisdiction to "issue all writs of mandamus, agreeable to the principles of law regulating those writs . . . arising out of matters over which the court has exclusive intermediate appellate jurisdiction under Section 22.220(d)." Tex. Gov't Code §§ 22.221(b), (c-1). This Court has intermediate appellate jurisdiction "as provided by law." Tex. Gov't Code § 22.220(d)(3), pursuant to Tex. Gov't Code § 25A.007(a).

## Issue Presented

Mandamus is appropriate because the trial court abused its discretion when it:

- Ruled that the Joint Official Liquidators of Charitable DAF Holdco are necessary parties under Rule 39 because all Relators' claims are derivative, and abated the case based on that ruling.

- Failed to consider Relators' well-pled allegations as true at this stage.

3

## Statement of Facts

The Relators (the "Charities") are non-profit corporations that serve solely to provide critical funding to longstanding charitable entities in Dallas, Kansas City, and Santa Barbara. (MR 0235, 1781-82, 1785-87). A charitable fund structure (the "Charitable DAF Fund" or "the Fund") held all the assets that provided the Charities' funding. (MR 1785-87).

The Charities' 98% economic interest in the fund was established via "Participating Shares" in Charitable DAF HoldCo ("Charitable DAF Holdco" or "HoldCo"), a Cayman entity, which in turn held the Fund. (MR 0235-0236, 1785-87). These shares entitled the Charities to the financial benefits of the Fund. These shares (and Cayman law) also conferred upon the Charities the right to petition for an equitable winding up of the Fund, which would—if approved by a Cayman court—entitle the Charities to the direct disbursement of the Fund assets in a proportion commensurate with their shares. (MR 0647-0649, 1797-98, 1804-05, 1808). During this time, the Fund held approximately $270 Million in assets. (MR 0246, 1792, 1796-99).

Control of the Fund structure was separate from the Participating Shares and was exercised instead by the holder of its Management

4

Shares—the "Control Position." (MR 0219-0220, 1787-89). The "Control Position" exercised its authority through a General Partner entity, Charitable DAF-GP, LLC. (MR 0232-0233, 1787-89). The governing documents of the Fund expressly obligate the Control Position to manage the Fund for the economic benefit of the Charities, and not for the benefit of the Management Shares or the Control Position itself. (MR 0058-0059, 1787-89). This is necessary because, under the Fund structure, the Charities are critically dependent upon the Control Position for information about their positions. While they have some powers (like equitable winding-up), on a day-to-day basis the Charities had to trust the Control Position to act in their best interests and rely on the accuracy of the information he provided. (*See* MR 00234-00235, 0241, 1787-89, 1806-12).

In 2021, Defendant Mark Patrick ("Patrick") replaced the prior holder of the Management Shares in the Control Position. (MR 0222, 1789-90). As a result, Patrick controls all the other Defendants in one manner or another. (MR 1781-83, 1798-1800). As the Charities pled: Beginning sometime in 2023, in violation of the fiduciary trust placed in him, Patrick embarked upon a scheme to alienate and sever the Charities

5

from the Fund that had been created to benefit them. (MR 1790-1806). In so doing, he planned to replace the Charities entirely with a new sham charity created and controlled by him. (MR 1797-1802). The express goal of the scheme was to use his powers within the Fund structure for an improper purpose: to harm the Charities and reduce their power, influence, and leverage with the Fund structure. (MR 1796-1806). By November 2023, Patrick had employed a law firm that summarized the task Patrick had assigned as follows: How could Patrick (via his Control Position) "make the [Charities'] Participation Shares worthless." (App. 234, MR 0627-28).

One challenge Patrick's lawyers identified was that the Charities could exercise their rights to "wind up" HoldCo and the Fund, which would then entitle the Charities to their proceeds. (MR 0645-49, 1797-98, 1804-05, 1808). But Patrick concocted a solution: by issuing new participation shares in HoldCo to a new "charity" that Patrick himself controlled, he could dilute down the Charities so they represented a minority percentage of HoldCo's shares and ultimately allow Patrick to take over the entirety of the $270 million Fund. (MR 0640, 0645-649, 1797-98).

The Charities' Second Amended Complaint elaborates at greater length Patrick's intricate scheme. (App. 223-250, MR 1785-1815). In essence, however, the scheme had six main components: (1) pay exorbitant salaries and bonuses to Patrick from charitable funds; (2) form new entities controlled by Patrick to replace the Fund structure; (3) dilute the Participation Shares the Charities held in HoldCo in favor of Patrick's new entities; (4) insert a new blocking entity to sever the Charities from the Fund; (5) secure a sham valuation of the Charities' interests in the Fund to strip all the Charities' interests in the Fund for a nominal amount; and (6) hide and misrepresent his actions and intentions to the Charities to delay or foreclose action by the Charities to protect their interests—including filing an equitable wind-up petition or any effort to reverse the dilution of their shares. (App. 223-250). By executing these steps, the Defendants would be able to cut the Charities off from their interest in the Fund.

As a first step, Patrick financially insulated himself by secretly taking significant sums from the Fund. In 2022, Patrick raised director fees from the $40,000 per annum under Patrick's predecessor, to $600,000 in 2023, to $2.25 million in the first half of 2024. (MR 0225,

0237-0238, 1792-94). Patrick's predecessor took an annual salary of $60,000 per year, while Patrick raised his to $850,000 in September 2024. (MR 0750-0751, 1792-94). In the same time period, Patrick also instituted a long-term incentive bonus plan, which he used immediately to pay himself an additional $975,000 in compensation. (MR 0750-0751, 1793). He also awarded himself a "discretionary bonus" of $2,125,000 in the fall of 2024. (MR 1793). Added together, Patrick received approximately $3,925,000 in compensation in 2024—excluding his share of $2,250,000 in director fees. (MR 1793). Patrick's likely total compensation in 2024 alone was at or above $5,000,000, all paid from funds meant to serve charitable purposes. (MR 1793).

After Patrick inflated his compensation, he implemented his overall plan to alienate the Charities from the Fund by creating a number of new entities. (MR 0243-46). Among these new entities was DFW Charitable Foundation. (MR 0244, 1797-98). Patrick named himself the sole member and sole director of DFW Charitable Foundation which listed its registered address at Patrick's home in Dallas. (MR 0244, 1797-98).

Patrick's new entities also included CDH, GP, Ltd., a replacement managing member entity to exercise the Management Shares in Holdco

(the entity in which the Charities held participating shares), as well as CDMCFAD, LLC, a new holding company meant to replace Holdco as the holder of the Fund assets. (MR 0244-0246, 1798-1800). The prior General Partner was a Delaware entity. Patrick's express directive to his lawyers at Walkers (Cayman) LLP was that the new General Partner be "hard to find or track or trace. Or find owners etc. Strong litigation protection." (MR 00610, 0629, 1800).

As these new entities came online, Patrick began executing secret transactions between the old structure and his new, undisclosed structure, with the goal of severing the Charities from the Fund. (MR 0244-46, 1805-06).

On December 18, 2024, Patrick caused HoldCo to transfer to his new holding company, CDMCFAD, LLC ("CDMCFAD") all of its interest in the Fund. (MR 0244-45, 1799-1800). In turn, HoldCo acquired all of the interest in CDMCFAD. (MR 0244-45, 1798-1800). As a result, Patrick inserted CDMCFAD as a blocking company in between Holdco, owned by the Charities, and the Fund itself (where the $270 million in assets resided). (MR 1799). Suddenly, the Charities no longer held a 100% beneficial interest in the entity that actually held the assets of the Fund.

Instead, CDMCFAD held the Fund assets; the Charities held only shares in the entity (HoldCo) that held CDMCFAD. Still, at this moment in late 2024, the Charities continued to hold more than 98 percent of HoldCo, meaning that their beneficial ownership of the Fund remained technically intact. (MR 1798-1800).

On or about February 7, 2025, however, Patrick and the Defendants issued a new majority interest of Participating Shares in HoldCo to DFW Charitable Foundation (now controlled by Patrick), with the intent and for the express purpose of blocking the Charities from a possible equitable winding up petition. (MR 0245, 0640, 1798-1800). Patrick issued the shares to alter the balance of power between the holders of Participating Shares, despite knowing that under Cayman law, the power to issue shares is a fiduciary power that may only be exercised for proper purposes and may never be deliberately intended to alter the balance of power between shareholders. (MR 0641, 1798-99). Patrick issued DFW Charitable Foundation a fifty-one percent interest (318 Participating Shares) in the charitable assets of HoldCo, more than were held by all the Charities put together. (MR 0245, 1798). This dilution

10

reduced the Charities' cumulative holding in HoldCo from approximately 98% of the participation shares to 48.9%. (MR 0245, 1798).

Then, on March 27, 2025, Patrick caused CDMCFAD (the new holding company that directly held the Fund's $270 million in assets) to issue new, directly-held shares solely to his personally-controlled "charity," DFW Charitable Foundation. (MR 0245, 1800). Patrick issued no shares in CDMCFAD to the Charities. (MR 0245, 1800). The result was that, as of March 27, 2025, two entities held direct economic interests in CDMCFAD (which itself held the $270 million Fund). The first was Holdco (still owned 48.5% by the Charities, but also owned 51% by DFW Charitable Foundation as of February 7, 2025). (MR 0245, 1800). The second was DFW Charitable Foundation, which—in addition to its 51 percent ownership of HoldCo—also owned *direct* shares in CDMCFAD. (MR 0245, 1800).

This meant that, if HoldCo ceased to hold an interest in CDMCFAD, the only remaining owner of CDMCFAD would be DFW Charitable Foundation. Since CDMCFAD now held the Fund, Patrick therefore knew that causing HoldCo to "redeem" its interest in CDMCFAD for cash would sever the Charities entirely from the Fund. This maneuver would

(fortuitously for Patrick) increase DFW Charitable Fund's ownership of the Fund to 100%. (MR 1800, 1805-06).

The remaining problem for the Defendants was the high value of the interests the Charities held in the Fund. Valuations of those interests had been performed continuously for years and had consistently, unerringly, and correctly reflected that they were roughly equivalent to the value of the Fund itself. (MR 0642-0643, 1804-05). In other words, as recently as September 2024, they were valued at well over $200 million. (MR 0643, 1804). But the Defendants had no interest in exchanging the interests of the Charities in Holdco (and therefore in the Fund) for equivalent or fair value. (MR 0642-653, 1801-06). Instead, their goal from the beginning had been to "make the Participation Shares [belonging to the Charities here] worthless" while giving the Charities nothing equivalent in return. (App. 234). To achieve this and to give themselves "cover" for doing so, the Defendants embarked on a self-interested, results-oriented, fraudulent exercise in valuation-shopping. (MR 1801-06).

Ultimately, two reputable firms—FTI Consulting in London and PwC (Price Waterhouse Coopers)—repudiated this effort. (MR 0643-

0650, 1801-04). Both firms raised uncomfortable questions and gave unwelcome answers. PwC apprised the Defendants that "there is no meaningful difference" between the two valuations requested – "i.e. the economic interest in the underlying [Net Asset Value] still fully accrues to the participating shareholders[.]" (MR 0644, 1801-02). In other words, PwC's professional guidance was precisely what the Defendants did not want to hear: any fair "redemption" of the Plaintiffs' interest in the Fund would require a payment at or very near the face value of the Fund itself. (MR 0644, 1801-02). In what should have been a warning bell, FTI responded similarly. (MR 0647-50, 1802-04). When pushed to change their advice, FTI remarked, "[w]hat is the intention of adding that directors should act in the interests of future members? I am struggling to understand how a director could act in a manner that is beneficial for future shareholders which is not also helpful for existing shareholders. The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work . . . [T]his memo should not be used to support a transaction." (MR 0650, 1802-04).

The Defendants then went to a third firm, ValueScope, seeking a deflated valuation. (MR 0650-53). Since year-end 2020, ValueScope had

13

provided valuations for the Fund's net assets, ranging between $177 million and $277 million, with the most recent being September 2024, at $270 million. (MR 0643). Over the same time period, ValueScope had provided fair market value for the Charities' shares on a per share basis ranging from $481,468 to $782,847, with the September 2024 valuation at $759,614, with some standard discounts. (MR 0643, 1804-05).

Accordingly, *ValueScope had valued the Charities' interests at around $225 Million just six months earlier*. Unlike FTI and PwC, however, ValueScope reversed course and suddenly applied a 99.2% discount against the Charities' interests for "Lack of Control" (a situation that had always been inherent in the structure of the Fund). (MR 0650-0653, 1802-04). Further, ValueScope changed from valuing the Charities' interests based on net assets and instead valued those interests on solely the discounted cash flow of annual distributions. (MR 0650-0653, 1802-05). The end result: ValueScope determined that each participating share now had a fair market value of $5,368 in March 2025, down from $759,614 just six months earlier. ValueScope's new "work" valued the Charities' interests at approximately 49 percent of $1.6 million. (MR 0650-0653, 1802-05).

Wasting no time, on April 2, 2025, Patrick and the Defendants used their formal authority to cause HoldCo to redeem its interests in CDMCFAD. (MR 0245-0246, 1805-06). In sum, Patrick exchanged $270 million for $1.6 million and thereby severed the Charities from the Fund. (MR 0245-0246, 1805-06). Patrick achieved his goal to "make the Participation Shares [belonging to the Charities] worthless." (App. 234). CDMCFAD participated directly by "buying" HoldCo's shares; the General Partner entities participated directly by causing the redemption. (MR 0245-0246, 1805-06).

While the Defendants executed their plan to strip the Charities of their interest in the Fund, they and their agents engaged in an orchestrated effort to mislead the Charities about their actions and intentions. (MR 0238-43, 1806-12). The Charities were dependent upon the Defendants for information about their interests, and the governing documents of the Fund charged the Defendants to exercise their management powers for the economic benefit of the Charities. The Defendants misled the Charities to convince them that the assets in the Fund were secure. (MR 0238-0243, 1806-12).

Further, the Defendants misled the Charities so that they could hide their efforts to "make the Participation Shares worthless" from the Charities; to hide their faithless corporate machinations entirely, or (when necessary) to mislead the Charities that Defendants' strange corporate "restructuring" acts served the Fund's legitimate charitable objectives and the needs of the Charities; and to dissuade or delay any action by the Charities to (a) protect or secure the value of their beneficial interests in the Fund, and/or to (b) reverse the dilution of their Participation Shares in HoldCo or the sham "redemption" of HoldCo by CDMCFAD—by, for instance, filing an equitable "winding up" petition. (MR 0084, MR 0238-0243, 1806-12, App. 234).

This deception worked. The Charities delayed any action to countermand the Defendants illicit acts, in reliance on the Defendants' misrepresentations and the position of trust the Defendants held. (MR 0238-0250, 1806-12). The Charities did not discover the Defendants' actions or intentions until the scheme was nearly complete. (MR 0238-0250, 1806-12). Finally, the Charities discerned that the Defendants were stonewalling them and hiding information, at least as to the material points. (MR 0238-50, 1812-15).

16

Accordingly, the Charities finally filed an involuntary winding up petition seeking to collect their share of the Fund's assets. (App. 251) But by then, the fraudulent scheme was essentially consummated. The Charities discovered only then, too late, the Defendants' true intent and machinations. (App. 250, MR 1812-15). The Charities also learned, only then, that the Defendants already had filed a ***voluntary*** winding-up petition in the Cayman Islands, seeking to quietly liquidate the now-worthless Holdco and leave the Charities holding worthless shares in a liquidated entity. (App. 250, MR 1812-15).

The Grand Court of the Cayman Islands granted the Charities' petition and denied the Defendants'. (App. 251). The result was that Joint Official Liquidators (the "JOLs") were appointed for Holdco. (App. 251). Those JOLs are now pursuing claims belonging to Holdco in the Cayman Islands and seeking recognition in the U.S. Bankruptcy Court in Delaware. (MR 0598-0601). The JOLs are aware of the Texas Business Court proceedings but have declined to appear or intervene in them. (MR 0768-69).

17

## Procedural History

The Charities filed this lawsuit on July 1, 2025, seeking money damages, a temporary restraining order and temporary injunction, a receivership over the entities through which Patrick exercised the Management Shares, and a constructive trust over Fund assets. (MR 0009). On July 20, 2025, and September 2, 2025, the Charities filed a First Amended Petition and Second Amended Petition, respectively, asserting the same claims but alleging additional facts learned since filing the Original Complaint. (MR 0386; MR 1780).

On July 2, 2025, the trial court held a hearing on the Charities' motion for a temporary restraining order. (App. 017). At the trial court's urging, the parties temporarily resolved the temporary restraining order by entering a Rule 11 agreement that imposed some restrictions upon the Defendants, pending resolution of the Charities' motions for temporary injunction and petition for receivership. (App. 063:24-065:12, MR 1861-1863). The Defendants expressly reserved their right to raise jurisdictional motions. (App. 064:1-2, MR 1861-1863).

The Rule 11 agreement stipulated that the parties' responses to expedited discovery would be due within seven days of the trial court's

ruling on the Defendants' jurisdictional motions, for use at the temporary injunction and receivership hearings that would quickly follow if the Defendants' jurisdictional motions were denied. (MR 1862).

On July 14, 2025, the Defendants filed a plea to the jurisdiction and motion to dismiss, challenging (1) the Charities' standing to raise the claims asserted in their Original Petition and (2) the jurisdiction of the Business Court to hear the case. (MR 0339). On August 4, 2025, after full briefing, the court held a hearing regarding the motions raised by the Defendants. (App. 096).

However, during the hearing on August 4, 2025, the trial court *sua sponte* raised two additional, waivable procedural hurdles not contemplated or raised by either party. (App. 096). First, the court indicated that it read Defendants' briefing as questioning the Charities' capacity, despite Defendants' sophisticated counsel not raising capacity or expressing uncertainty about it. (App. 120-22, 124-25). Second, the court raised whether the JOLs were mandatory, necessary parties pursuant to the joinder rules in Texas Rule of Civil Procedure 39. (App. 109-114).

19

Despite an earlier, lengthy briefing schedule on the standing and jurisdictional issues, and the Charities still-pending, urgent request to institute a receivership to have a court-appointed fiduciary replace Patrick to oversee the Fund, the court instructed the parties to provide yet another round of briefing on these two issues. Related to Rule 39, the court stated: "I think I know what I wanted to do with the Rule 39, but I want to give the parties an opportunity to brief that." (App. 189:22-190:2). Per the court's direction, the new briefing took three weeks and was completed by August 25, 2025. (MR 1717)

On September 18, 2025, the trial court issued an omnibus order addressing all the procedural issues raised by the parties and those raised *sua sponte* by the court. (App. 003). The court ruled that the Charities had standing to bring their claims and that the Business Court had jurisdiction to hear the case, meaning the two dilatory motions raised by the Defendants were denied. (App. 003-005). The court agreed with the Charities that Defendants did not raise the issue of capacity because the Defendants had not submitted it in a verified plea pursuant to the Texas Rules of Civil Procedure. (App. 005). But, the court ruled that the JOLs were necessary, mandatory parties pursuant to Rule 39(a)(1)

20

because "complete relief" could not be afforded to the existing parties in their absence. (App. 005). On that basis, the court abated the case indefinitely until the JOLs were added to the case, "voluntarily or involuntarily." (App. 005).

The Charities carefully considered the trial court's order and determined that a request for reconsideration or clarification was appropriate. On October 22, 2025, the Charities filed a motion for reconsideration with the trial court, asking the trial court to reconsider its ruling respecting "complete relief" under Rule 39. (MR 1847). The Charities urged that "complete relief" pursuant to Rule 39(a)(1) means only complete relief between the actual parties, and that the JOLs were not necessary to adjudicate the Charities' claims against the Defendants'. (MR 1849-53).

On October 31, 2025, the trial court denied the motion for reconsideration. (App. 008-010). The court ruled and clarified that the JOLs were necessary parties because all the claims raised by the Charities were derivative claims belonging to the JOLs. (App. 008-010). The court cited one Cayman Islands' precedent for this conclusion:

*Tianrui (Int'l) Holding Co. Ltd. v. China Shanshui Cement Grp. Ltd.*, [2024] UKPC 36. (App. 009-010).

The trial court's September 18, 2025 order further stated that no further pleadings or filings may be made at the trial court level without leave of court, and that the case was therefore indefinitely abated until the JOLs are joined, "voluntarily or involuntarily." (App. 005). Based on the trial court's October 31, 2025 clarification, the Charities were able to discern and analyze the basis for the abatement.

The court's action did two things. First, the decision stopped all discovery into Patrick's conduct. Second, the decision insulated Patrick's continued control over $270 million in charitable assets.

## Argument

The trial court abated Plaintiffs' entire case based on a discrete determination of law: under Cayman law, all Plaintiffs' claims are derivative. The trial court ruled:

> First, Cayman law governs here because each cause of action is related to HoldCo's internal affairs, a Cayman entity. TEX. BUS. ORG. CODE § 1.102; *see also id.*, § 1.105 (plaintiffs' claims relate to the duties of "governing persons" and its "ownership interests"). Second, under Cayman law, shareholders may have direct claims when they are deprived of their voting rights as shareholders, plaintiffs never had voting rights in the first place. *Tianrui (Int'l) Holding Co. Ltd. v. China Shanshui Cement Grp. Ltd.*, [2024] UKPC 36, ¶s 85–86. Under *Tianrui*, a board can legitimately dilute shareholders by issuing new shares, despite incidentally altering the balance of power and depriving a shareholder of control rights. *Id.*, ¶ 71. Accordingly, the court concluded that all of plaintiffs' claims are derivative and that the JOLs are indispensable parties under Rule 39(a).

(App. 009-010.) (footnote omitted). The trial court has "no discretion" in determining the law, and therefore "abuses its discretion if it clearly fails to correctly analyze or apply the law." *In re Austin Hous. Fin. Corp.,* No. 03-22-00091-CV, 2022 WL 2960796, at *2 (Tex. App.—Austin July 27, 2022, orig. proceeding) (mem. op.). Since the trial court gave a clear, narrow, and defined legal basis for the abatement, based on a discrete construction of Cayman law, the abatement order is an abuse of

23

discretion if the trial court's construction of Cayman law as applied to the Charities' claims is wrong. Put another way, the Charities' claims cannot be indefinitely abated based upon an erroneous analysis of the law. The Charities respectfully submit that, contrary to the trial court's ruling, they have pled claims that belong to them directly under Cayman law and are not derivative claims belonging to the JOLs or Holdco. The abatement is therefore based on an error in the trial court's analysis and application of the law. As such, it is an abuse of discretion and mandamus is proper.

## I.     An Incorrect Mandatory Joinder is an Abuse of Discretion

### A.     Mandamus Standard.

Mandamus is proper to correct an abuse of discretion by the trial court. "A trial court has no discretion in determining what the law is or applying the law to the facts, and therefore the trial court abuses its discretion if it clearly fails to correctly analyze or apply the law." *In re Austin* 2022 WL 2960796 at *2.

It is therefore an abuse of discretion for a trial court to mandate joinder when the record does not show such joinder is, in fact, mandatory under governing law. In *In re Austin Hous. Fin. Corp.*, the Court of

Appeals at Austin explained this principle: "Plaintiffs sought abatement before the trial court, and therefore had the burden to show that the parties they deemed to be necessary are, in fact, necessary under Rule 39 . . . [when] the record does not establish that joinder of [a] categories of nonparties was mandatory . . . the trial court abuse[s] its discretion by ordering their joinder." *In re Austin*, 2022 WL 2960796 at *3-4 (citing *In re Occidental W. Tex. Overthrust, Inc.,* 626 S.W.3d 395, 400 (Tex. App.—El Paso 2021, orig. proceeding); *In re Corcoran,* 401 S.W.3d 136, 139–40 (Tex. App.—Houston [14th Dist.] 2011, orig. proceeding)); *see also* Tex. R. Civ. P. 39(a).

## B. The Trial Court Misinterpreted Cayman Law and Erroneously Found that all the Charities' Claims are Derivative in Nature.

### *(i)    The Charities Possess Direct Breach of Fiduciary Duty Claims Against Defendants under Cayman law.*

The lynchpin of the trial court's decision—indeed, its only articulated basis—was that, pursuant to the United Kingdom's Judicial Committee of the Privy Council[1] decision in *Tianrui*, a direct shareholder

---

[1] The Judicial Committee of the Privy Council is "the final court of appeal for many Commonwealth countries, as well as the United Kingdom's overseas territories,

25

claim exists under Cayman law only "when [shareholders] are deprived of their voting rights as shareholders[.]"[2] (App. 009). The trial court thus ruled that *Tianrui* does not support any direct claims by the Charities because they "never had voting rights[.]" (App. 009).

That construction of *Tianrui* errs, because nothing in the language or logic of *Tianrui* supports the conclusion that "voting rights" form the sole basis for direct shareholder fiduciary claims under Cayman law. Rather, it is plain that direct shareholder claims are not limited to those based on the diminution of "voting rights."

The Privy Council stated its holding succinctly at the outset: a shareholder has a direct right of action "to challenge the allotment of shares by the board of directors on the basis that the allotment was made for an improper purpose in circumstances where the allotment will cause detriment to the shareholder." *Tianrui*, [2024] UKPC 36, ¶ 4. (App. 322). This holding was framed as consistent with a long line of "cases of high

---

crown dependencies, and military sovereign base areas." THE COMMITTEE AND JURISDICTION, located at https://jcpc.uk/about-judicial-committee.

[2] The Charities do not challenge the trial court's conclusion that, at least as to their claims for breach of fiduciary duty, Cayman law governs under the internal affairs doctrine. Tex. Bus. Org. Code § 1.102.

authority, by the Board, the UK Supreme Court, the High Court of Australia and other appellate courts[.]" *Id.*, ¶ 3. (App. 321).

Nothing in the *Tianrui* holding suggests that the Privy Council limited its recognition of this long line of authority ***solely*** to interference with voting rights. Indeed, the Privy Council noted that United Kingdom "courts have for a long time recognised the right of a shareholder to challenge the allotment and issue of shares by a company's directors for an improper purpose, ***such as*** to alter the voting power of shareholders." *Tianrui*, [2024] UKPC 36, ¶ 46 (App. 333) (emphasis added). In other words, the Council described the wrongful act giving rise to a right of direct shareholder action as changing "the allotment and issue of shares by a company's directors for an improper purpose," one example of which was a change intended "to alter the voting power of shareholders." *Id.* But nothing limits the "improper purpose" solely to alteration of voting power, nor can a plain reading of the case support that restriction.

To the contrary, the Privy Council was keenly aware that shares can embody all sorts of rights, and that power within a company takes many forms. Surveying relevant historical Commonwealth cases, the Privy Council noted that shares carry with them "constitutional rights"

27

in the company, whatever those constitutional rights may be, and such a direct claim can challenge "an improper allotment which 'reduces the aggrieved shareholder's voice in the company[.]'" *Tianrui*, [2024] UKPC 36, ¶ 61 (quoting *Residues Treatment & Trading Co Ltd v Southern Resources Ltd* (1988) 6 ACLC 1160, 1164) (App. 341).

In the same survey, the Council considered precedent from Australia, where the High Court of Australia concluded that a direct shareholder claim was available where a director, acting for an improper purpose, issues shares that "not only alter[] the balance of voting power of the shareholders in favour of the holders of ordinary shares but also improve[] the position of ordinary shareholders if a winding up should take place as the preference shares ranked equally with the ordinary shares." *Id.*, ¶ 59 (citing *Mills v Mills* (1938) 60 CLR 150) (App. 340).

While changes to these constitutional rights by directors can appropriately occur as an incident to an exercise of power for a proper purpose, should these changes be made for an improper purpose, they can be challenged by the affected shareholder.[3] *Tianrui*, [2024] UKPC 36,

---

[3] Notably, the Privy Council favorably cited the Australian High Court's decision in *Mills*—which emphasized that "improv[ing] the position of ordinary shareholders if

¶¶ 69-71 (App. 340). Direct claims are proper to challenge "an allotment [of shares] which is deliberately aimed at altering the balance of power between shareholders, so as to advance the power of one (or one group) at the expense of another[,]" and in such conditions, the critical issue is "the particular harm which that does to the value of the rights embedded in his shares." *Id.*, ¶¶ 71-72 (App. 345). This is "an actionable harm" on the part of the shareholder "because the impropriety in the exercise of the power contravenes the corporate contract binding him and the company, even though the relevant fiduciary duty breached by the directors is not owed to him." *Id.,* ¶ 72 (App. 345). In sum: "What matters is that the claiming shareholder . . . [has] suffered from an interference with their rights as shareholders brought about by the improper issue and allotment." *Id.*, ¶ 78 (App. 347).

Absent from this robust discussion in *Tianrui* is any language restricting the actionable direct harm solely to the diminishment of "voting rights." Such a narrow construction is unnatural. The Privy

---

a winding up should take place" would be actionable by a shareholder if done for an improper purpose, *Tianrui*, [2024] UKPC 36, ¶ 59—twice in this section of its decision. *Id.*, ¶¶ 69-70.

29

Council instead articulated a direct cause of action for interference with all the shareholder's "constitutional rights" because that interference "harm[s] . . . the value of the rights embedded in his shares." *Tianrui*, [2024] UKPC 36, ¶ 72 (App. 345).

The trial court's cramped construction is also illogical, because power and safeguards within a company (or a fund structure) take many forms. Voting rights are one such form, but they are far from exclusive. In fact, constitutional mechanisms are sometimes crafted specifically to protect shareholders **because** they lack meaningful voting rights. There is no basis in *Tianrui* to foreclose a direct claim alleging the intentional decimation of a shareholder's interests for an improper purpose.

That the trial court misapplied *Tianrui* is also clear from its explanation that the Charities did not plead a direct cause of action because "a board can legitimately dilute shareholders by issuing new shares, despite incidentally altering the balance of power and depriving a shareholder of control rights." (App. 009). While that statement of law may be correct insofar as it goes, it ignores the Privy Council's explanation that, "if this is to happen, it is done only by a ***proper exercise*** of the power, i.e. one that is exercised bona fide for the benefit

of the company as a whole and exercised for the purposes for which the power was conferred. ***This will necessarily exclude, for example, an allotment and issue of shares which is deliberately aimed at altering the balance of power between shareholders, so as to advance the power of one (or one group) at the expense of another***." *Tianrui*, [2024] UKPC 36, ¶ 71 (App. 345) (emphasis added).

That is precisely what happened here, as the Charities pled, based upon documents obtained in the Cayman Islands proceedings:

> In November 2024, Patrick and Murphy began to contemplate how they could defraud the charities of their interests in the Charitable DAF Fund. One challenge they identified was the prospect that the Charitable Owners might file a petition in the Cayman Islands to "wind up" Charitable DAF Holdco and its asset (the Charitable DAF Fund), which would then entitle the charities to its proceeds and Patrick to nothing. But Patrick and Murphy found a solution: By issuing new participation shares in Charitable DAF Holdco to a new "charity" that Patrick himself controlled, they could dilute down the Charitable Owners so they represent a smaller percentage of HoldCo's shares. As expressly contemplated by Patrick and Murphy, this would undermine any future petition to "wind up" because the shares in Charitable DAF Holdco controlled by Patrick's new entity could oppose the petition. Patrick believed that the opposition of his new "charity" to any "winding up" petition could insulate him against any effort by the Charitable Owners to thwart his scheme.

31

Second Amend. Pet. ¶ 5.39 (App. 235). As Defendants' own lawyers bluntly characterized their overall scheme at the time of its execution: "'Could HoldCo liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares [belonging to the Plaintiffs here] worthless?'" *Id.*, ¶ 5.38 (App. 234). The dilutive share issuance's purpose was to improperly shift the balance of power as part of an overall scheme to totally sever the Charities from the Fund for the benefit of DFW Charitable Foundation and Patrick. This gives rise to the Charities' direct claims. *Tianrui*, [2024] UKPC 36, ¶ 71 (App. 345).

*Tianrui* does not stand alone. It builds upon a significant body of British Commonwealth and Cayman Islands precedent establishing the existence of a direct fiduciary claim in circumstances like those pled here. In *Feiner Family Tr. v. VBI Corp.*, No. 07 CIV. 1914 (RPP), 2007 WL 2615448, at *7 (S.D.N.Y. Sept. 11, 2007), the Southern District of New York surveyed the scope of shareholder fiduciary duties under Cayman Islands and British Commonwealth precedent and observed that such direct fiduciary claims are well-established in those jurisdictions:

> [A] director does not owe any fiduciary duties to minority shareholders **solely** based on his or her relationship to the company. . . **Nevertheless, a duality of duties may exist** where directors, in addition to their duties to the

32

company, owe additional duties to shareholders, that if breached, would permit shareholders to bring direct actions against the directors. The fiduciary duties owed to the shareholders ... are dependent on establishing a special factual relationship between the directors and the shareholders in the particular case. For example, [e]vents may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations.

*Feiner Family Tr.*, 2007 WL 2615448 at *7 (emphases added) (quoting *Peskin v. Anderson*, [2001] 1 B.C.L.C. 372 ¶ 34) (internal citations and quotations omitted). The court continued quoting *Peskin* regarding the conditions under which direct fiduciary duties arise under Commonwealth precedent:

There are, for example, instances of the directors of a company making direct approaches to, and dealing with, the shareholders in relation to a specific transaction and holding themselves out as agents for them in connection with the acquisition or disposal of shares; or making material representations to them; or failing to make material disclosure to them of insider information in the context of negotiations for a take-over of the company's business; or supplying to them specific information and advice on which they have relied. ***These events are capable of constituting special circumstances and of generating fiduciary obligations, especially in those cases in which the directors, for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders.***

*Feiner Family Tr.*, 2007 WL 2615448 at \*7 (emphases added) (quoting

*Peskin v. Anderson*, [2001] 1 B.C.L.C. 372 ¶ 34). The *Feiner Family* court

cited another English Chancery case for the same proposition:

> "[I]n special circumstances a director may, in addition to the fiduciary duties owed by him to the company, also owe a duty to individual shareholders personally. Where such a duty exists and breach of it has caused loss to a shareholder directly (e.g., by inducing him to part with his shares at an undervalue), the shareholder may bring an action against the director to recover his loss.").

*Id.* (quoting *Kohn v. Meehan*, (Transcript Smith Bernal), at ¶ 101 (Ch.

Div. 2003)).

Other federal courts have ruled likewise. In *In re Harbinger Capital*

*Partners Funds Investor Litigation*, No. 12 Civ. 1244 (AJN), 2013 WL

5441754, \*7 (S.D.N.Y. Sept. 30, 2013), *vacated in part on reconsideration*

*on other grounds* by *In re Harbinger Capital Partners Funds Investor*

*Litigation,* 2013 WL 7121186 (S.D.N.Y. Dec. 16, 2013), the Southern

District of New York observed that, under Cayman law:

> [A] direct, individual claim of stockholders that does not depend on harm to the corporation can ... fall on all stockholders equally, without the claim thereby becoming a derivative claim. Thus, the relevant question is not whether all stockholders were harmed equally, but whether the duty breached was owed to the stockholder and [whether] he or she can prevail without showing an injury to the corporation.

> While it is true that injuries to a corporation often affect all investors equally, the mere fact that all investors are affected equally is insufficient to show that the corporation, not the investor, was the one injured.

*Harbinger*, 2013 WL 5441754 at *7 (internal citations and punctuation omitted).

Applying this standard to shareholder fiduciary claims based on misrepresentations, the *Harbinger* court rejected the defendants' assertions that such claims were derivative. The court observed that the "direct fiduciary duty claims . . . rest on the assertion that Defendants owed Plaintiffs, as limited partners, a fiduciary duty of disclosure independent of the duties that Defendants owed the Funds . . . Plaintiffs argue that Defendants breached that duty by making 'numerous false statements and omissions[.]'" *Harbinger*, 2013 WL 5441754 at *8. The court further noted that the plaintiffs' pleading alleged that "[a]s a result of Defendants' alleged breaches . . . [plaintiffs] 'were lulled into remaining invested and then were unable to redeem and leave the Fund.'" *Id.* (internal citations omitted). Focusing on the allegation of misrepresentations directed at the plaintiff shareholders, the *Harbinger* court ruled: "Defendants' fiduciary duty of disclosure flows to limited partners, not to the Funds, and . . . injuries arising from Defendants'

alleged misrepresentations and omissions do not depend on an injury to the Funds. Accordingly, the Court concludes that Plaintiffs' breach of fiduciary duty claims are direct insofar as they involve those misrepresentations and omissions." *Id.* at \*10; *see also McBeth v. Porges*, 171 F.Supp.3d 216, 232-33 (S.D.N.Y. 2016) (citing *Harbinger* and ruling that a direct fiduciary claim exists where the plaintiff "would have withdrawn his money had he received adequate information from [d]efendants.")

The *Harbinger* court likewise ruled that a direct shareholder fiduciary claim exists where the plaintiff asserts that the "[d]efendants . . . conferr[ed] an 'exclusive benefit' on a subset of investors in exchange for votes intended to injure other investors." *Id.* at 10; *In re Cencom Cable Income Partners, L.P.*, No. C.A. 14634, 2000 WL 130629, at \*3 (Del. Ch. Jan. 27, 2000) (explaining that, even where an "alleged injury applies to *all* limited partners[,] . . . this injury affects only these limited partners as a distinct class within the partnership and is not brought to benefit the entire partnership" because "the limited partners alone [] allegedly suffer injury here based upon the general partner's alleged failure to confer the economic benefit" owed to them). A conspiracy by a person in

36

control, like Patrick, who wiped out the interests of the Charities, but not himself or the Defendants, falls under the same rubric.

There can be no question, therefore, that courts construing Cayman law have consistently recognized a direct fiduciary claim for shareholders against directors like Patrick when a plaintiff alleges misrepresentations directed at the plaintiffs, and harm arising from the plaintiffs' action or inaction while relying upon those misrepresentations.

The Charities pled these essential elements. Patrick used his fiduciary position and information imbalance to hide the truth from the Charities while making countless, calculated misrepresentations to them about his transactions. Those transactions directly affected the Charities' interests. The Charities' petition is replete with detailed facts establishing their special reliance on the Defendants, along with the Defendants' taking advantage of that reliance for their own benefit, and the Defendants' particular targeting of the Charities. Second Am. Pet. ¶¶ 5.64-5.75. There is no question the Charities have pled the Defendants' conduct was directed *at them*. These allegations reflect the very factors deemed to establish a direct claim in *Feiner Family*. Among the Charities' allegations are:

- Due to Patrick's position of trust under the governing documents; and due to Patrick's practice of sharing information about the Charitable DAF Fund only through close and direct interactions or transmissions, the Charities were factually dependent upon the special relationship between them and Patrick—both for any information about the Charitable DAF Fund, its assets, and its transactions, and for the protection of the Charities' interests. As a result, the Charities were "unusually vulnerable to material misrepresentations and omissions the Defendants made while they were executing their scheme." Second Am. Pet., ¶ 5.65 (App. 245).

- During a November 5, 2024 call with Defendants' "compliance counsel," Defendants' counsel represented that the increased legal spend by the Defendants in 2024 was due to the need to settle legal disputes, and that the 2025 legal spend was thus expected to decrease. Defendants' counsel mentioned nothing about increased legal expenditures associated with a massive, contemplated restructuring. *Id.*, ¶ 5.66. (App. 245).

- On December 10, 2024, in advance of a video call with Defendants' attorney, occurring in the middle of Patrick's stripping away the Charities' interests, "'compliance counsel' for the Defendants referenced the Charitable Owners' 'concerns about depletion of assets' and asserted that, 'in fact . . . just the opposite has been happening under the leadership of Paul Murphy and Mark Patrick.'" *Id.*, ¶ 5.67. (App. 246).

- In response, the Charities' attorney emphasized their vulnerability and their inability to independently assess the Defendants' representations, given their reliance on the Defendants: "'[W]ithout detailed financials, or any financials at all, the Supporting Organizations are left in the unenviable position of having [to] rely on presentations about what parties say the numbers show rather than being able to see precisely the story the numbers tell.'" *Id.* (App. 246).

- In the December 11, 2024, video call—held the same week the Defendants formed CDMCFAD (the entity "inserted" below HoldCo to hold the Charitable DAF Fund) and the DFW Foundation (the sham charity controlled by Patrick); and just one week before the Defendants executed the fatal transfer of HoldCo's interests in the Charitable DAF Fund to CDMCFAD—the Defendants (including Patrick, who attended) worked to allay the concerns expressed in the November 2024 no-confidence letter and thereby delay or dissuade any action on the part of the Plaintiffs to petition for an equitable wind-up until Patrick's self-dealing "restructuring" was complete. *Id.*, ¶ 5.68. (App. 246).

- On December 13, 2024, "compliance counsel" for the Defendants sent a follow-up email to outside counsel for the Charitable Owners. "That correspondence did not disclose the formation or intended use of CDMCFAD. Instead, it encouraged and demanded the Charitable Owners rely on the representations made in the meeting and unilaterally abandon their well-founded concerns on that express basis. The email asserted: '[T]hese two meetings have provided the [Supporting Organizations] with a great deal of transparency regarding governance, financial matters, and independence of Charitable DAF HoldCo, Ltd. and its affiliates. (collectively, the DAF). Therefore, we believe it is imperative that each [Supporting Organization] not only retract the November 11 [no confidence] letter in writing but also affirmatively disavow the concerns[.]'" *Id.*, ¶ 5.70. (App. 247-248).

- Indeed, Defendants' counsel told the Charities in an email, "The DAF is actively working on one or more development projects from which your [the Charities] clients (and independently their supported organizations) will benefit from financially from Participating Shareholder dividend distributions for many years to come." *Id.*, ¶ 5.70. (App. 247-248).

- "On January 30, 2025, Paul Murphy (copying Patrick), sent an email to the Charities offering additional meetings, and

asserting that 'we are more than happy to continue to engage with the foundations/supporting organizations in an effort to provide clarity on investments and the DAF HoldCo structure.'" *Id.*, ¶ 5.71. (App. 248-249). Notwithstanding Murphy's protestations of "'DAF HoldCo hold[ing] itself to the highest standards,'" Defendants were in fact in the midst of forming a replacement General Partner entity that was "'hard to find or track or trace. Or find owners.'" *Id.* (App. 248-249).

- "On February 4, 2025, Paul Murphy (copying Mark Patrick) sent an additional email note to the Charitable Owners on behalf of the Defendants, promising a further meeting at which the Defendants could 'resolve [their] concerns.' The Defendants again failed to provide key details that would render the statements they did make not misleading, misrepresented facts, and expressed a false promise of 'working with' the Charitable Owners, hoping to delay or undermine any decisive action on their part to protect their valuable interests in the Charitable DAF Fund." *Id.*, ¶ 5.72. (App. 249).

- "On February 14, 2025—one day after the Defendants engaged FTI in an effort to secure a sham valuation reducing the value of the Plaintiffs' interests by more than 99%-- 'compliance counsel' for the Defendants continued to gaslight the Charitable Owners, asserting that "Charitable [D]AF is not paying Paul or Mark 'millions in director fees.'" *Id.*, ¶ 5.73. (App. 249).

- "On March 17, 2025—while the scheme to defraud the [Charities] was nearing its end—'compliance counsel' for the Defendants reached out to the Charitable Owners' outside counsel, purportedly seeking 'a couple of dates for Paul Murphy to make a presentation to your three clients,'" but had no intention of actually scheduling such a meeting, and did not. *Id.*, ¶ 5.74. (App. 249-250).

The Charities' pleadings must be taken as true at this stage. *Doty v. Davidson*, No. 04-20-00583-CV, 2022 WL 2334547, at *5 (Tex. App.—San Antonio June 29, 2022, pet. denied) ("Taking appellees' allegations as true in their fourth amended petition, Davidson has standing and capacity, as a partner, to maintain an action against the partnership or another partner for legal or equitable relief to enforce his rights under an alleged partnership agreement."). The Charities' pleadings set forth plain facts that, if proven, would establish a direct fiduciary claim under Cayman law, because a special relationship of reliance existed, and the Defendants abused that relationship for personal gain, targeting their conduct at the Charities. Yet the abatement forecloses the Charities from pursuing their claims based on the contrary, unproven presumption that the Defendants' actions only "incidentally" affected the Charities' rights. That conclusion is not plausible while taking the Charities' pleadings as true, which the trial court must at this time.

The trial court's abatement was an abuse of discretion in light of the law and pleadings.

### *(ii) The Charities' fraud claims are direct, not derivative.*

In addition to their breach of fiduciary duty claim, the Charities also brought specific claims against the Defendants for fraud and fraud by non-disclosure, arising from the same Defendants' conduct described above. Second Am. Pet., ¶¶ 6.1-6.17 (App. 254-255). The trial court, rather than analyzing either the allegations made by the Charities or the elements of these separate claims, flatly declared "that all of plaintiffs' claims are derivative." (App. 009). However, the Charities' fraud causes of action are both distinct from their cause of action for breach of fiduciary duties and actionable directly, not derivatively.

As set forth above, the distinction between derivative and direct claims under Cayman law turns not on "whether all stockholders were harmed equally, but whether the duty breached was owed to the stockholder and whether he or she can prevail without showing an injury to the corporation. While it is true that injuries to a corporation often affect all investors equally, the mere fact that all investors are affected equally is insufficient to show that the corporation, not the investor, was the one injured." *In re Harbinger,* 2013 WL 5441754 at *7 (internal quotations and court's alterations of original quote omitted). The rule is

the same in Texas: while "individual stockholders have no separate and independent right of action for injuries suffered by the corporation which merely result in the depreciation of the value of their stock," a stockholder may "recover[] damages for wrongs done to him individually where the wrongdoer violates a duty arising from contract or otherwise, and owing directly by him to the stockholder." *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990), *superseded by statute on other grounds as stated in Sneed v. Webre*, 465 S.W.3d 169 (Tex.2015) (internal citations and quotations omitted).

Where a shareholder alleges that he was individually injured by misrepresentations directed uniquely to him, a direct fraud claim exists. For example, a shareholder can bring a direct fraud claim against a director where it alleges that it made specific decisions in reliance upon specific misrepresentations by a director and thereafter suffered actual, realized loss. *Sherman v. Triton Energy Corp.*, 124 S.W.3d 272, 282 (Tex. App.—Dallas 2003, pet. denied) (petition alleging that plaintiffs "suffered economic damages by purchasing Triton stock after March 30, 1998, in reliance on specific misrepresentations and then sold their stock after the July 17, 1998 announcement and suffered losses . . . pleads causes of

43

action that an individual could bring"); *Ebert v. Gustin*, No. 4:15-CV-00225-O, 2016 WL 11663145, at *4 (N.D. Tex. Dec. 2, 2016) ("[T]he general rule that shareholder claims belong to the corporation gives way where the shareholders allege a harm resulting from purchasing stock on a specific date based on a specific misrepresentation. Such claims belong directly to individual shareholders, not the corporation.").

The *Harbinger* court also analyzed common law fraud claims alongside the fiduciary duty claims mentioned above, all through the lens of Cayman law. The result was the same: Because the plaintiffs pled misrepresentations directed at them (not at the company) which induced action or forbearance by them (not by the company) the common law fraud claim was direct, not derivative:

> [The common law fraud] claims primarily involve misrepresentations and omissions that Defendants allegedly made in connection with the LightSquared investment, which induced Plaintiffs to invest in the Funds and, once they had invested, caused them to forbear from redeeming their investments. Insofar as those claims arise from Defendants' actions while Plaintiffs were already invested in the Funds, they are subject to the same analysis as the "holding" claims discussed above [respecting fiduciary duty], and therefore may be brought directly. And to the extent that Plaintiffs' negligent misrepresentation and fraud claims involve their initial decision to invest, courts consider such "inducement"

claims to be direct as well . . . Thus, Plaintiffs may bring their fraud and negligent misrepresentation claims directly.

*In re Harbinger,* 2013 WL 5441754 at *10. The court was clear that under Cayman law, shareholders may plead direct claims for common law fraud by articulating intentional, material misrepresentations that induce harmful action or inaction. *Id.* "Plaintiffs' fraud, negligent misrepresentation, and breach of fiduciary duty claims are direct to the extent that they rest on Defendants' ***alleged misrepresentations and omissions and the preferential redemption status granted to [other] investors.***"[4] *Id.* at *11. (emphasis added).

There is no question the Charities have pled these allegations sufficiently to sustain a direct common law fraud claim. The Charities here were victims of a scheme that uniquely targeted and harmed them, and which turned upon misrepresentations made directly to them.

---

[4] This distinction is consistent with the law in other jurisdictions. *See, e.g., In re PHC, Inc. S'holder Litig.,* No. CIV.A. 11-11049-GAO, 2012 WL 1195995, at *2 (D. Mass. Mar. 30, 2012) ("These claims are direct in nature. The injury does not flow through the corporation. The Class A shareholders are being wronged by a deal that unduly favors the Class B shareholders, not the corporation. The corporation is not entitled to relief, because Class A shareholders alone suffered the injury."); *Strasenburgh v. Straubmuller,* 683 A.2d 818, 830 (N.J. 1996) ("claims against directors for the selective dissemination of information to one group of shareholders over another are not derivative in nature because the unfair dealing unequally affects shareholders that were deprived of the information").

Defendants made multiple representations to the Charities' representatives with the specific purpose and intent of "dissuad[ing] or delay[ing] the Plaintiffs from discovering or contesting the dilution of their interest in HoldCo; and dissuad[ing] or delay[ing] the Plaintiffs from filing an equitable winding up petition or taking other decisive action to protect their interest in the Fund, reverse the dilution, and/or reverse the sham 'redemption[].'" Second Am. Pet., ¶ 6.4 (App. 253). The Charities have expressly pled that the misrepresentations constituting fraud were targeted directly **at them**, with the object of delaying or foreclosing remedial action **by them**, and with the end goal of severing **only them—and not the majority shareholder, DFW Charitable Foundation--** from the Fund.

Examining the Defendants' conduct here (as pled), it is plain the harm from their lengthy course of deception and misrepresentation did not flow equally to all shareholders, just as the misrepresentations were not made to all shareholders. The sham "redemption" of HoldCo's shares, for instance, was the consummating act of Defendants' continuous fraudulent scheme. That "redemption" had the intent and effect of totally alienating the Charities from the Fund. But the redemption did *not* have

46

the same effect or intent for the remaining shareholder in HoldCo: Patrick's new, personally-controlled entity DFW Charitable Foundation.

Thanks to the Defendants' hidden machinations and continuous misrepresentations about them, DFW Charitable Foundation lost *nothing* in the sham "redemption" because the Defendants had secretly bestowed upon it an alternative avenue of ownership of the Fund. So, the Charities lost *everything* in this fraudulent culmination of a fraudulent scheme; the remaining HoldCo shareholder lost *nothing*. That is the *opposite* of a derivative claim by which the conduct at issue harmed all shareholders equally, in proportion to their ownership of the company.

With regard to the Charities' fraud by nondisclosure, such a claim arises where, *inter alia*, there is "a deliberate failure to disclose material facts . . . by one who had a duty to disclose such facts[.]" *Wise v. SR Dallas, LLC*, 436 S.W.3d 402, 409 (Tex. App.—Dallas 2014, no pet.). Cayman law recognizes that shareholders can be owed duties and obligations directly from the controllers of the company, when the controller "mak[es] material representations to them; or fail[s] to make material disclosure to them of insider information," or "suppl[ies] to them specific information and advice on which they have relied." *Feiner Family Tr.*,

47

2007 WL 2615448 at *7 (quoting *Peskin*, 1 B.C.L.C. 372 ¶ 34). "These events are capable of constituting special circumstances and of generating fiduciary obligations, especially in those cases in which the directors, for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders." *Id.* (quoting *Peskin*, 1 B.C.L.C. 372 ¶ 34). "'Where such a duty exists and breach of it has caused loss to a shareholder directly (e.g., by inducing him to part with his shares at an undervalue), the shareholder may bring an action against the director to recover his loss.'" *Id.* (citation omitted). This is precisely what the Charities assert.

The Charities allege that Defendants used material misrepresentations and omissions to hide their dilute-and-sever maneuver. Second Am. Pet., ¶¶ 5.64-5.75 (App. 244-50). That creates a direct cause of action against Defendants, not a derivative one. *Feiner Family Tr.*, 2007 WL 2615448 at *7 (direct duties under Cayman law exist where directors or officers "for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders." (citation omitted)). The trial court's conclusion to the contrary should be reversed.

## II. The Record Does Not Support Abatement Under Rule 39.

### A. Standard under Rule 39

"Texas Rule of Civil Procedure 39 provides that a person who is subject to service of process shall be joined in an action if (1) the court cannot grant 'complete relief' to the parties in the person's absence or (2) the person 'claims an interest relating to the subject of the action' and a judgment may impair his ability to protect his interest or leave the parties subject to a 'substantial risk of incurring' multiple or inconsistent obligations." *Matter of Tr. A & Tr. C. Established Under Bernard L. & Jeannette Fenenbock Living Tr. Agreement*, 690 S.W.3d 80, 86 (Tex. 2024) (quoting Tex. R. Civ. P. 39(a)).

"Under Rule 39, however, the parties' failure to join a person will rarely deprive the court of jurisdiction." *Fenenbock Living Tr. Agreement*, 690 S.W.3d at 86. The party seeking joinder must "show that the parties it claimed to be necessary were, in fact, necessary under Rule 39." *In re Occidental,* 626 S.W.3d at 400. A plea in abatement based on nonjoinder "should show definitely and specifically the nature and extent of the interest of such person who is claimed to be a necessary party," and must "give the court definite allegations as to the parties and the interests

claimed by them." *In re Austin Hous. Fin. Corp.,* 2022 WL 2960796 at *2 (internal citations and quotations omitted). If the Defendants do not show that joinder of an additional party is truly "mandatory" under the four corners of Rule 39, an order requiring such joinder is an abuse of discretion. *Id.* (*citing In re Corcoran*, 401 S.W.3d at 140). This is especially likely when the proposed joinder "will delay the trial and greatly increase costs" to the prejudice of plaintiffs. *In re Corcoran,* 401 S.W.3d at 140.

**B.    The Defendants Failed to Show that "Complete Relief" between the Actual Existing Parties Cannot be had.**

Rule 39(a)(1) of the Texas Rules of Civil Procedure authorizes mandatory joinder when "complete relief" cannot be afforded without the joinder of an absent party. But "complete relief" refers to relief between persons ***already parties to an action and not to an absent party whose joinder is sought***. *Sanson v. Allstate Tex. Lloyds*, No. 4:17-cv-00733, 2018 WL 3630136, at *4 (E.D. Tex. 2018) (emphasis added) (citing *Payan v. Cont'l Tire N. Am., Inc.*, 232 F.R.D. 587, 589 (S.D. Tex. 2005), *Ortiz v. A.N.P., Inc.*, 10-CV-917, 2010 WL 3702595, at *4 (S.D. Tex. Sept.

15, 2010)).[5] Even an absent party who may owe contribution or have claims against an existing party need not be added under the complete-relief prong of the joinder rule. *Ortiz*, 2010 WL 3702595 at *4.

The trial court ruled that "all of plaintiffs' claims are derivative [therefore] this court cannot afford the parties complete relief without the JOLs joinder." App. 009. As set forth above, the Charities' claims are not derivative, and basing the abatement on this erroneous finding necessarily constitutes an abuse of discretion. *In re Austin Hous. Fin. Corp.,* 2022 WL 2960796 at *2.

Further, the record is devoid of any evidence that the JOLs are necessary parties to this action, and this erroneous finding contradicts the Charities' actual allegations. The Charities "are the masters of their

---

[5] "The commentary to Rule 39's amendment states that the purpose of the amendment is to conform joinder practices in State courts to practices followed by federal courts under Rule 19 of the Federal Rules of Civil Procedure." *Kodiak Res., Inc. v. Smith*, 361 S.W.3d 246, 250 (Tex. App.—Beaumont 2012, no pet.); *see McCarthy v. George*, 618 S.W.2d 762, 763 (Tex. 1981) ("Rule 39 is almost an exact copy by Texas of Federal Rule 19, Federal Rules of Civil Procedure."); *McCarthy v. George*, 618 S.W.2d 762, 763 (Tex. 1981); *Clear Lake City Water Auth. v. Clear Lake Utilities Co.*, 549 S.W.2d 385, 390 (Tex. 1977) (citing treatises discussing application of "Federal Rule 19," which is "virtually identical to Rule 39"); *Cooper v. Tex. Gulf Indus., Inc.*, 513 S.W.2d 200, 203 (Tex. 1974) ("Amended Rule 39, effective January 1, 1971, is almost an exact copy by Texas of Federal Rule 19, Federal Rules of Civil Procedure, which is also of recent origin, having been adopted in 1966.").

suit regarding the claims and parties they choose to pursue." *Heard v. Moore*, 101 S.W.3d 726, 728 (Tex. App.—Texarkana 2003, pet. denied). The Charities have not named HoldCo as a defendant and have brought no claims against it. Rather, the Charities bring claims against Defendants who, by virtue of their positions committed the wrongdoing and, even now, remain in control of the Fund's structure. Whether those claims will succeed or fail on their merits (for any reason) is irrelevant as to whether complete relief can be granted amongst the current parties. *Field v. Volkswagenwerk AG*, 626 F.2d 293, 301 (3d Cir. 1980) ("If the right of either [plaintiffs] to relief against [defendant] were established, these parties would be awarded a judgment; if their claims are not sustained, their complaint would be dismissed. In either event, the district court will be able to grant complete relief as between the parties without the joinder of [an additional party.]"). Likewise, the fact "that the joinder of [HoldCo] to this proceeding would suit [Defendants'] convenience, since it might minimize the delay, expense, and risks involved in the possibility of having to litigate in two forums against different parties" is not the standard under Rule 39(a)(1). *Id.* at 301-302.

In the trial court, the Defendants raised the additional argument—not accepted by the trial court in abating the case—that "complete relief" between the parties here is not possible because, without joining HoldCo, the Court cannot grant a receivership or constructive trust over the Fund's assets. But, Defendants here—specifically, Patrick, CDMCFAD, and CDH GP, Ltd.—*control* the Fund and its assets, not HoldCo. Defendants still hold the management and participation shares and exercise authority over the Fund. Nothing happens to the Fund assets without their authorization. That is why the Charities asked for interim protections to prevent further dissipation of assets by replacing *Defendants' current control* with a receiver responsible to the trial court. That is all that is required by Rule 39(a)(1). *Sanson*, 2018 WL 3630136 at *2 ("The definition of complete relief…refers to relief as between the persons already parties not as between a party and the absent person whose joinder is sought.") (internal citations omitted).

The Charities have consistently explained that they are not asking the Court to take non-parties' assets. (*See, e.g.*, App. 165:18-166:21). Thus, the effect of a receivership would be to put a stop to Patrick's faithless management of the Fund, not to directly seize its assets.

53

Furthermore, while monetary damages are sought, those damages are not directly tied to Fund assets—the Defendants can be liable for the Charities' losses regardless of who holds the Fund. For the same reasons, disputes about the disposition of Fund assets after the Charities' interests are restored go beyond "relief as between the persons already parties to the action" but are rather "as between a present party and the absent party whose joinder is sought." *Sanson*, 2018 WL 3630136 at *2 (citation omitted).

Accordingly, the trial court's finding that the JOLs are necessary parties in order to afford the Charities complete relief on their claims was a clear abuse of discretion.

## III. Mandamus is Warranted Because the Charities Lack an Effective Appellate Remedy

As noted above, it is an abuse of discretion for a trial court to mandate joinder when the record does not show such joinder is, in fact, mandatory. *In re Austin Hous. Fin. Corp.,* 2022 WL 2960796 at *3. "Relators lack an adequate remedy by appeal. Generally, mandamus relief is available for the improper joinder of parties." *In re Austin,* 2022 WL 2960796 at *2; *see In re Boyaki*, 587 S.W.3d 479, 484 (Tex. App.—El Paso 2019, no pet.) (granting mandamus relief for improper joinder under

Rule 39); *In re Corcoran*, 401 S.W.3d at 139–40 (granting mandamus relief for improper joinder under Uniform Declaratory Judgments Act).

Appellate courts have ruled that the correction of erroneous abatements is essential due to their effects upon the parties' ability to develop and pursue their claims and defenses. The Austin Court of Appeals ruled: "Mandamus relief is also appropriate here because the order suspends the underlying lawsuit until additional parties are joined, leaving Relators without any other method for challenging the court's action or presenting their defenses." *In re Austin*, 2022 WL 2960796 at *2 (citing *In re Shulman*, 544 S.W.3d 861, 867 (Tex. App.—Houston [14th Dist.] 2017, orig. proceeding), *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36, 138 (Tex. 2004) (orig. proceeding)).

The Houston Court of Appeals (14th District) elaborated further: "Even when an abatement is not 'indefinite,' if it completely curtails the prosecution of an entire case and denies another party the right to proceed with full discovery or to resolution within a reasonable time, the aggrieved party has no adequate remedy for appeal and mandamus may issue." *In re Shulman*, 544 S.W.3d at 870-71; *see also In re Baldridge*, No. 04-16-00011-CV, 2016 WL 1128236, *4 (Tex. App.—San Antonio, Mar.

55

23, 2016, orig. proceeding) (granting mandamus and noting that "abatement completely deprives [plaintiff] of any ability to proceed with discovery regarding her claims."); *Trapnell v. Hunter*, 785 S.W.2d 426, 429 (Tex. App.-Corpus Christi, 1990, orig. proceeding). An abatement that "effectively vitiates a party's ability to present a claim or defense" can also "violate the open courts provision" of the Texas Constitution. *In re Benge*, No. 13-18-00283-CV, 2018 WL 3233867 (Tex. App.—Corpus Christi, July 3, 2018, orig. proceeding) (citing *Trapnell*, 785 S.W.2d at 429) (further internal citations omitted).

These same concerns warrant mandamus relief here. The trial court has imposed an indefinite halt upon the Charities' ability to pursue their well-pled claims, develop and plead additional claims, conduct discovery, or seek preliminary relief to protect their interests – much less pursue merits relief. The Charities have no access to any other court. Ordinary appellate review is not available because the abatement is interlocutory and indefinite.

The trial court has stalled all of the Charities' claims based on an erroneous construction of Cayman law. It did so in deference to the interests of an unnecessary, absent party that is well-represented, can

56

protect its own interests, and has chosen not to join the Texas litigation.

Absent mandamus, this case will never get to a final judgment.

## Conclusion and Prayer

Relators pray that the Court grant their Petition for Writ of Mandamus and order the Business Court to vacate its Order dated September 18, 2025, abating the action in the Business Court of the State of Texas, Division 1B; vacate its Order dated October 31, 2025; and deny the Real Parties in Interest's Motion to Abate. Relators pray for such further relief to which they may be justly entitled.

Respectfully submitted,
**MCCARTY LAW PLLC**

*/s/ Darren McCarty*
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street, Suite 400
Austin, Texas 78701
512-827-2902

- and -

**DUANE MORRIS LLP**
Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox

57

State Bar No. 04950200
jmcox@duanemorris.com
Benjamin L. Warden
State Bar No. 24115926
bwarden@duanemorris.com
Dallas, Texas 75201
200 Crescent Court, Suite 900
Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

**ATTORNEYS FOR RELATORS**

## Rule 52.3(J) Certification

In compliance with Rule 52.3(j) of the Texas Rules of Appellate Procedure, I certify that I have reviewed the Petition for Writ of Mandamus and have concluded that every factual statement in the petition is supported by competent evidence included in the record.

/s/ *Craig M. Warner*
Craig M. Warner

## Certificate of Compliance

This brief complies with the length limitations of Tex. R. App. P. 9.4(i)(3) because this petition consists or 10,429 words as determined by Microsoft Word Count, excluding the parts of the petition exempted by Tex. R. App. P. 9.4(i)(1).

/s/ *Craig M. Warner*
Craig M. Warner

# Certificate of Service

I hereby certify that on the 26th day of November, 2025 a true and correct copy of this Petition for Writ of Mandamus, including an appendix and the Mandamus Record, was served on counsel of record by using the Court's e-filing system (service only) and on the Honorable William Whitehill through the Division 1B Business Court email noted below. I further certify that a hard copy of this petition was mailed to the Honorable William Whitehill. Addresses are as follows:

**Brian P. Shaw**
Texas Bar No. 24053473
Email: bshaw@ccsb.com
**Monica E. Gaudioso**
Texas Bar No. 24084570
Email: mgaudioso@ccsb.com
**Brent M. Rubin**
Texas Bar No. 24086834
Email: brubin@ccsb.com
**Joshua D. Kipp**
Texas Bar No. 24078793
Email: jkipp@ccsb.com
**Andrea C. Reed**
Texas Bar No. 24121791
Email: areed@ccsb.com
**Emily H. Owen**
Texas Bar No. 24116865
Email: eowen@ccsb.com
901 Main Street, Suite 5500
Dallas, Texas 75202
(214) 855-3000 – Telephone
*Counsel for Real Parties in Interest*

The Honorable Bill Whitehill
Texas Business Courts—Dallas, Division 1B
8080 Park Lane, Suite 500
Dallas, Texas 75231
BCDivision1B@txcourts.gov


*Respondent*

/s/ *Craig M. Warner*
Craig M. Warner

No. _____

_____

IN THE FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS

_____

*In re* The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and the Highland Santa Barbara Foundation, Inc.,

*Relators*

_____

Original Proceeding Arising From the
Business Court of the State of Texas, First Division
Cause No. 25-BC01B-0027
Honorable William Whitehill, Judge of the Texas Business Court

_____

**APPENDIX TO PETITION FOR WRIT OF MANDAMUS**

_____

**INDEX**

September 18, 2025 Order ............................................. Tab 1

October 31, 2025 Order .............................................. Tab 2

Texas Rule of Civil Procedure 39 ............................... Tab 3

July 2, 2025 Hearing Transcript ................................ Tab 4

August 4, 2025 Hearing Transcript ........................... Tab 5

Plaintiffs' Second Amended Petition ......................... Tab 6

Foreign Authorities .................................................. Tab 7

# Tab 1



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC.; THE HIGHLAND KANSAS CITY FOUNDATION, INC.; and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., *Plaintiffs* | § § § § § § § | |
| v. | § § | Cause No. 25-BC01B-0027 |
| MARK PATRICK and DFW CHARITABLE FOUNDATION; CDMCFAD, LLC; CHARITABLE DAF GP, LLC; and CDH GP, LTD., *Defendants* | § § § § § § | |

## ORDER

Before the court are

1.      Defendants' July 14, 2025, Motion to Dismiss and Plea to the Jurisdiction;

2.      Plaintiffs' July 21, 2025, Response to Defendants' Motion to Dismiss and Plea to the Jurisdiction;

3. Defendants' July 25, 2025, Reply in Support of their Motion to Dismiss and Plea to the Jurisdiction;

4. Plaintiffs' July 30, 2025, Surreply to Defendants' Motion to Dismiss and Plea to the Jurisdiction;

5. Defendants' August 11, 2025, Supplemental Brief and Alternative Motion to Abate;

6. Plaintiffs' August 18, 2025, Response to Defendants' Supplemental Brief and Alternative Motion to Abate;

7. Defendants' August 21, 2025, Reply in Support of their Supplemental Brief and Alternative Motion to Abate; and

8. Plaintiffs' August 25, 2025, Sur-reply to Defendants' Supplemental Brief and Alternative Motion to Abate.

Having considered the pleadings, motions, party submissions, and oral arguments, the court makes the following findings and conclusions:

1. Plaintiffs have constitutional standing to assert their claims because they allege an injury to themselves. Additionally, the court has statutory jurisdiction under Texas Government Code § 25A.004(b). Therefore, Defendants' Motion to Dismiss and Plea to the Jurisdiction based on those premises is denied. These are not rulings on (i) the validity of plaintiffs'

-2-

App. 004

causes of action; (ii) whether plaintiffs are proper parties to assert those causes of action; or (iii) whether all necessary parties are before the court.

2. The court does not at this time decide whether plaintiffs have the legal capacity to assert their causes of action because defendants have not filed a verified denial raising a lack of capacity defense. *See* TEX. R. CIV. P. 93(1).

3. Charitable DAF HoldCo, Ltd.'s joint official liquidators (JOLs) are necessary parties under Texas Rule of Civil Procedure 39(a), they are not parties to this case, and the court cannot provide complete relief in their absence. Accordingly, this case should be abated until when the JOLs become parties, voluntarily or involuntarily.

4. Any further filings must be made by leave of court.

So ORDERED.

_____
BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED: September 18, 2025

-3-

App. 005

STATE OF TEXAS
BUSINESS COURT OF TEXAS
CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY.
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE <u>November 21, 2025</u>

Beverly Crumley
BUSINESS COURT CLERK

BY _____ DEPUTY

Tab 2



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC.; THE HIGHLAND KANSAS CITY FOUNDATION, INC.; and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., *Plaintiffs* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| v. | §<br>§ | Cause No. 25-BC01B-0027 |
| MARK PATRICK and DFW CHARITABLE FOUNDATION; CDMCFAD, LLC; CHARITABLE DAF GP, LLC; and CDH GP, LTD., *Defendants* | §<br>§<br>§<br>§<br>§ | |

## ORDER

The court (i) grants plaintiffs' October 22, 2025, Motion for Leave to File Motion for Reconsideration as to Complete Relief, (ii) deems plaintiffs' Motion for Reconsideration filed, and (iii) denies the same.

The court's September 18, 2025, order held that Charitable DAF HoldCo, Ltd.'s joint official liquidators (JOLs) are indispensable parties under

Texas Rule of Civil Procedure 39(a) and complete relief cannot be granted in their absence. Plaintiffs' motion posits that the court's order ignores plaintiffs' premise that their claims are direct claims.[1] However, in issuing its September 18, 2025, order the court considered and concluded that all of plaintiffs' claims are derivative. Therefore, this court cannot afford the parties here complete relief without the JOLs' joinder.

First, Cayman law governs here because each cause of action is related to HoldCo's internal affairs, a Cayman entity. TEX. BUS. ORG. CODE § 1.102; *see also id.*, § 1.105 (plaintiffs' claims relate to the duties of "governing persons" and its "ownership interests").

Second, under Cayman law, while shareholders may have direct claims when they are deprived of their voting rights as shareholders, plaintiffs never had voting rights in the first place.[2] *Tianrui (Int'l) Holding Co. Ltd. v. China Shanshui Cement Grp. Ltd.*, [2024] UKPC 36, ¶s 85-86. Under *Tianrui*, a board can legitimately dilute shareholders by issuing new shares, despite

---

[1] Motion for Reconsideration at 3-4, 6-7.
[2] *See* 7/1/2025 Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver, Appendix at 76, ¶ 19:
> Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

-2-

incidentally altering the balance of power and depriving a shareholder of control rights. *Id.*, ¶ 71.

Accordingly, the court concluded that all of plaintiffs' claims are derivative and that the JOLs are indispensable parties under Rule 39(a).

So ORDERED.

/s/ Bill Whitehill

BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED: October 31, 2025

STATE OF TEXAS
BUSINESS COURT OF TEXAS
CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY.
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE <u>November 21, 2025</u>

Beverly Crumley
BUSINESS COURT CLERK

BY_____DEPUTY

Tab 3

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 3. Parties to Suits

TX Rules of Civil Procedure, Rule 39

## Rule 39. Joinder of Persons Needed for Just Adjudication

Currentness

**(a) Persons to be Joined if Feasible.** A person who is subject to service of process shall be joined as a party in the action if

(1) in his absence complete relief cannot be accorded among those already parties, or

(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may

  (i) as a practical matter impair or impede his ability to protect that interest or

  (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff.

**(b) Determination by Court Whenever Joinder Not Feasible.** If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.

**(c) Pleading Reasons for Nonjoinder.** A pleading asserting a claim for relief shall state the names, if known to the pleader, of any persons as described in subdivision (a)(1)-(2) hereof who are not joined, and the reasons why they are not joined.

**(d) Exception of Class Actions.** This rule is subject to the provisions of Rule 42.

**Credits**
Oct. 29, 1940, eff. Sept. 1, 1941. Amended by order of July 21, 1970, eff. Jan. 1, 1971.

Notes of Decisions (593)

**O'CONNOR'S NOTES**
**Source:** FRCP 19.

App. 013

**Caution:** TRCP 39 is affected by Fam. Code §§1.105 and 162.002.

**O'CONNOR'S CROSS REFERENCES**

See also TRCP 40, 41, 51, 174; *O'Connor's Texas Rules,* "Plaintiff's Original Petition," ch. 2-B, §1 et seq.; *O'Connor's Texas Rules,* "Parties & Claims," ch. 2-F, §1 et seq.; *O'Connor's Texas Rules,* "The Answer--Denying Liability," ch. 3-E, §1 et seq.; *O'Connor's Texas Rules,* "Motion to Abate--Challenging the Suit," ch. 3-I, §1 et seq.; *O'Connor's Texas Rules,* "Motions for Severance & Separate Trials," ch. 5-I, §1 et seq.

**O'CONNOR'S ANNOTATIONS**

*In re Trust A & Trust C*, 690 S.W.3d 80, 86 (Tex.2024). "Under Rule 39, … the parties' failure to join a person will rarely deprive the court of jurisdiction. Instead, Rule 39 addresses whether the court has 'authority' to proceed in the person's absence. But the rule was designed 'to avoid questions of jurisdiction,' and it 'would be rare indeed if there were a person whose presence was so indispensable in the sense that his absence deprives the court of jurisdiction to adjudicate between the parties already joined.'" *See also Henry v. Cox*, 520 S.W.3d 28, 35-36 (Tex.2017) (Commissioners Court was indispensable); *State Office of Risk Mgmt. v. Herrera*, 288 S.W.3d 543, 549 (Tex.App.--Amarillo 2009, no pet.) (City was indispensable).

*Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 913 (Tex.2017). "[O]nly [D] has actually claimed that the [potential parties to be joined] have … an interest; the [potential parties] themselves have not, either directly or indirectly. [T]he [potential parties] did not need to actually 'c[o]me to court to assert an interest' in order to claim an interest under Rule 39. But they needed to do *something*, and the [potential parties] have done nothing." *See also In re Kappmeyer*, 668 S.W.3d 651, 656-58 (Tex.2023).

*Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 162 (Tex.2004). "Rule 39 determines whether a trial court has authority to proceed without joining a person whose presence in the litigation is made mandatory by the Declaratory Judgment[s] Act. [¶] [N]othing in the rule precluded the trial court from rendering complete relief among [parties] who had sued for a declaration of rights. Although the parties continue to litigate its correctness, the trial court's judgment represents a final and complete adjudication of the dispute for the parties who were before the court."

*Longoria v. Exxon Mobil Corp.*, 255 S.W.3d 174, 180 (Tex.App.--San Antonio 2008, pet. denied). "Although [TRCP 39] provides for joinder in mandatory terms, 'there is no arbitrary standard or precise formula for determining whether a particular person falls within its provision.' If the trial court determines an absent person falls within the provisions of the rule, the court has a duty to effect the person's joinder. If a person required to be joined under Rule 39(a) cannot be joined, the trial court must decide 'whether in equity and in good conscience the action should proceed among the parties before it, or should be dismissed' by considering the factors listed in Rule 39(b)." *See also Pierce v. Blalack*, 535 S.W.3d 35, 40-41 (Tex.App.--Texarkana 2017, no pet.).

*Gilmer ISD v. Dorfman*, 156 S.W.3d 586, 588 (Tex.App.--Tyler 2003, no pet.). "A state official primarily responsible for enforcement of a statute must be joined in any suit affecting the constitutionality of that statute. Failure to add a necessary and indispensable party to the constitutional challenge of a statute leaves the trial court without jurisdiction."

*Griggs v. Latham*, 98 S.W.3d 382, 385 (Tex.App.--Corpus Christi 2003, pet. denied). TRCP 39 "focuses not so much on whether the court has jurisdiction over the parties, but rather on whether the court ought to proceed with the parties before it. Generally, the trial court has broad discretion under the rules of civil procedure in questions regarding the joinder of parties, and its determination will not be disturbed on appeal except for abuse of discretion. Even under the rule regarding joinder of persons needed for just adjudication, there is 'no arbitrary standard or precise formula for determining whether a particular person falls within its provisions.' Cases involving joinder disputes must turn on an application of the particular facts involved."

Vernon's Ann. Texas Rules Civ. Proc., Rule 39, TX R RCP Rule 39

Current with amendments received through September 15, 2025. Some rules may be more current, see credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Tab 4

**REPORTER'S RECORD**

**VOLUME 1 OF 1 VOLUMES**

**TRIAL COURT CAUSE NO. 25-BC01B-0027**

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | : : : : : : : : | TEXAS BUSINESS COURT |
| Plaintiffs, | : : | DIVISION 1B |
| VS. | : : | |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd., | : : : : : | |
| Defendants. | : | DALLAS COUNTY, T E X A S |

**PLAINTIFFS' ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**

On July 2nd, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Bill Whitehill, Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by computerized stenographic machine shorthand.

Donna A. Goree, CSR, RPR, CRR   (979) 533-0422

**A P P E A R A N C E S**

APPEARING FOR THE PLAINTIFFS:

    HON. CRAIG M. WARNER
    State Bar No. 24084158
    cmwarner@duanemorris.com
    HON. JOSEPH M. COX
    State Bar No. 04950200
    jmcox@duanemorris.com
    DUANE MORRIS, LLP
    100 Crescent Court, Suite 1200
    Dallas, Texas  75201
    (214) 257-7200


APPEARING FOR THE DEFENDANTS:

    HON. BRIAN PATRICK SHAW, JR.
    State Bar No. 24053473
    HON. MONICA GAUDIOSO
    State Bar No. 24084570
    HON. ANDREA REED
    State Bar No.24121791
    CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, LLP
    901 Main Street, Suite 5500
    Dallas, Texas  75202-3767
    (214) 855-3120

    HON. SAWNIE E. McENTIRE
    State Bar No. 13590100
    PARSONS MCENTIRE MCCLEARY, PLLC
    1700 Pacific Ave, Suite 4400
    Dallas, Texas  75201-7324
    (214) 237-4300

    HON. MATTHEW MURPHY

    HON. REED COX

    HON. MARK GOODMAN

    HON. JENNIFER COLGATE

ALSO PRESENT:

    Shawn Raver, Client Representative/Counsel
    Philip Spears, Division 1B Staff Attorney
    Susan Fox Bowen, Court Administrator
    Andrea Anderson, Legal Intern

*** **CHRONOLOGICAL INDEX** ***

**VOLUME 1 OF 1**

**(July 2nd, 2025)**

|                                       | PAGE | VOL |
|---------------------------------------|------|-----|
| Case called/appearances               | 4    | 1   |
| Opening statement by Mr. Warner       | 8    | 1   |
| Statement by Mr. Cox                   | 15   | 1   |
| Statement by Mr. Shaw                  | 17   | 1   |
| Statement by Mr. McEntire             | 21   | 1   |
| Proposal by The Court                  | 22   | 1   |
| Statement by Mr. McEntire             | 24   | 1   |
| Response by Mr. Warner                 | 24   | 1   |
| Statement by Mr. Goodman              | 26   | 1   |
| Statement argument by Mr. Shaw         | 29   | 1   |
| Statement by Mr. Warner               | 30   | 1   |
| Statement by Mr. McEntire             | 32   | 1   |
| Statement by Mr. Raver                 | 33   | 1   |
| Statement by Mr. Murphy               | 35   | 1   |
| Statement by Mr. Warner               | 38   | 1   |
| Statement by Ms. Colgate              | 39   | 1   |
| Rule 11 agreement by Mr. Shaw          | 47   | 1   |
| Adjournment                            | 55   | 1   |
| Certificate of Court Reporter          | 56   | 1   |

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

*** **P R O C E E D I N G S** ***

**THE COURT:** All right, everybody. We'll call Cause No. 25-BC01B-0027, the Highland Dallas Foundation, Inc., et al versus Mark Patrick, et al. Let's go around the table and take appearances. Please go slow.

**MR. WARNER:** I'm Craig Warner, for plaintiffs.

**THE COURT:** Okay.

**MR. COX:** Joe Cox.

**THE COURT:** Mr. Cox. All right.

**MR. COX:** Here for the plaintiffs along with Mr. Warner.

**MR. McENTIRE:** Saul McEntire on behalf of the defendants.

**MR. SHAW:** Brian Shaw on behalf the defendants. I have Mr. Shawn Raver, who is our client representative. He's the chief operating officer and general counsel. I also have my colleagues Monica Gaudioso and --

**MS. GAUDIOSO:** I'll spell it for you. Actually Brian always did that. G-A-U-D as in David, I-O-S as in Sam, O.

**MR. SHAW:** And also from my firm, Andrea Reed.

**THE COURT:** With me is Philip Spears, staff attorney which y'all have met before; Adreana Anderson our intern from SMU. Not in the room, but certainly participating, is Susan Fox Bowen, court manager. Susan is going to be your

best friend in this case because everything is going to run through her. If not through her, it's going to run through Philip.

You all may or may not have had an opportunity yet to view the Court guidelines. We'll go through those more thoroughly at a later point in time when we have a scheduling conference to do that. But we're here today on an emergency application for temporary restraining order and appointment of a receiver.

MR. COX: It's Joe Cox. We're not going to go through the receiver today, Judge. We're just here for the restraining order. We'll pick up the receiver at a later hearing.

THE COURT: Okay. Good. That would have been my inclination based upon what I've read.

MR. COX: Yes.

MR. SHAW: Judge, we have a few lawyers that are appearing virtually, as well.

THE COURT: That's true. Let's get that on the record.

MR. MURPHY: Good afternoon, Your Honor. Matthew Murphy of Richards, Layton & Finger in Delaware on behalf of CDMCFAD, LLC; and my partner, Reed Cox, is also online.

THE COURT: Fantastic. Anybody else?

**MR. GOODMAN:** Mark Goodman from Campbell's in the Cayman Islands on behalf of the same companies.

**MS. COLGATE:** Jennifer Colgate on behalf of DFW Charitable Foundation from Baker & Partners in the Cayman Islands. Thank you.

**THE COURT:** Can we have the admonishments, please?

**THE COURT ADMINISTRATOR:** We are conducting this hearing both in person and via electronic means. You are participating both in person and in a virtual courtroom and should treat this hearing as though you were in a real courtroom. Conduct yourself in the same manner that you would in a real courtroom.

The same rules of decorum apply, and the local rules are still in effect. The hearing is open to the public via live streaming on YouTube and it is currently being live streamed.

Recording this proceeding is prohibited without the express permission of the Court; and this applies to all participants of the hearing, including anyone who may be watching on the live stream.

The official recording of any proceeding is the court reporter's record, and the chat function has been disabled by the Court on all platforms. This proceeding is not being recorded for any public use, and the live stream

recording will be deleted at the conclusion of these proceedings and will not be available for reply.  Thank you, Judge.

THE COURT:  Okay.  I think we need a few more acronyms in this case.

MR. COX:  Judge, could I make one request?  Currently, one of our lawyers is having cataract surgery right now; and he would like to see it later on when he can see.  Is there a way to do that?

THE COURT:  Susan, are you still there?

THE COURT ADMINISTRATOR:  Yes, Judge, I'm here.

THE COURT:  Mr. Cox, could you hit that okay button, please?  Thanks.

So, we have a request to record it.  I don't think our rules allow us to do that.

THE COURT ADMINISTRATOR:  They do not, Judge.

THE COURT:  We have a reporter here.  So, we can do that.  But I don't think -- you know, we have been doing this almost a year; and nobody has ever asked.

MR. WARNER:  Once his eye surgery is over, he would like to review.

THE COURT:  I'm sure if you want a rush copy, Donna will be happy to prepare one for you.  But, yeah, there is an official transcript of that.  It doesn't appears to be an issue in this case, but it has come up in the past about AI

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

note-taking functions participating in these hearings. And it has been the position of the Court that, no, y'all take all of the notes that you want for your own purposes; but we have one official recording. And that's going to be that.

MR. SHAW: One other thing. We have not been served with an answer, and we have not filed answers in this case. We want to make sure that the record is clear that we are not generally appearing by opposing this temporary restraining order. And just for the record, we are not waiving the jurisdiction, personal jurisdiction of the defendants because we have not, again, been served a citation, had an opportunity to file an answer or to challenge the personal jurisdiction of the Court.

THE COURT: Okay. All three of us have read what was submitted. I appreciate the opportunity to do that. What I'm going to suggest is why don't respective sides take up to, but no more than, ten minutes to just give me the lowdown of what you are thinking; and then we'll pick up from there and see where we go, if that works. Go ahead.

## OPENING STATEMENT

MR. WARNER: Thank you, Your Honor. First, Mr. McCarty extends his apologies for not being here because of his eye surgery.

Your Honor, we represent Supporting Organizations. We need a TRO today to freeze that fraud in

place and prevent further waste, transfer, and dissipation of more than $270 million dollars in charitable assets. Now, in a blink of an eye ago our clients were the beneficial owners of a holding company, a holding company that has seen $270 million in fund for their benefit.

Mr. Patrick was charged to manage that holdco and that fund for their economic benefit. He was essentially a trustee for the interests of the independent charitable organizations, how they are referred to in the governing document, for the Supporting Organizations that were benefiting from the fund. He had basic fiduciary duties arising under common law and supported by the governing documents of the fund which repeatedly and clearly spelled out that all his powers would be exercised for their economic benefit.

Today these same clients who held interest in $270 million of this fund are the beneficial owners of a diluted portion of that same holdco, but that holdco now possesses nothing. Mr. Patrick used a sophisticated series of transactions to lift $270 million out from under them.

I will explain a brief overview of that strategy and what happened in a moment. I have an illustrative explanation. Mr. Patrick, it was argued, that each step in the fraud was an exercise of power to affect the independence of authority. The problem with that is that you can't use lawful means to achieve an unlawful end.

App. 025

A state official or senator may have power to do many things. He orders to an agency to cast a vote, what have you, but not in exchange for a bribe or as part of a kickback, being some other scheme.

So, here's the key. When Mr. Patrick took the first step towards the pathway we will outline in a moment, as it is spelled out in the papers, he owed a fiduciary duty at that time to the plaintiffs in this action. And the first step that he took and every subsequent one violated that duty.

Mr. Patrick gained control of the fund in 2021. And there are a lot of entities here; and you are right, a lot of acronyms. Effectively, Mr. Patrick controlled seats in these various organizations.

Since then he's created a pattern of self-dealing that provides critical content for subsequent events. Those are also spelled out in the paper. Directors fees increased from $40,000 in 2022, to almost $600,000 in 2023, and to 2.25 million in the first half of 2024. So, 12,400 percent increase from 2022 in payments.

Legal expenses lept from 6 million in the first six months of 2024 compared to 4 million for all of 2022, 300 per cent increase. Overall expenses for the first half of 2024 were about $18.3 million compared to $18.6 million for all of 2023. So, that's gone up.

But now we had more specific incidents. In

June of 2023 Mr. Patrick requested that one of the Supporting Organizations direct money to an entity, a nonprofit entity that he formed in 2023, expecting it to be an annual donation; but he failed to disclose he and his wife and daughter were the directors of the entity that he created two weeks earlier. So, he got the contribution, but not the recurring contribution.

In September 2023, there is evidence in the filing of the papers, testimony establishing that in 2023 Mr. Patrick approached someone in order to try to obtain a kickback on funds paid by the DAF fund to them. That didn't happen because the person was righteous and declined and reported it; and now we know that that occurred.

There is a variety of self-dealing conduct that precedes the main conduct in this case that paints a pattern against which we have to see the subsequent events. Against that backdrop, over the past year, Mr. Patrick engaged in a scheme that was secret from the plaintiffs to alienate the plaintiffs from the 270-million-dollar fund in favor of a new organizational structure owned entirely by him.

It's five key steps in this scheme. First, Mr. Patrick created a new purported charity, DFW Foundation -- that's one of the defendants -- created by him and controlled by him. So, now we have a new entity up on top to go along with the plaintiffs' charitable organizations.

Second, remember that the holdco is the

governing entity that holds the beneficial interests in the fund. There is another entity, through which Mr. Patrick exercises control that goes through management shares of the fund. Okay. So, the plaintiffs, our clients, at this point before this conduct, they hold a little over 98 percent of the beneficial interest in the holdco, which holds the $270 million in funds.

THE COURT: Repeat that last part for me.

MR. WARNER: Our clients, the plaintiffs, they hold over 98 percent of the beneficial ownership interests in the holdco. The holdco holds the fund.

THE COURT: All right.

MR. WARNER: All right. So, $270 million in charitable assets in the fund. And to be clear again, circle back on what the task is for Mr. Patrick in his management. Stomping all over the governing documents of the fund when his job is to use his powers for the economic benefit of the independent charitable organizations. That's all.

So, second step, Mr. Patrick reports the issue of 51 percent of new shares in holdco. That's the company that holds the fund -- previously that's owned 98 percent by our client -- through his newly created charity that he controls. So, this dilutes the plaintiffs' ownership of holdco from more than 98 percent to less than 50 percent, now the 50-percent-plus beneficial owner of holdco in Mr. Patrick's new

charity. So, the plaintiffs suddenly own less than 50 percent of holdco; and Patrick is effectively on both sides of the charitable organizations, the manager and the grantee charity, precisely what the structure was trying to avoid.

Third, Mr. Patrick creates essentially a new holdco called CDMCFAD. That's an event. Then using his management powers, the management seat over the fund, he has the existing holdco -- still owned 49 percent by the plaintiffs but controlled by Patrick. We only have beneficial ownership. We don't have control. He has the existing holdco transfer all of his interest in the fund to his new holdco, CDMCFAD. In exchange for that, the holdco gets an interest in CDMCF. So, now there is essentially a blocking company between the holdco, which is still partially held by our client and the fund. CDMCFAD is between. Well, maybe not now. That's coming.

So, he has the existing holdco transfer all of its interest in the fund and its $270 million to the new holdco, CDMCFAD. So, now the entity that holds the fund is CDMCFAD, which was just created by Mr. Patrick.

**THE COURT:** I want to see if I can take this to a broader level. So, the allegation is that there was a fund created to fund this other organization. Mr. Patrick was put in charge over that fund, and he has essentially created a different organization to control those funds and use them for a different purpose than original credit folio, for lack of a

better word, intended. Is that where we are?

MR. WARNER: That's a start. That's about where we are right now.

THE COURT: In essence, he's done some self-dealing and attempted inappropriate transactions.

MR. WARNER: That's definitely happened at this point, but right now --

THE COURT: What's in the fire is if I don't do something today, what's going to happen tomorrow?

MR. WARNER: As far as the TRO request, Your Honor?

THE COURT: Yes.

MR. WARNER: We will get to that in a moment. I'll get as far as I can, but I have to get to the end of this structure of transactions. And so it happened in five key steps.

The fourth key step is Mr. Patrick issued shares directly in CDMCFAD, his new charity DFW Foundation, okay, but now to the plaintiffs. So, now DFW Foundation has an interest in CDMCFAD and, through that, in the fund directly. Plaintiffs only have an indirect interest in the fund for holdco.

Now, here is the situation. CDMCFAD, created by Patrick, holds the fund. DFW Foundation, created by Patrick, holds CDMCFAD directly. The plaintiffs hold an interest in CDMCFAD at this point through their -- only through their

remaining diluted shares of the original holdco. Okay?

The fifth and final step, using his management powers, Mr. Patrick has the original holdco redeem its entire interest in CDMCFAD -- which again holds a 270-million-dollar charitable fund -- for $1.6 million. So, holdco's interest in the fund at this point is set. Now, the only DFW has an interest in the fund because it is the only entity that has an interest in CDMCFAD. And CDMCFAD is only --

THE COURT: I think all of that is in the petition. There is no way I can digest all of that in ten minutes.

MR. WARNER: Understood. We're working on that.

THE COURT: I'm trying to get to a level that I can understand in a short time period.

MR. COX: Let me interrupt. The issue is this: Our plaintiffs had a right to these -- to the general interest in the $270 million. Now they don't. It's as simple as that.

And Mr. Patrick took it; and just now he runs it on his own? No. If it wasn't filtered money, he could not take it.

Just overnight he can move it to a Swiss bank account or somewhere remote and we would never get it again or never even see it. That's why we need a TRO. It's the fact that he has now taken everything behind the charitable organizations' backs and done all this stuff, and we can't

trust him.

And we asked for the financials from him, and the organization has asked for their financials. He said: I'm not going to give them to you. He said he's never used to that.

We have never gotten the financials. They just left us in the dark. Now we don't know where the money is going to go. It was funded a long time ago by Dondero. Everybody knows that. Mr. Patrick and Mr. Dondero have some sort of beef with each other that goes way back to who knows what. I don't know. But be it as it may, Mr. Patrick cannot take these funds that were intended for the charitable organizations and now move them to his own means.

THE COURT: What's going on in the Cayman Islands?

MR. COX: So, the Cayman Islands, there was a lawsuit. There was something going on over there that relates to two of these entities or Cayman Island entities. Mr. Patrick put his in voluntary bankruptcy over there to be done with it. And then the entities powers yield with respect to the fund. So, then the --

MR. WARNER: So, the original holdco.

MR. COX: The original holdco. He said let's just get rid of it. We then filed an interest to put it in involuntary bankruptcy over there. And now that Court, as we

put in our papers, said, you know, y'all can make a choice. You can file suit over there in the United States, over here in the Caymans. We've now chosen to file suit over here in the United States and take it up from there.

THE COURT: Isn't it something that should be part of, should be brought up in the Cayman Islands instead of here?

MR. COX: No, because the entities that you see here are not Cayman entities.

MR. WARNER: This Court has jurisdiction over entities that the Caymans allow jurisdiction of people we have the jurisdiction of.

MR. SHAW: Judge, this is, as Yogi Berra says, deja vu all over again. I think you were referring to that. I was in the TRO with you the day before Thanksgiving.

THE COURT: Well, you did not come from the golf course today.

MR. SHAW: I did not come from the golf course today, but this time I left the office and was able to get a suit on quickly. You know, I have been trying to convince my friends this is not normal and this is not the way it's supposed to happen, but I'm having a hard time convincing them about that.

There has been a lot of noise, a lot of allegations. But, you know, when you get down to the basics,

what we look at when we're looking at a temporary restraining order, application for that, is what evidence do they have to support that is extraordinary request for relief? So, I think that's what we need to emphasize.

I remember being in one county one time and looking at a judge while she was reviewing, and she went right to those affidavits. And that was really kind of a learning experience for me that it's all about the evidence.

But I'm going to take one step back from that, which is one step that is more important than that, which is jurisdiction. And this Court, you know, rightly pointed to jurisdiction as an initial issue.

Ms. Reed is becoming an expert on this Court's jurisdiction through the other related cases that we have. You have a seen us in this room before with Mr. Raver here on that. But none of the plaintiffs own any interest in any of the defendant entities. Let me repeat that. None --

**THE COURT:** Well, that was my question.

**MR. SHAW:** They don't. They don't have an ownership interest in any of the named defendants, none. And so are they -- is this an action in regarding the governance, governing documents, or internal affairs of an organization? They are strangers to those governing documents.

Is this an action by an owner of an organization? No. They are not an owner of this organization.

You know, they talk about the fact that they had an interest in Charitable DAF HoldCo, but not any of these entities. So, they don't get past go on jurisdiction right out of the gate. So, that's the first point. They don't have standing, and this Court does not have jurisdiction over this particular dispute.

Then we look at the TRO, and we go to the evidence. And what does the evidence say? We look at this extraordinary relief. The rule says you have got to define the injury -- quote, unquote, define the injury and state why it is irreparable, why the harm is irreparable.

The affidavits -- I was so surprised that Mr. Dondero put it in his affidavit, although he is not here today. And by the way, Mr. Patrick wishes he was here. He's out of town, obviously, on the 4th of July holiday. But we have Mr. Raver here in his stead.

But Mr. Dondero's affidavit, you've reviewed that affidavit; and what it says is extraordinary in my mind. He talks about how the fact that Mr. Patrick is the controlling person and has the authority to do these things. He talks about how Mr. Patrick is a great tax lawyer. He talks about how he's funding this litigation.

So, you know, they can make arguments all they want to about what this case is and that Mr. Patrick has engaged in all sorts of wrongdoing; but their client really is Mr. Dondero. And what he says is nothing about irreparable

harm. He talks about actions that happened in 2020. He doesn't talk about anything being imminent. And that's the key under a TRO, is that you show immediate, imminent, and irreparable harm.

You can look at the affidavit of Ms. Diaz. Again, it talks about things that happened in 2023. She hasn't talked about the burning house or what happens tomorrow or on July 4th that necessitates us all being here on July 2nd, not a word of that. And their allegations about irreparable harm are simply allegations. There are no facts about how the harm here is irreparable.

Then you look at the scope of this proposed temporary restraining order. I've never seen anything like it. You might as well just have one sentence that says you can't do anything, because that's what it is. It is so overbroad and so out of touch with the facts that they presented through the affidavit of James Dondero and Ms. Diaz that the Court just cannot -- cannot grant that relief. So, we would ask the Court to deny the temporary restraining order.

There is not a burning house. There is not a building about to be crashed. These are monetary dangers that they are alleging. And we are happy to get in when we can have these arguments before a jury about whether Mr. Patrick breached judiciary duties or what this is really about, which is Mr. Dondero trying to control this organization.

MR. McENTIRE: Sonny McEntire for the record. One week ago today there was a hearing in the United States Bankruptcy Court before the Judge Jernigan. Jim Dondero took the stand. Almost verbatim all of the allegations that are perhaps financial were basically advanced one way or the other in that hearing.

Bruce Springboat, Judge, who owns Highland Capital -- Highland Capital has in connection with a settlement from Hunter Mountain Investment Trust, which is one of my clients; and Highland Capital got Jim Dondero attempting to mark Patrick as a control person for Hunter Mountain. He raised many, if not all, of these same allegations during the course of that hearing. His objection was overruled.

Julie Diaz, who verified this petition, she had also filed on behalf The Dallas Foundation an objection to that settlement containing most, if not all, of the allegations in this petition. And on the eve of the hearing, she withdrew those allegations, unbeknownst to Mr. Dondero, the same one who verified this petition.

The objection was withdrawn because you are not going to overrule the objections of Mr. Dondero in advance during the course of the hearing. This is forum shopping on steroids.

And Mark Goodman is very familiar with what is going on down in the Cayman Islands, and that's why he's

participating here. They already have proceedings going forward down there that address many of these same issues.

They are coming to you to try to have a multi-front war. And what this really is, is Mr. Jim Dondero doesn't like what happened in the bankruptcy court; and I don't think he's liking what is going on in the Cayman Islands. And that's why this proceeding was initiated. And what this really is, is tortious interference with Mr. Mark Patrick and the controlling entity of the DAF Fund, which none of the plaintiffs have an interest. It's really tortious interference with his ability to conduct business, which is ultimately to provide funds for charitable foundations.

THE COURT: Okay. So, a couple of thoughts. One, I have a question about jurisdiction which we need to address first. I hate to enter or do things if I don't have jurisdiction. Never a good idea. So, let's -- what I want to do is, as much as possible in the adversarial context, come up with a plan that we can all agree to do that will help solve some of these problems on an efficient economic basis.

One of the things that I want to do is quickly and efficiently resolve jurisdictional questions.

Two, I would be concerned if I had evidence indicating that this money is about to go somewhere irreparably if I don't do something today. I'm not sure I have seen that yet. I'm a little concerned that it's taken a while to get

App. 038

this dispute going with some of these things going on back in 2023.

So, what can we do in terms of creating a workable plan to (A) make sure that nothing bad happens to the money -- although, I do notice that each of the substantive counts all end with a request for damages -- to make sure money doesn't go hide somewhere in the Caribbean, where it shouldn't be; but at the same time make sure that we're getting the jurisdictional issue done correctly.

I have some basic understanding of how foundations work and supporting organizations work. What I have read in this petition seems a little different than what my understanding is. One idea I might throw out is -- and just throwing it out as an idea to get feedback from you all. Do any of y'all know Steve Gillis? Steve is a well-recognized state-wide, if not a national, expert on 501(c)(3) and foundations and management control and all that stuff. He could be very helpful to me in making sure I'm understanding the issues, the organizations correctly, and make recommendation to see me, (A) helping me understand the issues; and (B) making sure that if you all's clients wanted to spend money and distribute money, that that was an appropriate use of funds, with an opportunity for you all to comment on that. So, I throw that out as an idea.

Is there an agreement that we can reach until we

can have a TI hearing, if we need a TI hearing, to make sure that the funds are safe in the interim?

MR. McENTIRE: I want to supplement what I said. As part of the withdrawal of the objection, Dallas Foundation, which is above, I think, what we call the Supporting Organizations -- The Dallas Foundation, that filed the objection, withdrew their objection. And one of the portions of the agreement was that Mr. Shawn Raver -- and this may be subject to Rule 408. There is an understanding in the agreement that they would participate in ongoing dialogue; and there was a dialogue this morning, specifically.

And Mr. Diaz, who verified this complaint, as I believe it, attended. I don't know the details, and I'm not sure if it's something that may be subject to Rule 408 exemption; but I think a mechanism has already been created.

THE COURT: Let's get a response to that.

MR. WARNER: We are not on that case, Your Honor. I believe there are proceedings in the Caymans. Those proceedings are ongoing. My understanding is -- a limited understanding is that we discovered these facts about the alienation of this ordinary knowledge only very recently. And I understand the objection with --

THE COURT: Wait, wait. Morris or Mr. Dondero?

MR. WARNER: Neither. We don't represent Mr. Dondero.

THE COURT: Who is the person or people that you report to as your client?

MR. WARNER: We report to the three plaintiffs' shareholders.

THE COURT: Yeah, I mean but who are the people, the individuals?

MR. WARNER: There is a Mr. Atkins, Ms. Diaz, the presidents and COEs of the two other organizations. I believe counsel -- I think you will hear something from the counsel, kind of standby outside counsel.

THE COURT: Well, I'm interested in how long they have known some of these facts that y'all are complaining about.

MR. WARNER: I understand that it was very recent. Now, some of them are more longstanding in nature. Of course, the background allegations are owner and the owner fund; but what we are focused on and the reason I call them background is the alienation Ms. Diaz had to know about powers and structure and just the structural steps that were taken to accomplish it. My understanding is that that is all very new.

MR. COX: Judge, the one thing that came out during these Cayman proceedings, and it's my understanding we put it out petition here, is that on the stand down in the Caymans, Mr. Patrick had said that now these plaintiffs in this case, the injured means that they thought they had interest in,

that we'll get them the funds and then it's just worth nothing. It has no value whatsoever. That's what -- that's when the alarm went off. He said it down there in those proceedings. We have a copy of the transcript we attached as an exhibit here, in the bankruptcy, wherever it was.

THE COURT: Why is house burning down now?

MR. COX: We're worried that if you don't enter into a TRO today, he can take the money and the fund that he controls and take it anywhere he wants, put it in a bank in Cypress. He can put it in a Russian bank. He can put it anywhere he wants. We have no idea where he can put it. That's what the issue is. That's what's scary.

THE COURT: I understand that.

MR. McENTIRE: Ms. Diaz is the vice-president of the Houston-Dallas foundation. She met with this gentleman this morning concerning where the money is going, how it's standing.

And, Your Honor, Mark Goodman is here. He is actually our client's counsel in the Caymans. And perhaps it would benefit the Court if he could give a status report on what is actually happening on this.

THE COURT: Sure. Mr. Goodman?

MR. GOODMAN: What I can tell you, Your Honor, is that in terms of oversight of the --

THE COURT: Is he a witness?

**MR. COX:** I don't need a witness. Okay.

**MR. GOODMAN:** In terms of the oversight of the financial dealings of the new structure, the outcome displacement's explanation on the 2nd of April, 2025, voluntarily. An independent firm Kroll were appointed. There was then that application to bring that under court supervision with the firm Grant Thornton replacing the liquidators. That is now under court supervision. It has been since the 2nd of May.

We, on the 6th of May -- sorry -- on the 16th of May, offered voluntarily a transaction reporting protocol where we gave the liquidators in the Caymans a reporting of all the financial transactions, all material transactions, so that they would have oversight of what was happening with the money.

There was no engagement with that offer. It was repeated on the 30th of May, on the 9th of May, and on the 19th -- sorry -- on the 9th of June and on the 19th of June. And this is the first time there has been any kind of engagement by the liquidators in agreeing the terms of protocol so that oversight would be given.

It's simply not correct to say that there is just no way of understanding what is happening here. The liquidators in Cayman are court-appointed and court-supervised, and they have control of the old structure. So, to the extent that there is anything improper in the way the assets were

transferred away is incumbent upon those liquidators to take steps to recover the assets; and that process is ongoing in Cayman. And this suggestion that there is no control and no oversight of where the money might go is just inconsistent with the record in Cayman how this case has developed.

THE COURT: And so let me ask a question. Who has control of the $270 million? Is it under the control of the liquidators in Cayman?

MR. COX: No.

MR. GOODMAN: No, it's apparently -- sorry. I thought it was a question to me.

THE COURT: It was a question.

MR. GOODMAN: There is -- if someone has a copy of the structure, it would sure be helpful for the Judge to see that. But the MCI represents CDMCFAD, LLC, as a Delaware entity which owns in turn a Charitable DAF Fund, LP, in the Cayman Islands, which then in turn owns the structure of asset holding companies.

And so those companies are all currently under the control of CDMCFAD, LLC, the Deleware entity. It's that entity which has offered the reporting protocol to the liquidators. The liquidators are collecting the information about the transaction by which the assets were moved; and the liquidators, if they believe there was some reason to question the proprietary of what would be done, would be duty bound to

take action to recover that. They can seek recognition in the U.S. through Chapter 15 of the bankruptcy code.

(Crosstalk.)

MR. GOODMAN: It is routinely done from the Cayman liquidators.

MR. COX: They don't hold in the Caymans.

THE COURT: Okay. So, let me ask a question. Are there any creditors that have to be paid in the next 14 days?

MR. McENTIRE: I don't know the answer to that question.

MR. SHAW: We do. We have obligations.

THE COURT: That are due in the next 14 days?

MR. RAVER: I would have to look to see what specifically the payment terms are; but, generally, it's law firms and then the payroll.

THE COURT: Payroll is one thing. Law firms are accustomed to having payment.

MR. SHAW: Judge, if I may, they talk about the sophisticated and malicious fraud. I mean, to your point, we have been -- Carrington, Coleman, Sloman & Blumenthal has been representing the DAF for a year and a half. The DAF is represented by Doug Mancino of Seyfarth Shaw. He is one the preeminent nonprofit organization lawyers.

We have ValueScope (sic.) as a financial

advisor, FTI Consulting as a financial advisor, Weaver & Tidwell as a financial advisor. We have Cayman counsel, Walkers, Maples Group, Gary Olsen, Campbell's. We have Delaware counsel, Dorsey & Whitney; Richards, Layton & Finger.

There is not some fraud afoot. The idea -- and they certainly have not presented evidence, evidence, which is what this Court is relied upon to substantiate that there is a fraud afoot and that any injunctive relief is warranted here.

So, I hear your question, and I'm anticipating where you are going; but the fact of facts are what we have to rely on that are sworn to. And there are no facts that are sworn to that there is imminent irreparable harm. And there is no basis to impose some kind of oversight on these organizations, certainly if we don't even know if this Court has jurisdiction.

MR. WARNER: If I may, Your Honor?

THE COURT: Sure.

MR. WARNER: Two points, maybe three. First, the entity that was referred to before as the one that holds the coal over the money, CDMCFAD, that's Mr. Patrick. Okay? So, the answer to your question who has control of the funds now, the answer to that question is Patrick.

THE COURT: Okay.

MR. McENTIRE: That's not part of the Cayman proceedings.

MR. WARNER:  Nobody else at this point in time, and that is why we're here.  It may be that in three or four weeks the Cayman the liquidator will do something great.

THE COURT REPORTER:  The reporter cannot hear.

MR. WARNER:  I said that it may be that at some point -- it may be that at some point the Cayman liquidator will do something helpful; but that's not right now.  We can't see into the future.  And right now the only person who has control of these funds is Mr. Patrick.

Second, we can talk all we want on what law firms are involved; but I don't think we should care.  I don't think we should make these decisions on the basis of invoking a bunch of law firm names.

What matters here fundamentally, from the plaintiffs' perspective, is about six months ago they had a clear beneficial interest in $270 million in this fund; and now they have nothing.  That happened with astonishing, incredible speed through, I'm sure, the direction of some very sophisticated business people and lawyers.  That doesn't change the fact that Mr. Patrick owed a fiduciary duty to our clients.  At the outset of that conduct, maybe he convinced some people that he didn't.  I don't know.

But the question for a TRO is:  Do we have a likelihood of success showing this person owed a fiduciary duty to our fund?  The answer is yes.  They were the sole

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

beneficiaries or near the sole beneficiaries, 98 percent plus of this 270-million-dollar fund for years.

The governing documents of the fund expressly state that duties of Mr. Patrick in his organization are to exercise his power for the economic benefit of those organizations, our plaintiffs.

Now we are holding 49 percent of an empty bag; and what we are asking is that we make sure that before all of that can be untangled, that the rapidity with which all of that happened does not happen again, because it's been demonstrated very clearly that Mr. Patrick is capable of some very impressive machinations to make money go away. We just want the money frozen so that the issue can be addressed.

**MR. McENTIRE:** Your Honor, I think we are conflating ownership with something else.

**THE COURT REPORTER:** The reporter cannot hear.

**MR. McENTIRE:** Yes, ma'am. And that is a failing deficiency in their application of the law. By what we just heard here, these proceedings have been underway for almost two months. Where is the irreparable harm? Where is the emergency? Mr. Goodman has explained this has all began in early May of this year.

And, lastly, Ms. Diaz, who verified the petition, the application -- the petition and their application, it was met with this gentleman this morning.

There is already a mechanism in place.

MR. RAVER: I presented balance sheets to them from 9-30-2024, 3-31-25, May 31st, '25. And I explained to them all the assets that have been disposed of, what was done with the proceeds. And then there was also part of the spreadsheet that we had agreed to that was part of the bankruptcy settlement, that money that Hunter Mountain received.

We were told that we would just be paying general legal expenses for outstanding matters that Hunter Mountain had ongoing. So, I just explained it in detail or just kind of in general what those proceedings are and gave them kind of a quarterly budget through, I guess, September 30th, 2025, what the estimated legal fees were that would be paid.

THE COURT: And what's that number?

MR. RAVER: It was -- one firm did not give me a total budget on one of the litigations; but the other two, I think it was approximately 275,000.

THE COURT: When you say litigations, what --

MR. McENTIRE: I represent CLOH HoldCo, which is in the DAF chain currently in proceedings in New York. I was successful in having them dismissed, but it's subject to appeal. Like the law offices on the other side, UBS is the plaintiff. Mr. Dondero's case is over, and I was the only one

who was dismissed.

I'm representing Hunter Mountain Investment Trust, which is in this chain, as of perhaps today or, if not today, then tomorrow when they are taking an assignment from the Highland Capital Group of the Kirschner litigation. And I will be lead counsel in that matter, and that is a very substantial amount.

THE COURT: So, that's why these attorneys' fees are going up, is there is a lot of litigation going on.

MR. McENTIRE: Yes, sir.

MR. WARNER: Your Honor, while we're inquiring about that, I also ask if every item that was matching to see perhaps more pressing than attorneys' fees was payback. I'm just interested to know what that is. Does that involve anyone other than Mr. Raver and Mr. Patrick?

MR. RAVER: Does not.

MR. WARNER: So, we're just talking about Mr. Raver and Mr. Patrick then. I don't mean to target the witness.

THE COURT: No, we're having a conversation. We're all adults having a conversation, trying to come up with a commonsense resolution to several problems.

MR. COX: I'll just add everybody in the group -- this is Joe Cox. Everybody knows this. Mr. Dondero does not run Highland Capital anymore. When he says Highland

Capital will be doing this and that, it's not Dondero. It's whoever is running Highland Capital. Everyone wants to point a finger at Dondero. I get that he's not loved, but he does some things that are right from time to time.

THE COURT: Mr. Dondero is as welcome and respected in this Court as everybody else.

MR. WARNER: Your Honor, as far as our deal, our object is on behalf of these three charities, period. Our object is to ensure that this can be unraveled and that these moneys are safe.

THE COURT: All right. So, here is kind of what I'm thinking. I'm thinking we're going to take a ten-minute break; and I'm going to consult my colleagues.

MR. MURPHY: Your Honor, can we interrupt? I'll try to be very brief, Your Honor. Again, I'm Mat Murphy from Richards Layton in Delaware. If we only represent CDMCFAD, LLC, which I'll just -- for ease of reference, I'll refer to as CDM, if that's okay with Your Honor.

THE COURT: Are you on the Joe Cox side or the other side?

MR. MURPHY: We're on --

MR. SHAW: I object to him appearing on a TRO. Then I will request temporary pro hac admission just pending that.

(Multi-crosstalk.)

**THE COURT:** That's fine.

**MR. COX:** Listen, it's not my law license. I teach professional responsibility at SMU, and you cannot practice law in another state without -- I'm being honest trying to make everybody aware of it. If he wants to speak on his own, that's fine.

**THE COURT:** Okay. You are not speaking on behalf of any particular client. You are an amicus curiae before this Court.

**MR. MURPHY:** Understood, Your Honor. I would just like you to know, Your Honor, what plaintiffs are challenging here in this action and what they are seeking the TRO, the basis for that, is a redemption that plaintiffs seem to be referring to as the alienation, which was authorized by the member of CDM in his sole discretion of the CDM membership units that were previously held by non-party charitable DAF HoldCo, Ltd. which is a Cayman entity.

Now, you know, we've heard about consideration or concern about whether CDM became parties per this structure. That occurred in December of 2024. I would just like to note, Your Honor, that CDM is named as a defendant. There are three counts that are purportedly asserted against CDM, although it's not actually alleged to have done anything wrong.

The petition is flawed in several ways, I suggest, Your Honor. The plaintiffs here were not

stockholders. The stockholders were Charitable DAF HoldCo. They are not members of CDM. They have no legal rights with respect to CDM.

As my friends on Mr. Patrick's side noted, Charitable DAF HoldCo is currently in restructuring proceedings in the Caymans and a liquidator is appointed over that entity. To the extent that there is any party that has standing to bring any challenge regarding this redemption, it would be the liquidators on behalf of Charitable DAF holdco, not the plaintiffs here.

Plaintiffs have said on several occasions that Mr. Patrick owed fiduciary duties; and they cite in their petition to case law that indicates that they're default fiduciary duties for members related to LLCs. But that's only true if you ignore the black letter Delaware law that says that LLCs can eliminate fiduciary duties, which is exactly what happened in Section 6.5 of the CDM, LLC, agreement. CDM, as the entity, obviously, also doesn't owe fiduciary duties to Charitable DAF HoldCo, let alone plaintiffs here.

The LLC agreement contemplates and authorized the unilateral redemption of CDM's membership units by the manager, who is Mr. Patrick, through his, quote, unquote, sole discretion. The redemption must have been for fair market value; but to the extent that there is a claim that their redemption did not meet that standard, that claim would be

brought by the liquidators, not by the plaintiffs here. It's also not clear if that claim would be brought in this Court or would be brought in the Caymans or in Delaware.

The plaintiffs also seek monetary damages, as your Court noted, which did not seem to support the extreme injunctive relief that they seek here. And the timing element, as I know Mr. Patrick's comments had pointed out, also doesn't support the injunctive relief that they are seeking here, particularly to the extent that it imposes grave restrictions on CDM and essentially locks it up and prevents it from operating.

**MR. WARNER:** Your Honor, if I may.

**THE COURT:** Only if you speak up so Donna can hear.

**MR. WARNER:** Yes. Sorry. I have such a loud voice. Thank you.

Your Honor, first of all, to be clear, here is the point. CDMCFAD is the entity that I was talking about at the beginning, the new holdco that was formed through Patrick, through him. So, sure, he wrote a lot of stuff into it that gave him a lot of exculpation; but he wrote that for him.

Fiduciary duties that we're talking about right here in this case preceded the formation of CDMCFAD. Formation of CDMCFAD is part of a malicious scheme that, itself, violates those fiduciary duties toward the first client.

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

Our clients, the independent charitable organization, were owed a fiduciary duty by Mr. Patrick that precedes the formation of CDMCFAD and any exculpation provisions that were written as edits. And he can't equal redemption between an entity of CDMCFAD and the holdco and an interest in $270 million for 1.6 that we get 49 percent of because he's diluted us down. Granted, I'm sure there will be a lot of testimony about valuation at trial on this, but that does not pass the smell test that a TRO can.

Again, what we are after is something that will protect our ability, as these three charitable organizations, to have the potential to unwind this corrupt scheme before this very rapid course of conduct that took us from beneficial interest in $270 million to zero in six months. That's all we asking for.

**MS. COLGATE:** And, Your Honor, apologies. If I may interject on behalf of DFW, I'm Jennifer Colgate with Baker & Partners in the Cayman Islands. And if I can just address a few points relevant to the proceedings today that arise in Cayman, I would be grateful for the opportunity.

**THE COURT:** Sure.

**MS. COLEGATE:** Thank you, Your Honor.

Firstly, the assertion that's been repeatedly made as to the beneficial interest in the $270 million-odd assets is simply incorrect and so excepted. That is a matter

for the foundations to establish.

But, firstly, as Mr. Matthew has alluded to, any claims that the foundations may have to any interest in the structure for those firstly has got to be determined during the course of the liquidation by the liquidators.

The liquidation proceedings are ongoing and they are continuing. There was recently a hearing before the judge that's presiding over those proceedings here. The purpose of that hearing was to sanction certain actions of the liquidators.

One of the issues that was raised before the Court where they were not decided, it was the protocol to be entered into, that Mr. Goodman has already spoken to. Whilst that was not directed at that hearing and the Judge there indicated that it was a sensible way for the liquidators to proceed with regard to the management and the ongoing interest in the CDM entities, to the extent that there were any concerns about those assets.

And I know the point has already been made regarding that the liquidation has been on foot and voluntarily since the 2nd of April and under the supervision of the Court of the Cayman Islands since the 6th of May; and the assets have not been disposed of or otherwise dissipated, which seems to be the allegation that has been made repeatedly this afternoon.

The protocol, My Lord, Your Honor, we would

suggest is the appropriate way to go and is being progressed in the Cayman Islands. The assertion is that -- the pattern that's being painted here and through various legal steps to thwart unlawful means is a point that was being excepted. The steps that were taken in the Cayman Islands are matters that will be dealt with by the Cayman court. The question there is how.

Mr. Matthew is quite right in saying that these are firstly matters for the liquidators to look at during the course of the liquidation. And DFW, on the 9th of June, in fact, filed a summons before the Court; and that was provided to the Highland Foundations. And they are invited to be a part of those proceedings to bring on -- which the Court has seized of in Cayman, to determine the validity of each of the steps that have been complained of and justify -- and seek to justify the basis for the TRO today. That remains a matter for the Court's direction as to how that is taken forward, but the issues are before the Cayman Court and the right to be determined during the course of the liquidation of Charitable DAF.

In any event -- and I think Mr. Brian mentioned it -- the restructuring, itself, was carried out with independent advice, had the benefit of an independent director overseeing the steps and various valuation reports, both from FTI and ValueScape.

There will, should this become a contempt issue and should this proceed to a trial, and then we say that takes place in the Cayman Islands, it's going to require significant evidence. But the matter is before the Cayman Court. It was filed on the 9th of June. And the object of that, Your Honor, would be that we see no basis for the TRO from the DFW's point of view, as the majority participating shareholder, to be issued today.

THE COURT: Okay. Let's come back like at ten after 3:00.

(Break.)

THE COURT: So, here is kind of what I'm thinking. Two thoughts, just thoughts. They are not rulings, decisions, or anything.

I'm struggling to find evidence in the record that there is an immediate threat of irreparable harm. It appears that the $270 million is gone. Your concern is you don't want to confirm it away. But I'm not seeing anything in the record to indicate to me that there is an immediate threat of that.

On the other hand, other than paying bills that come due in the ordinary course of business, I don't see an immediate need for the money that -- and it's certainly bills that come due in the ordinary course of business need to be paid, payroll and lawyers' fees. Anything due, they need to be

paid.

It would be great if we could reach some form of agreement to carry us through to a TI hearing to happen next week, which we could do on the 11th for sure. So, I don't know if y'all can reach some form of agreement along those lines.

In the meantime, I would really like to get all the players before me, Mr. Dondero, Mr. Patrick, Ms. Diaz, and get a better understanding of why the events that have happened, why the money moved from one place to the other, what the need for that -- what business purpose behind that was. You know, there may be perfectly great reasons for it. Maybe it's business judgment. Maybe it doesn't matter.

But I do want to pin down jurisdiction. I'm still a little bit concerned about that. I think Mr. Spears has helped me understand that question better; but I still have some reservations of mine.

Is there any possibility of y'all reaching that kind of agreement to get us through to the 11th?

**MR. COX:** Judge, I think if they would agree for them not to move the money from the company except to pay for ordinary business expenses, we can live with that.

**THE COURT:** Is there any problem?

**MR. SHAW:** Well, the question is what -- we have active investments that we don't know what we have. So, if there is an investment opportunity, we need to be able to take

it. We need to be able to take the deal. We actually actively, you know, manage this money and these assets. So, like it's not just about paying law firms. It's not as simple as that. It's not like what the DAF does. It manages -- actively manages this money.

THE COURT: Is it a day trading firm?

MR. SHAW: It's not a day trading firm; but they do have a lot of investments, some of which include Dondero affiliated entities, right?

THE COURT: Do any of the investments mature in the next ten days?

MR. SHAW: Not that I'm aware of, but there might be opportunities that do. And I guess my point is that's not the standard for a TRO. It's not like: Hey, well, if I enter one, it's not going to hurt you. That's not the standard.

THE COURT: I'm just asking if y'all can reach an agreement. I'm throwing out an idea.

MR. COX: I'm just saying if they don't want to, they won't.

MR. SHAW: Yeah, I would have to talk to -- I would have to talk to my client about it before. So, I can't commit to that without authority.

THE COURT: Can you get the authority as a client to --

MR. SHAW:  I'm not going to do that in front of counsel.

THE COURT:  Go out in the hallway and have a conversation and come back.

MR. SHAW:  Yeah, we can do that.

THE COURT:  Okay.  Let's do that.

MR. SHAW:  And the proposal is that -- I don't know exactly.  The proposed TRO says we can't do anything.  So, I guess I want to understand what exactly is being proposed.

MR. COX:  That the money doesn't go anywhere.  You can't move it, dispose of it, buy anything, or sell anything unless it relates to the normal course of business, payroll and --

THE COURT:  Well, for example, if there is policies that come due, if they need to reinvest the money, for sure they need to make prudent investment decisions.  I'm sure they are under some form of a UPF.

MR. SHAW:  Well, if the question is will we refrain from taking actions outside of the ordinary course of business, I mean I can pitch that to my client.

THE COURT:  Pitch that to your client.  Y'all can go somewhere so there is no question of ex parte or anything going on.

MR. SHAW:  Okay.  Thank you, Judge.

(Break.)

**THE COURT:** And the idea is we are going to try and come back on the 11th and try to get more people here and have more time to digest what is going on. I am a visual learner. So, the more charts and backgrounds you have to put up, the better you are going to be.

**MR. COX:** Is it possible to have it in a courtroom downtown somewhere?

**THE COURT:** If you can get me one. Dallas County has no room for me.

(Discussion off the record.)

**THE COURT:** Listen. So, something occurred that was talked about Business Court. We're all about business. Okay? Bill has been all about business since the first day he set foot on the University of Texas campus, Court of Appeals six years, three and a half years at Condon Tobin where we had a national practice in the course of litigation disputes.

I like a different approach to how we are going to do things in the Business Court. We have professional business people. Everybody is professional. Our No. 1 job is to be fair and efficient and treat everybody fairly. We have got that.

The next job is to help people solve their problem. If it takes a trial to solve the problem, great, we're happy to do that. I promise you I will make decisions. I'm in the decision-making business. But if we can find a way

to solve problems short of that, then great, I want to do that, too.

So, we're going to, at 9:00 o'clock on Friday, July 11th, meet at the conference room in the Carr Collins building and have a noticed temporary injunction hearing.

**MR. COX:** Judge, I think they need some more time, and somebody is out of town. If we can strike an agreement, which I think we will, we may be able to push that out a little bit.

**THE COURT:** Sure, that's fine. I'm happy to do that. I want to -- listen. This is you all's case, you all's clients. Y'all know the web in English better than I ever will. And so I want to facilitate as much cooperation as humanly possible to do that.

So, if y'all can reach an agreement that everybody can live with -- nobody is going to be perfectly happy with it -- to get us to a TI hearing, then great. If not, I will make a decision. I'm happy to make a decision. That's my job. But if y'all can reach an agreement, then great. Let's do that.

**MR. SHAW:** Are we on the record?

**THE COURT:** Donna?

(Reporter indicates affirmatively.)

**MR. SHAW:** I announce, I believe, the terms of a Rule 11 agreement, not an agreed temporary restraining order.

I want to note that we still reserve our rights to contest personal subject matter jurisdiction. But until a temporary injunction hearing is held, the named defendants will agree to operate in the ordinary course, No. 1; will not engage in any corporate restructuring transactions; and 3, if there are any sales of assets, the sale proceeds will stay in the entity that sold the asset, and the sale proceeds may be used to buy other assets within that same entity. And I believe that is the extent of our agreement.

THE COURT: Plaintiffs?

MR. COX: We say yes. I think we agree that they can make payments out of the ordinary course of business, that's fine; and that the other entity issue regarding no restructuring, that's good; and then the third one was if they sell any of the assets inside of whatever fund that has it, they will leave the money there or just use the money in that entity. And if they buy something, they value that asset. I will just add that it will have to be on reasonable value and things. It's got to be in the normal course of business. It can't be a fire sale or sell off an asset.

MR. SHAW: One clarification, Mr. Cox. You said ordinary course of making payments. It's not just as to making payments. We need to operate in the ordinary course of business.

MR. COX: In the ordinary course of business.

MR. SHAW:  So, stipulated.

MR. COX:  So, no restructuring, no investments that you manage to either in or out.  They can do that in exchange for reasonable value.

MR. SHAW:  Agreed.

THE COURT:  Anybody else have any comments on that?  Hearing none, okay, we'll accept that as --
Mr. McEntire?

MR. McENTIRE:  No, I agree.

THE COURT:  Okay.  We'll accept that as the parties' agreement.  It's on the record.  It's a Rule 11 agreement.

What date do y'all want to get back together?

MR. SHAW:  We were looking at the week of the 21st, I believe.

MR. McENTIRE:  I will be out of the country for two weeks.  I return on the 19th.

THE COURT:  Okay.  I assume there may be depositions and whatnot that happen in the meantime.

MR. McENTIRE:  Yes, I understood that will happen; and I probably will not be involved.  If I am, I will be remote.

THE COURT:  Okay.  We're not going to get a last minute motion to quash?

MR. McENTIRE:  No, I can handle that.

MR. COX: Y'all saying the week of the 21st?

MR. McENTIRE: Yes, sir.

MR. COX: The 24th works for me; 23, 24, 25 are good for me.

THE COURT: Okay. Well, is a day going to be enough?

MR. COX: Maybe not.

MR. McENTIRE: I think I'll defer to Andrea. I think a day is fine.

MS. REED: I think a day is enough.

MR. COX: You said you want to hear from Dondero, Patrick, Diaz.

THE COURT: They don't have to testify. I'm really trying to get a sense of what's going on here.

MR. WARNER: Your Honor, I want to be respectful of all of your time limits. So, I think we should block out more time than less.

THE COURT: It is that. Just getting all of the acronyms is complicated.

MR. WARNER: I suggest that we schedule it for two days.

THE COURT: All right. So, let's look at the week of the 28th. What are y'all doing the 28th, 29th?

MR. WARNER: I have a temporary injunction hearing with Judge Novak on the 29th.

THE COURT: Twenty-fourth, 25th?

MR. WARNER: That works.

THE COURT: We have a 10:00 o'clock status conference on the 25th, but we can push that.

MR. COX: Judge, we need have a communication with Mr. Dondero. We need to find out if he's available. I don't know. But they need to find out if Mr. Patrick is available. I don't know.

MR. WARNER: If we have a major problem, Your Honor, we'll let you know.

THE COURT: Listen, pencil in for the 24th and 25th. It will still be in the conference room at Carr Collins Hall. Let's try to have a narrow presentation.

Feel free to do some briefs on jurisdiction in the meantime. You all believe there is jurisdiction. So, why don't you do a short brief, let's say, by the 11th; and you guys can respond by the 18th. I'll see you all on the 24th and 25th.

Anything else that we need to do?

MR. McENTIRE: We want to address our personal jurisdiction, not subject matter jurisdiction.

THE COURT: Well, I was thinking of subject matter jurisdiction; but if we have personal jurisdiction questions, you need special appearance.

MR. SHAW: Judge, the only thing I was thinking

about timing on that is that, you know, for example, we had an Atlas case. We have, I think, we have a temporary for temporary injunction set. But I believe what will happen is we have response of the 18th. I don't know that that gives you enough time between then and the 24th. Maybe it does, but we're all getting ready for a TI hearing that maybe doesn't happen. I just maybe suggest that we move up the briefing schedule on jurisdiction so that we can get you more time.

THE COURT: Sure. Well, nobody is going to work over the 4th of July.

MR. COX: We can have our brief on the 11th, no problem, or sooner.

THE COURT: Sooner. Then let's do it on the 9th, and then you guys respond by the 14th. File special appearances, if you want to file a special appearance. Under the guidelines, we come up with a separate plan for anyone making a special appearance. Folks that may be pursuing a special appearance maybe want to think about whether they want to show up at a preliminary injunction hearing and ask for relief from the Court. In my view, nobody who might be filing a special appearance asked for relief from me today.

MR. COX: That asked for relief, that's true.

THE COURT: Nobody asked for relief from me today. Listen, this TRO --

MR. COX: I understood. We're not insinuating a

thing.

MR. WARNER: We have a discovery motion that we haven't finished (undiscernible).

THE COURT: I'm happy to do that. One, we don't have discovery disputes in here. I can't, by rule, disallow them; but what we could do under our guidelines is, other than a motion to quash that has to be filed within three days, before you get into expensive email campaigns and motions, call Susan; and if I'm available, we'll be on the phone and talk about it right then and there. If I'm not available, the first available opportunity, we'll get together and work through that.

Business Court local rule is what we don't resolve there goes into the 700-page letter funding campaign. If we can't resolve it there, then we get into motions.

All right. Listen, I know both firms. I have known both firms or at least the lawyers in both firms for over 40 years. High quality people everywhere. And so I know that, as professionals, the odds of an unworkable discovery dispute are slim; and if there is one, we'll resolve it promptly.

MR. COX: I think what Mr. Warner is saying --

This is Joe Cox. I'm talking. I think Mr. Warner is saying we filed a motion for expedited discovery during pendency. I'm happy to work with Mr. Shaw and see if we can figure this out. Like they got some stuff from us --

THE COURT: Yeah, I got that. I'm just giving you advance information because we haven't had a scheduling conference.

MR. WARNER: We will work it out.

THE COURT: You are perfectly clear. I was just giving everybody the introduction of how we do things in the Division 1B. They heard this before. Ask your friends the lengths to which we will go to help people resolve their positions.

We had a temporary injunction come up. Both sides said it's urgent and we have to get this thing resolved immediately. This was two weeks before Memorial Day weekend. But they couldn't come to agreement on a date. I said, okay, fine. We'll do it Saturday morning, Memorial Day weekend.

So, you know, I'm familiar with working nights. I'm familiar with working weekends. I did it for many decades. I will do whatever I can do to help you all resolve your problems.

MR. SHAW: Did y'all end up having a hearing on Saturday?

THE COURT: No, they settled the case. We did our job. We helped these people solve their problem, and they did.

MR. COX: One more procedural thing for Mr. Shaw. Will he accept service for the defendants if they

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

are going to file special appearances?

MR. SHAW: Okay. Well, we can talk about that.

MR. COX: You talking about filing a special appearance. We haven't served anybody. I was just trying to make it easy.

MR. SHAW: We can talk about that.

THE COURT: That's it. I know you all are professionals and do things in a professional manner.

MR. SHAW: Thank you for your time, Judge, counsel.

THE COURT: We are in the service business.

(Hearing adjourned.)

App. 071

**THE STATE OF TEXAS:**

**TEXAS BUSINESS COURTS:**

### CERTIFICATE OF COURT REPORTER

I, DONNA A. GOREE, Official Court Reporter in and for the Texas Business Courts, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-entitled and numbered cause, all of which occurred in open court in-person and by videoconference and were stenographically reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND on this the 12th day of July, 2025.

/s/ *Donna Goree*

_____
DONNA A. GOREE, CSR, RPR, CRR
Official Court Reporter
Texas Business Courts
3721 Carmen Avenue
Rancho Viejo, Texas   78575
(979) 533-0422
donna.goree.csr3909@gmail.com
Texas Certification No. 3909
Expiration Date: 07/31/2025

MR. COX: [35]  4/8
4/10 5/10 5/16 7/6
15/15 16/16 16/23 17/8
25/21 26/7 27/1 28/9
29/6 34/23 36/2 43/19
44/19 45/10 46/6 47/6
48/11 48/25 49/2 50/1
50/3 50/7 50/11 51/5
52/11 52/22 52/25
53/21 54/24 55/3
**MR. GOODMAN: [6]**  6/1
26/23 27/2 28/10 28/13
29/4
**MR. McENTIRE: [17]**
4/12 21/1 24/3 26/14
29/10 30/24 32/14
32/17 33/21 34/10 49/9
49/16 49/20 49/25 50/2
50/8 51/20
**MR. MURPHY: [4]**  5/21
35/14 35/21 36/10
**MR. RAVER: [4]**  29/14
33/2 33/17 34/16
**MR. SHAW: [30]**  4/14
4/21 5/17 8/5 17/13
17/18 18/19 29/12
29/19 35/22 43/23 44/7
44/12 44/21 45/1 45/5
45/7 45/18 45/24 47/21
47/24 48/21 49/1 49/5
49/14 51/25 54/19 55/2
55/6 55/9
**MR. WARNER: [33]**  4/6
7/20 8/21 12/9 12/13
14/2 14/6 14/10 14/13
15/12 16/22 17/10
24/17 24/24 25/3 25/7
25/14 30/16 30/18 31/1
31/5 34/11 34/17 35/7
38/12 38/15 50/15
50/20 50/24 51/2 51/9
53/2 54/4
**MS. COLEGATE: [1]**
39/22
**MS. COLGATE: [2]**  6/3
39/16
**MS. GAUDIOSO: [1]**
4/18
**MS. REED: [1]**  50/10
**THE COURT
ADMINISTRATOR: [3]**
6/8 7/11 7/16
**THE COURT REPORTER:
[2]**  31/4 32/16

**THE COURT: [92]**

**$**

**$1.6 [1]**  15/5
**$1.6 million [1]**  15/5
**$18.3 [1]**  10/23
**$18.3 million [1]**
 10/23
**$18.6 [1]**  10/23
**$18.6 million [1]**
 10/23
**$270 [14]**  9/2 9/4 9/16
 9/19 12/6 12/13 13/17
 15/17 28/7 31/16 39/6
 39/14 39/24 42/17
**$270 million [11]**  9/2
 9/16 9/19 12/6 12/13
 13/17 15/17 28/7 39/6
 39/14 42/17
**$270 million-odd [1]**
 39/24
**$40,000 [1]**  10/17
**$600,000 [1]**  10/17

**'**

**'25 [1]**  33/3

**/**

**/s [1]**  56/18

**0**

**0027 [2]**  1/3 4/3
**0422 [1]**  56/22
**04950200 [1]**  2/5
**07/31/2025 [1]**  56/23

**1**

**1.6 [1]**  39/6
**100 [1]**  2/6
**10:00 o'clock [1]**  51/3
**11 [2]**  47/25 49/11
**11th [6]**  43/4 43/18
 46/2 47/4 51/16 52/11
**12,400 percent [1]**
 10/19
**1200 [1]**  2/6
**12th [1]**  56/16
**13590100 [1]**  2/16
**14 [2]**  29/8 29/13
**14th [1]**  52/14
**15 [1]**  29/2
**16th [1]**  27/10
**1700 [1]**  2/17
**18th [2]**  51/17 52/4
**19th [3]**  27/17 27/17
 49/17

**1B [3]**  1/8 2/24 54/7

**2**

**2.25 million [1]**  10/18
**2020 [1]**  20/1
**2021 [1]**  10/10
**2022 [3]**  10/17 10/19
 10/21
**2023 [8]**  10/18 10/24
 11/1 11/3 11/7 11/8
 20/6 23/2
**2024 [5]**  10/18 10/21
 10/22 33/3 36/20
**2025 [6]**  1/20 3/3 27/4
 33/14 56/17 56/23
**214 [3]**  2/7 2/14 2/18
**21st [2]**  49/15 50/1
**23 [1]**  50/3
**237-4300 [1]**  2/18
**24 [1]**  50/3
**24053473 [1]**  2/10
**24084158 [1]**  2/3
**24084570 [1]**  2/11
**24th [4]**  50/3 51/11
 51/17 52/5
**25 [2]**  33/3 50/3
**25-BC01B-0027 [1]**  1/3
**257-7200 [1]**  2/7
**25th [4]**  51/1 51/4
 51/12 51/18
**270-million-dollar [3]**
 11/18 15/4 32/2
**275,000 [1]**  33/19
**28th [2]**  50/23 50/23
**29th [2]**  50/23 50/25
**2nd [6]**  1/20 3/3 20/8
 27/4 27/8 40/21

**3**

**3-31-25 [1]**  33/3
**300 [1]**  10/21
**30th [2]**  27/16 33/14
**3120 [1]**  2/14
**31st [1]**  33/3
**3721 [1]**  56/21
**3767 [1]**  2/14
**3909 [1]**  56/23
**3:00 [1]**  42/10

**4**

**4 million [1]**  10/21
**40 [1]**  53/18
**408 [2]**  24/9 24/14
**4300 [1]**  2/18
**4400 [1]**  2/17
**49 percent [3]**  13/8

**4**

**49 percent... [2]** 32/7 39/6

**4th [3]** 19/14 20/8 52/10

**5**

**50 percent [2]** 12/24 13/1

**50-percent-plus [1]** 12/25

**501 [1]** 23/16

**51 percent [1]** 12/20

**533-0422 [1]** 56/22

**5500 [1]** 2/13

**6**

**6 million [1]** 10/20

**6.5 [1]** 37/17

**6th [2]** 27/10 40/22

**7**

**700-page [1]** 53/14

**7200 [1]** 2/7

**7324 [1]** 2/17

**75201 [1]** 2/7

**75201-7324 [1]** 2/17

**75202-3767 [1]** 2/14

**78575 [1]** 56/21

**8**

**855-3120 [1]** 2/14

**9**

**9-30-2024 [1]** 33/3

**901 [1]** 2/13

**979 [1]** 56/22

**98 percent [5]** 12/5 12/10 12/21 12/24 32/1

**9:00 o'clock [1]** 47/3

**9th [5]** 27/16 27/17 41/10 42/5 52/14

**A**

**ability [2]** 22/11 39/11

**able [4]** 17/19 43/25 44/1 47/8

**about [48]** 7/25 10/23 14/2 17/23 18/8 19/1 19/18 19/20 19/20 19/23 19/25 20/1 20/2 20/6 20/7 20/9 20/10 20/21 20/23 20/24 22/14 22/23 24/20 25/13 25/18 28/23

29/19 31/15 34/12 34/17 36/18 36/19 38/18 38/22 39/8 40/18 43/14 44/3 44/22 46/12 46/12 46/13 52/1 52/18 53/10 55/2 55/3 55/6

**above [4]** 1/21 24/5 56/6 56/9

**above-entitled [2]** 1/21 56/9

**accept [3]** 49/7 49/10 54/25

**accomplish [1]** 25/20

**account [1]** 15/22

**accustomed [1]** 29/18

**achieve [1]** 9/25

**acronyms [3]** 7/5 10/12 50/19

**action [5]** 10/8 18/21 18/24 29/1 36/12

**actions [3]** 20/1 40/9 45/19

**active [1]** 43/24

**actively [2]** 44/2 44/5

**actually [5]** 4/18 26/19 26/21 36/23 44/1

**add [2]** 34/23 48/18

**address [4]** 22/2 22/15 39/18 51/20

**addressed [1]** 32/13

**adjourned [1]** 55/12

**Administrator [1]** 2/25

**admission [1]** 35/23

**admitted [1]** 56/15

**admonishments [1]** 6/6

**Adreana [1]** 4/23

**adults [1]** 34/21

**advance [2]** 21/21 54/2

**advanced [1]** 21/5

**adversarial [1]** 22/17

**advice [1]** 41/23

**advisor [3]** 30/1 30/1 30/2

**affairs [1]** 18/22

**affect [1]** 9/23

**affidavit [5]** 19/12 19/16 19/17 20/5 20/17

**affidavits [2]** 18/7 19/11

**affiliated [1]** 44/9

**affirmatively [1]** 47/23

**afoot [2]** 30/5 30/8

**after [2]** 39/10 42/10

**afternoon [2]** 5/21

40/24

**again [9]** 8/11 12/14 15/4 15/22 17/14 20/6 32/10 35/15 39/10

**against [3]** 11/15 11/15 36/22

**agency [1]** 10/2

**ago [4]** 9/3 16/8 21/2 31/15

**agree [5]** 22/18 43/19 48/4 48/11 49/9

**agreed [3]** 33/6 47/25 49/5

**agreeing [1]** 27/19

**agreement [17]** 23/25 24/8 24/10 37/17 37/20 43/3 43/5 43/18 44/18 47/8 47/15 47/19 47/25 48/9 49/11 49/12 54/13

**ahead [1]** 8/19

**AI [1]** 7/25

**al [2]** 4/4 4/4

**alarm [1]** 26/3

**alienate [1]** 11/17

**alienation [3]** 24/21 25/18 36/14

**all [59]**

**all's [3]** 23/21 47/11 47/11

**allegation [2]** 13/21 40/24

**allegations [8]** 17/25 20/9 20/10 21/4 21/12 21/16 21/18 25/16

**alleged [1]** 36/23

**alleging [1]** 20/22

**allow [2]** 7/15 17/11

**alluded [1]** 40/2

**almost [4]** 7/19 10/17 21/4 32/20

**alone [1]** 37/19

**along [3]** 4/10 11/23 43/5

**already [5]** 22/1 24/15 33/1 40/13 40/19

**also [12]** 2/23 4/16 4/21 5/23 10/16 21/15 33/5 34/12 37/18 38/2 38/4 38/7

**although [3]** 19/12 23/5 36/22

**always [1]** 4/19

**am [2]** 46/3 49/21

**amicus [1]** 36/8

**amount [1]** 34/7

**A**

**Anderson [2]** 2/25 4/23
**ANDREA [4]** 2/12 2/25 4/21 50/8
**announce [1]** 47/24
**annual [1]** 11/3
**another [2]** 12/2 36/4
**answer [6]** 8/6 8/12 29/10 30/21 30/22 31/25
**answers [1]** 8/6
**anticipating [1]** 30/9
**any [26]** 6/22 6/25 18/16 18/16 18/20 19/2 23/15 27/18 29/8 30/8 36/8 37/7 37/8 39/3 40/2 40/3 40/17 41/21 43/17 43/22 44/10 48/5 48/6 48/15 49/6 56/14
**anybody [3]** 5/25 49/6 55/4
**anymore [1]** 34/25
**anyone [3]** 6/20 34/14 52/16
**anything [13]** 20/2 20/13 20/15 27/25 36/23 42/14 42/18 42/25 45/8 45/11 45/12 45/23 51/19
**anywhere [3]** 26/9 26/11 45/10
**apologies [2]** 8/22 39/16
**apparently [1]** 28/10
**appeal [1]** 33/24
**Appeals [1]** 46/14
**appearance [6]** 51/24 52/15 52/17 52/18 52/21 55/4
**appearances [3]** 4/5 52/15 55/1
**appearing [5]** 2/2 2/9 5/18 8/8 35/22
**appears [2]** 7/24 42/17
**application [7]** 1/16 5/8 18/2 27/6 32/18 32/24 32/25
**applies [1]** 6/19
**apply [1]** 6/14
**appointed [3]** 27/5 27/23 37/6
**appointment [2]** 1/17 5/8
**appreciate [1]** 8/15
**approach [1]** 46/17

**approached [1]** 11/9
**appropriate [2]** 23/22 41/1
**approximately [1]** 33/19
**April [2]** 27/4 40/21
**are [88]**
**argued [1]** 9/22
**arguments [2]** 19/22 20/23
**arise [1]** 39/19
**arising [1]** 9/11
**around [1]** 4/4
**as [58]**
**ask [6]** 20/18 28/6 29/7 34/12 52/19 54/7
**asked [6]** 7/19 16/2 16/3 52/21 52/22 52/23
**asking [3]** 32/8 39/15 44/17
**asserted [1]** 36/22
**assertion [2]** 39/23 41/2
**asset [4]** 28/17 48/7 48/17 48/20
**assets [13]** 9/2 12/14 27/25 28/2 28/23 33/4 39/25 40/18 40/22 44/2 48/6 48/8 48/15
**assignment [1]** 34/4
**assume [1]** 49/18
**astonishing [1]** 31/17
**Atkins [1]** 25/7
**Atlas [1]** 52/2
**attached [1]** 26/4
**attempted [1]** 14/5
**attempting [1]** 21/10
**attended [1]** 24/13
**attorney [2]** 2/24 4/23
**attorneys' [2]** 34/8 34/13
**authority [4]** 9/24 19/19 44/23 44/24
**authorized [2]** 36/14 37/20
**available [6]** 7/2 51/6 51/8 53/9 53/10 53/11
**Ave [1]** 2/17
**Avenue [1]** 56/21
**avoid [1]** 13/4
**aware [2]** 36/5 44/12
**away [3]** 28/1 32/12 42/18

**B**

**back [8]** 12/15 16/10 18/9 23/1 42/9 45/4 46/2 49/13
**backdrop [1]** 11/16
**background [2]** 25/16 25/18
**backgrounds [1]** 46/4
**backs [1]** 15/25
**bad [1]** 23/4
**bag [1]** 32/7
**Baker [2]** 6/4 39/17
**balance [1]** 33/2
**bank [3]** 15/21 26/9 26/10
**bankruptcy [7]** 16/19 16/25 21/3 22/5 26/5 29/2 33/7
**Bar [6]** 2/3 2/5 2/10 2/11 2/12 2/16
**BARBARA [1]** 1/7
**based [1]** 5/15
**basic [2]** 9/11 23/10
**basically [1]** 21/5
**basics [1]** 17/25
**basis [6]** 22/19 30/13 31/12 36/13 41/16 42/6
**BC01B [2]** 1/3 4/3
**be [80]**
**became [1]** 36/19
**because [11]** 5/1 8/11 8/22 11/11 15/7 17/8 20/15 21/20 32/10 39/7 54/2
**become [1]** 42/1
**becoming [1]** 18/13
**beef [1]** 16/10
**been [24]** 5/14 6/23 7/18 8/2 8/5 8/11 17/20 17/24 24/15 27/8 27/18 29/21 29/21 32/10 32/19 33/4 37/23 39/23 40/19 40/20 40/23 40/24 41/15 46/13
**before [21]** 1/21 4/23 12/5 17/15 18/15 20/23 21/3 30/19 32/8 36/9 39/12 40/7 40/11 41/11 41/18 42/4 43/7 44/22 53/8 54/7 54/12
**began [1]** 32/21
**beginning [1]** 38/19
**behalf [10]** 4/12 4/14 5/23 6/2 6/3 21/15

**B**

**behalf... [4]** 35/8 36/8 37/9 39/17

**behind [2]** 15/24 43/10

**being [12]** 6/16 6/25 8/22 10/4 18/5 20/2 20/8 36/4 41/1 41/3 41/4 45/9

**believe [9]** 24/13 24/18 25/9 28/24 47/24 48/8 49/15 51/15 52/3

**beneficial [10]** 9/3 9/16 12/1 12/6 12/10 12/25 13/9 31/16 39/13 39/24

**beneficiaries [2]** 32/1 32/1

**benefit [7]** 9/5 9/7 9/14 12/17 26/20 32/5 41/23

**benefiting [1]** 9/10

**Berra [1]** 17/13

**best [1]** 5/1

**better [5]** 14/1 43/8 43/15 46/5 47/12

**between [4]** 13/13 13/15 39/5 52/5

**Bill [2]** 1/22 46/13

**bills [2]** 42/21 42/23

**bit [2]** 43/14 47/9

**black [1]** 37/15

**blink [1]** 9/3

**block [1]** 50/16

**blocking [1]** 13/13

**BLUMENTHAL [2]** 2/13 29/21

**both [8]** 6/9 6/10 13/2 41/24 53/16 53/17 53/17 54/10

**bound [1]** 28/25

**Bowen [2]** 2/25 4/25

**breached [1]** 20/24

**break [3]** 35/13 42/11 45/25

**BRIAN [4]** 2/10 4/14 4/19 41/21

**bribe [1]** 10/3

**brief [4]** 9/20 35/15 51/16 52/11

**briefing [1]** 52/7

**briefs [1]** 51/14

**bring [3]** 27/6 37/8 41/13

**broader [1]** 13/21

**brought [4]** 17/6 38/1 38/2 38/3

**Bruce [1]** 21/7

**budget [2]** 33/13 33/18

**building [2]** 20/21 47/5

**bunch [1]** 31/13

**burning [3]** 20/7 20/20 26/6

**business [25]** 1/5 22/11 31/19 42/22 42/24 43/10 43/12 43/21 45/12 45/20 46/12 46/12 46/13 46/18 46/19 46/25 48/12 48/19 48/24 48/25 53/13 55/11 56/2 56/5 56/20

**button [1]** 7/13

**buy [3]** 45/11 48/8 48/17

**C**

**call [4]** 4/2 24/5 25/17 53/8

**called [1]** 13/6

**came [2]** 1/20 25/21

**campaign [1]** 53/14

**campaigns [1]** 53/8

**Campbell's [2]** 6/1 30/3

**campus [1]** 46/14

**can [56]** 6/6 7/8 7/17 13/20 14/14 15/10 15/14 15/21 17/1 17/2 19/22 20/5 20/22 22/18 23/3 23/25 24/1 26/8 26/10 26/10 26/11 26/23 29/1 31/10 32/9 32/13 35/9 35/14 37/16 38/13 39/9 39/18 43/5 43/21 44/17 44/24 45/5 45/20 45/22 46/8 46/25 47/7 47/15 47/16 47/19 48/12 49/3 49/25 51/4 51/17 52/8 52/11 53/25 54/17 55/2 55/6

**can't [11]** 9/24 15/25 20/14 31/7 39/4 44/22 45/8 45/11 48/20 53/5 53/15

**cannot [6]** 16/11 20/18 20/18 31/4 32/16 36/3

**capable [1]** 32/11

**Capital [7]** 21/8 21/8 21/10 34/5 34/25 35/1 35/2

**care [1]** 31/11

**Caribbean [1]** 23/7

**Carmen [1]** 56/21

**Carr [2]** 47/4 51/12

**carried [1]** 41/22

**CARRINGTON [2]** 2/13 29/21

**carry [1]** 43/3

**case [15]** 5/1 7/5 7/25 8/7 11/14 19/23 24/17 25/25 28/5 33/25 37/13 38/23 47/11 52/2 54/21

**cases [1]** 18/14

**cast [1]** 10/2

**cataract [1]** 7/7

**cause [4]** 1/3 1/21 4/3 56/10

**Cayman [31]** 6/2 6/4 16/14 16/16 16/18 17/6 17/9 21/25 22/6 25/22 27/23 28/3 28/5 28/8 28/17 29/5 30/2 30/24 31/3 31/6 36/17 39/18 39/20 40/22 41/2 41/5 41/6 41/14 41/18 42/3 42/4

**Caymans [9]** 17/3 17/11 24/18 25/24 26/19 27/12 29/6 37/6 38/3

**CDH [1]** 1/12

**CDM [12]** 35/18 36/15 36/15 36/19 36/21 36/22 37/2 37/3 37/17 37/17 38/10 40/17

**CDM's [1]** 37/21

**CDMCF [1]** 13/12

**CDMCFAD [24]** 1/11 5/23 13/6 13/11 13/15 13/18 13/19 14/18 14/20 14/22 14/24 14/25 15/4 15/8 15/8 28/15 28/20 30/20 35/16 38/18 38/23 38/24 39/3 39/5

**cent [1]** 10/22

**certain [1]** 40/9

**certainly [4]** 4/24 30/6 30/14 42/23

**CERTIFICATE [1]** 56/3

**Certification [1]** 56/23

**certify [2]** 56/5 56/13

**chain [2]** 33/22 34/3

**challenge [2]** 8/12 37/8

**C**

**challenging [1]** 36/12
**change [1]** 31/19
**Chapter [1]** 29/2
**charge [1]** 13/23
**charged [1]** 9/6
**charitable [23]** 1/11
1/11 6/4 9/2 9/8 11/24
12/14 12/18 13/3 15/5
15/24 16/12 19/2 22/12
28/16 36/16 37/1 37/5
37/9 37/19 39/1 39/11
41/19
**charities [1]** 35/8
**charity [5]** 11/21
12/22 13/1 13/3 14/18
**charts [1]** 46/4
**chat [1]** 6/23
**chief [1]** 4/16
**choice [1]** 17/1
**chosen [1]** 17/3
**CHRONOLOGICAL [1]** 3/1
**circle [1]** 12/14
**citation [1]** 8/11
**cite [1]** 37/12
**CITY [1]** 1/6
**claim [3]** 37/24 37/25
38/2
**claims [1]** 40/3
**clarification [1]**
48/21
**clear [6]** 8/7 12/14
31/16 38/2 38/17 54/5
**clearly [2]** 9/13 32/11
**client [12]** 2/24 4/15
12/22 13/14 19/24 25/2
36/8 38/25 44/22 44/25
45/20 45/21
**client's [1]** 26/19
**clients [9]** 9/3 9/15
12/4 12/9 21/10 23/21
31/20 39/1 47/12
**CLOH [1]** 33/21
**cmwarner [1]** 2/4
**coal [1]** 30/20
**code [1]** 29/2
**COEs [1]** 25/8
**COLEMAN [2]** 2/13 29/21
**COLGATE [3]** 2/22 6/3
39/17
**colleagues [2]** 4/17
35/13
**collecting [1]** 28/22
**Collins [2]** 47/4 51/12
**come [14]** 7/25 17/16

17/18 22/17 34/21 42/9
42/22 42/24 45/4 45/15
46/2 52/16 54/10 54/13
**coming [2]** 13/15 22/3
**comment [1]** 23/23
**comments [2]** 38/7 49/6
**commit [1]** 44/23
**common [1]** 9/12
**commonsense [1]** 34/22
**communication [1]** 51/5
**companies [3]** 6/2
28/18 28/19
**company [5]** 9/4 9/4
12/20 13/13 43/20
**compared [2]** 10/21
10/23
**complained [1]** 41/15
**complaining [1]** 25/12
**complaint [1]** 24/12
**complicated [1]** 50/19
**computerized [1]** 1/24
**concern [2]** 36/19
42/17
**concerned [3]** 22/22
22/25 43/14
**concerning [1]** 26/16
**concerns [1]** 40/17
**conclusion [1]** 7/1
**Condon [1]** 46/15
**conduct [7]** 6/12 11/13
11/14 12/5 22/11 31/21
39/13
**conducting [1]** 6/8
**conference [5]** 5/7
47/4 51/4 51/12 54/3
**confirm [1]** 42/18
**conflating [1]** 32/15
**connection [1]** 21/8
**consideration [1]**
36/18
**consult [1]** 35/13
**Consulting [1]** 30/1
**containing [1]** 21/16
**contains [1]** 56/6
**contemplates [1]** 37/20
**contempt [1]** 42/1
**content [1]** 10/15
**contest [1]** 48/2
**context [1]** 22/17
**continuing [1]** 40/7
**contribution [2]** 11/6
11/6
**control [14]** 10/10
12/3 13/10 13/24 20/25
21/11 23/17 27/24 28/3

28/7 28/7 28/20 30/21
31/9
**controlled [3]** 10/12
11/22 13/9
**controlling [2]** 19/18
22/9
**controls [2]** 12/22
26/9
**conversation [3]** 34/20
34/21 45/4
**convince [1]** 17/20
**convinced [1]** 31/21
**convincing [1]** 17/22
**cooperation [1]** 47/13
**copy [3]** 7/22 26/4
28/13
**corporate [1]** 48/5
**correct [2]** 27/21 56/6
**correctly [3]** 23/9
23/19 56/14
**corrupt [1]** 39/12
**could [8]** 7/6 7/12
15/19 23/18 26/20 43/2
43/4 53/6
**couldn't [1]** 54/13
**counsel [12]** 2/24 4/16
25/9 25/10 25/10 26/19
30/2 30/4 34/6 45/2
55/10 56/8
**country [1]** 49/16
**counts [2]** 23/6 36/22
**county [4]** 1/13 1/23
18/5 46/9
**couple [1]** 22/13
**course [20]** 17/17
17/18 21/13 21/22
25/16 39/13 40/5 41/10
41/19 42/22 42/24
45/12 45/19 46/16 48/4
48/12 48/19 48/22
48/23 48/25
**court [46]** 1/3 1/5 2/6
2/25 4/25 5/5 6/19
6/23 6/24 8/2 8/13
16/25 17/10 18/11 19/5
20/17 20/18 21/3 22/5
26/20 27/6 27/8 27/23
27/23 30/7 30/14 35/6
36/9 38/2 38/5 40/12
40/21 41/6 41/11 41/13
41/18 42/4 46/12 46/14
46/18 52/20 53/13 56/3
56/4 56/10 56/20
**Court's [2]** 18/13
41/17

**C**

**court-appointed [1]** 27/23

**court-supervised [1]** 27/23

**courtroom [4]** 6/10 6/12 6/13 46/7

**COURTS [3]** 56/2 56/5 56/20

**COX [11]** 2/4 2/20 4/8 4/9 5/10 5/23 7/12 34/24 35/19 48/21 53/22

**CRAIG [2]** 2/3 4/6

**crashed [1]** 20/21

**created [11]** 10/14 11/5 11/21 11/22 12/22 13/19 13/22 13/23 14/22 14/23 24/15

**creates [1]** 13/5

**creating [1]** 23/3

**credit [1]** 13/25

**creditors [1]** 29/8

**Crescent [1]** 2/6

**critical [1]** 10/15

**crosstalk [2]** 29/3 35/25

**CRR [1]** 56/19

**CSR [1]** 56/19

**curiae [1]** 36/8

**currently [5]** 6/16 7/7 28/19 33/22 37/5

**Cypress [1]** 26/10

**D**

**DAF [15]** 1/11 11/10 19/2 22/9 28/16 29/22 29/22 33/22 36/16 37/1 37/5 37/9 37/19 41/20 44/4

**DALLAS [13]** 1/5 1/13 1/22 1/23 2/7 2/14 2/17 4/3 21/15 24/4 24/6 26/15 46/8

**damages [2]** 23/6 38/4

**dangers [1]** 20/21

**dark [1]** 16/7

**date [3]** 49/13 54/13 56/23

**daughter [1]** 11/4

**David [1]** 4/19

**day [10]** 17/15 44/6 44/7 46/13 50/5 50/9 50/10 54/12 54/14 56/16

**days [5]** 29/9 29/13 44/11 50/21 53/7

**deal [2]** 35/7 44/1

**dealing [3]** 10/15 11/13 14/5

**dealings [1]** 27/3

**dealt [1]** 41/6

**decades [1]** 54/16

**December [1]** 36/20

**December of [1]** 36/20

**decided [1]** 40/12

**decision [3]** 46/25 47/18 47/18

**decision-making [1]** 46/25

**decisions [4]** 31/12 42/14 45/16 46/24

**declined [1]** 11/11

**decorum [1]** 6/14

**default [1]** 37/13

**defendant [2]** 18/17 36/21

**defendants [9]** 1/13 2/9 4/13 4/14 8/10 11/22 18/20 48/3 54/25

**defer [1]** 50/8

**deficiency [1]** 32/18

**define [2]** 19/8 19/9

**define the [1]** 19/9

**definitely [1]** 14/6

**deja [1]** 17/14

**Delaware [6]** 5/22 28/15 30/4 35/16 37/15 38/3

**deleted [1]** 7/1

**Deleware [1]** 28/20

**demonstrated [1]** 32/10

**deny [1]** 20/19

**depositions [1]** 49/19

**detail [1]** 33/11

**details [1]** 24/13

**determine [1]** 41/14

**determined [2]** 40/4 41/19

**developed [1]** 28/5

**DFW [9]** 1/10 6/3 11/21 14/18 14/19 14/23 15/6 39/17 41/10

**DFW's [1]** 42/6

**dialogue [2]** 24/10 24/11

**Diaz [10]** 20/5 20/17 21/14 24/12 25/7 25/18 26/14 32/23 43/7 50/12

**did [10]** 4/19 17/16

17/18 33/17 37/25 38/5 54/16 54/19 54/21 54/23

**didn't [2]** 11/10 31/22

**different [4]** 13/24 13/25 23/12 46/17

**digest [2]** 15/10 46/3

**diluted [3]** 9/17 15/1 39/7

**dilutes [1]** 12/23

**direct [1]** 11/2

**directed [1]** 40/14

**direction [2]** 31/18 41/17

**directly [3]** 14/18 14/20 14/24

**director [1]** 41/23

**directors [2]** 10/16 11/5

**disabled [1]** 6/24

**disallow [1]** 53/5

**disclose [1]** 11/4

**discovered [1]** 24/20

**discovery [4]** 53/2 53/5 53/19 53/23

**discretion [2]** 36/15 37/23

**Discussion [1]** 46/10

**dismissed [2]** 33/23 34/1

**displacement's [1]** 27/4

**dispose [1]** 45/11

**disposed [2]** 33/4 40/23

**dispute [3]** 19/5 23/1 53/19

**disputes [2]** 46/16 53/5

**dissipated [1]** 40/23

**dissipation [1]** 9/1

**distribute [1]** 23/22

**DIVISION [3]** 1/8 2/24 54/7

**do [52]** 5/7 7/9 7/15 7/16 7/18 8/15 10/1 14/8 18/2 19/19 20/14 22/15 22/17 22/18 22/20 22/24 23/3 23/5 23/14 29/12 31/3 31/7 31/23 43/4 43/13 44/8 44/10 44/13 45/1 45/5 45/6 45/8 46/18 46/24 47/1 47/10 47/14 47/20 49/3 49/13 51/14 51/16

**D**

**do... [10]** 51/19 52/13
53/4 53/6 54/6 54/14
54/17 54/17 55/8 56/5
**document [1]** 9/10
**documents [5]** 9/12
12/16 18/22 18/23 32/3
**does [10]** 19/5 19/7
32/10 34/14 34/16
34/25 35/3 39/9 44/4
52/5
**doesn't [10]** 7/24 20/2
22/5 23/7 31/19 37/18
38/7 43/12 45/10 52/6
**doing [3]** 7/18 35/1
50/23
**dollar [3]** 11/18 15/4
32/2
**dollars [1]** 9/2
**don't [39]** 7/14 7/18
8/16 13/10 14/8 15/17
16/7 16/11 18/19 18/19
19/3 19/4 22/5 22/15
22/24 24/13 24/24 26/7
27/1 29/6 29/10 30/14
31/11 31/11 31/22
34/18 42/18 42/22 43/4
43/24 44/19 45/7 50/13
51/7 51/8 51/16 52/4
53/4 53/13
**donation [1]** 11/3
**Dondero [21]** 16/8 16/9
19/12 19/25 20/17
20/25 21/3 21/10 21/18
21/21 22/4 24/23 24/25
34/24 35/1 35/3 35/5
43/7 44/8 50/12 51/6
**Dondero's [2]** 19/16
33/25
**done [8]** 14/4 15/25
16/20 23/9 28/25 29/4
33/4 36/23
**Donna [6]** 7/23 38/13
47/22 56/4 56/18 56/19
**donna.goree.csr3909 [1]**
56/22
**Dorsey [1]** 30/4
**Doug [1]** 29/23
**down [8]** 17/25 21/25
22/2 25/23 26/3 26/6
39/7 43/13
**downtown [1]** 46/7
**DUANE [1]** 2/6
**duanemorris.com [2]**
2/4 2/5

**due [5]** 29/13 42/22
42/24 42/25 45/15
**during [7]** 21/12 21/22
25/22 40/4 41/9 41/19
53/24
**duties [9]** 9/11 20/24
32/4 37/12 37/14 37/16
37/18 38/22 38/25
**duty [6]** 10/7 10/9
28/25 31/20 31/24 39/2

**E**

**each [4]** 9/22 16/10
23/5 41/14
**earlier [1]** 11/5
**early [1]** 32/22
**ease [1]** 35/17
**easy [1]** 55/5
**economic [5]** 9/7 9/14
12/17 22/19 32/5
**edits [1]** 39/4
**effect [1]** 6/15
**effectively [2]** 10/12
13/2
**efficient [2]** 22/19
46/20
**efficiently [1]** 22/21
**either [1]** 49/3
**electronic [1]** 6/9
**element [1]** 38/6
**eliminate [1]** 37/16
**else [6]** 5/25 31/1
32/15 35/6 49/6 51/19
**email [1]** 53/8
**emergency [3]** 1/16 5/7
32/21
**emphasize [1]** 18/4
**empty [1]** 32/7
**end [4]** 9/25 14/14
23/6 54/19
**engage [1]** 48/4
**engaged [2]** 11/16
19/24
**engagement [2]** 27/15
27/19
**English [1]** 47/12
**enough [3]** 50/6 50/10
52/5
**ensure [1]** 35/9
**enter [3]** 22/15 26/7
44/15
**entered [1]** 40/13
**entire [1]** 15/3
**entirely [1]** 11/19
**entities [11]** 10/11

16/18 16/18 16/20 17/8
17/9 17/11 18/17 19/2
40/17 44/9
**entitled [2]** 1/21 56/9
**entity [22]** 11/2 11/2
11/5 11/23 12/1 12/2
13/18 15/7 22/9 28/16
28/20 28/21 30/19
36/17 37/6 37/18 38/18
39/5 48/7 48/8 48/13
48/17
**equal [1]** 39/4
**essence [1]** 14/4
**essentially [5]** 9/7
13/5 13/13 13/23 38/10
**establish [1]** 40/1
**establishing [1]** 11/8
**estimated [1]** 33/14
**et [2]** 4/4 4/4
**eve [1]** 21/17
**even [2]** 15/23 30/14
**event [2]** 13/6 41/21
**events [3]** 10/16 11/15
43/8
**ever [2]** 7/19 47/12
**every [2]** 10/9 34/12
**everybody [10]** 4/2
16/9 34/23 34/24 35/6
36/5 46/19 46/20 47/16
54/6
**Everyone [1]** 35/2
**everything [2]** 5/1
15/24
**everywhere [1]** 53/18
**evidence [11]** 11/7
18/2 18/8 19/7 19/7
22/22 30/6 30/6 42/4
42/15 56/7
**ex [1]** 45/22
**exactly [3]** 37/16 45/8
45/9
**example [2]** 45/14 52/1
**except [1]** 43/20
**excepted [2]** 39/25
41/4
**exchange [3]** 10/3
13/12 49/4
**exculpation [2]** 38/21
39/3
**exemption [1]** 24/15
**exercise [2]** 9/23 32/5
**exercised [1]** 9/14
**exercises [1]** 12/3
**exhibit [1]** 26/4
**exhibits [1]** 56/14

**E**

existing [3]  13/8 13/10 13/16
expecting [1]  11/3
expedited [1]  53/23
expenses [4]  10/20 10/22 33/10 43/21
expensive [1]  53/8
experience [1]  18/8
expert [2]  18/13 23/16
Expiration [1]  56/23
explain [1]  9/20
explained [3]  32/21 33/3 33/11
explanation [2]  9/22 27/4
express [1]  6/19
expressly [1]  32/3
extends [1]  8/22
extent [6]  27/24 37/7 37/24 38/9 40/17 48/9
extraordinary [3]  18/3 19/8 19/17
extreme [1]  38/5
eye [3]  7/20 8/23 9/3

**F**

facilitate [1]  47/13
fact [6]  15/23 19/1 19/18 30/10 31/20 41/11
facts [6]  20/10 20/16 24/20 25/12 30/10 30/11
failed [1]  11/4
failing [1]  32/18
fair [2]  37/23 46/20
fairly [1]  46/20
familiar [3]  21/24 54/15 54/16
Fantastic [1]  5/25
far [3]  14/10 14/14 35/7
favor [1]  11/18
feedback [1]  23/14
Feel [1]  51/14
fees [5]  10/17 33/14 34/8 34/13 42/25
few [3]  5/17 7/4 39/19
fiduciary [11]  9/11 10/7 31/20 31/24 37/12 37/14 37/16 37/18 38/22 38/25 39/2
fifth [1]  15/2
figure [1]  53/25

file [6]  8/12 17/2 17/3 52/14 52/15 55/1
filed [8]  8/6 16/24 21/15 24/6 41/11 42/5 53/7 53/23
filing [3]  11/8 52/20 55/3
filtered [1]  15/19
final [1]  15/2
financial [6]  21/5 27/3 27/13 29/25 30/1 30/2
financials [3]  16/2 16/3 16/6
find [4]  42/15 46/25 51/6 51/7
fine [6]  36/1 36/6 47/10 48/13 50/9 54/14
finger [3]  5/22 30/4 35/3
finished [1]  53/3
fire [2]  14/8 48/20
firm [7]  4/21 27/5 27/7 31/13 33/17 44/6 44/7
firms [7]  29/16 29/17 31/11 44/3 53/16 53/17 53/17
first [15]  8/21 10/6 10/8 10/18 10/20 10/22 11/20 19/4 22/15 27/18 30/18 38/17 38/25 46/13 53/10
firstly [4]  39/23 40/2 40/4 41/9
five [2]  11/20 14/15
flawed [1]  36/24
focused [1]  25/17
folio [1]  13/25
Folks [1]  52/17
following [1]  1/20
foot [2]  40/20 46/14
foregoing [1]  56/6
form [3]  43/2 43/5 45/17
formation [3]  38/23 38/23 39/3
formed [2]  11/3 38/19
forum [1]  21/22
forward [2]  22/2 41/17
foundation [14]  1/5 1/6 1/7 1/11 4/3 6/4 11/21 14/18 14/19 14/23 21/15 24/4 24/6 26/15

foundations [6]  22/12 23/11 23/17 40/1 40/3 41/12
four [1]  31/2
fourth [2]  14/17 51/1
Fox [2]  2/25 4/25
fraud [5]  8/25 9/23 29/20 30/5 30/8
free [1]  51/14
freeze [1]  8/25
Friday [1]  47/3
friend [1]  5/1
friends [3]  17/21 37/4 54/7
front [2]  22/4 45/1
frozen [1]  32/13
FTI [2]  30/1 41/25
function [1]  6/23
functions [1]  8/1
fund [38]  9/5 9/7 9/11 9/12 9/16 10/10 11/10 11/18 12/2 12/4 12/11 12/14 12/16 12/21 13/7 13/11 13/14 13/17 13/18 13/21 13/22 13/23 14/20 14/21 14/23 15/5 15/6 15/7 16/21 22/9 25/17 26/8 28/16 31/16 31/25 32/2 32/3 48/15
fundamentally [1]  31/14
funded [1]  16/8
funding [2]  19/21 53/14
funds [10]  11/10 12/7 13/24 16/12 22/12 23/23 24/2 26/1 30/21 31/9
further [2]  9/1 56/13
future [1]  31/8

**G**

G-A-U-D [1]  4/19
gained [1]  10/10
Gary [1]  30/3
gate [1]  19/3
GAUDIOSO [2]  2/11 4/17
gave [3]  27/12 33/12 38/21
general [4]  4/16 15/16 33/10 33/12
generally [2]  8/8 29/15
gentleman [2]  26/15

**G**

**gentleman... [1]**   32/25
**get [32]**   5/19 14/13 14/14 14/14 15/13 15/22 16/24 17/19 17/25 19/3 20/22 22/25 23/14 24/16 26/1 35/3 39/6 43/6 43/8 43/18 44/24 46/2 46/8 47/17 49/13 49/23 50/14 52/8 53/8 53/11 53/15 54/11
**gets [1]**   13/12
**getting [3]**   23/8 50/18 52/6
**Gillis [1]**   23/15
**give [4]**   8/17 16/4 26/20 33/17
**given [1]**   27/20
**gives [1]**   52/4
**giving [2]**   54/1 54/6
**gmail.com [1]**   56/22
**go [19]**   4/4 4/5 5/5 5/10 8/19 8/19 11/23 16/8 19/3 19/6 22/23 23/7 28/4 32/12 41/1 45/3 45/10 45/22 54/8
**goes [3]**   12/3 16/10 53/14
**going [39]**   4/25 5/1 5/2 5/10 8/4 8/16 14/9 16/4 16/8 16/14 16/17 18/9 21/21 21/25 22/1 22/6 23/1 23/1 26/16 30/10 34/9 34/9 35/12 35/13 42/3 44/15 45/1 45/23 46/1 46/3 46/5 46/17 47/3 47/16 49/23 50/5 50/14 52/9 55/1
**golf [2]**   17/16 17/18
**gone [2]**   10/24 42/17
**good [5]**   5/14 5/21 22/16 48/14 50/4
**GOODMAN [7]**   2/21 6/1 21/24 26/18 26/22 32/21 40/13
**GOREE [3]**   56/4 56/18 56/19
**got [8]**   11/6 19/8 21/10 40/4 46/21 48/19 53/25 54/1
**gotten [1]**   16/6
**governance [1]**   18/21
**governing [7]**   9/9 9/12 12/1 12/16 18/22 18/23 32/3

**GP [2]**   1/12 1/12
**grant [2]**   20/18 27/7
**Granted [1]**   39/7
**grantee [1]**   13/3
**grateful [1]**   39/20
**grave [1]**   38/9
**great [8]**   19/20 31/3 43/2 43/11 46/23 47/1 47/17 47/20
**group [3]**   30/3 34/5 34/24
**guess [3]**   33/13 44/13 45/9
**guidelines [3]**   5/5 52/16 53/6
**guys [2]**   51/17 52/14

**H**

**hac [1]**   35/23
**had [20]**   5/4 8/11 9/11 10/25 15/16 19/1 21/14 22/22 25/18 25/24 25/25 31/15 33/6 33/11 38/7 41/23 46/15 52/1 54/2 54/10
**half [4]**   10/18 10/22 29/22 46/15
**Hall [1]**   51/13
**hallway [1]**   45/3
**hand [2]**   42/21 56/16
**handle [1]**   49/25
**happen [9]**   11/11 14/9 17/22 32/10 43/3 49/19 49/21 52/3 52/7
**happened [10]**   9/21 14/6 14/15 20/1 20/6 22/5 31/17 32/10 37/17 43/9
**happening [3]**   26/21 27/14 27/22
**happens [2]**   20/7 23/4
**happy [8]**   7/23 20/22 46/24 47/10 47/17 47/18 53/4 53/24
**hard [1]**   17/22
**harm [8]**   19/10 20/1 20/4 20/9 20/10 30/12 32/20 42/16
**has [47]**   6/23 7/19 7/25 8/2 9/4 13/7 13/10 13/16 13/23 14/19 15/3 15/6 15/7 15/24 16/3 17/10 17/24 19/19 19/23 21/8 24/15 26/2 27/8 27/18 28/5

28/7 28/13 28/21 29/21 30/15 30/21 31/8 32/21 32/21 37/7 40/2 40/4 40/13 40/19 40/20 40/24 41/13 43/15 46/9 46/13 48/15 53/7
**hasn't [1]**   20/6
**hate [1]**   22/15
**have [106]**
**haven't [3]**   53/3 54/2 55/4
**having [7]**   7/7 17/22 29/18 33/23 34/20 34/21 54/19
**he [57]**
**he's [11]**   4/15 10/14 14/4 16/4 19/13 19/21 21/25 22/6 35/3 39/7 51/6
**hear [6]**   25/9 30/9 31/4 32/16 38/14 50/11
**heard [4]**   1/21 32/19 36/18 54/7
**hearing [25]**   5/13 6/9 6/11 6/15 6/20 21/2 21/6 21/13 21/17 21/22 24/1 24/1 40/7 40/9 40/14 43/3 47/5 47/17 48/3 49/7 50/25 52/6 52/19 54/19 55/12
**hearings [1]**   8/1
**held [5]**   1/22 9/15 13/14 36/16 48/3
**help [4]**   22/18 46/22 54/8 54/17
**helped [2]**   43/15 54/22
**helpful [3]**   23/18 28/14 31/7
**helping [1]**   23/20
**her [2]**   5/2 5/2
**here [43]**   4/10 5/7 5/11 7/11 7/17 8/22 10/11 14/22 17/2 17/3 17/7 17/9 18/15 19/12 19/13 19/15 20/8 20/10 22/1 25/23 26/5 26/18 27/22 30/8 31/2 31/14 32/19 35/11 36/12 36/25 37/10 37/19 38/1 38/6 38/8 38/17 38/23 40/8 41/3 42/12 46/2 50/14 53/5
**here's [1]**   10/5
**hereby [1]**   56/5
**Hey [1]**   44/14

**H**

**hide [1]**   23/7
**High [1]**   53/18
**HIGHLAND [12]**   1/5 1/6 1/7 4/3 21/7 21/8 21/10 34/5 34/25 34/25 35/2 41/12
**him [9]**   11/19 11/22 11/23 16/1 16/2 35/22 38/20 38/21 38/21
**his [26]**   7/20 8/22 8/23 9/13 11/4 12/15 12/16 12/17 12/22 13/6 13/11 13/11 14/18 15/2 15/19 16/13 16/19 19/12 19/15 21/13 22/11 32/4 32/5 36/6 36/15 37/22
**hit [1]**   7/12
**hold [4]**   12/5 12/10 14/24 29/6
**holdco [33]**   9/6 9/17 9/17 11/25 12/6 12/11 12/11 12/20 12/23 12/25 13/2 13/6 13/8 13/10 13/11 13/12 13/13 13/16 13/18 14/21 15/1 15/3 16/22 16/23 19/2 33/21 36/17 37/1 37/5 37/9 37/19 38/19 39/5
**holdco's [1]**   15/5
**holding [4]**   9/4 9/4 28/18 32/7
**holds [9]**   12/1 12/6 12/11 12/21 13/18 14/23 14/24 15/4 30/19
**holiday [1]**   19/14
**HON [10]**   2/3 2/4 2/10 2/11 2/12 2/15 2/19 2/20 2/21 2/22
**honest [1]**   36/4
**Honor [26]**   5/21 8/21 8/24 14/11 24/18 26/18 26/23 30/16 32/14 34/11 35/7 35/14 35/15 35/18 36/10 36/11 36/21 36/25 38/12 38/17 39/16 39/22 40/25 42/5 50/15 51/10
**Honorable [1]**   1/22
**house [3]**   20/7 20/20 26/6
**Houston [1]**   26/15
**Houston-Dallas [1]**

**how [13]**   9/9 19/18 19/20 19/21 20/10 23/10 25/11 26/16 28/5 41/7 41/17 46/17 54/6
**humanly [1]**   47/14
**Hunter [5]**   21/9 21/11 33/7 33/10 34/2
**hurt [1]**   44/15

**I**

**I'll [8]**   4/18 14/14 34/23 35/14 35/17 35/17 50/8 51/17
**I'm [46]**   4/6 7/11 7/22 8/16 15/13 16/3 17/22 18/9 22/24 22/25 23/18 24/13 25/11 30/9 31/18 34/2 34/13 35/12 35/12 35/13 35/15 36/4 39/7 39/17 42/12 42/15 42/18 43/13 44/12 44/17 44/18 44/19 45/1 45/16 46/25 47/10 47/18 50/13 53/4 53/9 53/10 53/22 53/24 54/1 54/15 54/16
**I've [2]**   5/15 20/13
**I-O-S [1]**   4/19
**idea [8]**   22/16 23/13 23/14 23/24 26/11 30/5 44/18 46/1
**ignore [1]**   37/15
**illustrative [1]**   9/21
**immediate [4]**   20/3 42/16 42/19 42/23
**immediately [1]**   54/12
**imminent [3]**   20/2 20/3 30/12
**important [1]**   18/10
**impose [1]**   30/13
**imposes [1]**   38/9
**impressive [1]**   32/12
**improper [1]**   27/25
**inappropriate [1]**   14/5
**INC [4]**   1/5 1/6 1/7 4/3
**incidents [1]**   10/25
**inclination [1]**   5/15
**include [1]**   44/8
**included [1]**   56/8
**including [1]**   6/20
**inconsistent [1]**   28/4
**incorrect [1]**   39/25
**increase [2]**   10/19

26/15 10/22
**increased [1]**   10/17
**incredible [1]**   31/17
**incumbent [1]**   28/1
**independence [1]**   9/23
**independent [6]**   9/8 12/18 27/5 39/1 41/23 41/23
**INDEX [1]**   3/1
**indicate [1]**   42/19
**indicated [1]**   40/15
**indicates [2]**   37/13 47/23
**indicating [1]**   22/23
**indirect [1]**   14/21
**individuals [1]**   25/6
**information [2]**   28/22 54/2
**initial [1]**   18/12
**initiated [1]**   22/7
**injunction [7]**   1/16 47/5 48/3 50/24 52/3 52/19 54/10
**injunctive [3]**   30/8 38/6 38/8
**injured [1]**   25/25
**injury [2]**   19/9 19/9
**inquiring [1]**   34/11
**inside [1]**   48/15
**insinuating [1]**   52/25
**instead [1]**   17/6
**intended [2]**   14/1 16/12
**interest [25]**   9/15 12/6 13/11 13/12 13/17 14/19 14/21 14/24 15/4 15/5 15/7 15/8 15/16 16/24 18/16 18/20 19/1 22/10 25/25 31/16 39/6 39/14 39/24 40/3 40/16
**interested [2]**   25/11 34/14
**interests [3]**   9/8 12/1 12/10
**interference [2]**   22/8 22/10
**interim [1]**   24/2
**interject [1]**   39/17
**intern [2]**   2/25 4/24
**internal [1]**   18/22
**interrupt [2]**   15/15 35/14
**introduction [1]**   54/6
**investment [4]**   21/9 34/2 43/25 45/16

**I**

investments [4]   43/24 44/8 44/10 49/2
invited [1]   41/12
invoking [1]   31/12
involuntary [1]   16/25
involve [1]   34/14
involved [2]   31/11 49/21
irreparable [9]   19/10 19/10 19/25 20/4 20/9 20/11 30/12 32/20 42/16
irreparably [1]   22/23
is [221]
Island [1]   16/18
Islands [13]   6/2 6/5 16/15 16/16 17/6 21/25 22/6 28/17 39/18 40/22 41/2 41/5 42/3
Isn't [1]   17/5
issue [9]   7/25 12/19 15/15 18/12 23/9 26/12 32/13 42/1 48/13
issued [2]   14/17 42/8
issues [5]   22/2 23/19 23/20 40/11 41/18
it [106]
it's [38]   5/2 5/10 11/20 15/17 15/23 17/21 18/8 22/10 22/25 24/14 25/22 26/1 26/16 27/21 28/10 28/20 29/15 32/10 33/23 35/1 35/1 36/2 36/22 38/1 42/3 42/23 43/12 44/3 44/3 44/4 44/7 44/14 44/15 48/19 48/22 49/11 49/11 54/11
item [1]   34/12
its [3]   13/17 13/17 15/3
itself [2]   38/24 41/22

**J**

James [1]   20/17
JENNIFER [3]   2/22 6/3 39/17
Jernigan [1]   21/3
Jim [3]   21/3 21/10 22/4
jmcox [1]   2/5
job [5]   12/17 46/19 46/22 47/19 54/22
Joe [5]   4/8 5/10 34/24

35/19 53/22
JOSEPH [1]   2/4
JR [1]   2/10
judge [23]   1/22 5/11 5/17 7/3 7/6 7/11 7/16 17/13 18/6 21/3 21/7 25/21 28/14 29/19 40/7 40/14 43/19 45/24 47/6 50/25 51/5 51/25 55/9
judgment [1]   43/12
judiciary [1]   20/24
Julie [1]   21/14
July [8]   1/20 3/3 19/14 20/8 20/8 47/4 52/10 56/17
July 11th [1]   47/4
July 2nd [1]   20/8
July 4th [1]   20/8
June [5]   11/1 27/17 27/17 41/10 42/5
June of [1]   11/1
jurisdiction [23]   8/10 8/10 8/13 17/10 17/11 17/12 18/11 18/12 18/14 19/3 19/5 22/14 22/16 30/15 43/13 48/2 51/14 51/15 51/21 51/21 51/23 51/23 52/8
jurisdictional [2]   22/21 23/9
jury [1]   20/23
just [40]   5/11 8/9 8/17 13/19 15/18 15/21 16/6 16/24 20/14 20/17 23/13 25/19 26/1 27/22 28/4 32/12 32/19 33/9 33/11 33/12 34/14 34/17 34/23 35/17 35/23 36/11 36/20 39/18 42/13 44/3 44/17 44/19 48/16 48/18 48/22 50/18 52/7 54/1 54/5 55/4
justify [2]   41/15 41/15

**K**

KANSAS [1]   1/6
key [5]   10/5 11/20 14/15 14/17 20/2
kickback [2]   10/3 11/10
kind [9]   18/7 25/10 27/18 30/13 33/12 33/13 35/11 42/12

43/18
Kirschner [1]   34/5
know [36]   7/18 11/12 16/7 16/11 17/1 17/20 17/25 18/11 19/1 19/22 23/15 24/13 25/18 29/10 30/14 31/22 34/14 36/11 36/18 38/7 40/19 43/4 43/11 43/24 44/2 45/8 47/12 51/7 51/8 51/10 52/1 52/4 53/16 53/18 54/15 55/7
knowledge [1]   24/21
known [2]   25/12 53/17
knows [3]   16/9 16/10 34/24
Kroll [1]   27/5

**L**

lack [1]   13/25
last [2]   12/8 49/23
lastly [1]   32/23
later [3]   5/6 5/12 7/8
law [12]   9/12 29/15 29/17 31/10 31/13 32/18 33/24 36/2 36/4 37/13 37/15 44/3
lawful [1]   9/24
lawsuit [1]   16/17
lawyer [1]   19/20
lawyers [5]   5/17 7/7 29/24 31/19 53/17
lawyers' [1]   42/25
Layton [3]   5/22 30/4 35/16
lead [1]   34/6
learner [1]   46/4
learning [1]   18/7
least [1]   53/17
leave [1]   48/16
left [2]   16/7 17/19
legal [6]   2/25 10/20 33/10 33/14 37/2 41/3
lengths [1]   54/8
lept [1]   10/20
less [3]   12/24 13/1 50/17
let [6]   15/15 18/17 28/6 29/7 37/19 51/10
let's [12]   4/4 5/19 16/23 22/16 24/16 42/9 45/6 47/20 50/22 51/13 51/16 52/13
letter [2]   37/15 53/14
level [2]   13/21 15/13

| L | M | |
|---|---|---|
| **license [1]**  36/2 | **ma'am [1]**  32/17 | **May 31st [1]**  33/3 |
| **lift [1]**  9/19 | **machinations [1]**  32/12 | **maybe [10]**  13/15 30/18 31/21 43/11 43/12 50/7 52/5 52/6 52/7 52/18 |
| **like [14]**  7/8 7/21 20/13 22/5 33/24 36/11 36/20 42/9 43/6 44/3 44/4 44/14 46/17 53/25 | **machine [1]**  1/25 | **McCarty [1]**  8/22 |
| **likelihood [1]**  31/24 | **made [3]**  39/24 40/19 40/24 | **MCCLEARY [1]**  2/16 |
| **liking [1]**  22/6 | **main [2]**  2/13 11/14 | **McENTIRE [5]**  2/15 2/16 4/12 21/1 49/8 |
| **limited [1]**  24/19 | **major [1]**  51/9 | **MCI [1]**  28/15 |
| **limits [1]**  50/16 | **majority [1]**  42/7 | **me [23]**  4/22 8/17 12/8 15/15 18/8 18/17 23/18 23/20 23/20 28/6 28/11 29/7 33/17 42/19 43/7 43/15 46/8 46/9 50/3 50/4 52/21 52/23 56/12 |
| **lines [1]**  43/5 | **make [19]**  7/6 8/7 17/1 19/22 23/4 23/6 23/8 23/19 24/1 31/12 32/8 32/12 36/5 45/16 46/24 47/18 47/18 48/12 55/5 | |
| **liquidation [5]**  40/5 40/6 40/20 41/10 41/19 | | |
| **liquidator [3]**  31/3 31/6 37/6 | **making [6]**  23/18 23/21 46/25 48/22 48/22 52/17 | **mean [4]**  25/5 29/20 34/18 45/20 |
| **liquidators [16]**  27/7 27/12 27/19 27/23 28/1 28/8 28/22 28/22 28/24 29/5 37/9 38/1 40/5 40/10 40/15 41/9 | **malicious [2]**  29/20 38/24 | **means [5]**  6/9 9/25 16/13 25/25 41/4 |
| | **manage [3]**  9/6 44/2 49/3 | **meantime [3]**  43/6 49/19 51/15 |
| **listen [6]**  36/2 46/11 47/11 51/11 52/24 53/16 | **management [7]**  12/3 12/15 13/7 13/7 15/2 23/17 40/16 | **mechanism [2]**  24/15 33/1 |
| | **manager [3]**  4/25 13/3 37/22 | **meet [2]**  37/25 47/4 |
| **litigation [4]**  19/21 34/5 34/9 46/16 | | **member [1]**  36/15 |
| **litigations [2]**  33/18 33/20 | **manages [2]**  44/4 44/5 | **members [2]**  37/2 37/14 |
| | **Mancino [1]**  29/23 | **membership [2]**  36/15 37/21 |
| **little [5]**  12/5 22/25 23/12 43/14 47/9 | **manner [2]**  6/12 55/8 | **Memorial [2]**  54/12 54/14 |
| | **many [4]**  10/2 21/12 22/2 54/16 | **mentioned [1]**  41/21 |
| **live [6]**  6/16 6/16 6/21 6/25 43/21 47/16 | **Maples [1]**  30/3 | **met [3]**  4/23 26/15 32/25 |
| **LLC [8]**  1/11 1/12 5/23 28/15 28/20 35/17 37/17 37/20 | **mark [8]**  1/10 2/21 4/4 6/1 21/11 21/24 22/8 26/18 | **might [5]**  20/14 23/13 28/4 44/13 52/20 |
| | **market [1]**  37/23 | **million [23]**  9/2 9/4 9/16 9/19 10/18 10/20 10/21 10/23 10/23 11/18 12/6 12/13 13/17 15/4 15/5 15/17 28/7 31/16 32/2 39/6 39/14 39/24 42/17 |
| **LLCs [2]**  37/14 37/16 | **Mat [1]**  35/15 | |
| **LLP [2]**  2/6 2/13 | **matching [1]**  34/12 | |
| **local [2]**  6/14 53/13 | **material [1]**  27/13 | |
| **locks [1]**  38/10 | **matter [8]**  34/6 39/25 41/16 42/4 43/12 48/2 51/21 51/23 | |
| **long [2]**  16/8 25/11 | | **mind [1]**  19/17 |
| **longstanding [1]**  25/15 | | **mine [1]**  43/16 |
| **look [8]**  18/1 19/6 19/7 20/5 20/12 29/14 41/9 50/22 | **matters [4]**  31/14 33/10 41/5 41/9 | **minute [2]**  35/12 49/24 |
| | **MATTHEW [4]**  2/19 5/22 40/2 41/8 | **minutes [2]**  8/17 15/11 |
| **looking [3]**  18/1 18/6 49/14 | **mature [1]**  44/10 | **moment [3]**  9/21 10/6 14/13 |
| **Lord [1]**  40/25 | **may [28]**  5/4 5/4 6/20 10/1 16/11 24/8 24/14 27/9 27/10 27/11 27/16 27/16 29/19 30/16 31/2 31/5 31/6 32/22 33/3 38/12 39/17 40/3 40/22 43/11 47/8 48/7 49/18 52/17 | **monetary [2]**  20/21 38/4 |
| **lot [9]**  10/11 10/11 17/24 17/24 34/9 38/20 38/21 39/8 44/8 | | **money [25]**  11/2 15/19 16/7 22/23 23/5 23/6 23/22 23/22 26/8 26/16 27/14 28/4 30/20 32/12 32/13 33/7 42/23 43/9 |
| **loud [1]**  38/15 | | |
| **loved [1]**  35/3 | | |
| **lowdown [1]**  8/17 | | |
| **LP [1]**  28/16 | | |
| **Ltd [2]**  1/12 36/17 | | |

## M

**money... [7]**  43/20 44/2 44/5 45/10 45/15 48/16 48/16
**moneys [1]**  35/10
**MONICA [2]**  2/11 4/17
**months [4]**  10/21 31/15 32/20 39/14
**more [16]**  5/5 7/4 8/17 9/2 10/25 12/23 18/10 25/15 34/13 46/2 46/3 46/4 47/6 50/17 52/8 54/24
**morning [4]**  24/11 26/16 32/25 54/14
**MORRIS [2]**  2/6 24/23
**most [1]**  21/16
**motion [4]**  49/24 53/2 53/7 53/23
**motions [2]**  53/8 53/15
**Mountain [5]**  21/9 21/11 33/7 33/11 34/2
**move [5]**  15/21 16/13 43/20 45/11 52/7
**moved [2]**  28/23 43/9
**Mr [8]**  4/9 25/7 26/22 34/17 34/18 38/7 39/2 53/22
**Mr. [76]**
**Mr. Brian [1]**  41/21
**Mr. Cox [2]**  7/12 48/21
**Mr. Diaz [1]**  24/12
**Mr. Dondero [12]**  16/9 19/12 19/25 20/25 21/18 21/21 24/23 24/25 34/24 35/5 43/7 51/6
**Mr. Dondero's [2]**  19/16 33/25
**Mr. Goodman [2]**  32/21 40/13
**Mr. Jim [1]**  22/4
**Mr. Mark [1]**  22/8
**Mr. Matthew [2]**  40/2 41/8
**Mr. McCarty [1]**  8/22
**Mr. McEntire [1]**  49/8
**Mr. Patrick [38]**  9/6 9/18 9/22 10/5 10/10 10/12 11/1 11/9 11/16 11/21 12/2 12/15 12/19 13/5 13/19 13/22 14/17 15/3 15/18 16/9 16/11 16/19 19/13 19/18 19/20 19/23 20/23

25/24 30/20 31/9 31/20 32/4 32/11 34/15 37/12 37/22 43/7 51/7
**Mr. Patrick's [2]**  12/25 37/4
**Mr. Raver [3]**  18/15 19/15 34/15
**Mr. Shaw [2]**  53/24 54/25
**Mr. Shawn [2]**  4/15 24/8
**Mr. Spears [1]**  43/14
**Mr. Warner [2]**  4/11 53/21
**Ms [2]**  25/18 26/14
**Ms. [6]**  18/13 20/5 20/17 25/7 32/23 43/7
**Ms. Diaz [5]**  20/5 20/17 25/7 32/23 43/7
**Ms. Reed [1]**  18/13
**much [2]**  22/17 47/13
**multi [2]**  22/4 35/25
**Multi-crosstalk [1]**  35/25
**multi-front [1]**  22/4
**MURPHY [3]**  2/19 5/22 35/15
**must [1]**  37/23
**my [22]**  4/17 4/21 5/15 5/23 17/20 18/18 19/17 21/9 23/13 24/19 25/20 25/22 35/13 36/2 37/4 40/25 44/13 44/22 45/20 47/19 52/20 56/16

## N

**named [3]**  18/20 36/21 48/3
**names [1]**  31/13
**narrow [1]**  51/13
**national [2]**  23/16 46/16
**nature [1]**  25/15
**near [1]**  32/1
**necessitates [1]**  20/8
**need [22]**  7/4 8/25 15/23 18/4 22/14 24/1 27/1 42/23 42/24 42/25 43/10 43/25 44/1 45/15 45/16 47/6 48/23 51/5 51/6 51/7 51/19 51/24
**Neither [1]**  24/24
**never [6]**  15/22 15/23 16/4 16/6 20/13 22/16

**new [13]**  11/18 11/21 11/23 12/20 12/25 13/5 13/11 13/17 14/18 25/20 27/3 33/22 38/19
**newly [1]**  12/22
**next [5]**  29/8 29/13 43/3 44/11 46/22
**nights [1]**  54/15
**no [36]**  1/3 2/3 2/5 2/10 2/11 2/16 8/2 8/17 15/10 15/19 17/8 18/25 20/10 26/2 26/11 27/15 27/22 28/3 28/3 28/9 28/10 30/11 30/13 34/20 37/2 42/6 45/22 46/9 48/13 49/2 49/2 49/9 49/25 52/11 54/21 56/23
**No. [3]**  4/3 46/19 48/4
**No. 1 [2]**  46/19 48/4
**No. 25-BC01B-0027 [1]**  4/3
**No.24121791 [1]**  2/12
**nobody [6]**  7/19 31/1 47/16 52/9 52/20 52/23
**noise [1]**  17/24
**non [1]**  36/16
**non-party [1]**  36/16
**none [5]**  18/16 18/17 18/20 22/9 49/7
**nonprofit [2]**  11/2 29/24
**normal [3]**  17/21 45/12 48/19
**not [86]**
**note [3]**  8/1 36/20 48/1
**note-taking [1]**  8/1
**noted [2]**  37/4 38/5
**notes [1]**  8/3
**nothing [5]**  9/18 19/25 23/4 26/1 31/17
**notice [1]**  23/5
**noticed [1]**  47/5
**Novak [1]**  50/25
**now [33]**  7/8 9/2 9/17 10/25 11/12 11/23 12/24 13/13 13/15 13/18 14/3 14/7 14/19 14/19 14/22 15/6 15/17 15/18 15/24 16/7 16/13 16/25 17/3 25/15 25/24 26/6 27/8 30/22 31/7 31/8 31/16 32/7 36/18
**number [1]**  33/16

**N**

**numbered [2]**   1/21 56/10

**O**

**o'clock [2]**   47/3 51/3
**object [4]**   35/8 35/9 35/22 42/5
**objection [7]**   21/13 21/15 21/20 24/4 24/7 24/7 24/22
**objections [1]**   21/21
**obligations [1]**   29/12
**obtain [1]**   11/9
**obviously [2]**   19/14 37/18
**occasions [1]**   37/11
**occurred [4]**   11/12 36/20 46/11 56/10
**odd [1]**   39/24
**odds [1]**   53/19
**off [3]**   26/3 46/10 48/20
**offer [1]**   27/15
**offered [2]**   27/11 28/21
**office [1]**   17/19
**officer [1]**   4/16
**offices [1]**   33/24
**official [7]**   6/22 7/24 8/4 10/1 56/4 56/16 56/20
**okay [26]**   4/7 5/14 7/4 7/12 8/14 12/4 14/18 15/1 22/13 27/1 29/7 30/20 30/23 35/18 36/7 42/9 45/6 45/24 46/13 49/7 49/10 49/18 49/23 50/5 54/13 55/2
**old [1]**   27/24
**Olsen [1]**   30/3
**Once [1]**   7/20
**one [37]**   7/6 7/7 7/23 8/3 8/5 10/9 11/1 11/22 18/5 18/5 18/9 18/10 20/14 21/2 21/5 21/9 21/18 22/14 22/20 23/13 24/7 25/21 29/17 29/23 30/19 33/17 33/18 33/25 40/11 43/9 44/15 46/8 48/14 48/21 53/4 53/20 54/24
**ongoing [6]**   24/10 24/19 28/2 33/11 40/6 40/16

**online [1]**   5/24
**only [13]**   13/9 14/21 14/25 15/6 15/7 15/8 24/21 31/8 33/25 35/16 37/14 38/13 51/25
**open [2]**   6/15 56/10
**OPENING [1]**   8/20
**operate [2]**   48/4 48/23
**operate in [1]**   48/23
**operating [2]**   4/16 38/11
**opportunities [1]**   44/13
**opportunity [7]**   5/4 8/12 8/15 23/23 39/20 43/25 53/11
**opposing [1]**   8/8
**order [9]**   1/16 5/8 5/12 8/9 11/9 18/2 20/13 20/19 47/25
**orders [1]**   10/2
**ordinary [10]**   24/21 42/22 42/24 43/21 45/19 48/4 48/12 48/22 48/23 48/25
**organization [10]**   13/22 13/24 16/3 18/22 18/25 18/25 20/25 29/24 32/4 39/2
**organizational [1]**   11/19
**organizations [16]**   8/25 9/9 9/10 10/13 11/2 11/24 12/18 13/3 16/13 23/11 23/19 24/6 25/8 30/14 32/6 39/11
**organizations' [1]**   15/25
**original [6]**   1/16 13/25 15/1 15/3 16/22 16/23
**other [18]**   8/5 10/4 13/22 16/10 18/14 21/5 25/8 33/18 33/24 34/15 35/20 42/21 42/21 43/9 48/8 48/13 53/6 56/7
**otherwise [1]**   40/23
**our [27]**   4/15 4/23 7/7 7/15 9/3 12/4 12/9 12/21 13/14 15/16 17/1 26/19 31/20 31/25 32/6 35/7 35/7 35/8 39/1 39/11 46/19 48/1 48/9 51/20 52/11 53/6 54/22
**out [26]**   9/13 9/19

10/7 10/16 19/3 19/14 20/16 23/13 23/14 23/24 25/21 25/23 38/7 41/22 44/18 45/3 47/7 47/9 48/12 49/3 49/16 50/16 51/6 51/7 53/25 54/4
**outcome [1]**   27/3
**outline [1]**   10/6
**outset [1]**   31/21
**outside [2]**   25/10 45/19
**outstanding [1]**   33/10
**over [22]**   7/20 11/16 12/5 12/10 12/16 13/7 13/23 16/17 16/19 16/25 17/2 17/2 17/3 17/10 17/14 19/5 30/20 33/25 37/6 40/8 52/10 53/17
**Overall [1]**   10/22
**overbroad [1]**   20/15
**overnight [1]**   15/21
**overrule [1]**   21/21
**overruled [1]**   21/13
**overseeing [1]**   41/24
**oversight [6]**   26/24 27/2 27/14 27/20 28/4 30/13
**overview [1]**   9/20
**owe [1]**   37/18
**owed [5]**   10/7 31/20 31/24 37/12 39/2
**own [6]**   8/3 13/1 15/19 16/13 18/16 36/6
**owned [3]**   11/19 12/21 13/8
**owner [5]**   12/25 18/24 18/25 25/16 25/16
**owners [2]**   9/3 9/16
**ownership [5]**   12/10 12/23 13/9 18/20 32/15
**owns [3]**   21/7 28/16 28/17

**P**

**Pacific [1]**   2/17
**page [2]**   3/4 53/14
**paid [5]**   11/10 29/8 33/15 42/25 43/1
**painted [1]**   41/3
**paints [1]**   11/14
**paper [1]**   10/16
**papers [3]**   10/7 11/8 17/1

**P**

PARSONS [1]  2/16
part [9]  10/3 12/8 17/6 24/4 30/24 33/5 33/6 38/24 41/12
parte [1]  45/22
partially [1]  13/14
participants [1]  6/20
participate [1]  24/10
participating [5]  4/24 6/10 8/1 22/1 42/7
particular [2]  19/5 36/8
particularly [1]  38/9
parties [3]  36/19 56/8 56/15
parties' [1]  49/11
partner [1]  5/23
Partners [2]  6/4 39/18
party [2]  36/16 37/7
pass [1]  39/9
past [3]  7/25 11/16 19/3
pathway [1]  10/6
pathway we [1]  10/6
PATRICK [52]  1/10 2/10 4/4 9/6 9/18 9/22 10/5 10/10 10/12 11/1 11/9 11/16 11/21 12/2 12/15 12/19 13/2 13/5 13/9 13/19 13/22 14/17 14/23 14/23 15/3 15/18 16/9 16/11 16/19 19/13 19/18 19/20 19/23 20/23 21/11 22/8 25/24 30/20 30/22 31/9 31/20 32/4 32/11 34/15 34/18 37/12 37/22 38/19 39/2 43/7 50/12 51/7
Patrick's [3]  12/25 37/4 38/7
pattern [3]  10/14 11/14 41/2
pay [1]  43/20
payback [1]  34/13
paying [3]  33/9 42/21 44/3
payment [2]  29/15 29/18
payments [4]  10/19 48/12 48/22 48/23
payroll [4]  29/16 29/17 42/25 45/13
pencil [1]  51/11
pendency [1]  53/24

pending [1]  35/23
people [11]  17/11 25/1 25/5 31/19 31/21 46/2 46/19 46/22 53/18 54/8 54/22
per [2]  10/22 36/19
percent [13]  10/19 12/5 12/10 12/20 12/21 12/24 12/24 12/25 13/1 13/8 32/1 32/7 39/6
perfectly [3]  43/11 47/16 54/5
perhaps [4]  21/5 26/19 34/3 34/13
period [2]  15/14 35/8
permission [1]  6/19
person [9]  6/9 6/10 11/11 19/19 21/11 25/1 31/8 31/24 56/11
personal [5]  8/10 8/12 48/2 51/20 51/23
perspective [1]  31/15
petition [11]  1/16 15/10 21/14 21/17 21/19 23/12 25/23 32/24 32/24 36/24 37/13
Philip [3]  2/24 4/22 5/3
phone [1]  53/9
pick [2]  5/12 8/18
pin [1]  43/13
pitch [2]  45/20 45/21
place [4]  9/1 33/1 42/3 43/9
plaintiff [1]  33/25
plaintiffs [28]  1/8 2/2 4/6 4/10 10/8 11/17 11/18 12/4 12/9 13/1 13/8 14/19 14/20 14/24 15/16 18/16 22/10 25/24 32/6 36/11 36/13 36/25 37/10 37/11 37/19 38/1 38/4 48/10
plaintiffs' [5]  1/16 11/24 12/23 25/3 31/15
plan [3]  22/18 23/4 52/16
platforms [1]  6/24
players [1]  43/7
please [3]  4/5 6/7 7/13
PLLC [1]  2/16
plus [2]  12/25 32/1

point [16]  5/6 12/4 14/7 14/25 15/6 19/4 29/20 31/1 31/6 31/6 35/2 38/18 40/19 41/4 42/6 44/13
pointed [2]  18/11 38/7
points [2]  30/18 39/19
policies [1]  45/15
portion [1]  9/17
portions [2]  24/7 56/7
position [1]  8/2
positions [1]  54/9
possesses [1]  9/18
possibility [1]  43/17
possible [3]  22/17 46/6 47/14
potential [1]  39/12
power [3]  9/23 10/1 32/5
powers [6]  9/13 12/17 13/7 15/3 16/20 25/18
practice [2]  36/4 46/16
preceded [1]  38/23
precedes [2]  11/14 39/3
precisely [1]  13/4
preeminent [1]  29/24
preliminary [1]  52/19
prepare [1]  7/23
PRESENT [1]  2/23
presentation [1]  51/13
presented [3]  20/16 30/6 33/2
president [1]  26/14
presidents [1]  25/8
presiding [2]  1/22 40/8
pressing [1]  34/13
prevent [1]  9/1
prevents [1]  38/10
previously [2]  12/21 36/16
pro [1]  35/23
probably [1]  49/21
problem [7]  9/24 43/22 46/23 46/23 51/9 52/12 54/22
problems [4]  22/19 34/22 47/1 54/18
procedural [1]  54/24
proceed [2]  40/16 42/2
proceeding [4]  6/18 6/22 6/24 22/7
proceedings [19]  1/20

**P**

**proceedings... [18]**
1/24 7/2 22/1 24/18
24/19 25/22 26/3 30/25
32/19 33/12 33/22 37/5
39/19 40/6 40/8 41/13
56/7 56/14
**proceeds [3]** 33/5 48/6
48/7
**process [1]** 28/2
**professional [4]** 36/3
46/18 46/19 55/8
**professionals [2]**
53/19 55/8
**progressed [1]** 41/1
**prohibited [1]** 6/18
**promise [1]** 46/24
**promptly [1]** 53/20
**proposal [1]** 45/7
**proposed [3]** 20/12
45/8 45/9
**proprietary [1]** 28/25
**protect [1]** 39/11
**protocol [5]** 27/11
27/19 28/21 40/12
40/25
**provide [1]** 22/12
**provided [1]** 41/11
**provides [1]** 10/15
**provisions [1]** 39/4
**prudent [1]** 45/16
**public [2]** 6/15 6/25
**purported [1]** 11/21
**purportedly [1]** 36/22
**purpose [3]** 13/25 40/8
43/10
**purposes [1]** 8/3
**pursuing [1]** 52/17
**push [2]** 47/8 51/4
**put [11]** 13/22 16/19
16/24 17/1 19/12 25/23
26/9 26/10 26/10 26/11
46/4

**Q**

**quality [1]** 53/18
**quarterly [1]** 33/13
**quash [2]** 49/24 53/7
**question [17]** 18/18
22/14 28/6 28/11 28/12
28/24 29/7 29/11 30/9
30/21 30/22 31/23 41/6
43/15 43/23 45/18
45/22
**questions [2]** 22/21

51/24
**quickly [2]** 17/20
22/20
**quite [1]** 41/8
**quote [2]** 19/9 37/22

**R**

**raised [2]** 21/12 40/11
**Rancho [1]** 56/21
**rapid [1]** 39/13
**rapidity [1]** 32/9
**Raver [7]** 2/24 4/15
18/15 19/15 24/8 34/15
34/18
**reach [6]** 23/25 43/2
43/5 44/17 47/15 47/19
**reaching [1]** 43/17
**read [3]** 5/15 8/14
23/12
**ready [1]** 52/6
**real [2]** 6/11 6/13
**really [8]** 18/7 19/24
20/24 22/4 22/7 22/10
43/6 50/14
**reason [2]** 25/17 28/24
**reasonable [2]** 48/18
49/4
**reasons [1]** 43/11
**received [1]** 33/8
**receiver [4]** 1/17 5/9
5/11 5/12
**recent [1]** 25/15
**recently [2]** 24/21
40/7
**recognition [1]** 29/1
**recognized [1]** 23/15
**recommendation [1]**
23/20
**record [15]** 1/1 5/20
6/23 7/14 8/7 8/9 21/1
28/5 42/15 42/19 46/10
47/21 49/11 56/9 56/13
**recorded [1]** 6/25
**recording [4]** 6/18
6/22 7/1 8/4
**recover [2]** 28/2 29/1
**recurring [1]** 11/6
**redeem [1]** 15/3
**redemption [6]** 36/13
37/8 37/21 37/23 37/25
39/5
**REED [5]** 2/12 2/20
4/21 5/23 18/13
**refer [1]** 35/17
**reference [1]** 35/17

**referred [2]** 9/9 30/19
**referring [2]** 17/14
36/14
**reflects [1]** 56/14
**refrain [1]** 45/19
**regard [1]** 40/16
**regarding [4]** 18/21
37/8 40/20 48/13
**reinvest [1]** 45/15
**related [2]** 18/14
37/14
**relates [2]** 16/17
45/12
**relevant [1]** 39/19
**relied [1]** 30/7
**relief [10]** 18/3 19/8
20/18 30/8 38/6 38/8
52/20 52/21 52/22
52/23
**rely [1]** 30/11
**remaining [1]** 15/1
**remains [1]** 41/16
**remember [2]** 11/25
18/5
**remote [2]** 15/22 49/22
**repeat [2]** 12/8 18/17
**repeated [1]** 27/16
**repeatedly [3]** 9/13
39/23 40/24
**replacing [1]** 27/7
**reply [1]** 7/2
**report [3]** 25/2 25/3
26/20
**reported [3]** 1/24
11/12 56/12
**reporter [7]** 7/17 31/4
32/16 47/23 56/3 56/4
56/20
**reporter's [4]** 1/1
6/23 56/9 56/13
**reporting [3]** 27/11
27/12 28/21
**reports [2]** 12/19
41/24
**represent [4]** 8/24
24/24 33/21 35/16
**representative [2]**
2/24 4/15
**Representative/Counsel
[1]** 2/24
**represented [1]** 29/23
**representing [2]** 29/22
34/2
**represents [1]** 28/15
**request [7]** 1/17 7/6

**R**

**request... [5]** 7/14 14/10 18/3 23/6 35/23
**requested [2]** 11/1 56/8
**require [1]** 42/3
**reservations [1]** 43/16
**reserve [1]** 48/1
**resolution [1]** 34/22
**resolve [6]** 22/21 53/14 53/15 53/20 54/8 54/17
**resolved [1]** 54/11
**respect [2]** 16/20 37/3
**respected [1]** 35/6
**respectful [1]** 50/15
**respective [2]** 8/16 56/15
**respond [2]** 51/17 52/14
**response [2]** 24/16 52/4
**responsibility [1]** 36/3
**restraining [8]** 1/16 5/8 5/12 8/9 18/1 20/13 20/19 47/25
**restrictions [1]** 38/9
**restructuring [5]** 37/5 41/22 48/5 48/14 49/2
**return [1]** 49/17
**review [1]** 7/21
**reviewed [1]** 19/16
**reviewing [1]** 18/6
**Richards [3]** 5/22 30/4 35/16
**rid [1]** 16/24
**right [22]** 4/2 4/9 7/7 10/11 12/12 12/13 14/3 14/7 15/16 18/6 19/3 31/7 31/8 35/4 35/11 38/22 41/8 41/18 44/9 50/22 53/10 53/16
**righteous [1]** 11/11
**rightly [1]** 18/11
**rights [2]** 37/2 48/1
**room [5]** 4/24 18/15 46/9 47/4 51/12
**routinely [1]** 29/4
**RPR [1]** 56/19
**rule [7]** 19/8 24/9 24/14 47/25 49/11 53/5 53/13
**rules [3]** 6/14 6/15 7/15

**rulings [1]** 42/13
**run [3]** 5/1 5/2 34/25
**running [1]** 35/2
**runs [1]** 15/18
**rush [1]** 7/22
**Russian [1]** 26/10

**S**

**safe [2]** 24/2 35/10
**said [13]** 16/3 16/4 16/23 17/1 24/3 25/24 26/3 31/5 37/11 48/21 50/11 54/11 54/13
**sale [3]** 48/6 48/7 48/20
**sales [1]** 48/6
**Sam [1]** 4/19
**same [10]** 6/2 6/12 6/14 9/15 9/17 21/12 21/18 22/2 23/8 48/8
**sanction [1]** 40/9
**SANTA [1]** 1/7
**Saturday [2]** 54/14 54/20
**Saul [1]** 4/12
**SAWNIE [1]** 2/15
**say [6]** 19/7 27/21 33/20 42/2 48/11 51/16
**saying [5]** 41/8 44/19 50/1 53/21 53/23
**says [8]** 17/13 19/8 19/17 19/25 20/14 34/25 37/15 45/8
**scary [1]** 26/12
**schedule [2]** 50/20 52/8
**scheduling [2]** 5/6 54/2
**scheme [5]** 10/4 11/17 11/20 38/24 39/12
**scope [1]** 20/12
**seat [1]** 13/7
**seats [1]** 10/12
**second [3]** 11/25 12/19 31/10
**secret [1]** 11/17
**Section [1]** 37/17
**Section 6.5 [1]** 37/17
**see [16]** 7/8 7/8 8/19 11/15 13/20 15/23 17/8 23/20 28/14 29/14 31/8 34/12 42/6 42/22 51/17 53/24
**seeing [1]** 42/18
**seek [4]** 29/1 38/4

38/6 41/15
**seeking [2]** 36/12 38/8
**seem [2]** 36/13 38/5
**seems [2]** 23/12 40/23
**seen [4]** 9/4 18/15 20/13 22/24
**seized [1]** 41/13
**self [3]** 10/15 11/13 14/5
**self-dealing [3]** 10/15 11/13 14/5
**sell [3]** 45/11 48/15 48/20
**senator [1]** 10/1
**sense [1]** 50/14
**sensible [1]** 40/15
**sentence [1]** 20/14
**separate [1]** 52/16
**September [2]** 11/7 33/14
**September 2023 [1]** 11/7
**September 30th [1]** 33/14
**series [1]** 9/18
**served [3]** 8/6 8/11 55/4
**service [2]** 54/25 55/11
**set [3]** 15/6 46/14 52/3
**settled [1]** 54/21
**settlement [3]** 21/8 21/16 33/7
**several [3]** 34/22 36/24 37/11
**Seyfarth [1]** 29/23
**shareholder [1]** 42/7
**shareholders [1]** 25/4
**shares [4]** 12/3 12/20 14/17 15/1
**SHAW [5]** 2/10 4/14 29/23 53/24 54/25
**Shawn [3]** 2/24 4/15 24/8
**she [6]** 18/6 18/6 20/6 21/14 21/17 26/15
**sheets [1]** 33/2
**shopping [1]** 21/22
**short [3]** 15/14 47/1 51/16
**shorthand [1]** 1/25
**should [8]** 6/11 17/5 17/6 31/11 31/12 42/1 42/2 50/16

**S**

**shouldn't [1]** 23/7
**show [2]** 20/3 52/19
**showing [1]** 31/24
**sic [1]** 29/25
**side [4]** 33/24 35/19 35/20 37/4
**sides [3]** 8/16 13/2 54/11
**significant [1]** 42/3
**simple [2]** 15/17 44/3
**simply [3]** 20/10 27/21 39/25
**since [5]** 10/14 27/8 40/21 40/22 46/13
**sir [2]** 34/10 50/2
**situation [1]** 14/22
**six [4]** 10/21 31/15 39/14 46/15
**slim [1]** 53/20
**SLOMAN [2]** 2/13 29/21
**slow [1]** 4/5
**smell [1]** 39/9
**SMU [2]** 4/24 36/3
**so [71]**
**sold [1]** 48/7
**sole [4]** 31/25 32/1 36/15 37/22
**solve [5]** 22/18 46/22 46/23 47/1 54/22
**some [25]** 10/4 14/4 16/9 22/19 23/1 23/10 25/12 25/15 28/24 30/5 30/13 31/5 31/6 31/18 31/21 32/11 35/3 43/2 43/5 43/16 44/8 45/17 47/6 51/14 53/25
**somebody [1]** 47/7
**someone [2]** 11/9 28/13
**something [12]** 14/9 16/17 17/5 22/24 24/14 25/9 31/3 31/7 32/15 39/10 46/11 48/17
**somewhere [5]** 15/22 22/23 23/7 45/22 46/7
**Sonny [1]** 21/1
**sooner [2]** 52/12 52/13
**sophisticated [3]** 9/18 29/20 31/19
**sorry [4]** 27/10 27/17 28/10 38/15
**sort [1]** 16/10
**sorts [1]** 19/24
**speak [2]** 36/5 38/13
**speaking [1]** 36/7

**Spears [3]** 2/24 4/22 43/14
**special [8]** 51/24 52/14 52/15 52/17 52/18 52/21 55/1 55/3
**specific [1]** 10/25
**specifically [2]** 24/11 29/15
**speed [1]** 31/18
**spell [1]** 4/18
**spelled [3]** 9/13 10/7 10/16
**spend [1]** 23/21
**spoken [1]** 40/13
**spreadsheet [1]** 33/6
**Springboat [1]** 21/7
**staff [2]** 2/24 4/22
**stand [2]** 21/4 25/23
**standard [3]** 37/25 44/14 44/16
**standby [1]** 25/10
**standing [3]** 19/4 26/17 37/7
**start [1]** 14/2
**state [13]** 2/3 2/5 2/10 2/11 2/12 2/16 10/1 19/9 23/16 32/4 36/4 56/1 56/5
**state-wide [1]** 23/16
**STATEMENT [1]** 8/20
**States [3]** 17/2 17/4 21/2
**status [2]** 26/20 51/3
**stay [1]** 48/6
**stead [1]** 19/15
**stenographic [1]** 1/24
**stenographically [1]** 56/11
**step [8]** 9/22 10/6 10/8 12/19 14/17 15/2 18/9 18/10
**steps [8]** 11/20 14/16 25/19 28/2 41/3 41/5 41/14 41/24
**steroids [1]** 21/23
**Steve [2]** 23/15 23/15
**still [8]** 6/15 7/10 13/8 13/14 43/14 43/15 48/1 51/12
**stipulated [1]** 49/1
**stockholders [2]** 37/1 37/1
**Stomping [1]** 12/16
**strangers [1]** 18/23
**strategy [1]** 9/20

**stream [2]** 6/21 6/25
**streamed [1]** 6/17
**streaming [1]** 6/16
**Street [1]** 2/13
**strike [1]** 47/7
**structural [1]** 25/19
**structure [10]** 11/19 13/4 14/15 25/19 27/3 27/24 28/14 28/17 36/19 40/4
**struggling [1]** 42/15
**stuff [4]** 15/25 23/17 38/20 53/25
**subject [6]** 24/9 24/14 33/23 48/2 51/21 51/22
**submitted [1]** 8/15
**subsequent [3]** 10/9 10/15 11/15
**substantial [1]** 34/7
**substantiate [1]** 30/7
**substantive [1]** 23/5
**success [1]** 31/24
**successful [1]** 33/23
**such [1]** 38/15
**suddenly [1]** 13/1
**suggest [5]** 8/16 36/25 41/1 50/20 52/7
**suggestion [1]** 28/3
**suit [3]** 17/2 17/3 17/20
**Suite [3]** 2/6 2/13 2/17
**summons [1]** 41/11
**supervised [1]** 27/23
**supervision [3]** 27/6 27/8 40/21
**supplement [1]** 24/3
**support [3]** 18/3 38/5 38/8
**supported [1]** 9/12
**supporting [5]** 8/24 9/10 11/1 23/11 24/5
**supposed [1]** 17/22
**sure [23]** 7/22 8/7 22/24 23/4 23/6 23/8 23/18 23/21 24/1 24/14 26/22 28/14 30/17 31/18 32/8 38/20 39/7 39/21 43/4 45/16 45/16 47/10 52/9
**surgery [3]** 7/7 7/20 8/23
**surprised [1]** 19/11
**Susan [5]** 2/25 4/25 4/25 7/10 53/9

**S**

**Swiss [1]** 15/21
**sworn [2]** 30/11 30/12

**T**

**table [1]** 4/4
**take [15]** 4/5 8/2 8/16 13/20 15/20 16/12 17/4 18/9 26/8 26/9 28/1 29/1 35/12 43/25 44/1
**taken [5]** 15/24 22/25 25/19 41/5 41/17
**takes [2]** 42/2 46/23
**taking [3]** 8/1 34/4 45/19
**talk [9]** 19/1 20/2 29/19 31/10 44/21 44/22 53/9 55/2 55/6
**talked [2]** 20/7 46/12
**talking [5]** 34/17 38/18 38/22 53/22 55/3
**talks [5]** 19/18 19/19 19/20 20/1 20/6
**target [1]** 34/18
**task [1]** 12/15
**tax [1]** 19/20
**teach [1]** 36/3
**tell [1]** 26/23
**temporary [15]** 1/16 1/16 5/8 8/8 18/1 20/13 20/19 35/23 47/5 47/25 48/3 50/24 52/2 52/3 54/10
**ten [5]** 8/17 15/10 35/12 42/9 44/11
**ten-minute [1]** 35/12
**terms [6]** 23/3 26/24 27/2 27/19 29/15 47/24
**test [1]** 39/9
**testify [1]** 50/13
**testimony [2]** 11/8 39/8
**TEXAS [13]** 1/5 1/23 2/7 2/14 2/17 46/14 56/1 56/2 56/5 56/5 56/20 56/21 56/23
**than [14]** 8/17 9/2 12/24 12/24 13/1 13/25 18/10 23/12 34/13 34/15 42/21 47/12 50/17 53/6
**Thank [7]** 6/5 7/2 8/21 38/16 39/22 45/24 55/9
**Thanks [1]** 7/13
**Thanksgiving [1]** 17/15

**that [348]**
**that's [43]** 5/19 8/4 10/24 11/22 12/18 12/20 12/21 13/6 13/15 14/2 14/2 14/6 15/23 18/4 19/4 20/2 20/15 21/25 22/7 26/2 26/2 26/12 26/12 30/20 30/24 31/7 34/8 35/18 36/1 36/6 37/14 39/14 39/23 40/8 41/3 44/13 44/15 47/10 47/19 48/13 48/14 52/22 55/7
**their [16]** 9/5 9/7 9/14 14/25 14/25 16/3 19/24 20/9 24/7 32/18 32/24 37/12 37/24 46/22 54/8 54/22
**them [15]** 9/19 11/10 13/24 16/4 16/13 17/22 25/15 25/17 26/1 33/2 33/4 33/13 33/23 43/20 53/6
**then [26]** 8/18 10/14 13/6 16/20 16/21 16/24 19/6 20/12 26/1 27/6 28/17 29/16 33/5 34/4 34/18 35/23 42/2 47/1 47/17 47/19 48/14 52/5 52/13 52/14 53/10 53/15
**there [73]**
**these [30]** 7/1 8/1 9/15 10/13 15/16 16/12 16/18 19/2 19/19 20/21 20/23 21/12 22/2 22/19 23/1 24/20 25/12 25/22 25/24 30/13 31/9 31/12 32/19 34/8 35/8 35/9 39/11 41/8 44/2 54/22
**they [71]**
**they're [1]** 37/13
**thing [7]** 8/5 25/21 29/17 51/25 53/1 54/11 54/24
**things [11]** 10/2 19/19 20/6 22/15 22/20 23/1 35/4 46/18 48/19 54/6 55/8
**think [28]** 7/4 7/15 7/18 15/9 17/14 18/3 22/6 24/5 24/15 25/9 31/11 31/12 32/14 33/19 41/21 43/14 43/19 47/6 47/8 48/11

50/8 50/9 50/10 50/16 52/2 52/18 53/21 53/22
**thinking [6]** 8/18 35/12 35/12 42/13 51/22 51/25
**third [2]** 13/5 48/14
**this [106]**
**Thornton [1]** 27/7
**thoroughly [1]** 5/6
**those [18]** 5/5 10/16 13/24 18/7 18/23 21/18 24/18 26/3 28/1 28/19 32/5 33/12 38/25 40/4 40/8 40/18 41/13 43/5
**though [1]** 6/11
**thought [2]** 25/25 28/11
**thoughts [3]** 22/13 42/13 42/13
**threat [2]** 42/16 42/19
**three [9]** 8/14 25/3 30/18 31/2 35/8 36/21 39/11 46/15 53/7
**through [23]** 5/2 5/2 5/2 5/5 5/11 12/2 12/3 12/22 14/20 14/25 14/25 18/14 20/16 29/2 31/18 33/13 37/22 38/19 38/20 41/3 43/3 43/18 53/11
**throw [2]** 23/13 23/24
**throwing [2]** 23/14 44/18
**thwart [1]** 41/4
**TI [5]** 24/1 24/1 43/3 47/17 52/6
**Tidwell [1]** 30/2
**time [19]** 5/6 10/8 15/14 16/8 17/19 17/22 18/5 23/8 27/18 31/1 35/4 35/4 46/3 47/7 50/16 50/17 52/5 52/8 55/9
**timing [2]** 38/6 52/1
**Tobin [1]** 46/15
**today [18]** 5/7 5/11 8/25 9/15 14/9 17/17 17/19 19/13 21/2 22/24 26/8 34/3 34/4 39/19 41/16 42/8 52/21 52/24
**together [2]** 49/13 53/11
**told [1]** 33/9
**tomorrow [3]** 14/9 20/7 34/4

**T**

**too [1]** 47/2
**took [5]** 10/5 10/9 15/18 21/3 39/13
**top [1]** 11/23
**tortious [2]** 22/8 22/10
**total [1]** 33/18
**touch [1]** 20/16
**toward [1]** 38/25
**towards [1]** 10/6
**town [2]** 19/14 47/7
**trading [2]** 44/6 44/7
**transaction [2]** 27/11 28/23
**transactions [6]** 9/19 14/5 14/15 27/13 27/13 48/5
**transcript [2]** 7/24 26/4
**transcription [1]** 56/7
**transfer [3]** 9/1 13/10 13/16
**transferred [1]** 28/1
**treat [2]** 6/11 46/20
**trial [4]** 1/3 39/8 42/2 46/23
**TRO [16]** 8/25 14/10 15/23 17/15 19/6 20/3 26/8 31/23 35/22 36/13 39/9 41/16 42/6 44/14 45/8 52/24
**true [4]** 5/19 37/15 52/22 56/6
**truly [1]** 56/14
**trust [3]** 16/1 21/9 34/3
**trustee [1]** 9/8
**try [6]** 11/9 22/3 35/15 46/1 46/2 51/13
**trying [8]** 13/4 15/13 17/20 20/25 34/21 36/5 50/14 55/4
**turn [2]** 28/16 28/17
**Twenty [1]** 51/1
**Twenty-fourth [1]** 51/1
**two [11]** 11/5 16/18 22/22 25/8 30/18 32/20 33/18 42/13 49/17 50/21 54/12

**U**

**U.S [1]** 29/2
**UBS [1]** 33/24
**ultimately [1]** 22/11

**unbeknownst [1]** 21/18
**under [11]** 9/11 9/19 20/3 27/6 27/8 28/7 28/19 40/21 45/17 52/15 53/6
**understand [7]** 15/14 23/20 24/22 25/14 26/13 43/15 45/9
**understanding [10]** 23/10 23/13 23/18 24/9 24/19 24/20 25/20 25/22 27/22 43/8
**understanding is [1]** 24/20
**understood [4]** 15/12 36/10 49/20 52/25
**underway [1]** 32/19
**undiscernible [1]** 53/3
**unilateral [1]** 37/21
**United [3]** 17/2 17/4 21/2
**units [2]** 36/16 37/21
**University [1]** 46/14
**unlawful [2]** 9/25 41/4
**unless [1]** 45/12
**unquote [2]** 19/9 37/22
**unraveled [1]** 35/9
**untangled [1]** 32/9
**until [2]** 23/25 48/2
**unwind [1]** 39/12
**unworkable [1]** 53/19
**up [19]** 5/12 7/25 8/16 8/18 10/24 11/23 17/4 17/6 22/17 34/9 34/21 38/10 38/13 46/5 52/7 52/16 52/19 54/10 54/19
**UPF [1]** 45/17
**upon [3]** 5/15 28/1 30/7
**urgent [1]** 54/11
**us [11]** 7/15 8/14 16/7 18/15 20/8 39/7 39/13 43/3 43/18 47/17 53/25
**use [6]** 6/25 9/24 12/17 13/24 23/22 48/16
**used [3]** 9/18 16/4 48/7
**using [2]** 13/6 15/2

**V**

**validity [1]** 41/14
**valuation [2]** 39/8 41/24

**value [5]** 26/2 37/24 48/17 48/18 49/4
**ValueScape [1]** 41/25
**ValueScope [1]** 29/25
**variety [1]** 11/13
**various [3]** 10/13 41/3 41/24
**verbatim [1]** 21/4
**verified [4]** 21/14 21/19 24/12 32/23
**versus [1]** 4/4
**very [11]** 21/24 23/18 24/21 25/14 25/20 31/18 32/11 32/11 34/6 35/15 39/13
**via [2]** 6/9 6/16
**vice [1]** 26/14
**vice-president [1]** 26/14
**videoconference [1]** 56/11
**Viejo [1]** 56/21
**view [3]** 5/5 42/7 52/20
**violated [1]** 10/9
**violates [1]** 38/24
**virtual [1]** 6/10
**virtually [1]** 5/18
**visual [1]** 46/3
**voice [1]** 38/16
**VOL [1]** 3/4
**volume [3]** 1/2 3/2 56/9
**VOLUMES [1]** 1/2
**voluntarily [3]** 27/5 27/11 40/20
**voluntary [1]** 16/19
**vote [1]** 10/2
**VS [1]** 1/9
**vu [1]** 17/14

**W**

**wait [2]** 24/23 24/23
**waiving [1]** 8/9
**Walkers [1]** 30/3
**want [25]** 7/22 8/3 8/7 13/20 19/23 22/16 22/20 24/3 31/10 32/12 42/18 43/13 44/19 45/9 47/1 47/11 47/13 48/1 49/13 50/11 50/15 51/20 52/15 52/18 52/18
**wanted [1]** 23/21
**wants [4]** 26/9 26/11

**W**

wants... [2]  35/2 36/5
war [1]  22/4
WARNER [5]  2/3 4/6
 4/11 53/21 53/23
warranted [1]  30/8
was [70]
wasn't [1]  15/19
waste [1]  9/1
watching [1]  6/21
way [11]  7/9 15/10
 16/10 17/21 19/13 21/5
 27/22 27/25 40/15 41/1
 46/25
ways [1]  36/24
we [163]
we'll [12]  4/2 5/5
 5/12 8/18 26/1 49/7
 49/10 51/10 53/9 53/11
 53/20 54/14
we're [21]  5/7 5/10
 5/11 15/12 18/1 23/8
 26/7 31/2 34/11 34/17
 34/20 34/21 35/12
 35/21 38/22 46/12
 46/24 47/3 49/23 52/6
 52/25
we've [2]  17/3 36/18
Weaver [1]  30/1
web [1]  47/12
week [5]  21/2 43/4
 49/14 50/1 50/23
weekend [2]  54/12
 54/14
weekends [1]  54/16
weeks [4]  11/5 31/3
 49/17 54/12
welcome [1]  35/5
well [15]  5/18 13/15
 17/16 18/18 20/14
 23/15 25/11 43/23
 44/14 45/14 45/18 50/5
 51/22 52/9 55/2
well-recognized [1]
 23/15
went [2]  18/6 26/3
were [25]  6/11 9/3
 9/10 10/23 11/4 16/12
 17/14 21/5 25/19 27/5
 27/25 28/23 31/25 33/9
 33/14 36/16 36/25 37/1
 39/2 39/4 40/12 40/17
 41/5 49/14 56/11
what [69]
what's [6]  14/8 14/9

16/14 26/12 33/16
50/14
whatever [2]  48/15
 54/17
whatnot [1]  49/19
whatsoever [1]  26/2
when [11]  5/6 7/8 10/5
 12/16 17/25 18/1 20/22
 26/2 33/20 34/4 34/25
where [14]  8/19 14/1
 14/2 16/7 23/7 26/11
 26/16 27/11 28/4 30/10
 32/20 32/20 40/12
 46/15
wherever [1]  26/5
whether [3]  20/23
 36/19 52/18
which [36]  4/23 9/13
 11/15 12/2 12/6 13/14
 13/19 15/4 18/10 18/10
 20/24 21/9 22/9 22/11
 22/14 24/5 28/16 28/17
 28/21 28/23 30/6 32/9
 33/21 34/3 35/17 36/14
 36/17 37/16 38/5 40/23
 41/13 43/4 44/8 47/8
 54/8 56/10
while [3]  18/6 22/25
 34/11
Whilst [1]  40/13
Whitehill [1]  1/22
Whitney [1]  30/4
who [17]  4/15 6/20
 9/15 16/10 21/7 21/14
 21/18 24/12 25/1 25/5
 28/6 30/21 31/8 32/23
 34/1 37/22 52/20
whoever [1]  35/2
why [12]  8/16 15/23
 19/9 19/10 21/25 22/7
 26/6 31/2 34/8 43/8
 43/9 51/15
wide [1]  23/16
wife [1]  11/4
will [38]  7/1 7/2 7/23
 9/20 10/6 14/13 22/18
 25/9 31/3 31/7 34/6
 35/1 35/23 39/7 39/10
 41/6 42/1 45/18 46/24
 47/8 47/13 47/18 48/3
 48/4 48/6 48/16 48/18
 48/18 49/16 49/20
 49/21 49/21 51/12 52/3
 54/4 54/8 54/17 54/25
wishes [1]  19/13

withdrawal [1]  24/4
withdrawn [1]  21/20
withdrew [2]  21/17
 24/7
within [2]  48/8 53/7
without [3]  6/18 36/4
 44/23
witness [4]  26/25 27/1
 34/19 56/16
won't [1]  44/20
word [2]  14/1 20/9
work [6]  23/11 23/11
 52/9 53/11 53/24 54/4
workable [1]  23/4
working [3]  15/12
 54/15 54/16
works [3]  8/19 50/3
 51/2
worried [1]  26/7
worth [1]  26/1
would [32]  5/14 6/12
 7/8 7/21 9/14 15/22
 20/18 22/22 24/10
 26/20 27/14 27/20
 28/14 28/25 28/25
 29/14 33/9 33/15 36/10
 36/20 37/8 37/25 38/2
 38/3 39/20 40/25 42/6
 43/2 43/6 43/19 44/21
 44/22
writing [1]  56/8
written [1]  39/4
wrong [1]  36/23
wrongdoing [1]  19/24
wrote [2]  38/20 38/21

**Y**

y'all [16]  4/23 8/2
 17/1 23/15 25/12 43/5
 43/17 44/17 45/21
 47/12 47/15 47/19
 49/13 50/1 50/23 54/19
yeah [5]  7/23 25/5
 44/21 45/5 54/1
year [4]  7/19 11/16
 29/22 32/22
years [4]  32/2 46/15
 46/15 53/18
yes [10]  5/16 7/11
 14/12 31/25 32/17
 34/10 38/15 48/11
 49/20 50/2
yet [2]  5/5 22/25
yield [1]  16/20
Yogi [1]  17/13

**Y**

**York [1]** 33/22
**you [95]**
**you've [1]** 19/16
**your [39]** 4/25 5/21
 8/3 8/21 8/24 14/10
 24/17 25/2 26/18 26/23
 29/20 30/9 30/16 30/21
 32/14 34/11 35/7 35/14
 35/15 35/18 36/10
 36/11 36/21 36/25 38/5
 38/12 38/17 39/16
 39/22 40/25 42/5 42/17
 45/21 50/15 50/16 51/9
 54/7 54/17 55/9
**yourself [1]** 6/12
**YouTube [1]** 6/16

**Z**

**zero [1]** 39/14

Tab 5

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
COURT CAUSE NO. 25-BC01B-0027

THE HIGHLAND DALLAS ) IN THE TEXAS BUSINESS
FOUNDATION, INC., THE ) COURT
HIGHLAND )
KANSAS CITY FOUNDATION, )
INC. )
And )
THE HIGHLAND SANTA BARBARA )
FOUNDATION, INC., )
)
)
Plaintiffs, )
) FIRST DIVISION
VS. )
)
)
MARK PATRICK and DFW )
CHARITABLE )
FOUNDATION, CDMCFAD, LLC, )
CHARITABLE DAF GP, LLC and )
CDH GP, )
Ltd., )
)
)
)
Defendants. ) DALLAS, TEXAS

-------------------------------

MOTION TO DISMISS

PLEA TO JURISDICTION

-------------------------------

On the 4th of August, 2025, the following

proceedings came on to be heard in the above-entitled

and numbered cause before the Honorable Bill Whitehill,

Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by Aerial M. Holloway via oral stenography.

APPEARANCES

FOR THE PLAINTIFFS,THE HIGHLAND DALLAS FOUNDATION, INC.,
THE HIGHLAND KANSAS CITY FOUNDATION, INC.
And THE HIGHLAND SANTA BARBARA FOUNDATION, INC.:

    DARREN L. MCCARTY
    SBOT: #(24007631)
    MCCARTY LAW PLLC
    316 West 12th Street,
    Suite 400
    Austin,Texas 78701
    Phone:512-827-2902
    Darren@mccartylawpllc.com


FOR THE PLAINTIFFS,THE HIGHLAND DALLAS FOUNDATION, INC.,
THE HIGHLAND KANSAS CITY FOUNDATION, INC.
AND THE HIGHLAND SANTA BARBARA FOUNDATION, INC.:

    CRAIG M. WARNER
    SBOT: #(24084158)
    DUANE MORRIS LLP
    100 Crescent Court,
    Suite 1200
    Dallas, Texas 75201
    Phone:214-257-7200 (ext. 7277)
    Cmwarner@duanemorris.com


    JOSEPH M. COX
    SBOT: #(04950200)
    DUANE MORRIS LLP
    100 Crescent Court,
    Suite 1200
    Dallas, Texas 75201
    Phone:214-257-7200 (ext. 7252)
    Cmwarner@duanemorris.com


    BENJAMIN L. WARDEN
    SBOT: #(24115926)
    DUANE MORRIS LLP
    100 Crescent Court,
    Suite 1200
    Dallas, Texas 75201
    Phone: 214 257-7200 (ext. 7253)
    BWarden@duanemorris.com

A P P E A R A N C E S (CONT.)

FOR THE DEFENDANTS, MARK PATRICK AND DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC AND CDH GP,LTD.:

    BRIAN SHAW
    SBOT: #(24053473)
    ANDREA REED
    SBOT: #(24053473)
    CARRINGTON, COLEMAN, SLOMAN &
    BLUMENTHAL, L.L.P.
    901 Main Street
    Suite 5500
    Dallas, Texas 75202
    Phone:214 -855-3000
    BShaw@CCSB.com

    Andrea Reed
    SBOT: #(24053473)
    CARRINGTON, COLEMAN, SLOMAN &
    BLUMENTHAL, L.L.P.
    901 Main Street
    Suite 5500
    Dallas, Texas 75202
    Phone:214 -855-3120
    AReed@CCSB.com

Also Present:

Julie Diaz - The Dallas Foundation

Torrey Litteton - The Dallas Foundation

Michael Stockhalm- Counsel for plaintiffs

I N D E X

(MOTION TO DISMISS

PLEA TO JURISDICTION )

August 4, 2025                                    Page, Volume

Appearance.................................3,        1

Proceedings...............................7,        1

General Discussion

With the Court............................7,        1

Defendants' Motion to Dismiss ...........29,        1

Plaintiffs' Plea to the Jurisdiction......50,       1

Defendants' Rebuttal......................90,        1

Plaintiffs' Rebuttal......................94,        1

Courts' Ruling............................94         1

Adjournment..............................101,        1

Reporter's Certificate...................102,        1

EXHIBIT  INDEX

| NO. | Description | Offered | Admitted | Vol. |
|---|---|---|---|---|
| C-1 | Court's Exhibit Chart(Demonstrative) | 9 | 9 | 1 |
| PX-1 | Plaintiffs' Exhibit Chart(Demonstrative) | 49 | 49 | 1 |
| PX-2 | Charities' Allegations (PowerPoint) | 54 | 54 | 1 |

P R O C E E D I N G S

(Open Court, All Parties Present)

THE COURT: We are on the record in Cause Number 25-BC01B-0027, *The Highland Dallas Foundation, Inc., et al, v. Mark Patrick, et al.*

Let's go around the room and make an appearance of counsel, please.

MR. SHAW: Your Honor, Brian Shaw and Andrea Reed with Carrington Coleman, on behalf of Defendants.

THE COURT: And who do you got with you?

MR. SHAW: With Andrea Reed, and --

MR. MCENTIRE: I'm just an observer. That's all.

MR. SHAW: Sawnie McEntire.

THE COURT: Okay.

MR. MCENTIRE: Sawnie McEntire, correct.

MR. MCCARTY: Darren McCarty for the Plaintiff charities. With me, Joe Cox and Craig Warner, my co-counsel; and Julie Diaz, president and CEO of The Dallas Foundation; and her colleague, Torrey Litteton.

THE COURT: We've got a few other folks.

MR. WARDEN: Yes, Your Honor. Ben Warden also with Duane Morris representing the Plaintiffs.

MR. STOCKHALM: Michael Stockhalm, with the

Plaintiffs.

THE COURT: Okay. Great. Y'all have met the folks up here before, and so we won't do that.

This is going to be an interesting morning because I haven't figured out exactly how I'm going to do things yet. We've got the room until at least 1:00 o'clock, maybe longer. Hopefully we won't take that long, but there are a few things that I want to explore.

One, I read everything. That doesn't mean I understand everything, but I've read it all. I think the gist of the case is that the Plaintiffs were getting money that HoldCo distributed from the fund, but the allegation is that Mr. Patrick exercised his ultimate control over the fund, or HoldCo, or both, to distribute the money elsewhere, and the Plaintiffs don't like that, and they want the $270 million back and some other stuff.

Is that basically the gist of it?

MR. MCCARTY: Well, Your Honor, I think there's little bit more to it than that.

THE COURT: Well, I know there is, but I -- but that was just from a high level.

MR. MCCARTY: Well, I would say that they -- that Mr. Patrick, wearing all of his various

hats, disenfranchised the participating shareholders of 100 percent economic interest in a $270 million fund to zero --

THE COURT: Right.

MR. MCCARTY: -- under a calculated plan over the course of a year and a half.

THE COURT: Right. But the gist of it is the Plaintiffs were getting money from basically the fund. Now they're not, and they think Mr. Patrick is legally responsible for that.

MR. MCCARTY: Yes, Mr. Patrick and the other Defendants under which he operated.

THE COURT: Well, under which he operated, yeah.

MR. MCCARTY: Right.

THE COURT: Okay. So we've got that.

So let's mark as a Court exhibit, one of these things that I handed out to you-all.

(Exhibit C-1 was marked and admitted.)

THE COURT: Okay. And that's going to be Court Exhibit 1. It's not evidence of anything. It's just demonstrative to help me try to visualize what's going on, so don't get upset about hearsay or anything like that. It's just me trying to visualize things. I'm a very visual person, and so that's why we're doing

that.

So the blue of Court Exhibit 1 represents the Plaintiffs.

Is everybody good with that?

Green is Charitable HoldCo.

Orange is the DAF -- Charitable DAF Fund.

And I'm not entirely sure who yellow is, but they're downstream from the fund today for sure.

Am I correct that the green HoldCo is the 99 percent, or at least was the limited partner in the partnership known as "the fund"?

MR. MCCARTY:  I would say it slightly differently.

THE COURT:  Okay.

MR. MCCARTY:  It's the limited partners held 100 percent of the economic benefit --

THE COURT:  Right.

MR. MCCARTY:  -- the participating shares. And Mr. Patrick held -- held 100 percent of the managing shares.

THE COURT:  Right.  But it's a limited partnership, correct?

MR. MCCARTY:  I'm sorry --

THE COURT:  The fund is a limited partnership.

MR. MCCARTY: Yes.

THE COURT: It has to have a general partner?

MR. MCCARTY: That's -- well, I'm sorry -- the fund.

THE COURT: Right.

MR. MCCARTY: Right. The fund. General partner was originally Charitable DAF GP.

THE COURT: Right. But my question is it's a limited partnership, so it has to have a general partner, correct?

MR. MCCARTY: And that was the general partner.

THE COURT: Right. Okay. So that general partner is the 1 percent ownership interest?

MR. MCCARTY: All management shares.

THE COURT: Right. And the 99 percent limited partnership interest was what -- you can call it a beneficial ownership or whatever. They were supposed to be the economic -- the green, correct?

MR. MCCARTY: Correct, Your Honor.

THE COURT: All right. So as I'm understanding it, all claims Plaintiffs are asserting have to flow through the green entity; is that correct?

MR. MCCARTY: Yes.

THE COURT: Okay. But the green entity's not a party to this case.

MR. MCCARTY: The green entity is not a party to this case.

THE COURT: The green entity is represented by two JOLs out of the Cayman Islands, correct?

MR. MCCARTY: Well, yes. They have the fund. Or they --

(Simultaneous conversation.)

THE COURT: Well, you're here representing them in a Cayman lawsuit; is that right?

MR. MCCARTY: Am I representing them?

THE COURT: Yes.

MR. MCCARTY: I am not.

THE COURT: Who filed the Complaint in the Cayman Islands?

MR. MCCARTY: Maples & Calder.

THE COURT: Okay. I'm sorry. I thought you were co-counsel in that.

MR. MCCARTY: I am not.

THE COURT: All right. Okay. Fair enough. I just wanted to straighten that out.

MR. MCCARTY: I do not represent the Joint Official Liquidators.

THE COURT: Okay. Somebody does?

MR. MCCARTY: Yes.

THE COURT: And we've established that all claims of Plaintiffs asserting flow through HoldCo, and HoldCo is not a party in this case.

MR. MCCARTY: No, that's --

THE COURT: But you just said earlier that they did.

MR. MCCARTY: Your Honor, the money flowed --

THE COURT: Right.

MR. MCCARTY: -- through HoldCo, but the control of HoldCo and all the others that are Defendants here, who we are suing because of their breaches to us, their fraud --

THE COURT: Right.

MR. MCCARTY: -- and their other fiduciary breaches to us are outside of HoldCo. So they made the decisions. They controlled the HoldCo.

THE COURT: So it's your position that Mr. Patrick owed direct fiduciary duties to your clients?

MR. MCCARTY: That is correct.

THE COURT: Okay.

MR. MCCARTY: Under the Feiner family case out of the Southern District of New York, and that's

exactly how we pled it.

THE COURT: Okay. Just getting things clarified in my mind.

MR. MCCARTY: I understand. It's a complicated case.

THE COURT: It is a complicated case.

So as an aside -- and I'm just going to throw out an idea. And when I throw out an idea, I'm throwing out an idea. It's not a ruling. It's not a suggestion. It's an idea. Somebody has money that can fund things, and I assume it's the fund?

MR. MCCARTY: The fund -- the fund holds a hundred percent of COL HoldCo, and HoldCo owns a bunch of things underneath it.

THE COURT: All right. So this involves a lot of tax issues and corporate structure issues and government issues under Cayman law, perhaps US law, and Texas law, whoever law. A lot of them are Delaware laws.

I know a gentleman, and for full disclosure, he's one of my former law firm partners, Steve Gillis, who is an expert in all of these areas. I'm throwing out an idea of having him appointed as a special master to assist in working through these issues.

You-all don't have to answer that question right this instant because you're going to want to talk about it amongst yourselves and your clients and all that stuff. But it might be helpful to the Court to have Mr. Gillis assist, and he is willing to work at the rate of a thousand dollars an hour, which is substantially less than his normal rate. So I'm just throwing that out there as an idea. I'm just looking for your input on that.

All right. I have very serious concerns about Rule 39, and whether the JOLs and whoever the fund is represented by -- neither of them are here -- are necessary parties, such that the Court can't go forward without their joinder or y'all telling me how I can fashion effective relief that would not affect their rights because there is the Cayman lawsuit going on that asserts many of these same claims and many of these same parties.

MR. MCCARTY: I -- I would suggest if that's a -- sort of a question.

THE COURT: That is a question.

MR. MCCARTY: Okay. I would suggest that the Cayman lawsuit is built upon a number of the same facts, in fact, almost entirely the same facts.

(Simultaneous conversation.)

THE COURT: Exactly. That's the way I --

MR. MCCARTY: However, I would say that our claims are different from the Joint Official Liquidators claims in this sense. There were direct obligations to the participating shareholders, the Plaintiff charities here, not to commit fraud, not to breach fiduciary duties under Cayman law, and they did both of those. And I hope to show the Court in our presentation, those were quite direct.

There was no -- their HoldCo itself was not implicated in those direct communications. And they're very direct, and they're very pointed. And I think when the Court sees that, they will understand the difference between what we are doing here and the Joint Official Liquidators are doing there.

THE COURT: But for right now -- so let's assume that we have two circles: One is the Cayman lawsuit, and one is this lawsuit. There is a substantial overlap of those two circles, where the rights and the claims of the JOLs would be implicated by the outcome of this case, correct?

MR. MCCARTY: While I would say that the facts and circumstances are the same, I would suggest to Your Honor that the Joint Official Liquidators probably understand that there is relief that we are seeking

here, that at least as a legal matter is different.

And I would also suggest that this Court has ultimately -- and this is not for today, I don't think, but ultimately this Court has power to do some things that the Joint Official Liquidators do not necessarily have.

THE COURT: Maybe; but I mean, is there any reason why the JOLs have intervened in this lawsuit, or y'all haven't joined them in this lawsuit?

MR. MCCARTY: Your Honor, I don't believe that the Joint Official Liquidators have made a decision about that.

THE COURT: Okay. But you can make a decision to sue them.

MR. MCCARTY: The Joint Official Liquidators?

THE COURT: Yes.

MR. MCCARTY: Your Honor, I don't think that there is a need to sue HoldCo.

THE COURT: Well, join them as a -- in some capacity.

MR. MCCARTY: Well, but -- but your question begs the question, right? Who -- who are we accusing of malfeasance against my charities?

THE COURT: I get that. But whatever the

outcome in this case is, it seems to me will have some impact on the litigation going on in the Cayman Islands and vice versa, depending upon who gets there first, the outcome of the litigation in the Cayman Islands will have an impact on this case.

MR. MCCARTY: I would also say, Your Honor, and it's important to your question because I don't want to leave anything unsaid --

THE COURT: You can sit down if you want.

MR. MCCARTY: Yeah. So -- thank you.

Importantly, Your Honor, the Cayman liquidators, the official liquidators who are obviously, as you understand, officers of the Court in the Cayman Islands, have not yet been recognized in the United States under a Chapter 15.

THE COURT: Yeah, but they've filed a Chapter 15 proceeding.

MR. MCCARTY: They have filed a proceeding, but they have not received recognition in the US.

THE COURT: What are the odds of that being denied?

MR. MCCARTY: Well, Your Honor, I -- I have no idea. I don't know if they're going to contest it, if the other side is going to contest it. And I don't see any reason why we would contest it, and I don't

believe we will contest it. It is not scheduled right now for a hearing.

And so until they are recognized in the United States, they cannot...

THE COURT: Right. Okay. At some point in the very near future, we need to address Rule 39 and its application in this case, if we can figure out a schedule of how to do that. We want to be efficient, whether it's here or in the Cayman Islands. One place or the other seems to be the appropriate place to do this.

So let's think about and discuss at the end of the day a schedule of how we are going to deal with Rule 39 and whether we have the necessary party issue to deal with it.

Again, these are not rulings. These are just thoughts to throw out there to help you-all guide in your discussions. It seems to me that the Plaintiffs probably have it -- well, let me back up.

There are at least five different categories of subject matter jurisdiction: You know -- you -- you have standing, which is a component of subject matter jurisdiction.

You have statutory subject matter jurisdiction. If you were in federal court, you'd have

federal question or diversity. 25A.004(b), it defines subject matter -- or statutory subject matter jurisdiction.

You can have all sorts of things. I don't think capacity is a matter of subject matter jurisdiction, but those deal with whether we have the correct parties in the case and who really owns the claims.

Now, I noticed going through the Cayman pleading, and I mentioned it before we got started, Paragraph 73.2, romanette (ii) says, "Except it's provided herein." And I think were talking about the Limited Partnership Agreement, "The limited partners," which should be HoldCo and management, right?

"In their capacity as limited partners shall not participate." And I think we're really talking about your clients. "Limited partners shall not participate in the management of or have any control over the partnership's business or shall the limited partners have the power to represent, act for, sign for, or bind the general partner or the partnership."

And so I'm curious how that plays out in this case.

MR. MCCARTY: Well, Your Honor, I think it's fairly straightforward; and again, I'll refer back

to the Feiner family case and Cayman law.  Just because there is not power granted under the partnership agreements, just like we have in the United States and in every state, we have other governing law over corporate structures.

And what we have pled, and what is very clear in Cayman law -- and I'm happy to brief this further for the Court -- is that they have -- that Mr. Patrick, as the control person in his various forms, had obligations to my clients that were outside of the partnership agreement.

THE COURT:  Okay.

MR. MCCARTY:  And -- and just because we can -- of course, we know you can have any sort of articles, governing articles, in Texas, or Delaware, or elsewhere, they don't trump the law.  And so when he breaches -- they don't trump the law.  The law may provide --

THE COURT:  I think -- I'm fairly confident, at least under the Texas Business Organizations Code, that partnership agreements can modify.

MR. MCCARTY:  They can.  Under Cayman law, it's not the same.

THE COURT:  Okay.

MR. MCCARTY: And regardless of the powers granted under the partnership agreement, which was the Amended and Restated Limited Partnership Agreement, they govern the fund, but also govern some of the matters and structure of the fund, despite saying that there were a lot of obligations, et cetera, which we think are important for other reasons.

But despite saying all these obligations, Mr. Patrick certainly did not honor those. And please don't hold me to Mr. Patrick. When I say "Mr. Patrick," Mr. Patrick is all that --

THE COURT: A lot of technical support.

MR. MCCARTY: Right.

So he did not -- you know, obviously did not honor that particular mandate, if you want to call it that, in the Amended and Restated Limited Partnership Agreement. But in addition to that, there is Cayman law, UK Commonwealth law, that applies as an umbrella over that, that says you cannot -- you cannot exercise your powers in a way that breaches certain duties to shareholders, et cetera.

THE COURT: You know, I -- and I'm sure that's correct. That's fairly universal.

MR. MCCARTY: Right.

THE COURT: But this just says who can

represent the limited partners. Basically it says they don't have the capacity to bring claims on behalf of the partnership.

MR. MCCARTY: Well, we know this: The limited partners were able to walk into the Cayman Islands Grand Court and ask for and receive an equitable lining out.

THE COURT: Right.

MR. MCCARTY: So they have power.

THE COURT: Yeah, and that's why we have JOLs because the JOLs are now representing the interest of the fund, the partnership.

MR. MCCARTY: Well, that is correct because of that action, yes.

THE COURT: All right.

So one of the other things we're going to need to talk about briefing-wise is what impact this provision of the Limited Partnership Agreement has on this Court's ability to proceed with you-all. And it may be that there are some causes of action that we can carve out. You're talking about direct causes of action?

MR. MCCARTY: Yes.

THE COURT: Okay. Maybe that's all we can go forward with. Maybe not. I don't know. And the

folks over here to my left (indicating) haven't had a chance to address anything yet.

MR. MCCARTY: He's listening and taking notes.

MR. SHAW: Judge, I'm loving this right now.

THE COURT: Well love it, because you're about to not love it so much.

But -- so I'm concerned about Rule 39. I'm concerned about this provision of the Limited Partnership Agreement.

Now, I'm just throwing it out for discussion, it seems to me that for having a directed particularized standing type injury, that component of subject matter jurisdiction -- and we need to be clear in the types of subject matter jurisdiction issues we're talking about.

One is statutory jurisdiction. You know, what part of this Government Code 25A.004(b) applies, if any? And particularized injury standing. Two completely different topics.

Now -- and, yeah, I can be persuaded otherwise, but my sense at the moment is the Plaintiffs have, certainly for direct claims, but for some of these corporate claims -- correct. For the direct claims, you

don't -- you know. We'll figure out what section they might go under.

For the claims that flow through the green entity on Court Exhibit Number 1, the Plaintiffs probably have sufficient particularized standing injury there, but I am very concerned about that capacity.

And so one question that I would have is the briefs that are before me, the motion and whatever, the discussion is -- is captioned and labeled jurisdiction, but the substance of it seems to be -- also be about capacity.

MR. MCCARTY: Well, Your Honor -

THE COURT: You can sit down. Whatever is comfortable. Don't feel compelled to stand up.

MR. MCCARTY: I'm sorry. It's --

THE COURT: Then stand up if you want to stand.

MR. MCCARTY: If you want me to sit down, I will. Thank you.

But, Your Honor, the -- first of all, it's not labeled capacity. Capacity can be waived. Your Honor is raising it sua sponte. And I think that's obviously the Court's providence, but this was brought as a matter of standing under the typical three components of standing: Injury, traceability, and

redressability, and under whether this Court has particular subject matter jurisdictions under Chapter 25A.

And so we -- you know, that is what we briefed obviously. I understand the Court's interest in joinder parties and all those other issues, but I think on those two issues, which were -- I -- I know we're both here to talk about today, we -- we believe that without question, we have standing under -- we have standing, and we have subject matter jurisdiction in this Court.

THE COURT: No, I've got that. I -- I guess my question is the substance of the argument seems to talk about both concepts: Injury standing, statutory subject matter jurisdiction, and capacity. I mean, granted the motion's called a motion to dismiss, and there's a lot of discussion about statutory stuff.

MR. MCCARTY: Well, if we wanted --

THE COURT: No, let me finish.

MR. MCCARTY: Sure.

THE COURT: My question is if -- the Supreme Court for the last 30-plus years has been abundantly clear. They want courts, lower courts, to deal with things on the substance, on the merits, as opposed to technicalities. I've learned that.

So if -- in substance, we're talking about both things -- if we're talking about subject matter jurisdiction and its components and capacity, is there anything else that needs to be said to enable the Court to make a ruling on capacity issues, or do you need to brief that separately?

MR. MCCARTY: Well, Your Honor, we can brief it separately, and would be happy to do so. I would suggest to the Court that on our direct claims; which again, I will hopefully make abundantly clear to the Court, there is no question that the Plaintiff charities have the capacity to bring those direct claims.

THE COURT: Well, direct claims, that would seem to be sensical. It's the things that flow through HoldCo and the fund that I am concerned about.

MR. MCCARTY: Well, Your Honor, all of these actions were taken by the control person acting in different capacities, okay? He was acting as the GP of the fund. He was acting as sole managing shareholder of HoldCo. He was acting as the sole member of the DFW Charitable Foundation. He was acting as the sole person in charge of CDMCFAD. He was acting in all of those capacities. All of those are governing capacities, and he set all of the wheels in motion, and thus, absolutely

has liability.

THE COURT: Okay. We're not concerned with liability at this point.

MR. MCCARTY: Well, that's --

THE COURT: We're trying to figure out where these claims are going to go forward. And maybe some of them go forward here, and some of them go forward in the Caymans. Maybe they all go here, maybe they all go there, but I don't want the same claims going on in two places at the same time.

MR. MCCARTY: Well, I would suggest, Your Honor, but liability -- the only reason I mention liability is due to traceability being addressed.

THE COURT: Yeah, I got that.

Okay. Y'all have been very patient and quiet over here to my left (indicating).

MR. SHAW: I have to stand up just so I can work out.

THE COURT: Okay. That's fine. Go to the podium if you want. I am decidedly not a federal Court. I don't want to be a federal Court, so whatever you're comfortable with.

MR. SHAW: Understood, Judge.

THE COURT: Go ahead.

MR. SHAW: We're ready to make argument?

THE COURT: No, I -- just talk about the things that we've been talking about if you want to, or you can proceed to your argument. I think I've laid out some of my thoughts and concerns.

And listen, if y'all want to take ten minutes to regather your thoughts based upon anything that I've said, I'm happy to accommodate that. I want the best picture of an argument that we can get.

MR. SHAW: I will just first comment about what you've said so far, and then if I can get into my argument, I --

THE COURT: Sure.

MR. SHAW: I'll -- I'll move to the -- to the lectern here.

THE COURT: Whatever you are the most comfortable with doing.

MR. SHAW: Judge, in general terms, I wholeheartedly agree with a lot of what you are saying, if not all. On the capacity issue, we would -- would like to brief that --

THE COURT: Okay.

MR. SHAW: -- to have additional briefing if we're going to look at the capacity, we have to look at that as a discrete issue, but we would want to look at that.

THE COURT: Phillip, make sure when we're done that we set some schedules for these agreeable things.

MR. SHAW: We share the Court's concern with regard to Rule 39 and the fact that all the relevant parties are here in order to afford full relief.

And overall, you know, the last comment you made, Judge, about trying the same things that are being tried in other places is our overarching concern. I think that, you know, we made clear that we're not saying that nobody has a right to a cause of action against anybody here. We're not saying that there is no redress. There is a redress. There is just an appropriate time and place for that.

The record, Judge, I think is pretty clear what is actually going on here, right? It's a fight over the control of the charitable DAF, as we referred to it in general.

THE COURT: Right.

MR. SHAW: And, you know, the record that was submitted by the Plaintiffs makes pretty clear that Mr. Patrick and Mr. Murphy are duly authorized control persons for what we call the charitable DAF.

THE COURT: Right.

MR. SHAW: We know that Mr. Dondero is funding the litigation that is proceeding.

Mr. Dondero does not like the status quo. He doesn't like that Mr. Patrick and Mr. Murphy are the control people. We get that. That's the overarching dispute here. There are allegations of wrongdoing, and in our time and place we will dispute that, and we will have a factfinder make a determination on that.

I -- I thought it was interesting that counsel said that what they're seeking is something different than what the JOLs are seeking. They're seeking -- they're seeking a receivership. They want to take over. They want someone else to take over.

So I don't know how we can say that the relief sought here is somehow different than what is being sought in the Chapter 15 or in the Cayman.

And ultimately the question here is, you know, we have these three different actions now: A Cayman liquidation; a Cayman lawsuit has been filed.

THE COURT: You know, maybe we can arrange for this Court to sit in the Cayman Islands?

MR. SHAW: It would be nice. Yeah, after hurricane season, I think. We want to wait until, you know, November or something like that.

But, you know, we have this Delaware

Chapter 15 pending, and now we have this case. So as the Defendants here, what we're simply saying is, you know, does this Court of limited jurisdiction, should this remain the third front in this litigation onslaught?

Should this be another vehicle to tap the resources of the charitable DAF, the charitable DAF that ultimately Mr. Dondero claims he is acting on behalf of? This all costs money. The liquidation costs money in the Caymans, the Chapter 15 costs money in -- in Delaware, and this action costs money as well, ultimately money that can't be provided to the charities.

I also want to make the distinction between the clients that are being represented here. Those are not the ultimate charities.

THE COURT: I got that.

MR. SHAW: Yeah. And so these are these Highland supporting organizations, each of which Mr. Dondero serves as a director.

So we say no, this is -- this is a round-peg-square-hole issue. And I was sitting over here thinking -- it wasn't because I was hungry, but I was thinking about a pretzel. That's all I could think about when I was listening to the conversation. We are

getting into a pretzel because this is the improper procedural method. And what they're doing here wasn't to run around the Caymans or around the due process of things, done right before the 4th of July in order to try to bullrush.

That's why we're having all these issues. That's why we're trying to create causes of action where they don't exist. These are the wrong plaintiffs bringing the wrong claims. They don't have everyone here that needs to be here, and it's in the wrong court.

You know, addressing the statutory construction issue, which obviously is key to determining whether this Court has subject matter jurisdiction. Plaintiffs say this is easy. Just look at the statute, done, done deal, mic drop, we don't even need the Judge, based upon their interpretation of the statute. I think it's a little bit more nuanced, and I think we need you.

This -- you know, and -- and I do want to point to one point issue, too, which is, you know, we referenced a Delaware law. We said that Delaware is currently the preeminent corporate governance venue.

You know, and I appreciate the bravado here, and I want Texas to be the preeminent corporate governance, but I don't think we can spike the ball

quite yet after less than a year. And what -- what is being promoted as an interpretation of this Court's governance as -- as the ability of this Court is really dangerous to that whole concept because what they say is that a stranger to an entity can sue another entity for a corporate governance issue, and I have a problem with that.

The Plaintiffs also offer no limiting principle at all and in particular to B(2). There is no limit. They say if we say it's about corporate governance and we meet the amount of controversy requirement, we're good, and I don't think that's the case.

So to your point, Judge, you talked about standing. We don't have any cases about standing in the context of the Texas Business Courts. And I recognize that the Texas Supreme Court has in recent years talked about standing since the term "standing" has been misused -- well -- and overly broad application.

We don't know quite how the Texas Supreme Court is going to characterize the issues that we've raised here because it hasn't gone up to the Texas Supreme Court yet. So we don't know if the Texas Supreme Court is going to call these issues standing or what they are going to call them; but typically, we are

in a court of general jurisdiction. We're in a district court. And when we're talking about subject matter, we're talking about something different than what we're talking about here.

So but I -- I don't think that label is really what's going to change the day here. I think it's about what the statute says and what claims and causes of action have been alleged here.

I also think it's an important point to talk about the legislative knowledge. When this statute was enacted that the legislature -- and I am quoting from *Paxton v. Annunciation House, Inc.*, which is a 2025 Texas Supreme Court case. The legislature uses statutory language with complete knowledge of existing law and with reference to it.

So when the Texas Legislature enacted the statute that governs this Court's subject matter jurisdiction, it took into account the existing causes of action, the cognizable causes of action that were available in Texas with regard to corporate governance and with regard to the breach of fiduciary duty, and with regard to the other issues that are in the statute. And so we have to read the statute with the recognition of that.

I'm going to take the first, what I believe

is the kind of low-hanging fruit subsections first, and then go to b(2) because b(2) is the broadest, I believe.

THE COURT: Yeah. And just for everybody's benefit, I struggle to see how b(4) and (5) apply on their terms. B(2) is their best shot. That's not to say that I am excluding 4 or 5, but I think their best shot is under b(2).

And just -- my thought is they are within the class of people that the legislature probably contemplated would have the ability to invoke b(2). They're not strangers off the street. They are the beneficial interest of the limited partnership that was created to provide -- to them to provide downstream to charities.

MR. SHAW: My job is to dissuade you from --

THE COURT: Your job is to persuade me otherwise.

MR. SHAW: -- when you pen your opinion. So I will start with these ones because I like these first.

Before -- it says "the organization" I think that term "the organization" is the real key part there.

THE COURT: Okay. Hang on a second. I've

got b(4) in front of me. It's an action by an organization -- that's not -- that's not in our case -- by an owner of an organization, okay? And so they're claiming to be owner of an organization, but I think the only organization that they are arguing to be an owner of is HoldCo, right?

MR. SHAW: Exactly right.

THE COURT: Okay. And so it's brought by them, Plaintiffs, against a controlling person, which I -- I believe they believe is Mr. Patrick of -- and he's acting as a controlling person of HoldCo; is that right?

MR. SHAW: That's exactly right. "The organization."

THE COURT: "The organization." Alleges an act or admission by Mr. Patrick in his capacity as a controlling person of HoldCo.

MR. SHAW: Exactly.

THE COURT: Is that what they're arguing?

MR. SHAW: That's what I understood.

THE COURT: Okay. Address that.

MR. SHAW: Well, the point there is that sub (a) talks about "the organization". So "the organization" is not even a party in this lawsuit.

THE COURT: Yeah.

MR. SHAW: And that's what doesn't make any sense.

THE COURT: Well, there's an owner of HoldCo, and HoldCo's not a party.

MR. SHAW: Correct.

THE COURT: But it seems to me they're complaining about his conduct as a controlling person of HoldCo.

MR. SHAW: As a completely separate entity.

THE COURT: Right, as a completely separate entity, and of the fund, probably, as well, which brings me back to Rule 39, and necessary parties in their capacity, and things like that.

MR. SHAW: Exactly, Your Honor.

THE COURT: Go ahead.

MR. SHAW: So I think that addresses b(4). B(5) is -- I'll call it the -- the loyalty, good faith, breach of fiduciary duty claim or -- or subsection.

THE COURT: Right.

MR. SHAW: You know, we believe that that section encompasses derivative actions. We agree with the Plaintiff that it doesn't only encompass derivative actions.

THE COURT: Correct.

MR. SHAW: It also encompasses actions by

an organization against its officers, directors, and managers.

THE COURT: Now, hang on a second. I think -- I think the test is -- somewhere -- are the Plaintiffs suing the Defendants in Defendants' capacity as a controlling person of an organization of which the Plaintiffs are an owner --

MR. SHAW: Exactly.

THE COURT: -- right? If only the legislature would ask me to write this statute. We'd be a lot better off. Okay. That's b(4); is that --

MR. SHAW: Correct. That's b(4). This has the ownership of provision there.

THE COURT: Okay. Go ahead with b(5).

MR. SHAW: And then b(5) also has an owner requirement. And it also talks about breach of fiduciary duty or loyalty -- it doesn't say breach of fiduciary duty, it says loyalty and good faith, the same thing.

Again, we think that encompasses both derivative action, not exclusively because b(1) has derivative, but also an action by an organization against a director, officer, et cetera, of that organization.

THE COURT: Right.

MR. SHAW: And that's, again, not what we have here.

THE COURT: Not completely.

MR. SHAW: So and again, I -- I go back to that touch point with the *Paxton v. Annunciation* case, which is the legislature was thinking about what is the body of existing corporate law and can someone sue in this capacity when we're interpreting the statute when they were drafting this. They don't point to any analogous case in Texas that would provide them some remedy that's akin to what they are asking for.

So b(2) is where I got a lot of this. And b(2) is obviously a very, very broad statute. And, you know, we have at least one sister Court of this Court that has expressed the broad nature of that Court or of the actual provision.

So what I -- what I think is important is we've talked about what is an action regarding, and then for shorthand, I'm saying corporate governance. What is an action -- quote, action regarding corporate governance?

They say, well, we've alleged facts about corporate governance of two non-parties to this litigation. And it's more than $5 million, and, ergo, this court has subject matter jurisdiction.

THE COURT: Aren't they really asserting a derivative claim?

MR. SHAW: That's how we read it, but they then disavowed that they were asserting a derivative claim.

THE COURT: Aren't you really asserting a derivative claim?

MR. MCCARTY: Absolutely not. And I will demonstrate that, I think.

THE COURT: All right.

MR. SHAW: So, you know, we have these non-party claims, and I go back to this square peg, round hole. That's the problem here, and that's what's creating these issues. So they don't seek any relief against the non-parties that they're claiming that this is about corporate governance. They are not parties, and there are no claims against either of them.

I don't know what ultimately a trial looks like. How do they -- and this goes to the Court's issue with Rule 39, how do you afford relief with regard to the corporate governance of two non-parties? I don't -- I don't know what effect that has at all.

So that's the problem. And I think what we need to go back to is, again, what does "action regarding" mean? Our position is that action regarding

is not just a fact pattern that touches upon corporate governance. That action regarding means that you have alleged a cognizable cause of action regarding corporate governance. That's it. Alleged a cognizable cause of action regarding corporate governance.

THE COURT: What does that mean?

MR. SHAW: It's something that's recognized by Texas law. That -- that you can't -- that -- and that can afford relief; so for example, that --

THE COURT: Well, the Cayman case would be under Cayman law. Internal affairs have --

MR. SHAW: It would be, and I haven't gone through all the different corporate documents. We do have some Delaware entities, we have some -- you know, but for those particular entities, you're right. But these are two -- these are two non-parties, nonparticipants in those entities, battling it out in Texas Business Court with regard to their corporate governance of two entities that are not part of the lawsuit.

So to your question, what does corporate governance look like? What does a cause of action regarding corporate governance look like? Well, it looks typically like a derivative claim or a claim by -- or a direct claim that somebody violated the corporate

governance documents that --

THE COURT: Which by our statute would be, for example, a breach of the partnership agreement or the bylaws, or things like that.

MR. SHAW: Exactly. And, you know, Judge, we go back to look and, you know, the -- that Rook case that we -- that we point to. You know, the Rook case refused to say that the statute only involved internal corporate governance. The Court rejected that.

And I -- from my reading of that case, the Court did that because it says the plain language does not say anything about internal corporate governance; and therefore, I am not going to limit the statute.

THE COURT: Let me ask you this question, a little bit off topic, but what charities are getting the fund of the money now?

MR. SHAW: We are -- no one is right now. We are in the process of naming new charities, but that has not -- and obviously, we have all this going on, so I don't know where that stands as of this moment, but I know that is in process.

THE COURT: Is there any thought to creating a way to get the money back to the original charities and bypasses the supportive organizations?

MR. SHAW: I think that could -- that -- I

don't see why that could not be a part of some resolution at some point. I can't commit to that, but I hear what you're saying.

THE COURT: Wouldn't that make sense as a way to resolve things, is to create a new structure that goes back to the intended beneficiaries?

MR. SHAW: Judge, I've learned a long time ago in this litigation with Highland and others that suggestions like that absolutely sound great. And we -- and I would agree, but I suspect that we would not have an agreement to address that.

THE COURT: That's just an opinion. Let's move on.

MR. SHAW. But this -- this is about control, and that's it.

THE COURT: Right. And I got it.

MR. SHAW: So going back to this action regarding -- I think that -- and if you look at that C-1031 LLC case, which is a Third Division.

THE COURT: Yeah, I'm -- kind of what I'm thinking is according to the partnership agreement, all the money that's in the fund is supposed to go way downstream to these four supported organizations, and if it's not happening, is that not a matter of governance?

MR. SHAW: A matter of governance over any

of the parties that are parties to this case, I would say no because it's --

THE COURT: The governance of HoldCo, and really the fund, I think is the key.

MR. SHAW: I think the question goes back to whether these parties have standing to assert those claims.

THE COURT: All right. But that's a different issue. Okay.

MR. SHAW: Are there corporate governance issues in this case as a -- are there facts alleged? Yes, they allege facts with regard to corporate governance. Our point is, is that that is not enough, that you have to allege causes of action that you can pursue with regard to corporate governance.

THE COURT: But that's a capacity issue.

MR. SHAW: And I hear you, Judge. I don't know whether we call it capacity or whether it's a jurisdictional issue. I think this is -- obviously, we're making law here because there's not any on it, but I don't know the answer to that, whether that is a capacity issue that we challenge through some other mechanism other than a motion to dismiss, or if it is a plea to the jurisdiction verses a dismissal. We've brought it as a motion to dismiss.

THE COURT: Yeah, I'm just reminding people that I'm very mindful of the Supreme Court direction to not get hung up on labels of documents dealing with the substance of the arguments presented, so...

MR. SHAW: And I am with you. I think that the Supreme Court also has a countervailing public policy, that we want to be efficient, that we don't want to try the same thing over and over again. We don't want to have three people pursuing three different -- arguing the same thing in three different venues, and that's why we have standing issues here.

So we're not here to get tripped up on technicalities. This is not a gotcha. This is we need to be efficient, and we need to pursue this. And we're ready to go. We're ready -- we're ready to dispute these allegations. We're ready to fight them and to demonstrate that they're wrong. But we want to do it in the appropriate place, and we don't want to do it in five or six different forums.

We want to do it where it should be held, which is either in the Caymans, or through the Chapter 15, or if the JOLs want to come down here and assert claims, we're happy to dispute them here. Our issue is these Plaintiffs, with these claims, in this Court.

I want to touch upon, just real quickly, the -- that on the court case that we cite out of Delaware, understanding that this Court is not bound by Delaware law, but, you know, it does stand for the premise that a stranger to a corporation does not have the ability or capacity or standing to dispute the corporate governance of a stranger here.

And I think that goes to, you know, our hypothetical -- Exxon, Chevron hypothetical. There's a danger here in a ruling that could creep outside of this particular set of facts and really trip up the jurisdictional basis for this Court.

And again, I -- I point to the fact that there is no limiting principle that is offered by the Plaintiffs at all. They simply say fact pattern regarding corporate governance, you know, amount in controversy, and legality.

So, you know, I've been talking for a while, so I'll -- yeah, I'll conclude. I want to emphasize that, and we've said this from the get-go, we are not saying that no one has a cause of action and that there is not a remedy.

And while we dispute the underlying facts, there is going to be a time and place that we are going to have an up or down before a factfinder. And so be

it.  So be it.

What we want to do is to be good stewards of the DAF's resources.  We want to litigate this in an efficient way in the correct and appropriate forums, and we believe this Court is not the correct and appropriate forum; and therefore, we ask the Court to dismiss the case based upon a lack of subject matter jurisdiction.

THE COURT:  Do you thing that your clients are subject personal jurisdiction in the Cayman Islands?

MR. SHAW:  I've got a lot of clients, so I've got to be careful -- I've got to be careful without a list, and I don't want this to be --

THE COURT:  You don't have to give me an answer right now, but think about that.

MR. SHAW:  I really dislike not giving you an answer, but that one I don't know.

THE COURT:  Well, listen, business court is a different experience.  And what I want to do is have conversations among people so that we can get to the bottom of things.

MR. SHAW:  Understood.  Well, I'm going to stick by my non-answer.

THE COURT:  That's fine.  At this stage, at least, that's a perfectly acceptable answer.

MR. SHAW:  Thank you for your time, Judge.

MR. MCCARTY: Thank you, Your Honor.

I am happy to be in business court, and I appreciate the mission of the court very much. I understood the mission of the court before it was formed. I'm happy to see it formed now.

So with permission, Your Honor, I am going to hand out a few things: One, I'm going to hand out something akin to what you've done, which are structure charts. It's the same structure charts that you see before you.

THE COURT: Right. Okay. I've got those.

MR. MCCARTY: And these are kind of -- the reason I am handing them up is because it will be a little bit easier to follow along with the PowerPoint that I think Mr. Warner is going to help with.

MR. WARNER: May I approach to plug in, Your Honor?

THE COURT: Yes, sure. And let's get those marked for the record.

MR. MCCARTY: And then, Your Honor, I'm going to go ahead and give counsel a couple of copies of this PowerPoint. It's a little more animated.

Would you like a copy?

THE COURT: Sure.

MR. MCCARTY: If you want one.

THE COURT: Yeah.

MR. MCCARTY: And I am a visual person as well, Your Honor, which is one of the reasons why we are doing the PowerPoint because it is a complex issue, but it demonstrates largely the correctness of our claims, and then why we think, obviously, there is standing here and -- the purpose of our claims, and why we are standing here, and why we think this Court has subject matter jurisdiction.

Now, one thing I want to stay off the bat is we have heard that there's been a standing decision in this Court, et cetera, and maybe he meant subject matter jurisdiction, but --

(Off-the-record discussion between counsel.)

THE COURT: Just tell me what slide you're on because I don't have eyes in the back of my head.

MR. MCCARTY: Yeah, I understand. So right now, I'm on the final slide. But standing is a constitutional matter. There's no difference in standing between this Court or any other Court in the State of Texas.

And so I don't think that's an issue. I think 25A is new, and there's subject matter jurisdiction under 25A. But I'll start with that, and

then move into the presentation.  And as I go through, hopefully I'll answer all of the questions raised by Mr. Shaw.  I am moving to Slide 2.

So we've heard a lot about Mr. Dondero, both in the briefing and somewhat this morning.  But Ms. Diaz is here on behalf of The Dallas Foundation, which is one of the main recipients.  And these recipients have done a lot of money -- a lot of good with the $270 million that Mr. Dondero gifted these charities, and that is true.  Mr. Patrick did not provide the $270 million.  Nobody else did.

So to the idea that Mr. Dondero cares about this case -- he cares equally, I'm sure, about this case; however, that is not who controls these charities. And if we eventually get to the point where we talk about it on the merits, I have no doubt that Ms. Diaz is going to explain, as well as some of her colleagues of the other organizations, will explain that they control these supporting organizations, and these supporting organizations, obviously, on their overall organizations.

Okay.  With that, I want to move into --

THE COURT:  And there's tax code reasons why --

MR. MCCARTY:  There's tax code reasons --

and -- and, Your Honor, yeah, that's -- this is a good time to address the question that you had earlier. Could -- could Mr. Patrick, if he wanted to, fund The Dallas Foundation directly? I think the problem with that is the tax code.

THE COURT: Well, it's not a question of Mr. Dondero. I mean, he could do that any time he wants. The question is money that's in the fund.

MR. MCCARTY: Right. Could Mr. Patrick do that without a supporting organization? I don't know that it could, but I'm not a tax lawyer. I'm not a corporate lawyer. I'm just a litigator, so I don't want to get into that too much, but I think there are complications with that.

But again, and I'm jumping way ahead here, but that is one of the reasons why a neutral party should be in place, so that we can start moving charitable funds back to where it needs to go. And make no mistake, the absence of $270 million is making an impact.

THE COURT: Well, I'm sure, yeah.

But the ultimate question is, I think, how did we get money back into the charities where it was intended to go? Isn't that...

MR. MCCARTY: Yes. Absolutely. That is

the question.  Today we'll get through -- I hope get through some of the preliminaries and get us along that road.

So I'm moving to the second side, which is just the claims that show jurisdiction.

Okay.  I'm going to start with some background because the background sets out the claims at issue here.  So we start --  we start -- oh.

THE COURT:  Hang on a second.  Let me number these pages here.  So we --

MR. MCCARTY:  Unfortunately, Your Honor, for your --

THE COURT:  I'm still numbering.

(There was a pause in the proceedings.)

THE COURT:  Okay.  What slide are you on?

MR. MCCARTY:  I am on Slide 4.

Now, there's -- I've tried to save you a headache by giving you these slides.  I thought you would have a monitor.  There are a bunch of slides we sort of animate through.

THE COURT:  Yeah.

MR.  MCCARTY:  So I skipped a bunch of animation.  This is not animation, but I'll tell you what it is.

THE COURT:  So we're going to call this

Plaintiff's Exhibit 1?

MR. MCCARTY:  Sure.

(PX-1 was marked for and admitted.)

MR. SHAW:  And it's demonstrative.

THE COURT:  It's just demonstrative.

MR. MCCARTY:  Right.  Of course -- of course.

So way back in November of 2023, we know that the participating charities, the Highland Foundations, had 100 percent ownership of the economic interest in Charitable DAF HoldCo, okay?  We also know that by September of 2024, those interests -- or HoldCo's interests were worth $270 million.  And again, the participating shareholders still held all of the ownership interests.  And this looks quiet --

THE COURT:  All of the economic interests.

MR. MCCARTY:  All of the economic interests, that's correct.  They held participating shares.  They own those participating shares.

So this also looks quiet from November of 2023 to September of '24; however, unfortunately it was not.  It was all in the dark to my clients, the charities.  But during that time, Mr. Patrick had engaged lawyers to answer certain questions, and I almost think -- this is an important slide.

So this is the next slide.

THE COURT: 5.

MR. MCCARTY: 5. There is no animation here.

I almost think I can begin and end with this slide, because this slide shows everything. This was a work plan generated by a law firm directed by Mr. Patrick. And the work plan in November of '23, well before anybody knew anything, so to speak, this law firm -- this law firm asked the following questions: Can the controlling person -- it's the words -- dilute the shares -- the participation shares; e.g., the participating shares. All their words.

Can the participating person redeem shares; e.g., the participating shares? Okay. Those are questions about governance I would suggest to the Court, no question.

Second -- or last, and really straight to the point, Could HoldCo liquidate, distribute all its assets elsewhere, or otherwise make the participation shares, which belong to my clients, worthless, okay?

That is not a question at this point of whether they did something to shut down and drain money, et cetera, from HoldCo. That is a direct attack on the participating shareholders' interest, the Plaintiffs'

charities' interest --

THE COURT: Uh-huh.

MR. MCCARTY: -- all right? It was how do we make their shares worthless, okay?

Moving to the next --

THE COURT: Just so we're clear if or when the Court reads this record, I just want to interject now that the slides that you gave me, I have marked as PX-1. I've numbered each of the pages in my own handwriting; otherwise, I'm not going to write on them, and they'll be part of the record for this hearing.

MR. MCCARTY: Thank you, Your Honor.

Okay. So -- but what does start happening in 2024? Mr. Patrick began restricting access to the fund records, specifically financial statements, et cetera. And so, in other words, he begins to operate in the dark.

Moving ahead. Now I am sort of getting to what will probably be Slide 6 and bringing in various points in the record. On November 11th of 2024, the supporting organizations, the Plaintiff charities here, sent a letter saying, "We no longer have conference in the governance structure of HoldCo."

And so why did that come out of the blue? Well, I don't want to get into the merits, though it

will certainly be covered in the receivership, too much, but what we have --

THE COURT: A little presumptive.

MR. SHAW: Well, it is presumptive, I'm sorry, Your Honor, so I understand that we have to -- we have to get through this first before we get there. But why did they send a letter on November 11th, 2024?

Well, there was a lack of transparency. But in addition to a lack of transparency, there had been investigations into Mr. Patrick and what he had been up to. So three highlights, low lights, or whatever you want to call them, of what Mr. Patrick was doing at that time was one, he had formed a charity and asked for a donation from the funds of $10,000 a year. What he failed to disclose was that charity was controlled by his family.

The next thing Mr. Patrick did during this time period -- or this earlier time period, was he attempted to provide a tip of non-public material information to one of the funds -- to one of the foundations, such that they could trade one that which, obviously, was a breach of securities law and was a breach of corporate policy, obviously, of Highland Capital.

And finally, and maybe most concerning,

there was credible evidence, a former law-enforcement official, who had a company, was a vendor, that he had been approached by Mr. Patrick to engage in a kickback scheme.

And so all of these things combined with a lack of transparency around financial stability of the fund, $270 million, obviously concerned the charities greatly, and they wanted to fix it, for lack of a better word. Mr. Patrick and the others involved eventually responded, and we will get to that in a minute.

Okay. So the first thing that Mr. Patrick seems to have done in response was to form the DFW Charitable Foundation. That's all he did. He formed an entity in Delaware, and it's sitting there. That was on December 9th, 2024.

The next thing he does two days later, and he has a video call with Mr. Murphy and others, and with my clients, that says we are creating a professional institutional vehicle for the benefit of its charitable purposes and the charitable owners, okay? He's just formed a new charity.

THE COURT: Mm-hmm.

MR. MCCARTY: Two days later, after that representation, Mr. Patrick forms CDMCFAD, which of course, as you know, ultimately became the blocking

mechanism, and ultimately became the replacement for HoldCo, and now owns the fund, at least on paper.

One day later, his counsel, Mr. Patrick's counsel, follows up with the participating shareholders' counsel and says this, "The DAF is actively working on one or more development projects your clients will benefit from for many years to come." Blatant fraud. They're implementing the scheme right now.

All right. Six days later, Patrick has HoldCo essentially exchange its interest, so this is -- so six days after, he says, "You'll have it for years to come."

All of this is unbeknownst to my clients, and all of this is with Mr. Patrick is on both sides of the transaction in his governing positions, in his control position. And at that point, on December 18th, 2024, he has HoldCo exchange its interest in the DAF fund, so it held a hundred percent of interest in the DAF fund.

He had to give it to CDMCFAD, and return -- the triangle completes with CDMCFAD, giving a hundred percent of its interest to HoldCo, right? So essentially what you have now is you have HoldCo, not the fund, okay? You have HoldCo, CDMCFAD, and the fund.

THE COURT: So it sounds like things have

gone full circle.

MR. MCCARTY: Right.

THE COURT: Right. So at this point HoldCo is --

MR. MCCARTY: HoldCo still has a hundred percent interest, but through CDMCFAD --

THE COURT: Right.

MR. MCCARTY: -- which is now a new Delaware entity --

THE COURT: Okay.

MR. MCCARTY: -- all right? Why? Well, what do we do with -- nobody even knew at the time what happened, which would've been an interesting thing for the supporting shareholders to know that their interest had been exchanged, but it's not disclosed, of course.

And we believe that that was done to avoid certain responsibilities that Mr. Patrick had in the Cayman Islands under the new structure.

THE COURT: The difference between Delaware law and Cayman law, you're suggesting?

MR. MCCARTY: Yes, and other governing documents.

So then on January 23rd -- so the holidays passed, we still don't have financial statements. And when I say "we," you have, of course, the shareholders,

the charities, still don't have financial statements, still trying to understand what's going on in the letter. Their letter has been ignored. There's been no response to, you know, the really overarching governance issues. So they, again, demanded clarity into the fund's financial position.

January 28th, having received no response to our owners request, the winding up of the Charitable DAF. Well, that gets -- apparently that gets Mr. Patrick's attention. And then on February 7th, Mr. Patrick uses his control position to issue new shares in The Charitable DAF HoldCo to DFW Charitable Foundation.

So he -- the charitable organization that is formed on December 9th now receives 51 -- 51 percent of that HoldCo, okay? So now 49 percent is owned by the my clients of that HoldCo. 51 percent is owned by -- directly by Mr. Patrick's DFW charitable organization foundation, and of course with no oversight of his own. And that is response number one to the suggestion that that they made here.

THE COURT: Isn't that what the Cayman Island proceeding is all about?

MR. MCCARTY: Well, its certainly based on the same facts, Your Honor.

THE COURT: Yeah. But, I mean, that's the relief that's being sought there.

MR. MCCARTY: Well, they are seeking relief, Your Honor, but we believe that there are direct -- there are direct fiduciary breaches by Mr. Patrick. Mr. Patrick, in November of 2023, asked how he could attack my clients' interests directly, not through fiduciary breaches to the organization itself, but how could he use his control and positions to make my client's shares worthless. How could he do that?

That is a -- and as you see, fraud all along the way. The Highlands -- to keep us from coming to you earlier and asking for an injunction against them from doing all these things, to keep us, our clients, from going to the Cayman Islands and stopping this earlier.

The fact is, I think you probably know already, we did not learn of all this until we finally did file this in the Cayman Islands, and they shut up and said that we don't hold anything; you hold nothing, which is not exactly true.

Okay. Despite the dilution of the Plaintiff charities' interests, Patrick still needed a method to finish them off. So at this point, we still have HoldCo, and we still have CDMCFAD, and then the

fund. And the charities' problem, you know, the charities used to own a hundred percent, still own 49 percent, and what are you going to do about that, because, of course, we can't have that.

So that begins the shopping expedition for an evaluation of my clients' interest, essentially discounting them to nothing. So Mr. Patrick first went to PricewaterhouseCoopers, of course, to get a nice name on there, a fancy name on there, to say that there is really nothing -- there's -- there's really no value here. PricewaterhouseCoopers, not surprisingly, sniffed that out, and rejected Mr. Patrick's overture.

Then they -- Mr. Patrick went to FTI, and then FTI, again, sort of said, Okay, well, what will the discounts be? Well, we can think about that. There's a big range, who knows what the discount of your shared value would be because of lack of control, okay?

So all fine and well, and then Mr. Patrick says, Well, we do want to use this in a transaction, Mr. Patrick's lawyers, I should say. We do want to use this in a transaction, so please remove your limitation that this can't be used in a transaction.

FTI says, Well, wait a minute, that's not what we signed up for and limitation will remain. And so FTI sniffed out the problem, too.

Then Mr. Patrick's lawyers find ValueScope. They go back to well, because ValueScope had been valuing these shares all along, I suspect that they thought that was a stretch because ValueScope had said, I think it's about six months prior only, that the shares were worth, I think it was $225 million.

Well, the reason ValueScope said the shares were worth $225 million instead of $270 million was because there were certain discounts already taken, right? So ValueScope took discounts for lack of control, subject for -- for lack of marketability, which was a bigger discount than lack of control in accordance with their evaluation method.

THE COURT: What are these assets? Are they marketable securities, or...

MR. MCCARTY: No, not -- not generally, Your Honor. They're passive investments.

THE COURT: In what?

MR. MCCARTY: In various -- and you're going to test me here, Your Honor, but they are --

THE COURT: Generally.

MR. MCCARTY: They are real estate investment trusts. There is a life insurance interest. There are many, many --

THE COURT: Is NextPoint involved in those?

MR. MCCARTY: I'm sorry?

THE COURT: Is NextPoint involved with those?

MR. MCCARTY: NextPoint, I do believe, has some involvement, but I'm not -- but if I say that, Your Honor, please don't hold me to it because I have not looked at the holdings.

THE COURT: Somebody's saying yes.

MR. MCCARTY: Okay.

MR. LITTLETON: Yeah, there's -- there's NextPoint involved, as the majority of it is cash. NextPoint, marketable securities, real estate and various other things.

MR. MCCARTY: Okay. I'll get mad at him later for that.

THE COURT: Yeah, don't do that. I asked the question.

MR. MCCARTY: That's right. Thank you, Your Honor, so --

THE COURT: The point here is to get to facts and truth, right?

MR. MCCARTY: Yeah, I understand, Your Honor. Thank you.

Okay. So there are -- yes. To the extent that your question is, is Mr. Dondero's -- if -- for

organizations that he oversees, are the participants lowering the fund? Well, of course because he granted a number of structures into the charitable funds that had been valued at $270 million as late as 2024. There is also, we understand, I believe a number of $140 million in cash in this structure; so it's not just, sort of, passive investments.

THE COURT: Yeah, you don't need a lot of discounts on cash.

MR. MCCARTY: You don't need a lot of discounts on cash, that's right. So anyway, there -- and so in September of 2024, the overall value of participating shareholders had dropped to $225 million.

Then ValueScope comes back on March 26th, about six months later, and says, Actually, now that we understand this control issue better, it's only worth $1.6 million. So 225 million to 1.6 million in six months. We don't understand that the value of the fund particularly changed at that point, but certainly the according to ValueScope it had changed.

So without delay, Mr. Patrick immediately had CDMCFAD redeem the participating shareholders' interest in it for $1.6 million, okay?

So -- and this is, I think, maybe an important point, but that was CDMCFAD redeeming the

interest -- the participating shareholders' interest in it, okay? Not in HoldCo. So the participating shareholders were still an owner in HoldCo, okay?

THE COURT: Right. Where in all these charts does CDMF -- whatever, fit?

MR. MCCARTY: Okay.

THE COURT: Back here?

MR. MCCARTY: Yeah. So if you look at the -- at the second one.

THE COURT: Right.

MR. MCCARTY: So if you look at the top, now it's DFW Charitable Foundation, obviously not shareholders -- participating shareholders --

THE COURT: Okay. I see it now.

MR. MCCARTY: Yeah, not DAF HoldCo. DAF HoldCo is, sort of, out of this structure now. And then everything now goes through CDMCFAD --

THE COURT: Okay.

MR. MCCARTY: -- okay? So that's where it is. And it essentially sits where HoldCo sat. And DFW Charitable Foundation sits where the participating shareholders, the charity claimants here, sat.

THE COURT: Okay.

MR. MCCARTY: Fair enough?

THE COURT: Got it.

MR. MCCARTY: Okay.

So interestingly enough, as sort of a side note, Mr. Patrick, as I understand it, found it somewhat humorous that he had distributed that $1.6 million into bank accounts that the charities never really saw. They belong to the charities, but they were not in their own bank accounts that they would normally operate out of.

So they didn't know -- they didn't even know that the 1.6 million have come in, obviously, which would have raised the question well, why did that happen? Where did that come from?

Okay. According to Mr. Patrick's own testimony about six weeks ago in the bankruptcy proceedings, he made it very clear, "The entity in liquidation(Charitable DAF HoldCo) owns nothing." In other words, he had achieved what he set out to achieve in November of 2023.

THE COURT: I mean, it still owns 99 percent of the interest in the fund, it's just that the money has gone out of the fund. It's gone somewhere else.

MR. MCCARTY: No. It was redeemed out. No, Charitable DAF HoldCo is not in there. It's been redeemed. Its interest has been redeemed. CDH GP, which is the new Delaware -- I'm sorry -- the new

Cayman, or the general partner is still there, but HoldCo is not.

Okay. So moving into the law...

THE COURT: So are the JOLs saying we're going to get this stuff back into HoldCo?

MR. MCCARTY: They are trying to bring -- yes, they are trying to bring value back into the HoldCo. They will seek undoubtably fraudulent transfer, fraudulent transfer on all of these things.

THE COURT: All of these things.

MR. MCCARTY: Yes. We don't know who they will go after. We know certainly that we have a claim against Mark Patrick as the controlling person for his fraud against us, delivering fraudulent statements. They were made to delay our action -- to delay our action, et cetera, at the time.

He will be on the hook for -- we believe he will be on the hook for monetary damages, but and what the -- what the JOLs may do and what they may not do, I don't know, but I do know that what he did to my clients, which is to the Plaintiff charities here, is deliberately work to devalue their shares and defraud them along the way.

Okay. So standing, which I think is really the most important issue that we have before us, and I

hope is clear to the Court, it has nothing to do with it being in business court or any other court in the State of Texas. And we all know the elements of standing, I think, from law school, and I'm sure Your Honor has dealt with them many, many times.

First, we have to have a particularized injury. Unquestionably, when they set out to render the shares worthless, they did. They exchanged $1.6 million for what we believe was at least $225 million in value, and they defrauded my clients to keep them from taking action to prevent that. So we -- my clients are unquestionably injured.

And then it is all traceable to Mr. Patrick, personally, and through the many hats that he wore. It was all him. He orchestrated it.

Was there redressable injury -- is there redressable injury? Yes, we believe there is redressable injury. Number one, we believe the receivership is part of the method to redress the injury. Why is that? Because Mr. Patrick still sits in all of these positions, so it would be that same structure chart, the structure chart that you had before you just a minute ago.

Mark Patrick, he controls the DFW Charitable Foundation. Mark Patrick controls CDH GP,

Limited Partnership, that owns Charitable DAF. Mr. Patrick is the manager of CDMCFAD, et cetera, et cetera, he controls all of it; and removing him, who has proven himself to be anything but an honest fiduciary, it would go a long, long way to address injury here.

We also know -- and again, this is, you know, for hopefully another hearing, that in the -- in late last year, he paid himself $4 million. So -- and nothing right now prevents him from doing that in the usual course of business as time progresses.

He is also, with respect to Mr. Shaw and everybody else who's here, who are quite competent counsel, and all the others that you heard from at the initial TRO hearing, he's paying a lot of lawyers, undoubtedly healthy amounts out of charitable funds.

Should these lawyers be paid? I'm not sure Mr. Patrick -- when I say "paid," should these lawyers be doing all the work that they should to protect the interests of the charitable funds? I don't know that that should be Mr. Patrick's decision. I think that should be a neutral's decision. And again, that's why we think a receivership can help redress the injury here.

Next, Your Honor, whatever claims and whatever Mr. Patrick was ultimately able to pay, and the

other entities that he controls, whether they have money or not, I don't know, do they -- does CDH-GP have money to pay? Mr. Patrick, how much money does he have to pay?

All these people -- all these people and entities participated in the fraud against my clients, and our claims are against those parties. They were -- they were the controlling interest.

So we come to does this court have subject matter jurisdiction? So let's talk about that, and let's talk about first -- do you want to take a break?

THE COURT: Yeah, let's take a little break. Thank you. Let's come back in about ten.

(A recess was taken at 10:23 a.m.)

(Open Court, All Parties Present.)

THE COURT: Okay. What slide are we on now?

MR. MCCARTY: Well, if you'll let me go slightly off script, I want to address something that is I think an issue that's been raised here by our direct claims and whether Cayman law provides for them or not.

So first, I'm just going to quickly quote from the Feiner Family Foundation case because that's something that we have cited in the briefing, but then I also I want to quote from some additional Cayman law,

and I'll give you the cites if you can find them.  You probably have better Westlaw access than I do.

THE COURT:  Well, fine.  I mean, it's -- it's going to tie directly into the issues before us today, as opposed to speaking to your client's preferences?

MR. MCCARTY:  Oh, absolutely.

THE COURT:  Okay.

MR. MCCARTY:  Yeah.  Okay.  So -- so first from the Feiner Family Trust case, which is cited in our briefing at 2007 Westlaw 2615448, shareholders can be owed duties and obligations directly from the controllers of the company if the controller "makes material misrepresentations to them" -- I'm sorry -- "material misrepresentations to them or fails to make material disclosures to them of insider information, or supplies to that specific information advice on which they have relied."

So that is a basis for a direct claim under Cayman law.  "Special circumstances of generating fiduciary obligations, especially in those cases in which the directors for their own benefit, seek to use their position and special inside and knowledge acquired by them to take improper or unfair advantage of the shareholders."  So that's Feiner family, and that's what

you have. So I want to give you a couple of other Cayman law cites.

THE COURT: Those claims are still going to involve the nucleus effects that we've been talking about.

MR. MCCARTY: They are, Your Honor. But these are direct claims that the shareholders --

THE COURT: No, I've got that.

MR. MCCARTY: And so that's -- that's what I want to make. And these are different, what I am about to read now, complaints of different circumstances.

So this one is from a case called TIAN RUI, T-I-A-N, R-U-I (International Holding Company Limited) the China Shanshui Cement Group. Shanshui is spelled S-h-a-n-s-h-u-i. It's a 2024 case. The cite is UK-PC-F4. From the Cayman Islands, "A shareholder has a right of action against the company to challenge the allotment of shares by the board of directors on the basis that the allotment was made for improper purpose in circumstances where the allotment will cause detriment to the shareholders."

And so obviously that is a cause of action that directly speaks to -- against the company. And I hope Your Honor picked up on that. And that's

important, but we believe that same concept applies to the control person who are guiding that company's actions. The decision also has the discussion that applies broadly to the exercise of powers by directors.

Secondly, Your Honor, from -- let's see. I think this is from the same case, actually, Your Honor. I'm sorry. This is a little bit on the fly. "The contract between the shareholder of the company contains the implied term that, in exercising the power to allot and issue shares," the director, as the company's agents -- "the directors, as the company's agents, will do so in accordance with their fiduciary duties." And where the directors exercise their powers for the improper purposes, then the act may be voidable -- long word. There may be a challenge by the affected shareholders bringing their own properly constituted action against the company in court, okay?

And again, we're talking about a person who resided on both sides of all the transaction -- transactions, was a 100 percent shareholder, and also the GP of the fund, and now CDMCFAD, and also the DFW Charitable Foundation.

So we believe with all the Feiner family, particularly the case and these other cases, indicate that there is, under Cayman law, a direct cause of

action.

Now, is that a decision necessarily for today? You know, and I don't necessarily know that we have to get into the merits and all of that. But we do believe that it outlines the cause of action, and why we have a direct cause of action.

Okay. Moving back. I'll go back on script, Your Honor. And we are going to be...

THE COURT: Bear in mind the discussion we had earlier this morning.

MR. MCCARTY: I'm sorry?

THE COURT: I've shared with you my views on the statute, so these are my views, as opposed to the statutes.

MR. MCCARTY: Understood. Well, let's talk about 2 -- b(2) because that's where I know you're focused.

I do -- if you will allow me to, I do want to make my case.

THE COURT: No, that's fine.

MR. MCCARTY: But we'll start, of course, at b(2) because that's what the Court is the most interested in, and I understand.

So first let's talk about what it means, governance? And this is from your sister Court.

THE COURT: We're one Court.

MR. MCCARTY: I'm sorry?

THE COURT: We're one Court. We have different divisions, and different judges, but it's really, really important to understand that we're one Court.

MR. MCCARTY: Okay. I appreciate that. Your sister division, is that a proper way to put it?

THE COURT: Absolutely.

MR. MCCARTY: From the *Reed v. Rook* decision.

THE COURT: I'm very familiar with it.

MR. MCCARTY: Yes. It says about governance: "It does not define governance, but defines a governing person as one who is entitled to manage and direct an organization's affairs under the governing documents and governing law. This indicates that governance relates to the management and direction of the entity's affairs under its governing documents" -- and this is critical -- "applicable law," all right?

So it's not -- so governance is not just all about internal documents. Governance is about all the laws that apply to the governance of the company, and these are laws that we think Mr. Patrick breached, and its very obvious .

I have a very, very difficult time understanding how this case could be principally distinguished from the *Reed V. Rook* --

THE COURT: Well, isn't it fair to say that governance involves governing?

MR. MCCARTY: Yes.

THE COURT: So if you're governing the company, it involves governance?

MR. MCCARTY: Yes. And he was clearly governing the company.

So -- and so I think the *Reed v. Rook* case is an important one because it does bear directly on the issues here. I think that in the *Reed v. Rook case*, at least as I understand the case, I haven't seen all the underlying pleadings; but as I understand, the Court's ruling, Reed, the plaintiff was actually not a person who was ever a member of the company or directly involved in the company. That's what my take from the case -- but I -- again, I don't -- or the partnership or whatever it was. But I haven't seen all the ongoing pleadings. That's what -- that's what it says to me.

Now, a big argument about b(2) that I've heard from the other side is there's no limiting principle about b(2). So it could be anything. It could be Chevron -- or Exxon taking on Chevron for --

for its governing documents. Well, that's true today. That case could be brought today. Maybe it could be brought in this court. Probably it could be brought in this court. It certainly could be brought in district courts. I have not seen a case like that in the district courts. I'm sure there has been one before.

But the limited principles are the same as they have always been. You have to have standing, and now you have to be able to supply limiting language.

THE COURT: You have to have capacity.

MR. MCCARTY: And you have to have capacity, assuming the other side brings up capacity, but --

THE COURT: Assume that they have.

MR. MCCARTY: Assume that they have. Yes, you have to have capacity. And I think clearly, Cayman law suggests that we have capacity as shareholders to bring direct causes of action.

Now, I -- I'm kind of reading in, and maybe misappropriately, reading into the idea that Your Honor is concerned because well, the trustee is going to take over, and all that stuff -- not the trustee -- the liquidators are going to take over in this case. Well, they haven't yet. They're not even recognized in the United States.

So as of now -- and there has been no --

THE COURT:  I'm not going to tell the Delaware Bankruptcy Judge what to do, but my guess is it's not a difficult bar to cover.

MR. MCCARTY:  But then --

THE COURT:  Not in my experience, at least.

MR. MCCARTY:  But then the Delaware Bankruptcy Court will have to rule that our claims are the property of the liquidation estate.

THE COURT:  I think under Chapter 15, once they're recognized, they could come and join this lawsuit if they want.

MR. MCCARTY:  They could come and join the lawsuit, absolutely.

THE COURT:  They could file their own lawsuit in Delaware or --

MR. MCCARTY:  Yes, but -- but none of that strips the jurisdiction of this Court until there is a determination that their --

THE COURT:  But we know that there is a lawsuit pending in the Cayman Islands.

MR. MCCARTY:  But, Your Honor, we believe we have direct claims -- we do have direct claims --

THE COURT:  Okay.

MR. MCCARTY:  -- okay?  And until another

court says that our direct claims, our property of the estate -- a federal bankruptcy court says that, then we still have capacity.

THE COURT: I'm really not -- I'm focusing on Rule 39.

MR. MCCARTY: Okay.

THE COURT: How do we have two proceedings covering much of the same factual subject matter going on at their time, and not resulting in potentially inconsistent results?

MR. MCCARTY: Sure. Well, I've unfortunately in my career dealt with that many, many times. We can have class-actions dealing with, for instance, unintended acceleration in elements, 300 of them, in fact. And we can have direct claimants saying that they were injured because of unintended acceleration in those elements, those separate claimants, and they have direct claims.

They don't necessarily have to opt out, but it comes from the same nucleus of facts, all right? They are different claims operating from the same nucleus of facts. And that's what we have. That's why we have capacity. No federal bankruptcy court says that it owns -- that the estate owns those claims at this point. And until they do, certainly, there is not a

capacity issue. And, of course, nothing that the federal bankruptcy court does will restrict this Court from jurisdiction, right?

It may impact our capacity in the moment, but as you see in the Moser Trust -- it looks -- the Moser Trust case from the Dallas Court of Appeals, makes it pretty clear that capacity, even if it's overtaken by a Bankruptcy Court for a time, it doesn't necessarily prevail forever, all right?

So these claims could come back. For instance, what if the joint liquidators for some reason say, eh, we've gotten all we needed --

THE COURT: And they abandon the claims?

MR. MCCARTY: Right. That's right. And so here we would be.

THE COURT: Here we would be.

MR. MCCARTY: And right -- and right now the Bankruptcy Court hasn't done anything to take those claims. They haven't even recognized yet the Cayman liquidators. So I understand where the Court is going and its concerns. I think that this Court will likely hear from the liquidators at some point. I can't control their actions, but I suspect that it will.

THE COURT: I suspect we will.

MR. MCCARTY: Yeah. And at that point, I

don't know that the -- I don't necessarily think that the liquidators are going to claim that the actions undertaken by this Court are in any way harmful to them.

THE COURT: Well, we'll see what they say.

MR. MCCARTY: Right. But as of today -- but as of today, we have capacity.

So we got off on capacity, which is an important discussion. But going back for b(2), so the limiting factors in b(2) were the same limiting factors that have always prevailed -- or presided over any sort of action, and continues to this day.

So this Parade of Horribles that we've heard from the other side, they just don't seem real. And frankly, I suspect that if Exxon came to you and said Chevron is violating laws, they would say okay, that's great because they sort of often say this -- okay, great, what's your cause of action.

THE COURT: Right.

MR. MCCARTY: All right. So I don't believe -- well, let me say this: The legislature wrote what it did, and as we all know in Texas, we certainly know, the text of the statute wins the day every time. And the text of the statute --

THE COURT: Most of the time.

MR. MCCARTY: That's actually a fair

statement, Your Honor. It should win the day.

THE COURT: Well, we could have uncertain results.

MR. MCCARTY: Now, we could have uncertain results, but I don't think it's uncertain results here today, to say, at least, because we were certainly not a "stranger" to Mr. Patrick and his roles and his governance through the various entities.

Certainly right now, for instance, DFW Charitable Foundation sits where the participating shareholders used to sit. They are holding, essentially, the powers that my clients used to hold. Mr. Patrick was on both sides of that transaction. As the controlling shareholder, he held 100 percent of the management shares, and as now the owner of the DFW Charitable Foundation.

Mr. Patrick was on both sides of the transaction when HoldCo seeded its interest to CDMCFAE from the fund. Mr. Patrick was on both side of the transaction when he diluted my client's interest in HoldCo to his own charity, his newly created charity, on December 29th, 2024.

So at every turn, we believe -- and the question is really -- now I'm kind of jumping to the next slide, but everything he did was in line with what

he planned to do in November of 2023. And every one of those things was a direct attack on my clients.

MR. MCCARTY: And -- and every one of --

THE COURT: An indirect attack on your clients.

MR. MCCARTY: Well, according to him, he wants to know if he could make the participation shares worthless, which is -- that was his lawyer's question.

THE COURT: Yeah, but he had to go through HoldCo and the fund to do that.

MR. MCCARTY: But it was a direct action aimed at my clients.

And so he, in all of those questions, do -- can the controlling person dilute? Can the controlling person redeem? Can they make the shares worthless? All of those are questions of governance, directly questions of governance asked by lawyers, for lawyers to go research documents in the law.

And so I think it clearly falls under b(2), and I see nothing in b(2) that would, based on its text, exempt my client's claims from this Court's jurisdiction.

So at the risk of moving into an area that I'll get more questions about...

THE COURT: Well, you wouldn't want to pass

this bench, would you?

MR. MCCARTY: No. No. In fact, I actually prefer the other, so thank you.

So b(4) -- I'm sorry -- an action by an organization of owner against a controlling person or a managerial official for acts/omissions in that capacity. So again, $270 million interest for $1.6 million.

THE COURT: You can assume that I've read everything.

MR. MCCARTY: Okay. Well, I'm sorry. Yes, that's fine. I don't see -- I don't see the exception to b(4). I don't see where b(4) says the organization needs to be a party. It needs -- potentially needs to be about the organization.

Let me -- let me read from b(4), because it's easier for me to read off of these. So I'm at the last slide now. B(4) says: "An action by an organization or an owner of an organization" -- we're an owner of an organization, we were -- the supporting boards still have an ownership interest in HoldCo -- "is brought against an owner, controlling person" -- which Mr. Patrick was, no question. He held managing shares, and he was a managerial official. He was a controlling person -- "and alleges an act or omission by the person in the person's capacity" -- controlling shareholder, as

an owner/controller or in a managerial official of the organization.

THE COURT: An organization before this HoldCo, right?

MR. MCCARTY: Well, I would say CDH-GP -- and I -- I'm sorry. I would say, yes, the organization -- yes. So he had a -- he had a controlling interest based on his 100 percent ownership of the management shares. So he was an owner of that organization, of HoldCo.

THE COURT: Well -- yeah, okay.

MR. MCCARTY: Well, I think he would say he was an owner because he owned the management shares.

And second, he was certainly a controlling person by virtue of those managing shares.

THE COURT: Right.

MR. MCCARTY: And we've sued him in those capacities.

THE COURT: Okay.

MR. MCCARTY: All right. Then under b(5): "An action alleging that an owner, controlling person, or managerial official, breached a duty owed to an organization or an owner of the organization." So in other words, a controlling person breached a duty to an owner of an organization. That's Mr. Patrick, and

that's my clients.

"By reason of the person's status as an owner, controlling person," which is how he did it, that's how he committed the fraud. The only way he committed that fraud against us by lying to us about his true intentions was because of his capacity or status as a controlling person, as a managerial official.

So we think we fall thereto. And all through this, we were an owner. And when the breaches occurred, and I think most importantly -- I think this is the point. When the breaches occurred, we were others of the organization. But it doesn't say -- b(5) does not say that we have to sue the organization.

THE COURT: Okay.

MR. MCCARTY: So that's -- I think that is it. Let me see if there was anything else.

I want to respond to one statement that Mr. Shaw said, that this is all about control. This is not all about control. This is about restoring to my clients what they rightfully own.

THE COURT: But your clients -- they're the supporting organizations.

MR. MCCARTY: They are.

THE COURT: But the real people of interest here are the supported organizations.

MR. MCCARTY: I would -- I mean, that's an interesting way for a Court to look at it because in my experiences, the Courts are always more interested in the direct legal relationships, and the direct legal relationship here is between the participating shareholders --

THE COURT: I got that. But the supporting organizations exists for a tax purpose to be a pipeline for getting money to the supported organizations.

MR. MCCARTY: Well, I'm guessing that it's a tax purpose.

THE COURT: Well, that's what they said in the Caymans.

MR. MCCARTY: Yeah. I'm guessing that that's true. I'm not a tax lawyer, so I would hate to represent that, but I --

THE COURT: That's part of the reason why I suggested the idea of getting a tax lawyer who really knows this stuff to tell me.

MR. MCCARTY: Understood.

But I believe that to be the case; and yes, do the supported organizations ultimately benefit from the participating shareholders' interests, legal interests in the entity? Of course they do. Absolutely. No question.

THE COURT: Right. Because the goal is really to support the supported organizations.

MR. MCCARTY: Well, we do want to support the supported organizations. And the way -- the vehicle that was used to do that was through the participating shareholders' interests.

THE COURT: Right.

MR. MCCARTY: And I believe that -- unless there are any other questions, I think -- I think that's all I have for you.

THE COURT: I appreciate it. Yeah.

Mr. Shaw, I believe you have something to say.

MR. SHAW: I have a brief rebuttal.

MR. WARNER: Mr. Shaw, why don't I turn this off for you.

MR. SHAW: Oh, great. Thank you.

Judge, I've discussed the *Paxton v. Annunciation House* case that legislate -- the legislature is aware of the law that existed at the time they enacted the statute. Part of that body of law that the legislature was aware of when they enacted these statutes was Rule 39, Texas Rules of Civil Procedure 39, that requires the joinder of necessary parties.

And so I agree with Mr. McCarty that --

that this is an action regarding the corporate governance of two non-parties. And I would agree with him that this would fall under b(2) if those two entities were parties to the case, but they're not. They're not. And -- and again, we go back to why they're not because ultimately what this was about was -- was an interim. *Rook v. Reed...*

THE COURT: *Rook v. Rook.*

MR. SHAW: *Rook vs. Rook,* I'm sorry. From this Court, it was -- I did not know that, so I just learned something.

THE COURT: Yeah, no, it's -- and I don't want to be pedantic about it, but it's very important in the way we operate that we're viewed as one court.

MR. SHAW: Yeah, it's fascinating.

THE COURT: It has a lot to do with the mechanics in our mission and things like that, but it is an important distinction.

MR. SHAW: Okay. So I -- and I believe that was the lottery case.

THE COURT: Yes, it was.

MR. SHAW: And what I think the important distinction between that case and this case is that the parties whose corporate governance that we're discussing and was at issue was a party to the lawsuit, and that's

in stark contrast to what we have here. We have two non-entities that they are claiming that this is a -- an action regarding.

And our position is that, you know, we've got to have a cognizable cause of action regarding the corporate governance of a party to the case. And I think Rule 39 fits in nicely with that paradigm.

So, you know, the issue that we talk about is this, you know, limiting factor, which it would be if you have a party of the case that would be part of the governing action.

I'm going to close with -- I would be remiss not to at least talk a little bit about the righteousness of my client because I've heard a lot about the lack of righteousness.

THE COURT: Alleged.

MR. SHAW: Alleged.

THE COURT: We will talk about the alleged righteousness of --

MR. SHAW: We'll talk about the alleged righteousness of my client as well. So suffice it to say that we dispute that there's been any breach of fiduciary duty, any violation of any obligation, that we have worked in earnest with and tried to work with The Dallas Foundation.

And in fact that Mr. Raver was meeting with Louis Phillips, who's a former Bankruptcy Judge, who also represents the DAF, and Ms. Diaz, the morning of the TRO hearing, in order to work towards a resolution. It came at much of a surprise that this action was filed.

Also that -- that the idea here that these supporting organizations always had only a right to a discretionary distribution up to the complete discretion of the general partner.

And then finally, Mr. Dondero received a significant tax savings through the structure, estimated more than $50 million. Our concern and -- and everything that has been animating the actions that we have taken, are for the DAF, and to ensure that the DAF's structure is intact and that it's not attacked by the IRS or other of Mr. Dondero's creditors, of which there are many.

So Mr. Patrick and Mr. Murphy acted in reliance on competent counsel and experts, acted in the best interest using their reasonable business judgment, and the idea that there is this massive fraud is just inaccurate.

Thank you, Judge.

MR. MCCARTY: Can I just respond to one

comment?

THE COURT: Sure.

MR. MCCARTY: And I'm sorry, but I want to make it very clear, we did not file this action while they were discussing resolving this matter. There has been no discussion -- no real discussion to resolve this matter. That discussion was subsequent to the bankruptcy proceedings that The Dallas Foundation and Mr. Patrick were both involved with, not this case.

THE COURT: Okay. All right. Anything else that anybody wants to say?

MR. SHAW: Nothing further from the Defense, Your Honor.

MR. MCCARTY: Nothing more, Your Honor.

THE COURT: Mr. Cox, you've been unusually quiet.

MR. COX: I'm just here. Just trying to be quiet. That's all right. I have questions about stuff.

THE COURT: Mr. McEntire?

MR. MCENTIRE: Not today, sir. Maybe later.

THE COURT: All right. So let's just take stock of kind of where I think we are on some things: One, I think I know what I wanted to do with the Rule 39, but I want to give the parties an opportunity to

brief that. And so let's -- I think the opening brief on that, Mr. Shaw, should come from you.

MR. SHAW: Thank you, Your Honor.

THE COURT: When do you think you can do that?

MR. SHAW: Seven days from today, Your Honor.

THE COURT: Seven days from today, we'll have the brief. Seven days after that, we'll have a response. That implies that it will be done after that. In my view of things, things are ripe for a decision after I have a response, but I typically wait for a reply if I think it's going to come. So we will come up with an order that will include that. Mr. Spear will get you that.

Capacity. Any briefing that you all want to discuss on the capacity issues? I think that was one of the subject matters that one gave a fair reading to the motion to dismiss that was included, although there wasn't a lot of case law that was cited on capacity as such, so...

MR. SHAW: Should we just do a combined brief on capacity, Your Honor?

THE COURT: Sure. That's fine.

Is that fine for you?

MR. MCCARTY: Sure -- yes.

THE COURT: Well, it's --

MR. MCCARTY: My uncertainty only stems from we very much want a receivership hearing. It's not an empty bag for us.

THE COURT: Yeah, okay. That's probably not going to happen until the Rule 39 issue is resolved because I don't know how I can appoint a receiver over entities on the basis of receivership.

MR. MCCARTY: Well, of course we're not asking that.

THE COURT: Well, that's kind of what you're asking.

MR. MCCARTY: That is not. But, yes, I understand, Your Honor, you want the briefing prepared on the same schedule.

THE COURT: Okay. That's fine. I mean, if you need more time, let me know. It's summertime. I understand.

What else do we need to talk about? They don't need to be long briefs, but --

MR. MCCARTY: Well, if we can shorten our time on response, I assume that wouldn't be difficult.

THE COURT: You can -- yeah, when we say seven days to respond, it doesn't mean you have to take

seven days.

MR. MCCARTY: Can we say three days to reply?

THE COURT: The score is going to be seven and -- and you're saying three days on a reply?

What do you think?

MR. SHAW: I don't know what their response is going to look like.

THE COURT: Yeah, we'll go seven, and then if -- need to do that. I'm detecting a certain amount of frustration.

MR. MCCARTY: I'm very frustrated, yes.

THE COURT: Okay.

MR. MCCARTY: We have given generous time to this briefing, and we --

THE COURT: Well, no one has briefed Rule 39.

MR. MCCARTY: Well, and today is the first day, Your Honor, but...

THE COURT: Well, but that's something people could have thought about.

MR. MCCARTY: They certainly could have thought about that.

THE COURT: Well, listen, my sense is -- well, I will withhold that thought.

MR. MCCARTY: Well, Your Honor, I want to make something plain because my frustration is not simply a lawyer being frustrated. My frustration is this: We have a person, and despite all the accolades that we just heard about Mr. Patrick, and how he wants to preserve charitable assets and all that sort of stuff, he took $4 million.

THE COURT: I heard that. And I heard about all the other things that are alleged.

MR. MCCARTY: We're concerned.

THE COURT: I get that.

MR. MCCARTY: Yes.

MR. COX: But are you finding that this Court has subject matter jurisdiction under b(2)?

THE COURT: I haven't made that ruling yet.

MR. COX: Oh, okay. I just -- are we going to get past that, or are we going to have to brief that again?

THE COURT: No, you don't have to brief that again. That is fully briefed. Trust me.

MR. COX: Okay. All right.

THE COURT: And the understanding -- the capacity of your argument is well, they have capacity because they have direct claims, right? Under Cayman law, they were directed to do so, that the controlling

persons of the entities owe fiduciary duties to the shareholders.

MR. MCCARTY: Yeah. And plus one right now certainly, we have capacity. There is no recognition in the United States for any other plaintiff. I don't want to be -- I'm not trying to be obstructive but it's true, right? And these claims are direct claims.

THE COURT: What's the schedule going on in the bankruptcy case?

MR. MCCARTY: The schedule that's going on right now is there is an agreed -- essentially an agreed injunction, much like our Rule 11, that was entered in the Cayman Islands. We understand that that injunction will be brought to the United States. There is no schedule at the current for the liquidators to be recognized in the United States.

And there will be further briefing in the Cayman Islands after September 18th. I don't know if we have a date yet -- after September 18th on the injunction; so in other words, they have this agreed -- sort of like us, right? We have an agreed injunction there, much like the Rule 11 that's been placed until it's fully briefed and presumably --

THE COURT: So let's do that. Let's go off the record.

(Off-the-record discussion)

THE COURT: Do we have things for the record?

MR. COX: I have a question Judge, on Rule 39:

Is the thought that you believe that there is an indispensable party that's not here and you --

THE COURT: That's my question.

MR. COX: And you want briefing on that one that is indispensable, and then what you can or cannot do based on that fact and whether we can proceed or not proceed if they are indispensable?

THE COURT: My concern is that the -- the rights of HoldCo are at issue.

MR. COX: Understood. I'm just trying to understand where you are so we can brief the right things.

THE COURT: Yeah, no, absolutely. That's my absolute concern is claims and causes of action; rights that appear to belong to HoldCo are also going to be litigated here.

MR. COX: Understood. As you know in Rule 39, it has a procedure, though, that is built in that if they cannot be here, can you still proceed?

THE COURT: Exactly.

MR. COX: And I wanted to know if that's what you want us to focus on or -- however.

THE COURT: Whatever it says right here.

MR. COX: I got it. Okay. I just make sure were on the same page. We had some other questions --

THE COURT: That's how it might apply -- and I mentioned at the very beginning, is there a remedy that we can fashion if they're not here?

MR. COX: Okay. Understood. I just wanted to make sure that we focus on the indispensability of -- the issues here in Rule 39.

THE COURT: That's -- that's one of the issues under Rule 39.

MR. COX: I agree. Thank you.

THE COURT: Anything else?

MR. SHAW: No, Your Honor.

MR. MCCARTY: No, Your Honor.

THE COURT: All right. Great. Thank you.

(The proceedings adjourned at 11:27 a.m.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS   )
COUNTY OF DALLAS     )

I, Aerial M. Holloway, Official Court Reporter in and for the First Business Court of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the copy cost for the preparation of this Reporter's Record is $459.00 and was paid by DUANE MORRIS LLP.

WITNESS MY OFFICIAL HAND this the 7th day of August, 2025.

_/s/_____
Aerial M. Holloway, Texas CSR 12401
Expiration Date: 12/31/2026
Official Court Reporter
Texas Business Court
First District
Dallas County
Dallas Texas



January 2024

Defendant Mark Patrick

Plaintiff "Charitable Owners" (The Dallas, Kansas City, & Santa Barbara Highland Foundations) (DE non-profit corps.)

100% Manager
100% Management Shares
~98% Participation Shares

Defendant Charitable DAF GP, LLC (DE)

Charitable DAF HoldCo, Ltd. (Directors: Patrick & Paul Murphy) (Cayman)

99% LP

1% GP

Charitable DAF Fund, LP ("the Fund") (Cayman)

100%

CLO HoldCo. Ltd. (Cayman)

100%

Assets

App. 198



EXHIBIT
C-1

PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
PM-1
tabbies®

August 4, 2025

Plea to the Jurisdiction,
Plaintiff-Charities Presentation



# The Charities' Allegations Fall Squarely into the Court's Jurisdiction



## Plaintiff Charities

$270 Million

Since its inception in 2011:

- Granted over $42 million to charitable organizations

- Donations to 275 organizations (funding education programs, healthcare services and supporting economic development and community welfare projects)

- Average annual grant payments of $3.7 million

App. 201

# The Charities Allege Actions and Claims Showing Standing and Jurisdiction

3

# Key Points in Defendants' Fraud and Breach of Fiduciary Duties.



Sept. 2024 - Known Value of Charitable DAF Fund

100% Ownership
Charitable DAF Fund, LP

100% Ownership
Charitable DAF Fund, LP

$270 Million

| November | December | January | February | March | April | May | June | July | August | September |

**2023**

**2024**

App. 202

4



# Key Points in Defendants' Fraud and Breach of Fiduciary Duties.

App. 203

# Key Points in Defendants' Fraud and Breach of Fiduciary Duties.

Sept. 2024 - Known Value
of Charitable DAF Fund

**100% Ownership**
Charitable DAF Fund, LP

**100% Ownership**
Charitable DAF Fund, LP

**$270 Million**

| November | December | January | February | March | April | May | June | July | August | September |

**2023**

**2024**

🚩 **Patrick Begins restricting access to the Fund Records - ultimately foreclosed entirely**

**Nov. 2023**

"workplan" to raid the fund

**Control Position**

**Mark Patrick**
Tax Attorney





App. 205

App. 206

**Despite the dilution of the Plaintiff Charities' interests, Patrick still needed a method to finish them off.**

## Key Points in Defendants' Fraud and Breach of Fiduciary Duties.

**After being rejected by both PwC and FTI, on March 26, 2025 Patrick finally obtains a negligible value of the Charities' interest via ValueScope.**





ValueScope determined that each participating share had a ==fair market value of $5,368 in March 2025, down from $759,614, just several months earlier.==

According to ValueScope's "work," the Charitable Owners ==total value was approximately $1.6million.==

App. 207

9



App. 208



# Standing



"In Texas, the standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court."

*Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012)

App. 210

12

# Standing

| Category | Law | Evidence |
|---|---|---|
| **Particularized Injury** | "[I]njury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"<br><br>*Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012) | Defendants plan was to "make the participation shares . . . worthless," which they did, exchanging $1.6 million for shares valued at $225 million approximately 6 months earlier – via expressly fraudulent statements and fiduciary breaches directed specifically at the Charities. |
| **Traceable to defendant** | "The injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'"<br><br>*Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012) | Just as Defendants' lawyers queried, could the "control person" "dilute" and "redeem" on a course to rendering the participation shares worthless?  The Control Person, Mark Patrick, wearing his various Defendant hats, did just that.  All of it traces back to Defendants. |
| **Redressable Injury** | "[I]t must be 'likely,' as opposed to merely 'speculative,' that  the injury will be 'redressed by a favorable decision.'"<br><br>*Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154–55 (Tex. 2012) | By replacing Mark Patrick with a receiver as the control person, the remainder of the value will be protected.  Mark Patrick will be personally, and Defendants corporately responsible for fraud and breaches of fiduciary to the Charities. Defendants can ultimately be held liable on the merits for the lost value to the Plaintiffs of their interest in the $270 Million fund. |

App. 211

13

App. 212



# This Court Has Subject-Matter Jurisdiction

14

# The Charities' Allegations Fall Squarely into the Court's Jurisdiction

| § 25A.004(b) Element | Sample Petition Allegations | Source (Am. Pet Citation) |
|---|---|---|
| (2) Action regarding the governance, governing documents, or internal affairs of an organization | • Issuance of shares altered power structure contrary to fiduciary obligations.<br><br>• Secret formation of CDMCFAD to replace Charitable DAF Holdco and sever connection to Charitable Owners.<br><br>• Patrick caused CDMCFAD to redeem the Plaintiff Charities' interest for a plainly inadequate $1.6 million | ¶ 5.41<br>¶ 5.69<br>¶ 5.61 |
| (4)(A)-(B) Action by an organization or owner against a controlling person or managerial official for acts/omissions in that capacity | • Redemption of $270M interest for $1.6M orchestrated by Patrick and other controlling entities.<br><br>• Issuance of dilutive shares to DFW Charitable (sham charity) was meant to alter power structure in breach of fiduciary obligations<br><br>• Secret formation of new entity to circumvent control structure. | ¶ 5.31<br>¶ 5.61<br>¶ 5.65<br>¶ 5.69 |
| (5) Breach of duty by owner, controlling person, or managerial official (e.g., duty of loyalty or good faith) | • Defendants intended to render Plaintiffs' shares worthless.<br><br>• Fiduciary obligations under Cayman law were disregarded.<br><br>• Plaintiffs relied on misrepresentations arising from special fiduciary relationship.<br><br>• Defendants misled Plaintiffs regarding asset depletion and leadership conduct. | ¶ 5.31<br>¶ 5.38<br>¶ 5.41<br>¶ 5.61<br>¶ 5.65<br>¶ 5.67<br>¶ 5.75 |

App. 213



# Business Court Subject Matter Jurisdiction under Chapter 25A

App. 214

"Can the controlling person <u>dilute</u> shares, e.g., the Participation Shares?"

*Defendants' lawyers*

"Can the controlling person <u>redeem</u> shares, e.g., the Participation Shares?"

*Defendants' lawyers*

**More to the point:**

"Could Holdco liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares [belonging to the Plaintiffs here] worthless?"

*Defendants' lawyers*

## Texas Business Court sections 25A(b):

(b) Subject to Subsection (c), <u>the business court has civil jurisdiction concurrent with district courts in the following actions</u> in which the amount in controversy exceeds $5 million, excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

..



(2) an action regarding the governance, governing documents, or internal affairs of an organization;

\*\*\*

(4)   an action by an organization, or an owner of an organization, if the action:

(A)   is brought against an owner, controlling person, or managerial official of the organization; and

(B)   alleges an act or omission by the person in the person's capacity as an owner, controlling person, or managerial official of the organization;



(5)   an action alleging that an owner, controlling person, or managerial official breached a duty owed to an organization or an owner of an organization by reason of the person's status as an owner, controlling person, or managerial official, including the breach of a duty of loyalty or good faith;

Chapter 25A.004



**DAF/Rand Structure Chart**
**As of January 2024**



PLAINTIFF'S EXHIBIT
RX-2

App. 215

```
The Dallas              Greater Kansas City        Santa Barbara           The Community
Foundation              Community                  Foundation              Foundation of North
(nonprofit charity)     Foundation                 (nonprofit charity)     Texas (CFNT)
                        (nonprofit charity)                                (nonprofit charity)
```

Supporting Organization | Supporting Organization | Supporting Organization | Donor Advised Fund Account

```
Highland Dallas         Highland Kansas City       Highland Santa Barbara   HCMLP Charitable
Foundation, Inc.        Foundation, Inc.           Foundation, Inc.         Fund
(nonprofit nonstock     (nonprofit nonstock        (nonprofit nonstock
DE corp.)               DE corp.)                  DE corp.)
```

**Mark Patrick**
*(Managing Member)*

100% | 100% Management Shares | 32..787% Participation Shares | 32..787% Participation Shares | 32..787% Participation Shares | 1.639% Participation Shares

**Charitable DAF GP, LLC**
Managing Member: Mark Patrick
*(Delaware)*

**Charitable DAF HoldCo, Ltd.**
*(Cayman Islands)*
Directors: Mark Patrick Paul Murphy

1% GP | 99% LP

**Charitable DAF Fund, LP**  Governed by the GP
*(Cayman Islands)*

100%

**CLO HoldCo, Ltd.**
*(Cayman Islands)*
Directors: Mark Patrick Paul Murphy

100%

Directors: Mark Patrick
**Charitable DAF Holdings Corp.**
Officers: Mark Patrick - President
*(Delaware)*

100% | 100% | 100%

100%

**Rand Advisors, LLC**
*(Delaware)*

**Allanon Capital Management LLC**
*(Texas)*

**Liberty CLO Holdco, Ltd.**
*(Cayman Islands)*

**HCT Holdco 2, Ltd.**
*(Cayman Islands)*

**MGM Studios Holdco, Ltd.**
*(Cayman Islands)*

100%

**Liberty Sub, Ltd.**
*(Cayman Islands)*

Directors: Mark Patrick Paul Murphy

# Current DAF



App. 216

Source: Sykes Affidavit p.58, Cayman Proceeding for all entities other than DFW Charitable Foundation.
Additional of DFW Charitable based on testimony of Mark Patrick at hearing on June 25, 2025.

2

Tab 6

E-filed in the Office of the Clerk
for the Business Court of Texas
9/2/2025 10:04 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

CAUSE NO. 25-BC01B-0027

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § | IN THE TEXAS BUSINESS COURT |
| *Plaintiffs*, | § § | |
| v. | § § § | FIRST DIVISION |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § § § | |
| *Defendants*. | § | DALLAS, TEXAS |

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**

Plaintiffs The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc., (together, the "Charitable Owners" or "Plaintiffs") file this Second Amended Petition, Application for Temporary Injunction, and Application for Appointment of Receiver, and respectfully show the Court as follows:

## I.     PRELIMINARY STATEMENT

1.1     Defendant Mark Patrick took over $270 million in funding support from some of the best community-based charities in the country. He testified on June 25, 2025, that, by the time his plan was complete, Plaintiffs were left with "nothing."[1]

1.2     Patrick flagrantly violated his fiduciary duties to Plaintiffs, and he redirected the fund's beneficial ownership to a new sham organization he controlled. This follows his pattern of using Plaintiffs' resources to enrich himself at the expense of charities and the communities and

---

[1] *See* June 25, 2025, Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11 (App. Pg. 200).

PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
APPLICATION FOR APPOINTMENT OF RECEIVER                                                                PAGE 1

App. 218

people they benefit. So far, he has paid himself at least $3.9 million in a single year from funds meant to support the charities he betrayed.

1.3     If the Court does not bar Patrick's and the other Defendants' further adverse actions through a receivership, Plaintiffs will lose millions in charitable funds earmarked for the communities they serve. And their loss will be at the hands of the very person who was supposed to protect them. Accordingly, Plaintiffs seek a Temporary Injunction freezing the funds and the appointment of a Receiver over the funds and the organization holding them.

## II.     DISCOVERY CONTROL PLAN AND MONETARY RELIEF

2.1     Plaintiffs intend that discovery be conducted under Level 2 as set forth in Rule 190.3 of the Texas Rules of Civil Procedure. Plaintiffs reserve the right to request to conduct discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure.

2.2     Plaintiffs seek damages in excess of $5,000,000 exclusive of interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs.

## III.     PARTIES

3.1     **The Highland Dallas Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Dallas Foundation, Inc. provides funding to The Dallas Foundation, a Texas charitable entity established in 1929, which has awarded over $1 billion in charitable grants that support a broad range of needs.

3.2     **The Highland Kansas City Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Kansas City Foundation, Inc. provides funding to the Greater Kansas City Community Foundation, established in 1978, which has awarded over $8 billion in in charitable grants that support a broad range of needs.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                      **PAGE 2**

App. 219

3.3     **The Highland Santa Barbara Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Santa Barbara Foundation, Inc. provides funding to charitable organizations including the Santa Barbara Foundation, established in 1928, which has awarded over $750 Million in charitable grants and supports a broad range of needs.

3.4     **DFW Charitable Foundation** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code.  It was organized on December 9, 2024, with Defendant Mark Patrick as the DFW Charitable Foundation's sole member and sole director.   It purports to be a nonprofit nonstock corporation serving exclusively charitable purposes. The DFW Charitable Foundation is headquartered at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.5     **Mark Patrick ("Patrick")** is an individual who resides in Texas and holds management control over the Charitable DAF Fund ("Charitable DAF Fund" or the "Fund") structure, as explained more thoroughly below. Patrick resides and at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.6     **CDMCFAD, LLC** is a Delaware limited liability company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.7     **CDH GP, Ltd**. is a Cayman Island limited company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                    **PAGE 3**

App. 220

3.8    **CHARITABLE DAF GP, LLC** is a Delaware limited liability company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

## IV.    JURISDICTION AND VENUE

4.1    Pursuant to Government Code § 25A.004, this Court has jurisdiction over this matter because the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

- and is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and Charitable DAF HoldCo, Ltd;

- and is an action by an owner of an organization, namely the Charitable Owners as participating and beneficial owners of Charitable DAF HoldCo, Ltd ("Charitable DAF HoldCo") and thereby the Fund in which the Charitable Owners held the sole economic interest, and through a sham transaction, briefly owners of CDMCFAD, LLC, and is brought against a controlling person and managerial entities of the organization, namely Patrick, Charitable DAF, GP, LLC,  CDH GP, Ltd and Patrick's controlled entities, DFW Charitable Foundation, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF GP, LLC's, and CDH GP, Ltd.'s obligations in the capacity of a controlling person and managerial official of Charitable DAF HoldCo, Ltd and the Fund.

- and is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Charitable Owners as a controlling owner of Charitable DAF HoldCo,  and thus an equitable owner of CDMCFAD, LLC and Charitable DAF Fund, L.P. by reason of Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith;

- and is an action seeking equitable and injunctive relief.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 4**

App. 221

4.2    The Court also has related supplemental jurisdiction per Government Code § 25A.004.

4.3    The Court also maintains plenary power to appoint a receiver under Texas Government Code § 24.003, Texas Civil Practice and Remedies Code § 64.001(a)(3), Texas Business and Organizations Code §§ 11.401 and 11.410, and through the Court's inherent powers at equity.

4.4    Personal jurisdiction is proper by Texas courts pursuant to Texas Civil Practice & Remedies Code § 17.042 because Defendants committed tortious actions, including Texas resident Mark Patrick, who improperly took approximately $270 million in value, and other conduct within Texas, incorporated herein, which are the subject of this Petition. Defendants are therefore subject to specific personal jurisdiction because of the complained-of acts that they committed in Texas. Defendants all have substantial business operations, assets, and other connections to Texas. Defendants are subject to general personal jurisdiction in Texas because they both reside in, and have continuous and systematic contacts with, Texas. Defendants have also consented to the jurisdiction of Texas courts.

4.5    Venue is proper in this county under Texas Civil Practice & Remedies Code § 15.002 because Defendant Patrick is a resident of Dallas County, Texas and Patrick undertook and directed a substantial portion of the complained-of acts in Dallas County, Texas. On information and belief, the DFW Charitable Foundation, CDH GP, Ltd., Charitable DAF GP, LLC, and CDMCFAD are headquartered in Dallas County. Dallas County is within the 1st Division of the Texas Business Court.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                 **PAGE 5**

App. 222

A. *The Charitable DAF Fund Structure*

5.1     Highland Capital Management, L.P. ("**Highland**") was an SEC registered investment advisor. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated by Highland's founder, James Dondero, through his charitable trust to a charitable foundation. The goal was to create a permanent, self-sustaining, self-governing charitable infrastructure to facilitate sustained philanthropic efforts in specific communities in the United States through several Charitable Owners.  Together, three of those Charitable Owners are the Plaintiffs here.[2]  As with all "supporting organizations," disinterested parties must hold a majority of the voting rights in the Charitable Owners.  So, Mr. Dondero as the original donor held one vote as a director; and the Foundations supported by the Charitable Owners held the remaining two votes and thus control over them.

5.2     To that end, in 2011, the Fund was formed to hold the donated assets.

5.3     The Charitable DAF Fund primarily holds assets through a wholly-owned subsidiary entity called CLO HoldCo, Ltd. ("**CLO HoldCo**").

5.4     At the same time the Charitable DAF Fund was created, Charitable DAF HoldCo, a Cayman Islands entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund.

5.5     The ultimate purpose of forming Charitable DAF Fund and Charitable DAF HoldCo was to benefit certain, substantial regional nonprofit charities in California, Missouri, and Texas. The governing documents of the Charitable DAF Fund specifically refer to these Charitable

---

[2] A fourth charitable owner that held less than a 2% interest is not party to this action.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                          **PAGE 6**

App. 223

Owners. Participating shares in Charitable DAF HoldCo were therefore issued to Charitable Owners, which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the Charitable Owners owned nearly 100% of the Participating Shares of Charitable DAF HoldCo. The Charitable Owners held their beneficial ownership in the assets of the Charitable DAF Fund by virtue of those Participating Shares in Charitable DAF HoldCo. Put simply: the Charitable Owners owned nearly 100% of Charitable DAF HoldCo, which was the beneficial owner of all the assets in the Charitable DAF Fund. Three of the four Charitable Owners are the Plaintiffs in this Lawsuit and held 98.34% of the economic interests in the Fund.

5.6     In turn and as intended, the funds generated by the Charitable DAF Fund enabled the Charitable Owners to provide funding directly to charitable causes foundations in three regions of the United States, primarily through nonprofit organizations. Specifically, The Dallas Foundation, The Greater Kansas City Community Foundation, and The Santa Barbara Foundation (together, the "**Charities**") are each affiliated with one of the Charitable Owners and receive regular grants for charitable work ultimately funded by Charitable DAF Fund. For example, funds have supported schools for the needy, children's advocacy, educational and recreational institutions accessible to the public, and important medical facilities and programs. From funding education programs and healthcare services to supporting economic development and community welfare projects, these funds help strengthen the Charitable Owners' ability to serve individuals and families in need.

5.7     Since the Charitable DAF Fund's inception, the Charitable Owners have granted over $42 million to charitable organizations, including donations to 275 organizations, with average annual grant payments of $3.7 million. The Charitable Owners perform irreplaceable

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                **PAGE 7**

App. 224

philanthropic work in their communities and/or throughout the nation, and do so in a steady, reliable manner that permits them to build progress on initiatives year after year.

## B. *Control of the Charitable DAF Fund*

5.8     The Charitable Owners, via Charitable DAF HoldCo, were the sole economic beneficiaries of the Charitable DAF Fund and together held all of the economic interest in it. Management control of the Charitable DAF Fund and Charitable DAF HoldCo, however, was vested not with those organizations but rather in "Management Shares." The "Management Shares" provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But these shares explicitly did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged and was expressly reserved solely to the Charitable Owners (the Plaintiffs).

5.9     Ownership of the general partner in the Charitable DAF Fund and the Management Shares in Charitable DAF HoldCo were concentrated in one person, vested with enormous trust (the "**Control Position**"). The Control Position was expressly obligated to manage the Charitable DAF Fund and Charitable DAF HoldCo for the economic benefit of the Charitable Owners. The Control Position therefore owed the Charitable Owners fiduciary duties of candor, care, and loyalty, including a prohibition against any self-dealing.

5.10     The Amended and Restated Limited Partnership Agreement of the Charitable DAF Fund dated November 7, 2011 (the "**ARLPA**"), and the Amended and Restated Memorandum and Articles of Association of the LP dated January 19, 2015 ("**Articles**"), govern the Charitable DAF Fund and its partners. These were the effective governing documents over the Charitable DAF Fund and Charitable DAF HoldCo at the time the conduct alleged herein commenced. The ARLPA and the Articles, from which the Control Position derives its authority, also impose a clear duty

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                 **PAGE 8**

App. 225

upon the Control Position to exercise his powers for the sole benefit of the Charitable Owners (the Plaintiffs).

5.11    For example, the Preamble to the ARLPA states: "WHEREAS, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended and the parties hereto desire for the Partnership to be *for the economic benefit of the Limited Partner and its Charitable Owners* (as defined below) as set forth herein[.]"[3]

5.12    Likewise, Section 1.3 (Purpose and Powers) states that the Control Position must manage the fund assets "*for the purpose of benefitting, directly or indirectly, the Charitable Owners.*"[4]

5.13    Section 1.6 (Powers) likewise emphasizes: "[T]he General Partner [Control Position] . . . is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*"[5]

5.14    The ARLPA thus provides that Charitable DAF Fund was formed to make investments, directly or indirectly, "for the economic benefit of the Limited Partner [DAF HoldCo] and its Charitable Owners." In this context, the Control Position is responsible for the governance and management functions of the Charitable DAF Fund as required for it to carry out its sole purpose of benefiting the Charitable Owners and the Charities they support.

---

[3] Emphasis added
[4] Emphasis added.
[5] Emphasis added.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 9**

App. 226

5.15    The ARLPA is infused throughout with the singular command: The Control Position has great authority but is required to act with fidelity in exercising it for the benefit of the Charitable Owners. The governing documents of the Charitable DAF Fund thus form the foundation of a special factual relationship based on direct and close contact between the Control Position and the Charitable Owners.  The governing documents establish that by virtue of the role and express obligations, the Control Position holds himself out as an agent acting for the benefit of the Charitable Owners and supplies them the information upon which they must rely.  Patrick and the Defendants thus undertook, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs were treated as having entrusted their interests, transactions, affairs, and property to them.  As set forth herein, the Parties built upon that foundation through their conduct over years, and it is this conduct directly pertinent to the instant case.

5.16    Grant Scott was initially selected for the Control Position. Mr. Scott effectively served the Charitable Owners' charitable purposes in his role in the Control Position. For this, Mr. Scott received $60,000 in annual compensation—a compensation rate that remained unchanged for the better part of a decade. During this time, the Charitable Owners and their respective charitable foundations made great strides in creating philanthropic, charitable work that was efficient, steady, and reliable, and that grew and built on their progress year after year.

C.  *Mark Patrick's Assumption of Control*

5.17    Highland filed for bankruptcy in October 2019 ("**Highland Bankruptcy**") and, as a result, the Charitable DAF Fund became engaged in certain disputes arising from the bankruptcy, increasing the time and responsibilities associated with the Control Position. Mr. Scott did not feel qualified to manage those disputes and decided to resign from the Control Position.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 10**

App. 227

5.18    Mark Patrick, a tax attorney who had played a significant role in developing the overall Charitable DAF Fund structure while at Highland, suggested that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected Charitable DAF Fund.

5.19    On March 25, 2021, Mr. Scott resigned transferring all his management shares and membership interest to Patrick for nominal consideration, and Patrick was appointed as director of Charitable DAF HoldCo. Patrick therefore assumed the Control Position from that date. Patrick then hired Paul Murphy, a Cayman Islands' director, to join him in his efforts to abscond with the $270 million in assets.

### D. *Patrick's Breaches of Fiduciary Duty*

5.20    In 2023, while acting as the sole fiduciary for the Charitable Owners at Charitable DAF Fund and DAF HoldCo, Patrick embarked upon a brazen and calculated conspiracy to defraud the Charitable Owners of their beneficial interest in the $270 Million held by the Charitable DAF Fund, in direct violation of the fiduciary duties imposed by the Charitable DAF Fund's governing documents and by common law.  Patrick further conspired to transfer that entire $270 Million interest to a new entity controlled by Patrick and operated out of his living room in Dallas, Texas.

### E. *Undisclosed Self-Dealing*

5.21    Patrick engaged in a series of ethically and legally dubious conduct prior to embarking upon his grand scheme to defraud the Charitable Owners.  For example, in June 2023, Patrick requested that The Highland Dallas Foundation, Inc. direct $10,000 to Creative HEARTS TX, a non-profit entity formed on June 13, 2023. Patrick expected this to be an annually recurring donation. Patrick failed to disclose that he, his wife, and daughter were the directors of this entity,

PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
APPLICATION FOR APPOINTMENT OF RECEIVER                                                    PAGE 11

App. 228

which had been created approximately two weeks earlier. The Highland Dallas Foundation, Inc. funded an initial $10,000 contribution but declined to commit to doing so annually.

### F. *Attempted Fraudulent Kickback Scheme*

5.22    In September 2023, Patrick approached Kevin Cronin, CEO of Fortaris Capital Advisors, proposing a fraudulent kickback scheme to personally benefit Patrick. Fortaris previously provided legitimate services to the Charitable DAF Fund. Now, Patrick proposed that the Charitable DAF Fund engage a new vendor controlled by Mr. Cronin. Patrick proposed that the Charitable DAF Fund pay this sham vendor a monthly fee of $25,000-$50,000. The sham vendor, however, would not provide any services to the Charitable DAF Fund. Instead, Patrick expected to collect half of the fee as undisclosed supplemental compensation. That is, he expected to collect something for nothing in a classic fraud.

5.23    Mr. Cronin declined and relayed what occurred to Mr. Dondero. Mr Dondero then confronted Patrick, who admitted that what Mr. Cronin reported was true.

5.24    Mr. Dondero ensured that Charitable Owners were also informed about Patrick's kickback scheme. Despite significant concern, the Charitable Owners had doubts about whether, based on the governing documents and Patrick's positions, they could remove Patrick from the Control Position.

### G. *Insider Trading*

5.25    In August 2024, Patrick tried to capitalize on material non-public information obtained through his employment at Skyview through his self-described "outside compliance counsel" Douglas Mancino to advise the Highland Dallas Foundation, Inc. to exercise a put option in a NexPoint affiliated asset, constituting attempted violations of U.S. securities laws. The Dallas Foundation declined to trade on Patrick's improper tip.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                        **PAGE 12**

App. 229

5.26    Skyview's compliance department conducted an internal investigation that concluded Patrick's actions constituted serious breaches of compliance obligations and attempted serious breaches of U.S. securities laws.

5.27    Patrick resigned from Skyview immediately before the investigation was finalized and simultaneously terminated the Charitable DAF Fund's services agreement with Skyview without justification and against the Charitable DAF Fund's interests.

## H. *Patrick Raids the Charitable DAF Fund*

5.28    After resigning from Skyview, Patrick began shrouding the Charitable DAF Fund structure's overall financial reporting and communications to the point that the Plaintiffs were essentially cut off from any view into the finances of the fund. As of September 2024—the last reliable data accessible to the Plaintiffs prior to filing this Action—the Charitable DAF Fund held approximately $270 million strictly for the financial benefit of the Plaintiffs and ultimately their supported Charities.

5.29    Prior to Patrick's tenure in the Control Position and for a period thereafter, the Control Position received a reasonable but measured stipend of $60,000 per year, consistent with the nature of the position as a fiduciary for charitable organizations serving those in need. Patrick's predecessor never awarded himself compensation more than $60,000 per annum. During that time, the Charitable DAF Fund was a tremendous success, growing in value and contributing to the good works of the Charitable Owners.

5.30    No later than 2024, however, Patrick raided the fund for personal gain. A review of the Charitable DAF Fund's last accessible financial records—provided in August 2024—showed dramatic and unexplained increases in expenditures:

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 13**

App. 230

- Directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023, and to approximately $2.25 million in the first half of 2024 alone (a 12,400% increase from 2022 if annualized).

- Legal expenses increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022 (a 300% increase if annualized).

- Overall expenses for the first half of 2024 were around $18.3 million, compared to $18.6 million for all of 2023.

5.31    This was only a warmup. In September 2024, without advising the Charitable Owners or their supported charities, and without approval from anyone other than himself and his hand-picked second Director-for-hire in the Cayman Islands, Mr. Murphy, Patrick used his authority over Charitable DAF HoldCo to award himself an annual salary of $850,000 per year. Patrick also awarded himself a "long-term incentive" payment tied to the fund's returns, amounting to 7.5% of annualized net fund returns in excess of 10% (capped at an annualized 25% return). Then, the next month, on the basis of this "LTI" calculation Patrick awarded himself an "LTI" payment of $975,000 and an "annual discretionary bonus" for 2023 in the amount of 2.5 times his base salary.  The result:  In two months in Fall 2024, Partick awarded himself $3,925,000 in compensation directly from the Charitable DAF Fund that was held for the benefit of the Charitable Owners.  Patrick did this even though the governing documents of the Charitable DAF Fund, by which both his powers and his duties to the Charitable Owners arose, were explicit that the Charitable DAF Fund was to be managed "for the economic benefit of the Limited Partner [DAF HoldCo] and its Charitable Owners [the Plaintiffs]" and "not for the economic benefit of the General Partner [Patrick]."

5.32    Patrick did all this in secret. Because of the structure of the Charitable DAF Fund and its management, no one supervised his compensation decisions aside, presumably, from his self-appointed fellow Director Murphy.  The beneficiaries of the Charitable DAF Fund were never

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 14**

App. 231

advised, and had no opportunity to learn, that in a few short years, Patrick had unilaterally increased his personal compensation from the Charitable DAF Fund by 6,441%. Patrick and the other Defendants provided the Plaintiffs with partial information about the Charitable DAF Fund's finances, doing so through half-truths and partial disclosures that obscured the whole truth from them. Patrick did so despite repeated requests from the Plaintiffs and their counsel and counsel for the Charitable DAF Fund for complete information.

## I. *Patrick Ignores the Charitable Owners' Concerns*

5.33　On November 11, 2024, given what the Charitable Owners already knew, the three major Charitable Owners drafted a letter to Murphy, the Cayman Islands director, stating that "we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "**DAF-related entities**"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable."[6]

5.34　The letter continued, "because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."

5.35　On January 23, 2025, the Charitable Owners again demanded Patrick and Murphy provide clarity into the Charitable DAF Fund's financial position, expressing dismay that Patrick and Murphy continued to ignore their repeated requests for information. The Plaintiffs requested:

---

[6] Ltr. of Nov. 11, 2024 (Appx. Pg. 162-163)

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**　　　　　　　　　　　　　　　　　　　**PAGE 15**

App. 232

- Income Statements for the last four years: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses.

- Listing of Underlying Assets: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.

- Audited Financial Statements: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.

- Current Structure of DAFHoldCo Operations: An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

5.36    The Defendants never acknowledged receipt of this January 23, 2025, email. On January 28, 2025, therefore, the Charitable Owners requested a winding up of the Charitable DAF Fund's assets:

> These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Charitable Owners so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the assets further.

Importantly, at the time of this communication, the Charitable owners via Charitable DAF HoldCo, still held the beneficial interest in the Charitable DAF Fund, though (as set forth below, and unknown to the Plaintiffs), that interest was now layered through Patrick's new entity, CDMCFAD. In other words, at the time the Plaintiffs requested a winding up, there is no question

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                                      **PAGE 16**

App. 233

that they remained the 100% beneficial owners of the assets in the Charitable DAF Fund and were entitled to the distribution of those assets under the Charitable DAF Fund's governing documents. By contrast, Patrick (whether individually or through one or more of his secretly-created entities) held nothing more than the miniscule par value of the Management Shares.

5.37    As set forth below in more detail, Patrick and the Defendants eventually responded to the Charitable Owners' inquiries by making a series of false statements, promising information and meetings that never arrived, and presenting carefully selected, incomplete information to mislead the Plaintiffs into a false sense of security and delay any decisive action on their part to effect a distribution. Meanwhile, Defendants used that veil of secrecy and misrepresentation to embark upon a conspiracy intended to defraud the Plaintiffs from their entire beneficial interests in the Charitable DAF Fund, before they could act to effect a distribution of its assets.

**J.    *Patrick Conspires to Defraud the Charities of $270 Million***

5.38    Between November 2024 and the present, internal documents obtained through proceedings in the Cayman Islands reveal that Patrick conspired to defraud the Charitable Owners of their beneficial interest in the $270 Million in assets held by the Charitable DAF Fund. At the outset of the scheme, the Defendants' agents summarized the essence of the task they had been assigned: "Could Holdco liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares [belonging to the Plaintiffs here] worthless?"[7] The entire premise of Patrick's project was to sever the Charitable Owners and their related Charities from the assets of the Charitable DAF Fund that Patrick was supposed to invest and maintain for their economic benefit, leaving them with worthless shares.

---

[7] Writ of Summons and Statement of Claim, ¶ 80.4, filed on July 15, 2025 at Cause No. FSD2025-0201 in the Grand Court of the Cayman Islands between Charitable DAF HoldCo, Ltd. v. Mark Eric Patrick, et al. (the "CI Statement of Claim")

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                    **PAGE 17**

App. 234

5.39    Patrick and the other Defendants first diluted the Charitable Owners' interests in the Charitable DAF Fund to impede them from being able to exercise their right to wind up the Charitable DAF Fund's operations and thereby obtain their equitable share of the $270 Million fund.  Patrick then engaged in a calculated series of moves to defraud the charities of their $270 Million interest in the Charitable DAF Fund.  He did this while a demand to "wind up" the Charitable DAF Fund was pending from the Charitable Owners, and with the express intent of lifting the Charitable DAF Fund's assets away from the Charitable Owners before that wind-up could occur.  In November 2024, Patrick and Murphy began to contemplate how they could defraud the charities of their interests in the Charitable DAF Fund. One challenge they identified was the prospect that the Charitable Owners might file a petition in the Cayman Islands to "wind up" Charitable DAF HoldCo and its asset (the Charitable DAF Fund), which would then entitle the charities to its proceeds and Patrick to nothing.  But Patrick and Murphy found a solution: By issuing new participation shares in Charitable DAF HoldCo to a new "charity" that Patrick himself controlled, they could dilute down the Charitable Owners so they represent a smaller percentage of HoldCo's shares.  As expressly contemplated by Patrick and Murphy, this would undermine any future petition to "wind up" because the shares in Charitable DAF HoldCo controlled by Partick's new entity could oppose the petition.  Patrick believed that the opposition of his new "charity" to any "winding up" petition could insulate him against any effort by the Charitable Owners to thwart his scheme.[8]

5.40    Accordingly, on December 9, 2024, Patrick formed Defendant DFW Charitable Foundation (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Patrick named himself the Sham Charity's sole member and sole director and its registered address

---

[8] CI Statement of Claim, ¶ 91.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                        **PAGE 18**

App. 235

was Patrick's home in Dallas. This entity was formed for the express purpose of later diluting down the Charitable Owners and blocking them from opposing the remainder of Patrick's scheme.

5.41 In February 2025, Patrick, Murphy, and the Defendants issued new Participating Shares in Charitable DAF HoldCo to the Sham Charity created by Patrick, with the intent and for the express and stated purpose of blocking a possible equitable winding up petition by the Charitable Owners. Notably, this was after the Charitable Owners had requested in writing that the Charitable DAF Fund be wound up. In other words, Patrick and the other Defendants issued the shares expressly in order to alter the balance of power between the holders of Participating Shares. Defendants did this in direct contravention of their express obligations to the Charitable Owners; and his specific knowledge that, under Cayman law, the power to issue shares is a fiduciary power that may only be exercised for proper purposes and may never be deliberately intended to alter the balance of power between shareholders. On February 7, 2025, Patrick issued his newly-formed and personally-created-and-controlled Sham Charity a fifty-one percent (51%) interest in the charitable assets—318 participating shares in Charitable DAF HoldCo, more than were held by all the Charitable Owners put together. This sham dilution reduced the Charitable Owners' cumulative holding in Charitable DAF HoldCo from 100% of the participation shares to 48.9%. Following the new issuance: (i) The Highland Dallas Foundation, Inc.'s interest was diluted from 32.787% to 16.05%; (ii) The Highland Kansas City Foundation, Inc.'s interest was diluted from 32.787% to 16.05%; (iii) The Highland Santa Barbara Foundation, Inc.'s interest was diluted from 32.787% to 16.05% and (iv) the HCMLP Charitable Fund's[9] interest was diluted from 1.639% to 0.80%.

---

[9] The HCMLP Charitable Fund is a separate charity which provides funding for the North Texas Community Foundation. While it is not a named plaintiff, the damages it incurred because of the acts of Patrick are notable and relevant to show Patrick's impact across the State of Texas.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 19**

App. 236

5.42    Patrick and the other Defendants never advised the Charitable Owners of any of these steps, and as set forth below, made affirmative misrepresentations and material omissions to hide them, and to dissuade and delay the Plaintiffs from taking certain specific actions to discover, oppose, or reverse them.  The formation of the new "charity" controlled by Patrick, and the award of 318 new participating shares to that Sham Charity, were all done in secret, with the cooperation of all the Defendants.  Moreover, throughout this very same secret process, as set forth in more detail below, Patrick and the Defendants (directly and through their agents) were falsely presenting a partial picture to the Plaintiffs about these facts, and were falsely representing to the Charitable Owners that (A) the reported increases in expenditures on Director's fees were inaccurate; and (B) the "restructuring" of the fund was proper and for the benefit of the Charitable Owners. Accordingly, Plaintiffs had no opportunity to learn the facts that the Defendants were keeping secret, and in fact the Defendants affirmatively misled the Plaintiffs about them.

5.43    Around the same time, Patrick formed the sham charity, on December 12, 2024, Patrick incorporated CDMCFAD, LLC, a Delaware limited liability company.

5.44    In secret, and without notice to the Charitable Owners, on December 18, 2024, Patrick caused Charitable DAF HoldCo to transfer to CDMCFAD, LLC 100% of its interest in Charitable DAF Fund.  In turn, Charitable DAF HoldCo acquired 100% of the interest in CDMCFAD, LLC. As a result, CDMCFAD effectively was inserted as a blocking company in between Charitable DAF HoldCo, owned by the Charitable Owners, and the Charitable DAF Fund itself (where the $270M assets resided). Suddenly, the Charitable Owners no longer held a 100% beneficial interest in the entity that held the assets of Charitable DAF Fund. Instead, Patrick

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 20**

App. 237

ensured a different and new entity (CDMCFAD) held Charitable DAF Fund. This was a critical step in the plan to "make the Participation Shares [held the Charities] worthless[.]"[10]

5.45    In February 2024, without telling the Charitable Owners, Patrick formed a new entity in the Cayman Islands to replace the General Partner entity managing the Charitable DAF Fund.  The prior General Partner had been a Delaware entity.  Patrick's express directive was that the new General Partner be "hard to find or track or trace.  Or find owners etc.  Strong litigation protection."[11]  By early March 2025, Patrick had formed this new secret entity, and it had replaced the General Partner of the Charitable DAF Fund.  Again, the Charitable Owners were never informed.

5.46    On March 27, 2025, Patrick caused CDMCFAD (the new holder of $270 million in assets) to issue new shares to the Sham Charity, *and only to the Sham Charity*. He issued no additional shares in CDMCFAD to the Charitable Owners. His fraudulent scam was nearly complete.

5.47    Now, only two entities held direct economic interests in CDMCFAD (the entity that now held the $270M Charitable DAF Fund).  Those two entities were Charitable DAF HoldCo (still owned 48.5% by the Plaintiffs) and DFW Charitable Foundation.

5.48    Now that HoldCo's interest in the Charitable DAF Fund existed only through CDMCFAD, Patrick and Murphy knew that causing HoldCo to exchange or redeem its interest in CDMCFAD would sever the Charitable Owners entirely from the Charitable DAF Fund.

5.49    The remaining problem for Patrick and the Defendants was the obvious value of the interests the Charitable Owners held in the Charitable DAF Fund. Valuations of those interests had been performed continuously for years and had consistently, unerringly, and correctly reflected

---

[10] CI Statement of Claim, ¶ 80.4.
[11] CI Statement of Claim, ¶ 82.

PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER                                                            PAGE 21

App. 238

that they were roughly equivalent to the value of the Charitable DAF Fund itself. In other words, as recently as September 2024, they were valued at roughly $270 Million.

5.50    Patrick and the Defendants thus faced a problem. They had no interest in exchanging the interests of the Charitable Owners in HoldCo (and therefore in the Charitable DAF Fund) for equivalent value. Instead, their goal from the beginning had been to "liquidate" HoldCo, "distribute all its assets elsewhere," and "make the Participation Shares [belonging to the Charitable Owners here] worthless[.]"[12] So, to achieve this and to give themselves "cover" for doing so, Patrick and the Defendant embarked on a self-interested, results-oriented, fraudulent exercise in valuation-shopping.

5.51    Thus began a shopping expedition for a valuation firm willing to provide a deflated valuation of HoldCo's interest in the Charitable DAF Fund, now held via CDMCFAD. In January 2025, Patrick's legal counsel in the Cayman Islands, Walkers, approached PricewaterhouseCoopers ("**PwC**"), seeking a valuation of shares in Charitable DAF HoldCo, noting that the Charitable Owners were "potential adverse parties." In February 2025, Walkers informed PwC that CDMCFAD was inserted into the structure and also requested a valuation of membership interests in CDMCFAD, on the one hand, and of the Participation Shares held by the Charitable Owners in HoldCo, on the other. But PwC gave an unwelcome answer, responding that "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders[.]*" In other words, PwC's professional guidance was precisely what the Defendants did not want to hear—any fair "redemption" of the Plaintiffs' interest in the Fund would require a payment at or very near the face value of the Fund itself. A phone call followed wherein PwC asked for clarity about what

---

[12] *See Id.*

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                **PAGE 22**

App. 239

Mr. Patrick was trying to achieve by the Restructuring. After that call, PwC declined the assignment. The Defendants, however, brazenly ignored the guidance they had just obtained and rushed forward to find a more compliant valuator.

5.52    The next stop on Patrick's shopping trip was FTI Consulting in London ("**FTI**"). Walkers again presented the scenario. FTI suggested, depending on the alignment with the Charitable DAF Fund's mission, a discount of approximately 14% on the low end or 95% on the high end. But FTI was also clear that a real valuation in support of a transaction would require a much closer inspection of the specific terms of the transaction, the restructuring of the organizations, and the underlying assets themselves. FTI thus advised that their preliminary analysis could not be used in support of any transaction.

5.53    Patrick was anxious to finish his scheme to steal all the Charitable Owners' interests. On March 17, 2025, Patrick informed and instructed Walkers that they needed to have FTI remove its restriction against using any valuation for the purposes of a transaction. Patrick also disclosed his attempt at a post-hoc justification for his fraudulent, tortious, and unethical conduct: Patrick was seeking "new advice of two separate U.S. Tax counsel" that the "best interests of the Company [was] to have non Dondero holders of its interests." Once again, all of this brazen conduct was hidden from the Plaintiffs.

5.54    Over the next several days, Walkers sought to have FTI issue a valuation opinion that was unrestricted for use to support Patrick's transaction against the Charitable Owners. For its part, Walkers opined to FTI that the directors owed no "overriding duty to act in the shareholders' interest," but only in the "best interest of the company." FTI responded with a pertinent question, "Can you explain how it was in the interests of the company to materially dilute the existing shareholders?" There was never a satisfactory answer.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                      **PAGE 23**

App. 240

5.55    Slightly later, Walkers asked FTI, "please could you delete references to our advice so as to avoid any arguments about waiver of privilege." Walkers further advised FTI that what it really wanted was a "valuation report which may, in connection with a proposed redemption of the membership interests in CDM[CFAD], be disclosed to third parties and relied on to establish fair market value[.]"

5.56    Now realizing that Walkers was hiding the ball, FTI responded: "This is material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDM[CFAD] redeem the shares owned in by DAF? . . . We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation we would need to do a more detailed exercise, including valuing the underlying assets." Shortly thereafter, FTI further elaborated: "If the firm was wound down, would it result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing?"[13] Then FTI touched the point with a needle, in language making it clear that the rigged estimate Defendants were seeking could not survive scrutiny: "[W]hy haven't the participating shareholders triggered a wind-down? If they can trigger a wind down and then in short order receive $300m of distributions, *it does change things re discount*."[14]

5.57    Walkers continued on behalf of Defendants to push FTI to give a valuation opinion that could be used to justify their intended fraud. But, now understanding some of what Defendants intended, FTI refused. FTI closed the book as follows on March 26: "What is the intention of adding that directors should act in the interests of future members*? I am struggling to understand how a director could act in a manner that is beneficial for future shareholders which is not also*

---

[13] CI Statement of Claim, ¶ 134
[14] CI Statement of Claim, ¶ 134 (emphasis added).

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 24**

App. 241

*helpful for existing shareholders.* The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work . . . [T]his memo should not be used to support a transaction."[15] So in the end, FTI—like PwC—explained to the Defendants that the Charitable Owners' interests had substantial value given all the facts and circumstances, and it could not issue an opinion for use in a transaction that said otherwise. Again, the Defendants got news they did not want to hear; again, they ignored the guidance received and moved on to find a more malleable partner.

5.58    Patrick's next stop seeking a deflated valuation was ValueScope. Since year-end 2020, ValueScope had provided valuations for Charitable DAF Fund net assets, ranging between $177 million and $277 million, with the most recent being September 2024, at $270 million. Over the same time period, ValueScope had provided fair market value for the Charitable Owners' shares on a per share basis ranging from $481,468 to $782,847, with the September 2024 valuation at $759,614. In other words, ValueScope had valued the Charitable Owners' interests at around $270 Million just six months earlier. Unlike FTI and PwC, however, ValueScope saw its way to applying a 99.2% discount against the Charitable Owners' interests for "Lack of Control" (a situation that had *always* been inherent in the structure of the Fund) and entirely changed its methodology from prior periods. The end result: ValueScope determined that each participating share had a fair market value of $5,368 in March 2025, down from $759,614 just several months earlier. According to ValueScope's "work," the Charitable Owners total value was approximately $1.6 million. ValueScope failed in their "valuation" even to address a key point that PwC and FTI had emphasized: The Charitable Owners would acquire the lion's share of $270 Million if they

---

[15] *Id.* ¶ 135 (emphasis added).

PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
APPLICATION FOR APPOINTMENT OF RECEIVER                                                           PAGE 25

App. 242

triggered an equitable wind-up, which they likely had the right to do. But the Defendants were happy to take "yes" for an answer.

5.59    Patrick wasted no time before weaponizing his sham valuation. The April 2 "redemption" outlined below relied extensively on the sham ValueScope report—without ever mentioning ValueScope's sharp change in methodology from years of its earlier reports; without recognizing that ValueScope failed to account for the possibility or right of the Plaintiffs to wind up; without any serious effort to justify the 99.2% reduction in value estimation from the report issued just six months earlier; and without giving the Plaintiffs any chance even to see the report, much less rebut it.

5.60    But, the Defendants also relied upon and cited in the "redemption" the FTI "memo," despite FTI's express assertion and disclaimer that its preliminary work ***could not be used to support a transaction***, and despite FTI's clear advice that the reality of the Charitable Owners' rights to effect a wind up and acquire the value of the Charitable DAF Fund required a substantial necessary adjustment upwards to the estimated value of their shares.

5.61    On April 2, 2025, Patrick and the Defendants caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. That is, he exchanged $270 million for $1.6 million, a ridiculous transaction bereft of reasonably equivalent value.[16] Their goal—to "make the Participation Shares [belonging to the Plaintiffs here] worthless"—was achieved.[17] CDMCFAD participated directly by "buying" Charitable DAF HoldCo's shares; the General Partner entities participated directly by causing the redemption.

5.62    After the transaction, Charitable DAF HoldCo purportedly had no assets and no remaining interest in Charitable DAF Fund. As a result, Patrick's Sham Charity, Defendant DFW

---

[16] Written Resolutions of the Directors of the Company dated 2 April 2025 (Appx. Pg. 102-103)
[17] CI Statement of Claim, ¶ 80.4.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**      **PAGE 26**

App. 243

Charitable Foundation, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund. This final step completely severed the Charitable Owners and their nonprofit charities from the assets of the Charitable DAF Fund. In Patrick's own words under oath, "the entity in liquidation [Charitable DAF HoldCo, Ltd.] owns nothing."[18]

5.63    Before the start of these self-dealing transactions, in October 2024, the Charitable Owners owned 100% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Charitable Owners owned Participation Shares worth zero. Again, all of his self-dealing activity took place with no clarity or transparency. Patrick converted the Charitable Owners' assets to Patrick's personal benefit and ownership, and violated his fiduciary duties of care, candor, and loyalty that he owed to the Charitable Owners.

K.  *The Defendants' Material Misstatements and Omissions*

5.64    Through this entire conspiracy, from Fall 2024 through May 2025, the Defendants and their agents engaged in an orchestrated effort to mislead the Plaintiffs about their actions and intentions.   The Defendants did so in order to convince the Plaintiffs that the assets in the Charitable DAF Fund were secure; to hide their efforts to "make the Participation Shares worthless" from the Plaintiffs; to falsely convince the Charitable Owners that Defendants' strange corporate "restructuring" acts were in legitimate service to the Charitable DAF Fund's charitable objectives and the needs of the Plaintiffs; and to dissuade or delay any action by the Charitable Owners to protect or secure the value of their beneficial interests in the Charitable DAF Fund, and/or to reverse the dilution of their Participation Shares in Charitable DAF HoldCo or the sham

---

[18] June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11; (Appx. Pg. 200).

PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
APPLICATION FOR APPOINTMENT OF RECEIVER                                                    PAGE 27

App. 244

"redemption" of Charitable DAF HoldCo by CDMCFAD—by, for instance, the filing of an equitable "winding up" petition.

5.65    Due to the position of trust the governing documents assigned to the Control Position; and due to Patrick's practice of sharing information about the Charitable DAF Fund only through close and direct interactions or transmissions, the Plaintiffs were factually dependent upon the special relationship between them and Patrick—both for any information about the Fund, its assets, and its transactions, and for the protection of the Plaintiffs' interests.  The Plaintiffs were required to rely on information and advice that Patrick provided directly to them and depended on him to make material disclosures to them of pertinent information regarding transactions, acquisitions, and the like.   This rendered the Plaintiffs unusually vulnerable to material misrepresentations and omissions the Defendants made while they were executing their scheme. By virtue of the governing documents and the Parties' relations over time, Patrick and the Defendants had undertaken, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs entrusted their interests, transactions, affairs, and property to them. The Defendants, for their own benefit, used the position and special inside knowledge they held to take improper and unfair advantage of the Charitable Owners, especially through their material misrepresentations and omissions.

5.66    On or about November 5, 2024, "compliance counsel" for Defendants, Doug Mancino, held a call with outside counsel for the Charitable Owners.  In that call, Defendants' counsel represented that the increased legal spend by the Defendants in 2024 was due to the need to settle legal disputes, and that the 2025 legal spend was thus expected to decrease.  Defendants' counsel mentioned nothing about increased legal expenditures associated with a massive, contemplated restructuring.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                    **PAGE 28**

App. 245

5.67 On or about December 11, 2024, even while the Defendants were executing their scheme to render the Participation Shares "worthless," Defendants' counsel arranged for a video call with outside counsel for the Charitable Owners. In an email the prior day, on December 10, 2024, "compliance counsel" for the Defendants referenced the Charitable Owners' "concerns about depletion of assets" and asserted that, "in fact . . . just the opposite has been happening under the leadership of Paul Murphy and Mark Patrick." In response, outside counsel for the Charitable Owners emphasized their vulnerability and their inability to independently assess the Defendants' representations, given their reliance on the Defendants: ""[W]ithout detailed financials, or any financials at all, the Supporting Organizations are left in the unenviable position of having [to] rely on presentations about what parties say the numbers show rather than being able to see precisely the story the numbers tell."

5.68 In the December 11, 2024, video call, the Defendants worked to allay the concerns expressed in the November 2024 no-confidence letter and thereby delay or dissuade any action on the part of the Plaintiffs to petition for an equitable wind-up until Patrick's self-dealing "restructuring" was complete. Patrick, Murphy, and their agents attended. The meeting literally happened the same week the Defendants formed CDMCFAD (the entity "inserted" below HoldCo to hold the Charitable DAF Fund) and the DFW Foundation (the Sham Charity controlled by Patrick); and just one week before the Defendants executed the fatal transfer of HoldCo's interests in the Charitable DAF Fund to CDMCFAD. At this meeting, the Defendants purported to provide to the Charitable Owners a global survey on their plans for the Charitable DAF Fund. The Defendants presented their purported vision of running the Charitable DAF Fund as a more professional and institutional investment vehicle, for the benefit of its charitable purposes and the Charitable Owners. They promised to provide more financial information in the future. Through

PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
APPLICATION FOR APPOINTMENT OF RECEIVER                                                              PAGE 29

App. 246

this presentation, the Defendants expressed two fundamental messages: First, the Control Position remained dedicated to the duty imposed by the Charitable DAF Fund's governing documents—managing Charitable DAF Fund assets for the benefit of the Charitable Owners; Second, Defendants' "restructuring" was for the purpose of executing that duty in a more professional and institutional manner. These messages were explicitly false, as the Defendants well knew that they were in the very midst of executing their scheme to "make the Participation Shares worthless." And they were false by omission, as the Defendants shared some information but failed to disclose the critical lodestar by which that information could be accurately read: Defendants' pending, concrete acts to subvert the Plaintiffs' interests in HoldCo and the Charitable DAF Fund, and the intentions and overall scheme behind those acts.

5.69    The very next day, on December 12, 2024, the Defendants secretly formed CDMCFAD, the entity the Defendants intended to use to replace Charitable DAF HoldCo, and ultimately to sever the connection between the Charitable Owners and the Fund.

5.70    Just one day later, on December 13, 2024, "compliance counsel" for the Defendants sent a follow-up email to outside counsel for the Charitable Owners. That correspondence did not disclose the formation or intended use of CDMCFAD. Instead, it encouraged and demanded the Charitable Owners rely on the representations made in the meeting and unilaterally abandon their well-founded concerns on that express basis. The email asserted: "[T]hese two meetings have provided the [Supporting Organizations] with a great deal of transparency regarding governance, financial matters, and independence of Charitable DAF HoldCo, Ltd. and its affiliates. (collectively, the DAF). Therefore, we believe it is imperative that each [Supporting Organization] not only retract the November 11 [no confidence] letter in writing but also affirmatively disavow the concerns[.]" The Defendants' counsel further asserted: "The DAF is actively working on one

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                          **PAGE 30**

App. 247

or more development projects from which your [Supporting Organization] clients (and independently their supported organizations) will benefit from financially from Participating Shareholder dividend distributions for many years to come." Again, the Defendants' representatives made these assertions and encouraged and demanded that the Plaintiffs rely upon them, while literally in the midst of executing their plan to permanently sever the Plaintiffs from the very "dividend distributions" referenced in the correspondence.

5.71   On January 30, 2025, Paul Murphy (copying Mark Patrick), acting for the Defendants, sent an email to the Charitable Owners offering additional meetings, and asserting that "we are more than happy to continue to engage with the foundations/supporting organizations in an effort to provide clarity on investments and the DAF Holdco structure." In the same correspondence, Murphy added: "DAF Holdco holds itself to the highest standards in achieving its goal of maximizing returns in risk adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF Holdco's independence and are advised by best-in-class, independent experts." Defendants sent this promise of "clarity on investments and the DAF Holdco structure" little more than a month after secretly inserting CDMCFAD into that structure as a "blocker" between the Charitable Owners and their interests in the Charitable DAF Fund; and less than a week before executing on their scheme to replace the Charitable DAF Fund's General Partner to better insulate Patrick. Again, Defendants' statement was an express untruth and a failure to perform on an express promise—they had no intent to provide "clarity" to the Plaintiffs, but in fact were in the midst of forming a replacement General Partner entity that was "hard to find or track or trace. Or find owners."[19] And again, these statements omitted the critical facts that would have informed the Plaintiffs of the true landscape.

---

[19] CI Statement of Claim, ¶ 82.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 31**

App. 248

Again, Patrick and the Defendants intended by these misrepresentations and omissions to forestall and defeat an effort by the Charitable Owners to secure the value of their Participating Shares. Indeed, they had no regard for any inferences the Charitable Owners would draw from their misstatements and omissions—indeed, they were counting on misdirection.

5.72    On February 4, 2025, Paul Murphy (copying Mark Patrick) sent an additional email note to the Charitable Owners on behalf of the Defendants, promising a further meeting at which the Defendants could "resolve [their] concerns."  The Defendants again failed to provide key details that would render the statements they did make not misleading, misrepresented facts, and expressed a false promise of "working with" the Charitable Owners, hoping to delay or undermine any decisive action on their part to protect their valuable interests in the Charitable DAF Fund. The Defendants represented: "We remain committed to trying to work with your clients and would be grateful if you could confirm your clients' willingness to do so."  This happened at the same time the Defendants were deeply entrenched in executing their plot.  Again, the Defendants made expressly false statements—their "commit[ment]" to "work with" the Charitable Owners; made a false promise to work with the Charitable Owners when the Defendants had no intent to do so, and at the same time, omitted critical facts essential to accurately understand the true nature of the Defendants' actions and commitments.

5.73    On February 14, 2025—one day after the Defendants engaged FTI in an effort to secure a sham valuation reducing the value of the Plaintiffs' interests by more than 99%--"compliance counsel" for the Defendants continued to gaslight the Charitable Owners, asserting that "Charitable [D]AF is not paying Paul or Mark 'millions in director fees."

5.74    On March 17, 2025—while the scheme to defraud the Plaintiff was nearing its end—"compliance counsel" for the Defendants reached out to the Charitable Owners' outside

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 32**

App. 249

counsel, purportedly seeking "a couple of dates for Paul Murphy to make a presentation to your three clients." Plaintiffs' counsel responded with three options for dates the following day. Defendants never set the meeting. At this point, the Defendants were irrevocably committed to the path of severing the Charitable Owners from the Fund, and the only possible purpose for such an overture was to keep the charade begun with earlier promises of cooperation, transparency, and future benefits from the Participation Shares going for just a bit longer—just long enough to consummate the conspiracy.

5.75   The Plaintiffs relied on the misrepresentations of the Defendants throughout the relevant period. That reliance was justified under all the circumstances, including Defendants' course of conduct, Defendants' specific representations, and Defendants' obligations to Plaintiffs arising under the governing documents and common law. Those representations were effective in dissuading and delaying the Plaintiffs from taking action that would have secured to them their interests in the $270 Million Fund, including by discovering and opposing the dilution of their interest in the Charitable DAF Fund and by seeking an equitable winding up to secure their interest.

## L.  *The Cayman Island Proceedings*

5.76   On April 2, 2025, again unbeknownst to the Charitable Owners, the Defendants voted to place DAF HoldCo into *voluntary* liquidation in the Cayman Islands through written resolutions of directors executed by Patrick, with joint voluntary liquidators appointed.

5.77   But the Charitable Owners already did know: that Patrick had (1) actively thwarted all financial transparency; (2) refused to address the Charitable Owners well-founded concerns including their expression of no-confidence; and (3) engaged in a pattern of fraudulent self-dealing.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                    **PAGE 33**

App. 250

5.78    As a result, the Charitable Owners filed an *involuntary* Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.* Absent doing so, the Charitable Owners would not have learned about Patrick's voluntary liquidation.

5.79    Cayman Islands counsel for the Charitable Owners alleged essentially the same facts as recounted in this Petition before the Grand Court.

5.80    The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things[20]:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.
>
> 6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:
>
> a) the power to present a petition for the winding up of Charitable DAF Fund, LP if so advised;
>
> b) the power to file a summons and to apply for an order appointing provisional liquidators of the Charitable DAF Fund if so advised; and
>
> c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

---

[20] Supervision Order (Appx. Pg. 244-246)

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 34**

App. 251

5.81    Once appointed to fill the shoes of Charitable DAF HoldCo, the Joint Official Liquidators performed an internal investigation, reviewing the documents and correspondence belonging to that entity.  Based on that investigation and in the interests of Charitable DAF HoldCo (not a party here), they determined to waive privilege over substantial records now in their control. On July 15, 2025, the Joint Official Liquidators filed a Statement of Claim in the Grand Court of the Cayman Islands on behalf of Charitable DAF HoldCo.  The Statement of Claim quotes extensively from the records belonging to Charitable DAF HoldCo, which document in detail the conduct of the Defendants in this Action.[21]

5.82    To this Court, the Defendants have asserted that the Joint Liquidators are responsible and independent. In the July 2, 2025, hearing before this Court, for example, Mark Goodman appeared on behalf of the Defendants and represented that there was no exigency and therefore no justification for the relief sought herein, because the Joint Liquidators would be "duty-bound" to pursue any valid claims to the benefit of the Charities in a bankruptcy recognition proceeding.

5.83    But when the Joint Liquidators took preliminary steps to do so, the Defendants' attitude changed.  On August 18, 2025, Defendants filed a motion in the Grand Court to replace the Joint Liquidators. Undoubtedly, Patrick will try to prevail upon replacement liquidators to cease the JOLs' recognition proceeding now pending in Delaware.  This is clear because Patrick expressly argues in the Cayman filing that the Delaware proceedings are so unnecessary and wrong-headed that they are a reason to replace the Joint Liquidators. Never mind the Defendants' July 2, 2025, representation to this Court that the JOLs are "duty-bound" to pursue any

---

[21] CI Statement of Claim.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                    **PAGE 35**

App. 252

improprieties they identify. Now Patrick says the JOLs' execution of that "duty" is cause to replace them.

5.84 There is therefore no assurance that relief on the Charities' claims can come from any source other than this Action. Patrick and the Defendants continue to expend and dissipate the Fund's assets.

## VI. CAUSES OF ACTION

### Count 1 – Common Law Fraud Against All Defendants

6.1 Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

6.2 The Defendants made material misrepresentations to the Plaintiffs, as set forth above and herein.

6.3 The Defendants made the representations with knowledge of their falsity; or recklessly as a positive assertion, without knowledge of their truth, as set forth above and herein.

6.4 The Defendants intended for the Plaintiffs to rely upon the representations, or to induce reliance upon the representations. Specifically, amongst other purposes, the Defendants intended that their representations would dissuade or delay the Plaintiffs from discovering or contesting the dilution of their interest in Charitable DAF HoldCo; and dissuade or delay the Plaintiffs from filing an equitable winding up petition or taking other decisive action to protect their interest in the Charitable DAF Fund, reverse the dilution, and/or reverse the sham "redemption," all of which would have saved and preserved the value of their interest in the Charitable DAF Fund and defeated the Defendants' scheme to "make the Participation Shares [belonging to the Plaintiffs] worthless[.]"

6.5 Patrick has testified that through their hidden manipulations, at great expense of the funds meant for charitable purposes via the Plaintiffs, the Plaintiffs now own "nothing."

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 36**

App. 253

6.6    The Plaintiffs justifiably relied upon the representations, as set forth herein and otherwise, as they knew Defendants were charged by the governing documents of the Charitable DAF Fund to always manage its assets for the economic benefit of the Charitable Owners (the Plaintiffs), and the Defendants repeatedly asserted that the purpose of their actions and the changes in Charitable DAF Fund management were not to harm the Plaintiffs, but to better serve the Plaintiffs through more professional and institutional structures and procedures.

6.7    The Plaintiffs suffered injury and damages as a result of the reliance, and seek actual and exemplary damages in an amount to be determined at trial.

### Count 2 – Fraud by Nondisclosure Against All Defendants

6.8    Paragraphs 1.1 - 5.84 are incorporated as though fully set forth herein.

6.9    The Defendants deliberately failed to disclose certain material facts.

6.10    The Defendants had a duty to disclose those facts to the Plaintiffs, arising from their obligations pursuant to the Charitable DAF Fund's governing documents to always manage the Charitable DAF Fund for the economic benefit of the Plaintiffs.

6.11    The Defendants had a further duty to disclose those facts to the Plaintiffs arising from their fiduciary obligations arising under common law.

6.12    The Defendants had a further duty to disclose those facts to the Plaintiffs because the Defendants made a partial disclosure that created a false impression, as set forth above and herein, as set forth above and herein.

6.13    The Defendants had a further duty to disclose those facts to the Plaintiffs because they voluntarily disclosed certain information, creating a duty to disclose the whole truth, as set forth above and herein.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                 **PAGE 37**

App. 254

6.14     The Plaintiffs were ignorant of the true facts and did not have an equal opportunity to discover them, as set forth above and herein.

6.15     The Defendants knew the Plaintiffs were ignorant of the true facts and did not have an equal opportunity to discover them, as set forth above and herein.

6.16     The Defendants intended that the Plaintiffs act or refrain from acting based on the nondisclosure, as set forth above and herein.

6.17     The Plaintiffs relied on the nondisclosure, which resulted in their injury in the amount to be proven at trial, but which exceeds $250 Million.

### Count 3 – Breach of Fiduciary Duty against Patrick, CDMCFAD, LLC, CDH GP, Ltd., and Charitable DAF GP, LLC

6.18     Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

6.19     By virtue of Defendants' Control Positions related to the overall Charitable DAF Fund structure and specifically DAF HoldCo and the Charitable DAF Fund, and his special relationship with Plaintiffs, Patrick owed fiduciary duties to the Plaintiffs.

6.20     The Defendants held a special factual relationship of direct and close reliance with the Plaintiffs, as set forth above, expressed by the governing documents and then by the reality that the Plaintiffs were dependent upon the Defendants to protect their interests in the transactions, finances, and acquisitions of the Fund, and were required to rely (and did rely) on information and advice the Defendants provided about the Fund.  Patrick and the Defendants undertook, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs were treated as having entrusted their interests, transactions, affairs, and property to them. On this basis, the Defendants owed further and greater fiduciary duties to the Plaintiffs in their management of the Fund and its assets.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 38**

App. 255

6.21    By virtue of their assertions and by virtue of the governing documents empowering them to act, the Defendants expressly and implicitly asserted that they acted on behalf of the Plaintiffs as agents for them in the transactions of the Fund.   On this basis, the Defendants owed further and greater fiduciary duties to the Plaintiffs in their management of the Fund and its assets.

6.22    Patrick's position of trust was underscored by the governing documents of the Charitable DAF Fund, which expressed his required fidelity to the Plaintiffs in making all decisions in the Control Position for their economic benefit.

6.23    The Defendants breached their fiduciary duties to the Plaintiffs by diluting and then stripping them of their legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.  In so doing, Defendants for their own benefit used their position and special inside knowledge acquired by them to take improper or unfair advantage of the Plaintiffs.

6.24    The Defendants breached these duties through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.  Again, in so doing, they for their own benefit used their position and special inside knowledge to take improper or unfair advantage of the Charitable Owners.

6.25    Patrick breached his fiduciary duties by mismanaging the Charitable DAF Fund's finances, and dramatically increasing director compensation to his own benefit.  Again, in so doing, they for their own benefit used their position and special inside knowledge to take improper or unfair advantage of the Plaintiffs.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 39**

App. 256

6.26    Patrick breached his fiduciary duty by successfully causing a transfer of assets ultimately from the Plaintiffs to a charity controlled by Patrick and his immediate family without disclosing the relationship.

6.27    The actions incorporated herein have wrongfully deprived the Plaintiffs of substantial economic support and assets, harming, and threatening irreparable harm to, the Plaintiffs and the Charities that they support, including by causing them to lose the value of their Participation Shares at an undervalue. Plaintiffs have suffered damages as a result of Defendants' breach of their fiduciary duties.

### Count 4 – Civil Conspiracy against all Defendants.

6.28    Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

6.29    The Defendants conspired and combined their efforts to effect a common scheme.

6.30    The Defendants sought through that combination to achieve a common object and course of action—to wit, to "make the Participation Shares worthless" and thereby transfer away from the Plaintiffs, and to the Defendants, the entire beneficial ownership of the $270 Million in assets in the Charitable DAF Fund.

6.31    The Defendants took one or more unlawful, overt acts in pursuit of the object and course of action of the combination and conspiracy—to wit, at minimum, fraud, breach of fiduciary duty, conversion, and constructive fraud, as set forth herein.

6.32    The Plaintiffs suffered damages as a proximate result of the combination and conspiracy.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 40**

App. 257

## Count 5 - Constructive Fraud Against All Defendants

6.33    Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

6.34    "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Tex. Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App.—Dallas 2009).   "In constructive fraud the actor's intent is irrelevant." *Id*.   "Constructive fraud is the breach of a legal or equitable duty which the law declares fraudulent because it violates a fiduciary duty." *Id.*

6.35    As a fiduciary, Patrick's and the other Defendants' conduct in diluting the Plaintiffs' interests, selling interests at below-market values, and liquidating DAF HoldCo and transferring its interests to the Sham Charity without notice constitutes constructive fraud.

6.36    Plaintiffs have suffered damages as a result of Patrick's fraud.

## Count 6 - Unjust Enrichment Against Patrick, CDMCFAD, LLC and DFW Charitable Foundation

6.37    Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

6.38    A claim of unjust enrichment applies when a party obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010)).

6.39    Patrick, CDMCFAD**,** and the DFW Charitable Foundation stripped the Plaintiffs of their rightful legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.40    Patrick, CDMCFAD**,** and the DFW Charitable Foundation took these interests and assets for their own benefit via fraud and taking undue advantage of the access available through the Control Positions and overlapping control with the DFW Charitable Foundation.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 41**

App. 258

6.41    Patrick also took undue advantage through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.42    Patrick, CDMCFAD**,** and DFW Charitable Foundation have been unjustly enriched at the expense of the Plaintiffs. Plaintiffs have been damaged by Patrick's unjust enrichment.

### Count 7 – Conversion Against Patrick, CDMCFAD, LLC, CDH GP, Ltd., and DFW Charitable Foundation

6.43    Paragraphs 1.1 – 5.84 are incorporated as if fully restated herein.

6.44    Conversion requires a showing that (1) the plaintiff owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights, and (3) the plaintiff demanded the property, and (4) defendant refused the return of the property. *Wells Fargo Bank Northwest, N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 699 (Tex. App.—Dallas 2012 no pet.).

6.45    The Plaintiffs held legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.46    Patrick with the other named Defendants have unlawfully and without authorization, assumed and exercised dominion over the Plaintiffs' legal, equitable, and beneficial interests in the Charitable DAF Fund structure including their participation in DAF HoldCo, the Charitable DAF Fund, and Charitable DAF Fund assets through the dilution scheme that diverted all the legal and beneficial economic interests to Patrick's controlled entity, DFW Charitable Foundation.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 42**

App. 259

6.47     The Plaintiffs requested distribution in kind of the Charitable DAF Fund structure assets, which all have ignored and refused. Plaintiffs have been damaged as a result of these conversions.

### Count 8 – Imposition of Constructive Trust Against Patrick, CDMCFAD, LLC and DFW Charitable Foundation

6.48     Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

6.49     "A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment." *Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex. App.—Dallas, no pet.). "To obtain a constructive trust, the proponent must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer, and (3) tracing to an identifiable res." *Id*.

6.50     Patrick through the DFW Charitable Foundation has breached his fiduciary relationship with the Plaintiffs by converting legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit, resulting in the unjust enrichment of the DFW Charitable Foundation and Patrick.

6.51     All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                              **PAGE 43**

App. 260

## VII. APPLICATION FOR RECEIVERSHIP

7.1     Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

7.2     The Plaintiffs seek the immediate appointment of a receiver over Defendants CDH GP, Ltd., the DFW Charitable Foundation and CDMCFAD, LLC (the "**Receivership Entities**") under three independent bases: Texas Civil Practice & Remedies Code sections 64.001(a), Texas Business Organizations Code section 11.410, and the Court's inherent equitable powers.

### A. *Texas Civil Practice & Remedies Code*

7.3     Under section 64.001 of the Texas Civil Practice and Remedies Code, a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund," or "in any case in which a receiver may be appointed under the rules of equity." TEX. CIV. PRAC. & REM. CODE § 64.001(a)(3), (7).

7.4     A party with a probable interest or a right to the property or fund has standing to seek the appointment of a receiver. *Id*. § 64.001(b). "[T]he property or fund must be in danger of being lost, removed, or materially injured." *Id.*

7.5     A probable interest exists by statute in actions between partners and in actions between joint owners of property. *Id*. § 64.001(a)(3).

7.6     One purpose of a receivership is to preserve assets and resolve issues relating to an entity's affairs where there are allegations of fraud or improper activities. *See Floyd v. MMWKM Advisors, LLC*, No. 05-23-00638-CV, 2024 WL 549036 at *2 (Tex. App.–Dallas 2024, pet. denied, reh'g denied).

### B. *Texas Business and Organizations Code*

7.7     A court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property in several scenarios, including an

PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
APPLICATION FOR APPOINTMENT OF RECEIVER                                    PAGE 44

App. 261

action between "partners or others jointly owning or interested in the property or fund." TEX. BUS. ORG. CODE § 11.403(a)(3).

7.8    Additionally, under Section 11.410 of the Texas Business Organizations Code, a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas and its business if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court. *Id*. § 11.410(a).

C.  *Rules of Equity*

7.9    In addition to specific statutory authority to appoint receivers, Texas courts retain inherent equitable power to do so. Texas law makes clear that the rules of equity control the appointment and power of a receiver unless inconsistent with a statutory provision. TEX. CIV. PRAC. & REM. CODE § 64.004

D.  *Receivership Standards Under Texas Law and Equity*

7.10    The appointment of a receiver lies within the discretion of the trial court. *See Spiritas v. Davidoff*, 459 S.W.3d 224, 231 (Tex. App.—Dallas 2015, no pet.).

7.11    The facts alleged in the receivership application will be construed as favorably as possible for the applicant. *Couch Mortgage Co. v. Roberts*, 544 S.W.2d 944, 946-47 (Tex. Civ. App. – Houston [1st Dist.] 1976, writ dismissed).

7.12    Conduct that supports a cause of action for fraud or breach of fiduciary duties is often the same type of conduct that supports an application for a receivership. *Ritchie v. Rupe*, 443 S.W.3d 856, 873 (Tex. 2014).

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 45**

App. 262

### E. *The Charitable Owners are entitled to the Emergency Appointment of a Receiver to Oversee the Receivership Entities*

7.13 The Plaintiffs have an ownership and beneficial interest in the participating and management shares and thereby their economic ownership and control of the Charitable DAF Fund and the assets that were rightfully held by the Charitable DAF Fund and entrusted to the control of Patrick.

7.14 Patrick's malfeasance, attempted malfeasance, and his deliberate scheme to take the Charitable Owner's economic interest show him to be unqualified to have control over the structure.

7.15 Patrick wrongfully caused the Plaintiffs' participation shares to be diluted and then caused the Plaintiffs' beneficial economic interests in the Charitable DAF Fund structure to be wrongfully transferred to a collection of sham entities wholly dominated by Patrick. Patrick accomplished those acts by virtue of his control of the management and participation shares, including those held by the Receivership Entities.

7.16 Charitable DAF Fund was valued at $270 million as recently as September 2024. The Charitable Owners have been stripped of any interest. The Charitable Owners have not received any just compensation, participation, or other consideration for the conversion of their substantial interests in the Charitable DAF Fund structure.

7.17 The Receivership Entities now maintain complete management control and beneficial rights over the Charitable DAF Fund structure's substantial assets or otherwise possess those assets.

7.18 Patrick dominates and controls the Receivership Entities. Through them, he exercises complete control over the Fund and the dissipation of its assets. As shown, Patrick has demonstrated a pattern of selling assets at below-market values, attempting to engage in self-

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**      **PAGE 46**

App. 263

dealing transactions, transacting assets at non-market terms in potential self-dealing transactions, dramatically increasing internal and professional administrative expenses that burdens and dissipates charitable assets, and secreting his activities while controlling assets dedicated to charitable causes. Even further, Patrick has demonstrated a proclivity for dissipating the Fund's assets through imprudent expenses designed to protect himself, as when he caused DFW Charitable Foundation to expend tremendous resources on an effort to supplant the Joint Liquidators in favor of a handpicked replacement that he hopes will stop aggressively pursuing Charitable DAF HoldCo's interests in the Cayman Islands and in Delaware. *See* Plaintiffs' Not. of Filing, Aug. 21, 2025. These wasteful actions are authorized by virtue of the Defendants' control of the Fund through the Receivership Entities. To preserve assets from further dissipation, a receiver should replace Patrick's oversight of the Receivership Entities and their assets, which were wrongfully acquired and held. Further decisions about the expenditure of charitable funds should be made by a neutral responsible to this Court, not by Patrick.

7.19    Patrick is using, at great expense, funds meant for charitable purposes as his own legal war chest to preserve his own interests.

7.20    The Plaintiffs have been stripped of access to the benefit of assets meant to support charitable causes, resulting in financial distress and immediately threatening planned and ongoing support of countless charities including education, medical research, and community initiatives.

7.21    The Plaintiffs have demonstrated a strong likelihood of success on their claims given the documented pattern of breaches, financial irregularities and successful litigation in the Cayman Islands.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                      **PAGE 47**

App. 264

7.22    The Plaintiffs have demonstrated a clear and compelling need for immediate court oversight to prevent further injury and preserve the charitable assets at risk due to Patrick's actions via the Receivership Entities.

7.23    The participating shares in Charitable DAF HoldCo as well as assets valued at $270 million are in danger of being lost, removed, or materially injured and circumstances exist to necessitate the appointment of a receiver to conserve the property, fund, and avoid further, irreparable harm to Plaintiffs.

7.24    Given Patrick's demonstrated and recent malfeasance using the Receivership Entities as tools of fraud, no other adequate remedy exists under law.

## VIII – APPLICATION FOR TEMPORARY INJUNCTION PENDING APPROVAL OF RECEIVERSHIP

8.1.    Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

8.2.    Plaintiffs seek injunctive relief preventing the Defendants from further use, transfer, dispersal, and/or alienation of the assets that were held in the Charitable DAF Fund following a hearing on Plaintiffs' Application for Temporary Injunction , regardless of where they are presently held.  If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment. This application is supported by the sworn declarations of Julie Diaz and James David Dondero.

8.3.    A writ of injunction is proper where "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant," or where "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 48**

App. 265

would tend to render the judgment in that litigation ineffectual," or where "irreparable injury to real or personal property is threatened, irrespective of any remedy at law." TEX. CIV. PRAC. & REM. CODE § 65.011. "A temporary injunction pending trial on the merits 'may be and usually is issued in connection with any species of litigation where it is necessary to preserve the status quo pending a final adjudication of the rights of the parties." *Turcotte v. Alice Nat'l Bank*, 402 S.W.2d 894, 896 (Tex.1966). An applicant for the writ must show (1) a probable right to recover on the merits after final hearing and (2) a probable and irreparable injury unless the writ is issued. *See* TEX. CIV. PRAC. & REM. CODE § 65.011; *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002)

8.4.    Texas courts universally recognize that in cases where dispersal or liquidation of assets required to pay a judgment is likely, temporary injunctive relief is proper to preserve the status quo and ensure that the efficacy of ultimate relief for the Plaintiffs is not defeated by financial machinations while the case is pending.  In other words, the adequacy of an available legal remedy must be judged in the circumstances of the particular case, and in such circumstances, any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety. *See Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ).

8.5.    The above authorities support the award of the temporary injunctive relief requested herein, because the assets formerly held in the Charitable DAF Fund for the benefit of the Plaintiffs are already being alienated from their beneficial owners and the conduct of Defendants demonstrates the likelihood of their continued transfer, alienation, expenditure, and dispersal while this case is pending and before the rights of the Plaintiffs to those funds can be vindicated.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                 **PAGE 49**

App. 266

8.6.    Unless enjoined, Patrick and the other Defendants will cause and continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law; including, without limitation, the dispersal, expenditure, transfer, and further alienation of more than $270 Million that can never be replaced because the Defendants will lack the means to do so.

8.7.    Plaintiffs will therefore suffer immediate and irreparable injury without adequate remedy at law if a Temporary Injunction is not ordered against the Defendants.  Accordingly, Plaintiffs request the Court freeze:

(a)    all assets that were held in the Charitable DAF Fund as of the instant date of this filing, and

(b)    prohibiting Patrick and the other Defendants, or anyone acting in concert with them or at their direction, from any use, expenditure, transfer, dispersal, dilution, encumbrance, or alienation of any of those funds pending resolution of Plaintiff's Motion for Temporary Injunction.

8.8.    The harm to Plaintiffs is imminent, and if the Court does not enjoin the Defendants, they will be irreparably injured, as set forth herein. If the Defendants prevail on the merits, the funds will still be available to them for their use in future.  The balance of burdens thus strongly favors Plaintiffs, who stand to lose everything absent injunctive relief—over Defendants, who will at most suffer a minor inconvenience if they ultimately prevail.

8.9.    The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, including the significant potential for irreparable harm to the Plaintiffs and the lack of harm to Defendants, demonstrates that the relief will not disserve the public interest. Indeed, freezing the funds at issue in place to ensure that this fraudulent scheme is not permitted consummation absent judicial scrutiny serves the public interest by protecting vital charitable interests.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 50**

App. 267

**A.** *Plaintiffs have a Probable Right to the Relief Sought in their Claims Against Defendants.*

8.10.    Plaintiffs easily satisfy this test. Establishing a probable right to relief does not require the applicant for a TRO to establish that it will prevail at trial. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Instead, this element requires only that the applicant allege a cause of action and present evidence that tends to sustain that cause of action. *See id*; *Transport Co. of Tex. v. Robertson Transports, Inc.*, 261 S.W.2d 549, 552 (Tex. 1953). The cause of action itself need not involve permanent injunctive relief—the trial court "[has] discretion to preserve the status quo so long as [a movant] demonstrate[s] his probable right to recover damages." *Metcalfe*, 863 S.W.2d at 58.

8.11.    Plaintiffs have a probable right to the relief sought on its claims for breach of fiduciary duty, fraud, constructive fraud, civil conspiracy, unjust enrichment, and conversion. As alleged in more detail above, Defendants have committed and continue to commit acts that have raided four vital charitable organizations of $270 Million that funds vital philanthropic efforts relied upon by key communities across the nation.   The evidence summarized herein thus establishes that these injuries arise as a direct result of Defendants' conduct.

**B.** *Plaintiffs Will Suffer Immediate, Irreparable Injury in the Absence of a Temporary Restraining Order and Temporary Injunction.*

8.12.    Plaintiffs will suffer immediate, irreparable injury in the absence of a temporary restraining order and temporary injunction, as summarized above.  Plaintiffs will suffer precisely the sort of irreparable injuries Texas courts have sought to prevent by granting temporary injunctive relief. *See Staubach*, 667 S.W.2d at 567–68.

8.13.    Plaintiffs have no adequate remedy at law.  Without injunctive relief, the assets intended to benefit the Plaintiffs will be spent, dispersed, transferred, and alienated while this litigation unfolds.  These losses, as well as others which will inevitably occur if Defendants are

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                      **PAGE 51**

App. 268

not enjoined, cannot be compensated in monetary terms once the funds are dispersed, and are the types of harm for which injunctive relief is particularly necessary and appropriate.

8.14. Accordingly, and in order to preserve the status quo during the pendency of this action, Defendants should be cited to appear and show cause why the funds at issue should not be frozen for the pendency of this Action, and why Defendants should not be temporarily restrained during the pendency of this action from directly or indirectly using, spending, transferring, encumbering, dispersing, or further alienating the funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing.

8.15. Plaintiffs seek a temporary restraining order and temporary injunction against Defendants freezing all funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing, and enjoining Defendants and any others acting by, for, or in concert with them, including but not limited to their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the order by personal service or otherwise, from either directly or indirectly: spending, dispersing, using, encumbering, transferring, or alienating those funds and assets.

8.16. Plaintiffs further seek a receivership over the funds and assets and the entities holding the funds and assets, whereupon the temporary injunctive relief sought here may properly expire because the assets will then be under the control of a receiver answering to this Court.

8.17. Plaintiffs is willing to post a bond in an amount directed by the Court.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 52**

App. 269

# VIII.  PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

   A.  Appoint a receiver to take possession and control of all assets, properties, and operations of DFW Charitable Foundation, CDH GP, Ltd., and CDMCFAD, LLC;

   B.  Enjoin Defendants from further disposing of, transferring, encumbering, or dissipating any Charitable DAF Fund and DAF HoldCo assets;

   C.  Impose a Constructive Trust against Patrick, CDMCFAD, LLC and DFW Charitable Fund;

   D.  Require the reversal of the dilution scheme and unauthorized asset transfers;

   E.  Require recission of improper redemption of shares and share transfers;

   F.  Award actual damages in an amount to be proven at trial;

   G.  Award exemplary damages as permitted by law;

   H.  Award attorneys' fees and costs;

   I.  Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**MCCARTY LAW PLLC**

*/s/ Darren McCarty*
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street, Suite 400
Austin, Texas 78701
512-827-2902

- and -

**DUANE MORRIS LLP**

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
Benjamin L. Warden

PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER          **PAGE 53**

App. 270

State Bar No. 24115926
bwarden@duanemorris.com
Dallas, Texas 75201
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document was served by electronic means on this day, September 2, 2025, on all counsel or parties of record.

*/s/ Craig M. Warner*
Craig M. Warner

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 54**

App. 271

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Craig Warner on behalf of Craig Warner
Bar No. 24084158
CMWarner@duanemorris.com
Envelope ID: 105121623
Filing Code Description: Amended Filing
Filing Description: Plaintiffs' Second Am. Pet., App. for Receiver, App. for TI
Status as of 9/3/2025 9:05 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 9/2/2025 10:04:53 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 9/2/2025 10:04:53 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 9/2/2025 10:04:53 PM | SENT |

Tab 7

E-filed in the Office of the Clerk
for the Business Court of Texas
8/19/2025 6:51 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027



NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
BOSTON
HOUSTON
DALLAS
FORT WORTH
AUSTIN

*FIRM and AFFILIATE OFFICES*

CRAIG M. WARNER, P.C.
PARTNER
DIRECT DIAL: +1 214 257 7277
PERSONAL FAX: +1 214 853 4220
*E-MAIL:* CMWarner@duanemorris.com

*www.duanemorris.com*

MEXICO CITY
HO CHI MINH CITY
SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NORTH JERSEY
LAS VEGAS
SOUTH JERSEY
SYDNEY
MYANMAR

ALLIANCES IN MEXICO

August 19, 2025

VIA E-MAIL

Honorable Judge Bill Whitehill
Texas Business Courts--Dallas, Division 1B
8080 Park Lane, Suite 500
Dallas, Texas 75231

> **Re:** **Cause No. 25-BC01B-0027;** *The Highland Dallas Foundation, Inc., et al. v. Mark Patrick, et al.*; **Copies of Cayman Cases.**

Dear Judge Whitehill:

On August 19, 2025, the Court requested we provide copies of (1) the Appendix referenced by Plaintiffs in their brief dated August 13, 2025, and (2) all other copies of the Cayman cases cited by Plaintiffs thus far in the above captioned case. Attached with this letter please find the following:

1. Appendix Containing the Foreign Cases Relied on in Plaintiffs' Brief dated August 13, 2025, detailed below:

   a. *Eclairs Group Ltd v. JKX Oil and Gas plc,* [2016] 3 All ER 641.

   b. *Hogg v. Cramphorn Ltd,* [1966] 3 All ER 420

   c. *Peskin v. Anderson*, [2001] 1 B.C.L.C. 372.

   d. *Tianrui (International) Holding Co. Ltd. v. China Shanshui Cement Group Ltd.* [2024], 2024 WL 04794596, UKPC 36 (appeal taken from Cayman Islands).

2. Additional Foreign Cases Cited in Briefs to Date:

   a. *Kohn v. Meehan*, (Transcript Smith Bernal), at ¶ 101 (Ch. Div. 2003).

   b. *Ayerst (Inspector of Taxes) v. C&K (Construction) Ltd.,* [1975] AC 167, 179

**DUANE MORRIS LLP**

100 CRESCENT COURT, SUITE 1200          PHONE: +1 214 257 7200    FAX: +1 214 257 7201
DALLAS, TX  75201                                                    DM1\16989769.1



      c.  *Foss v. Harbottle*, (1843) 67 Eng. Rep. 189, 202 (Eng.).

      Going forward, we will provide additional copies of cases cited from foreign jurisdictions. Please let us know if the Court requires copies of any additional cases and we will provide them promptly.

      Very Respectfully,

      DUANE MORRIS LLP

      Craig M. Warner
      Partner

CMW
Attachments

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § | TEXAS BUSINESS COURT |
| *Plaintiffs,* | § § | FIRST DIVISION |
| v. | § | |
| MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § | DALLAS, TEXAS |
| *Defendants.* | § § § § | |

**APPENDIX TO PLAINTIFFS' BRIEF RE: CHANGE POWERS**

| Exhibit | Document | Appx. Page Nos. |
|---|---|---|
| Exhibit 1-A | *Eclairs Group Ltd v JKX Oil & Gas plc Glengary Overseas Ltd v JKX Oil & Gas plc, [2015] UKSC 71; [2015] Bus LR 1395*; [2016] 3 All ER 641, 2015 WL 7692969 (2015) | 29-44 |
| Exhibit 1-B | *Hogg v Cramphorn Ltd*, 1966 WL 22942 (1963) | 45-55 |
| Exhibit 1-C | *Peskin v. Anderson*, [2001] 1 B.C.L.C. 372 ¶ 34) | 56-70 |
| Exhibit 1-D | *Tianrui (International) Holding Co. Ltd. V. China Shanshui Cement Group Ltd. [2024], 2024 WL 04794596, UKPC 36* (appeal taken from Cayman Islands) | 71-102 |

# EXHIBIT 1-A

Eclairs Group Ltd v JKX Oil & Gas plc; Glengary Overseas Ltd v JKX Oil & Gas plc

*Overview* | *[2015] UKSC 71,* | **[2016] 3 All ER 641**, | *[2016] 2 All ER (Comm) 413*, | *[2016] 1 BCLC 1*,
| [2015] Bus LR 1395, | (2015) Times, 21 December, | *[2015] All ER (D) 20 (Dec)*

---

## *Eclairs Group Ltd and another v JKX Oil and Gas plc [2016] 3 All ER 641*

[2015] UKSC 71

SUPREME COURT

LORD NEUBERGER P, LORD MANCE, LORD CLARKE, LORD SUMPTION AND LORD HODGE SCJJ

18, 19 MAY, 2 DECEMBER 2015

**Company — Shares — Investigation of share acquisitions and disposals — Power of company to require disclosure of interests in voting shares — Failure to provide information — Restrictions on transfer etc of shares — Articles of association deemed information not provided if board knew or had reasonable cause to believe that information false or materially incorrect — Board imposing restrictions on voting and transfer of shares on basis of inadequate disclosure — Whether beneficial owners of shares held by nominees had standing to bring proceedings — Whether disclosure notices invalid because they sought information not permitted by statute or articles — Whether directors had reasonable cause to believe that responses received incorrect — Whether restrictions invalid because imposed by directors for improper purpose — Companies Act 2006, ss 793, 794.**

The board of directors of JKX, a company listed on the London Stock Exchange, convened an AGM to consider resolutions for the reappointment of directors, approval of their remuneration, the allotment of shares for cash and disapplication of pre-emption rights, and authorising market purchases of the company's shares. Some of those proposals required special resolutions. The claimants, EG Ltd and GO Ltd, held a combined 39% minority shareholding which was sufficient to defeat the special resolutions. The claimants were respectively owned or controlled by K and Z whose opposition to the resolutions was a matter of public knowledge. The board was concerned that JKX was the possible target of a corporate raid by K and Z to gain control of JKX's assets for less than their real worth and issued disclosure notices under *s 793*[a] of the Companies Act 2006 to the claimants, to K and Z and to others seeking particulars of their interests in JKX, the beneficial ownership of their JKX shares and the disclosure of any agreements or arrangements regarding their JKX shares or the exercise of any rights conferred by the holding of those shares. Under s 793 of the 2006 Act a public company had power to serve a disclosure notice on persons known or believed to be interested in the company's shares, requiring such persons to confirm whether or not that was so and to give such 'information about interests in [the] shares' required by the company, and particulars of persons who were parties to an agreement or arrangement relating to the acquisition of the shares or the exercise of any rights attached to the shares. Article 42 of JKX's articles, which supplemented the statutory power in s 794[b] to obtain a court order, empowered the board to serve a restriction notice imposing restrictions on dealings with the company's shares if the recipient of a disclosure notice failed to provide the information

---

[a] Section 793 is described at [9], below.
[b] Section 794 is set out at [10], below.

*[\*642]*

requested within a specified time or if the board knew or had reasonable cause to believe that the information provided was false or materially incorrect. The claimants, K and Z and other recipients of the disclosure notices provided particulars of interests in JKX's shares but denied the existence of any relevant acquisition or voting agreements. The board considered that response to be inadequate because of a failure to disclose certain agreements or arrangements and issued restriction notices under art 42 suspending the claimants' right to vote at general meetings attaching to their JKX sharess and restricting the right to transfer them. The claimants brought proceedings challenging the restriction notices on the grounds, inter alia, that the board had acted for a collateral and improper purpose in issuing the notices, namely to secure the passage of resolutions at the AGM by preventing the claimants blocking them, rather than for the purpose of enforcing the company's demand for information. At first instance the judge held that the claimants were entitled to vote at the AGM because the restriction notices were invalid as they had been imposed for the improper purpose of enhancing the

board's prospects of carrying the resolutions at the AGM. JKX appealed to the Court of Appeal which allowed the appeal and held that the restriction notices were not invalid, on the ground that the purpose or motive of the directors of a public company in serving disclosure and restriction notices under ss 793 and 794 of the 2006 Act and the company's articles was irrelevant, and if restrictions were imposed on a shareholder because the directors knew or had reasonable cause to believe that his response to a disclosure notice was incorrect or inadequate then he was a victim of his own choice not to provide full and accurate answers rather than because of any misuse of the directors' power to issue the notices. The claimants appealed to the Supreme Court.

**Held** – The appeal would be allowed for the following reasons—

(1) The power to restrict the rights attaching to shares by a restriction notice served under art 42 of JKX's articles was wholly ancillary to the statutory power to call for information under s 793 of the 2006 Act. The purposes of art 42 were three-fold: (i) to provide an incentive for a shareholder to comply with a disclosure notice; (ii) to enable the company and its shareholders to have all the relevant information when making decisions about their respective interests; and (iii) to provide a sanction for failure or refusal of a recipient of a disclosure notice to provide the information requested. All of those purposes were directly related to the failure to provide information requisitioned by a disclosure notice. There was in principle a clear line between protecting the company and its shareholders against the consequences of non-provision of the information requested and seeking to manipulate the fate of particular resolutions or to alter the balance of forces at the company's general meetings. The latter were no part of the purpose of art 42, being instead matters for the shareholders, not the board, and the disenfranchising of a predator was not a legitimate purpose of a restriction notice even if it had that consequence in fact. Accordingly, the decision to issue a restriction notice under art 42 required the directors to recognise the difference between the purpose of that decision and its incidental consequences and to exercise their power to issue a restriction notice for the purpose of obtaining information rather than as a defence against a corporate raider (see [30]–[40], [46]–[47], below). Dicta of Millett J in *Re Ricardo Group plc* [1989] BCLC 566 at 572 applied; dicta of Hoffmann J in *Re TR Technology Investment Trust plc* [1988] BCLC 256 at 276 considered.

[*643]

(2) The board of JKX had acted for the wrong purpose in issuing the restriction notices since once they were satisfied that the information requested had not been provided they became interested only in the effect that would have on the outcome of the forthcoming AGM and the protection of the company from a corporate raid by K and Z (see [41]–[44], [46]–[47], below).

Per Lord Sumption (Lord Hodge concurring; Lord Mance, Lord Neuberger and Lord Clarke dubitante pending further argument if and when the issue arose). When directors acted for multiple concurrent purposes, all of which were influential in different degrees but some were proper and others not, the better test of whether the directors' decision ought to be set aside was not what was the principal or primary purpose for which directors made the decision or exercised their power but whether the improper purpose was causative in the sense that but for its presence the decision would not have been made (see [14]–[24], below).

Decision of the Court of Appeal *[2014] 4 All ER 463* reversed.

**Notes** For company notice requiring information about interests in shares, see 14 *Halsbury's Laws* (5th edn) (2016) para 453.

For the *Companies Act 2006, ss 793*, *794*, see 8 *Halsbury's Statutes* (4th edn) (2014 reissue) 1339.

**Cases referred to** *Aleyn v Belchier* (1758) 1 Eden 132, 28 ER 634.

*Anglo-Universal Bank v Baragnon* (1881) 45 LT 362, CA.

*Balls v Strutt* (1841) 1 Hare 146, 66 ER 984, V-C.

*Birley v Birley* (1858) 25 Beav 299, 53 ER 651, Rolls Ct.

*Cannon v Trask* (1875) LR 20 Eq 669, V-C.

*Fraser v Whalley* (1864) 2 H & M 10, 71 ER 361, V-C.

*Hindle v John Cotton Ltd* 1919 56 SLR 625, HL.

*Hogg v Cramphorn Ltd* *[1966] 3 All ER 420*, [1967] 1 Ch 254, [1966] 3 WLR 995.

*Howard Smith Ltd v Ampol Petroleum Ltd* *[1974] 1 All ER 1126*, [1974] AC 821, [1974] 2 WLR 689, PC.

*Lane v Page* (1754) Amb 233, 27 ER 155, LC.

*Mills v Mills* (1938) 60 CLR 150, Aus HC.

*Portland (Duke of) v Topham* (1864) 11 HL Cas 32, 11 ER 1242, *[1861–73] All ER Rep 980*, HL.

*Pryor v Pryor* (1864) 2 De GJ & Sm 205, 46 ER 353, *[1861–73] All ER Rep 616*, CA.

*R* (*on the application of FDA*) *v Secretary of State for Work and Pensions [2012] EWCA Civ 332, [2012] 3 All ER 301*, [2013] 1 WLR 444.

*R* (*Smith*) *v North East Derbyshire Primary Care Trust [2006] EWCA Civ 1291*, [2006] 1 WLR 3315.

*Ricardo Group plc, Re [1989] BCLC 566*.

*Roadchef* (*Employee Benefits Trustees*) *Ltd v Hill [2014] EWHC 109 (Ch)*, *[2014] All ER (D) 04 (Feb)*.

*TR Technology Investment Trust plc, Re [1988] BCLC 256*.

*Turner's Settled Estates, Re* (1884) 28 Ch D 205, 54 LJ Ch 690, CA.

*Vatcher v Paull [1915] AC 372*, *[1914–15] All ER Rep 609*, PC.

*Whitehouse v Carlton Hotel Pty Ltd* (1987) 162 CLR 285, (1987) 70 ALR 251, Aus HC.

[*644]

**Appeal** The respondents, Eclairs Group Ltd ('EG Ltd') and Glengary Overseas Ltd ('GO Ltd'), appealed from the decision of the Court of Appeal (Longmore LJ and Sir Robin Jacob; Briggs LJ dissenting) (*[2014] EWCA Civ 640, [2014] 4 All ER 463*) delivered on 13 May 2014 allowing the appeal of the claimant, JKX Oil & Gas plc, against orders of Mann J made on 1 October 2013 further to his judgment of 30 August 2013 (*[2013] EWHC 2631 (Ch)*, *[2014] 1 BCLC 202*) by which he ruled that restrictions imposed by the directors of JKX, pursuant to *Pt 22* of the Companies Act 2006 and the company's articles of association, on the voting and transfer of shares in which Eclairs and Glengary were beneficially interested, were invalid because the directors acted with an improper purpose. The facts are set out in the judgment of Lord Sumption.

*David Mabb QC* and *Nigel Dougherty* (instructed by *Freshfields Bruckhaus Deringer LLP*) for Eclairs Group Ltd.

*Andreas Gledhill QC* and *Paul Sinclair* (instructed by *Locke Lord* (*UK*) *LLP*) for Glengary Overseas Ltd.

*Michael Swainston QC* and *Tony Singla* (instructed by *Allen and Overy LLP*) for JKX Oil & Gas plc.

*Judgment was reserved.*

2 December 2015. The following judgments were delivered.

**LORD SUMPTION**
(Lord Hodge concurring).
**Introduction[1]** This appeal is about an alleged 'corporate raid'. According to the judgment of Mann J *[2013] EWHC 2631 (Ch)*, *[2014] 1 BCLC 202* (at [224]), this expression is a 'loose, convenient and pejorative shorthand' which can be applied to a variety of situations, but in this case means an attempt to exploit a minority shareholding in a company to obtain effective management or voting control without paying what other shareholders would regard as a proper price. I shall use the expression in that sense in spite of its pejorative overtones, but only because it is convenient.
**[2]** One of the tools available to a public company seeking to resist the covert acquisition of control by raiders is a statutory disclosure notice calling for information about persons interested in its shares. There are statutory provisions empowering the court to restrict the exercise of rights attaching to shares if those interested in them fail to comply with a disclosure notice. But it is common for the articles of a public company to empower the board to impose such restrictions. The questions at issue on this appeal affect companies which have adopted powers of this kind in their articles. They are, in bald summary, what are the proper purposes for which the board may restrict the exercise of rights attaching to shares, and in what circumstances can the restrictions be challenged on the ground that they were imposed for a collateral purpose?
**[3]** JKX Oil & Gas plc is an English company listed on the London Stock Exchange. It is the parent company of a group whose business consists in the development and exploitation of oil and gas reserves, primarily in Russia and the Ukraine. For reasons which are disputed, and for present purposes irrelevant, the company has not prospered of late. Its difficulties have been

[*645]

reflected in its share price which has fallen to historically low levels. In 2013 the directors of JKX perceived that it had become the target of a raid by two companies, Eclairs and Glengary, both incorporated in the British Virgin Islands. Eclairs is a company controlled by trusts associated with Mr Igor Kolomoisky and Mr Gennadiy Bogolyubov. Mr Kolomoisky is a prominent Ukrainian businessman and politician and Mr Bogolyubov is his business associate. Eclairs beneficially owns some 47m shares amounting to 27.55% of the issued share capital of JKX. Glengary is a company controlled by Mr Alexander Zhukov in which his right-hand man Mr Ratskevych also has a small holding. The company

beneficially owns 19m shares amounting to 11.45% of the issued share capital of JKX. The judge found that Mr Kolomoisky and Mr Bogolyubov had a reputation as corporate raiders. Rather less is known about Mr Zhukov, but the directors of JKX believed him to have had business dealings with Mr Kolomoisky in the past.

[4] Between 2010 and 2012 JKX was trying to raise capital. It encountered some difficulty in raising it from banks and other financial institutions, partly because of the risks associated with investment in the Ukraine, and partly because Mr Kolomoisky's substantial stake in the company proved to be a deterrent. A number of proposals were made for raising capital by the issue and allotment of new shares, but these failed because Mr Kolomoisky opposed them. They would have required shareholders' special resolutions, and Eclairs' holding constituted a blocking minority. On 7 March 2013 Eclairs wrote to JKX calling upon it to convene an extraordinary general meeting to consider ordinary resolutions for the removal of the chief executive, Dr Davies, and the commercial director, Mr Dixon, from the board, and the appointment of three new directors. Enquiries suggested that this move had been concerted between Mr Kolomoisky and Mr Zhukov, and that the proposed new directors were associates of theirs. Newspapers in the Ukraine reported that Mr Kolomoisky was trying to take control of JKX's principal Ukrainian subsidiary.

[5] The company received Eclairs' request on 15 March 2013. Its response was to issue five disclosure notices between 20 and 26 March. On the Eclairs side, they were addressed to Eclairs and Mr Bogolyubov, and on the Glengary side to Glengarry, Mr Zhukov and Mr Ratskevych. On 13 May 2013 further disclosure notices were issued to the same addressees as the March notices plus, on the Eclairs side, Mr Kolomoisky. The notices requested information about the number of shares held, their beneficial ownership and any agreements or arrangements between the various persons interested in them. The responses, which were received promptly, admitted the existence of interests in JKX shares, but denied that the addressees were party to any agreement or arrangement among themselves.

[6] On 23 April 2013 the company convened an AGM for 5 June 2013. The business included the re-election of Dr Davies, the approval of the directors' remuneration report and three resolutions empowering the board to allot shares for cash, to disapply statutory pre-emption rights upon the allotment of shares, and to make market purchases of the company's shares. On 23 May 2013 Eclairs published an advertisement in the *Financial Times* and an open letter to shareholders. In these documents, shareholders were invited to oppose the above five proposed resolutions. Since the resolutions to authorise market purchases and to disapply pre-emption rights required a special resolution, this meant that as matters stood they were certain to fail. The other resolutions

[*646]

required only an ordinary resolution but would be difficult to get through in the face of opposition from two blocks together controlling 39% of the company.

[7] The responses to the second batch of disclosure notices were received on 27 and 28 May 2013. On 30 May a board meeting was held. One director (Mr Miller) was absent, but had given instructions to the chairman as to how he wished to vote, and two others (Dr Davies and Mr Dixon) recused themselves and took no part in the proceedings. The remaining directors considered that the responses to the notices were inadequate because they believed that there were agreements or arrangements between the addressees which they had not disclosed. They resolved to issue restriction notices under powers conferred on the board by the company's articles on the 47m shares in which Eclairs was interested and the 19m shares in which Glengary was interested. The effect of the restriction notices was to suspend the right to vote at general meetings attaching to these shares and to restrict the right of transfer.

[8] On 4 June 2013, the day before the AGM, Eclairs and Glengary began separate proceedings in the Chancery Division challenging the restriction notices. A number of grounds were advanced, most of which were rejected by Mann J and have now fallen away. The one ground which subsists and is now before this court is that the board acted for a collateral, and therefore improper, purpose. It was contended that the only proper purpose for which the power could be exercised was to extract the information, and that the real purpose of the board had been to ensure that the resolutions at the forthcoming AGM would be passed. In the event, the company gave undertakings to David Richards J on the day that the proceedings were commenced, the effect of which was to allow the votes attaching to the 47m and 19m shares to be cast on the resolutions without prejudice to their validity.

**Disclosure notices[9]** The power to issue a statutory disclosure notice originates in s 27 of the Companies Act 1976. That provision was subsequently replaced by s 74 of the Companies Act 1981, and then by s 212 of the 1985 Act. It is now contained in *s 793* of the Companies Act 2006 ('the 2006 Act'). Section 793 empowers a public company to issue a disclosure notice to any person whom it knows or reasonably believes to be interested in its shares. The notice may require that person to disclose (among other things) whether or not it is interested in shares, the nature of that interest if there is one, and whether any persons interested are party to any agreement for the acquisition of interests in shares or the exercise of any rights conferred by the holding of shares. Sections 820–825 of the 2006 Act contain very broadly framed provisions for determining when a person is to be regarded as interested in shares for these purposes. It extends to any legal or equitable interest, or any right to exercise or control the exercise

of any right attaching to shares, or any such right or interest vested in a company under a person's control or in specified categories of close relative, or any control or influence arising from an agreement for the acquisition of shares.

[10] Under the statute, the failure of a person interested in shares to comply with a disclosure notice may result in the restriction of the rights conferred by those shares. Section 794(1) provides:

*[\*647]*

'**794 Notice requiring information: order imposing restrictions on shares**
Where—
(a)  a notice under section 793 (notice requiring information about interests in company's shares) is served by a company on a person who is or was interested in shares in the company, and
(b)  that person fails to give the company the information required by the notice within the time specified in it, the company may apply to the court for an order directing that the shares in question be subject to restrictions.
For the effect of such an order see section 797.'

Section 797 identifies the restrictions as being that any transfer of the shares is void, no voting rights are exercisable, no further shares may be issued in right of the shares or pursuant to an offer made to their holder, and except in a liquidation no payment of capital or income may be made on the shares.

[11] In the case of JKX, corresponding powers were conferred on the board by art 42, which empowered the board to issue a 'restriction notice' whenever a statutory disclosure notice had been issued under s 793 and had not been complied with. It provided (so far as relevant):

'(2) Notwithstanding anything in these articles to the contrary, if (a) a disclosure notice has been served on a member or any other person appearing to be interested in the specified shares, and (b) the Company has not received (in accordance with the terms of such disclosure notice) the information required therein in respect of any of the specified shares within 14 days after the service of such disclosure notice, then the board may (subject to paragraph 7 below) determine that the member holding the specified shares shall, upon the issue of a restriction notice referring to those specified shares in respect of which information has not been received, be subject to the restrictions referred to in such restriction notice, and upon the issue of such restriction notice such member shall be so subject. As soon as practicable after the issue of a restriction notice the Company shall serve a copy of the notice on the member holding the specified shares.
(3) The restrictions which the board may determine shall apply to restricted shares pursuant to this article shall be one or more, as determined by the board, of the following:
(a)  that the member holding the restricted shares shall not be entitled, in respect of the restricted shares, to

attend or be counted in the quorum or vote either personally or by proxy at any general meeting or at any separate meeting of the holders of any class of shares or upon any poll or to exercise any other right or privilege in relation to any general meeting or any meeting of the holders of any class of shares,
(b)  that no transfer of the restricted shares shall be effective or shall be registered by the Company,
(c)  that no dividend (or other moneys payable) shall be paid in respect of the restricted shares and that, in circumstances where an offer of the right to elect to receive shares instead of cash in respect of any dividend is or has been made, any election made thereunder in respect of such specified shares shall not be effective.
(4) The board may determine that one or more of the restrictions imposed on restricted shares shall cease to apply at any time. If the

*[\*648]*

Company receives in accordance with the terms of the relevant disclosure notice the information required therein in respect of the restricted shares all restrictions imposed on the restricted shares shall cease to apply seven days after receipt of the information …'

[12] Article 42 differs in a number of respects from ss 794–800 of the 2006 Act, notably in vesting the power to impose restrictions on the board instead of the court. It also contains a definition section which specifies the circumstances in which the board is entitled to treat a response to the notice as non-compliant. Article 42(1)(j) provides:

'(j) for the purposes of paragraphs (2)(b) and (4) of this article the Company shall not be treated as having received the information required by the disclosure notice in accordance with the terms of such disclosure notice in circumstances where the board knows or has reasonable cause to believe that the information provided is false or materially incorrect.'

[13] These were the powers which the board of JKX purported to exercise at their meeting on 30 May 2013 and which are now challenged.

**The proper purpose rule[14]** Part 10, Chap 2 of the 2006 Act codified for the first time the general duties of directors. The proper purpose rule is stated in s 171(b) of the 2006 Act, which provides that a director of a company must 'only exercise powers for the purposes for which they are conferred'. The rule thus stated substantially corresponds to the equitable rule which had for many years been applied to the exercise of discretionary powers by trustees. 'It is a principle in this court', Sir James Wigram V-C had observed in *Balls v Strutt* (1841) 1 Hare 146, 'that a trustee shall not be permitted to use the powers which the trust may confer upon him at law, except for the legitimate purposes of the trust.' Like other general duties laid down in the 2006 Act, this one was declared to be 'based on certain common law rules and equitable principles as they

apply in relation to directors and have effect in place of those rules and principles as regards the duties owed to a company by a director': s 170(3). Section 170(4) accordingly provides that the general duties are to be 'interpreted and applied in the same way as common law rules or equitable principles, and regard shall be had to the corresponding rules and equitable principles in interpreting and applying the general duties'.

[15] The proper purpose rule has its origin in the equitable doctrine which is known, rather inappropriately, as the doctrine of 'fraud on a power'. For a number of purposes, the early Court of Chancery attached the consequences of fraud to acts which were honest and unexceptionable at common law but unconscionable according to equitable principles. In particular, it set aside dispositions under powers conferred by trust deeds if, although within the language conferring the power, they were outside the purpose for which it was conferred. So far as the reported cases show, the doctrine dates back to *Lane v Page* (1754) Amb 233, and *Aleyn v Belchier* (1758) 1 Eden 132 at 138, but it was clearly already familiar to equity lawyers by the time that those cases were decided. In *Aleyn's* case, Lord Northington could say in the emphatic way of 18th century judges that 'no point was better established'. In *Duke of Portland v Topham* (1864) 11 HL Cas 32 at 54 Lord Westbury LC stated the rule in these terms:

[*649]

'that the donee, the appointor under the power, shall, at the time of the exercise of that power, and for any purpose for which it is used, act with good faith and sincerity, and with an entire and single view to the real purpose and object of the power, and not for the purpose of accomplishing or carrying into effect any bye or sinister object (I mean sinister in the sense of its being beyond the purpose and intent of the power) which he may desire to effect in the exercise of the power.'

The principle has nothing to do with fraud. As Lord Parker of Waddington observed in delivering the advice of the Privy Council in *Vatcher v Paull* [1915] AC 372 at 378, it—

'does not necessarily denote any conduct on the part of the appointor amounting to fraud in the common law meaning of the term or any conduct which could be properly termed dishonest or immoral. It merely means that the power has been exercised for a purpose, or with an intention, beyond the scope of or not justified by the instrument creating the power.'

The important point for present purposes is that the proper purpose rule is not concerned with excess of power by doing an act which is beyond the scope of the instrument creating it as a matter of construction or implication. It is concerned with abuse of power, by doing acts which are within its scope but done for an improper reason. It follows that the test is necessarily subjective. 'Where the question is one of abuse of powers,' said Viscount Finlay in *Hindle v John Cotton Ltd* 1919 56 SLR 625 at 630, 'the state of mind of those who acted, and the motive on which they acted, are all important'.

[16] A company director differs from an express trustee in having no title to the company's assets. But he is unquestionably a fiduciary and has always been treated as a trustee for the company of his powers. Their exercise is limited to the purpose for which they were conferred. One of the commonest applications of the principle in company law is to prevent the use of the directors' powers for the purpose of influencing the outcome of a general meeting. This is not only an abuse of a power for a collateral purpose. It also offends the constitutional distribution of powers between the different organs of the company, because it involves the use of the board's powers to control or influence a decision which the company's constitution assigns to the general body of shareholders. Thus in *Fraser v Whalley* (1864) 2 H & M 10 the directors of a statutory railway company were restrained from exercising a power to issue shares for the purpose of defeating a shareholders' resolution for their removal. In *Cannon v Trask* (1875) LR 20 Eq 669, which concerned the directors' powers to fix a time for the general meeting, Sir James Bacon V-C held that it was improper to fix a general meeting at a time when hostile shareholders were known to be unable to attend. In *Anglo-Universal Bank v Baragnon* (1881) 45 LT 362 Sir George Jessel MR held that if it had been proved that the power to make calls was being exercised for the purpose of disqualifying hostile shareholders at a general meeting, that would be an improper exercise of the directors' powers. In *Hogg v Cramphorn Ltd* [1966] 3 All ER 420, [1967] 1 Ch 254 Buckley J held that the directors' powers to issue shares could not properly be exercised for the purpose of defeating an unwelcome takeover bid, even if the board was genuinely convinced, as the current management of a company commonly is, that the continuance of its own stewardship was in the company's interest. The company's interest was an additional and not an alternative test for the propriety of a board resolution.

[*650]

[17] In all of these cases, either there was no dispute about the directors' purpose or else the only purpose which could plausibly be ascribed to them was an improper one. But what if there are multiple purposes, all influential in different degrees but some proper and others not? An analogy with public law might suggest that a decision which has been materially influenced by a legally irrelevant consideration should generally be set aside, even if legally relevant considerations were more significant: *R (on the application of FDA) v Secretary of State for Work and Pensions* [2012] EWCA Civ 332, [2012] 3 All ER 301, [2013] 1 WLR 444 (at [67]–[69]) per

Lord Neuberger MR. In some contexts, such as rescission for deceit or breach of the rules relating to self-dealing, equity is at least as exacting. But the proper purpose rule, at any rate as applied in company law, has developed in a different direction. Save perhaps in cases where the decision was influenced by dishonest considerations or by the personal interest of the decision-maker, the directors' decision will be set aside only if the primary or dominant purpose for which it was made was improper. To some extent this is a pragmatic response to the range of a director's functions and the conflicts which are sometimes inseparable from his position. The main reason, however, is a principled concern of courts of equity not just to uphold the integrity of the decision-making process, but to limit its intervention in the conduct of a company's affairs to cases in which an injustice has resulted from the directors' having taken irrelevant considerations into account.

**[18]** In his seminal judgment in the High Court of Australia in *Mills v Mills* (1938) 60 CLR 150 at 185–186, Dixon J pointed out the difficulties associated with too rigorous an application of the public law test to the decisions of directors:

> 'it may be thought that a question arises whether there must be an entire exclusion of all reasons, motives or aims on the part of the directors, and all of them, which are not relevant to the purpose of a particular power. When the law makes the object, view or purpose of a man, or of a body of men, the test of the validity of their acts, it necessarily opens up the possibility of an almost infinite analysis of the fears and desires, proximate and remote, which, in truth, form the compound motives usually animating human conduct. But logically possible as such an analysis may seem, it would be impracticable to adopt it as a means of determining the validity of the resolutions arrived at by a body of directors, resolutions which otherwise are ostensibly within their powers. The application of the general equitable principle to the acts of directors managing the affairs of a company cannot be as nice as it is in the case of a trustee exercising a special power of appointment. It must, as it seems to me, take the substantial object the accomplishment of which formed the real ground of the board's action. If this is within the scope of the power, then the power has been validly exercised.'

**[19]** Once one accepts the need to compare the relative significance of different considerations which influenced the directors, the question inevitably arises what is the 'primary' or 'dominant' purpose, and how is it to be identified. One possibility is that it is the 'weightiest' purpose, ie the one about which the directors felt most strongly. The other is that it is the purpose which caused the decision to be made as it was. Of course, the two things are connected. The ordinary inference is that the 'weightiest' purpose (in this sense) will also have been causative, and that minor purposes will not have

been. In most cases the two tests will in practice lead to the same result. But that will not always be so and, as will be seen, it is not necessarily the case here.

**[20]** The first test seems to me to be difficult to justify, for reasons of both practicality and principle. The practical difficulty was pointed out by Dixon J in the passage which I have quoted. It would involve a forensic enquiry into the relative intensity of the directors' feelings about the various considerations that influenced them. A director may have been influenced by a number of factors, but if they all point in the same direction he will have had no reason at the time to arrange them in order of importance. The attempt to do so later in the course of the dispute is likely to be both artificial and defensive. Moreover, a realistic appreciation of the directors' position will show that it is liable to lead to the wrong answer. Directors of companies cannot be expected to maintain an unworldly ignorance of the consequences of their acts or a lofty indifference to their implications. A director may be perfectly conscious of the collateral advantages of the course of action that he proposes, while appreciating that they are not legitimate reasons for adopting it. He may even enthusiastically welcome them. It does not follow without more that the pursuit of those advantages was his purpose in supporting the decision. All of these problems are aggravated where there are several directors, each with his own point of view.

**[21]** The fundamental point, however, is one of principle. The statutory duty of the directors is to exercise their powers 'only' for the purposes for which they are conferred. That duty is broken if they allow themselves to be influence by *any* improper purpose. If equity nevertheless allows the decision to stand in some cases, it is not because it condones a minor improper purpose where it would condemn a major one. It is because the law distinguishes between some consequences of a breach of duty and others. The only rational basis for such a distinction is that some improprieties may not have resulted in an injustice to the interests which equity seeks to protect. Here, we are necessarily in the realm of causation. The question is which considerations led the directors to act as they did. In *Hindle v John Cotton Ltd* 1919 56 SLR 625 at 631 Lord Shaw referred to the 'moving cause' of the decision, a phrase taken up by Latham CJ in *Mills v Mills* (1938) 60 CLR 150 at 165. But this cryptic formula does not help much in a case where the board was concurrently moved by multiple causes, some proper and some improper. One has to focus on the improper purpose and ask whether the decision would have been made if the directors had not been moved by it. If the answer is that without the improper purpose(s) the decision impugned would never have been made, then it would be irrational to allow it to stand simply because the directors had other, proper considerations in mind

as well, to which perhaps they attached greater importance. This was the point made by Dixon J in the passage immediately following the one which I have cited from his judgment in *Mills v Mills*:

> 'But if, except for some ulterior and illegitimate object, the power would not have been exercised, that which has been attempted as an ostensible exercise of the power will be void, notwithstanding that the directors may incidentally bring about a result which is within the purpose of the power and which they consider desirable.'

Correspondingly, if there were proper reasons for exercising the power and it would still have been exercised for those reasons even in the absence of improper ones, it is difficult to see why justice should require the decision to be set aside.

[*652]

[22] Dixon J's formulation has proved influential in the courts of Australia. As the majority (Mason, Deane and Dawson JJ) pointed out in the High Court of Australia in *Whitehouse v Carlton Hotel Pty Ltd* (1987) 162 CLR 285 at 294, (1987) 70 ALR 251 at 257:

> 'As a matter of logic and principle, the preferable view would seem to be that, regardless of whether the impermissible purpose was the dominant one or but one of a number of significantly contributing causes, the allotment will be invalidated if the impermissible purpose was causative in the sense that, but for its presence, "the power would not have been exercised" …'

I think that this is right. It is consistent with the rationale of the proper purpose rule. It also corresponds to the view which courts of equity have always taken about the exercise of powers of appointment by trustees: see *Birley v Birley* (1858) 25 Beav 299 at 307 (Sir John Romilly MR), *Pryor v Pryor* (1864) 2 De GJ & Sm 205 at 210 (Knight Bruce LJ), *Re Turner's Settled Estates* (1884) 28 Ch D 205 at 217, 219, *Roadchef* (*Employee Benefits Trustees*) *Ltd v Hill [2014] EWHC 109 (Ch), [2014] All ER (D) 04 (Feb)* (at [130]), and generally *Thomas on Powers* (2nd edn, 2012), paras 9.85–9.89.

[23] The leading modern case is *Howard Smith Ltd v Ampol Petroleum Ltd [1974] 1 All ER 1126*, [1974] AC 821, a decision of the Privy Council on appeal from New South Wales, which proceeded on the basis that the law was the same in England and in New South Wales. It was another case of a board decision to issue and allot new shares against the background of a takeover bid, although rather unusually it was the directors who wanted the bid to succeed over the opposition of two existing shareholders who together held a majority of the shares. Delivering the advice of the Privy Council, Lord Wilberforce observed (*[1974] 1 All ER 1126 at 1132*–1133, [1974] AC 821 at 834):

> 'The directors, in deciding to issue shares, forming part of Millers' unissued capital, to Howard Smith acted under cl 8 of the company's articles of association. This provides, subject to certain qualifications which have not been invoked, that the shares shall be under the control of the

directors, who may allot or otherwise dispose of the same to such persons on such terms and conditions and either at a premium or otherwise and at such time as the directors may think fit. Thus, and this is not disputed, the issue was clearly intra vires the directors. But, intra vires though the issue may have been, the directors' power under this article is a fiduciary power: and it remains the case that an exercise of such a power though formally valid, may be attacked on the ground that it was not exercised for the purpose for which it was granted.'

[24] The main interest of the decision for present purposes lies in the fact that it was a case of multiple concurrent purposes. The company was genuinely in need of fresh capital, and the directors had received legal advice that this was the only ground on which they could properly authorise an issue of shares. The number of shares to be issued and the amount of the subscription had been carefully calculated to match the company's capital requirements. After a trial lasting 28 days in which the four directors supporting the share issue gave evidence, Street J had found that the company's need for capital, although urgent, was not yet critical and that its normal practice had been to meet its capital requirements by borrowing rather than issuing shares. For this reason he rejected the evidence of the four directors

[*653]

that their sole purpose was to meet the company's shortage of capital and found that their primary purpose was in fact to dilute the shareholdings of those who opposed the bid. Lord Wilberforce adopted the primary purpose test which had been applied by the judge and affirmed his decision (*[1974] 1 All ER 1126 at 1131*–1132, [1974] AC 821 at 832):

> 'when a dispute arises whether directors of a company made a particular decision for one purpose or for another, or whether, there being more than one purpose, one or another purpose was the substantial or primary purpose, the court, in their Lordships' opinion, is entitled to look at the situation objectively in order to estimate how critical or pressing, or substantial or, per contra, insubstantial an alleged requirement may have been. If it finds that a particular requirement, though real, was not urgent, or critical, at the relevant time, it may have reason to doubt, or discount, the assertions of individuals that they acted solely in order to deal with it, particularly when the action they took was unusual or even extreme.'

Lord Wilberforce did not express the point in terms of causation, but it is I think clear that by the 'substantial or primary purpose', he meant the purpose which accounted for the board's decision. He approved the judge's adoption of Dixon J's test (*[1974] 1 All ER 1126 at 1131*, [1974] AC 821 at 831–832), and went on to adopt an analysis of the facts based on that test. Although the directors were influenced by the company's need for capital, the decisive factor in *Howard Smith Ltd v Ampol Petroleum Ltd* was that but

[Appendix] Page 37

for their desire to convert the majority shareholders into a minority, the directors would not have sought to raise capital by means of a share issue, nor at that point of time.

**The judgment of Mann J[25]** In Mann J's view, the only purpose for which the power to impose restrictions was conferred by art 42 was to 'provide a sanction or an incentive to remedy the default' (*[2014] 1 BCLC 202 at [206]*). In a meticulous judgment he went on to make the following findings of fact (at [168]–[179] and [183]–[200]).

> (1) He expressed no view of his own on the merits of the dispute between the company and Messrs Kolomoisky and Bogolyubov and their associates. But he found that the board had reasonable cause to believe (whether or not it was right) that they were parties to an agreement or arrangement relating to shares in JKX with a view to carrying out a raid on the company. The board believed that the objective of the raiders was to depress the value of the shares so as to enable them to buy other shares more cheaply and eventually to take control of the company's Ukrainian subsidiary. They regarded the removal of Dr Davies and Mr Dixon and their replacement by inexperienced associates of the raiders as part of that plan. They therefore had reasonable cause to believe that the answers to the disclosure notices had been false.

> (2) Of the seven directors who took part in the decision, six gave evidence and were cross-examined. The seventh was not cross-examined in relation to purpose for want of time, and no point was taken on that. Of the six, one was found to have had the primary purpose of extracting the information from the addressees of the disclosure notices. Another took a 'balanced' view which attached substantially the same importance to

[*654]

extracting the information and preventing the raiders from voting against the resolutions at the AGM. The judge summarised the motives of the other four as follows (at [189]):

'While they may (and in all probability actually did) appreciate that the restrictions would have to be lifted if the information was provided, they did not regard the ability to impose restrictions as being one designed to protect the company pending the provision of information;

they regarded it as one which they could use, and did actually use, to get an advantage (the opportunity to pass the resolutions) for its own sake, not linked to the extraction of information. Putting the matter another way, they did not regard the opportunity to get special resolutions passed which would otherwise not be passed (and the increased chance of getting the ordinary ones passed too) as an incidental benefit of imposing restrictions as an incentive to provide information; they elevated it in their minds, and in their purposes, to something with its own independent merit as a way of doing down the "raiders" for the benefit of the shareholders.'

> (3) The judge concluded (at [200]):

'The differences between relevant states of mind can be quite subtle in this situation, but I find that the evidence demonstrates that the following purposes, beliefs and states of mind existed among the voting directors:
(a) They all knew that the purpose of the notices was to get information.
(b) They all appreciated that the effect of restrictions would be (unless the information was provided before the AGM) that Eclairs/Glengary would be prevented from voting, with the effect that all the resolutions would be likely to be passed, or that there was a very enhanced prospect of that happening.
(c) They all saw that as operating for the benefit of the company as a whole, and as hindering the cause of the "raiders".
(d) The majority of the voting directors (Mrs Dubin, Mr Moore, Mr Miller and Lord Oxford) saw that as a sort of standalone proper and useful objective, and achieving it was a substantial purpose of voting for the restrictions, separate from the need to have information. Those directors did not have in mind the protection of the company pending the provision of the information; they had in mind protecting the company full stop. The restrictions were thus a useful weapon to be used against the "raiders". The disenfranchisement of the "raiders" at the AGM was not just an incidental effect of the imposition of restrictions; it was the positively desired effect, seen as beneficial to the company in the long term.
(e) The bona fides of those directors, and the genuineness of their desire to benefit the company as a whole, was not challenged, and in my view cannot be challenged.'

> (4) It followed that the primary purpose of the board in issuing the restriction notices was to influence or determine the fate of the resolutions before the AGM. The directors (at [227])—

[*655]

'took the opportunity of using the power to alter the potential votes at the forthcoming AGM in order to maximise the chances of the resolutions being passed in a manner which they thought was in the best interests of the company.'

> Since this was beyond the purpose for which the power to impose restrictions was conferred, he set aside the restriction notices and the board resolutions authorising them with effect from the time that they were made.

[26] In the course of final speeches, the judge raised with the parties the question whether the board would have reached the same decision even if they had not taken account of the impact of the restriction notices on the resolutions at the AGM. 'On the basis of what I heard, and the shape of the case before me', he said, he thought it 'likely, and to be frank virtually inevitable' that the board would have reached the same conclusion and imposed the same restrictions even if they had confined themselves to the proper purpose of inducing the addressees of the disclosure notices to comply with them and imposing sanctions for their failure to do so to date. He 'provisionally' concluded that on this alternative factual hypothesis the court would have had a discretion whether to set aside the board resolution and restriction notices, which it might have exercised in favour of the company. The alternative factual hypothesis had not, however, been pleaded or addressed by the relevant witnesses and had formed no part of the company's case. For this reason the judge, having raised the point, refused to allow the company to take it at that late stage. He put the position as follows (at [232]):

> 'on the evidence that I have heard, I find it very hard indeed to believe that the directors would have come to any different conclusion. I deal with this in a short section below in which I consider the facts. However, in circumstances in which the directors have not made such a case in their own evidence-in-chief (or in the pleadings of the company), it would, in the end, be a step too far to allow them to say my purpose was X, but if I had been told that that was an improper purpose and I had to consider a legitimate purpose Y, I would have arrived at the same decision. If that were to be their case then it should have been positively advanced at some stage during the hearing. Although on the evidence I heard I find it difficult to see that the directors would have come to a different decision, nonetheless I can see that the claimants might have wished to have advanced their case differently, perhaps devoting more attention to the earlier events leading up to the service of the notices and what happened, and what the thinking was, between then and the board meeting.'

The 'short section below' was paras [235]–[237]. In these paragraphs, the judge summarised what he would have found if he had allowed the company to advance

the alternative factual hypothesis and had been obliged to deal with it on the basis of the existing evidence. He appears to have done this in case there was an appeal against his refusal to allow the point to be taken. In the event, however, there was no appeal on that point.

**The judgments of the Court of Appeal[27]** The appeals were heard by Longmore and Briggs LJJ and Sir Robin Jacob (*[2014] EWCA Civ 640*, *[2014] 4 All ER 463*, *[2014] 2 BCLC 164*). There was no challenge to the judge's findings of fact. The appeal revolved entirely around their legal significance. By a majority, the court allowed the appeal.

[*656]

[28] The majority (Longmore LJ and Sir Robin Jacob at para [138]) considered that the proper purpose doctrine had 'no significant place in the operation of art 42 or Pt 22 of the 2006 Act'. They appear to have reached this conclusion for three overlapping reasons. The first was that restrictions arising from a shareholder's failure to comply with a disclosure notice did not reflect a 'unilateral' exercise of power by the board. By this they meant that the shareholder could avoid the restrictions by complying with the disclosure notice. 'Why should the law protect him when all he had to do was tell the truth?' (at [136]). Their second reason was that the restrictions on the voting and other rights attaching to the shares was the very thing that art 42 was designed to permit if the directors reasonably considered that the disclosure notices had not been complied with. So once the board had reached that conclusion, there was no further limitation on their power to issue a restriction notice. The majority's third reason was that no limitation on the proper purpose of a restriction notice was expressed, either in Pt 22 of the 2006 Act or in art 42 of JKX's articles. In their view there was no room for the implication of such a purpose, because in the nature of things the statutory disclosure procedure was most likely to be operated at a time of controversy in the company's affairs. They thought (at [141]), that the draftsman was unlikely to have intended a detailed enquiry into the minds of directors 'in what may often be a rapidly changing scene'; and (at [142]) that in a battle for control against predators who were 'up to something subversive but secret' the directors would naturally want to see them disenfranchised. In their view, the result of applying the proper purpose rule would be to emasculate the statutory scheme and the corresponding provisions of art 42. Underlying much of this reasoning was the view expressed in their peroration, that any other view 'would only be an encouragement to deceitful conduct and not something which English company law should countenance' (para [143]).

[29] In a formidable dissent, Briggs LJ set out the rationale for the proper purpose test and the authorities for its application to the exercise of discretionary powers by companies. He accepted the view of Mann J that the purpose of art 42 was to encourage or coerce the

provision of information which had been requested under s 793, with the rider that it was also to prevent the accrual of any unfair advantage to any person as a result of the failure to comply with such a request. Even with that limited expansion, on the judge's findings of fact the directors' decision to impose restrictions under art 42 was improper, and there were no satisfactory reasons why the rule should not be applied to the draconian powers conferred by art 42 of JKX's articles. He added (at [122]):

'Furthermore, I consider it important that the court should uphold the proper purpose principle in relation to the exercise of fiduciary powers by directors, all the more so where the power is capable of affecting, or interfering with, the constitutional balance between shareholders and directors, and between particular groups of shareholders. The temptation upon directors, anxious to protect their company from what they regard as the adverse consequences of a course of action proposed by shareholders, to interfere in that way, whether by the issue of shares to their supporters, or by disenfranchisement of their opponents' shares, may be very hard to resist, unless the consequences of improprieties of that kind are clearly laid down and adhered to by the court.'

[*657]

**The proper purpose of article 42[30]** The submission of Mr Swainston QC, who appeared for the company, was that where the purpose of a power was not expressed by the instrument creating it, there was no limitation on its exercise save such as could be implied on the principles which would justify the implication of a term. In particular, the implication would have to be necessary to its efficacy. In my view, this submission misunderstands the way in which purpose comes into questions of this kind. It is true that a company's articles are part of the contract of association, to which successive shareholders accede on becoming members of the company. I do not doubt that a term limiting the exercise of powers conferred on the directors to their proper purpose may sometimes be implied on the ordinary principles of the law of contract governing the implication of terms. But that is not the basis of the proper purpose rule. The rule is not a term of the contract and does not necessarily depend on any limitation on the scope of the power as a matter of construction. The proper purpose rule is a principle by which equity controls the exercise of a fiduciary's powers in respects which are not, or not necessarily, determined by the instrument. Ascertaining the purpose of a power where the instrument is silent depends on an inference from the mischief of the provision conferring it, which is itself deduced from its express terms, from an analysis of their effect, and from the court's understanding of the business context.

**[31]** The purpose of a power conferred by a company's articles is rarely expressed in the instrument itself. It was not expressed in the instrument in any of the leading cases about the application of the proper purpose rule to the powers of directors which I have summarised. But it is usually obvious from its context and effect why a power has been conferred, and so it is with art 42. Article 42(2) authorises the issue of a restriction notice only in the event that a disclosure notice has been issued under s 793 of the 2006 Act and the company has received either no response or a response which it knows or has reasonable cause to believe is false or materially incorrect. Under art 42(4) in the event that the information is supplied after the restrictions have been imposed (ie that a response has been received which the directors have no reasonable cause to regard as wrong), they are automatically lifted seven days thereafter. Any dividends or other payments in respect of the shares which were withheld while the restrictions were in force will then become payable under art 42(6). As Millett J observed in *Re Ricardo Group plc* [1989] BCLC 566 at 572about the corresponding power of the court to impose restrictions under what was then *s 216* and *Pt XV* of the Companies Act 1985, these restrictions—

'are granted as a sanction to compel the provision of information to which the company is entitled. It follows, in my judgment, that once the information is supplied, any further justification for the continuance of the sanction disappears.'

The inescapable inference is that the power to restrict the rights attaching to shares is wholly ancillary to the statutory power to call for information under s 793.

**[32]** It follows that I accept the view of Mann J that the purpose of art 42 is to provide a 'sanction or incentive' to remedy a failure to comply with the disclosure notice. But I would not limit it to inducing the defaulter to comply, any more than I believe Mann J to have done in this case or Millett J in the *Ricardo Group* case. Otherwise the board would be disabled from imposing restrictions in a case where the defiant obduracy of the defaulter made it

[*658]

obvious that the restrictions would not produce compliance. I would therefore identify the purpose in slightly different terms. In my view art 42 has three closely related purposes. The first is to induce the shareholder to comply with a disclosure notice. This is the purpose which Millett J and Mann J regarded the restrictions as serving, and it is the least that they can have been intended to achieve. Secondly, the article is intended to protect the company and its shareholders against having to make decisions about their respective interests in ignorance of relevant information. As Hoffmann J observed in *Re TR Technology Investment Trust plc* [1988] BCLC 256 at 276, 'the company, through its existing board, is given the unqualified right to insist that contests for the hearts and minds of shareholders are conducted with cards on the table.'

Thirdly, the restrictions have a punitive purpose. They are imposed as sanctions on account of the failure or refusal of the addressee of a disclosure notice to provide the information for as long as it persists, on the footing that a person interested in shares who has not complied with obligations attaching to that status should not be entitled to the benefits attaching to the shares. That is the natural inference from the range and character of restrictions envisaged in art 42(3), which affect not only the right to participate in the company's affairs by voting at general meetings, but the right to receive dividends. These three purposes are all directly related to the non-provision of information requisitioned by a disclosure notice. None of them extends to influencing the outcome of resolutions at a general meeting. That may well be a consequence of a restriction notice. But it is no part of its proper purpose. It is not itself a legitimate weapon of defence against a corporate raider, which the board is at liberty to take up independently of its interest in getting the information.

[33] Basing himself on the observation of Hoffmann J in *Re TR Technology Investment Trust plc*, Mr Swainston argued that the purpose of a restriction notice was related to the non-provision of the information in a broader sense. The argument was that for as long as the addressee of a disclosure notice failed to put his 'cards on the table', the directors were justified in treating the restrictions as a free-standing technique for frustrating the raiders' plans. In my view this extends the purpose of a restriction notice beyond its proper limits. It treats failure to comply with a disclosure notice as no more than a 'gateway' or condition precedent to the directors' right to impose and maintain the restrictions for any purpose which they bona fide conceived to be in the interests of the company, including securing their preferred outcome at the AGM. But as the judge put it (at para [206]), the 'non-provision of information is not to be taken as a justification for opening up a new front against the predator with the benefit of a new weapon.' Otherwise, directors would be entitled to impose restrictions in a case where they attached no importance to the information requisitioned in the disclosure notice. However difficult it may be to draw in practice, there is in principle a clear line between protecting the company and its shareholders against the consequences of non-provision of the information, and seeking to manipulate the fate of particular shareholders' resolutions or to alter the balance of forces at the company's general meetings. The latter are no part of the purpose of art 42. They are matters for the shareholders, not for the board.

[34] We were pressed with a number of arguments about the purpose of art 42 based on an analogy with Pt 22 of the 2006 Act. I did not find these arguments helpful. The two schemes are both directed at an assumed failure to comply with a statutory disclosure notice, and have a number of other points

in common. But they differ in a number of respects, some of them significant. Arguments based on language which is to be found in the statute but not in the articles are unlikely to throw any light on the purpose of the latter.

**Does the proper purpose rule apply?** [35] At this stage, two preliminary observations are called for.

[36] The first is that the imposition of restrictions under art 42 is a serious interference with financial and constitutional rights which exist for the benefit of the shareholder and not the company. In the case of listed companies such as JKX a restriction notice is also an interference with the proper operation of the market in its shares, in which there is not only a private but a significant public interest. One would expect such a draconian power to be circumscribed by something more than the directors' duty to act in the company's interest as they may in good faith perceive it.

[37] The second preliminary observation concerns the role of the proper purpose rule in the governance of companies. The rule that the fiduciary powers of directors may be exercised only for the purposes for which they were conferred is one of the main means by which equity enforces the proper conduct of directors. It is also fundamental to the constitutional distinction between the respective domains of the board and the shareholders. These considerations are particularly important when the company is in play between competing groups seeking to control or influence its affairs. The majority of the Court of Appeal were right to identify this as the background against which disclosure notices are commonly issued. But they drew the opposite conclusion from the one which I would draw. They seem to have thought it unrealistic, indeed undesirable, against that background to expect directors to distinguish between the proper purpose of enforcing the disclosure notice and the improper purpose of defeating the ambitions of one group of shareholders. I find this surprising. The decision to impose restrictions under art 42 requires the directors to recognise the difference between the purpose of a decision and its incidental consequence. That certainly calls for care on their part and possibly for legal advice. But there is nothing particularly special in this context about a decision to issue a restriction notice under a provision such as art 42. The directors' task is no more difficult than it was in the many cases like *Howard Smith Ltd v Ampol Petroleum Ltd* in which other fiduciary powers, such as the power to issue shares, have been held improperly exercised because in the face of pressures arising from a battle for control the directors succumbed to the temptation to use their powers to favour their allies. I would agree with the majority of the Court of Appeal that in that situation the board would naturally wish to have the predators disenfranchised. That is precisely why it is important to confine them to the more

limited purpose for which their powers exist. Of all the situations in which directors may be called upon to exercise fiduciary powers with incidental implications for the balance of forces among shareholders, a battle for control of the company is probably the one in which the proper purpose rule has the most valuable part to play.

**[38]** I therefore approach with some scepticism the suggestion that in this of all contexts the proper purpose rule has no application. Of the three reasons given by the majority of the Court of Appeal, I have already dealt with their second reason, which was essentially a slightly repackaged version of Mr Swainston's 'gateway' argument, and with their third, which is that no limiting purpose can be implied in a case where the directors are likely to exercise their powers for the purpose of disenfranchising a predator. I reject

[*660]

both of them as contrary to principle. I would add that I am unimpressed by the suggestion that it is impractical to examine the state of mind of the directors in a rapidly changing situation such as a takeover bid or an attempted raid. The present proceedings were begun on the day before the AGM. The interests of both parties were sufficiently protected pending the decision by the orders made on the same day by David Richards J, and the dispute was heard by Mann J within seven weeks and decided within three months. In some cases, for example where a tight timetable is imposed under the City Code on Takeovers and Mergers, it may be necessary to accelerate the procedure even more drastically, but the judges of the Chancery Division are perfectly capable of responding to these exigencies as they arise.

**[39]** That brings me to the majority's first and, I think, main reason, which was that the power to impose restrictions under art 42 was not a 'unilateral' power. The addressees of the disclosure notices had only to answer the questions fully and truthfully to bring the restrictions to an end. I reject this also. The short and principled objection to it was given by Briggs LJ. The limitation of the power to its proper purpose derives from its fiduciary character. If its exercise would otherwise be an abuse, it cannot be an answer to say that the person against whom it is directed had only himself to blame. Moreover, the majority's proposition assumes that that person is the only one whose interests are adversely affected. But that is not right. Other shareholders who agreed with them would be deprived of their support. In *Anglo-Universal Bank v Baragnon* (1881) 45 LT 362 Sir George Jessel MR considered that the proper purpose rule would apply to a board decision to make calls on shareholders if the object was to prevent particular shareholders from voting at general meetings, although any shareholder could remove the disability by paying. There is no trace in this or any other authority of a distinction between unilateral and non-unilateral powers. Moreover, I reject the majority's premise. The problem

cannot always be resolved by unilaterally complying with the disclosure notice. Under a provision in the form of art 42 there may be a deemed non-compliance with a disclosure notice even in a case where the answers are prompt, complete and accurate. This is because the directors may reasonably though erroneously conclude that the answers are defective. This is not a fanciful hypothesis. The 'interest' in shares about which information may be sought under s 793 of the 2006 Act is very broadly defined. It will often be a highly debatable question whether it exists. An alleged omission to disclose a relevant agreement or arrangement between persons with a relevant interest may be just as debatable. An agreement sufficient to give rise to a concert party may be informal. An arrangement may be no more than a nod and a wink or a tacit understanding. Reasonableness in these circumstances is very much in the eye of the decision-maker. It will depend on what other facts or inferences are available to him. With the best will in the world, things may look very different on the other side of the partition. The weapon which the majority's analysis puts into the hands of the board is a blunderbuss whose shot is liable to injure the just and the unjust alike.

**[40]** That is part of the reason why I am unable to accept the majority's parting assertion (at para [143]) that the application of the proper purpose rule would be an 'encouragement to deceitful conduct' by predators with 'subversive but secret' projects. There is, however, a more fundamental objection to it, which is that it is incoherent once the operation of the rule is properly understood. If the 'deceit' consists simply in the secrecy, ie in the withholding or deemed withholding of the information, a decision to impose

[*661]

restrictions which is based simply on that fact will be entirely consistent with the proper purpose of the power. But secrecy is one thing, subversion another. If the real objection is to the subversion, it is nothing to do with the issue or enforcement of disclosure notices. Directors owe a duty of loyalty to the company, but shareholders owe no loyalty either to the company or its board. Within broad limits, derived for the most part from Pt 30 of the 2006 Act (Protection of Members against Unfair Prejudice) and the City Code on Takeovers and Mergers, they are entitled to exercise their rights in their own interest as they see it and to challenge the existing management for good reasons or bad.

**The present case[41]** What the judge's findings amount to is that although at the critical board meeting the majority genuinely wanted to receive the information which they had requisitioned, once they were satisfied that it had not been provided and turned to consider the issue of restriction notices, they were interested only in the effect that this would have on the outcome of the forthcoming general meeting. They 'did not have in mind the protection of the company pending the provision of

the information; they had in mind protecting the company full stop' (para [200](d)). In any case where concurrent purposes are being considered, they must have been actual purposes in the minds of the directors, not merely possible or hypothetical ones. If the only consideration which actually influenced the decision was an improper one, it is difficult to envisage any basis on which their decision could have been sustained.

**[42]** I have drawn attention earlier in this judgment to the relevance of causation in this field. The judge posed the question (at [228]) whether the notices could be 'saved' on the footing that although the directors' purpose was improper, they would have acted in the same way if the improper considerations had been ignored and they had applied their minds to proper ones. Suppose that the directors had decided to issue the restriction notices as a sanction for the non-provision of the information and to protect the company from the consequences of its non-disclosure pending its provision. Suppose that they also made the decision in order to secure the passing of the resolutions, but would have done the same thing even if that had never entered their minds. On that hypothesis, it would be difficult to regard the impact on the resolutions as a primary consideration. The want of the information would have been a sufficient justification of the restrictions and the resolutions would have been irrelevant, in fact no more than a welcome incidental consequence.

**[43]** That, however, was not the company's case. As summarised by the judge (at [181] and [207]–[208]), their case was that once the raiders had failed to provide the information, the power to make a restriction order could properly be exercised for the purpose of defeating their attempt to influence or control the company's affairs, provided that this was conceived in good faith to be in the company's interests. Indeed it could properly be exercised for the purpose of ensuring the passage of the resolutions at the general meeting in the face of their objections. There was no attempt to justify the decision on some narrower basis if these purposes were found to be improper. Forensic judgments of this kind are often required and they are not easy. This one was no doubt a realistic approach in the face of the facts. But for whatever reason, none of the parties focused on the possibility that the same decision might have been reached without reference to the desire to defeat the raiders, until the judge drew their attention to its possible relevance. By that time it was too late

*[*662]*

to explore the point with the witnesses. In his judgment (at [235]–[237]), the judge summarised the findings of fact which he would have made if he had allowed the company to rely on the alternative hypothesis that the directors had disregarded their desire to defeat the raiders. He thought that they would have applied their

minds to the right point and made the same decision. But the judge did not allow the company to take the point and there has been no appeal against that refusal. Since his reason for refusing was that the claimants had not had a proper opportunity to challenge the alternative hypothesis in the course of the evidence, it seems to me that the judge's hypothetical alternative findings are not properly before this court.

**[44]** I would allow the appeal and restore the decision of Mann J.

**[45]** In the light of the observations of other members of the court, I should record that while we received no oral argument on the role of causation in identifying the relevant purpose(s) of a board decision, full and helpful written submissions on the point were delivered after the hearing, at the invitation of the court.

**LORD CLARKE**
(Lord Neuberger concurring).

**[46]** I initially intended simply to agree with Lord Sumption's judgment. Like Lord Mance (and Lord Neuberger), I agree with Lord Sumption that the appeal should be allowed for the reasons given in his paras [27]–[43]. I am inclined to agree with the other views expressed by Lord Sumption but there does seem to me to be force in Lord Mance's reservation that not all the points were the subject of full argument and consideration below. In these circumstances I would prefer to defer reaching a final conclusion on the other points identified by Lord Mance until they arise for decision and have been the subject of such argument.

**LORD MANCE**
(Lord Neuberger concurring).

**[47]** I gratefully adopt Lord Sumption's summary of the relevant facts in paras [1]–[13] and of the judgments of Mann J and the Court of Appeal *[2014] 4 All ER 463*, *[2014] 2 BCLC 164* (at [25]–[29]). I also agree with his reasons for allowing this appeal in paras [30]–[44].

**[48]** I have read with interest the discussion of the proper purpose rule in paras [14]–[24]. It accepts an analysis which was suggested in general terms by the judge at first instance, but which became immaterial in the light of his refusal to allow any point on causation to be raised. It was not in those circumstances advanced by any party during the oral hearing before the Supreme Court. The analysis was first revived by the Supreme Court in a draft judgment handed down, but then withdrawn before delivery in the light of the parties' representations.

**[49]** Thereafter, both appellants confirmed that they had argued the case before the Supreme Court on the basis that, if the proper purpose rule applied, the restriction notices fell to be set aside, since the judge had found the notices to have been issued for the principal purpose of improving the prospects of passing at the

forthcoming AGM two special resolutions to authorise market purchases and to disapply pre-emption rights as well as of passing three ordinary resolutions. Eclairs submitted that any issue as to whether a 'but for' test should be applied should in these circumstances await a case where it arose squarely. Eclairs and Glengary each supplied a copy of its submissions to the judge at the trial in 2013, which had suggested a two-pronged alternative analysis, according to which the notices would be set aside if a court concluded

[*663]

either that (a) the principal purpose was to ensure the passing of the resolutions, or (b) even if that was not the principal purpose, the notices would not have been issued but for the wish to ensure the passing of the resolutions. JKX on the other hand sought to use the Supreme Court's 'new development in the law' as a springboard to argue that the appeals should not be allowed and/or that there should be a further hearing on the issue of causation.

[50] I readily accept my part in agreeing to the original draft judgment. But I am now satisfied, having considered the authorities without the benefit of oral or written submissions other than those dating from 2013 submitted by Eclairs and Glengary, that we should not express any firm or concluded views on points which do not arise for decision on this appeal. I will summarise my reasons.

[51] First, it would be helpful to clarify the meaning of *s 171(b)* of the Companies Act 2006, providing that directors may use their powers 'only' for the purposes for which they were conferred. On the face of it this is clear. All purposes in mind must be legitimate. But *Buckley on the Companies Act* (15th edn, 2000, looseleaf edn) at 3 [869] suggests that it itself involves a primary purpose test, commenting:

'What if a power were used for mixed purposes, some good and some bad? According to the old law the exercise would be good if its primary purpose were proper. By virtue of *CA 2006, section 170(4)*, this law should inform the construction of *CA 2006, section 171(b)*. Thus, a director who has exercised powers for mixed purposes has still only exercised them primarily, if not exclusively, for the purposes for which they are conferred and this should be within *CA 2006, section 171(b)*. *CA 2006, section 171(b)* can be construed (as it should be), in accordance with *CA 2006, section 170(4)* to mean that a director must exercise his powers primarily (or substantially) only for the purposes for which they are conferred.'

[52] *Buckley* cites for the 'old law' *Howard Smith Ltd v Ampol Petroleum Ltd [1974] 1 All ER 1126*, [1974] AC 821. Lord Sumption (at paras [14] and [21]) treats s 171(b) as requiring a director's power to be used 'with an entire and single view to the real purpose and object of the power', assimilating a director's power in this respect with the exercise of discretionary powers by

trustees. But Dixon J in his judgment in *Mills v Mills* (1938) 60 CLR 150 at 185–186 (which Lord Sumption commends at para [18]), expressly noted that—

'The application of the general equitable principle to the acts of directors managing the affairs of a company cannot be as nice as it is in the case of a trustee exercising a special power of appointment. It must, as it seems to me, take the substantial object the accomplishment of which formed the real ground of the board's action. If this is within the scope of the power, then the power has been validly exercised.'

I would therefore wish to have submissions on the scope of the duty under s 171(b).

[53] Second, whatever the scope of the duty, I understand Lord Sumption's point that the granting of relief in the event of a breach of s 171(b) is a different matter. But here too I think it would both assist and be wise to hear submissions. I do not for my part think that the interpretation which Lord Sumption (in para [24]) puts on Lord Wilberforce's speech in *Howard Smith Ltd v Ampol Petroleum Ltd [1974] 1 All ER 1126*, [1974] AC 821is

[*664]

necessarily or clearly what Lord Wilberforce meant. Equally, the passage already quoted from Dixon J's judgment in *Mills v Mills* appears to me far from conclusive, while its later explanation in the High Court in *Whitehouse v Carlton Hotel Pty* (1987) 162 CLR 285 at 294, (1987) 70 ALR 251 at 257 (quoted by Lord Sumption at para [22]) is, at least arguably, consistent with 'but for' causation being viewed either as the only test or as affording an extended basis for the grant of relief, even where the principal purpose was legitimate, as Eclairs and Glengary submitted to the judge. In these circumstances, although I have sympathy with Lord Sumption's view that 'but for' causation offers a single, simple test, which it might be possible or even preferable to substitute for references to the principal or primary purpose, I am not persuaded that we can or should safely undertake what all parties consider would be 'a new development' of company law, without having heard argument.

[54] Third, Lord Sumption expresses the view (in para [20]) that identification of the principal or primary purpose for which directors exercised a power would 'involve a forensic enquiry into the relative intensity of the directors' feelings about the various considerations that influenced them', in relation to which directors' evidence would be 'likely to be both artificial and defensive'. To the extent that that is a difficulty, I cannot see that it exists any the less in relation to a test based on 'but for' causation. Human nature being what it is, that is just as likely to give rise to artificial and defensive attempts to justify what was done. If anything, I would have thought that the principal or primary purpose in mind would be likely to be easier to identify, since it is likely to be reflected in directors' exchanges before

and/or at the time of the decisions under examination, than the answer to a question whether they would have acted as they did without taking into account their main expressed purpose. They will have been less likely to have directed express attention to this: that is, unless well advised by their lawyers, in which case further caution might be necessary about accepting their assertions at face value.

**[55]** Fourth, if a 'but for' test were to be adopted, attention should I think be given to the standard to which the directors, on whom the onus would presumably lie, would have to show that they would have reached the same decision, even if they had not had the illegitimate purpose in mind. Would probability be enough? Or would the test be whether their decision would inevitably have been the same? See eg by analogy the public law test, as stated by May LJ in *R* (*Smith*) *v North East Derbyshire Primary Care Trust* [2006] 1 WLR 3315, and quoted by Lord Neuberger in *R* (*on the application of FDA*) *v Secretary of State for Work and Pensions [2012] EWCA Civ 332*, *[2012] 3 All ER 301*, [2013] 1 WLR 444(at [68]).
Appeal allowed.


Peter Hutchesson  Barrister (NZ).

---

**End of Document**

# EXHIBIT 1-B

## *Hogg v Cramphorn Ltd and Others [1966] 3 All ER 420*

CHANCERY DIVISION

BUCKLEY J

8, 9, 10, 18 OCTOBER 1963

**Company — Shareholder — Minority shareholder — Representative action — Scheme to confer majority of votes at general meetings on directors and their supporters — Moves to withstand threatened take-over — Whether minority shareholder can validly bring representative action challenging vires of bona fide acts of directors ratifiable in general meeting.**

**Company — Ultra vires — Allotment of preference shares with special voting rights — Establishment of trust for employees — Loans to trustees to purchase preference shares — Moves by directors to withstand threatened take-over — Whether proper exercise of directors' fiduciary powers.**

The share capital of a company incorporated in 1896, carrying on business as corn and seed merchants and horticulturalists, consisted of ninety-six thousand £1 five per cent preference shares and forty thousand £1 ordinary shares; of these 90,293 preference shares and 35,888 ordinary shares had been issued. Each share carried one vote. By art 10 of the company's articles of association its shares were under the control of the directors, who might allot them as they thought fit. About thirty-seven thousand shares were held by the directors and their friends. A reserve of £34,000 was described in the company's balance sheet as "employees' benevolent and pension fund"; this sum, accumulated over years, was the absolute property of the company. In March, 1963, B proposed to the chairman and managing director that B should buy the whole of the issued preference shares at 25s each and the whole of the ordinary shares at 50s each. The take-over seemed to foreshadow a change in the nature of the company's trading, which the directors considered would be unsettling to the company's staff; the directors bona fide believed that the avoidance of acquisition of control by B would benefit the company. To meet the situation the company entered into a trust deed for the benefit of its

employees, and 5,707 preference shares, each carrying ten votes, were issued and allotted to trustees, who were the chairman, a partner in the company's auditors, and an employee of the company. The votes attached to these shares, taken with those of the thirty-seven thousand shares held by the directors and their friends, would amount to a majority of votes at a general meeting. The £5,707 required to pay for the preference shares was provided from the reserve as an interest-free loan to the trustees. Subsequently, in May, 1963, the directors advanced the rest of the reserve (£28,293) to the trustees to enable them to buy preference shares at 25s per share; this loan was not to bear interest. The board circularised shareholders with a view to the acquisition of preference shares by the trustees, explaining the position. The plaintiff, who held fifty ordinary shares in the company, issued writs, suing on behalf of himself and all other shareholders except three defendant shareholders, against the company and the three defendant shareholders, who were the trustees of the trust deed; by these writs the plaintiff claimed that the attachment of the special voting rights to the 5,707 preference shares and their allotment were ultra vires, and that the company's execution of the trust deed was ultra vires. Subsequently B's offer was formally made to the shareholders by circular; it was conditional on ninety per cent acceptance by each class of shareholders, but the condition was not satisfied and the offer lapsed. On the true construction of the articles of association[a] the court found that the directors had no power to attach the special voting rights to the 5,707 preference shares. On the question whether the allotment, etc was an improper use by the directors of their powers,

[a] See p 426, letter *a*, post.

> **Held** – (i)(a) it did not follow from the invalidity of the special voting rights attached to the 5,707 preference shares that the allotment of them
>
> *[\*421]*
>
> should be set aside, for the allottees were entitled to elect to retain their preference shares without the

special voting rights (see p 426, letter *b*, post).

(b) nevertheless shareholders in general meeting were entitled to pursue what course they chose, so long as the majority did not unfairly oppress a minority, and, therefore, the fact that the directors believed it to be for the benefit of the company that the 5,707 preference shares should be issued with special voting rights did not justify the allotment of these shares by the directors to the trustees without the approval of the shareholders in general meeting, and the allotment was liable to be set aside (see p 428, letters *g* and *h*, post).

(c) a majority of the shareholders in general meeting would have power to ratify the issue of the 5,707 preference shares, and, accordingly, opportunity should be given for the shareholders in general meeting (at which no votes would be cast in respect of the 5,707 preference shares) to decide whether or not to ratify the issue of the shares (see p 429, letter *e*, and p 430, letter *f*, post).

(ii) the execution of the trust deed by the company was also invalid without the confirmation of the shareholders in general meeting for the reason stated in (i)(b) ante, and an opportunity should also be afforded for the shareholders in general meeting to decide whether to ratify the execution of the trust deed (see p 429, letter *g*, post).

(iii) the loan of £28,293 was similarly invalid unless sanctioned by the shareholders in general meeting, for it was an integral part of the scheme for securing to the directors the support of a controlling body of votes (see p 429, letter *i*, and p 430, letter *a*, post).

(iv) since the defendants had throughout maintained that the ten votes attached to each of the 5,707 preference shares were validly attached thereto, the plaintiff was justified in suing in a representative capacity, eg, in regard to the loans made to the trustees, notwithstanding that (in the absence of the special voting rights) these loans were matters which could be validated by a majority at a general meeting of members of the company, because, if the special voting rights had been valid, the majority of votes at such a meeting must have lain with the directors and their supporters (see p 430, letter *e*, post).

**Notes** As to the exercise by directors of the power of issuing shares, see 6 *Halsbury's Laws* (3rd Edn) 295, para 598, note *(f)*; and for cases on the subject, see 9 *Digest* (Repl) 301, 302, *1896–1902*. As to the court's power to interfere where shares are being issued to secure a majority of votes, see 6 *Halsbury's Laws*

(3rd Edn) 420, para 811, note *(u)*.

**Cases referred to in judgment** *Foss v Harbottle* (1843), 2 Hare, 461, 67 ER 189, 9 *Digest* (Repl) 662, *4382*.

*Fraser v Whalley, Gartside v Whalley* (1864), 2 Hem & M 10, *11 LT 175*, 71 ER 361, 9 *Digest* (Repl) 662, *4383*.

*Piercy v S Mills & Co Ltd* *[1918–19] All ER Rep 313*, *[1920] 1 Ch 77*, 88 LJCh 509, *122 LT 20*, 9 *Digest* (Repl) 302, *1901*.

*Punt v Symons & Co Ltd* *[1903] 2 Ch 506*, 72 LJCh 768, *89 LT 525*, 9 *Digest* (Repl) 302, *1900*.

*Royal British Bank v Turquand* *[1843–60] All ER Rep 435*, (1856), 6 E & B 327, 25 LJQB 317, 2 Jur NS 663, 119 ER 886, 9 *Digest* (Repl) 660, *4374*.

*Trevor v Whitworth* *[1886–90] All ER Rep 46*, (1887), *12 App Cas 409*, 57 LJCh 28, *57 LT 457*, 9 *Digest* (Repl) 650, *4321*.

**Actions** These were two actions commenced by writs issued on 15 and 20 May 1963, and consolidated by order of Ungoed-Thomas J dated 21 May 1963, in which Samuel Rolleston Hogg, suing on behalf of himself and all other members of

*[\*422]*

the defendant company except the individual defendants was the plaintiff, and Cramphorn Ltd, John Frederick Cramphorn, John Carrington Sheldrake and John Gledhill Cottam were the defendants. The plaintiff sought declarations (i) that a trust deed dated 18 April 1963 and made between the defendant company and the three individual defendants as trustees for constituting a scheme for the benefit of employees of the defendant company pursuant to s 54(1)*(b)* of the Companies Act, 1948, was void, (ii) that an issue of 5,707 preference shares of the company to the individual defendants as such trustees was void; and (iii) that a sum of £28,293 made available by the company to the individual defendants as such trustees between 18 April and 13 May 1963, or the property representing that sum was held in trust for the company. The facts are stated in the judgment.

*R B S Instone* for the plaintiff.

*E I Goulding QC* and *R A K Wright* for the defendants.
*Cur adv vult*

18 October 1963. The following judgment was delivered.

**BUCKLEY J**

read the following judgment. The plaintiff in these consolidated actions, who is the holder of fifty ordinary shares of the defendant company, Cramphorn Ltd, sues on behalf of himself and all other members of the company except the three personal defendants. The defendants are the company and three gentlemen who are trustees of a trust deed to which I shall refer. They are John Frederick Cramphorn (whom I will refer to as Colonel Cramphorn), who is the chairman and managing director of the company, John Carrington Sheldrake, a partner in the firm of accountants who are the company's auditors, and John Gledhill Cottam, an employee of the company. The plaintiff seeks a declaration that the trust deed is void, that the issue of 5,707 preference shares of the company to the personal defendants as trustees of that deed is void and that a sum of £28,293 lent by the company to them as such trustees or the property now representing that sum is held in trust for that company.

The company was incorporated in 1896 to acquire and carry on two businesses of corn and seed merchants, theretofore carried on respectively by Colonel Cramphorn's father and his great-uncle at Brentwood and Chelmsford. Although it is not technically a private company, its shares are not quoted on any stock exchange. Members of Mr Cramphorn's family retain a substantial interest in the company. The business has prospered and grown and is now carried on through about sixty retail branches in East Anglia and the south-east of England. Immediately before the events with which I am concerned, the authorised capital of the company was £136,000, divided into ninety-six thousand five per cent cumulative preference shares of £1 each, of which 90,293 were issued and 5,707 were unissued, and forty-thousand ordinary shares of £1, of which 35,888 were issued and the remainder were unissued. The financial position of the company was strong: its trade was profitable, but the earning yield on the amount of capital employed in the business was not very high. The company's assets included freehold properties which were shown in the company's balance sheet at cost at about £207,000, but were in fact worth considerably more. The directors, their relations and friends, held about thirty-seven thousand of the 126,181 issued shares. Every share, whether preference or ordinary, carried one vote at the meetings of the company.

On 28 March 1963, a Mr Baxter made an oral proposition to Colonel Cramphorn, which was confirmed in writing the following day, to buy the whole of the issued share capital of the company at 25s for each preference share and 50s for each ordinary share. Mr Baxter had no experience of the particular kind of business carried on by the company. He gave Col Cramphorn an assurance that, if he acquired control of

the company, it would be his intention to expand its business, but it appeared to Col Cramphorn that there would be a change in the nature of the company's trading. Col Cramphorn formed the view that

*[\*423]*

the offer would unsettle the company's staff. Col Cramphorn reported the offer to the board on 3 April. The board took legal advice, and a scheme was devised and put into operation which has resulted in the present proceedings.

The scheme took this form. The company entered into a trust deed, the other parties to which were the three personal defendants, for the benefit of employees. The trustees applied for allotment of the 5,707 unissued preference shares on condition that there should be attached to them ten votes per share on a poll. The board allotted these shares to the trustees at par with such special voting rights. The board made a loan to the trustees out of the company's funds of £5,707 free of interest and not to be repaid until the termination of the scheme contained in the trust deed. The trustees utilised this loan to pay for the shares. The effect of these transactions was to increase the existing voting rights to a total of 183,251 votes. As I have said, the directors and their supporters already controlled about thirty-seven thousand votes. If there are added to these the 57,070 votes conferred or purported to be conferred on the trustees, the directors could rely on the support of about ninety-four thousand votes or more than half of the total. These steps were taken at a board meeting held on 18 April and together constituted a scheme avowedly formulated to meet the situation created by Mr Baxter's offer. The trust deed provided that the trustees should hold the shares on trust to apportion any dividends received thereon amongst employees of the company as the board should direct or, in default of such direction, as the trustees should think fit. It further provided that the trustees should exercise all voting and other rights conferred on them in respect of the shares in accordance with the directions of a majority of them, and that the scheme embodied in the deed should determine at the expiration of one year after notice given by the company, or on the winding-up of the company or at the end of a stated perpetuity period, whereupon the trustees should sell the shares, repay the £5,707 to the company and distribute any balance among employees of the company.

On 18 April 1963, the company's solicitors informed Mr Baxter that the price which he proposed for the ordinary shares was quite inadequate and that the directors did not propose to place his offer before the shareholders. The £5,707 was treated as provided out of a reserve fund of £34,000 described in the company's balance sheet as Employees' Benevolent and Pension Fund. Although so described, this fund was the absolute property of the company. On 14 May 1963, the board resolved to advance £28,293, the balance of this

reserve, to the trustees to enable them to buy preference shares to be held on the trusts of the trust deed at 25s a share, being the price offered by Mr Baxter. This loan also was not to bear interest and was to be repayable on the determination of the scheme embodied in the deed. On or about 9 May 1963, the plaintiff, who was an associate of Mr Baxter, became the registered holder of fifty ordinary shares, of which it appears from the correspondence that he and Mr Baxter were the joint beneficial owners. On 13 May the board circularised all the members of the company who held preference shares only, and some other large holders of preference shares telling them of Mr Baxter's offer. The letter goes on:

> "The possibility that an offer might be made led your directors to consider in particular the position of the company's staff, upon whose loyalty and enterprise the company is very dependent for its success and development. They concluded that an offer such as that to which reference has been made, would have an unsettling effect on the staff and accordingly it was thought they should have a sizeable voice in the affairs of the company. The company had over the years created an 'Employees' Benevolent and Pension Fund' (later called 'The Fund') and the directors decided to use this to establish a scheme whereby some of the company's shares could be acquired for the benefit of the full-time members of the company's staff. Such a scheme has been set up by an appropriate trust deed … "

[*424]

The letter then names the trustees and recounts the allotment and payment up of the 5,707 shares, leaving a balance of £28,293 in the fund and proceeds:

> "This balance the company proposes should be used to acquire further preference shares of the company at 25s. a share."

The letter goes on to invite the recipient to sell his preference shares to the trustees.

On 15 May 1963, a circular letter in similar terms was sent to the rest of the company's shareholders. On that day the plaintiff, having become aware of the issue of the 5,707 shares and of the special voting rights attached to them, issued his first writ, claiming that the board's attempt to attach to each of the 5,707 preference shares the right on a poll to ten votes was ultra vires and void and also that the allotment of those shares to the trustees was ultra vires and void. On 20 May 1963, the plaintiff, having then become aware of the contents of the circular letters and so of the existence of the trust deed, issued his second writ, claiming that the company's execution of the trust deed was ultra vires and void. The plaintiff launched a motion in each action. Both motions came before Ungoed-Thomas J on 21 May, when he ordered the actions to be consolidated, and, on certain undertakings being given, made no further order on the motions, apart from giving procedural directions. Both motions were stood

over to the trial of the consolidated action, the costs in each case being made costs in the cause. Mr Baxter's offer was formally made to the shareholders by means of a circular letter sent to all the shareholders by Gatehouse Securities Ltd on 22 May 1963. It was conditional on acceptances being received in respect of ninety per cent in nominal value of each class of shares by 14 June 1963. In the event, this condition was never satisfied and the offer has lapsed.

It is conceded that the 5,707 shares were part of 45,500 preference shares created on 11 November 1947, on an increase in the company's capital. It will, I think, be convenient for me to deal first with two short points which arose on the meaning and effect of the resolution for that increase of capital and of the company's articles of association.

By the memorandum of association of the company, its original capital was divided into preference, ordinary and deferred shares and the rights of each class to participate in distributed profits and surplus assets were defined, but nothing was said as to voting rights. The class of deferred shares has since disappeared. The relevant articles are as follows:

> "Article No. 10: The shares shall be under the control of the directors, who may allot or otherwise dispose of the same to such persons, on such terms and conditions, and at such times as the directors think fit. Article 12: The company in general meeting may from time to time increase the capital by the creation of new shares of such amount as may be deemed expedient (subject to the provisions of the memorandum of association and of the articles). Article No. 13: Subject as aforesaid, the new shares shall be issued upon such terms and conditions, and with such rights and privileges annexed thereto as the general meeting resolving upon the creation thereof shall direct, and if no direction be given, as the directors determine; and in particular such shares and any shares forming part of the original capital of the company, may be issued with a preferential or qualified right to dividends and in the distribution of the assets of the company and with a special or without any right of voting (subject to the provisions of the memorandum of association and of the articles). Article No. 14: The directors may, before the issue of any new shares, determine that the same, or any of them, shall be offered in the first instance to all the then members, or to the members and holders of debentures or debentures stock of the company, in proportion to the amount of the capital held or advanced by them, or make any other provisions as to the issue and allotment of new shares, but in default of any such determination, and as far as the same shall

[*425]

not extend, the new shares may be allotted or otherwise disposed of by the directors to such persons, on such terms and conditions, and at such times as the directors may think fit. Article No. 15: Any capital raised by the

creation of the new shares shall, subject as aforesaid, be considered part of the original capital, and shall accordingly be subject to the provisions herein contained with reference to the payment of calls and instalments, transfer and transmission, forfeiture, lien, surrender and otherwise. Article No. 75: On a show of hands, every member shall have one vote only. In case of a poll, every member shall have one vote for every share (whether preference, ordinary or deferred) held by him."

The resolution of 11 November 1947, was in the following terms:

"that the capital of the company be increased from £86,030 (divided into 50,500 preference shares, and 35,500 ordinary shares of £1 each) to £136,030 by the creation of 45,500 preference shares of £1 each to rank equally with the existing preference shares and 4,500 ordinary shares of £1 each to rank equally with the existing ordinary shares."

Counsel for the plaintiff has contended that by using the expression "to rank equally with the existing preference shares", the company in general meeting attached to the new preference shares created by that resolution the same rights in all respects, including voting, as were attached to the then existing preference shares. He says that the company in general meeting have so directed, the directors had no power under art 13 to determine otherwise. In my judgment, however, the words, "to rank equally with", are not appropriate to refer to voting rights. In such a context, I think that the word "rank" suggests considerations of preference or priority or of the absence of preference or priority and, particularly, in respect of such matters as participation in profits and surplus assets. The circumstance that one share carries the right to more votes than another does not involve any consideration of priority. Every vote is equally potent. I consequently am unable to accept this argument of counsel for the plaintiff.

Counsel next submitted that art 75 made the directors incompetent to attach to the 5,707 shares the right to ten votes each on a poll. On the other hand, counsel for the defendants has submitted that this would make the reference to special voting rights in art 13 nugatory and that, consequently, art 75 must be construed in a qualified way, so as to make its operation subject to any special rights attached to particular shares. In effect, counsel for the defendants asks me to read into art 75, by implication, some such words as I do find in art 126 dealing with dividends, viz, "subject to the rights of members entitled to shares issued upon special conditions". In fact, however, art 75, in contra-distinction to art 126, contains no such words, and art 13 does contain the words "Subject to the provisions … of the articles". There is thus no escaping the conclusion that art 13 must be read subject to art 75, but, of course, subject to the latter article as properly interpreted. It is, in these circumstances, difficult, to say the least, to find in art 13 valid grounds for modifying what would

otherwise be the clear meaning of art 75, and it is, in my judgment, impossible to do so, if, when art 75 is properly interpreted it is found that the words "with a special or without any right of voting" in art 13 are not entirely ineffectual. In my judgment the words "every member" in art 75 cannot be read with absolute literalness, for art 80 in clear terms disfranchises any member who is in arrears in respect of calls on his shares. Article 75 must be construed as referring only to members entitled to be present and to vote. It follows that, without conflicting with art 75, the company could issue shares having only a qualified right of voting or no right to vote. It is, therefore, erroneous to say that art 75, construed in this way, renders the reference to voting rights in art 13 nugatory. It follows, I think, that any special right of voting attached to any share under art 13, must be one that is consistent

*[\*426]*

with art 75 and so cannot confer more than one vote in respect of that share. I thus reach the conclusion that the directors have no power to attach to the 5,707 preference shares the special voting rights that they purported to attach to them.

It does not, however, in my opinion follow from this that the plaintiff is entitled on this ground to have the allotment of the 5,707 shares set aside. It may well be that the trustees whose application was conditional on the shares carrying ten votes each on a poll could do so, but I think that they must be entitled to waive non-compliance with this condition and to elect, if they choose, to retain these shares without special voting rights attached. The matter rests, in my judgment, between the trustees and the company. The plaintiff, in my opinion, whether suing on his own behalf or in a representative capacity, is not competent to procure this allotment to be set aside.

I now turn to what has been the main matter of debate in this case, which is whether the allotment of the 5,707 shares was an improper use by the directors of their discretionary and fiduciary power under art 10, to decide to whom these unissued shares should be allotted. Counsel for the plaintiff has submitted that the allotment was made with the primary object of preventing Mr Baxter from obtaining control of the company and ousting the then existing board of directors and that the allotment was accordingly a breach of the directors' fiduciary duties and should be set aside on the authority of *Piercy v S Mills & Co Ltd*. In this connexion, I should, I think, ignore the fact that, as I have held, the directors were incompetent to attach to the shares the special voting rights which they purported to attach to them.

It is common ground that the scheme of which this allotment formed part was formulated to meet the threat, as the directors regarded it, of Mr Baxter's offer. The trust deed would not have come into existence, nor would the 5,707 shares have been issued as they were, but for Mr Baxter's bid and the threat that it constituted

to the established management of the company. It is also common ground that the directors were not actuated by any unworthy motives of personal advantage, but acted as they did in an honest belief that they were doing what was for the good of the company. Their honour is not in the least impugned, but it is said that the means which they adopted to attain their end were such as they could not properly adopt. I am satisfied that Mr Baxter's offer, when it became known to the company's staff, had an unsettling effect on them. I am also satisfied that the directors and the trustees of the trust deed genuinely considered that to give the staff through the trustees a sizeable, though indirect, voice in the affairs of the company would benefit both the staff and the company. I am sure that Col Cramphorn and also probably his fellow directors firmly believed that to keep the management of the company's affairs in the hands of the existing board would be more advantageous to the shareholders, the company's staff and its customers than if it were committed to a board selected by Mr Baxter. The steps which the board took were intended not only to ensure that, if Mr Baxter succeeded in obtaining a shareholding which, as maters stood, would have been a controlling shareholding, he should not secure control of the company but, also, and perhaps primarily, to discourage Mr Baxter from proceeding with his bid at all.

Counsel for the defendants has submitted that a trading company and its board of directors are fully entitled to take an interest in who becomes a member of the company and to arrange or influence matters in such a way that a particular person shall not become a member. In the present case, he says, that the board was entitled to try to kill Mr Baxter's bid, if in doing so they acted in good faith, having regard to what they believed to be the interests of the company, and if the means they employed were lawful. The establishment of an employees' trust was, he says, intra vires the company and intra vires the board under the

[*427]

general delegation of powers to them, and the loan made by the company to the trustees did not in any way conflict with s 54 of the Companies Act, 1948. Counsel for the plaintiff does not dispute the right and power of the company or of the board on a company's behalf to establish in proper circumstances a trust of shares in the company for the benefit of employees, and concedes that the scheme adopted by the board involved no contravention of s 54. Counsel for the defendants says that this scheme was one which conferred a genuine benefit on the employees, in that it conferred on their trustees an influential voice on the counsels of the company, as well as providing some perhaps rather modest financial benefit for employees. There is no doubt that the staff thoroughly appreciated and approved the board's action in establishing the trust. Counsel for the defendants says that the scheme

was rightly regarded by the board as being in the interests of the shareholders both on the ground that it tended to cement the loyalty of the staff and on the ground that it would be likely to prevent the displacement of an experienced management by an inexperienced one. On these grounds he contends that the establishment of the trust fund, the issue of the 5,707 shares with special voting rights and the making of the interest-free loans to the trustees were justified as reasonably incidental to the favourable conduct of the company's business, and so intra vires not only the company, but also the board.

Accepting, as I do, that the board acted in good faith and that they believed that the establishment of a trust would benefit the company and that avoidance of the acquisition of control by Mr Baxter would also benefit the company, I must still remember that an essential element of the scheme, and indeed its primary purpose, was to ensure control of the company by the directors and those whom they could confidently regard as their supporters. Was such a manipulation of the voting position a legitimate act on the part of the directors? Somewhat similar questions have been considered in the well-known cases of *Punt v Symons & Co Ltd* and *Piercy v S Mills & Co Ltd*. In *Punt v Symons* directors had issued shares with the object of creating a sufficient majority to enable them to pass a special resolution depriving other shareholders of special rights conferred on them by the company's articles. In *Piercy v Mills* directors had issued shares with the object of creating a sufficient majority to enable them to resist the election of three additional directors, whose appointment would have put the two existing directors in a minority on the board. In each case the directors were held to have acted improperly. In the earlier case, Byrne J said ([1903] 2 Ch at pp 515, 516):

> "A power of the kind exercised by the directors in this case is one which must be exercised for the benefit of the company: primarily it is given them for the purpose of enabling them to raise capital when required for the purposes of the company. There may be occasions when the directors may fairly and properly issue shares in the case of a company constituted like the present for other reasons. For instance, it would not be at all an unreasonable thing to create a sufficient number of shareholders to enable statutory powers to be exercised; but when I find a limited issue of shares to persons who are obviously meant and intended to secure the necessary statutory majority in a particular interest, I do not think that is a fair and bona fide exercise of the power."

In the later case, Peterson J after citing *Fraser v Whalley, Gartside v Whalley* and *Punt v Symons*, said ([1918–19] All ER Rep at p 316; [1920] 1 Ch at pp 84, 85):

> "The basis of the decisions in these two cases I have referred to is that directors are not entitled to use their

powers of issuing shares merely for the purpose of maintaining their control or the control of themselves and their

*[\*428]*

friends over the affairs of the company, or merely for the purpose of defeating the wishes of the existing majority of shareholders. That is, however, exactly what has happened in the present case. With the merits of the dispute as between the directors and the plaintiff I have no concern whatever. The plaintiff and his friends held a majority of the shares of the company, and they were entitled, so long as that majority remained, to have their views prevail in accordance with the regulations of the company; and it was not, in my opinion, open to the directors, for the purpose of converting a minority in voting power into a voting majority, and solely for the purpose of defeating the wishes of the existing majority, to issue the shares which are in dispute in the present action."

With those observations I respectfully agree. Unless a majority in a company is acting oppressively towards the minority, this court should not and will not itself interfere with the exercise by the majority of its constitutional rights or embark on an enquiry into the respective merits of the views held or policies favoured by the majority and the minority. Nor will this court permit directors to exercise powers, which have been delegated to them by the company in circumstances which put the directors in a fiduciary position when exercising those powers, in such a way as to interfere with the exercise by the majority of its constitutional rights, and in a case of this kind also, in my judgment, the court should not investigate the rival merits of the views or policies of the parties. Thus, in *Fraser v Whalley, Gartside v Whalley*, Sir William Page Wood, V-C said ((1864), 2 Hem & M at p 29):

"I say nothing on the question whether the policy advocated by the directors, or that which I am told is to be pursued by Savin, is the more for the interest of the company",

and in *Piercy v Mills* ([1918–19] All ER Rep at p 316; [1920] 1 Ch at p 84), Peterson J said that he had no concern whatever with the merits of the dispute. It is not, in my judgment, open to the directors in such a case to say, "We genuinely believe that what we seek to prevent the majority from doing will harm the company and, therefore our act in arming ourselves or our party with sufficient shares to outvote the majority is a conscientious exercise of our powers under the articles, which should not be interfered with." Such a belief, even if well-founded, would be irrelevant. A majority of shareholders in general meeting is entitled to pursue what course it chooses within the company's powers, however wrong-headed it may appear to others, provided the majority do not unfairly oppress other members of the company. These considerations lead

me to the conclusion that the issue of the 5,707 shares with the special voting rights which the directors purported to attach to them could not be justified by the view that the directors genuinely believed that it would benefit the company if they could command a majority of the votes in general meetings. The fact that, as I have held, the directors were mistaken in thinking that they could attach to these shares more than one vote each, is, I think, irrelevant. The power to issue the shares was a fiduciary power and if, as I think, it was exercised for an improper motive, the issue of these shares is liable to be set aside.

Counsel for the defendants, however, contends that the present case is distinguishable from those which I have cited in an important respect. In both *Punt v Symons* and *Piercy v Mills*, the majority and minority were already arrayed for battle on a specific issue when the latter attempted to create reinforcements by issuing additional shares. If the question whether that issue should be allowed to stand had been referred to a general meeting at which the newly issued shares were excluded from voting, the resulting answer would in each case have been a negative one. Such a meeting would have served no

*[\*429]*

useful purpose. In the present case, on the other hand, no battle had been joined when the 5,707 shares were issued; the directors were merely fearful that Mr Baxter would acquire control and that in any ensuing battle they would find themselves outnumbered. In the event, as I have said, Mr Baxter's offer lapsed. One cannot say what the result would have been if the directors had sought the approval of a general meeting before making the issue, and it is very possible that if the issue of the shares were now submitted to the company for approval it would be approved.

Counsel for the plaintiff says, no doubt rightly, that the company in general meeting could not by ordinary resolution control the directors in the exercise of the powers under art 10. He goes on to say, I think with less justification, that what they could not ordain a majority could not ratify. There is, however, a great difference between controlling the directors' exercise of a power vested in them and approving a proposed exercise by the directors of such a power, especially where the proposed exercise of the power is of a kind which might be assailed if it had not the manifest approval of the majority. Had the majority of the company in general meeting approved the issue of the 5,707 shares before it was made, even with the purported special voting rights attached (assuming that such rights could have been so attached conformably with the articles), I do not think that any member could have complained of the issue being made; for in these circumstances, the criticism that the directors were, by the issue of the shares, attempting to deprive the majority of their constitutional rights would have ceased to have any

force. It follows, in my opinion, that a majority in a general meeting of the company at which no votes were cast in respect of the 5,707 shares could ratify the issue of those shares. Before setting the allotment and issue of the 5,707 shares aside, therefore, I propose to allow the company an opportunity to decide in general meeting whether it approves or disapproves of the issue of these shares to the trustees. Counsel for the defendants will undertake, on behalf of the trustees, not to vote at such a meeting in respect of the 5,707 shares. The execution of the trust deed and the allotment of the 5,707 shares were, as I have said, integral parts of one scheme, of which the degree of control assured to the directors through the trustees by the creation of the 57,070 votes purported to be attached to these shares was the principal objective. The execution of the deed, is accordingly, in my judgment, tainted with the same vice, if it be a vice, as the issue of the shares. If the issue of the shares is to be set aside, so, I think, must the deed: if the issue of the shares is to stand, so may the deed.

What then of the other preference shares bought by the trustees? The purchase of these shares was not (on the assumption that the special voting rights were effectually attached to the 5,707 shares) necessary to preserve for the board the support of a majority of the votes capable of being cast in general meeting. Nevertheless, these purchases in my judgment, formed a further integral part—although a less important one than the issue of the 5,707 shares—of the same scheme, for I cannot doubt that the reasons for procuring the trustees to offer to buy these shares at 25s each were to forestall criticism by preference shareholders of the directors having burked an opportunity for them to dispose of their preference shares to Mr Baxter at the admittedly advantageous price of 25s a share and to obtain for the trustees the votes attached to these shares as a further means of procuring for the board the support of a controlling interest in the company. I am led, therefore, to the conclusion that the loan of £28,293 to the trustees was tainted with the same vice as the rest of the scheme, that is to say, it was an integral part of a scheme for securing for the directors the support of a controlling body of votes. The loan was not made with the single-minded purpose, or even with the primary purpose, of benefiting the company otherwise than by securing that control of the directors or facilitating their securing that control. Accordingly, although I do not question that the loan

[*430]

was made with honourable intentions, the making of it was not, in my judgment, a conscientious exercise by the directors of their powers to make loans of the company's funds for the purposes of the company's business or purposes reasonably incidental thereto. The loan was, consequently, in my judgment, ultra vires the

directors and invalid unless sanctioned or ratified by the company in general meeting.

Counsel for the defendants has contended that in accordance with the principles discussed in *Foss v Harbottle*, the present action in which the plaintiff is suing on behalf of himself and all the shareholders of the company other than the personal defendants is misconceived except so far as the issue of the 5,707 shares is concerned, because he says that the establishment of the trust and the loans to the trustees, if objectionable on any ground, could, nevertheless, be validated by a majority in a general meeting of the company. I think, however, that it is relevant in this connexion to remember that the defendants have throughout maintained that the right to ten votes per share was validly attached to the 5,707 shares. Had this, contrary to my judgment, been the true view, it is clear that at any general meeting the directors and those who support them would, in consequence of the very transactions complained of by the plaintiff, have been in a position to outvote the plaintiff and the other shareholders who would or might have been concerned to complain that the scheme improperly deprived them of their position as a majority in the company. As all the transactions to which I have referred, including the interest-free loans to the trustees, were in my judgment, integral parts of the scheme of which the allotment of the 5,707 shares with special voting rights formed part, the primary object of which was to deprive those members who were not recognised supporters of the board, of their position as a majority in the company, I am of the opinion that this is a case in which the plaintiff was justified in suing in a representative capacity even in respect of that part of the case which relates to alleged improper dispositions by the directors of moneys belonging to the company in respect of which, prima facie, the company would be the proper plaintiff. If the company in general meeting elects to ratify what the board has done, there will be no objection to the trustees continuing to hold the shares which they have bought on the trusts of the trust deed. Otherwise, the loans to the trustees must be treated as having been made by the directors in excess of their powers, and, since the trustees cannot, I think, in this case rely on the doctrine of *Royal British Bank v Turquand*, the moneys would fall to be treated as having always remained the property of the company held by the trustees on a resulting trust for the company. On this footing, the moneys could not properly be applied in the purchase of the company's own shares (see *Trevor v Whitworth)* and it would be necessary for the trustees to dispose of all the shares which they bought from preference shareholders and to account to the company for the proceeds.

In these circumstances I propose to stand the action over for a specified period to enable the directors, if so advised, to convene a general meeting[b] to

b Shareholders in general meeting, convened pursuant to this judgment on 21 November 1963, ratified and approved (a) the establishment by a deed dated 18 April 1963, of a trust establishing a scheme for the acquisition of shares of the company to be held by the trustees for the benefit of its employees; (b) the allotment by the company to the trustees of such deed for cash at par of 5,707 five per cent cumulative preference shares of £1 each on the footing that the holders thereof were entitled to one vote per share on a poll at any general meeting and otherwise ranking pari passu with the existing preference shares in the capital of te company; and (c) the advance by the company to the trustees of an aggregate of £34,000 for the acquisition (inter alia) by allotment of such 5,707 preference shares and the purchase of 18,366 previously existing preference shares in the capital of the company. The shareholders by resolution further ratified and adopted every act and deed done by the directors of the company or the trustees in connexion with these matters

*[*431]*

consider such resolutions as may be submitted to it. I will consider what order I should make in the light of the proceedings at any such meeting. Counsel for the defendants will undertake that at any such meeting the trustees will not vote in respect of the 5,707 shares, but I do not think that there is any need for me to disfranchise any other shares from voting at the meeting.
Action stood over accordingly.

Solicitors: *Richards, Butler & Co* (for the plaintiff); *Stilgoes* (for the defendants).

Jenifer Sandell Barrister.

---

**End of Document**

# EXHIBIT 1-C

# *Peskin and another v Anderson and others [2001] 1 BCLC 372*

COURT OF APPEAL, CIVIL DIVISION

SIMON BROWN, MUMMERY AND LATHAM LJJ

20, 21 NOVEMBER, 14 DECEMBER 2000

**Director — Fiduciary duty — Club owned by company — Club members were shareholders of company and committee members were directors — Company sold valuable assets and proceeds were distributed to club members — Club members who had resigned claimed that failure to inform them of proposed sale was breach of contract or breach of duty — Whether committee members in breach of club rules — Whether directors of company in breach of fiduciary duty.**

RACL owned the RAC Club and a motoring services business, RACMS. Members of the club were shareholders in RACL. In 1998 RACMS was sold and members of the club received over £34,000 each. The claimants were former members of the club who ceased to be members in the three years before RACMS was sold. On ceasing to be members of the club the claimants ceased to be shareholders in RACL, by virtue of the articles of association of the company, and therefore did not share in the proceeds of sale of RACMS. Under rule 56 of the club rules a member who resigned and reapplied for membership within three years might, if the committee so decided, be re-elected to membership without having to be proposed and seconded under the rules. The claimants took proceedings alleging that once the committee began to reconsider the disposal of RACMS it should have informed former members. The failure to do so was in breach of the contract contained in the club rules, in particular rule 19 which required the committee to report annually on 'the work done by the club'. The claimants relied on letters sent to them after resigning which informed them in accordance with rule 56 that if they wished to rejoin within three years they might do so without undergoing the formalities of election procedure. The claimants applied to amend the statement of claim to add further claimants and to claim against the defendant committee members in their alternative capacity as directors of RACL on the basis that they had a duty as directors to inform former members of the club of the proposed sale of RACMS. The defendants applied to strike out the statement of claim and for the summary determination of points of law under CPR, Pt 24. Neuberger J dismissed the claims on the grounds inter alia that the directors did not on the facts owe any fiduciary duties to members who had ceased to be members of their own choice. The members appealed.

**Held** – Fiduciary duties owed by directors to shareholders only arise if there is a special factual relationship between the directors and the shareholders in the particular case capable of generating fiduciary obligations, such as a duty of disclosure of material facts, or an obligation to use confidential information and valuable commercial opportunities for the benefit of shareholders and not to prefer and promote the directors own interests at the expense of

*[\*373]*

shareholders. In this case there was no distribution contrary to the prohibitions in the memorandums before those prohibitions were deleted under the schemes of arrangement. It was not ultra vires for the directors to authorise expenditure of the company's money on investigating proposals to sell RACMS, or proposals to demutualise the company and distribute assets to members and, for that purpose, to amend the memorandums. Even a provision purporting to entrench the prohibition in the memorandum could lawfully be removed by a

scheme of arrangement. The removal of the prohibition was plainly incidental to the lawful purpose of selling the motoring services business. There was no wrongdoing and no duty to disclose. The judge was right that there were no special circumstances such as to impose a duty on the directors to disclose to the claimants the proposals and plans for demutualisation generally. There was insufficient evidence that the directors were acting wrongfully by benefiting personally from the demutualisation and there was therefore no duty to disclose. In any event the duty would be to make disclosure to the company. Further any breach in relation to personal benefits would not have been causative in relation to claimants' decisions to cease to be members.

**Cases referred to in judgments**

Allen v Hyatt *(1914) 30 TLR 444, PC.*

Brunninghausen v Glavanics *(1999) 46 NSWLR 538, NSW CA.*

Chez Nico *(*Restaurants*) Ltd,* Re *[1992] BCLC 192.*

Coleman v Myers *[1977] 2 NZLR 225, NZ CA.*

Company*,* Re a *(*Case No 005136 of 1986*) [1987] BCLC 82.*

Howard Smith Ltd v Ampol Petroleum Ltd *[1974] 1 All ER 1126, [1974] AC 821, [1974] 2 WLR 689.*

Percival v Wright *[1902] 2 Ch 421.*

RAC Motoring Services Ltd*,* Re *[2000] 1 BCLC 307.*

Stein v Blake *(*No 2*) [1998] 1 BCLC 573, [1998] 1 All ER 724, CA.*

**Appeal**

Former members of the Royal Automobile Club appealed against the decision of Neuberger J of 7 December 1999 in which he refused permission to amend a statement of claim against the respondents which alleged a breach of fiduciary duty owed by the respondents to the appellants in respect of the demutualisation of the Royal Automobile Club Ltd.

Geoffrey Vos QC *and* Daniel Lightman *(instructed by* Class Law*) for the appellants.*

Lord Grabiner QC *and* Craig Orr *(instructed by* Slaughter and May*) for the respondents.*

*Cur adv vult*

14 December 2000. The following judgments were delivered.

**MUMMERY LJ**

**(**giving the first judgment at the invitation of Simon Brown LJ).

**[1]** This is an appeal from the order of Neuberger J on 7 December 1999 under CPR Pt 24. He summarily dismissed claims for damages for breach of duty brought (or intended to be brought) by about 355 former full members

*[*374]*

of the Royal Automobile Club (the club) against the committee of the club (the committee) and against its holding company. His judgment is now reported in *[2000] 2 BCLC 1.*

**[2]** He refused permission to amend the statement of claim dated 21 July 1998. He refused permission to appeal, which was granted by a single Lord Justice on 19 April 2000.

**[3]** The dispute arises out of the fact that the claimants did not obtain any benefit from the demutualisation of the club. That took place after their membership of the club (and of its holding company) had ceased, either by their retirement from membership or by them allowing their membership to lapse, during the period from 9 July 1995 to 28 March 1998. The substantial sums (£34,161 each) distributed to those who were members of the club at 8 July 1998 stemmed from the sale in mid-1999 of the valuable motoring services business associated with the club and its holding company.

**[4]** It is common ground that the relevant question is whether the claims have a real prospect of succeeding. If they do not, then the judge was right to dismiss them at this stage. If they do, then they should be allowed to proceed to trial in the usual way.

**The club, the companies and the members**

**[5]** The club was a proprietary club. It was not a members' club. It was the property of its holding company, The Royal Automobile Club Ltd (RACL), which was incorporated in 1897 as a company limited by guarantee.

**[6]** The full members of the club were members of RACL. The board of directors of RACL for the time being constituted the committee. The committee was vested with the entire management of the club in accordance with the rules of the club. The rules provided for the submission of an annual report by the committee to the annual general meeting under r 19 and for the election of members. Membership was from year to year ending on 31 December in each year. Subscriptions were due and payable on 1 January in each year. Membership ceased for non-payment of subscriptions. Members were permitted to resign in accordance with a notice procedure in r 56. If a member resigned and reapplied for membership within three years, he might be re-elected without being proposed and seconded, if the committee so decided.

**[7]** RAC Motoring Services (RACMS), which operated the motoring services business, was also owned by RACL. So the full members of the club had an indirect interest in it.

**[8]** The memorandum of association of RACL (the memorandum) contained provisions at the heart of this dispute between the former members and the committee. The objects of RACL stated in clause 3 of the memorandum included:

> '(a) To establish, maintain and conduct a club for the encouragement and development in Great Britain of the auto-motor vehicle and other allied industries, and for the accommodation of Members of the Company and their friends, and to provide a club-house or club-rooms, and other conveniences, and generally to afford to Members and their

*[\*375]*

> friends all usual advantages, conveniences, and accommodation of a social club and centre of information and advice on all matters pertaining to auto-motor vehicles.
>
> ... (m) To sell or dispose of the undertaking of the Company, or any part thereof, for such consideration as the Company may think fit, and in particular for shares, debentures, or securities of any other company.
>
> ... (p) To do all such other things as are incidental or conducive to the attainment of the above objects, or any of them ...'

Clause 4 provided that:

> 'The income and property of the Company, whensoever derived, shall be applied solely towards the promotion of the objects of the Company as set forth in this Memorandum of Association, and no portion thereof shall be paid or transferred directly or indirectly, by way of dividend, bonus or otherwise howsoever, by way of profit to the Members of the Company. And upon the winding up of the Company, the surplus assets (if any) of the Company or funds arising from the realisation thereof which shall remain, after payment of all the debts and liabilities of the Company, shall not be paid or distributed among Members of the Company, but shall be given, paid or transferred to such public museum or to such institution or

institutions connected with engineering, or with the objects of the Company as the Directors of the Company shall determine at or before the time of dissolution of the Company ...'

Article 67 of the articles of association provided that:

'If upon the winding up or dissolution of the Company there remains ... any property whatsoever, the same shall not be paid to or distributed among the Members of the Company but shall be paid or applied as provided for by the Memorandum of Association.'

Clause 4 of the memorandum of RACMS contained a prohibition on distribution to members in slightly different terms with a further clause 5 which stated that: 'No addition, alteration or amendment shall be made to Clause 4 hereof.'

[9] In mid-1998, after all the claimants had ceased to be members of the club, these prohibitions were deleted from the memorandum of each company by the combined effect of special resolutions and two schemes of arrangement made by the court under *s 425* of the Companies Act 1985 (the 1985 Act).
**The sale of RACMS**_A The negotiations for sale to Cendant_

[10] The defendants' case is that in March 1998 an approach was made to RACL by Cendant Corporation (Cendant) with a view to acquiring the business of RACMS. This is disputed by the claimants. Coincidentally, a proposal to call an EGM, as the first step in a process to demutualise the club and to demerge RACMS, was made in a letter dated 27 March 1998 from the then chairman of RACL, Mr Jeffrey Rose, to all the full members of the

*[\*376]*

club. The board resolved that it would not elect any person as a member of RACL after 27 March 1998. In May 1998 the terms of sale of RACMS to Cendant for £450m were finally agreed.
_B The scheme_

[11] On 4 June 1998 a meeting was held for a scheme of arrangement of RACMS. On 19 June 1998 a meeting was held for a scheme of arrangement of RACL. At that meeting a special resolution was passed for the deletion of clause 4 of the memorandum.

[12] On 8 July Neuberger J approved the schemes of arrangement of RACMS and RACL under s 425 of the 1985 Act: see _Re RAC Motoring Services Ltd [2000] 1 BCLC 307_. The schemes of arrangement became effective on 9 July 1998. They facilitated the transaction for the disposal of RACMS to Cendant and enabled the members to realise their indirect interest in RACMS.

[13] The effect of the scheme was that the members ceased to be members of RACL at the close of business on 8 July 1998. A new company named RAC Acquisitions became the sole member of RACL. RAC Acquisitions itself became a subsidiary of RAC Holdings Ltd (RACH). One share of £1 each in RACH was allotted to each person who was a member of RACL at the close of business on 8 July 1998. That share was later divided into two shares of 50p each.

[14] In addition, each of those former members of RACL became a member of New Club Company Ltd, to which the entire share capital of a company called Club Acquisition Company Ltd (CACL) was transferred. CACL had, while it was a subsidiary of RACL, acquired all the assets of RACL.

[15] The New Club Company, which became and remains the ultimate proprietor of the club, was later renamed 'The Royal Automobile Club Ltd'. RACL was renamed 'RAC Ltd' and was subsequently reregistered as an unlimited company with a share capital, whereupon its name became 'RAC'.
_C The sale to Lex Service_

[16] On 4 February 1999 it was announced that Cendant had decided not to proceed with the purchase in view of conditions imposed by the Secretary of State for Trade and Industry on competition grounds.

[17] On 9 February 1999 Lex Service PLC announced that it was making a bid. On 21 May Lex Service made an

offer to the shareholders in RACH to purchase their shares. That offer became unconditional on 9 July 1999. The sale took place for £437m.

**[18]** The end result was that Lex Service became the holding company of RACH, RACL and RACMS and that the members, in their new capacity as shareholders in RACH, received about £34,000 each direct from Lex Service in respect of the sale of their shares in RACH.
**The proceedings**

**[19]** As the claimants had all ceased to be members of the club and to be members of RACL before the schemes of arrangement took effect, they never became shareholders in RACH. So they never became entitled to receive any part of the benefits flowing from the sale of RACMS to Lex Service.

*[\*377]*

**[20]** The majority of the personal defendants were the directors of RACL and the members of the committee at the material time. Four of the defendants only became directors of RACL and members of the committee on or after 1 January 1998, by which time most, if not all, of the claimants had ceased to be members. RACL is a proposed defendant under its new name RAC Ltd.

**[21]** The claims in the draft amended statement of claim were for damages for breach of fiduciary duties of disclosure and for being wrongfully deprived of the opportunity to make a fully informed choice as to whether or not to continue their membership of the club. The basis of the claims was that the defendants, in breach of a fiduciary duty owed by them to the claimants, failed to disclose to them the plans, discussions, proposals, investigations and instructions relating to the demutualisation of the club and the demerger of RACMS, in particular the expenditure by them of the assets of RACL on the proposed cancellation of clause 4 of the memorandum, so as to permit distributions to be made to the members.

**[22]** It is alleged that, if these matters had been disclosed to the claimants before they retired, they could then have made an informed decision about their membership. They would have decided not to retire. Instead, they would have remained members of the club and shareholders in RACL. They would then have been entitled to benefit from the sale of RACMS to Lex Service in 1999.

**[23]** On 7 December 1999 Neuberger J acceded to an application by the defendants under CPR Pt 24 to dismiss the action on the ground that it had no real prospect of success.
**The judgment of Neuberger J**

**[24]** The claims were unsuccessfully advanced to the judge on a number of grounds which have now been dropped from the draft reamended statement of claim.

**[25]** The judge rejected the claimants' contentions that the Rules of the club, (including r 19 which required the committee to report annually 'on the work done by the club'), represented the terms of a contract between the members of the club or between the members and the committee; that r 19 of the club put the committee under an obligation to inform the members about the developments and all likely future developments affecting the club and the company and its subsidiaries, including discussions, investigations and proposals with a view to selling RACMS; and that r 56 (which conferred a discretion on the committee to re-elect a member who had resigned and reapplied for membership within three years of his resignation) entitled former members to be reinstated automatically.

**[26]** As for the remaining claims based on breach of fiduciary duty as pleaded in the draft amended statement of claim, the judge held that they had no real prospect of succeeding. In outline, his reasoning on this issue was as follows:

1. A director does not owe a general fiduciary duty to shareholders of the company.

2. A director of a company could owe a fiduciary duty to shareholders, if he had, in relation to the sale of shares, special knowledge not possessed by the shareholders.

*[\*378]*

3. There was no fiduciary duty in the circumstances of this case. The judge identified eight factors leading him to that conclusion: (1) the absence of any special facts in the relationship of the directors and the members of RACL, which would make the existence of a fiduciary duty more likely; (2) the claimants had resigned membership of their own motion, uninfluenced by any information provided by, or views expressed by, the directors; (3) no specific transaction was in contemplation at the time of the resignations; (4) the defendants did not, in their capacity as directors of RACL, benefit from the claimants ceasing to be members, either directly (eg they did not acquire shares from the members or encourage them to part with their shares) or indirectly (eg by minimising the number of members, so as to increase their share of the proceeds of sale); (5) the alleged interest of the directors in profits from the sale in the form of 'golden hellos and employment contracts' did not impinge on the issue whether they were under a duty to disclose at an early stage the possibility of selling off the RACMS business; (6) the investigation and promotion of proposals for the demutualisation of RACL (including the incurring of costs in relation to the amendments of the memoranda of RACL and RACMS sanctioned by the court) did not involve the directors in the pursuit of an unauthorised and improper object; (7) it was unreasonable for directors to be put in the sort of position which the claimants' contentions would necessarily involve with regard to the disclosure of contemplated arrangements or transactions best kept confidential; and (8) the claimants' arguments would place directors in the unfortunate position of being 'damned if they do and damned if they don't', if they were put under a duty to disclose to the members a contemplated sale which might, or might not, happen.

**Fiduciary duties – the legal principles**

[27] There was no serious dispute between Mr Vos QC, for the claimants, and Lord Grabiner QC, for the committee and RAC Ltd, about the relevant legal principles governing the fiduciary duties of company directors.

[28] For his part, Mr Vos accepted that the fiduciary duties owed by the directors to RACL do not necessarily extend to the individual members of the club and that, in general, directors do not, solely by virtue of the office of director, owe fiduciary duties to the shareholders, collectively or individually.

[29] According to the headnote in *Percival v Wright* [1902] 2 Ch 421that case decided that:

> 'The directors of a company are not trustees for individual shareholders, and may purchase their shares without disclosing pending negotiations for the sale of the company's undertaking.'

[30] The apparently unqualified width of the ruling has, over the course of the last century, been subjected to increasing judicial, academic and professional critical comment; but few would doubt that, as a general rule, it is important for the well-being of a company (and of the wider commercial community) that directors are not overexposed to the risk of multiple legal actions by dissenting minority shareholders. As in the affairs of society, so in the affairs of companies, rule by litigation is not to be equated with the rule of law.

*[\*379]*

[31] For his part, Lord Grabiner accepted that the fiduciary duties owed by the directors to the company do not necessarily preclude, in special circumstances, the coexistence of additional duties owed by the directors to the shareholders. In such cases individual shareholders may bring a direct action, as distinct from a derivative action, against the directors for breach of fiduciary duty.

[32] A duality of duties may exist. In *Stein v Blake and others* (*No 2*) *[1998] 1 BCLC 573 at 576*, 579, *[1998] 1 All ER 724 at 727*, 729 Millett LJ recognised that there may be special circumstances in which a fiduciary duty is owed by a director to a shareholder personally and in which breach of such a duty has caused loss to him directly (eg by being induced by a director to part with his shares in the company at an undervalue), as distinct from loss sustained by him by a diminution in the value of his shares (eg by reason of the misappropriation by a director of the company's assets), for which he (as distinct from the company) would not have a cause of action against the director personally.

**[33]** The fiduciary duties owed to the company arise from the legal relationship between the directors and the company directed and controlled by them. The fiduciary duties owed to the shareholders do not arise from that legal relationship. They are dependent on establishing a special factual relationship between the directors and the shareholders in the particular case. Events may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of disclosure of material facts to the shareholders, or an obligation to use confidential information and valuable commercial and financial opportunities, which have been acquired by the directors in that office, for the benefit of the shareholders, and not to prefer and promote their own interests at the expense of the shareholders.

**[34]** These duties may arise in special circumstances which replicate the salient features of well-established categories of fiduciary relationships. Fiduciary relationships, such as agency, involve duties of trust, confidence and loyalty. Those duties are, in general, attracted by and attached to a person who undertakes, or who, depending on all the circumstances, is treated as having assumed, responsibility to act on behalf of, or for the benefit of, another person. That other person may have entrusted or, depending on all the circumstances, may be treated as having entrusted, the care of his property, affairs, transactions or interests to him. There are, for example, instances of the directors of a company making direct approaches to, and dealing with, the shareholders in relation to a specific transaction and holding themselves out as agents for them in connection with the acquisition or disposal of shares; or making material representations to them; or failing to make material disclosure to them of insider information in the context of negotiations for a take-over of the company's business; or supplying to them specific information and advice on which they have relied. These events are capable of constituting special circumstances and of generating fiduciary obligations, especially in those cases in which the directors, for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders.

*[\*380]*

**[35]** The court has been referred to the valuable and detailed surveys of the authorities, expounding the special circumstances which justify the imposition of fiduciary duties on directors to individual shareholders, in the judgments of Court of Appeal in New Zealand in *Coleman v Myers* [1977] 2 NZLR 225 (especially 323-325, 328-330) and of the Court of Appeal of New South Wales in *Brunninghausen v Glavanics* (1999) 46 NSWLR 538 (especially 547-560). In both of those cases fiduciary duties of directors to shareholders were established in the specially strong context of the familial relationships of the directors and shareholders and their relative personal positions of influence in the company concerned.

**[36]** The cases of *Allen v Hyatt* (1914) 30 TLR 444 at 445 (directors making representations to secure options to purchase shares of shareholders and undertaking to sell shares of shareholders in agency capacity); *Howard Smith Ltd v Ampol Petroleum Ltd [1974] 1 All ER 1126 at 1132*-1133, 1135-1136, [1974] AC 821 at 834, 837-838 (directors' use of fiduciary power of allotment of shares for a different purpose than that for which it was granted, and so as to dilute the voting power of the majority shareholding of issued shares); *Re a company* (*Case No 005136 of 1986*) *[1987] BCLC 82 at 84*-85; and *Re Chez Nico* (*Restaurants*) *Ltd [1992] BCLC 192 at 208* were also cited. See also the discussion in Spencer Bower *Actionable Non-Disclosure* (2nd edn, 1990) pp 417-435.

**[37]** The claims for breach of fiduciary duty owed by the directors to the members of the club are put in several different, though interrelated and overlapping, ways. They have been argued on the appeal by Mr Vos (who did not appear below) with a somewhat different emphasis than before the judge as indicated in a draft reamended statement of claim. This judgment will refer to certain passages in the draft amended statement of claim (which have since been deleted), since they were the pleaded claims before the judge.

**The ultra vires expenditure point**

**[38]** Mr Vos's primary attack on the judgment focused on point (6) in the above summary of the list of factors considered by the judge.

**[39]** He asserted, and Lord Grabiner accepted, that directors act in breach of the fiduciary duties owed by them to the company, if they participate in the commission of acts ultra vires the company.

**[40]** Mr Vos went further and asserted that, where all the directors are involved in the same ultra vires act, they are under a duty to disclose to the individual members their intention to commit, and their commissions of, ultra vires acts and the ultra vires intentions and acts of their fellow directors. In such a case proper disclosure by the directors to the company cannot be made. The duty to disclose to the company would lack content, if all the directors are embarked on a course which is ultra vires and benefits them all, but is detrimental to the shareholders at large.

**[41]** This additional duty to disclose ultra vires intentions and acts to individual shareholders does not, he emphasised, depend on establishing special circumstances justifying an exception to the general rule that fiduciary duties are owed by the directors only to the company. He made separate submissions on that exception to the principle in *Percival v Wright* (above). They are discussed later in this judgment.

*[\*381]*

 **[42]** Further, liability for non-disclosure to the shareholders is not abrogated by s 35 of the 1985 Act, as amended by *s 108(1)* of the Companies Act 1989. It is true that sub-s (1) provides that:

> 'The validity of an act done by a company shall not be called into question on the ground of lack of capacity by reason of anything in the company's memorandum.'

But sub-s (2) provides that:

> 'A member of a company may bring proceedings to restrain the doing of an act which but for subsection (1) would be beyond the company's capacity ... '

and sub-s (3) provides that:

> 'It remains the duty of the directors to observe any limitations on their powers flowing from the company's memorandum; and action by the directors which but for subsection (1) would be beyond the company's capacity may only be ratified by the company by special resolution.'

**[43]** The claimants' primary case in this court is that the directors of RACL owed a fiduciary duty to disclose to them their ultra vires intentions and acts; and that they acted in breach of duty by not disclosing to them their intentions not to observe, and their failure to observe, the limitations on their powers flowing from the provisions of clause 4 of the memorandum. If there were no such duty of disclosure to the members, the right of the members to seek to restrain the commission of ultra vires acts under s 35(2) of the 1985 Act would be sterilised. Disclosure was also required so that the members could consider whether to ratify under s 35(3) of the 1985 Act the ultra vires acts by special resolution.

**[44]** Mr Vos reminded the court of the approach which it should take at this early stage (without the benefit of disclosure and evidence) in these unprecedented proceedings: when the full facts are not known and when the legal principles are in a state of development, the court should be cautious in concluding that the claims have no real prospect of succeeding.

**[45]** The argument was developed in this way. The fiduciary duty of disclosure of ultra vires intentions and acts is owed to the members, because the damage caused by the breach of duty is to the personal interests of the individual shareholders (in this case the retired members), not to the value of the company or its assets or the shares in it.

**[46]** The directors should have disclosed to the members intended and actual expenditure from 1996 onwards of RACL's assets (eg on professional advice), which was considerable and was committed to the furtherance of complex proposals for the restructuring of the company in order to allow distribution of the proceeds of the intended sale of RACMS among the members of the club.

**[47]** This was not simply a case of proposing to change the objects of a company, so that it could sell an existing business or engage in a new business. The proposal was for the distribution of the company's property in the face of an express absolute prohibition in clause 4 on the distribution to

members of any part of the property of RACL. That clause is not the same as an object of the company, which may be changed by special resolution. As a matter of construction of clause 4 of the memorandum, that expenditure on the formulation and implementation of the proposal for the sole purpose of demutualisation was ultra vires RACL. That purpose was prohibited.

[48] The directors were in breach of fiduciary duty in committing the company to that ultra vires expenditure and in not disclosing that conduct to the members. The members should have been consulted. The directors should have sought the approval of the members in general meeting about the proposals to investigate and prepare a scheme for demutualisation before assets were expended on that prohibited purpose. Had the claimants been consulted, they would have known about it. They would have decided to remain full members of the club. They could have obtained an injunction under s 35(2) of the 1985 Act; or they could have ratified the expenditure under s 35(3) of the 1985 Act, so as to benefit from the demutualisation. As it was, they made their decision to retire from the club in ignorance of the commitment of the directors to impermissible and significant actual and intended expenditure in pursuing and achieving an expressly prohibited object.

[49] In my judgment, this flight of fancy does not, on the pleaded facts, even make it to the point of take off and should be grounded immediately under CPR Pt 24.

[50] It is not even alleged that the directors caused any distribution of the assets of RACL to be made to members in breach of clause 4 of the memorandum before 8 July 1998, when that clause was cancelled under the scheme of arrangement. It was not ultra vires for the directors to authorise the expenditure of the company's money on investigating proposals to sell RACMS, or on proposals to demutualise the company and distribute assets to the members and, for that purpose, to amend the memorandum. That expenditure was not caught by clause 4. The prohibition in clause 4 did not extend to attempts to change the law of the company by altering the clause or cancelling it from the memorandum, so as to permit what was previously prohibited. Even if it did, such as by a prohibition of the kind to be found in clause 5 of the memorandum of RACMS, the entrenching provision could also be lawfully removed by a scheme of arrangement.

[51] In substance the expenditure complained of in this case is no different from expenditure, which Mr Vos accepts may be permitted, on changing the objects in the memorandum, so as to allow the company to carry on a different business, which is impliedly prohibited until the objects are changed. It is lawful for a company to change its objects and to amend its memorandum by means of the appropriate procedures: s 4 of the 1985 Act (special resolution altering the memorandum with respect to the statement of the company's objects) and s 17 (special resolution altering a condition in the company's memorandum which could have been lawfully contained in the articles of association and cancellation of the condition so far as it is confirmed by the court).

[52] It must follow that it is lawful for the directors to authorise the expenditure of company's money for the purpose of the cancellation of clause 4. That expenditure is reasonably incidental to the attainment or pursuit of the lawful purpose of the cancellation of clause 4 from the

memorandum in the context of giving effect to the overall object permitted in clause 3(m) of selling or disposing of RACMS. I do not agree with Mr Vos's contention that the demutualisation was completely unrelated and irrelevant so far as the sale of RACMS was concerned. The expenditure was not made to achieve a prohibited object. There was no wrongdoing on the part of the directors in relation to the expenditure, which it was their duty to disclose either to the company or to the individual shareholders in RACL.

**The special circumstances point**

[53] Quite apart from the alleged fiduciary duty of directors to disclose their own and each others' intended and actual ultra vires acts to the members, Mr Vos submitted that there was a free-standing fiduciary duty of full

disclosure of the demutualisation and demerger plans, discussions and proposals to the members, as well as to the company, by reason of special circumstances. Had all the members been made aware of these matters, they would not have resigned their membership of the club.

**[54]** It was pleaded in the draft amended statement of claim that the duty of the directors was not to withhold from the members of the club or the company any information, which they obtained as members of the committee or the board and which they knew, or ought to have known, would be, or might be, material to their decisions each year whether or not to renew their membership of the club or to dispose of their interests in the company. Further, in the event that the committee or the board were considering plans for and/or were in the course of conducting negotiations with third parties concerning the disposal of substantial assets of the company, there was a duty to disclose all matters relevant to the interests of the members of the club, or the company, who were contemplating retirement from the club (and thereby a disposal of their interests in the company) in circumstances where they knew, or had reason to believe, that such retiring members were inadequately informed. The directors were in exclusive possession of information, which they had acquired by virtue of their office, affecting the potential financial value of membership of the club and of RACL. The members would not have had that information. In their state of knowledge (or ignorance), the members could only have placed a nil value on their membership.

**[55]** It was also alleged that, for a period of at least 18 months prior to March 1998, the committee had been actively considering taking professional advice concerning and discussing the sale and disposal of RACMS and the possibility of demutualisation of the club and the potential demerger of RACMS. At a meeting in about October 1996 the committee and/or the board is alleged to have considered and rejected a scheme for demutualisation and/or demerger of RACMS, but still continued to seek to formulate a workable plan to that end.

**[56]** As already indicated in the submissions on the ultra vires point, it is alleged that the committee had, in relation to those matters, incurred a liability on behalf of the club and RACL for professional fees, mergers, expenses and disbursements, including a liability in respect of the retainer of Messrs Slaughter and May to prepare a scheme for demutualisation and /or demerger of RACMS.

*[*384]*

**[57]** Mr Vos submitted that this duty of disclosure to the members fell within an exception to the general rule laid down in *Percival v Wright* (above). The special facts from which it is contended that this fiduciary duty to the members emerges are that knowledge of the proposal by the directors was inside information of which the directors had exclusive possession; that they had acquired the information by virtue of their office; that the information provided knowledge to the directors of the potential financial value of membership of the club and RACL, which was not known to the members; that that knowledge was, contrary to their expectations, that their membership (which could not have been sold or transferred) could have any value; that, by resigning membership, the claimants had given up any right to participate in the substantial assets of RACL; and that they had done so in ignorance of the directors' plans to allow members to benefit from a distribution.

**[58]** I agree with the judge that these factors are insufficient to found a claim for the existence and breach of a fiduciary duty to disclose to the claimants the proposals and plans for demutualisation.

**[59]** There was nothing special in the factual relationship between the directors and the members in this case to give rise to a fiduciary duty of disclosure. In particular there were no relevant dealings, negotiations, communications or other contact directly between the directors and the members; the actions of the directors had not caused the members to retire when they did; and, probably most important of all, prior to March 1998 there was nothing sufficiently concrete and specific, either in existence or in contemplation, for the directors to disclose to the members.

**The benefits to directors and associates point**

**[60]** The third area of alleged fiduciary duty to the members is that the directors failed to disclose to the members of the club that they had committed breaches of duty to RACL, in that they personally and their associates stood to

benefit, and had in fact benefited, from the proposed demerger and demutualisation and that, had they made disclosure of these matters to all the members, as they should have done, the claimants would have chosen to remain members and would have benefited from the distribution of the proceeds of sale of RACMS.

[61] In particular, the draft amended statement of claim pleaded that the members of the committee were under a duty to treat all the members of the club fairly; not to disclose to a third party any information which they had obtained as members of the committee or the board of RACL and which was material to the interests of the members of the club and the company, without first informing all of the members; and not to disclose any such information to some members and not others.

[62] An assortment of personal benefits constituting breaches of the duty to disclose are alleged, though it has to be said that the pleading is short on particulars and the evidence is exiguous. The claimants contend that this is almost bound to be the case in advance of disclosure of documents by the defendants and, indeed, they rely on that as a factor relevant to the court's discretion under CPR Pt 24.

[*385]

[63] The allegations in the draft amended statement of claim may be summarised as follows: there was a conflict of interest between, on the one hand, the interests of the members of the committee and of the board and, on the other hand, the interests of the members, who were ignorant of these material matters; the directors stood to benefit as more existing members retired and gave up their shares in the company; under the Cendant proposal some directors were to receive substantial additional personal benefits in the form of shared bonuses and, in the case of Mr Neil Johnson (the fifth defendant), office as chief executive in the new group; under the sale to Lex Service the directors received undisclosed bonuses and one (Mr Ian Mavor –the twelfth defendant) was to be appointed to a consultancy; some directors were able to, and did, fast track friends into full membership of the club before March 1998, in the knowledge of the intended disposal of RACMS and the distribution of the proceeds; the directors were in a position to, and did, slow down the waiting list for full membership of the club (eg the case of a Mr Malcolm Bissiker) and that would increase the value of their own membership on demutualisation.

[64] At the end of the day, however, these additional allegations add nothing of substance to the arguments already deployed and rejected. The points made on directors' benefits are essentially the same as the other arguments; ie, that it was the duty of the directors to disclose to the members that they were committing, or intending to commit, ultra vires acts (eg by benefiting, or intending to benefit, personally from the distribution of the sale proceeds to the members) and in circumstances which justified an exception to the general rule that the directors' fiduciary duties are owed only to the company. For the above reasons and for the reasons given by the judge, the facts pleaded are insufficient to support the existence of a duty of disclosure to the members.

[65] Even if the allegations were established (and they are strongly disputed by the defendants), the duty to disclose the ultra vires acts in this case would be owed by the directors to the company and not, in the absence of special circumstances, to the individuals members of the club.

[66] I would add that these alleged breaches of duty do not appear to impact on the alleged duty to disclose to the members, before their decision to resign, the plans and proposals to demutualise the club and to demerge RACMS. It was non-disclosure at an earlier stage of those plans and of the alleged ultra vires commitment to expenditure on them, rather than non-disclosure of the personal benefits for directors and associates, that would have affected the opportunity of the members to make an informed decision on membership.

[67] It is also contended that there was a breach of fiduciary duty to shareholders by one of the directors (Mr Johnson), who frequented a Warwickshire shooting club. It was alleged that, in consequence of the disclosure of inside information, about ten members of the shooting club were fast tracked into full membership of the club early in 1998, shortly before demutualisation. The claim was that this involved unfairness between shareholders, as the inside information should have been shared with all the members of the club. That allegation would not, however, justify claims for

breach of fiduciary against all the members of the committee. For the reasons already stated, however, this claim does not, in any event, have any real prospect of succeeding against any of the defendants.

**Conclusion**

**[68]** In my judgment, the claims, as pleaded and as proposed to be amended or reamended, have no real prospect of succeeding at trial against the personal defendants or against the company. The judge was right to make an order under CPR Pt 24. I would dismiss the appeal.

**LATHAM LJ.**

I agree with both judgments.

**SIMON BROWN LJ.**

**[69]** The club has over 12,000 members. All those who were full members on 8 July 1998 received windfall payments of some £34,000 following the sale of the RAC motor services business. It was for them a happy and unexpected event: until March that year they had had no reason to suppose that their membership was of any financial value whatever.

**[70]** The appellants represent 355 retired members of the club who resigned (or in a few cases failed to pay their annual subscription) in the three years prior to this payout. To them, understandably, it seemed a less happy event: their chagrin is not difficult to imagine.

**[71]** The appellants' complaint in these proceedings is against the committee (strictly the board of the company of which all full members of the club were members) and is to the effect that the committee kept from them the various discussions and investigations which led to this payout. Had they known it was in the offing, they would never, of course, have resigned.

**[72]** They cannot complain simpliciter that the committee should have kept them in the picture: Mr Vos was constrained to recognise that no such general duty is cast upon directors. He has therefore had to argue a more circuitous case. What he asserts is first that the board acted ultra vires and therefore in breach of their fiduciary duty, and secondly that they thereby came under a further duty to disclose their ultra vires conduct to the members. Thus would the members have discovered the financial value of their membership.

**[73]** The conduct which principally Mr Vos contends to have been ultra vires was the defendants' expenditure of company funds on preparing for the sale of the motor services business and, more particularly, for the scheme of demutualisation which was a necessary precondition of any payment to members. Clause 4 of the memorandum is central to the argument. Let me read only the most material part:

'4. The income and property of the Company, whensoever derived, shall be applied solely towards the promotion of the objects of the Company as set forth in this Memorandum of Association, and no portion thereof shall be paid or transferred directly or indirectly, by way of dividend, bonus or otherwise howsoever, by way of profit to the Members of the Company. And upon the winding up of the Company, the surplus assets (if any) of the Company or funds arising from the realisation thereof which shall remain, after payment of all the debts and

liabilities of the Company, shall not be paid to or distributed among Members of the Company, but shall be given, paid or transferred to such public museum or such institution or institutions connected with engineering, or with the objects of the Company as the Directors of the Company shall determine ... '

The objects of the company most relevant to this appeal are:

'3(a) To establish, maintain and conduct a club for the encouragement and development in Great Britain of the auto-motor vehicle and other allied industries, and for the accommodation of Members of the Company and their friends, and to provide a club-house or club-rooms, and other conveniences, and generally to afford to Members and their friends all usual advantages, conveniences and accommodation of a social club and centre of information and advice on all matters pertaining to auto-motor vehicles.

3(m) To sell or dispose of the undertaking of the Company, or any part thereof, for such consideration as the Company may think fit, and in particular for shares, debentures, or securities of any other company.

3(p) To do all such other things as are incidental or conducive to the attainment of the above objects, or any of them ...'

**[74]** As I understand the appellants' argument with regard to these clauses it runs essentially as follows: (1) Clause 4 constituted a fundamental prohibition against any form of payment out to members. Any scheme for demutualisation clearly, therefore, required its removal. (2) Demutualisation was distinct from the sale of the motor services business and did not itself fall within any of the objects clauses. In particular it was not to be regarded (within clause 3(p)) as 'incidental or conducive to the attainment of' the sale of the motor services business (within clause 3(m)). (3) The defendants were, therefore, forbidden to apply any company funds towards demutualisation.

**[75]** The difficulty with this argument is that it appears to overlook the plain fact that, by the same token as a company may seek to change its objects, so too it may seek to change its other rules such as the prohibition constituted by clause 4 in the present case. And if a company can seek to change its rules, then in my judgment it must also be entitled to expend such sums (for example by way of legal fees) as are reasonably incurred in exploring the need for and effecting such change. This, we kept suggesting to Mr Vos in argument, was the complete answer to his case. Not so, he repeatedly submitted, but, I confess, I never came to understand why not. All I can do is to quote verbatim from the last of the relevant passages in the transcript of the argument before us to indicate my difficulty:

'Mr Vos QC: It is, of course, not illegal to change the law of the company. But the question is, whether on the facts ... that expenditure ... was in fact directly spent for the purpose, not just of changing the law of the company, but for the purpose of ensuring that monies were paid to members in violation of the memorandum ... The scheme was not directed at just changing, that was just one small part of the scheme. The scheme was directed at distributing the money to the members indirectly

*[*388]*

... Let us assume that in order to transfer to the members of the company you have to expend £1m, and let us assume that the assets of the company are £10m, and that the object of the scheme and the proposal is to get the £10m to the members, that is what is intended and that is what is alleged. In order to achieve it, you have to spend £1m and therefore the distribution is only £9m; it can only be. It would be, because you have spent £1m of the £10m of the assets of the company on achieving the purpose ... Assume that is all right, can it really be said that you have not expended that £1m for this prohibited purpose? In our respectful submission, you have obviously expended it for that purpose and it is not an answer to say that the mechanics, the way in which you achieved it, was by changing this provision ...

Mummery LJ: It is spent for the purposes of removing the prohibition.

Mr Vos QC: That is the dispute, with respect. Your Lordship says it is spent just for the purpose of removing the prohibition, and I say it is spent for achieving the prohibited object ... It is an obvious wrong to go about doing something before you change the provision. You have to change it first. That is why s 35(3) says so ...You go to the general meeting, under s 35(3), which assumes you do, and say: "We want to spend money on this *ultra vires* act, may we do so?", and you can have it approved.'

**[76]** For the life of me, I remain unable to see how payments (say to solicitors) expended to remove a prohibition against making payments to members can themselves be characterised as payments to members in violation of the prohibition, and nor can I see how s 35(2) of the 1985 Act advances the appellants' argument. Section 35(3) provides:

'It remains the duty of the directors to observe any limitations on their powers flowing from the company's memorandum; and action by the directors which but for subsection 1 would be beyond the company's capacity may only be ratified by the company by special resolution.

A resolution ratifying such action shall not affect any liability incurred by the directors or any other persons; relief from any such liability must be agreed to separately by special resolution.'

Section 35(1) prevents third parties from calling into question the validity of an act done by a company on the ground of lack of capacity by reason of anything in the company's memorandum.

**[77]** Mr Vos's submission on s 35(3) begs rather than answers the question at issue. If, as I think, it is lawful to spend money changing the company's rules, then there can be no occasion to seek ratification of such expenditure from the company (even assuming, which I doubt, that s 35(3) contemplates advance rather than retrospective ratification).

**[78]** I referred earlier to Mr Vos having acknowledged that directors (at least of private companies) are under no general duty to inform shareholders of developments or proposals which may increase the value of their shareholding. Were it otherwise, I for my part would regard this as a prime case for asserting a breach of such duty. After all, nothing could more fundamentally affect the value of club memberships than the demutualisation

*[\*389]*

scheme here devised which overnight transformed a worthless membership into one worth £34,000. But the same surely is true of a company which strikes a rich vein or contemplates takeover; or a building society which contemplates demutualisation. And yet no one suggests that those unlucky enough to miss out on these bonanzas have any claim in law.

**[79]** The RAC's ex-members' cri de coeur is, as I began by saying, understandable. Given, however, that they cannot frontally attack their directors for not keeping them informed – and thereby giving them an opportunity to prolong a membership they had not otherwise thought worth maintaining – it seems to me not merely contrived but unattractive to criticise, not demutualisation itself (the necessary foundation of their damages' claim), but rather the inevitable expense of demutualising. And the same can be said too of their further complaints about the directors gaining personal advantages from the eventual scheme – complaints which might more logically come from members who remained than those who resigned (certainly absent any shred of evidence that the directors were allowing numbers to dwindle to enhance the value of their own individual memberships).

**[80]** Although agreeing with all that Mummery LJ has said I have been anxious in addition to indicate my own basic reasoning for rejecting this claim. One way or another I have no doubt that it is worthless and must fail. I too would dismiss the appeal.

Appeal dismissed with costs. Leave to appeal to the House of Lords refused.

Kenneth Dow Esq Barrister.

---

**End of Document**

# EXHIBIT 1-D

# Tianrui Holding Co Ltd v China Shanshui Cement Group Ltd

From the Court of Appeal of the Cayman Islands | November 14, 2024 | 2024 WL 04794596

**Search Details**

Search Query:   adv: "(2024) UKPC 36"

**Delivery Details**

Date:           August 7, 2025 at 3:56 PM
Delivered By:   Cate Nash
Client ID:      99999-00091
Status Icons:   👓

**~~Tianrui~~ (International) Holding Company Ltd v. China Shanshui Cement Group Ltd(Cayman Islands)**

Privy Council Appeal No 0002 of 2023
From the Court of Appeal
of the Cayman Islands
14 November 2024

**Michaelmas Term [2024] UKPC 36**

**2024 WL 04794596**

before Lord Hodge Lord Briggs Lord Sales Lord Leggatt Lord Richards
Judgment Given On 14 November 2024

[Analysis](#)

Heard on 12 and 13 March 2024

**Representation**

- Appellant Thomas Lowe KC Tara Taylor Gemma Bellfield Corey Byrne (Instructed by Ogier (Cayman) LLP and Enyo Law LLP ).
- Respondent Tom Smith KC Paul Fradley Adrian Davey (Instructed by Maples and Calder (Cayman) LLP and Freshfields Bruckhaus Deringer LLP (London)).

**Judgment**
Lord Hodge and Lord Briggs:

The issue on this appeal is whether a shareholder, including a minority shareholder, has a personal claim against a company when the directors of the company allot shares for an improper purpose. In particular, does the shareholder have a private right to sue the company for a declaration that the power of the company has been invalidly exercised by the board of directors on the company's behalf?

The allotment of shares can have the effect of altering the balance of voting power between shareholders within the company and the relative economic stakes they have in the company. The allegation in this case is that the allotment was made to reduce the appellant's stake in the company below 25 per cent, thereby removing its negative control so as to assist the other shareholders to consolidate their control over the company. The exercise of the power to issue and allot the shares is alleged to have been in breach of the directors' fiduciary duty owed to the company to exercise their powers for a proper purpose.

It has long been held in cases of high authority, by the Board, the UK Supreme Court, the High Court of Australia and other appellate courts, that in these circumstances proceedings may be brought by shareholders personally, rather than by derivative action on behalf of the company, to challenge such

allotments, notwithstanding that the duty of directors to exercise their powers of allotting shares for proper purposes is owed not to shareholders personally but to the company alone. Although it has never previously been doubted that shareholders personally have standing to bring proceedings in these circumstances, the juridical basis for their standing has not been decided, and barely discussed, in most cases. In the present case, the Court of Appeal, reversing the decision of the first instance judge, held that the claimant shareholders had no personal standing to bring the present claim.

For the reasons set out below, the Board concludes that a shareholder has a right of action against the company to challenge the allotment of shares by the board of directors on the basis that the allotment was made for an improper purpose in circumstances where the allotment will cause detriment to the shareholder.

The appeal comes before the Board against a successful strike out application by the company. The case has been decided in the courts below on assumed facts. The Board also addresses the appeal on the basis of assumed facts which may not be established at trial.

**A summary of the factual background and the assumed facts**

There has been a prolonged battle for control of the respondent company, China Shanshui Cement Group Ltd ("CSCGL"), which is a Cayman Islands exempted company that is also registered in Hong Kong as a non-Hong Kong company. CSCGL's shares are listed on the Hong Kong Stock Exchange ("HKSE"). CSCGL is a holding company of operating subsidiaries which are registered in Hong Kong and the People's Republic of China ("the PRC"). The group is principally engaged in the production, distribution and supply of cement and related construction products in the PRC. CSCGL's principal subsidiary, Shandong Shanshui Cement Group Co, is the sixth largest cement company in the PRC, measured by annual production capacity.

The principal shareholders in CSCGL are (i) the appellant ("Tianrui"), a company incorporated in the British Virgin Islands with a shareholding of 28.16%, (ii) Asia Cement Corporation ("ACC"), a company incorporated in Taiwan with a shareholding of 26.72%, (iii) China National Building Materials Co Ltd ("CNBM"), a company incorporated in the PRC with a shareholding of 16.67%, and (iv) China Shanshui Investment Company Ltd ("CSI"), a company incorporated in Hong Kong with a shareholding of 25.09%.

Each of CSCGL, Tianrui, ACC and CNBM are competitors in the cement production industry in the PRC.

As recorded in the agreed statement of facts and issues, CSCGL's shares were suspended from trading on the HKSE from April 2015 to 31 October 2018. On 23 October 2017, the HKSE gave notice that CSCGL would be delisted unless by 31 October 2018 (i) CSCGL restored its public float above the 25% minimum threshold required by a rule of the HKSE Main Board Listing Rules, and (ii) CSCGL addressed the facts that its auditors, KPMG, had issued a disclaimer of opinion on CSCGL's accounts on the financial years 2015 and 2016 and that the then board of CSCGL had not been able to publish their report for the financial year 2017.

On or about 23 May 2018 a majority of shareholders of CSCGL, including ACC, CNBM and CSI, voted at an extraordinary general meeting of CSCGL to reconstitute the board of directors. The reconstituted board comprised one director from CNBM (Chang Zhangli), one director from ACC (Wu Ling-Ling) and three independent non-executive directors.

Thereafter, CSCGL issued convertible bonds in two tranches. The first tranche, issued to one subscriber on or about 8 August 2018, involved bonds for a total value of US$210,900,000 at a conversion price of HK$6.29 per share. The second tranche was issued to seven subscribers on or about 3 September 2018 for a total of US$320,700,000 at a conversion price of HK$6.29 per share.

CSCGL claims that the proceeds of the bonds were primarily used to repay US$500 million loan notes that were repayable in March 2020 and were fully repaid on 28 November 2018.

After the first bond issue and before the second bond issue, on 30 August 2018, Tianrui filed in the Grand Court of the Cayman Islands a petition to wind up CSCGL on the ground that it would be just and equitable to do so. One of Tianrui's complaints was the improper issue of the shares described below. CSCGL's attempt to strike out that petition failed in the Court of Appeal, which, in a judgment dated 5 April 2019, held that, if Tianrui's allegations in the petition were true, they were capable of establishing that it would be just and equitable to wind up CSCGL.

On or about 6 October 2018 CSCGL (i) entered into deeds of amendment with each of the subscribers of the bonds to accelerate the conversion of US$456,600,000 in principal amount of the first and second bond issues into shares at a reduced "Early Conversion Price" of HK$4.20 per share, and (ii) agreed with the holders of bonds the allotment of 888,980,352 new shares in exchange for some of the bonds.

CSCGL held an adjourned annual general meeting and an extraordinary

general meeting of shareholders on 30 October 2018. At the extraordinary general meeting a majority of the shareholders passed a resolution mandating the directors to allot and issue 1,067,830,759 shares, comprised of the new shares in para 14 above and a further 93,004,771 shares, representing shares relating to the bonds held by persons who had not already agreed to the share conversion referred to in para 14 above. The new shares were issued on 30 October 2018, and restored the public float of CSCGL to 25%. As a result, trading in CSCGL's shares on the HKSE resumed on the following day.

Tianrui does not dispute this brief account of events which, on its face, may appear to be a rational response to the notice which the HKSE gave and which is referred to in para 9 above. But Tianrui says that that is not the whole story. Tianrui pleads in its writ in these proceedings that the bondholders were connected with ACC and CNBM by an undisclosed agreement or concert party to take over voting control of CSCGL. Tianrui pleads that the issue of the bonds and the allotment and issue of the new shares were an improper exercise of CSCGL's power to allot and issue securities. It is alleged that the shares were issued for the purpose of enabling ACC and CNBM to control CSCGL and achieving a dilution of Tianrui's shareholding to under 25% (in fact 21.85%) with the result that Tianrui could no longer block special resolutions. Mr Thomas Lowe KC

for Tianrui submits that if the share issues are valid, Tianrui cannot prevent the merger of CSCGL with another company and it might have to have its shares bought out under section 238 of the Companies Act.

Tianrui's pleadings are made before discovery and before the administration of interrogatories. It explains that the PRC government had imposed restrictions on cement production capacity in 2014 with the result that cement producers could only expand their market shares through taking over other producers and that CSCGL had become a target for takeover. It asserts that in a series of meetings in person in 2015 attended by the directors of ACC and CNBM and telephone conversations it had been agreed that ACC and CNBM would form an alliance to take over CSCGL, that they would make a joint offer for CSCGL's shares and that they would oppose Tianrui's attempts to obtain a greater interest in CSCGL. ACC and CNBM then made a joint offer to purchase the shares of CSCGL on 12 August 2015. ACC, CNBM and CSI used their votes to requisition the extraordinary general meeting in May 2018 at which CSCGL's board was removed and replaced by a board entirely nominated by ACC. It avers that the bond issues and share conversion were concluded in secret, that they were not arm's length transactions and that the subscribers were connected with ACC and/or CNBM.

Tianrui describes the effect and purpose of the convertible bond and share issues in its statement of claim as follows:

"56. As a result of having its shareholding reduced to under 25%, Tianrui is prejudiced as it can no longer block a special resolution in a general meeting of [CSCGL], which requires not less than 75% of the votes in general meeting.

Improper Purpose

57. The Convertible Bonds were issued by the board of [CSCGL] to persons connected with and/or acting in concert with ACC and/ or CNBM for the improper purposes of enabling ACC and CNBM by themselves or with others to control [CSCGL] as set out below.

58. ACC and CNBM entered into a secret or undisclosed

voting agreement about how to exercise votes between ACC and CNBM and the Bond Subscribers and/ or New Shareholders and/or each of them and/or reached an understanding with them and/or each of them."

Tianrui avers that the reconstituted board of CSCGL exercised their power to issue the convertible bonds and new shares for an improper purpose and that those transactions were invalid. Similarly, Tianrui avers that ACC, CNBM and CSI acted for an improper purpose in supporting the resolution at the extraordinary general meeting on 30 October 2018 to grant the specific mandate to issue the shares described in para 15 above.

Tianrui seeks as remedies declarations that the exercise by the directors of CSCGL of the powers (i) to issue the convertible bonds, (ii) to convert the bonds into shares, and (iii) to issue the new shares described in para 15above were each not a valid exercise of the relevant power.

The Board, like the courts below, is required to determine the strike out

application on the basis that Tianrui's averments in paras 16-19 above are assumed to be true.

The court may strike out a statement of case if, among other grounds, the statement of case discloses no reasonable cause of action or is otherwise an abuse of the process of the court: Grand Court Rules, O18, r19.

## the judgments of the Grand Court and the Court of Appeal

CSCGL sought to have both the winding up petition and the writ seeking declaratory relief struck out on various grounds. The Board is not concerned with the challenge to the winding up petition as it has earlier refused permission to appeal the Court of Appeal's judgment referred to in para 13 above. The only challenge to the writ proceedings made before Segal J in the Grand Court which is live before the Board is the challenge that the writ action is an abuse of process because Tianrui does not have standing to sue CSCGL for what are essentially claims arising out of breaches by the reconstituted board of the fiduciary duties which they owed to CSCGL.

In a detailed judgment delivered on 6 April 2020 Segal J rejected this challenge: 2020 (2) CILR 6. In so doing Segal J declined to follow a judgment of Kawaley J in the Grand Court in *Gao v China Biologic Products Holdings, Inc* 2018 (2) CILR 591 (" *Gao* ")

in which the court struck out the writ action by a minority shareholder challenging the exercise by a board of directors of the power to allot and issue shares on the ground that the plaintiff lacked standing to sue the company for a breach of fiduciary duty by the directors which was owed to the company and not to him. Segal J discussed various authorities, which the Board discusses below, and concluded that a minority shareholder had a personal claim against the company and that the appropriate remedy was a declaration, binding on the company, that the allotment and issue of the shares was unlawful. That is the remedy which Tianrui now seeks. He held that it followed from the characterisation of the shareholder's claim as a personal right against the company that the other shareholders could not ratify the acts of the directors. Segal J also rejected the argument that a shareholder did not have a personal claim because the shareholder could obtain redress by a derivative action.

CSCGL appealed that decision. In a judgment dated 1 July 2022 the Court of Appeal (Goldring P, and Field and Morrison JJA) held that an aggrieved shareholder had no personal right of action against the company for the diminution of his voting power caused by the issue of shares in breach of a fiduciary duty owed to the company: 2022 (2) CILR 28. The Court of Appeal reasoned that the central question on the appeal was whether a minority

shareholder had standing to sue the company in which it held shares in the face of two possible obstacles. The first was that it was trite law that directors owe their fiduciary duties to the company which appoints them and not to its shareholders. The second possible hurdle was the view that the damage suffered as a result of a breach of fiduciary duty by the directors is damage to the company and not to the shareholder whose voting power has been diminished by the issue of new shares.

Mr Tom Smith KC advanced on behalf of CSCGL the argument that it was the company that suffered the loss and not the aggrieved shareholder (ie the second obstacle). He relied on dicta in the judgment of Harman LJ in Bamford v Bamford [1970] Ch 212 and the judgment of the UK Supreme Court in *Marex Financial Ltd v Sevilleja* [2020] UKSC 31; [2021] AC 39 . The Court of Appeal rejected that argument, holding that the shareholder's loss was separate and distinct from any loss suffered by the company. The argument has not been advanced again before the Board.

In addressing the first possible obstacle, the Court of Appeal considered several authorities which the Board will consider below. They were Fraser v Whalley (1864) 2 H & M 10 ; Punt v Symons & Co Ltd [1903] 2 Ch 506 ; Howard Smith Ltd v Ampol Petroleum Ltd [1974] AC 821 ("Howard Smith") ; *In re a* Company (No 005136 of 1986)

[1987] BCLC 82 (aka *In re Sherborne Park Residents Co Ltd* (" *Sherborne Park* ")); and the judgment of the Supreme Court of South Australia in *Residues Treatment & Trading Co Ltd v Southern Resources Ltd* (1988) 6 ACLC 1160 (" *Residues* "). The Court accepted Mr Smith's submissions that in *Sherborne Park* Hoffmann J had not explained why the shareholder had a personal right of action, in Howard Smith the House of Lords had not discussed how the shareholder could bring a personal claim, and in *Residues* King CJ, while referring to a shareholder's personal right "founded in equity" (p 1165), had failed to provide a principled basis for the conclusion that a shareholder had such a personal right. The Court of Appeal concluded (para 51) that "it remains the law of the Cayman Islands that the postulated aggrieved shareholder has no such personal right of action but must found his claim on a basis that is consistent with the rule in Foss v Harbottle or with the fraud on the minority exception to that rule."

**the issues raised in Tianrui's appeal**

Tianrui now appeals to the Board against the striking out of its writ which followed upon this ruling.

In the Board's view, there are four principal questions that need to be addressed on this appeal. They are:

- (i) Bearing in mind that the duty of the directors alleged to have been breached is owed to CSCGL and not to its shareholders, what, if anything, is the shareholder's cause of action?
- (ii) What, if any, distinctive aspects of the shareholder's cause of action mean that it may be pursued notwithstanding the rule in Foss v Harbottle ?
- (iii) Was the impugned exercise of the board's power void or voidable?
- (iv) Was the alleged breach of duty capable of being ratified by a majority of CSCGL's shareholders? If so, what is the consequence of the theoretical availability of ratification for the pursuit of the shareholder's claim in the meantime?

Before addressing the case law relating to a shareholder's personal right of action against a company, the Board summarises the relevant constitutional provisions relating to CSCGL in its memorandum and articles of association and in statute.

## the relevant provisions of Cscgl's constitution

Unless the objects and business of a company are restricted in its memorandum of association, it has power to carry out any object not prohibited by law: Companies Act (2023 rev) ("CA"), section 7(4). When registered, a company's memorandum of association binds the company and its members as if each member had subscribed the memorandum and it contained a covenant on the part of the member, his heirs and administrators to observe all its conditions: CA section 12. Similarly, when registered the articles of association bind the company and its members as if each member had subscribed the articles and it contained a covenant on the part of the member, his heirs and administrators to conform to the regulations contained in the articles: CA section 25. There is, as the Board will explain below, a contract between the company and its members and between its members inter se that the company and its members will observe the conditions of the memorandum and the regulations of the articles of association, but the statutory contract is entered into on terms which are alterable by a 75% majority of the shareholders as vote at a general meeting, through the amendment of those articles by special resolution.

Clause 4 of CSCGL's memorandum of association empowers it to issue convertible bonds. CSCGL's amended and restated articles of association dated 16 May 2014, which were effective until 30 May 2019, gave the board power, in article 3.13, to allot or otherwise dispose of its unissued shares and, in article 11.2, to borrow and to grant securities for CSCGL's debts.

Tianrui in its statement of claim para 13, pleads that it is an implied term of the articles of association that the exercise of such powers of the board cannot result in the valid issue of securities if the exercise was materially affected by an improper motive or purpose.

**the prior case law on the standing of the shareholder**

Underpinning the challenge by CSCGL to the right of Tianrui to bring these proceedings is the so-called "rule in Foss v Harbottle" ((1843) 2 Hare 461 ). This "rule" is made up of two related principles.

The first, known as the "proper plaintiff" principle, is that where a wrong has been done to a company only the company, not an individual shareholder, can take action. A breach by a director or by the board of directors of a duty which is owed to the company is a wrong done to the company, and the general rule is that only the company has a remedy for that breach.

The second principle, which is known as the "majority rule" principle, is that the will of the majority of the shareholders of the company should, as a general rule, prevail in the running of the company's business. Thus, if a transaction can be made binding on the company by a simple majority of shareholders, and that majority does not

want to take action against a director or directors for a breach of duty in relation to it, the majority can, as a general rule, waive the breach or ratify the irregular acts of the director or directors.

There is an exception to the operation of these principles where the wrongdoers are guilty of dishonest conduct or attempting to appropriate or have appropriated to themselves property or opportunities to which the company is entitled or in which other shareholders are entitled to participate, and the wrongdoers are themselves in control of the company. In that event, which is often called "fraud on the minority", the aggrieved shareholder or minority may bring a derivative action seeking relief on behalf of the company in whom the cause of action is vested.

The "rule" in Foss v Harbottle and the exception or exceptions to the "rule" are discussed in many authorities, including Edwards v Halliwell [1950] 2 All ER 1064, 1066-1069 ; and Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204, 219-222 .

The boundaries of the exception or exceptions to the "rule" are ill-defined. In many jurisdictions, the shareholder derivative action has been placed on a statutory basis in order to remove the uncertainties which remain within the common law. For example, in the United Kingdom Part 11 of the Companies Act 2006 has created

a statutory derivative action. The Cayman Islands has preserved the common law rules and the court exercises a degree of control over derivative actions under Order 15, rule 12A of the Grand Court Rules under which, if a defendant in a derivative action has given notice of an intention to defend, the plaintiff must apply to the court for leave to continue the action.

The "rule" in Foss v Harbottle is only part of the picture. The courts have long recognised that a shareholder has personal rights against a company which it can enforce by a personal action. For example, a shareholder has a personal right to vote on a resolution before a company in general meeting and, when his vote has been improperly rejected at a general meeting, is entitled to an injunction against the implementation of the irregularly obtained resolution: Pender v Lushington (1877) 6 Ch D 70, 80-81 per Jessel MR. This right of a shareholder personally to institute proceedings to assert or protect personal rights was the basis of the decision of the Court of Appeal in Edwards v Halliwell. In that case, a trade union had purported to increase the regular contributions payable by members without the resolution passed by a two-thirds majority required by the rules. Two members who were threatened with expulsion from the union for failure to pay the increased contributions were held to be entitled to bring proceedings personally for

a declaration that the increases were invalid. Jenkins LJ said at p 1067, having discussed the rule in Foss v Harbottle:

"In my judgment, this is a case of a kind which is not even within the general ambit of the rule. It is not a case where what is complained of is a wrong done to the union, a matter in respect of which the cause of action would primarily and properly belong to the union. It is a case in which certain members of a trade union complain that the union, acting through the delegate meeting and the executive council in breach of the rules by which the union and every member of the union are bound, has invaded the individual rights of the complainant members, who are entitled to maintain themselves in full membership with all the rights and privileges appertaining to that status so long as they pay contributions

in accordance with the tables of contributions as they stood before the purported alterations of 1943, unless and until the scale of contributions is validly altered by the prescribed majority obtained on a ballot vote. Those rights, these members claim, have been invaded. The gist of the case is that the personal and individual rights of membership of each of them have been invaded by a purported, but invalid, alteration of the tables of contributions. In those circumstances, it seems to me the rule in Foss v Harbottle has no application at all, for the individual members who are suing sue, not in the right of the union, but in their own right to protect from invasion their own individual rights as members."

By contrast, in other cases, the rights of shareholders are invaded not because the company or its agents have acted contrary to the express terms of the articles of association or other constitutional documents but because the directors, acting as the company's agents, have exercised powers within the letter of their express terms but for improper purposes. All powers conferred on the directors are fiduciary in nature and they are required by equity to exercise such powers for proper purposes. An exercise of a fiduciary power for an improper purpose is a breach of the duty owed by the directors to the company. Although the duty is owed to the company, and not to shareholders personally, shareholders whose personal rights are adversely affected by the directors' exercise of the power have been held in the context of a range of different powers to be entitled to maintain a personal action against the company to remedy the wrong done to them.

The House of Lords in a Scottish appeal, Hindle v John Cotton Ltd (1919) 56 Sc LR 625 , allowed an action by a shareholder against the company to proceed to proof (trial) in which the allegations by the shareholder were that the company's directors had acted in bad faith when, after dismissing him from office as managing director, they purported to exercise a power in the company's articles of association to acquire his shares at their nominal value. In *In* Re Smith and Fawcett Ltd [1942] Ch 304 an executor of a deceased shareholder of a private company, after the directors of the

company refused to register him as a shareholder, applied to the court to have the register rectified. The application failed because the plaintiff had not shown that the directors had exercised their fiduciary powers other than in the interests of the company. More recently, in Eclairs Group Ltd v JKX Oil & Gas plc [2015] UKSC 71; [2015] Bus LR 1395; [2016] 3 All ER 641 , the UK Supreme Court gave a remedy to the beneficial owners of shares, which had asserted a personal right against the company in which they had invested, when the directors of the company had, in breach of their duty to exercise their powers for proper purposes, resolved to issue restriction notices suspending the right to vote at general meeting attached to the shares and to restrict the right to transfer the shares.

The issue at the heart of this appeal, namely the juridical basis of the individual shareholder's standing to bring proceedings to challenge the directors' exercise of a power for improper purpose, arose also in those cases. Given that in each case the shareholder's rights were directly affected by the relevant improper decision, they were obvious cases for intervention by the courts, but there still needs to be a proper legal basis - in short, a cause of action. As we discuss later in this judgment, we consider that, as an intrinsic feature of the contract constituted by the memorandum and articles of association, it is implicit that when exercising their powers on behalf of the company the directors will exercise them in accordance with their fiduciary duties, including the duty to exercise powers only for a proper purpose.

In each of the cases mentioned, the courts have recognised a shareholder's personal right to bring legal proceedings against the company when the directors act to appropriate the shares or to remove or restrict rights attached to them. The circumstances of this appeal are different in the sense that it does not involve the removal or restriction of rights attached to shares. The appeal is concerned with the detriment to a shareholder's ability to exercise the proportionate voting power attached to its shares resulting from the allegedly improper allotment and issue of new shares to other parties. It is necessary to look more closely at the case law which is concerned with personal actions by a shareholder against a company which challenge the allotment and issue of new shares because CSCGL submits that the cases do not establish a proper jurisprudential basis for the recognition of such actions.

In the Cayman Islands, the courts have not accepted the standing of a shareholder to challenge the allotment and issue of shares to others. As the Board has mentioned in para 24 above, in *Gao* Kawaley J struck out a minority shareholder's action against the company on the ground that the

shareholder lacked standing. The Court of Appeal has accepted his reasoning in this case in preference to that of Segal J who accepted that Tianrui had standing.

In the United Kingdom, the courts have for a long time recognised the right of a shareholder to challenge the allotment and issue of shares by a company's directors for an improper purpose, such as to alter the voting power of shareholders. In Fraser v Whalley , Sir William Page Wood V-C granted an injunction against the directors of a company to prevent them from invoking a prior resolution by shareholders to issue shares, which had been made for a superseded purpose, for another, improper purpose of gaining control of a forthcoming general meeting at which it was likely to be proposed that they be removed as directors. The Vice-Chancellor at p 29 concurred with the principle laid down in Foss v Harbottle but stated that the court will intervene when directors "clandestinely and at the last moment use a stale resolution for the express purpose of preventing the free action of the shareholders".

In Punt v Symons & Co Ltd [1903] 2 Ch 506 Byrne J followed Fraser v Whalley in granting an injunction against a company to restrain the holding of a general meeting of the company after the directors had issued shares for the improper purpose of gaining a sufficient majority of votes at that meeting to pass a special resolution

to alter the company's articles of association. Byrne J stated (p 517):

> "If I find as I do that shares have been issued under the general and fiduciary power of the directors for the express purpose of acquiring an unfair majority for the purpose of altering the rights of parties under the articles, I think I ought to interfere."

Peterson J in Piercy v S Mills & Co Ltd [1920] 1 Ch 77 reached a similar decision in an action by a majority shareholder against the company and its directors when he granted a declaration that the allotment of shares which the directors had made for an improper purpose was invalid and void. In that case, the plaintiff was a manager of the company who had acquired a majority of its shares and wished to use the voting power of those shares at general meeting to appoint himself and his two brothers as directors in face of opposition from the current directors. In response to his requisitioning of a general meeting, the directors on two occasions allotted shares to their friends to destroy his majority and thereby keep control over the management of

the company. Referring to Fraser v Whalley and Punt v Symons & Co Ltd Peterson J stated, at p 84:

> "The basis of both cases is, as I understand, that directors are not entitled to use their powers of issuing shares merely for the purpose of maintaining their control or the control of themselves and their friends over the affairs of the company, or merely for the purpose of defeating the wishes of the existing majority of shareholders."

Holding that the majority shareholders were entitled to have their views prevail in accordance with the company's articles of association, Peterson J granted the declaration invalidating the allotments of the shares.

In Hogg v Cramphorn Ltd [1967] Ch 254 Buckley J addressed a scheme devised by the directors of a company, acting in good faith in what they believed to be the best interests of the company, to thwart a proposal by an investor from outside the company to acquire its whole share capital.

The directors' scheme involved the issue of new preference shares with special voting rights of ten votes per share. Buckley J held that the company's articles of association did not give the directors power to issue shares with enhanced voting rights but recognised that the allottees might elect to accept the shares without the special voting rights attached. He then addressed the wider question of whether the allotment should be set aside, observing that it was common ground that the directors were not motivated by personal advantage but acted in the honest belief that their scheme to prevent the unwanted take-over was for the good of the company. He referred with approval to statements in Fraser v Whalley , Punt v Symons & Co Ltd and Piercy v S Mills & Co Ltd that it was not open to directors to use their power to issue shares in order to interfere with the right of a majority of shareholders to exercise their constitutional rights within the company. Nonetheless, he observed that a majority of the shareholders could have approved the issue of the contested shares and, had it done so, there could have been no force in the argument that the directors were attempting to deprive the majority of their constitutional rights. That being so, a majority in a general meeting of the company at which no votes were cast in respect of the contested shares could ratify the issue of those shares. Buckley J, therefore, rather than setting aside the allotment and issue of the

WESTLAW © 2025 Thomson Reuters. [Appendix] Page 86

contested shares, gave the company the opportunity in general meeting to decide whether it approved the issue of those shares, with the owners of the contested shares undertaking not to vote at the meeting in respect of those shares. As the report of the decision records, the shareholders thereafter ratified and approved the allotment of the shares, which had equal voting rights.

Another example of a personal action by shareholders to challenge an allotment of shares allegedly made for an improper purpose is the judgment of the Court of Appeal in Bamford v Bamford [1970] Ch 212 . The directors of a public company allotted a significant block of shares in an attempt to block a take-over bid. Two minority shareholders in the company brought a personal action seeking a declaration that the allotment was invalid. In response, the directors gave notice convening a general meeting of the shareholders of the company to consider a resolution ratifying and approving the allotment. The two shareholders then issued a second writ challenging the validity of any resolution passed at the proposed general meeting. In the event, the resolution ratifying the allotment was passed by a substantial majority vote at the general meeting, the allotted shares not being voted. The two actions were consolidated, and a preliminary issue was tried as to whether the allotment was capable of being ratified and approved by a general meeting of the shareholders of the company. Plowman J answered the question in the affirmative, holding that as the allotment had been approved by a majority of the shareholders, it was validated, even if the directors had acted for an improper motive in making the allotment. The Court of Appeal upheld his conclusion, and approved Buckley J's judgment in Hogg v Cramphorn Ltd. It held that a majority of shareholders at the general meeting could waive and had waived any impropriety on the part of the directors. The allotment, if initially voidable, had been subsequently validated by the shareholders.

Harman LJ regarded the case as being "tolerably plain" (p 237). If the directors, by having regard to the exigencies of the take-over battle had not addressed the single question of the benefit of the company, the allotment would be voidable at the instance of the company because it was a wrong done to the company (p 238). The company in general meeting, which had the right to recall the allotment also had the right to approve it. Russell LJ, who gave the other substantive judgment on the appeal, stated (p 242):

> "It is true that the point before us is not an objection to the proceedings on Foss v Harbottle (1843) 2 Hare

461 grounds. But it seems to me to march in step with the principles that underlie the rule in that case. None of the factors that admit exceptions to that rule appear to exist here. The harm done by the assumed improperly-motivated allotment is a harm done to the company, of which only the company can complain. It would be for the company by ordinary resolution to decide whether or not to proceed against the directors for compensation for misfeasance."

The Board will return to this case in its discussion below. It is sufficient now to observe that in Bamford v Bamford the alleged wrong was not targeted at a shareholder or group of shareholders but was a wrong which affected all shareholders of the company. Russell LJ's dictum that only the company could complain of the harm done must be read in that context.

Before completing this survey of the case law from England and Wales, the Board turns to its judgment in an appeal from the Supreme Court of New South Wales in the well-known case of Howard Smith . The appeal concerned a struggle for the takeover of a company ("Millers") in which Howard Smith and Ampol were the rival parties. Another substantial shareholder in Millers, called Bulkships Ltd, was associated with Ampol and together they held about 55% of Millers' issued share capital. Millers needed more capital. The board of Millers recommended that Ampol's offer for the whole share capital of Millers be rejected as too low after Howard Smith had announced its intention to make a higher offer. Ampol and Bulkships announced their intention to act together in the future operations of Millers and to reject any offer for their shares. Howard Smith then applied to Millers for the allotment of 4.5 million shares and the directors of Millers by majority resolved to make the allotment and immediately issued the shares. The effect of the share issue was to give Millers much needed capital and to reduce Ampol's and Bulkships' combined shareholding to 36.6% of Miller's issued shares, thereby enabling Howard Smith to make an effective takeover offer.

Ampol brought an action against Howard Smith, Millers, 11 directors of Millers and a company which acted as Millers' registrar. Only Ampol and Howard Smith appeared in the appeal before the Board.

The question for the Board was whether the issue of the shares to Howard Smith was valid when the primary object of the directors was to alter the majority shareholding of the issued shares so as to procure the takeover offer by Howard Smith but the directors were not acting for their own personal advantage.

Lord Wilberforce, giving the judgment of the Board, stated (p 834) that the issue of the shares by the directors was intra vires but it was a fiduciary power whose exercise could be attacked on the ground that it was not exercised for the purpose for which it was granted. After referring to Fraser v Whalley , Punt v Symons & Co Ltd , Piercy v S Mills & Co Ltd , and Hogg v Cramphorn Ltd , which were cases in which the directors acted in their self-interest or at least to preserve their own control of management, he observed that the absence of self-interest is not enough to make a share issue valid and that a wider investigation must be made. He continued (p 837):

> "The purpose found by the judge is simply and solely to dilute the majority voting power held by Ampol and Bulkships so as to enable a then minority of shareholders to sell their shares more advantageously. So far

as authority goes, an issue of shares purely for the purpose of creating voting power has repeatedly been condemned … In the leading Australian case of Mills v Mills, 60 CLR 150 , it was accepted in the High Court that if the purpose of issuing shares was solely to alter the voting power the issue would be invalid. And, though the reported decisions, naturally enough, are expressed in terms of their own facts, there are clear considerations of principle which support the trend they establish. The constitution of a limited company normally provides for directors, with powers of management, and shareholders, with defined voting powers having power to appoint the directors, and to take, in general meeting, by majority vote, decisions on matters not reserved for management. Just as it is established that directors, within their management powers,

may take decisions against the wishes of the majority of shareholders, and indeed that the majority of shareholders cannot control them in the exercise of these powers while they remain in office …, so it must be unconstitutional for directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist. To do so is to interfere with that element of the company's constitution which is separate from and set against their powers."

The Board therefore concluded that the power to allot and issue shares had been improperly exercised by the issue of shares to Howard Smith. The Board upheld Street J's order setting aside the allotment and ordering the rectification of the company's share register.

The Board observes, as CSCGL has emphasised on this appeal, that Lord Wilberforce recorded (at p 838) that it was not disputed in that case that Ampol as plaintiff had properly brought the action to set aside the allotment and rectify the register. The Board did not address any challenge to Ampol's standing. By contrast, Tianrui's standing to bring the proceedings in this case is the central issue on this appeal.

Returning to jurisprudence in England and Wales, in *Sherborne Park* Hoffmann J explained a jurisprudential basis for a personal action by a shareholder against the improper exercise by directors of the power to allot shares. The reported judgment is an ex tempore judgment in an ex parte application made, in a petition brought under section 459 of the Companies Act 1985 , by the petitioner shareholder for an order that he be indemnified in advance by the company for his costs in the petition. The casus belli was a directors' resolution to issue and allot shares in the company alleged to have been motivated by an improper desire by the directors to alter the balance of voting power in the company. Entitlement to a costs indemnity depended upon the claim being properly constituted as a derivative action, rather than as a personal action by the claimant. In refusing the application, Hoffmann J drew a distinction between a derivative action in which a shareholder sues in

his own name for a wrong done to the company, such as where the directors misappropriate the company's property, and a personal action for a wrong done to a shareholder. A writ challenging an abuse by the directors of their fiduciary power in a wrongful share allotment was a personal action. He stated:

> "Although the alleged breach of fiduciary duty by the board is in theory a breach of its duty to the company, the wrong to the company is not the substance of the complaint. The company is not particularly concerned with who its shareholders are. The true basis of the action is an alleged infringement of the petitioner's individual rights as a shareholder. The allotment is alleged to be an improper and unlawful exercise of the powers granted to the board by the articles of association, which constitute a contract between the company and its members. These are fiduciary powers, not to be exercised for an improper purpose, and it is generally speaking improper —

> "for the directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist."

(see Howard Smith Ltd v Ampol Petroleum Ltd [1974] 1 All ER 1126

at 1136, [1974] AC 821 at 837 ). An abuse of these powers is an infringement of a member's contractual rights under the articles."

Turning to Australian jurisprudence, in *Mills v Mills* (1938) 60 CLR 150 , which Lord Wilberforce cited in Howard Smith , the High Court of Australia addressed what was in substance a dispute in a family company between two directors, one of whom was the managing director, and the other, his nephew. The uncle's interest was mainly in ordinary shares which carried one vote per share, while the nephew's interest was mainly in preference shares which carried three votes per share. The nephew challenged the resolution of the directors to issue new ordinary fully paid up shares to the holders of ordinary shares. No new shares were issued to the holders of preference shares. This share issue not only altered the balance of voting power of the shareholders in favour of the holders of ordinary shares but also improved the position of ordinary shareholders if a winding up should take place as the preference shares ranked equally with the ordinary shares. The nephew and two other shareholders brought an action on their

own behalf and on behalf of the shareholders of the company against the company, the uncle and another director seeking a declaration that the share issue was invalid. The action failed as it was not established that the resolution of the directors was passed in bad faith; the mere fact that the uncle derived some benefit from the passing of the resolution was not sufficient ground for invalidating the share issue when it was not established that the resolution was passed for an improper purpose.

The High Court of Australia rejected a challenge to the right of minority shareholders to seek an order invalidating the exercise by directors of their fiduciary power to allot shares in *Ngurli Ltd v McCann* (1953) 90 CLR 425 ("Ngurli"). The case involved identical transactions in four companies. Simplifying the facts, shares were issued at par for the improper purpose of giving a director and shareholder controlling voting power at meetings of a company and no shares were issued to minority shareholders. The judge at first instance, Mayo J, held that there had been a breach of fiduciary duty by the controlling director but that the wrong had been done to the company and it alone was the proper plaintiff. The Supreme Court of South Australia set aside his order and declared that the allotment and issue of the shares were invalid. The High Court (Williams ACJ, Fullagar and Kitto JJ) dismissed

an appeal against that order. They held (p 447) that the controlling director in failing to take into account the interests of the minority shareholders when deciding to issue the new shares had acted in breach of his fiduciary duty to consider the interests of the company as a whole and that in those circumstances "the plaintiffs have a clear right to sue in their own names to remedy the breach of trust."

The Supreme Court of South Australia rejected a similar challenge to the standing of a minority shareholder to seek an order invalidating the allotment of shares by directors of a company for an allegedly improper purpose in *Residues* , to which the Board has referred in para 27 above. In the leading judgment of King CJ, with whom Matheson J agreed, the court recognised that the exercise by directors of a power to allot shares for an improper purpose was a breach of their fiduciary duty to the company and that such an allotment was voidable "in the sense that it is valid unless and until disavowed by the company in general meeting or declared invalid by a court in a properly constituted action" (p 1163). The court recognised that to establish standing the statement of claim must raise a cause of action based upon an infringement of the plaintiff's personal rights. King CJ referred to several cases in which a shareholder had successfully challenged allotments of shares made by directors for an improper purpose, including *Ngurli* ,

Howard Smith , and *Whitehouse v Carlton Hotel Pty Ltd* (1987) 162 CLR 285 . The cases, he stated, contained "strong indications … of the recognition of a personal right in a shareholder to be protected against dilution of his voting rights in the company by improper action on the part of the directors." He considered that the principle applied not only to an improper allotment that converted a majority into a minority but also to an improper allotment which "reduces the aggrieved shareholder's voice in the company." (p 1164)

King CJ explained the jurisprudential basis for the personal right in these terms (p 1165):

> "The personal right of a shareholder to which I refer is founded, in my opinion, upon general equitable considerations referred to in the cases cited above arising out of membership of a body whose management is in the hands of directors having fiduciary obligations. It is fortified by the nature of the contract between the company and the members constituted by the memorandum and articles of association

and given statutory force by section 78(1) of the Companies Code. I do not mean that the relevant right of a shareholder is founded in contract or that his remedies for infringement are remedies for breach of contract. The shareholder's right is founded in equity and is a right to have the say in the company which accrues to him by virtue of the voting rights which are attached to his shares by his contract with the company, preserved against improper actions by the company or the directors who manage its affairs."

The improper allotment of shares which diminished a shareholder's effective voting power was "a wrong done to the shareholder by the company acting through its agents" and therefore the rule in [Foss v Harbottle](#) did not apply. He drew support for his conclusion from Hoffmann J's judgment in *Sherborne Park* .

King CJ expressed the view that any potential for ratification of the exercise of the power at general meeting would not deprive the plaintiff of standing while the infringement exists. The Board addresses the Company's argument on the potential for ratification in paras 80 – 84 below.

Bollen J in a short judgment concurred and referred to Hoffmann J's "carefully considered dicta" in *Sherborne Park* as giving strong support for his conclusion (p 1168).

**the legal basis of the shareholder's personal action**

The series of English and Australian cases reviewed above shows that courts, applying principles of company law which are not materially different to those in force in the Cayman Islands, have repeatedly recognised the right of one or more shareholders of a company to bring a personal action in their own names against the company (rather than a derivative action on behalf of the company) by way of challenge to the validity of an allotment of shares made on behalf of the company by its directors, based upon the allegation that the directors acted for an improper purpose. In only one (Australian) case, the *Residues* case, has a challenge to the shareholders' standing been addressed and rejected with principled reasons for doing so. Yet in two Cayman cases, *Gao* and the decision of the Court of Appeal in this case, that right to bring such

an action has been asserted but denied. At the heart of each of those decisions was the reasoning that shareholders could not bring a claim in their own right in respect of a breach of fiduciary duty owed by the directors solely to the company. The company was the only proper claimant, and shareholders could only assert the company's claim by way of a derivative action, where the law permitted such an action to be brought and where leave of the court to do so was obtained in accordance with the rules.

The Board's opinion is that *Gao* was wrongly decided, and that the Court of Appeal was wrong to follow it in the present case. A shareholder whose holding is diluted by an improper allotment of shares by the directors may bring a personal claim against the company challenging the validity of that allotment, although in certain circumstances (not applicable here) the claim may be defeated by ratification of the allotment by a majority of the shareholders (other than the allottees) at a general meeting. Since the Board does not entirely agree with the reasoning of King CJ in the *Residues* case for reaching that conclusion, the Board will set out its own reasons. They require the matter to be approached from first principles.

The registration of a person as a shareholder in a company brings with it a bundle of rights. Subject to any special class rights or restrictions, the rights include a proportionate share in the distributed profits of the company and in any distribution of capital. The value per share of the shareholding will follow the fortunes of the company. That which benefits or harms the company will correspondingly increase or reduce the value of the shares.

Subject again to any class restrictions, shares will carry the right to attend and vote at general meetings of the company, and thereby play a part in the exercise of the shareholders' collective power to influence or control the general direction of its affairs. The active power of a shareholder is critically dependent upon the proportion which the shares (of an individual shareholder or group of shareholders acting together) bear to the shares in the company (or the relevant class) as a whole. In companies which are controlled by the majority vote of ordinary shareholders, the possession of a majority of the shares confers control (critically through the power to appoint and remove directors), while possession of more than 25% of the shares confers what is sometimes called negative control, through the ability to block certain steps requiring a special resolution, including the power to alter the articles of association. The value per share of such a block is critically sensitive to dilution, where in particular its percentage falls below 50% or 25% of the whole. The exercise of (or ability to exercise) those rights by individual

shareholders or groups of shareholders is how power over the company's affairs is maintained, and dilution of those shareholding proportions by the allotment and issue of new shares may critically affect the balance of power between shareholders.

The power to issue shares is conferred upon CSCGL by its memorandum of association, but the power to cause the company to allot and issue shares is conferred upon the directors, acting as fiduciaries, by the articles of association. The power is therefore necessarily a fiduciary power and must therefore only be exercised for proper purposes. The proper purposes for the exercise of the power to allot and issue shares include the raising of new capital where that is genuinely considered by the directors to be in the best interests of the company, but there can be other legitimate purposes. No part of those proper purposes includes deliberately altering the balance of power between shareholders. But, of course, an allotment and issue of new shares will frequently have that effect, save where the allotment is made to, and taken up by, all existing shareholders in strict proportion to their existing holdings. Equally, an allotment to the whole of one class of shareholders may alter that balance of power, as is illustrated by the facts of *Mills v Mills* , as explained by Latham CJ at pp 159-160.

The conferment upon the directors of that fiduciary power to allot and issue shares is an important part of the contract between shareholders and the company, constituted by its memorandum and articles: see sections 12 and 25 of the Companies Act (para 31 above). The inevitable consequence of the conferral of a power upon fiduciaries is that it must be exercised for proper purposes: see again *Mills v Mills,* per Dixon J, at pp 185-186, followed in Howard Smith at pp 835-836 and more recently Eclairs , at paras 15ff. Where such a power is conferred by the articles upon fiduciaries, this constraint upon its exercise is as much a part of that corporate contract as if it had been spelt out word for word in the articles. It is a term of the corporate contract that, if the exercise of the power to allot and issue new shares by the directors as agents for the company is to be valid and binding as between the individual shareholder and the company, it should comply with all conditions necessary to make it a proper exercise. These include compliance with the directors' fiduciary duty owed to the company. This is a constraint implied by law as inherent in the relationship between the shareholder and the company.

It is not, of course, any part of the corporate contract that a shareholder's holding will not be diluted, or that nothing will be done by the directors which alters the balance of power between shareholders. The Board may

for example perfectly legitimately decide to issue shares for proper business purposes to new shareholders and that issue, while diluting all existing shareholders' holdings in equal proportions, incidentally alters the balance of power by depriving a shareholder or group of majority control, or of negative control. But it is part of the corporate contract that, if this is to happen, it is done only by a proper exercise of the power, ie one that is exercised bona fide for the benefit of the company as a whole and exercised for the purposes for which the power was conferred. This will necessarily exclude, for example, an allotment and issue of shares which is deliberately aimed at altering the balance of power between shareholders, so as to advance the power of one (or one group) at the expense of another.

This is, in the Board's view, the basis of the shareholder's right to bring an action against the company to challenge an improper exercise of the directors' power to allot and issue shares. It is implicit in the contract constituted by the articles of association that the company's power to allot and issue new shares, delegated by the articles to the directors, will be exercised properly, which is to say by the directors on behalf of the company in accordance with their fiduciary duties. The harmful consequence to the shareholder is the alteration (adverse to him) in the balance of power between the company's shareholders and the

particular harm which that does to the value of the rights embedded in his shares. It is an actionable harm because the impropriety in the exercise of the power contravenes the corporate contract binding him and the company, even though the relevant fiduciary duty breached by the directors is not owed to him.

It is precisely in the identification of the corporate contract as the basis of the shareholder's claim against the company that the Board respectfully differs from the otherwise compelling reasoning of King CJ in the *Residues* case in the quotation in para 62 above.

It is correct to say that the constraint which requires the directors to exercise their power to allot and issue shares only for proper purposes is of equitable origin, because it is an aspect of the conduct which equity requires of directors as fiduciaries. This is for example the reason why the exercise of the directors' power to allot and issue shares is only rendered voidable (rather than void) by an equitable impropriety in its exercise, and why a challenge to its exercise may be ineffective against a bona fide purchaser of the issued shares without notice of the impropriety: see again *Residues* , at pp 1162-1163. But the Board does not consider that the breach of an equitable restraint upon the exercise of a power gives rise automatically and without more to an equity to set it aside enjoyed by someone, such as a shareholder, who is

[Appendix] Page 97

App. 345

neither the donor nor the beneficiary of the power. What gives the shareholder that right is the corporate contract binding between the shareholder and the company, in which this right not to have his say in the company adversely affected by an improper exercise of the power is embedded.

In that respect the Board prefers the analysis of Hoffmann J in *Sherborne Park* which the Board has quoted in para 58 above. Although this was an ex tempore judgment refusing an ex parte application for a costs indemnity at the outset of an unfair prejudice petition, it is nonetheless compelling and consistent with principle. It chimes with Lord Wilberforce's emphasis in Howard Smith on the contractual constitution of a company in the passage which the Board has set out in para 55 above. The Board agrees with Hoffmann J's pithy analysis of the essential nature of the shareholder's personal action to challenge an improper allotment and issue of shares by directors. Although the action is founded upon the fact of the commission of a breach of fiduciary duty by the directors, the cause of action is that the contract between the shareholder and the company contains the implied term that, in exercising the power to allot and issue shares, the directors as the company's agents will do so in accordance with their fiduciary duties.

In the Board's view this term falls to be implied into the contract between the shareholder and the company and between the shareholders inter se and it arises out of the nature of the contractual constitution of the company. It is a term which is implied as a result of the nature of the contract and the relationship thereby created between the parties to that contract. This involves implication in the sense that the House of Lords discussed in Liverpool City Council v Irwin [1977] AC 239 , see especially Lord Wilberforce at p 254 and Lord Fraser of Tullybelton at p 270. It is a necessary legal incident of the relationship between a shareholder and a company, and between the shareholders inter se.

The Board would add that the right of the shareholder to sue the company is not dependent upon the alteration in the balance of power being adverse only to a minority of shareholders (although it was on the assumed facts of this case). Directors may seek deliberately to deprive a single existing shareholder (or group) of majority control by allotting shares to a favoured outsider. That is what happened in Howard Smith , but the claimant, which was one of a pair of shareholders which together held 55% of the company's shares, nonetheless succeeded. There the majority were determined to resist a take-over bid, and the directors improperly allotted sufficient shares to the bidder to

destroy that majority, so as to facilitate the bid. In both [Hogg v Cramphorn Ltd](#) and [Bamford v Bamford](#) the directors feared that the majority would succumb to an unwelcome take-over bid. In neither case did this render the shareholders' personal actions improperly constituted. As explained below, the claimants ultimately failed in both cases because the improper issue and allotment of shares by the directors was ratified in general meeting.

Nor by contrast is the personal right to sue dependent upon the claiming shareholders being, or being part of, a majority, as was submitted by Mr Smith, even though that was in fact the position in a number of the cases where a personal claim succeeded. The Board considers that the size of the claimant's shareholding is in principle irrelevant. The Board agrees with the following extract from the judgment of Barwick CJ in *Ashburton Oil NL v Alpha Minerals NL* (1971) 123 CLR 614 ("Ashburton") at p 620:

> "The remaining basis of the appellants' claim was that their majority shareholding itself gave them a right to relief in each action which they had commenced. But, in my opinion, the extent of that shareholding in itself gave the appellants no

equity to any of the relief sought in either action. Of course, that shareholding because of its extent might enable the appellants to carry resolutions at general meetings of the company, but always subject to the absence of any relevant oppression of the minority. Though the appellants have the equity of a shareholder to which I have referred, they have, in my opinion, no greater and no differing right because their shareholding is a numerical majority of the issued shares of the company."

What matters is that the claiming shareholder, together in an appropriate case with those other shareholders he claims to represent, have suffered from an interference with their rights as shareholders brought about by the improper issue and allotment.

It is also in principle irrelevant whether or not the company itself has a cause of action against the directors for the breach of the fiduciary duty owed

to it. Usually it will, because the right of the beneficiary to challenge the improper exercise of a fiduciary power, and to seek to set aside the resulting transaction, is not dependent upon proof of loss or damage. To that extent, if the dicta of Hoffmann J in *Sherborne Park* might be thought to suggest that the two types of action are mutually exclusive, the Board respectfully disagrees, even if they may have been on the facts of that case. The Board agrees with the analysis of Professor Gower in his *Principles of Company Law*, 4th ed (1979) at pp 653-654 that a shareholder's action against the company may coexist with an action by the company in respect of the same breach of duty by the directors, so that the availability of the latter by no means excludes the former.

A major plank in Mr Smith's submissions was that one thing which prohibited a shareholder's action against the company was the ever-present theoretical possibility that the offending exercise of power by the directors could be ratified by the members in general meeting. The Board has already acknowledged that, in certain circumstances, ratification may defeat the shareholder's personal claim. It is necessary again to start from first principles. The shareholders of a solvent company may, acting unanimously, ratify any action taken by the directors which falls within the corporate capacity of the company itself. The thing done becomes the act

of the company: see [Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd [1983] Ch 258](#) .

But if the shareholders seek to use their power to act by a majority, then they are constrained by the equitable principle that they may not do so by way of oppression of the dissenting minority: see [Allen v Gold Reefs of West Africa Ltd [1900] 1 Ch 656](#) , Lindley MR at pp 671-672; [Cook v Deeks [1916] 1 AC 554](#) , Lord Buckmaster LC at pp 563-565; [Greenhalgh v Arderne Cinemas Ltd [1951] Ch 286](#) , Evershed MR at p 291; *Peters' American Delicacy Co Ltd v Heath* (1939) 61 CLR 457 ("Peters"), Latham CJ at pp 480-482; *Ashburton* , Barwick CJ at p 620. That constraint is inherent in the power of the majority of a class to bind the minority. Whether it is actionable by the minority having a mere equity of their own to set the majority action aside, or because that constraint is also embedded in the corporate contract, may be a matter for debate, but it makes no practical difference for present purposes.

There have been, and will always be, cases where a personal claim by a shareholder may be defeated by ratification, both before and after proceedings have been begun or even tried. [Hogg v Cramphorn Ltd](#) and [Bamford v Bamford](#) are well known examples of such cases. In the former the allotment by the directors was

ratified at a general meeting held after the case had been tried and judgment given in the claimant's favour, during an adjournment granted for the purpose, before any final order was made. In Bamford the impugned allotment had been ratified shortly after the issue of the writ challenging the allotment. The ratification was then challenged by a second writ, and the two were consolidated and heard together. In neither case was the ratification held to have involved oppression of a minority. In such cases (unless ratification has occurred before the commencement of proceedings) it may be said that the shareholder has a defeasible claim, but it will rarely be open to the company to say that the claim is demurrable merely because of the theoretical possibility of ratification in the future. The court may well stay a claim as a matter of good case management (as in Hogg v Cramphorn Ltd) to see whether ratification occurs.

There will also be cases where the nature of the breach of duty by the directors is such that ratification will be seen to be impossible, either because it has been attempted without success or because any attempt in the future would be bound to fail. For example, a breach constituted by the directors having the improper purpose of assisting an existing majority to oppress a minority could hardly be ratified by the majority, without itself falling foul of the constraint against majority oppression: see in *Residues*

at p 1167, King CJ's doubt whether the share allotment in that case could be ratified. As Dixon J explained in *Peters,* pp 504ff and especially pp 511-513, the power of the shareholders in general meeting to alter the articles of association must be exercised in a manner which is both within the power and consistent with the contemplated purpose of the power.

No part of this analysis supports Mr Smith's submission that the mere theoretical possibility of ratification is sufficient to deprive the claimant shareholder of a cause of action. If that were so, then there would have been no need for a trial in Hogg v Cramphorn Ltd , still less an adjournment to see whether ratification would succeed. Nor, in Bamford , would there have been any need for a second writ. The possibility of ratification would have been enough to defeat the claim made by the first writ.

**the Law Applied to the Assumed Facts**

The Board regards this as a strong case, on the assumed facts, for the availability of a personal shareholder's action, such as is pursued by Tianrui's writ. It is alleged that the disputed share issue was allotted to outsiders who were acting in concert with the majority shareholder group and the directors to consolidate their control over CSCGL, and that the allotment was ratified by the same majority in general meeting. The effect of the dilution of Tianrui's

shareholding was to deprive it of negative control of CSCGL. It was an interference with Tianrui's rights as shareholder to have a say in the collective control of CSCGL's affairs by the shareholders.

It is plain that, if the assumed facts are proved to be true, the directors acted for an improper purpose in the issue and allotment of the disputed shares, and that the purported ratification of their actions was itself vitiated by the intent of the majority to oppress Tianrui as a minority shareholder. It is equally plain, if the assumed concert party between the majority and the recipients of the shares is proved, that the recipients, once identified by discovery and joined as defendants, would be unlikely to be able to resist the setting aside of the allotments on the basis that they are bona fide purchasers without notice of the impropriety.

## Conclusion

It follows that the writ should not have been struck out by the Court of Appeal. The Board will therefore humbly advise His Majesty that this appeal be allowed.

Crown copyright
2024 WL 04794596

**End of Document**

© 2025 Thomson Reuters.

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § | TEXAS BUSINESS COURT |
| *Plaintiffs,* | § § | FIRST DIVISION |
| v. | § | |
| MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § § | DALLAS, TEXAS |
| *Defendants.* | § § § § | |

**ADDITIONAL FOREIGN CASES CITED TO DATE**

| Exhibit | Document |
|---|---|
| Exhibit 2-A | *Kohn v. Meehan*, (Transcript Smith Bernal), at ¶ 101 (Ch. Div. 2003). |
| Exhibit 2-B | *Ayerst (Inspector of Taxes) v. C&K (Construction) Ltd.* [1975] AC 167, 179 |
| Exhibit 2-C | *Foss v. Harbottle*, (1843) 67 Eng. Rep. 189, 202 (Eng.). |

# EXHIBIT 2-A

---

# *Kohn v Meehan and another [2003] All ER (D) 315 (Jan)*

Chancery Division

EnglandandWales

Launcelot Henderson QC sitting as a deputy judge of the High Court

31 January 2003

**Companies – Shares – Purchase of shares – Shareholder selling minority shareholding – Shareholder seeking declarations and damages on basis he had not received full consideration to which entitled on sale – Application by defendant to strike out parts of claim.**

The claimant and the first defendant were, at all material times, the directors of O Ltd (the company). The company entered into a settlement agreement with nine other parties, as a result of which new articles of association were introduced. Those articles provided for the service of a 'drag along notice' on the minority shareholders of the company, requiring them to sell their shares to a person contracting to buy 50% or more of the issued share capital of the company. In December 2001, the claimant sold his minority shareholding in its entirety to M Ltd for £1·189m. He later alleged that he had been unaware of negotiations which had taken place between M Ltd and the first and second defendants relating to the sale of shares in the company, and commenced proceedings against the defendants by which he sought declarations and damages on the basis that he had not received the full consideration to which he was entitled on the sale of his shares. In addition, he made allegations of breach of fiduciary duty and fraudulent misrepresentation against the first defendant in relation to the settlement agreement. The first defendant applied for summary judgment under CPR Pt 24 in respect of certain parts of the claim against him or, alternatively, for those parts of the claim to be struck out under CPR 3.4(2) as disclosing no reasonable grounds for bringing them, or being an abuse of the court's process, or otherwise likely to obstruct the just disposal of the action. It was agreed that the general approach which the court was to take on that application was to decide whether the claimant had no real prospect of succeeding on those aspects of its claim.

The application would be allowed.

The first defendant's contentions were made out and, accordingly, the paragraphs at issue would be struck out. It was, inter alia, unnecessary for the claimant to plead as substantive allegations that the drag-along notices served on other minority shareholders were invalid, that they had suffered loss and damage, and so on, and embarrassing for him to plead their treatment as substantive issues in their own right and, expressly or by implication, to ask the court to determine those issues. Further, the claims for breach of fiduciary duty and fraudulent misrepresentation had, in the circumstances of the case, no real prospect of succeeding at trial and would be disposed of summarily in favour of the first defendant.

Catharine Otton-Goulder QC (instructed by Pitmans, Reading) for the claimant.

Robert Anderson (instructed by Kingsley Napley) for the first defendant.
Victoria Parkin   Barrister.Judgment

## **CHANCERY DIVISION**

31 JANUARY 2003

MR L HENDERSON QC SITTING AS A DEPUTY JUDGE OF THE HIGH COURT

**APPROVED JUDGMENT**

I. direct pursuant to CPR PD 39A para.6.1 that no official shorthand note shall be taken of this judgment and that copies of this version as handed down may be treated as authentic , A i J

**ABBREVIATIONS**

1. In this judgment I shall use the following abbreviations:

| | |
|---|---|
| Omnilabs | Omnilabs Limited, a UK company |
| OGL | Omnilabs Group Limited, a UK subsidiary of Omnilabs |
| Sonetti | Sonetti Investments Limited, a company incorporated in Gibraltar and a wholly-owned subsidiary of Pettmond |
| Pettmond | the Second Defendant, Pettmond Investments Limited, also incorporated in Gibraltar and the parent of Sonetti |
| Mr Meehan | the First Defendant, Mr Graham Meehan |
| Mr Kohn | the Claimant, Mr Eric F. Kohn TD |
| Mr Curtis | Mr Andrew Curtis |
| Unilabs | Unilabs SA, a company registered in Switzerland and a minority shareholder in Omnilabs |
| UGL | Unilabs Group Limited BV, a company registered in the British Virgin Islands and a minority shareholder in Omnilabs |
| UIL | Unilabs International Limited, also registered in the British Virgin Islands and a minority shareholder in Omnilabs |
| Unilabs companies | Unilabs, UGL and UIL |
| MIA | MIA Group Limited, a company incorporated in Australia and the parent of MIA (UK) Limited |
| MIA UK | MIA (UK) Limited, MIA's UK subsidiary |
| "the Settlement Agreement" | the Settlement Agreement relating to Omnilabs dated 19 September 2001 and made between Omnilabs and nine other parties, including OGL, Sonetti, the Unilabs companies and Mr Kohn |
| "the Share Sale Agreement" | the Deed of Share Purchase dated 16 November 2001 and made between Pettmond. (1) MIA (UK) (2) MIA (3) Mr Meehan (4) and Mr Curtis (5), whereby Pettmond agreed to sell all the shares in Sonetti, and to procure the sale of the minority shareholdings in Omnilabs, to MIA (UK). |

**INTRODUCTION**

2. This is an application by the First Defendant, Mr Meehan, seeking summary judgment under CPR 24.2 in respect of certain parts of the claim brought against him in the action, or alternatively that the same parts of the claim

should be struck out pursuant to CPR 3.4(2)(a) and/or (b) as disclosing no reasonable grounds for bringing them or being an abuse of the court's process or otherwise likely to obstruct the just disposal of the action.

3. On the hearing of the application before me Mr Meehan was represented by Mr Robert Anderson of Counsel and the Claimant, Mr Kohn, was represented by Miss Catharine Otton-Goulder QC. The Second Defendant, Pettmond, played no part in the proceedings, but it supports Mr Meehan's application and the parties have agreed that insofar as Mr Meehan's applications are successful the orders made should apply equally to the case against Pettmond.

4. In December 2001 Mr Kohn sold the whole of his substantial minority shareholding in Omnilabs to MIA (UK) for a cash consideration of approximately £1.189m. In the action, which he commenced on 15 April 2002, he first of all claims declarations, and damages to be assessed, against both Defendants, on the basis that he has not received the full consideration to which he was entitled on the sale of his shares. The claim is put in various alternative ways, and involves issues of construction of certain key documents as well as allegations of estoppel, breach of contract and unfair prejudice to Mr Kohn as a shareholder in Omnilabs. The Defendants accept that many aspects of this claim must go to trial, but submit that parts of it (including a major component of the claim for damages, and the allegation of unfair prejudice in its entirety) should be struck out or disposed of summarily in their favour. In addition, Mr Kohn makes allegations of breach of duty and fraudulent misrepresentation against Mr Meehan (but not against Pettmond) in relation to the Settlement Agreement, and alleges that he was thereby induced to enter into it on terms less favourable than he would otherwise have obtained. Mr Meehan submits that the whole of this additional claim should be struck out, essentially on the ground that it is bad in law and discloses no reasonable cause of action.

## THE FACTUAL BACKGROUND

5. I must begin by setting out so much of the factual background as is necessary to an understanding of the issues. Except where I indicate the contrary, these background facts are not controversial.

6. Omnilabs was incorporated in the UK in 1993, and by October 2001 it was the second largest provider of private pathology services in the UK- At all material times both Mr Meehan and Mr Kohn were directors of the company.

7. On 19 September 2001 the Settlement Agreement was entered into, to resolve disputes which had arisen relating to the security held by Unilabs for certain loan notes issued by OGL and an investment in Omnilabs by Sonetti (which then had a stake of about 25 per cent in the company). For present purposes nothing turns on the detail of those disputes, but certain provisions of the Settlement Agreement itself are important:

(1) First, the overall effect of the settlement terms was that Sonetti increased its stake in Omnilabs to just over 75 percent. This was mainly achieved by Sonetti agreeing to buy 683,453 ordinary shares in Omnilabs from OGL for £950,000, and to subscribe about £1.34m in cash for the allotment of a further 1,043,166 ordinary shares in Omnilabs, while at the same time OGL agreed to sell back to Omnilabs over 3 million of its (i.e. Omnilabs') ordinary shares in consideration of a rescheduling of the loans.

(2) Secondly, Mr Kohn agreed to transfer 180,130 of his holding of ordinary shares in Omnilabs back to the company. It was expressly provided that no amount was payable by Omnilabs to Mr Kohn in consideration of this transfer: see clause 2.1.10. The transfer reduced Mr Kohn's holding of ordinary shares in Omnilabs to 249,682, together with 6,791 'W' warrants, and 217,899 "B" warrants issued in February 2001.

(3) Thirdly, the parties agreed to procure that Omnilabs should adopt new Articles of Association in the form set out in Appendix 4 to the Settlement Agreement: see further paragraphs 9 to 13 below.

(4) Fourthly, Omnilabs undertook to set up an executive committee of its Board comprising Mr Kohn and two persons nominated by Sonetti to deal with the day-to-day business of the Group, and also undertook that the Board should consist of not more than seven directors, including three to be nominated by Sonetti (including Mr Meehan and Mr Curtis).

(5) Lastly, by clause 12.1.3 each party agreed that it had no right of action or other remedy in respect of any "Pre-contractual Statements" (as defined) made or given by any person, other than ones expressly set out in the "Settlement Documents" (as defined), and that no party would have the right to rescind any of the Settlement Documents for negligent or innocent misrepresentation or otherwise

"provided always that this clause 12.1 shall not exclude or limit any liability or any right which any party ... may have in respect of Pre-contractual Statements made or given fraudulently or dishonestly or in circumstances where there has been wilful concealment."

8. Mr Meehan was not a party to the Settlement Agreement, but he was in some sense a driving force behind Sonetti and its parent Pettmond, and Mr Kohn alleges that he was beneficial owner of the shares in Sonetti. The nature of his relationship with those companies was not, however, disclosed in the evidence before me, although Mr Meehan has put in no fewer than three witness statements. These statements contain very little by way of factual evidence, and are mainly confined to exhibiting relevant documents.

9. The new Articles of Association of Omnilabs, which were duly adopted on 19 September 2001, included provisions relating to the transfer of shares which in broad terms were clearly designed to protect the interests of minority shareholders on a sale of more than 50 per cent of the shares in Omnilabs or a change in control of the registered holder of more than 50 per cent of the shares in Omnilabs.

10. Article 1. 1 defines a "Trade Sale" as meaning the entering into of a bona fide binding contract for a sale of, and/or change of control of the registered holder of, 50 per cent or more of the issued share capital of the company. "Trade Seller" is then defined as meaning "the member who enters into a bona fide contract to sell Shares and/or for its change of control on a Trade Sale", and "Trade Buyer" is defined as meaning "the person who enters into a bonafide contract to purchase Shares on a Trade Sale". "Shares" are defined as meaning the ordinary shares of 25p each in the capital of Omnilabs.

11. Article 4, which is headed "Transfer of Shares", provides so far as material as follows:

"4.1 Drag Along Rights

On a Trade Sale, the Trade Seller shall be entitled to serve a notice (a "Drag Along Notice") on the other members, including any person who becomes a member within 30 days of the Trade Sale by exercising a warrant or any other securities convertible into Shares:

(a) in the case of a sale, requiring them to sell to the Trade Buyer upon the terms set out in the Drag Along Notice all their respective Shares at the equivalent price per Share and on substantially the same terms and conditions as the Trade Buyer is proposing to offer the Trade Seller (subject to Article 4.3 below...); and

(b) in the case of a change of control, requiring them to sell to the Trade Seller or to the Controller [i.e. the person who acquires control of the registered holder of 50 per cent or more of the issued share capital of Omnilabs on a Trade Sale] upon the terms set out in the Drag Along Notice all their respective Shares at an equivalent price per Share and on substantially the same terms and conditions pro rata and similar to those paid by the Trade Buyer (subject to Article 4.3 below...),

in which case the members shall sell such Shares at such price free from all encumbrances...

…

4.3  Floor Price

In the situation of .. a Drag Along Notice ... being served upon Shareholders then the consideration offered for each of the Shares referred to in such notice shall be equal to at least 80% of the value of each Share which the Trade Seller is offering to sell to the Trade Buyer pursuant to the Trade Sale ("the Floor")."

12. It will be noted that Article 4.1, at least if read literally, does not provide for service of a Drag Along Notice where the "Trade Seller" is not itself a member of Omnilabs, but is instead a company which controls a majority shareholder of Omnilabs and which enters into a contract for the sale of shares in that company to a third party. Such a transaction does not appear to fall within the scope of Article 4.1, because "Trade Seller" is defined as meaning the member (in Omnilabs) who enters into a contract to sell shares (in Omnilabs) and/or for its change of control on a Trade Sale, and "Trade Buyer" is likewise defined by reference to entry into a contract to purchase shares in Omnilabs. Thus although a sale by Sonetti of its majority shareholding in Omnilabs would clearly be caught, and would trigger an obligation to serve Drag Along Notices on the minority shareholders, any sale by Pettmond of more than half its shares in Sonetti would seem not to be caught, even though the effect of such a sale would be to change the ultimate shareholder control of Omnilabs.

13. It should also be noted that Article 4 does not provide for what is to happen if a valid Drag Along Notice is not complied with by the shareholder upon whom it is served.

14. By a side agreement ("the Side Agreement"), evidenced by a letter dated 19 September 2001 from Sonetti to Mr Kohn and counter-signed by Mr Kohn, Sonetti confirmed the agreement between them

"that, in the event of a Trade Sale (as defined in the Articles) and, under the provisions of Article 4, the consideration per share payable to you is less than that received by us for our shares in [Omnilabs], the Floor (as defined in Article 4.3) in respect of your shares in [Omnilabs] shall be at least 90% of the consideration per share received by us."

Similar (but not identical) side agreements were also concluded between Sonetti and some other minority shareholders, including the Unilabs companies.

15. Meanwhile, but according to Mr Kohn without his knowledge, discussions were taking place between MIA (the initials stand for Medical Imaging Australasia) and an associated company of Pettmond called Woodload Investments Limited, also based in Gibraltar, with a view to the sale of the whole of the issued share capital of Sonetti to MIA (UK). On 28 September 2001 MIA and Woodload entered into a Memorandum of Understanding, subject to contract, paragraph 2 of which referred to the discussions between the parties and the recent restructuring of the share capital of Omnilabs, and continued:

"The Seller will procure that, prior to completion of the Proposal, the remaining shareholders in Omnilabs will sell or agree to sell their shareholdings to MIA (UK) so that at completion of the Proposal, MIA (UK) will acquire 100% of Omnilabs".

16. The Memorandum then set out the principal terms of the proposed transaction, including:

(a) that the purchase price for the shares in Sonetti would be £16.5m (subject to adjustment) initially, together with an earn-out calculated in accordance with a formula linked to the future earnings of Omnilabs over three periods ending on 31 December 2004;

(b) that 30 per cent of the initial consideration (i.e. £4.95m) would be paid in cash on completion, with the remaining 70 per cent to be satisfied by the issue of fully-paid shares in MIA at a price of A$1.24 per share;

(c) that the earn-out would also be payable in MIA shares, at the same price of A$1.24 per share; and

(d) that as security for the warranties etc to be given by the seller, 64 per cent of the MIA shares issued at completion would be held in escrow for a period of three years, with half of those shares (i.e. 32 per cent) to be released after one year, half of the remainder (i.e. 16 per cent) to be released at the end of the second year, and the remaining 16 per cent to be released at the end of the third year.

17. The Memorandum recorded that it was the parties' intention to sign a definitive sale and purchase agreement in October 2001, with completion to occur on 31 October.

18. A few days later, on 1 October 2001, MIA made a public ASX (i.e. Australian Stock Exchange) announcement headed "Memorandum of Understanding with Omnilabs Limited - UK Pathology Provider". The announcement said that MIA was pleased to announce a Memorandum of Understanding to acquire Omnilabs, which was the second largest private pathology provider in the UK with revenue of £1 lm. It went on to say that the acquisition by MIA would be achieved through a combination of cash and MIA shares "with the purchase price incorporating a performance driven component." Completion of the transaction was said to be conditional upon due diligence and formal documentation.

19. The negotiations bore fruit, and on 16 November 2001 the Share Sale Agreement was concluded, with Pettmond now the vendor. The Agreement recited the proposed sale and purchase of all the shares in Sonetti; that Sonetti was the beneficial owner of 75.01 per cent of the shares in Omnilabs; that the remaining shares in Omnilabs (defined as "the Balance Securities") were owned by the minority shareholders listed in Schedule 1; and by recital (E) that

"[MIA (UK)] also wishes to purchase the Balance Securities and [Pettmond] wishes to procure the sale of such Balance Securities to [MIA (UK)] by exercising its rights under the Articles of Association of Omnilabs or otherwise."

20. The Share Sale Agreement is a lengthy document running to some 140 pages. Its main provisions broadly reflect the earlier Memorandum of Understanding, but with the possibly significant difference that there is no longer any reference to an earn-out, either as being part of the consideration for the share sale or at all. Clause 2.1.1 provides for the sale of the Sonetti shares, while clause 2.1.2 obliged Pettmond to procure the minority shareholders to sell their holdings in Omnilabs. Clause 3.1 provided that the total consideration payable for both categories of shares (i.e. both the Sonetti shares and the Omnilabs shares) would be £4.95m (less a specified retention) payable on completion and the ordinary shares of MIA to be issued on completion in accordance with clause 6.4. 1.

21. Clause 6.1 provided that completion should take place on the later of "the EGM Date" and 30 November 2001, or such later date as the parties might agree in writing, the EGM Date being defined as "the date of the extraordinary general meeting of Omnilabs called by notice dated today to be held on 8 December 2001 to consider a resolution to amend the Articles of Association of Omnilabs." Clause 6.2 obliged Pettmond at completion to deliver (or procure delivery of) duly executed transfers of all of the shares contracted to be sold, including the Balance Securities. 22. Clause 6.4 provided for the issue of MIA shares on completion to an aggregate value of £11.55m, the value of each MIA share being taken as A$1.24 exchanged into sterling at a specified rate. The effect of this formula was that the number of shares MIA was obliged to issue on completion was, according to a calculation handed in by Mr Anderson, 25,756,500. As foreshadowed by the Memorandum of Understanding, however, 64 per cent of those shares (i.e. 16,484,160) were then to be held as security, and released over the ensuing three years, in accordance with the terms of a Security Agreement ("the Security Agreement") entered into on or about 11 December 2001 between Pettmond and Guardian Trust Australia Limited ("Guardian").

23. Before leaving the Share Sale Agreement, I should note that Pettmond (together with Mr Meehan and Mr Curtis) agreed to give extensive warranties, guarantees and indemnities to MIA, and also to be subject to restrictive covenants for the benefit of MIA: see clauses 10 to 13 and 15 to 17. The retained 64 per cent of the MIA shares issued on completion were provided by Pettmond to Guardian as security for a guarantee given by Guardian to MIA of certain of the obligations undertaken by Pettmond under the Share Sale Agreement, and also under a separate Earn-Out Agreement of the same date.

24. On the same day as the Share Sale Agreement, that is to say 16 November 2001, Mr Kohn in his capacity as a director of Omnilabs signed notices calling an EGM of Omnilabs on 8 December 2001 for the purpose of considering and, if thought fit, passing a Special Resolution to amend the company's Articles by the addition of a new Article 4.4 in the following terms:

> "Failure by any Shareholder to comply with the terms of this Article 4 as required pursuant to any Drag Along Notice served upon it shall enable the Company to comply with the Drag Along Notice in such manner as the Directors of the Company determine. To give effect to such Drag Along Notice which has not been complied with the Directors may authorise some person to execute a stock transfer form or other instrument of transfer on that Shareholder's behalf and to do all such things in the name of that Shareholder ... to enable the Shareholder who serves the Drag Along Notice to conduct the Trade Sale referred to in such notice...".

25. Also on 16 November 2001, Mr Kohn in his capacity as a member of Omnilabs signed a form of consent to short notice of the EGM, although in his case such consent was in fact unnecessary because the period of notice required by the Articles was 21 clear days, and there are 21 clear days between 16 November and 8 December.

26. A few days later, on 21 November 2001, Drag Along Notices (or purported Drag Along Notices) were served on Mr Kohn and the other minority share-holders in Omnilabs. Each notice was headed with Sonetti's name and address, and was signed by the same signatory on behalf of both Sonetti and Pettmond. The notice served on Mr Kohn said that it constituted a Drag Along Notice as contemplated by Article 4.1 of the Articles of Omnilabs, and continued:

> "We, being the holders currently of 75.01% of the issued share capital in the Company, hereby serve notice of a Trade Sale, which occurred on 16 November 2001, as defined in the Articles of Association of the Company, with MIA (UK) Limited (the "Trade Buyer").
>
> In accordance with Article 4.1 of the Articles of Association of the Company, we hereby give notice that you are required to sell all your Ordinary Shares of 25p each (each a "Share") in the Company (together with any warrants or other securities convertible into shares which you hold or which are registered in your name) to the Trade Buyer free from all encumbrances whatsoever and with full title guarantee at a price of £2.5435 per Share.
>
> This price assumes that no "A" Warrants are subscribed for in the capital of the Company in accordance with their terms.
>
> As you currently hold 249,682 Shares in the Company this represents a payment to you of £635,066.16...
>
> Pursuant to Article 4.3 ... we confirm that currently such price represents an amount equal to at least 80% of the value of each Share being sold to the Trade Buyer."

Mr Kohn was requested to return the enclosed stock transfer form, together with the relative share certificates, as soon as possible and in any event before 30 November to Messrs Norton Rose. The letter concluded by warning

> "Failure by you to execute the stock transfer form and promptly comply with the terms of this letter may result in financial loss for which you may be held liable."

27. The Drag Along Notices served on the other minority shareholders were in materially similar terms, apart of course from the details of the recipients' shareholdings.

28. It will be appreciated that the validity of these Drag Along Notices, and hence the alleged obligation on Mr Kohn and the other minority shareholders to sell their shares in Omnilabs to MIA (UK) at the stated price, depended on the Share Sale Agreement being a Trade Sale within the meaning of the Articles of Omnilabs. Since the vendor

under the Share Sale Agreement was Pettmond (not Sonetti), and since the shares actually sold by Pettmond were the shares in Sonetti, not shares in Omnilabs, it is at first sight hard to see how the Share Sale Agreement could have been a Trade Sale for the reasons given in paragraph 12 above. Nevertheless, Mr Kohn says in paragraph 17 of his witness statement that he subsequently "sought to obtain payment of the sums due to [him] pursuant to the Articles and the Side Letter, on the assumption that the Drag Along Notice was valid and the Side Letter was operative."

29. It is pleaded in paragraph 25.2 of Mr Meehan's Defence, and I did not understand it to be disputed by Mr Kohn, that on or about 22 November Mr Kohn signed and returned an executed stock transfer form for the sale of 249,682 shares in Omnilabs to MIA (UK), although in fact the stock transfer form specified an incorrect number of shares, together with a Loan Agreement between Pettmond and Mr Kohn whereby Pettmond agreed to lend him a sum in excess of £300,000 interest free so as to enable him to exercise his "B" Warrants and acquire a further 217,899 shares in Omnilabs, and a charge over his shareholding in Omnilabs in favour of Pettmond as security for he loan.

30. It is then pleaded in paragraph 25.3 of Mr Meehan's Defence that on or about 27 November Mr Curtis (acting on behalf of Sonetti) offered to pay Mr Kohn for his shares partly in cash (30 per cent) and partly in MIA shares (70 per cent), and that Mr Kohn accepted this offer. Mr Kohn does not dispute (and indeed avers) that Mr Curtis made an oral offer to him on or around 21 November to pay for his shares by way of 30 per cent in cash and 70 per cent in MIA shares: see paragraph 24 of his witness statement. It is Mr Kohn's case, in short, that he accepted this offer by an e-mail of 28 November (see paragraph 34 below), and that pursuant to the contract so concluded he was entitled to receive the whole of the 70 per cent in MIA shares at completion, and was to be free to deal with them immediately as he wished. This version of events is disputed by Mr Meehan, who says that Mr Kohn's original agreement to accept 70 per cent of the purchase price for his shares in the form of MIA shares was superseded by an agreement to take the total consideration for his shares in cash after it was pointed out to him that only 36 per cent of his MIA shares would be delivered on completion, with the remainder being released over the ensuing three years.

31. In support of their rival contentions both sides rely on an exchange of e-mails between 27 and 29 November 2001, to which I must now turn. 32. The exchange begins with an e-mail sent by Mr Kohn to Christopher Randall of Norton Rose on 27 November, thanking him for "the forms". These were presumably fresh stock transfer forms which Mr Randall had sent to Mr Kohn, the original forms having been filled in incorrectly. The e-mail continues:

"I    will return to be held to my order, however the forms do not have consideration on them. How should that be filled in as I am receiving 70% shares in MIA and 30% cash[?]".

33. Simon Cox of Norton Rose then replied to Mr Kohn on the same day: "Thanks Eric. We will take instructions on the point raised."

34. On 28 November Mr Kohn sent a further e-mail to Mr Cox, timed 7.14 pm, which I must quote in full:

"I    am sending to Norton Rose tomorrow the 2 correct stock transfer forms signed. The forms are to be held to my order as are Loan & Charge document and to be released, on my receipt of confirmation by [Sonetti] that the consideration of £554,226.11 for 217,899 shares of 25p of [Omnilabs] and £635,066.17 for 249,682 shares of 25p of [Omnilabs] is payable in 30% cash and 70% in shares of MIA "free trading" valued at Aus$1.24 per share and that this represents at least 90% of substantially the same deal as is attributable to Sonetti."

35. Norton Rose evidently then sought instructions from Sonetti and/or Pettmond, and on 29 November Mr Curtis e-mailed Mr Kohn at 4.54 pm in the following terms, which again I must quote in full:

"Dear Eric,

I understand that Norton Rose are holding to your order two stock transfer forms the Loan Agreement and Charge pending clarification of the nature of the consideration that you will receive at completion. On behalf of [Sonetti], I can confirm this to be (at your option):

100% cash i.e. £ 1, 189,292.20; or

70% in MIA shares and 30% cash.

Please note that if you choose the second option only 36% of your shares will be delivered at completion. 50% of the retained balance are due to be released on the first anniversary of completion and a further 25% on each of the second and third anniversaries. As you know, tomorrow is the last day to exercise your warrants. I should be grateful therefore, if you would let me know which option you have chosen as soon as possible."

36. Finally, following a telephone conversation with Mr Randall and Mr Cox, Mr Kohn sent them an e-mail timed 5.48 pm on 29 November saying:

"I will accept the cash, and release "the hold to order" on the basis that you for Sonetti have confirmed to me by phone that the offer is the cash equivalent of the same deal being offered to Sonetti, allowing for the side letter in respect of 90%."

37. I should mention at this point that Mr Kohn says he was still ignorant on 29 November of the terms of the Earn-Out Agreement between Pettmond, MIA (UK) and MIA, although he accepts in paragraph 14 of his witness statement that Mr Curtis had mentioned to him on or about 16 November that there was a management earn-out agreement and he had also read in the press announcement of the deal at about the same time that there was such an agreement. He was not supplied with a copy of the Earn-Out Agreement, however, until 4 December when Norton Rose wrote to his solicitors enclosing copies of it and the Guardian security documentation.

38. Meanwhile, on 3 December the Unilabs companies started proceedings in the Chancery Division of the High Court ("the Unilabs Proceedings") against Sonetti, Omnilabs and Pettmond, claiming (in summary):

(a) that the EGM notice served on Unilabs was invalid, with the result that no EGM of Omnilabs could validly be held on 8 December;

(b) that the Drag Along Notices served on all three companies were likewise invalid, or alternatively that on completion of the Share Sale Agreement Unilabs was entitled to be paid £1,050,000 (that being the minimum amount specified in the relevant side letter), and UIL and UGL were entitled to be paid a price which properly reflected all the terms and conditions on which the Trade Buyer was to acquire the shares in Sonetti; and

(c) that the affairs of Omnilabs were being, or had been, conducted in a manner which was unfairly prejudicial to the interests of the Unilabs companies.

39. The particulars of claim in the Unilabs Proceedings, like those in the present action, were settled by Miss Otton-Goulder QC, and as Mr Anderson points out the allegations are pleaded in a very similar manner to the first part of Mr Kohn's claim in the present action, although there are important differences between the position in which the Unilabs companies found themselves in early December 2001 and the position of Mr Kohn when he started the present action, In particular, Unilabs had not been given 21 clear days' notice of the EGM, and on 3 December 2001 all of the Unilabs companies were still share-holders in Omnilabs.

40. The Unilabs Proceedings were short-lived, as they were settled on 7 December. The terms of settlement are not in evidence, but I was told by Miss Otton-Goulder (and did not understand it to be disputed) that the Defendants more or less capitulated. Certainly no EGM of Omnilabs was ever held; and in paragraph 16 of his witness statement Mr Kohn says he believes Sonetti to have conceded that Unilabs' side agreement was valid, and to have

paid Unilabs the full £1.05m claimed (which was over £700,000 more than the price specified in the Drag Along Notice served on Unilabs). For his part, Mr Meehan relies on the fact that the Unilabs Proceedings were settled, and also confirms that a settlement was reached at the same time with all the other minority shareholders apart from Mr Kohn (see paragraph 6 of his second witness statement).

41. Following the settlement with the other minority shareholders, Mr Kohn remained the only obstacle to completion of the Share Sale Agreement. The evidence does not reveal the precise nature of the claims which he was advancing, but I assume they were along the lines of his allegations in the present action. The parties to the Share Sale Agreement were anxious to complete it as soon as possible, and on 11 December an agreement was reached ("the Kohn settlement") whereby Mr Kohn effectively withdrew all his claims against Sonetti and Omnilabs, thus enabling completion of the Share Sale Agreement to take place, and also agreed to accept the sum of £ 1, 18 9,292.20 in respect of his total holding of shares in Omnilabs, but on the express basis that he reserved all his rights and that Mr Meehan and Pettmond jointly and severally assumed any liability of any nature which Sonetti and/or Omnilabs and/or its group had to Mr Kohn immediately before the Kohn settlement: see paragraphs 34 and 35 of Mr Kohn's witness statement and Norton Rose's letter of 11 December 2001 at p.259 of exhibit "GM1."

## THE ISSUES IN THE PRESENT ACTION

42. The Particulars of Claim in the present action (dated 12 April 2002) begin by referring to the Settlement Agreement, the new Articles of Omnilabs and the Side Agreement. It is alleged that in concluding the Settlement Agreement and the Side Agreement Sonetti acted both on its own behalf and also for Pettmond as its undisclosed principal. This allegation of undisclosed agency is denied by both Defendants. Issue is also joined on the true construction both of the Articles and of the Side Agreement. Since it is agreed that these issues should go to trial, it is enough for me to say that Mr Kohn contends for a literal construction of the relevant parts of Article 4, such that they could not apply to the Share Sale Agreement, but for a broad construction of the Side Agreement, such that the guaranteed minimum of at least 90 per cent of the consideration received by Sonetti and/or Pettmond would apply to the circumstances of the Share Sale Agreement; while the Defendants adopt the diametrically opposed position of arguing for a broad construction of Article 4, such that it does apply to the Share Sale Agreement, but a narrow construction of the Side Agreement, such that it does not apply (and would have applied only to a sale by Sonetti of shares in Omnilabs).

43. Paragraph 15 of the Particulars of Claim then refers to the Share Sale Agreement and alleges that the consideration for the Sonetti shares included "sums to be paid pursuant to a secret earn-out agreement". This is denied by the Defendants, who also aver that the Earn-Out Agreement was not a secret (having been referred to in MIA's press releases of 1 October and 19 November 2001) and in any event did not provide further consideration for the purchase of the Omnilabs shares, being intended only to reward Omnilabs' management for any future upturn in the company's fortunes following its purchase by MIA (UK). Again, I need say no more about the Earn-Out Agreement as it is agreed that all questions relating to it should go to trial.

44. Paragraphs 16 to 19 of the Particulars of Claim deal with the EGM notices, alleging that neither Mr Kohn nor any of the other minority shareholders received a copy of the notice within the period stipulated by the Articles and that the notices were accordingly invalid. It is further alleged that the purpose of the Special Resolution was to extinguish, or significantly diminish, the rights of minority shareholders under the Settlement Agreement and their respective side agreements, by enabling Omnilabs to comply with the Drag Along Notices in such manner as the directors of Omnilabs might determine.

45. The Defendants' pleaded response to these allegations is to deny the alleged invalidity of the EGM notice so far as Mr Kohn is concerned (because he signed it himself, and anyway agreed to accept short notice), while making no admission as to the purpose of the EGM. It is further pleaded that in any event no EGM was held on 8 December or at all, and no special resolution was passed on that or any other date. Paragraph 20 of each Defence then avers that

"In the premises, Mr Kohn's allegations in respect of the EGM Notice are without justification and irrelevant to any matter in issue in this action and, accordingly, should be struck out."

46. The next section of the Particulars of Claim (paragraphs 20 to 28) deals with the Drag Along Notices served on Mr Kohn and the other minority share-holders. Mr Kohn's primary contention, reflecting the literal construction of the Articles for which he argues, is that the notices were invalid, and he seeks a declaration to that effect. Alternatively, however, he claims that by serving the notice on him in the form which it took Sonetti, Pettmond and Omnilabs acted on an agreed assumption that the true construction of the Articles was (in substance) as pleaded by the Defendants, and they are precluded and/or estopped from contending otherwise, with the result that the notice should to that extent be treated as validly served. He further pleads:

(a) in paragraph 22 that by service of the notice Sonetti, Pettmond and Omnilabs acted on an agreed assumption that the true construction of the Side Agreement was the broad construction referred to above, and are precluded and/or estopped from contending otherwise; and

(b) in paragraph 28 that by service of the Drag Along Notices on the other minority shareholders, including the Unilabs companies, those minority shareholders together with Sonetti, Pettmond and Omnilabs acted on the same agreed assumption as to the true construction of the Articles and are likewise precluded and/or estopped from contending otherwise.

47. The Defendants' response to these allegations, broadly speaking, is:

(a) to deny the relevance of the notices served on the other minority share-holders, reserving the right to apply to strike out the relevant paragraphs of the Particulars of Claim;

(b) to allege as their primary case that the notice served on Mr Kohn was valid and binding (reflecting the broad construction of the Articles for which they contend), but that in offering Mr Kohn in excess of 90 per cent of the value of his shares Sonetti was under no legal obligation to do so (because the Side Agreement is to be narrowly construed); and

(c) to plead in the alternative that if the notice was "technically invalid" Mr Kohn and Sonetti nevertheless acted on the common assumption that it was valid, and following the exchange of c-mails at the end of November it would be inequitable for Mr Kohn to renege on that common assumption.

Finally, and in the further alternative, the estoppel pleaded by Mr Kohn as the alternative to his primary case is adopted by the Defendants: see paragraph 27,3 of each Defence.

48. Paragraph 29 of the Particulars of Claim alleges that the price per share at which, and the terms and conditions on which, MIA (UK) acquired the shares in Omnilabs pursuant to the Share Sale Agreement considerably exceeded the stated consideration of about £2.80 per share because:

(a) 70 per cent of the purchase price was payable in MIA shares, which were valued at A$1.24 at the time of the Agreement but had risen in value to A$1.42 at completion; and

(b) MIA (UK) was also to receive further sums under the "secret earn-out agreement".

49. These allegations are denied by the Defendants, who aver that Mr Kohn's only legal entitlement was to receive the floor price specified in Article 4.3 of the Articles; that he received a consideration for his shares greatly in excess of that floor price; that he initially agreed to accept 70 per cent of the consideration in MIA shares, but changed his mind on 29 November; and that nothing further was due to him in respect of the Earn-Out Agreement.

50. Paragraph 30 of the Particulars of Claim then alleges that if (contrary to Mr Kohn's primary case) Sonetti and Pettmond were entitled on 21 November 2001 to serve a Drag Along Notice on him, the notice was nonetheless invalid and/or in breach of the Settlement Agreement because the consideration payable to him in accordance with

the notice was too low and did not accord with the terms and conditions on which the Trade Buyer was to acquire its shareholding in Omnilabs. Paragraph 31 then repeats the same allegation in relation to the Drag Along Notices served on the other minority shareholders.

51. These allegations too are denied, and the Defendants also aver that para-graph 31 is irrelevant and liable to be struck out.

52. Paragraphs 32 to 34 of the Particulars of Claim allege anticipatory repudiatory breaches of the side agreements of Mr Kohn and the other minority share-holders. These allegations in their turn are denied, and are again averred to be irrelevant and liable to be struck out so far as the minority shareholders are concerned.

53. Paragraph 35 of the Particulars of Claim then alleges that Sonetti and Pettmond were in breach of the Settlement Agreement and/or the Side Agreement in paying him only £1, 189,292.20 for his shares, and paragraph 36 quantifies the loss and damage which he claims under four heads. There is no dispute that the first and fourth heads should go to trial (they reflect the difference between 100 per cent and 90 per cent of the price per share stated in the Share Sale Agreement, and the further sums alleged to be due in respect of the Earn-Out Agreement). The second head claims that Mr Kohn ought to have received 70 per cent of the purchase price in MIA shares at A$1.24 per share, and that he would then have sold all of those shares on completion at A$1.42 per share, thereby realising a profit of about £120,000. The third head claims that alternatively he would have retained some of the MIA shares, and has suffered further loss by reason of the continued rise in their price. Paragraph 37 then pleads that Sonetti and Pettmond were likewise in breach of their contracts with other minority share-holders "by reason of which they also have similarly suffered and will continue to suffer loss and damage."

54. Paragraphs 35 and 36 are denied by the Defendants and Mr Kohn is put to strict proof of his alleged loss and damage. The Defendants go on to say, inter alia, that if he had chosen to accept 70 per cent of the consideration for his Omnilabs shares in the form of shares in MIA he would have been unable to sell all of them on completion, because of the three-year retention provisions, and that the quoted price of MIA shares had in any event fallen to A$0.90 by the date of the Defence in early July 2002. It is then averred that paragraph 37 of the Particulars of Claim is irrelevant and liable to be struck out.

55. Paragraph 38 of the Particulars of Claim is headed "Unfair prejudice" and alleges that the affairs of Omnilabs were conducted in a manner which was unfairly prejudicial to the interests of Mr Kohn and the other minority share-holders; there then follows a list of certain specified acts or omissions (such as the purported service of the EGM notices) which are alleged. to have constituted such prejudice. A corresponding declaration is sought in para- graph 39(2).

56. The allegation of unfair prejudice is denied by the Defendants, who also plead that it is bad in law and should be struck out as an abuse of process because (in short) only a current member of a company may apply to the court, by petition, for an order under *Part XVII* of the Companies Act 1985 on the ground of unfair prejudice; Mr Kohn is not a current member of Omnilabs, and the present proceedings were not brought by petition; and there is no concept of "unfair prejudice" at common law or in equity which might other- wise justify the allegation.

57. Paragraphs 40 to 42 of the Particulars of Claim then deal with the completion of the Share Sale Agreement and the Kohn settlement. It is unnecessary for me to summarise these paragraphs or the response to them.

58. The remainder of the Particulars of Claim is taken up with the claim for breach of duty and fraudulent misrepresentation by Mr Meehan which is pleaded in the following terms:

"43. Further, at all material times, both Mr Kohn and Mr Meehan were directors of Omnilabs, and, accordingly, owed a duty to disclose to the other any negotiations with a third party for a sale of the character and significance to Omnilabs of the [Share Sale Agreement].

44. At all material times before the conclusion of the Settlement Agreement on 19 September 2001 and the [Share Sale Agreement] [on] or about 16 November 2001, and as long as possible thereafter, Mr Meehan:

(1) in breach of his duty owed by him as a director of Omnilabs to Mr Kohn as a fellow-director, deliberately concealed from Mr Kohn the fact that negotiations were on foot for the [Share Sale Agreement], and had been on foot well before 19 September 2001; and

(2) fraudulently represented to him that no such negotiations were on foot.

45. The said representations were false, in that negotiations were on foot for the [Share Sale Agreement] well before 19 September 2001 and continued thereafter until the conclusion of the [Share Sale Agreement] on or about 16 November 2001.

46. Mr Meehan made the said misrepresentations in order to induce Mr Kohn to enter the Settlement Agreement on the terms on which it was concluded.

47. Mr Kohn was induced to enter into the Settlement Agreement by the said misrepresentations insofar as they were made before it was concluded.

48. By reason of Mr Meehan's said misrepresentations and/or breaches of duty, Mr Kohn has suffered loss and damage, in that he would not have concluded the Settlement Agreement on the terms on which it was concluded, but on terms more favourable to him. In particular, he would not have given up the 180,130 shares which he transferred without payment of any sum in respect thereof, notwithstanding the fact that their value was not less than £509,067.38.

49. In the premises, Mr Kohn is entitled to additional damages from Mr Meehan together with interest thereon to be assessed."

59. In response to these allegations, Mr Meehan pleads in paragraphs 39 and 40 of his Defence:

(a) that the allegation of breach of duty in paragraph 43 of the Particulars of Claim is bad in law and should be struck out;

(b) that the allegation of fraudulent misrepresentation is embarrassing for lack of particularity, and breaches paragraph 8.2 of the Practice Direction made pursuant to CPR Part 16 (which provides so far as material that the claimant must specifically set out in his particulars of claim any allegation of fraud, and details of any misrepresentation, where he wishes to rely on them in support of his claim); and

(c) that the allegation is itself made in bad faith, in an attempt to obviate the effect of the "entire agreement clause" set out in clause 12 of the Settlement Agreement (as to which see para-graph 7(5) above).

It is admitted that Mr Meehan did not inform Mr Kohn of the negotiations between Pettmond and MIA which took place prior to 19 September 2001, but averred that he was under no duty to do so and that if Mr Meehan had revealed the fact of such negotiations to Mr Kohn he would (or alternatively might well) have been in breach of his own duties to Pettmond, since Pettmond and MIA had concluded a confidentiality agreement in respect of the negotiations.

60. In paragraph 41 of his Defence, Mr Meehan denies paragraphs 45 to 49 of the Particulars of Claim and goes on to plead as follows:

"4  1. 1 if Mr Kohn had learned of the negotiations in his capacity as a director of Omnilabs ... and had used such knowledge for his own personal advantage... Mr Kohn would thereby have acted in breach of his fiduciary duties to Omnilabs;

41.2 it is specifically denied that, even if Mr Kohn had known of the negotiations, he would have concluded (or would have been able to conclude) the Settlement Agreement on different terms;

41.3 in particular, as at the date of the Settlement Agreement, Omnilabs was in a parlous financial state. Mr Kohn (as a director of, and shareholder in, Omnilabs) was extremely keen for the Settlement Agreement to be concluded, pursuant to which Sonetti invested further significant sums in

Omnilabs. In the absence of such investment, Omnilabs would have failed and Mr Kohn's shareholding therein would have been worthless (as he well knew);

41.4 further, as Mr Kohn well knew, Sonetti was only prepared to make such investment in Omnilabs on condition that it owned in excess of 75% of Omnilabs' issued share capital;

41.5 accordingly, had Mr Kohn not given up 180,130 of his shares, Sonetti's investment would not have taken place and Omnilabs would have failed;

41.6 further, on learning of the negotiations (by, at the latest, 28 September 2001), Mr Kohn was delighted, because he realised that he would receive a significant capital sum (in excess of £1,000,000) for his shares and the Warrants (that until recently would have been almost worthless but for such negotiations succeeding);

41.7…".

61. Mr Meehan's Defence was settled by Miss Barbara Dohmann QC and Mr Anderson. It was accompanied by a Request for Further Information, to which Mr Kohn responded on 18 September 2002. This Further Information amplifies and clarifies Mr Kohn's case in a number of respects, to which I will refer where relevant when I come to discuss the parties' contentions on the present application.

**THE PRESENT APPLICATION**

62. By Application Notice dated 8 October 2002 Mr Meehan seeks summary judgment against Mr Kohn in respect of that part of the claim set out in paragraphs 16 to 19, 26, 28, 29(1), 31, 34, 36(2), 36(3), 37, 38, 39(1)(ii) (in part), 39(2) and 43 to 49 of the Particulars of Claim, together with the corresponding parts of the prayer for relief, and/or that the same parts of the claim and the prayer for relief should be struck out.

63. CPR 24.2 provides so far as material that the court may give summary judgment against a claimant on the whole of a claim or on a particular issue if it considers that the claimant has no real prospect of succeeding on the claim or issue, and there is no other compelling reason why the case or issue should be disposed of at a trial.

64. CPR 3.4(2) provides that the court may strike out a statement of case, or part of a statement of case, if it appears to the court -

"(a) that the statement of case discloses no reasonable grounds for bringing or defending the claim;

(b) that the statement of case is an abuse of the court's process or is otherwise likely to obstruct the just disposal of the proceedings; or...".

65. There is no dispute between the parties about the general approach that the court should adopt to an application of this nature. The "real prospect of succeeding" referred to in CPR 24.2 must be a prospect which is not, to quote paragraph 24.2.3 in the White Book, "false, fanciful or imaginary". In *Swain v Hillman [2001] 1 All ER 91* Lord Woolf MR gave the following guidance at 94a-c:

> "It is important that a judge in appropriate cases should make use of the powers contained in Part 24. In doing so he or she gives effect to the overriding objectives contained in Part 1. It saves expense; it achieves expedition; it avoids the court's resources being used up in cases where this serves no purpose, and I would add, generally, that it is in the interests of justice. If a claimant has a case which is bound to fail, then it is in the claimant's interests to know as soon as possible that that is the position."

However, Lord Woolf added the salutary warning at 95b that:

> "Useful though the power is under Part 24, it is important that it is kept to its proper role. It is not meant to dispense with the need for a trial where there are issues which should be investigated at the trial ... The proper disposal of an issue under Part 24 does not involve the judge conducting a mini-trial, that is not the object of the provisions; it is to enable cases, where there is no real prospect of success either way, to be disposed of summarily."

See too *Three Rivers DC v Bank of England* [2001] UK HL/16, *[2001] 2 All ER 513* at para.[951, pp.542-3, per Lord Hope of Craighead and paras.[158] to [159], pp.567-8, per Lord Hobhouse, both endorsing the guidance given by Lord Woolf in *Swain*.

66. There is obviously a considerable degree of overlap between the grounds for summary judgment in CPR 24.2 and the grounds on which a statement of case may be struck out under CPR 3.4(2), and also between paragraphs (a) and (b) of CPR 3.4(2) itself. In argument before me neither Counsel sought to draw fine distinctions between the different grounds relied on in the Application Notice, and both were content to approach the application on a relatively broad-brush basis in this regard.

67. The parts of the claim which are attacked by Mr Meehan may conveniently be considered under the following five headings:

    (1)  the minority shareholders;

    (2)  the EGM notice;

    (3)  the sale consideration (cash only, or cash and shares);

    (4)  unfair prejudice; and

    (5)  breach of duty and fraudulent misrepresentation.

**DISCUSSION AND CONCLUSIONS**

**(1) The minority shareholders**

68. This part of the application relates to paragraphs 26, 28, 31, 34 and 37 of the Particulars of Claim, each of which essentially repeats in relation to the other minority shareholders in Omnilabs an allegation that has already been pleaded in relation to Mr Kohn himself. The allegations in question concern the alleged invalidity of the Drag Along Notices (paragraph 26), an alleged agreed assumption about the true construction of the Articles (paragraph 28) and alleged breaches of the Settlement Agreement and/or the relevant side agreements (paragraphs 31, 34 and 37).

69. It is on the face of it very hard to see how Mr Kohn's case could possibly be advanced by establishing that the Defendants were also in breach of their obligations to the other shareholders in the same or a similar way as they are alleged to have been in breach of their obligations to Mr Kohn himself It is axiomatic that Mr Kohn's case must be decided by reference to his personal position and the documents to which he was a party or which concerned him personally. The other shareholders are not parties to the action, and none of these issues are live ones so far as they are concerned because of the settlements reached with them in December 2001: see paragraph 40 above. Nevertheless, Miss Otton-Goulder argued that these allegations are relevant to her client's case and relied on the Further Information where it is said that they are relevant to the construction of the Settlement Agreement, the Articles and the Side Letter, and are also relevant to issues of the Defendant's conduct and Mr Kohn's knowledge of that conduct: see the answers to requests 1 and 2, which are repeated without qualification in response to requests seeking to elicit the precise relevance of the paragraphs in the Particulars of Claim which I am now considering.

70. With regard to the alleged relevance to questions of construction, Mr Anderson argued that none of the matters pleaded in these paragraphs could assist the court in construing the Settlement Agreement, the Articles or the Side Agreement, because each of those agreements was concluded on 19 September 2001 and the matters pleaded all occurred on or after 21 November 2001. Accordingly, he submits, they could not have formed part of the matrix of fact against which the documents fall to be construed: see *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 at 912g-h per Lord Hoffmann. With regard to the alleged relevance of these paragraphs to issues of conduct and knowledge, Mr Anderson argued that such conduct could only be relevant, if at all, to the claim that Mr Kohn's rights as a shareholder have been unfairly prejudiced, which is itself unsustainable.

71. In oral argument Miss Otton-Goulder stressed that issues of construction and estoppel lie at the heart of Mr Kohn's case, and submitted that the conduct of the parties after 19 September, including how they behaved in relation to the other minority shareholders, might be highly material to the estoppels pleaded on both sides, and not only to the allegation of unfair prejudice.

72. I readily agree that Mr Kohn's claims should be examined at trial in the context of the treatment of the other minority shareholders, and that the allegations of estoppel by convention relied on by Mr Kohn are in principle capable of being supported by evidence of how the other minority share-holders were treated, or themselves behaved, after 19 September 2001. However, it is in my judgment quite unnecessary for this purpose for Mr Kohn to plead as substantive allegations that the Drag Along Notices served on the other minority shareholders were invalid, that they were themselves estopped from making certain contentions, that they themselves suffered loss and damage, and so on. All that is necessary is for Mr Kohn to lead evidence at trial, if so advised, directed to establishing the facts he wishes to rely upon, including if appropriate evidence from the other shareholders. It is in my view both irrelevant and embarrassing for him to plead the treatment of the other shareholders as substantive issues in their own right, and either expressly or by implication to ask the court to determine those issues, especially having regard to the settlement reached with all the other minority shareholders in December 2001. Furthermore, despite Miss Otton-Goulder's submissions I am unable to see any way in which this material could throw any admissible light on the true construction of the documents which were executed on 19 September 2001.

73. For these reasons I have come to the conclusion that these paragraphs of the Particulars of Claim should be struck out, while making it clear (as indeed Mr Anderson accepted) that Mr Kohn will be free at trial to adduce such relevant evidence as he thinks fit in support of his own pleaded case, including (if appropriate) evidence relating to the other minority shareholders.

**(2) The EGM notice**

74. This part of the application relates to paragraphs 16 to 19 inclusive of the Particulars of Claim. Further Information was provided in respect of paragraph 18, confirming that the relevant EGM notice first came into Mr Kohn's possession on 16 November 2001 when it was given to him personally by Mr Curtis in Mr Kohn's office.

75. I have no hesitation in deciding that this part of the claim should be struck out. In my judgment it is simply

absurd for Mr Kohn to claim that the EGM notice served on him was invalid, given that he signed it himself 21 clear days before the proposed meeting and for good measure also signed an unnecessary consent to short service. So far as the other shareholders are concerned, the alleged invalidity of the notices served on them is to my mind irrelevant and embarrassing if put forward as a substantive allegation in the present action for the reasons which I have already given in paragraph 72 above.

76. Again, however, I should make it clear for the avoidance of doubt that in striking out these paragraphs I do not intend to preclude Mr Kohn from relying on the proposed EGM and related matters as background material in support of his claim, or as material on which to cross-examine the Defendants, subject to the usual constraints of relevance and so forth.

**(3) The sale consideration (cash only, or cash and shares)**

77. This part of the application relates to paragraphs 29(1), 36(2), 36(3) and part of 39(1)(ii) of the Particulars of Claim, together with part of paragraph 1(2) of the prayer. The central question I have to consider is whether it is open to Mr Kohn to claim that he should have received 70 per cent of the purchase price for his shares in MIA shares, or whether his contention to that effect is so obviously hopeless that it demonstrably has no real prospect of success.

78. I have already outlined the rival versions of the agreement reached between Mr Curtis and Mr Kohn in paragraph 30 above. In more detail, Mr Kohn alleges in paragraph 12.3 of the Further Information that:

(a) Mr Curtis originally made an oral offer to pay for his shares by way of 30 per cent in cash and 70 per cent in shares, on the basis that they were immediately saleable and not subject to any restriction;

(b) Mr Kohn's initial intention (during the period from 16 to 29 November 2001) was to accept this offer, to exercise his share warrants, and to pay for the exercise of the warrants by borrowing the necessary money, which he intended to repay with the cash he would receive in respect of the remaining 30 per cent;

(c) on 29 November 2001, Mr Curtis by his e-mail of that date to Mr Kohn purported to vary, or unilaterally varied, his earlier offer, to the effect that Mr Kohn now had the option of being paid the whole of his entitlement in cash or of being paid 30 per cent in cash plus 70 per cent in shares whose sale would be restricted over the following three years; and

(d) "In the circumstances, as a matter of practicality, Mr Kohn elected to take the 100 per cent in cash without accepting that either Mr Curtis or Mr Meehan [or anybody else] was entitled so to vary the terms of the offer to him".

79. In response to a further request, Mr Kohn says in paragraph 17 of the Further Information that if he had received 70 per cent of his entitlement in unrestricted shares, as he ought to have done, he would immediately have sold them on completion.

80. These allegations now need to be read in conjunction with paragraphs 24 to 30 of Mr Kohn's witness statement. In paragraph 25 he confirms that in the oral offer made to him by Mr Curtis on or about 21 November 2001

"there were no conditions attached to the shares I was to receive. I was to receive 100 per cent of the shares immediately on completion of the [Share Sale Agreement] and I was to be free to deal with those shares as I wished from the moment that I received them."

Paragraphs 26 and 29 taken together then make it reasonably clear (although I find the wording of paragraph 26 in isolation equivocal) that Mr Kohn claims to have duly accepted Mr Curtis' offer, and to have done so by the e-mail of 28 November quoted in paragraph 34 above. Miss Otton-Goulder helpfully confirmed in oral argument that nothing other than the e-mail of 28 November is relied upon as constituting acceptance of the offer. Accordingly the critical

question is whether this e-mail can plausibly be regarded as an acceptance of the oral offer that Mr Kohn says was made to him by Mr Curtis.

81. On an objective appraisal, I find it impossible to read this e-mail as constituting an unqualified acceptance of the offer allegedly made by Mr Curtis. On a natural reading, it suggests that confirmation was being sought by Mr Kohn of two crucial points on which he required reassurance before committing himself, namely (a) that the consideration would be as stated by him, including 70 per cent in shares of MIA "free trading" and (b) that this represented at least 90 per cent of substantially the same deal as Sonetti was obtaining. There is no wording that looks remotely like acceptance of an earlier offer made by Mr Curtis. Moreover, even if it could somehow be understood as an acceptance, such acceptance was on any view a qualified or conditional one, so when Mr Curtis explained on the following day that 64 per cent of the MIA shares would be retained on completion it must have been plain to Mr Kohn that the condition attached to his acceptance was not satisfied. In whatever way the e-mail is read, it seems to me impossible to argue that it gave rise to a concluded contract for payment as to 70 per cent in "free trading" shares. Moreover, this conclusion appears to be borne out by Mr Kohn's e-mail of 29 November accepting 100 per cent in cash, after Mr Curtis had explained the position to him and he had discussed the matter by telephone with Norton Rose.

82. To my mind the contrast between the language of Mr Kohn's e-mails of 28 and 29 November speaks for itself, and it is also striking that there is no reference in the latter to the contract that Mr Kohn now says he had already concluded by the former, although if that were the true position one would expect him to have protested vigorously. Nor is this a case where oral evidence, or disclosure of documents, might put a different complexion on the matter, because (as I have already said) it is only the e-mail of 28 November that is relied on as constituting acceptance of Mr Curtis' offer. In summary, I am satisfied that Mr Kohn does indeed have no reasonable prospect of success in establishing the contract for which he now contends, and I therefore conclude that Mr Meehan is entitled to summary judgment on this issue.

83. The question still remains, however, whether the relevant paragraphs of the Particulars of Claim should be struck out, or whether they may still provide an arguable basis for quantification of Mr Kohn's loss even in the absence of the agreement with Mr Curtis for which he contends.

84. Paragraph 29(1) of the Particulars of Claim is mainly directed to recording the terms of the Share Sale Agreement, and the rise in value of MIA shares between the date of that agreement and completion. These allegations are in my view potentially relevant, or at least innocuous, and I see no reason to strike them out.

85. As to paragraph 36(2), Miss Otton-Goulder argues that if the Drag Along Notice was valid, and if Sonetti and/or Pettmond had been entitled to compel Mr Kohn to sell his shares at a comparable price and on comparable terms, then the price which he received was less than what he would have received if he had been paid on the same basis as the majority shareholder. On that footing, it is said, he would have received the entitlement to any increase in the share value as and when each tranche could be sold, and accordingly he is entitled to maintain the head of loss pleaded in this sub-paragraph.

86. I reject this submission for two reasons. First, paragraph 36(2) as currently pleaded is predicated on the assumption that Mr Kohn could and would have sold all of his MIA shares immediately after completion, so on any view the sub-paragraph would require substantial amendment to found a claim for loss along the more limited lines indicated above. No such application was made, but if this were the only objection I would in principle be willing to give Mr Kohn an opportunity to make the amendment. Secondly, however, and fundamentally, the contention seems to me impossible to reconcile with Mr Kohn's e-mail of 29 November 2001 accepting 100 per cent in cash as the consideration for his shares. I fully understand that on one argument Mr Kohn claims not to be bound by this apparent agreement; but the argument I am now considering is founded on the proposition that Mr Kohn was obliged to sell his shares on substantially the same terms as Pettmond and/or Sonetti. Those terms undoubtedly included the retention provisions which Mr Curtis put to Mr Kohn in his e-mail of 29 November, and which Mr Kohn clearly rejected in favour of 100 per cent in cash. I am therefore unable to see any scope for quantification of Mr

Kohn's loss by reference to a phased receipt of MIA shares, and I therefore conclude that paragraph 36(2) should be struck out.

87. As to paragraph 36(3), it alleges that Mr Kohn "would have retained some of the said shares". Quite apart from the fact that this sub-paragraph too seems to be predicated on the same assumption as paragraph 36(2), it is in my view unsustainable for the short and simple reason that Mr Kohn's own evidence is that he would not have retained any MIA shares but would have sold them all immediately: see paragraph 17 of the Further Information and paragraph 30 of his witness statement. I therefore conclude that this sub-paragraph too should be struck out.

88. Finally, if sub-paragraphs 36(2) and (3) are struck out it must follow that the relevant part of paragraph 39(1)(ii) should also go.

**(4) Unfair prejudice**

89. I have already summarised in paragraph 56 above the Defendants' pleaded objections to paragraph 38 of the Particulars of Claim. These objections were amplified by Mr Anderson in his Skeleton Argument, referring to authority that the parties cannot agree to clothe the court with a jurisdiction it does not possess. In my judgment these submissions are well-founded and I accept them. It is unnecessary for me to examine them in any detail, because Miss Otton-Goulder did not take issue with them as such, but rather submitted that they betrayed a misunderstanding of the function and relevance of Mr Kohn's plea of unfair prejudice to himself and his fellow minority shareholders. As I understand it, her case was that the affairs of Omnilabs were in fact conducted in a manner that was unfairly prejudicial to the interests of Mr Kohn and his fellow minority shareholders, and he is therefore entitled to obtain a declaration to that effect even though it would now be impossible for him to obtain any substantive relief by way of petition under *section 459* of the Companies Act 1985 because he is no longer a member. In support of this submission she points to the terms of the Kohn settlement, whereby the two Defendants jointly and severally assumed any liability of any nature that Omnilabs had to Mr Kohn immediately before 11 December 2001 (when he was of course still a member of Omnilabs). See too paragraph 19 of the Further Information, where it is averred that Mr Kohn would have continued to be a shareholder but for the Kohn settlement, which preserved the position which he enjoyed immediately beforehand, with the result (so it is submitted) that he cannot "be debarred from seeking the remedies he seeks merely by reason of the fact that he no longer is a shareholder".

90. I am prepared to assume in Mr Kohn's favour (without deciding the point) that in a suitable case the court would have jurisdiction to grant a declaration to a former shareholder that the affairs of the company were conducted in a manner which was unfairly prejudicial to him at a time when he was a share-holder. However, this assumption only leads to the question whether in the present case there would be any point whatever in entertaining an application for such a declaration; and I emphasise that no relief at all is sought by Mr Kohn apart from a declaration in respect of this part of his case. In my judgment no real grounds have been put forward which would justify the court in adopting the highly unusual course of granting a declaration which would be of only retrospective relevance, and could not affect the interests of the parties today in any material respect. Indeed, I would go further and say that it would in my opinion be a waste of the court's time and resources, and an abuse of process, to undertake such an exercise in the present case. Nor does the Kohn settlement take the matter any further, because a mere declaration as to the state of affairs before 11 December 2001 could not be translated into any actual liability as at that date which could now be visited on the Defendants.

91. For these reasons I consider that paragraphs 38 and 39(2) of the Particulars of Claim should be struck out.

**(5) Breach of duty and fraudulent misrepresentation**

92. This part of the application relates to paragraphs 43 to 49 of the Particulars of Claim, which I have already set out in paragraph 57 above.

93. For allegations of this seriousness, the case as originally pleaded in paragraphs 43 to 49 strikes me as thin in

the extreme. Paragraph 43 appears to base the alleged duty of disclosure on nothing more than the mere fact that both Mr Kohn and Mr Meehan were directors of Omnilabs, while paragraph 44(1) apparently confirms that the breach of duty alleged is one owed by Mr Meehan in his capacity as a director of Omnilabs to Mr Kohn in his capacity as a fellow-director. There is no allegation of any fiduciary duty owed by Mr Meehan to Mr Kohn in his capacity as a shareholder, and still less of any special circumstances which might exceptionally give rise to such a duty (see Gore-Browne on Companies, at para.27.3, pp.27-005 to 27.007, for a summary of the case law on this subject). As to paragraph 44(2), not only is the lack of particularity of the alleged fraud a clear breach of paragraph 8.2 of the Practice Direction supplementing CPR Part 16, but no indication whatever is given of the form or nature of the alleged misrepresentation or of the circumstances that are said to have made it fraudulent.

94. A belated effort to remedy these obvious deficiencies was made in paragraphs 20 and 21 of the Further Information, to which I must now turn.

95. Paragraph 20, responding to a request to specify precisely the alleged legal basis for the duty said to be owed by Mr Meehan to Mr Kohn, is again pleaded at a high level of generality. It alleges that the duty arises on a number of alternative grounds, which for clarity I would divide up as follows:

(a) the duty arises out of the fact that both were directors of Omnilabs and both owed fiduciary duties to Omnilabs; and/or

(b) it was reasonably foreseeable that Mr Meehan's failure to disclose the negotiations which ultimately resulted in the Share Sale Agreement might cause Mr Kohn loss, and the relationship between them was sufficiently proximate that the court would consider it fair, just and reasonable that the law should impose a duty on Mr Meehan to disclose the existence and terms of the negotiations to Mr Kohn; and/or

(c) the duty arises by virtue of Mr Meehan being a director and Mr Kohn being a shareholder in Omnilabs, it being reasonably foreseeable that the former's failure to disclose the negotiations might cause Mr Kohn loss, and the relationship between the two of them, as both being directors and shareholders, was again sufficiently proximate to justify the imposition of a duty on Mr Meehan to disclose the existence and terms of the negotiations to Mr Kohn.

It is then averred that "Mr Meehan owns Sonetti's shares beneficially".

96. Paragraph 21 of the Further Information, responding to a request to provide full and proper particulars of the allegation of fraudulent misrepresentation, then states as follows:

"Both Mr Meehan and Mr Kohn were directors of Omnilabs and both held shares in that company. (Mr Meehan owns Sonetti's shares beneficially). Mr Meehan was engaged in negotiations on behalf of Pettmond and Sonetti, with MIA (UK) and MIA, for the sale to them effectively of the majority of the shares in Omnilabs, and/or all the issued shares in Sonetti, from a date unknown to the Claimant, but certainly well before 19 September 2001, until the conclusion of the [Share Sale Agreement] on or about 16 November 2001. As Mr Meehan, Mr Curtis, Pettmond and Sonetti well knew throughout that period, Mr Kohn was unaware of the existence of any such negotiations.

In the circumstances, Mr Meehan owed Mr Kohn a duty to disclose the existence and terms of the negotiations and the proposed terms of the [Share Sale Agreement] as soon as Mr Meehan was aware of them.

Accordingly, the failure to disclose any of those matters to Mr Kohn at any time in the course of the period between the inception of those negotiations ... and 16 November 2001 constituted a continuing misrepresentation to the effect that there were no such negotiations on foot, when in fact, there were.

The representation to that effect was material and intended to, and did, influence the mind of Mr Kohn as to affect his conduct in deciding whether to enter the Settlement Agreement on its terms. As a result of the representation, Mr Kohn altered his position, in that he concluded the Settlement Agreement on the terms on which it was concluded, in the manner set out in paragraph 48 of the Particulars of Claim."

97. With regard to the alleged duty of disclosure, paragraph 20 of the Further Information seems to me to add little to the Particulars of Claim. It is still the relationship between Mr Meehan and Mr Kohn as directors which is primarily relied upon, with an alternative contention (which I have labelled (c) above) which appears to be to the general effect that the duty might also arise by virtue of Mr Kohn alone, or both of them, additionally being shareholders in Omnilabs, coupled with Mr Meehan's alleged beneficial ownership of Sonetti's shares.

98. Paragraph 21 of the Further Information then introduces the further allegation that Mr Kohn was unaware of the existence of the negotiations, and this ignorance on his part was well known to Mr Meehan, Mr Curtis, Pettmond and Sonetti. In paragraph 38 of his witness statement Mr Kohn confirms that he knew nothing of the negotiations.

99. In my judgment this further material still comes nowhere near providing an arguable basis for the alleged duty of care. No case-law has been cited to me by Miss Otton-Goulder in support of the contention that a duty of care might be held to be owed by a director to his co-director or co-shareholder merely by virtue of their mutual relationship as directors and/or shareholders, or merely by virtue of the fact that as directors they both owe fiduciary duties to the company. I would be very surprised if any such authority could be found. Furthermore, as Mr Anderson points out, the alleged duty is to disclose information not for the benefit of the company, but to enable the co-director to use it for his own personal benefit in relation to the company's affairs.

100. Mr Anderson goes on to submit that Mr Meehan owed no duty to Omnilabs to disclose any interest which he had in the Share Sale Agreement, or in the negotiations leading up to it, because Omnilabs was not a party to the Share Sale Agreement. This submission was not controverted by Miss Otton-Goulder, and seems to me to be correct. In particular, the statutory duty of disclosure in *section 317* of the Companies Act 1985 was not engaged, because the Share Sale Agreement was not a contract with Omnilabs. But if that is right, says Mr Anderson, it is inconceivable that Mr Meehan could at the same time have owed a duty to disclose the negotiations to Mr Kohn by virtue of the fact that they were both directors of Omnilabs. I agree.

101. I have already mentioned that in special circumstances a director may, in addition to the fiduciary duties owed by him to the company, also owe a duty to individual shareholders personally. Where such a duty exists and breach of it has caused loss to a shareholder directly (e.g. by inducing him to part with his shares at an undervalue), the shareholder may bring an action against the director to recover his loss. The relevant legal principles have recently been summarised by the Court of Appeal in *Peskin v Anderson* [2001] I BCLC 372 at paragraphs [27] to [37], pp.378e-380e, per Mummery LJ (with whom the other two members of the Court agreed). The nature of the special circum- stances that have to be established was stated by Mummery LJ as follows at 379d:

[33] The fiduciary duties owed to the company arise from the legal relationship between the directors and the company directed and controlled by them. The fiduciary duties owed to the shareholders do not arise from that legal relationship. They. Are dependent on establishing a special factual relationship between the directors and the shareholders in the particular case. Events may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of disclosure of material facts to the shareholders, or an obligation to use confidential information and valuable commercial and financial opportunities, which have been acquired by the directors in that office, for the benefit of the shareholders, and not to prefer and promote their own interests at the expense of the shareholders.

[34] These duties may arise in special circumstances which replicate the salient. features of well-established categories of fiduciary relationships. Fiduciary relationships, such as agency, involve duties of trust, confidence and loyalty. Those duties are, in general, attracted by and attached to a person who undertakes, or who,

depending on all the circumstances, is treated as having assumed, responsibility to act on behalf of, or for the benefit of, another person...".

102. Mr Kohn has neither pleaded nor adduced evidence of anything special in the factual relationship between him and Mr Meehan which might lead to a fiduciary duty of disclosure of the type discussed by the Court of Appeal in *Peskin v Anderson*. Nor did I understand Miss Otton-Goulder to submit that any such special relationship or fiduciary duty existed. She pins her case on establishing a common-law duty of care, but again it seems to me inconceivable that such a duty could have existed in circumstances where no fiduciary duty of disclosure was owed by Mr Meehan to Mr Kohn in his personal capacity as a shareholder. Furthermore, this is not a part of Mr Kohn's case where disclosure and/or full evidence might reasonably be expected to improve his position, because he should be able to plead and give evidence at this stage of any special circumstances he relies on as founding the alleged duty.

103. I conclude, therefore, that Mr Kohn's claim for breach of duty has no real prospect of succeeding at trial and should be disposed of summarily in Mr Meehan's favour.

104. This conclusion is also sufficient to dispose of the claim for fraudulent misrepresentation, as the Further Information makes it clear that no positive representation is relied on and the highest Mr Kohn's case can be put is that Mr Meehan deliberately said nothing to him about the negotiations, in the knowledge that he was ignorant of them. Had Mr Meehan been under a duty to disclose the negotiations to Mr Kohn, it might perhaps have been arguable that his failure to do so constituted a continuing misrepresentation to the effect that no such negotiations were in progress, and that in all the circumstances of the case such misrepresentation was not merely an innocent or negligent one but deliberate and dishonest. In the absence of any such duty, however, mere silence cannot constitute a misrepresentation. In my judgment the situation was one where both Mr Meehan and Mr Kohn were at liberty to, and did, pursue their own individual interests.

**CONCLUSION**

105. In the result I hold that this application succeeds in full, with the trivial exception that I would not strike out paragraph 29 of the Particulars of Claim. With regard to the surviving parts of the Particulars of Claim, I would ask Counsel to consider (and if possible agree) what case-management directions should be given at this stage.

---

**End of Document**

# EXHIBIT 2-B

# Ayerst (H M Inspector of Taxes) v C & K (Construction) Ltd  50 TC 651

HIGH COURT OF JUSTICE (CHANCERY DIVISION)

26TH AND 27TH NOVEMBER 1973

COURT OF APPEAL

25TH AND 28TH OCTOBER 1974

HOUSE OF LORDS

14TH, 15TH AND 17TH APRIL AND 21ST MAY 1975

**Income tax, Schedule D — Loss in trade — Losses forward — Succession — Company which incurred losses ordered to be wound up — Business subsequently sold as going concern to company of which it owns the share capital — "Subsidiary" — Whether predecessor remained beneficial owner of its assets after commencement of winding-up — Whether successor entitled to relief for predecessor's losses — Finance Act 1954 (2 & 3 Eliz. 2, c. 44), s. 17.**

For many years until 18th January 1963 M Ltd. carried on the business of builders and civil engineering contractors. At that date it had substantial unrelieved trading and losses and capital allowances. On 31st March 1962 a receiver of its property and assets had been appointed by a debenture holder, and on 4th June 1962, on a creditor's petition, an order had been made for its compulsory winding-up. Immediately before the commencement of the winding-up 99 per cent. of the share capital of the Respondent Company was in the legal and beneficial ownership of M Ltd. On 18th January 1963, M Ltd. being still the registered holder of those shares, the receiver, with the concurrence of the liquidator, sold its business as a going concern to the Respondent Company.

On appeal against assessments to income tax under Schedule D for the years 1962-63 and 1963-64, the Company claimed to be entitled to set off the unrelieved losses, etc., of M Ltd., on the ground that it was at the material time, viz. 18th January 1963, a "subsidiary" of M Ltd. within the meaning of *s. 17*, Finance Act 1954. The Company contended that the provision in s. 17(6)(a) that for the purposes of s. 17(5) "ownership" meant beneficial ownership did not extend to the definition of "subsidiary" in s. 17(6)(b). For the Crown it was contended that a company was not a subsidiary of another company for the purposes of s. 17 unless the relevant shares in it were beneficially owned by that other, and that M Ltd. was not the beneficial owner of such shares by reason of the order for its winding-up.

The Special Commissioners upheld the Company's contention.

The Chancery Division held that at the commencement of the winding-up of M Ltd. the Respondent Company ceased to be its subsidiary for the purposes of s. 17, and accordingly that Company was not entitled to the relief claimed.

Commissioners of Inland Revenue v Olive Mill Ltd. *41 TC 77*; [1963] 1 W.L.R. 712 applied.

*[*652]*

In the Court of Appeal the Company did not pursue the contentions which it had advanced below, but contended that immediately before the transfer the trade belonged to M Ltd. as trustee for its creditors and contributories and immediately after the transfer M Ltd. owned its ordinary shares in the Company as such trustee, so that under s. 17(4)(b) and (c) and (5), read with subss. (6)(a) and (7), the trade fell to be treated as belonging to the same persons before and after the transfer.

The Court of Appeal held (1) that the property of a company in liquidation was not held on trust for its creditors and contributories, either by the company or by the liquidator, but the beneficial ownership thereof was in suspense; moreover (2) the conception of a single collective beneficial ownership of a fluctuating body of persons according to their respective but unspecified and unknown rights and interests in the assets of the company could not be introduced into s. 17 since it would make the section unworkable, nor did subs. (7) apply to a fluctuating body who were entitled to capital as well as income under a trust.

Pritchard v M. H. Builders (Wilmslow) Ltd. *45 TC 360*; [1969] 1 W.L.R. 409 approved.

In the House of Lords the Company's only contention was that, since at the commencement of winding-up a company retained the legal ownership of its assets and the beneficial ownership thereof did not become vested in any other person, it must be taken also to retain the beneficial ownership.

> Held, in the House of Lords, that on going into liquidation a company ceased to be the beneficial owner of its assets.

## Case

Stated under the *Taxes Management Act 1970, s. 56*, by the Commissioners for the Special Purposes of the Income Tax Acts for the opinion of the High Court of Justice.

1. At a meeting of the Commissioners for the Special Purposes of the Income Tax Acts held on 4th and 5th November 1971, C. & K. (Construction) Ltd. (hereinafter referred to as "the Respondent") appealed against the under-mentioned assessments to income tax made upon it under the provisions of Schedule D of the *Income Tax Act 1952*.

⊞*Go to table1*

The grounds of the appeal were that under the provisions of the *Finance Act 1954, s. 17* and *Sch. 3*, the Respondent was entitled to the benefit of losses and capital allowances available to a company called Mactrac Ltd. as hereinafter appeareth and to offset such losses and capital allowances against its profits as computed for the purposes of the said assessments with the result that the said assessments fell to be discharged.

2. The following documents were produced and admitted at the hearing of the appeal:

(i)    A statement of facts agreed between the parties to the appeal (exhibit A).

*[\*653]*

(ii)    An agreement (hereinafter referred to as "the first agreement") made on 18th January 1963 between Laurence Rowland Wilkinson, of the first part, Leslie Harry Shipton, of the second part and the Respondent, of the third part (exhibit B).

(iii)    An agreement (hereinafter referred to as "the second agreement") made on 19th February 1963 between Laurence Rowland Wilkinson of the first part, Leslie Harry Shipton of the second part, Bank of Europe Ltd. of the third part and J. Murphy & Sons Ltd. of the fourth part (exhibit C).

3. There was produced to us at the hearing of the appeal a statement of facts agreed between the parties thereto. We found those facts to be facts relevant to this appeal, and a copy of the said statement of facts is attached to and forms part of this Case (exhibit A).

4. The following additional facts were also admitted at the hearing of the appeal by the parties thereto which we found to be relevant to the appeal.

(i)    At all times from the incorporation of the Respondent until the commencement of Mactrac Ltd.'s liquidation Mactrac Ltd. was the legal and beneficial owner of at least 99 per cent. of the share capital of Disorods Ltd.

(ii)    From 18th January 1962 until after 18th January 1963 the share - D holders of Mactrac Ltd. were unchanged.

5. The first agreement referred to in para. 1(9) of the statement of facts (exhibit A) is attached to and forms part of this Case (exhibit B) [1].

---

[1]  Not included in the present print.

6. The second agreement contained, inter alia, the following recitals:

"1. C. & K. (Construction) Ltd. (hereinafter called 'the Company') was incorporated under the Companies Act 1948 as a private limited company and has an issued share capital of One hundred pounds divided into One hundred shares of One pound each.
3. On the Fourth day of June One thousand nine hundred and sixty two a compulsory winding up order was made against Mactrac and on the Seventh day of August one thousand nine hundred and sixty two the Liquidator was appointed Liquidator of Mactrac.
4. Mactrac is the beneficial owner of all the shares in the Company and of the said One hundred shares Ninety nine have been registered in the name of Mactrac and the remaining share has been registered in the name of the Receiver.
5. The Receiver has agreed with the Purchaser for the consideration and subject to the terms and conditions hereinafter contained to sell to the Purchaser the said One hundred shares in the Company.
6. The Company is indebted to Mactrac in the sum of eighty thousand one hundred and eighty six pounds fourteen shillings and ten pence and the Purchaser has agreed to guarantee to the Receiver the payment by the Company to the Receiver of part of the said indebtedness as hereinafter appears and the Receiver has agreed to assign the balance of the said indebtedness to, the Purchaser or as the Purchaser shall direct as hereinafter appears.

*[\*654]*

and provided, inter alia, as follows:
"The Receiver in pursuance of the powers of sale contained in the Debentures or any other power or powers in that behalf and with approval and concurrence

of the Liquidator shall sell and the Purchase shall purchase free from any charges liens or other incumbrances the One hundred shares of One pound each of and in the capital of the Company at the price of One hundred pounds.

The said shares are sold free from any charges liens or incumbrances and with the benefit of all rights attaching to such shares up to and including the completion date as hereinafter defined.

The purchase shall be completed on the nineteenth day of February One thousand nine hundred and sixty three (hereinafter called 'the Completion Date')".

A copy of the second agreement is attached to and forms part of this Case (exhibit C) [1].

[1]  Not included in the present print.

7. It was contended on behalf of the Respondent:

> (i)     that by the first agreement the trade formerly carried on by Mactrac Ltd. was sold as a going concern to the Respondent, who thereafter carried on the said business;

> (ii)     that the Respondent was at the material times a subsidiary company of Mactrac Ltd., within the meaning of the *Finance Act 1954, s. 17(5)*;

> (iii)     that the provisions of the *Finance Act 1954, s. 17*, were thus satisfied and trading losses incurred by Mactrac Ltd. and capital allowances to which Mactrac Ltd. was entitled were available to set off against the profits of the Respondent as computed for the purposes of the assessments under appeal;

> (iv)     that the appeal should be allowed and the assessments adjusted accordingly.

8. It was contended on behalf of H.M. Inspector of Taxes:

> (i)     that to satisfy the conditions prescribed in the *Finance Act 1954, s. 17(5)*, a parent company, in the instant case Mactrac Ltd., must by virtue of s. 17(6)(a) be the beneficial owner of that proportion of the share capital of its subsidiary in this case the Respondent, as was prescribed in s. 17(6)(b);

> (ii)     that Mactrac Ltd. was not the beneficial owner of shares in the Respondent by reason of the winding-up order made on 4th June 1962 and the subsequent appointment of a liquidator;

> (iii)     that the provisions of the *Finance Act 1954, s. 17*, were thus not satisfied, and trading losses incurred by Mactrac Ltd. and capital allowances to which Mactrac Ltd. was entitled were not available to set off against the profits of the Respondent as computed for the purposes of the assessments under appeal;

> (iv)     that the appeal should be dismissed and the assessments adjusted accordingly.

9. We, the Commissioners who heard the appeal, upon consideration of the evidence adduced and the arguments addressed to us on behalf of the parties and the cases cited to us, namely: In re Oriental Inland Steam Co. (1874) L.R. 9 Ch. 557; Commissioners of Inland Revenue v Olive Mill Ltd. *41 TC 77*; [1963] 1 W.L.R. 712; Wood Preservation Ltd. v Prior *45 TC 112*; [1969] 1 W.L.R. 1077; Pritchard v M.H. Builders (Wilmslow) Ltd. *45 TC 360*; [1969] 1 W.L.R. 409, gave our decision in the following terms, inter alia:

*[\*655]*

The appeals were made by C. & K. (Construction) Ltd. against Schedule D assessments for the years 1962-63 and 1963-64 on the grounds that by the provisions of *s. 17*, Finance Act 1954, it was entitled to losses and capital allowances incurred by a company known as Mactrac Ltd., and to set off such losses and capital allowances against its profits, with the result that the tax fell to be discharged and the assessments fell to be discharged also.

Both parties were agreed that all the conditions required by *s. 17*, Finance Act 1954, were present but for one thing, i.e., that the company which owned and carried on the trade before the change and afterwards were the same except that a liquidation had intervened.

Counsel for C. & K. (Construction) Ltd. said that the persons who had owned or carried on the business were the shareholders of the old company (Mactrac Ltd.) and after the business had been sold the owners remained the same by virtue of s. 17(1), (5) and (6) and it was possible to establish the same identity. He said that he had no need to be concerned at what happened when the old company (Mactrac Ltd.) went into liquidation, and produced no argument on that point. The Crown took issue over that, and said that when a company went into liquidation the beneficial ownership was lost. It maintained that the application of s. 17(6)(a) to subs. (5) was to import reference to beneficial ownership; that it was necessary to apply subs. (6)(b) to subs. (5) also after subs. (6)(a), which again imported the concept of beneficial ownership. Subsection (6)(c) brought in the phrasing that had been used in drawing up the 1938 legislation. Reliance was placed on Wood Preservation Ltd. v Prior [1] and Lord Donovan's judgment; and Pritchard v M.H. Builders (Wilmslow) Ltd

2. Arising from those cases the Crown said that the carry-forward provided for by Parliament in *s. 17*, Finance Act 1954, was not available where a liquidator had been appointed.

¹ *45 TC 112*.

² *45 TC 360*.

Counsel for C. & K. (Construction) Ltd. did not quarrel with the Crown until it came to the question of beneficial ownership. He contended that the section referred to ownership, and that ownership was what the shareholders of Mactrac Ltd. had before liquidation. Even if the beneficial ownership was in limbo, then they still had the ownership of C. & K. (Construction) Ltd. and the condition of s. 17 was accordingly satisfied.

If the beneficial ownership was in limbo s. 17(6)(a) could not be applied, and it was necessary to apply subs. (6)(b) as best you could, and it did apply. The rubric of the section referred to "Company reconstructions etc. without change of ownership", and Lord Donovan had expounded on the purpose of s. 17. The proposition that the appointment of a liquidator nullified that was somewhat wide. We felt that if the section could be made to work it should be so used.

In the Crown's opinion, based on the authority of Pritchard v M.H. Builders (Wilmslow) Ltd., on the appointment of a liquidator the beneficial ownership went into limbo. The Crown relied on that because, it said, the shareholders, who were the legal owners, could not thus be the beneficial owners. In our view, however, the shareholders were the legal owners before and after the change. The case could be distinguished from Pritchard v M.H. Builders (Wilmslow) Ltd. The relevant point was not taken in that case, and we did not therefore feel obliged to follow what was then said.

We decided that the appeal succeeded in principle, and we adjourned the case for the agreement of figures.

*[\*656]*

10. On 14th April 1972, the parties having agreed on the basis of our decision in principle set forth above the effect on the assessments under appeal, we determined the appeal by discharging the said assessments.

11. Immediately after our determination of the appeal dissatisfaction therewith as being erroneous in point of law was expressed to us on behalf of H.M. Inspector of Taxes, and in due course we were required to state a Case for the opinion of the High Court of Justice pursuant to the *Taxes Management Act 1970, s. 56*, which Case we have stated and do sign accordingly.

12. The question of law for the opinion of the High Court of Justice is whether on the facts found by us as hereinbefore set forth there was evidence upon which we could properly arrive at our decision and whether on the facts so found our determination of the appeal was correct in law.

N. F. Rowe  Commissioners for the

B. James  Special Purposes of the Income Tax Acts

Turnstile House, 94-99 High Holborn, London W.C.1.
4th January 1973

**Statement of Facts**1. For the purpose of the determination of the appeal to the Special Commissioners against the assessments to income tax under Schedule D made on the Appellant for the years 1962-63 and 1963-64 the following facts are agreed as between the Appellant Company and the Commissioners of Inland Revenue.

(1)     On 9th January 1948 a company was registered as a private company under the name of L. J. McCarthy Ltd. to carry on business as civil engineers.

(2)     On 10th April 1958 pursuant to a special resolution in that behalf passed on 1st April 1958, the name of the company was changed from L. J. McCarthy Ltd. to Mactrac Ltd.

(3)     For many years prior to and until immediately before the change described in para. (9) below Mactrac Ltd. was engaged in carrying on the business of builders and civil engineering contractors. At the date of the said change the unrelieved losses incurred by Mactrac Ltd. in its business of builders and civil engineering contractors amounted to £326,486 and the unrelieved capital allowances amounted to £82,025.

(4)     On 31st March 1962 the holder of debentures issued by Mactrac Ltd., in pursuance of the powers contained in the debentures, appointed Mr. L. R. Wilkinson F.C.A., then of 79 Mosley Street, Manchester 2, receiver of the property and assets of Mactrac Ltd.

(5)     On 4th June 1962 pursuant to a creditor's petition in that behalf presented to the Court on 21st May 1962, an order was made for the winding up of Mactrac Ltd., and on 7th August 1962 Mr. L. H. Shipton, of Messrs. Poppleton & Appleby, 31 Lloyd Street, Manchester 2, was appointed liquidator.

(6)     On 4th July 1960 a company was registered as a private company under the name of Disorods Ltd. to carry on business as civil engineers. The authorised share capital of the Company was £100 divided into 100 shares of £1 each. At all times from incorporation until

the commencement of Mactrac's liquidation Mactrac Ltd. was the legal and beneficial owner of at least 99 per cent. of the shares in Disorods Ltd.

[*657]

(7)     In pursuance of a special resolution passed on 2nd September 1960 the name of the Company was changed from Disorods Ltd. to C. & K. (Construction) Ltd.

(8)     By a resolution passed on 13th September 1960 the authorised share capital of C. & K. (Construction) Ltd. was increased to £10,000 divided into 10,000 shares of £1 each.

(9)     By an agreement dated 18th January 1963 made between Laurence Rowland Wilkinson, receiver of the property and assets of Mactrac Ltd., of the first part, Leslie Harry Shipton, liquidator of Mactrac Ltd., of the second part and C & K (Construction) Ltd., of the third part, the whole of the builders' and civil engineering contractors' business of Mactrac Ltd. was sold as a going concern to C. & K. (Construction) Ltd. and as from the date of the agreement c. & 'L (Construction) Ltd. carried on the said builders' and civil engineering contractors' business.

(10)     At the date of the sale to C. & K. (Construction) Ltd. of the builders' and civil engineering contractors' business previously carried on by Mactrac Ltd the issued share capital of C. & K. (Construction) Ltd. was held as follows: (a) Mactrac Ltd., 99 shares; (b) Mr. Laurence R. Wilkinson, 1 share.

2. (1) On 6th April 1964 assessments to income tax under Schedule D were made on C. & K. (Construction) Ltd. (a) for the year of assessment 1962-63 in the sum of £350, and (b) for the year of assessment 1963-64 in the sum of £1,000. The Appellant lodged notice of appeal against each of these assessments on 22nd April 1964. (2) From 18th January 1962 until after 18th January 1963 the shareholders of Mactrac Ltd. were unchanged.

High Court

The case came before Templeman J. in the Chancery Division on 26th and 27th November 1973, when judgment was given in favour of the Crown, with costs. Rudiwa Estates Ltd. v Commissioner of Stamp Duty [1966] E.A.L.R. 576 (East Africa) was cited in argument

in addition to the cases referred to in the judgment. L.J. Bromley Q.C. and Peter Gibson for the Crown. C.N. Beattie Q.C. and G. R. Bretten for the Company. Templeman J. -This is a dispute between the Revenue and the taxpayer about the construction of *s. 17* of the Finance Act 1954. The section, which was passed to prevent tax relief being obtained by the deliberate discontinuance of a trade for the purpose of ameliorating the tax, is now sought to be used by the taxpayer to obtain or preserve a tax relief by the contrived continuance of the trade for the purpose of ameliorating the tax. The taxpayer's case is none the worse for that. Mr. Beattie, who appeared for the taxpayer and has great experience in this field, confessed that he was unable to make complete sense and logic of the whole of the section-a difficulty which I felt. Mr. Bromley, for the Crown, loyally cast no such aspersions; but having regard to my reading of the Act and to the authorities which have been necessary to decide other points on it, it occurred to me rather plaintively that this, after nearly twenty years, might be a section which, if time permits, the authorities could well consider tidying up.

[*658]

For many years prior to, and until, 18th January 1963 Mactrac Ltd. carried on the trade of builders and civil engineering contractors, and was the registered holder of 99 issued shares and the beneficial owner of the remaining one issued share in the taxpayer, C. & K. (Construction) Ltd. On 31st March 1962 a receiver of Mactrac Ltd. was appointed by a debenture-holder. On 21st May 1962 a winding-up petition was presented in respect of Mactrac Ltd., and following on that petition a compulsory winding-up order was made by the Court on 4th June 1962. None of these events effected a discontinuance of the trade carried on by Mactrac Ltd. On 18th January 1963 Mactrac Ltd. (in liquidation), by the receiver acting in pursuance of the powers of sale contained in his debenture, and with the approval and concurrence of the liquidator, sold its trade to the taxpayer, C. & K. (Construction) Ltd. This effected a change from Mactrac Ltd. to C. & K. (Construction) Ltd. of the person carrying on the trade, and but for the argument based on s. 17 would effect a discontinuance of the trade carried on by Mactrac Ltd. On 19th February 1963 Mactrac Ltd. (in liquidation), by the receiver, and again with the concurrence of the liquidator, sold the share capital of C. & K. (Construction) Ltd. For the years 1962-63 and 1963-64 the taxpayer, C. & K. (Construction) Ltd., was assessed to income tax under Schedule D. If the trade carried on by Mactrac Ltd. was not discontinued as a result of the sale of the trade to C. & K. (Construction) Ltd., then C. & K. (Construction) Ltd. are entitled to offset losses and capital allowances available to Mactrac Ltd. as a result of carrying on the trade against the profits which were

the origin of the two assessments made for 1962-63 and 1963-64. Hence these proceedings.

The claim by the taxpayer that there was no discontinuance is based, as I have said, on *s. 17* of the Finance Act 1954. Subsection (1)of that section provides:

> "A trade carried on by a company, whether alone or in partnership, shall not be treated for any of the purposes of the Income Tax Acts as permanently discontinued, nor a new trade as set up and commenced, by reason of a change in the year 1954-55 or any subsequent year of assessment in the persons engaged in carrying on the trade, if the company is the person or one of the persons so engaged immediately before the change and on or at any time within two years after the change the trade or an interest amounting to not less than a three-fourths share in it belongs to the same persons as the trade or such an interest belonged to at some time within a year before the change."

Applying that subsection to the present facts, the trade carried on by Mactrac Ltd. shall not be treated as permanently discontinued by reason of the fact that the agreement dated 18th January 1963 effected a change in the person carrying on the trade from Mactrac Ltd. to C. & K. (Construction) Ltd. if the persons to whom the trade belonged within two years after the change are the same as the persons to whom it belonged within one year before the change.

Mr. Beattie regretfully agreed that it is not possible to decide this case in his favour, at any rate in this Court, simply under s. 17(1)and by the light of nature. That is because, before 18th January 1963 and during the preceding year before the change, the trade belonged to Mactrac Ltd. After the change it belonged to C. & K. (Construction) Ltd. Therefore, in order to show that there is no discontinuance, the taxpayer must base its case on some further provision in the nine subsections of s. 17. Both Mr. Beattie, for the taxpayer,

*[\*659]*

and Mr. Bromley, for the Crown, are agreed that at the end of the day, having examined all those subsections diligently, the trade belonged to the same persons after as within one year before the agreement dated 18th January 1963 if and only if C. & K. (Construction) Ltd. was a subsidiary of Mactrac Ltd. on 18th January 1963. So the question which I have to determine is, When is a subsidiary not a subsidiary? The answer, says Mr. Bromley, is that, upon the true construction of s. 17 and for the purposes of that section, a subsidiary ceases to be a subsidiary when the parent company goes into compulsory liquidation.

It is agreed that s. 17(2) and (3) are of no assistance in the present case. Subsection (4) specifies:

> "For the purposes of this section - (a) a trade carried on by two or more persons shall be treated as belonging to them in the shares in which they are entitled to the profits of the trade; (b) a trade or interest therein belonging to

> any person as trustee … shall be treated as belonging to the persons for the time being entitled to the income under the trust".

Neither of those two paragraphs of subs. (4) is directly relevant, except, says Mr. Bromley, that they show that the Legislature is looking to beneficial ownership. Then, para. (c) is in these terms:

> "a trade or interest therein belonging to a company shall, where the result of so doing is that the conditions for subsection (1) or subsection (2) of this section to apply to a change are satisfied, be treated in any of the ways permitted by the next following subsection";

and that points in the direction which the taxpayer must go if, having failed to get within s. 17(1), he seeks to get into the section by another route.

Subsection (5) is in these terms:

> "For the purposes of this section, a trade or interest therein which belongs to a company engaged in carrying it on may be regarded-(a) as belonging to the persons owning the ordinary share capital of the company and as belonging to them in proportion to the amount of their holdings of that capital, or (b) in the case of a company which is a subsidiary company, as belonging to a company which is its parent company, or as belonging to the persons owning the ordinary share capital of that parent company, and as belonging to them in proportion to the amount of their holdings of that capital".

Then it goes on to deal with the situation which arises where the owners of ordinary share capital have a power to secure that the affairs of the company are conducted in accordance with their wishes. That does not apply, so we are back to subs. (5)(a) and (b). It is agreed that para. (a) does not apply. It fits the shareholders of Mactrac Ltd. before the liquidation, but it does not fit them after the liquidation, nor after the change. Mr. Beattie's argument therefore comes down to para. (b), and that applies only in the case of a company which is a subsidiary company. Therefore, to get his argument off the ground, Mr. Beattie must show that C. & K. (Construction) Ltd. was a subsidiary company of Mactrac Ltd. for the purposes of the section. Subsection (6) is a definition and deeming section, and begins with the expression, "For the purposes of the last foregoing subsection", which is subs. (5). Then para. (a) says:

> "references to ownership shall be construed as references to beneficial ownership, and the expression 'ordinary share capital' in relation to a

*[\*660]*

> company means all the issued share capital (by whatever name called) of the company, other than capital the holders whereof have a right to a dividend at a fixed rate or at a rate fluctuating in accordance with the standard rate of income tax, but have no other right to share in the profits of the company".

Mr. Beattie draws attention to the fact that references to

ownership are construed as references to beneficial ownership only "For the purposes of the last foregoing subsection", and thus, he says, they are of no assistance in construing the next paragraph, which is the most material and important paragraph because it deals with a subsidiary. That paragraph, s. 17(6)(b), is in these terms:

> "a company shall be deemed to be a subsidiary of another company if and so long as not less than three-quarters of its ordinary share capital 15 owned by that other company, whether directly or through another company or other companies, or partly directly and partly through another company or other companies".

Throughout s. 17 it is clear that "ownership" does not mean, and certainly is not confined to, legal ownership. Thus the fact that at the date of the change the shares in C. & K. (Construction) Ltd. were registered in the name of Mactrac Ltd. does not mean that C. & K. must be deemed to be a subsidiary of Mactrac, because that registration, although giving legal title, is not ownership within the meaning of any of the provisions of the section. Mr. Bromley says that ownership means beneficial ownership, and the question now to be determined is whether at the date of the agreement dated 18th January 1963 the shares of C. & K. were beneficially owned by Mactrac. He says that, looking at the whole of the section, whatever s. 17(6)(a) may say ex abundanti cautela, "ownership" means beneficial ownership. Mr. Beattie, shrinking from saying that "ownership" means legal ownership, but conscious of his difficulties if it means beneficial ownership, says that "ownership" in s. 17(6)(b) must be taken in a broad commonsense way and then, if one looks at it in a broad commonsense way, on the date of the agreement it could be said that Mactrac Ltd. owned the ordinary share capital in C. & K. (Construction) Ltd.

I shall have to deal with the question of what happens when a company goes into compulsory liquidation owning various assets, including shares of another company, in a moment, but to proceed with the section, subs. (6)(c) deals with a chain of companies and says:

> "the amount of ordinary share capital of one company owned by a second company through another company or other companies, or partly directly and partly through another company or other companies, shall be determined in accordance with the provisions of Part I of the Fourth Schedule to the Finance Act, 1938".

That Schedule was designed to work through legal into beneficial ownerships where companies and chains of companies were concerned in relation to the National Defence Contribution, and that Schedule was brought into effect by *s. 42* of the Finance Act 1938, which in many ways resembles the provisions of *s. 17* of the Finance Act 1954, save that in s. 17(6)(a) of the 1954 Act references to ownership are stated to be construed as references to beneficial ownership for the purposes of subs. (5) only, but s. 42(3) of the 1938 Act prescribes

that in the whole of that section and Part I of Sch. 4 "references to ownership shall be construed as references to beneficial ownership". Mr. Beattie says that there is a distinction between the 1938 Act, which applied beneficial ownership to

*[\*661]*

the whole of the section, and the 1954 Act, which applied beneficial ownership to subs. (5). Whatever the reason for the change, it is too subtle for me. Having read the whole of s. 17, including the opening words, it seems to me that there can be no half-way house between legal ownership and beneficial ownership; that the section is clearly not limited to legal ownership; and that, when I turn to subs. (6)(b) to find if one company is a subsidiary of another, the expression "ownership" in that case does not confine me to looking merely at the register but compels me to look to see who were the beneficial owners.

Now, when Mactrac Ltd. went into compulsory liquidation the Statute provided, of course, that there should be a liquidator and that he should go in and administer the assets of Mactrac Ltd. in a particular way; namely, upon trust to distribute to the creditors and to the contributories according to their respective interests. The result was first considered in In re Oriental Inland Steam Co. (1874) L.R. 9 Ch. 557. The decision was:

> "When a company has in this country been ordered to be wound up, judgment creditors who are in this country, and have proved under the winding-up, will not be allowed to attach property in India belonging to the company."

The reasons for the decision are relevant here. At page 559, James L.J. said:

> "The English Act of Parliament has enacted that in the case of a winding-up the assets of the company so wound up are to be collected and applied in discharge of its liabilities. That makes the property of the company clearly trust property. It is property affected by the Act of Parliament with an obligation to be dealt with by the proper officer in a particular way. Then it has ceased to be beneficially the property of the company; and, being so, it has ceased to be liable to be seized by the execution creditors of the company … There were assets fixed by the Act of Parliament with a trust for equal distribution amongst the creditors. One creditor has, by means of an execution abroad, been able to obtain possession of part of those assets. The Vice-Chancellor was of opinion that this was the same as that of one cestui que trust getting possession of the trust property after the property had been affected with notice of the trust. If so, that cestui que trust must bring it in for distribution among the other cestuis que trust. So I, too, am of opinion, that these creditors cannot get any priority over their fellow-creditors by reason of their having got possession of the assets in this way."

So the execution was prevented because the property had ceased to be the property of the company at the

date of the liquidation, and was affixed in the hands of the company in liquidation and in the hands of the liquidator with a trust to administer in accordance with the Act of Parliament for the benefit of the beneficiaries who were creditors, and, if there were enough to pay them, the contributories, and that equity prevents one beneficiary securing advantage over others of the same status. At page 560, Mellish L.J. said:

> "But, in my opinion, the beneficial interest is clearly taken out of the company. What the statute says in the 95th section is, that from the time of the winding-up order all the powers of the directors of the company to carry on the trade or to deal with the assets of the company shall be wholly determined, and nobody shall have any power to deal with them except the official liquidator, and he is to deal with them for the purpose of collecting the assets and dividing them amongst the creditors. It appears

[*662]

> to me that that does, in strictness, constitute a trust for the benefit of all the creditors and, as far as this Court has jurisdiction, no one creditor can be allowed to have a larger share of the assets than any other creditor."

So, if it is beneficial ownership which is material in order to show that one company is a subsidiary of another, Mactrac Ltd. was not the parent and C.& K. (Construction) Ltd. was not the subsidiary, because the ordinary share capital of C. & K. was not owned beneficially by Mactrac but was held upon the trusts which are mentioned in In re Oriental Inland Steam Co. [1].

[1]  L.R. 9 Ch. 557.

That case was cited in Commissioners of Inland Revenue v Olive Mill Ltd. [2] [1963] 1 W.L.R. 712. That was a case dealing with profits tax, in which a holding company was chargeable to profits tax in respect of its own profits and also in respect of a wholly-owned subsidiary, Spinners. In 1967 both companies were voluntarily wound up. The holding company contended that a similar position should continue after the date of liquidation because after that date it remained as it had been before, an investment company holding investments or property, one of the investments or properties being the shares in the subsidiary, Spinners. The Special Commissioners held that the holding company were entitled to the benefit of a notice which had been given providing that for profits tax purposes the holding company and the subsidiary company's profits should be grouped. Buckley J. held [3]:

[2]  *41 TC 77*.

[3]  [1963] 1 W.L.R. 712, at p. 173.

> "(1) that from the winding up the holding company's objective was not to hold investments to obtain a benefit, but to realise its assets and distribute the proceeds among creditors and members … (2) That on the passing of the winding-up resolution the

grouping notice became inoperative, first, because the holding company's last accounting period then ended and secondly, because that company then ceased to be the beneficial owner within *s. 42* of the Finance Act 1938" - to which I have already referred - "of the shares in Spinners";

and In re Oriental Inland Steam Co. was followed. The material passage of the judgment is to be found on page 726 [4], where, referring to an appeal which had been made by the subsidiary company, Spinners, in respect of profits tax, Buckley J. said:

[4]  *41 TC 77*, at pp. 89-90.

> "The appeal in the Spinners' case depends on the question whether or not Spinners remained grouped with the holding company for the purpose of the Finance Act, 1937. The relevant sections for this purpose are section 22 of the Act of 1937, which, by subsection (1), enables a company of which another company is subsidiary to give a grouping notice in respect of the chargeable accounting period in which the notice is given, and that notice continues during all subsequent chargeable accounting periods throughout which the subsidiary company remains a subsidiary of the principal company."

Then he set out *s. 42* of the Finance Act 1938, which defined a subsidiary company as being "a subsidiary of another body corporate if and so long as not less than three-quarters of its ordinary share capital is owned by that other body corporate", and he read the provision to which I have already -alluded; namely, that "references to ownership shall be construed as references -to beneficial ownership". Buckley J. continued:

> "So that the test is whether the parent company is the beneficial owner of not less than three-quarters of the ordinary share capital of the

[*663]

> subsidiary company. It seems to me that in fact the grouping notice ceased to be operative on December 12, 1957, on two grounds. First, on the view that I have taken on the company's appeal, the last accounting period of the holding company ended on that date and, therefore, that company was after that date no longer a company to which the relevant sections were applicable, and the grouping notice would on that ground have then ceased to operate so that Spinners would be assessable in its own right in respect of profits earned after that date. The grouping notice, I think, also falls to the ground for the reason that the holding company on going into liquidation ceased to be the beneficial owner of the shares in Spinners within the meaning of the section that I have just read."

Buckley J. then referred to In re Oriental Inland Steam Co. [1] and to the passages from the judgments of James and Mellish L.JJ. which I have read. He continued [2]:

[1]  L.R. 9 Ch. 557.

[2]  *41 TC 77*, at p. 90.

> "It has not been suggested to me that there has been any subsequent decision indicating that the views of the Lords Justices are not still good law, and it therefore appears to me to be established by the authority of that case that, on the winding-up resolution being passed, the beneficial Interest in the Spinners' shares held by the holding company ceased to reside in the holding company. Consequently Spinners ceased to be a subsidiary of the holding company within the meaning of these statutory provisions."

Of course, in the present case Mr. Beattie says that there is nothing in the *Finance Act 1954* which clamps the test of beneficial ownership on s. 17(6)(b). But that argument I have already rejected, and it seems to me that both the Oriental case and the Olive Mill case serve to show that a company ceases to be beneficial owner of its assets when it goes into compulsory liquidation. Now, if that is right it follows that C. & K. (Construction) Ltd. was not the subsidiary of Mactrac Ltd. after the date of the compulsory winding-up and was not, therefore, the subsidiary of Mactrac at the date of the change in the person carrying on the trade; and if C. & K. was not a subsidiary of Mactrac at the relevant date, then it is common ground that the taxpayer, C. & K., cannot rely on *s. 17(5)(b)* of the Finance Act 1954, and that there is no other paragraph or section to escape from a discontinuance which would otherwise have been effected.

I was referred to two other cases on the general approach to the construction of s. 17. The first was Wood Preservation Ltd. v Prior [3] [1969] 1 W.L.R. 1077, and in particular the views expressed by Lord Donovan at page 1096 [4]. He said:

[3]  *45 TC 112*.

[4]  Ibid., at p. 132.

> "But it is useful to remember that what the legislature was doing in section 17 was allowing one company to carry forward for its own tax benefit the losses of another. It was allowing that to be done where there was a substantial measure of identity between the two companies."

Mr. Bromley submits that there is no such identity in the present case. There are also the observations of Harman L.J. at page 1097 [5], where he said: "Now section 17 of the Finance Act, 1954, deals with

'ownership'. It then goes on to say that where the word 'ownership' is used it means 'beneficial ownership'." Certainly the sentiments expressed by Lord Donovan and the view on the application of "ownership" expressed by Harman L.J. are not inconsistent with the conclusion which I have reached.

[5]  Ibid., at p. 133.

[*664]

I was also referred to Pritchard v M.H. Builders (Wilmslow) Ltd. [1] [1969] 1 W.L.R. 409, where Cross J. said, at page 414, that s. 17(5) "cannot very well apply to an insolvent company in liquidation"; and he made the same comment with regard to subs. (4)(b). But Mr. Beattie points out that the point in issue in the present case was in fact never taken and argued. That case does not really carry the matter any further, except that again I have the comfort of knowing that the conclusion which I have reached is not inconsistent with what was said by Cross J. in the Pritchard case.

In the result, therefore, I come back to the requirement that the taxpayer must show that C. & K. (Construction) Ltd. remained a subsidiary after the date of the compulsory liquidation of Mactrac Ltd., and for that purpose it must be shown that the ordinary share capital of C. & K. remained owned by Mactrac. It is shown that the shares remained registered in the name of Mactrac, but in fact, on the authorities, they were then beneficially owned for the benefit of the creditors and contributories, and not for the moribund and dying company, Mactrac. I therefore accept Mr. Bromley's submission that C. & K. ceased to be a subsidiary and that, it not being a subsidiary, recourse cannot be had to the provisions of s. 17 to satisfy the Court that there was no permanent discontinuance on the change.

Bromley Q.C. - We would ask your Lordship to allow the appeal and to restore the assessments. I mentioned to your Lordship that the figures are not in fact agreed. We would ask your Lordship to remit the case to the Special Commissioners for determination in accordance with your Lordship's judgment.

Templeman J. - That would be right, would it, Mr. Beattie?

Beattie Q.C. - Yes, my Lord.

Bromley Q.C. - And I would ask for the costs, my Lord.

Templeman J. - Yes.

Court of Appeal

The Company having appealed against the above decision, the case came before the Court of Appeal (Stamp and Scarman L.JJ. and Brightman J.) on 25th and 28th October 1974, when judgment was given unanimously in favour of the Crown, with costs.

The following cases were cited in argument in addition to those referred to in Stamp L.J.'s judgment:- Calgary & Edmonton Land Co. Ltd. v Dobinson [1974] Ch. 102; Wood Preservation Ltd. v Prior 45 TC 112; [1969] 1 W.L.R. 1077; Smith v Anderson *(1880)15 Ch.D. 247*; In

re Barleycorn Enterprises Ltd. [1970] Ch. 465.

C.N. Beattie Q.C. and G. R. Bretten for the Company.

L.J. Bromley Q.C. and Peter Gibson for the Crown.

Stamp L.J. -This is an appeal from an Order of Templeman J. The case is reported under the name Ayerst (Inspector of Taxes) v C. & K. (Construction) Ltd. (which company I will call "C. & K.") at [1974] 1 All E.R. 676. Because the facts, so far as they are known, are fully stated in the report, I need not refer to them in this judgment; nor need I refer to the terms of *s. 17* of the Finance Act 1954, which are stated in the judgment of Templeman J.

[1] *45 TC 360*, at p. 366.

[*665]

In this appeal Mr. Beattie, appearing for the taxpayer, felt unable, I have no doubt rightly, to quarrel with the conclusion of the learned Judge that Mactrac had by the effect of its liquidation ceased to be the beneficial owner of the shares in C. & K., which company was accordingly not a subsidiary of Mactrac at the time of the transfer of the trade. He advanced a wholly new argument in support of the appeal, submitting that the persons carrying on Mactrac's trade as well before as after the sale to C. & K. were, within the meaning of s. 17 and by the effect of subs. (4)(b) and (4)(c) and subs. (5) of the section, which were not relied on in the Court below, the same persons, namely, the creditors and shareholders of Mactrac, who it is submitted were collectively the beneficial owners of each of Mactrac's assets within the meaning of the section.

Mr. Bromley, appearing for the Crown, did not object to the new point being raised. The new submissions were, as I have indicated, based on the provisions of s. 17(4)(b) and (c) and (5). Subsection (4)(b) provides:

> "For the purposes of this section - … (b) a trade or interest therein belonging to any person as trustee (otherwise than for charitable or public purposes) shall be treated as belonging to the persons for the time being entitled to the income under the trust."

Looking at the situation immediately prior to the transfer of Mactrac's trade, it was submitted that the trade belonged to Mactrac as trustee and that the creditors and contributories of Mactrac, as the only persons interested in the assets falling to be dealt with in the liquidation, were collectively entitled to the income under a trust. It followed, so it was submitted, that these persons were for the purposes of the section the beneficial owners of Mactrac's trade. Looking at the situation immediately after the transfer, reliance was placed on subs. (4)(c) and subs. (5) taken together. Subsection (4)(c) provides that, for the purposes of the section:

> "a trade or interest therein belonging to a company shall, where the result of so doing is that the conditions for subsection (1)or subsection (2) of this section to apply to a change are satisfied, be treated in any of the ways

permitted by the next following subsection."

That takes one to subs. (5), which provides, so far as relied on by Mr. Beattie:

> "For the purposes of this section, a trade or interest therein which belongs to a company engaged in carrying it on may be regarded-(a) as belonging to the persons owning the ordinary share capital of the company and as belonging to them in proportion to the amount of their holdings of that capital.

Relying on the latter subsection, Mr. Beattie submitted that after the transfer the creditors and shareholders of Mactrac collectively owned the ordinary shares of C. & K. and that accordingly the trade transferred to C. & K. may for the purposes of s. 17 be regarded as belonging again to the creditors and shareholders of Mactrac. So it is said the trade can be regarded as belonging to the same persons immediately after the transfer as it did, by the effect of subs. (4)(b), immediately before. I emphasise in passing that the analysis of the situation immediately after the transfer so advanced depends upon the proposition that, notwithstanding that Mactrac was in liquidation, the creditors and shareholders were the owners of Mactrac's shares in C. & K. within the meaning of subs. (5)(a) and also that the reference to ownership is, by the effect of subs. (6)(a), a reference to beneficial ownership.

[*666]

Similar submissions to those so put forward were rejected by Cross J. in Pritchard v M.H. Builders (Wilmslow) Ltd. [1] *45 TC 360* in circumstances not dissimilar from the facts in this case. Mr. Beattie accepted that in order to succeed in this appeal he must persuade us that that case was wrongly decided. Now, a liquidator in a liquidation has the duties imposed upon him by the Companies Acts. The creditors and contributors are entitled to require him to carry out those duties and to deal with the company's assets in accordance with the statutory provisions. But I cannot equate that right with the beneficial ownership of the assets or of any particular asset falling to be administered in accordance with the Acts. It does not, in my judgment, in the least follow that because a person or collection of persons have the right to have a collection of assets sold and the proceeds applied indirectly for their benefit, he or they are the beneficial owners of each asset. Basic to Mr. Beattie's submission is the proposition that a company in liquidation holds its assets upon trust for its creditors and contributories, and accordingly that the creditors and contributories are the beneficial owners of those assets. Cross J. in the Pritchard case took the view that, once a company is in liquidation, the beneficial ownership of its assets is in suspense. With that view I wholeheartedly agree. To describe those for whose benefit the assets of a company in liquidation fall to be administered as beneficial owners of each of those assets is, in my judgment, a misuse of the English language. The

creditors and shareholders in such a situation have no rights or powers, even collectively, to deal with a single asset or to direct how it shall be dealt with. There is some language in some of the cases we were referred in particular to In re Oriental Inland Steam Co. (1874) L.R. 9 Ch. 557 - to the effect that after liquidation a company's assets are subject to a trust, which no doubt is a convenient way of saying that the assets cease to belong to the company beneficially and become subject to the statutory provisions contained in the Companies Acts. I share the view of Romer J. in Knowles v Scott [1891] 1 Ch. 717that a liquidator does not hold the company's property on trust for its creditors and contributories; and the company itself, stripped as it is of all its rights, powers and obligations in relation to the property, cannot in my judgment be a trustee of it for the creditors and shareholders. The attempt to apply the conception of trustee and cestui que trust to the law relating to the liquidation of companies so as to fix a company as a trustee of its assets for its creditors and contributories must, in my judgment, fail.

[1] [1969] 1 W.L.R. 409.

It follows, in my judgment, that the shares in C. & K. did not, immediately after the transfer of the business to that company, belong to the creditors and shareholders of Mactrac collectively, so as to bring the case within s. 17(5)(a).

That by itself, if right, would be an end of the case. There is, however, another way of approaching the case. The conception of the creditors and shareholders of Mactrac collectively owning the share capital of C. & K. according to their respective rights and interests, in my judgment, ill accords with the concluding words of s. 17(5)(a), providing that the trade may be regarded as belonging to the persons owning the share capital "in proportion to their holdings of that capital". The latter words are no doubt included for the purpose of the computation required to determine whether the condition of subs. (1) is satisfied that at some time within two years from the change a three-fourths share of the trade belonged to the same persons as it belonged to a year before the change. In the instant case the problem is obscured by the fact that the comparison of ownership sought to be made is between the situation

[*667]

existing immediately before the change and that existing immediately afterwards. But once the conception of collective ownership of creditors and shareholders, as Mr. Beattie put it "according to their respective rights and interests", is introduced into the section, it would, as I see it, be in many cases impossible to undertake the necessary inquiry. If subs. (5) and subs. (4)(b) are designed, as I think they are, to assist in the determination of the question whether a specified proportion of the trade belonged at some date to the

same persons as it belonged to at some other date, and if the trade were to be treated by the effect either of subs. (4)(b) or subs. (5) as belonging at each date to the shareholders and creditors of a company in liquidation collectively according to their respective rights and interests, I know not how the inquiry could be answered in a case where between those two dates there had been dealings with those interests by the creditors or shareholders or where, for example, the preferential creditors had been paid in full. In the instant case the problem is, as I have indicated, obscured because the comparison sought to be made is a comparison between the persons owning the trade immediately before and immediately after the transfer. But it would, in my judgment, be contrary to the scheme of the section to introduce the conception of a single collective beneficial ownership of a fluctuating body of persons according to their respective but unspecified and unknown rights and interests in the assets of the company. To do so would, as I see it, make the section unworkable.

Mr. Beattie attempted to deal with the difficulty by referring to s. 17(7). That subsection provides as follows:

> "In determining, for the purposes of this section, whether or to what extent a trade belongs at different times to the same persons, persons who are relatives of one another and the persons from time to time entitled to the income under any trust shall respectively be treated as a single person".

So Mr. Beattie, reiterating his submission that the creditors and shareholders are collectively entitled to the assets, submitted that they were "the persons from time to time entitled to the income under any trust" and so fall to be treated as a single person for the purposes of subs. (1). I can only say, with all respect to that submission, that in the context of the section it would, in my judgment, be a misuse of language to describe a fluctuating body of persons who were collectively entitled as well to capital as income under a trust as persons from time to time entitled to any income under the trust. Even if the assets of the company in liquidation were correctly described as held by the company upon trust for the creditors and shareholders collectively - a view which I have rejected - that trust must relate to capital and income alike. In my judgment, subs. (7) is clearly not directed to meet such a case. I would add, for completeness, that a similar objection applies to the construction sought to be put upon s. 17(4)(b), which likewise is concerned with persons for the time being entitled to the income under the trust. For these reasons, I would dismiss the appeal.

Scarman L.J. -I agree.

Brightman J. -I agree.

Bromley Q.C. - I would ask your Lordships to dismiss the appeal with costs.

Stamp L.J. - That would be right, would it not, Mr.

Beattie?

[*668]

Beattie Q.C. - Yes, my Lord. I have nothing to say on that. May I respectfully ask your Lordships for leave to appeal to the House of Lords? I would say in principle this is important to liquidators of companies who are frequently in this position of wishing to dispose of a business with tax losses. As regards the law, the House of Lords has not examined the position of a company in liquidation; and it may be that, freed from already binding authority, a different view might be taken. (The Court conferred.)

Stamp L.J. - Mr. Beattie, we feel in the end that the point of construction on subs. (4)(b) and subs. (7) is fairly clear, and we do not think that it is a case in which we ought to give leave to appeal. You must apply to their Lordships.

Beattie Q.C. - If your Lordship pleases.

The Company having been granted leave by the Appeal Committee of the House of Lords to appeal against the above decision, the case came before the House of Lords (Lord Diplock, Viscount Dilhorne and Lords Kilbrandon and Edmund - Davies) on 14th, 15th and 17th April 1975, when judgment was reserved. On 21st May 1975 judgment was given unanimously in favour of the Crown, with costs.

The following cases were cited in argument in addition to those referred to in Lord Diplock's speech:- In re Farrow's Bank Ltd. *[1921] 2 Ch. 164*; Rudewa Estates Ltd. v Commissioner of Stamp Duties [1966] E.A.L.R. 576; Wood Preservation Ltd. v Prior 45 TC 112; [1969] 1 W.L.R. 1077; Mayor of Drogheda v Holmes (1855) 5 H.L. Cas. 460; Sudeley v Attorney-General *[1897] A.C. 11*; Brooklands Selangor Holdings Ltd. v Commissioners of Inland Revenue [1970] 1 W.L.R. 429; Parway Estates Ltd. v Commissioners of Inland Revenue (1958) 45 TC 135; In re Calgary and Edmonton Land Co. Ltd. [1975] 1 W.L.R. 355; Gerard v Worth of Paris Ltd. [1936] 2 All E.R. 905; In re Paraguassu Steam Tramroad Co., Black & Co.'s Case (1872) L.R. 8 Ch. 254; In re North Carolina Estate Co. Ltd. (1889) 5 T.L.R. 328; In re Central Sugar Factories of Brazil, Flack's Case [1894] 1 Ch. 369; In re Vocalion (Foreign) Ltd. *[1932] 2 Ch. 196*; English Sewing Cotton Co. Ltd. v Commissioners of Inland Revenue [1947] 1 All E.R. 679.

C.N. Beattie Q.C., R. Sykes and G. R. Bretten for the Company.

L.J. Bromley Q.C. and Peter Gibson for the Crown.

Lord Diplock. -My Lords, the only question that has been argued in your Lordships' House is whether when a company is ordered to be wound up under the Companies Act 1948 the effect of the winding-up order is to divest the company of the "beneficial ownership" of its assets within the meaning of that expression as it is used in *s. 17(6)(a)* of the Finance Act 1954.

Under the Income Tax Acts a trader who has sustained a trading loss in any year of assessment, or has incurred expenditure for which he is entitled to claim capital allowances to an amount which exceeds the taxable profits of the trade for that year, is entitled to carry forward the loss or the excess and set it off against his taxable profits of that trade in subsequent years of assessment; but before the *Finance Act 1954* this right of set-off was lost upon his ceasing permanently to carry on the trade. In the case of trading companies *s. 17* of the Finance Act 1954 allowed some piercing of the corporate veil by

[*669]

providing exceptions to the general rule as to cessation. The effect of the exception that is relevant to this appeal is that, where the trade continues to be carried on by a successor that is a subsidiary company of the company that previously carried on the trade, the successor company may avail itself of the right of set-off that would have been available to its predecessor if it had continued to carry on the trade itself. It is not now disputed that upon the true construction of this section a successor company is only to be treated as a subsidiary company of a parent company as predecessor if and so long as not less than three-quarters of its ordinary share capital is in the "beneficial ownership" of the parent company, whether directly or through another company or companies or partly directly and partly through another company or companies. This makes it unnecessary to set out again and analyse the various subsections and paragraphs which justify this conclusion. They are quoted in the judgment of Templeman J. [1] None of them throws any light upon the sense in which the expression "beneficial ownership" is used in s. 17(6)(a) or lends support to the view that it bears any other meaning than that which would have been ascribed to it in 1954 as a term of legal art as descriptive of the proprietary interest in its assets of a company incorporated under the Companies Act 1948 at successive stages of its existence from incorporation to the commencement of winding up and from the commencement of winding up to dissolution. Nor do I find it necessary to restate the particular facts that give rise to this appeal, beyond saying that it concerns two companies: a parent company, which was ordered to be compulsorily wound up, and the Appellant Company, of which all the shares were held by the parent company or its nominee. The parent company had carried on a trade. The trade continued to be carried on after the making of the winding-up order until the assets and goodwill of the trade were transferred to the Appellant Company. After the transfer the shares in the Appellant Company were sold to a third party and the proceeds of sale distributed in the liquidation of the parent company.

[1] Page 657 ante.

The Appellant Company relies upon *s. 17* of the Finance Act 1954 as entitling it to set off against its taxable

profits from the trade in two years of assessment after the transfer the trading losses and claims to capital allowances which had accrued to the parent company in the years of assessment before the transfer. It is common ground between the parties that the Appellant Company's right to do so depends upon whether its shares were still in the "beneficial ownership" of the parent company at the time of the transfer notwithstanding that by then the parent company had been ordered to be wound up.

My Lords, the making of a winding-up order brings into operation a statutory scheme for dealing with the assets of the company that is ordered to be wound up. The scheme is now contained in Part V of the Companies Act 1948, and extends to voluntary as well as to compulsory winding-up; but in so far as it deals with compulsory winding-up its essential characteristics have remained the same since it was first enacted by the Companies Act 1862. The procedure to be followed when a company is being wound up varies in detail according to whether this is done compulsorily under an order of the court or voluntarily pursuant to a resolution of the company in general meeting, and, in the latter case, whether it is a members' voluntary winding-up or a creditors' voluntary winding-up; but the essential characteristics of the scheme for dealing with the assets of the company do not differ whichever of these procedures is applicable. They remain the same as those of the original statutory scheme in the Companies Act 1862. For the sake of simplicity, in

[*670]

stating the essential characteristics of the statutory scheme I propose to refer only to those sections of the Companies Act 1948 which apply in a compulsory winding-up and to omit those sections which have a corresponding effect in the case of a voluntary winding-up. Upon the making of a winding-up order: (1) The custody and control of all the property and choses in action of the company are transferred from those persons who were entitled under the memorandum and articles to manage its affairs on its behalf to a liquidator charged with the statutory duty of dealing with the company's assets in accordance with the statutory scheme: s. 243. Any disposition of the property of the company otherwise than by the liquidator is void: s. 227. (2) The statutory duty of the liquidator is to collect the assets of the company and to apply them in discharge of its liabilities: s. 257(1). If there is any surplus he must distribute it among the members of the company in accordance with their respective rights under the Memorandum and articles of association: s. 265. In performing these duties In a compulsory winding-up the liquidator acts as an officer of the court: s. 273; and if the company is insolvent the rules applicable in the law of bankruptcy must be followed: s. 317. (3) All powers of dealing with the company's assets, including the power to carry on its business so far as may be necessary for

its beneficial winding-up, are exercisable by the liquidator for the benefit of those persons only who are entitled to share in the proceeds of realisation of the assets under the statutory scheme. The company itself as a legal person, distinct from its members, can never be entitled to any part of the proceeds. Upon completion of the winding-up, it is dissolved: s. 274. The functions of the liquidator are thus similar to those of a trustee (formerly official assignee) in bankruptcy or an executor in the administration of the estate of a deceased person. There is, however, this difference: that, whereas the legal title in the property of the bankrupt vests in the trustee and the legal title to property of the deceased vests in the executor, a winding-up order does not of itself divest the company of the legal title to any of its assets. Though this is not expressly stated in the Act it is implicit in the language used throughout Part V, particularly in ss. 243 to 246, which relate-to the powers of liquidators and refer to 'property … to which the company 15 … entitled", to "property … belonging to the company", to "assets … of the company" and to acts to be done by the liquidator "in the name and on behalf of the company". The question in this appeal is whether the legal title to its property which remains in the company after the commencement of the winding-up still carries with it any beneficial interest in that property, so as to leave the property in the company's "beneficial ownership" within the meaning of *s. 17(6)(a)* of the Finance Act 1954.

My Lords, the concept of legal ownership of property which did not carry with it the right of the owner to enjoy the fruits of it or dispose of it for his own benefit owed its origin to the Court of Chancery. The archetype is the trust. The "legal ownership" of the trust property is in the trustee, but he holds it not for his own benefit but for the benefit of the cestuis que trust or beneficiaries. Upon the creation of a trust in the strict sense as it was developed by equity the full ownership in the trust property was split into two constituent elements, which became vested in different persons: the "legal ownership" in the trustee, what came to be called the "beneficial ownership" in the cestui que trust. But it did not follow even in equity that a person could only be the legal owner without being at the same time the beneficial owner in cases where it was possible to identify some other person or persons in whom the beneficial ownership had become vested. Executorship of an estate in course of administration provides one example, which does not owe its origin to statute. No one would suggest that an executor, who was not also a legatee, was beneficial

[*671]

owner as well as legal owner of any of the property which was in the full ownership of the deceased before his death. He could not enjoy the fruits of it himself or dispose of it for his own benefit. Yet because an estate while still in course of administration was incapable of

satisfying the technical requirement of a "trust" in equity that there had to be specific subjects identifiable as the trust fund, it was impossible to identify, at any rate in the case of residuary legatees, a person or persons in whom the beneficial ownership in any particular property forming part of the estate was vested: see Commissioner of Stamp Duties (Queensland) v Livingston [1965] A.C. 694, per Viscount Radcliffe, at pages 707-8. Another example, which owes its origin to statute, is to be found in the law of bankruptcy. The legal ownership of the bankrupt's property becomes vested in the trustee in bankruptcy. Here, while the property is still being administered, not only is there a similar absence of specific subjects identifiable as the trust fund, but also the fact that the right to share in the proceeds of realisation of the property is dependent upon the creditor making a claim to prove in the bankruptcy makes it impossible until the time for proof has expired to identify those persons for whose benefit the trustee is administering the property. Both these factors would, in equity, have prevented that property possessing those characteristics of trust properties which have the consequence of vesting the beneficial ownership of any part of the undistributed property in those persons who will eventually become entitled to share in the proceeds of realisation. Nevertheless, as the very word "trustee" used in the statute implies, the beneficial ownership is not vested in him. He cannot enjoy the fruits of it himself or dispose of it for his own benefit. He is under a duty to deal with it as directed by the statute for the benefit of all the creditors who come in to prove a valid claim. It is no misuse of language to describe the property as being held by the trustee on a statutory trust if the qualifying adjective "statutory" is understood as indicating that the trust does not bear all the indicia which characterise a trust as it was recognised by the Court of Chancery apart from statute. The argument advanced for the Appellant Company is that it makes all the difference that, upon the winding-up of a company, the company does not cease to be the legal owner of its property, as does a person who dies or is adjudicated bankrupt. The contention is that so long as a person, in whom the full ownership of property has once been vested, continues to retain the legal ownership he can only be divested of the beneficial ownership as a result of its becoming vested in some other person or persons. This does not occur except where a "trust", in the strict sense as it was recognised in equity, is created in the property. Such a trust is not created by Part V of the Companies Act 1948 upon the making of a winding-up order; since, for the same reasons as apply in the case of bankruptcy, the persons entitled to share in the proceeds of realisation of the company's property are not invested with the beneficial ownership of that property while it is still being administered by the liquidator.

My Lords, I do not see how it can make any relevant difference that the legal ownership remains in the person in whom the full ownership was previously vested instead of being transferred to a new legal owner. Retention of the legal ownership does not prevent a full owner from divesting himself of the beneficial ownership of the property by declaring that he holds it in trust for other persons. I see no reason why it should be otherwise when an event occurs which by virtue of a statute leaves him with the legal ownership of property but deprives him of all possibility of enjoying the fruits of it or disposing of it for his own benefit.

*[\*672]*

The nature of a company's interest in its assets after a winding-up order had been made first fell to be considered by the Court of Chancery under the Companies Act 1862. It was, perhaps, inevitable that the court should find the closest analogy in the law of trusts. In one of the earliest reported cases, the Delhi Bank's Case (1871)15 S.J. 923, Lord Cairns L.C. puts it:

> "…. the assets of the company from the moment of winding up … become fixed and inalienable; the executive and the direction of the company are unable to alienate them or to part with them for any purpose; they become fixed and impressed with the trust declared by the 98th section [which corresponds to s. 257(1)of the Act of 1948], a trust by which all the assets of the company are to be applied in discharge of the liabilities of the company."

In the following year one finds Mellish L.J. equiparating the status of a company's assets under a winding-up order with the assets of a debtor in bankruptcy or under a decree of the Court of Chancery in an administration suit: In re General Rolling Stock Co. (1872) L.R. 7 Ch. 646, at page 649. The question of the beneficial ownership of the company's property was dealt with explicitly by both James L.J. and Mellish L.J. in In re Oriental Inland Steam Co. (1874) L.R. 9 Ch. 557.

> "The English Act of Parliament has enacted that in the case of a winding-up the assets of the company so wound up are to be collected and applied in discharge of its liabilities. That makes the property of the company clearly trust property. It is property affected by the Act of Parliament with an obligation to be dealt with by the proper officer in a particular way. Then it has ceased to be beneficially the property of the company": per James L.J., at page 559.

> "No doubt winding-up differs from bankruptcy in this respect, that in bankruptcy the whole estate, both legal and beneficial, is taken out of the bankrupt, and is vested in his trustees or assignees, whereas in a winding-up the legal estate still remains in the company. But, in my opinion, the beneficial interest is clearly taken out of the company. What the statute says in the 95th section is, that from the time of the winding-up order all the powers of the directors of the company to carry on the trade or to deal with the assets of the company shall be wholly determined, and nobody shall have any power to deal

with them except the official liquidator, and he is to deal with them for the purpose of collecting the assets and dividing them amongst the creditors. It appears to me that that does, in strictness, constitute a trust for the benefit of all the creditors": per Mellish L.J., at page 560.

The authority of this case for the proposition that the property of the company ceases upon the winding-up to belong beneficially to the company has now stood unchallenged for a hundred years. It has been repeated in successive editions of Buckley on the Companies Acts from 1897 to the present day. Nevertheless your Lordships are invited by the Appellant Company to say that it was wrong because it was founded on the false premise that the property is subject to a "trust" in the strict sense of that expression as it was used in equity before 1862.

My Lords, it is not to be supposed that, in using the expression "trust" and "trust property" in reference to the assets of a company in liquidation, the distinguished Chancery Judges whose judgments I have cited and those who followed them were oblivious to the fact that the statutory scheme for dealing with the assets of a company in the course of winding up its affairs

[*673]

differed in several respects from a trust of specific property created by the voluntary act of the settlor. Some respects in which it differed were similar to those which distinguished the administration of estates of deceased persons and of bankrupts from an ordinary trust; another, peculiar to the winding-up of a company, is that the actual custody, control, realisation and distribution of the proceeds of the property which is subject to the statutory scheme are taken out of the hands of the legal owner of the property, the company, and vested in a third party, the liquidator, over whom the company has no control. His status, as was held by Romer J. in Knowles v Scott [1891] 1 Ch. 717, differs from that of a trustee "in the strict sense" for the individual creditors and members of the company who are entitled to share in the proceeds of realisation. He does not owe to them all the duties that a trustee in equity owes to his cestuis que trust. All that was intended to be conveyed by the use of the expression "trust property" and "trust" in these and subsequent cases (of which the most recent is Pritchard v M.H. Builders Ltd. [1] [1969] 1 W.L.R. 409) was that the effect of the statute was to give to the property of a company in liquidation that essential characteristic which distinguished trust property from other property, viz., that it could not be used or disposed of by the legal owner for his own benefit, but must be used or disposed of for the benefit of other persons.

[1] 45 TC 360.

My Lords, the expression "beneficial owner" in relation to the proprietary interest of a company in its assets was first used in a taxing statute in 1927. Section 55 of the

Finance Act 1927 provided for relief from capital and transfer stamp duty in cases of reconstruction or amalgamation of companies where shares in a transferee company were issued as consideration for the acquisition of the undertaking of the transferor company. Subsection (6)(a), (b) and (c) made provision for three exceptions to the right to this relief. The exception provided for in para. (b) is expressed to depend upon whether within a period of two years from a specified date "the [transferor] company … ceases, otherwise than in consequence of reconstruction, amalgamation or liquidation, to be the beneficial owner of the shares so issued to it". From this can be inferred a recognition by Parliament that when a company is in liquidation it ceases to be the "beneficial owner" of its assets within the meaning of that expression as used by the draftsman in a taxing statute The expressions "beneficial owner" and "beneficial ownership" appear again in s. 42(2)(b) of the Finance Act 1930 in connection with what companies were to be treated as associated companies for the purpose of relief from transfer stamp duty; and in s. 42 of the Finance Act 1938. This dealt with grouping of profits of parent and subsidiary companies for the purpose of National Defence Contribution. The definition of subsidiary company, which incorporates the reference to the requirement of "beneficial ownership" of its shares by its parent company, is in the same words as the corresponding definition in s. 17(6) of the Finance Act 1954. So when those words were repeated in the Finance Act 1954 not only was there a consistent line of judicial authority that upon going into liquidation a company ceases to be "beneficial owner" of its assets as that expression has been used as a term of legal art since 1874, but also there has been a consistent use in taxing statutes of the expressions "beneficial owner" and "beneficial ownership" in relation to the proprietary interest of a company in its assets which started with the Finance Act 1927, where the context makes it clear that a company upon going into liquidation ceases to be "beneficial owner" of its assets as that expression is used in a taxing statute.

I would dismiss this appeal.

[*674]

Viscount Dilhorne. -My Lords, I have had the advantage of reading the speech of my noble and learned friend Lord Diplock. I agree with it, and that this appeal should be dismissed.

Lord Kilbrandon. -My Lords, I have had the advantage of reading the speech prepared by my noble and learned friend Lord Diplock. I agree with his conclusions, and would therefore dismiss this appeal.

Lord Edmund-Davies. -My Lords, for the reasons appearing in the speech of my noble and learned friend Lord Diplock, I too would dismiss this appeal.

Questions put:

That the Order appealed from be reversed.
The Not Contents have it.
That the Order appealed from be affirmed and the
appeal dismissed with costs.
The Contents have it.
[Solicitors:- Solicitor of Inland Revenue; Masons.]

**Table1 (***Return to related document text***)**

| Year | Amount of assessment |
|---|---|
| | £ |
| 1962-63 | 350 |
| 1963-64 | 1,000 |

**Table1 (***Return to related document text***)**

---

**End of Document**

# EXHIBIT 2-C

## *189  Foss v Harbottle

**Positive/Neutral Judicial Consideration**

**Court**
Court of Chancery

**Judgment Date**
25 March 1843

**Report Citation**
(1843) 2 Hare 461
67 E.R. 189

1843

**[461]** *March* 4, 6, 7, 8, 25, 1843.

[See *Hallows* v. *Fernie* , 1867-68, L. R. 3 Eq. 532; L. R. 3 Ch. 467; *Hoole* v. *Great Western Railway Company* , 1867, L. R. 3 Ch. 274; *Seaton* v. *Grant* , 1867, 36 L. J. Ch. 642; *Clinch* v. *Financial Corporation* , 1868, L. R. 5 Eq. 482; L. R. 4 Ch. 117; *Atwool* v. *Merryweather* , 1868, L. R. 5 Eq. 467, n.; *Turquand* v. *Marshall* , 1869, L. R. 4 Ch. 386; *Gray* v. *Lewis* (No. 1), 1869-73, L. R. 8 Eq. 541; L. R. 8 Ch. 1050; *Pickering* v. *Stephenson* , 1872, L. R. 14 Eq. 339; *Menier* v. *Hooper's Telegraph Works* , 1874, L. R. 9 Ch. 353; *Ward* v. *Sittingbourne and Sheerness Railway Company* , 1874, L. R. 9 Ch. 492, n.; *Macdougall* v. *Gardiner* (No. 1), 1875, L. R. 20 Eq. 393; L. R. 10 Ch. 606; *Macdougall* v. *Gardiner* (No. 2), 1875, 1 Ch. D. 13; *Russell* v. *Wakefield Waterworks Company* , 1875, L. R. 20 Eq. 480; *Duckett* v. *Gover* , 1877, 25 W. R. 554; *Pender* v. *Lushington* , 1877, 6 Ch. D. 80; *Isle of Wight Railway Company* v. *Tahourdin* , 1883, 25 Ch. D. 333; *Studdert* v. *Grosvenor* , 1886, 33 Ch. D. 535; *La Compagnie de Mayville* v. *Whitley* [1896], 1 Ch. 807; *Tiessen* v. *Henderson* [1899], 1 Ch. 866; *Alexander* v. *Automatic Telephone Company* [1900], 2 Ch. 69; *Burland* v. *Earle* [1902], A. C. 93; *Punt* v. *Symons & Company Ltd.* [1903], 2 Ch. 516.]

Bill by two of the proprietors of shares in a company incorporated by Act of Parliament, on behalf of themselves and all other the proprietors of shares except the Defendants, *190 against the five directors (three of whom had become bankrupt), and against a proprietor who was not a director, and the solicitor and architect of the company, charging the Defendants with concerting and effecting various fraudulent and illegal transactions, whereby the property of the company was misapplied, aliened and wasted; that there had ceased to be a sufficient number of qualified directors to constitute a board; that the company had no clerk or office; that in

such circumstances the proprietors had no power to take the property out of the hands of the Defendants, or satisfy the liabilities or wind up the affairs of the company; praying that the Defendants might be decreed to make good to the company the losses and expenses occasioned by the acts complained of; and praying the appointment of a receiver to take and apply the property of the company in discharge of its liabilities, and secure the surplus: the Defendants demurred.

Held, that, upon the facts stated, the continued existence of a board of directors *de facto* must be intended; that the possibility of convening a general meeting of proprietors capable of controlling the acts of the existing board was not excluded by the allegations of the bill; that in such circumstances there was nothing to prevent the company from obtaining redress in its corporate character in respect of the matters complained of; that therefore the Plaintiffs could not sue in a form of pleading which assumed the practical dissolution of the corporation; and that the demurrers must be allowed.

When the relation of trustee and *cestui que trust* begins, as between the projectors of public companies and such companies.

Some forms prescribed for the government of a corporation may be imperative, and others directory only.

On argument of a demurrer, facts not averred in the bill, and which might possibly have been denied by plea, if they had been averred, intended against the pleader.

The bill was filed in October 1842 by Richard Foss and Edward Starkie Turton, on behalf of themselves and all other the shareholders or proprietors of shares in the company called "The Victoria Park Company," except such of the same shareholders or proprietors of shares as were Defendants thereto, against Thomas Harbottle, Joseph Adshead, Henry Byrom, John Westhead, Richard Bealey, Joseph Denison, Thomas Bunting and Richard Lane; and also against H. Rotton, E. Lloyd, T. Peet, J. Biggs and S. Brooks, the several assignees of Byrom, Adshead and Westhead, who had become bankrupts.

© 2025 Thomson Reuters.

The bill stated, in effect, that in September 1835 certain persons conceived the design of associating for the purchase of about 180 acres of land, situated in the parish of Manchester, belonging to the Defendant, Joseph Denison, and others, and of enclosing and planting the same in an ornamental and park-like manner, and erecting houses thereon with attached gardens and pleasure-grounds, and selling, letting or otherwise disposing thereof; and the Defendants, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane, agreed to form a joint stock company, to consist of themselves and others, for the said purpose: that in October 1835 **[462]** plans of the land, and a design for laying it out, were prepared; that, after the undertaking had been projected and agreed upon, Denison purchased a considerable portion of the said land of the other original owners with the object of reselling it at a profit, and Harbottle, Adshead, Byrom, Westhead, Bunting and Lane, and one P. Leicester, and several other persons, not members of the association, purchased the said land in parcels of Denison and the other owners, so that at the time of passing the Act of Incorporation Harbottle, Adshead, Byrom, Westhead, Bunting and Lane owned more than half of the land in question, the remainder being the property of persons who were not shareholders: that Denison and the last-named five Defendants made considerable profits by reselling parts of the said land at increased chief rents before the Act was passed.

The bill stated that, between September 1835 and the beginning of 1836, various preliminary steps were taken for enabling the projectors of the said company to set it on foot: that in April 1836 advertisements, describing the objects of the proposed company and the probabilities of its profitable result, were published, in which it was proposed to form the association on the principle of a tontine: that the first eight *191* named Defendants and several other persons subscribed for shares in the proposed company, and, among others, the Plaintiff, Foss, subscribed for two shares, and the Plaintiff, Turton, for twelve shares of £100 each, and signed the contract, and paid the deposit of £5 per share: that at a public meeting of the subscribers called in May 1836 it was resolved that the report of the provisional committee should be received, and the various suggestions therein contained be adopted, subject to the approval of the directors, who were requested to complete such purchases of land, and also such other acts as they might **[463]** consider necessary for carrying the objects of the undertaking into effect; and it also resolved that Harbottle, Adshead, Byrom, Westhead and Bealey should be appointed directors, with power to do such acts as they might consider necessary or desirable for the interests of the company; and Westhead, W. Grant and J. Lees were appointed auditors, Lane architect, and Bunting solicitor: that, in order to avoid the responsibilities of an ordinary partnership, the Defendants Harbottle and others suggested to the subscribers the propriety of applying for an Act of Incorporation, which was accordingly done: that in compliance with such application, by an Act, intituled "An Act for Establishing a Company for the Purpose of Laying Out and Maintaining an Ornamental Park within the Townships of Rusholme, Charlton-upon-Medlock and Moss Side, in the County of Lancaster," which received the Royal assent on the 5th of May 1837 (7 Will. 4), it was enacted that certain persons named in the Act, including Harbottle, Adshead, Bealey, Westhead, Bunting and Denison and others, and all and every such other

persons or person, bodies or body politic, corporate or collegiate, as had already subscribed or should thereafter from time to time become subscribers or a subscriber to the said undertaking, and be duly admitted proprietors or a proprietor as thereinafter mentioned, and their respective successors, executors, administrators and assigns, should be and they were thereby united into a company for the purposes of the said Act, and should be and they were thereby declared to be one body politic and corporate by the name of "The Victoria Park Company," and by that name should have perpetual succession and a common seal, and by that name should and might sue and be sued, plead or be impleaded, at law or in equity, and should and might prefer and prosecute any bill or bills of indictment or information against any person or **[464]** persons who should commit any felony, misdemeaour, or other offence indictable or punishable by the laws of this realm, and should also have full power and authority to purchase and hold lands, tenements and hereditaments to them, and their successors and assigns, for the use of the said undertaking, in manner thereby directed. [The bill stated several other clauses of the Act. [1] ] *192*

**[465]** The bill also stated the schedule annexed to the Act, whereby the different plots of the said land, numbered **[466]** from 1 to 37, were stated to have been purchased by the Victoria Park Company from the various persons whose **[467]** names were therein set forth, and including the following names:—"Mr. P. Leicester and others;" "Mr. Lacy and another;" "Mr. Lane" and "Mr. Adshead;" that **[468]** the land so stated to be purchased of "P. Leicester and others" was at the time of passing of the Act vested partly in P. Leicester, and partly in Westhead, Bunting *193* and Byrom, and the land so stated to be purchased of "Mr. Lacy and another" was at the time of the passing of the Act vested partly in Mr. Lacey and partly in Lane.

The bill stated that the purchase and sale of the said land as aforesaid was the result of an arrangement fraudulently concerted and agreed upon between Harbottle, Adshead, Byrom, Westhead, Denison, Bunting and Lane, at or after the formation of the company was agreed upon, with the object of enabling themselves to derive a *194* profit or personal benefit from the establishment of the said company; and that the arrangement amongst the persons who were parties to the plan was that a certain number from amongst themselves should be appointed directors, and should purchase for the company the said plots of land from the persons in whom they were vested, at greatly increased and exorbitant prices: that it was with a view to carry the arrangement into effect that Harbottle, Adshead, Byrom and Westhead procured themselves to be appointed directors, and Denison procured himself to be appointed auditor: that accordingly, after the said plots of land had become vested in the several persons named in the schedule, and before the passing of the Act, the said directors, on behalf of the company, agreed to purchase the same from the persons named in the schedule at rents or prices greatly exceeding those at which the said persons had purchased the same: that after the Act was passed Harbottle, Adshead, Byrom, Westhead and Bealey continued to act as directors of the incorporated company in the same manner as before: that Adshead continued to act as director until the 18th of July 1839, Byrom until the 2d of December 1839, and **[469]** Westhead until the 2d of January 1840, at which

© 2025 Thomson Reuters.

dates respectively fiats in bankruptcy were issued against them, and they were respectively declared bankrupts, and ceased to be qualified to act as directors, and their offices as directors became vacated.

The bill stated that upwards of 3000 shares of £100 in the capital of the company were subscribed for: that the principle of tontine was abandoned: that before 1840 calls were made, amounting, with the deposit, to £35 per share, the whole of which were not, however, paid by all the proprietors, but that a sum exceeding £35,000 in the whole was paid.

The bill stated that, after the passing of the Act, Harbottle, Adshead, Byrom, Westhead, Bunting and Lane, with the concurrence of Denison and of Bealey, proceeded to carry into execution the design which had been formed previously to the incorporation of the company, of fraudulently profiting and enabling the other persons who had purchased and then held the said land, to profit by the establishment of the company and at its expense; and that the said directors accordingly, on behalf of the company, purchased, or agreed to purchase, from themselves, Harbottle, Adshead, Byrom and Westhead, and from Bunting and Lane, and the other persons in whom the said land was vested, the same plots of land, for estates corresponding with those purchased by and granted to the said vendors, by the original owners thereof, charged with chief or fee-farm rents, greatly exceeding the rents payable to the persons from whom the said vendors had so purchased the same: that of some of such plots the conveyances were taken to the Victoria Park Company, by its corporate name; of others, to Harbottle, Adshead, Byrom, Westhead and Bealey, as directors in trust for the company; **[470]** and others rested in agreement only, without conveyance: that by these means the company took the land, charged not only with the chief rents reserved to the original landowners, but also with additional rents, reserved and payable to Harbottle, Adshead, Byrom, Westhead, Denison, Bunting, Lane and others: that, in further pursuance of the same fraudulent design, the said directors, after purchasing the said land for the company, applied about £27,000 of the monies in their hands, belonging to the company, in the purchase or redemption of the rents so reserved to themselves, Harbottle, Adshead, Byrom, Westhead, Denison, Bunting, Lane and others, leaving the land subject only to the chief rent reserved to the original landowners.

The bill stated that the plans of the park were contrived and designed by Lane, in concert with Denison, the directors and Bunting, so as to render the formation of the park the means of greatly increasing the value of certain parcels of land, partly belonging to Denison and partly to Lane, situated on the outside of the boundary line of the park, but between such boundary line and one of the lodges and entrance gates, called Oxford Lodge and Gate, erected on a small part of the same land purchased by the company; and through which entrance, and the land so permitted to be retained by Denison and Lane, one of the principal approaches to the park was made: that the

© 2025 Thomson Reuters. 5

said land so retained by Denison and Lane was essentially necessary to the establishment of the park, according to the plans prepared by Lane, and the same was virtually incorporated in the park, and houses erected thereon would enjoy *195* all the advantages of the park, and plots thereof were in consequence sold by Denison and Lane for building land at enhanced prices.

[471] The bill stated that, after the purchase of the land as aforesaid, the directors proceeded to carry into effect the design of converting the same into a park, and they accordingly erected lodges and gates, marked out with fences the different crescents, terraces, streets and ways; formed drains and sewers, and made roadways, and planted ornamental trees and shrubs; that they also caused to be erected in different parts of the park several houses and buildings, some of which only were completed; and that the directors alleged the monies expended in the roads, drains and sewers amounted to £12,000, and in the houses and buildings to £39,000, or thereabouts: that the said directors sold and let several plots of land, and also sold and let several of the houses and buildings, and received the rents and purchase-money of the same.

The bill stated that Harbottle, Denison, Bunting and Lane did not pay up their calls, but some of them retained part, and others the whole thereof; Harbottle and Lane claiming to set off the amount of the calls against the chief rents of the lands which they sold to the company, Bunting claiming to set off the same against the chief rents, and the costs and charges due to him from the company; and Denison claiming to set off the amount of the calls against the rents payable to him out of the land which he sold to persons who resold the same to the company.

The bill stated that owing to the large sums retained out of the calls, the sums appropriated by the said directors to themselves, and paid to others in reduction of the increased chief rents, and payment of such rents, and owing to their having otherwise wasted and misapplied a considerable part of the monies belonging to the company, the funds of the company which came [472] to their hands shortly after its establishment were exhausted: that the said directors, with the privity, knowledge and concurrence of Denison, Bunting and Lane, borrowed large sums of money from their bankers upon the credit of the company: that, as a further means of raising money, the said directors, and Bunting and Lane, with the concurrence of Denison, drew, made and negotiated various bills of exchange and promissory notes; and that the said directors also caused several bonds to be executed under the corporate seal of the company for securing several sums of money to the obligees thereof: that by the middle or latter part of the year 1839 the directors, and Bunting and Lane, had come under very heavy liabilities; the chief rents payable by the company were greatly in arrear, and the board of directors, with the concurrence of Denison, Bunting and Lane, applied to the United Kingdom Life Assurance Company to advance the Victoria Park Company a large sum of money by way of mortgage of the lands and hereditaments comprised in the park; but the Assurance Company were advised that the Victoria

© 2025 Thomson Reuters.                                                                                      6

Park Company were, by the 90th section of their Act, precluded from borrowing money on mortgage, until one-half of their capital (namely £500,000) had been paid up, and on that ground declined to make the required loan: that the directors, finding it impossible to raise money by mortgage in a legitimate manner, resorted to several contrivances for the purpose of evading the provisions of the Act, and raising money on mortgage of the property of the company, by which means several large sums of money had been charged by way of mortgage or lien upon the same: that to effect such mortgages or charges, the directors procured the persons who had contracted to sells plots of land to the company, but had not executed conveyances, to convey the same, by the direction of the board, to some **[473]** other person or persons in mortgage, and afterwards to convey the equity of redemption to the directors in trust for the company: that the directors also conveyed some of the plots of land which had been conveyed to them in trust for the company to some other persons by way of mortgage, and stood possessed of the equity of redemption in trust for the company: that, for the same purpose, the board of directors caused the common seal of the company to be affixed to several conveyances of plots of land which had been conveyed to the company by their corporate name, and to the directors in trust for the company, whereby the said plots of land were expressed to be conveyed for a pretended valuable consideration to one or more of the said directors absolutely, and the said directors or director then conveyed the same to other persons on mortgage to secure sometimes *196* monies advanced to the said directors, and by them paid over to the board in satisfaction of the consideration monies expressed to be paid for the said prior conveyances under the common seal, sometimes antecedent debts in respect of monies borrowed by the board, and sometimes monies which had been advanced by the mortgagees upon the security of the bills and notes which had been made or discounted as aforesaid: that, in other cases, the said directors and Bunting deposited the title-deeds of parcels of the land and buildings of the company with the holders of such bills and notes to secure the repayment of the monies due thereon, and in order to relieve the parties thereto: that, by the means aforesaid, the directors, with the concurrence of Denison, Bunting and Lane, mortgaged, charged or otherwise incumbered the greater part of the property of the company: that many of such mortgagees and incumbrancers had notice that the said board of directors had not power under the Act to mortgage or charge the property of the company, and that the **[474]** said mortgages, charges and incumbrances were fraudulent and void as against the company, but that the Defendants allege that some of the said incumbrances were so planned and contrived that the persons in whose favour they were created had not such notice.

That the said directors having exhausted every means which suggested themselves to them of raising money upon credit, or upon the security of the property and effects of the company, and being unable by those means to provide for the whole of the monies due to the holders of the said bills and notes, and the other persons to whom the said directors in the said transactions had become indebted as individuals, and to satisfy the debts which were due to the persons in whose favour the said mortgages and incumbrances had been improperly created, and in order to release themselves from the responsibility which they had personally incurred by taking conveyances or demises of parts of the said land to the said directors as individuals in trust for

© 2025 Thomson Reuters.

the company, containing covenants on their parts for payment of the reserved rents, the said directors resolved to convey and dispose of the property of the company, and they accordingly themselves executed and caused to be executed under the common seal of the company, divers conveyances, assignments and other assurances, whereby divers parts of the said lands and effects of the company were expressed to be conveyed or otherwise assured absolutely to the holders of some of the said bills and notes, and some of the said mortgagees and incumbrancers, in consideration of the monies thereby purported to be secured; and also executed, and caused to be executed under the common seal of the company, divers conveyances and assurances of other parts of the said lands to the persons who sold the same to the company, in consideration of their releasing them from **[475]** the payment of the rents reserved and payable out of the said lands: that many of such conveyances had been executed by Harbottle, Adshead, Westhead and Bealey, and a few by Byrom, who had been induced to execute them by being threatened with suits for the reserved rents: that Harbottle, Adshead, Byrom, Westhead and Bealey threatened and intended to convey and assure the remaining parcels of land belonging to the company to the holders of others of the said bills and notes, and to others of the said mortgagees and incumbrancers and owners of the chief rents, in satisfaction and discharge of the said monies and rents due and to become due to them respectively.

The bill stated that, upon the bankruptcy of Byrom, Adshead and Westhead, their shares in the company became vested in the Defendants, their assignees, and that they (the bankrupts) had long since ceased to be, and were not, shareholders in the company: that the whole of the land resold by them was vested in some persons unknown to the Plaintiffs, but whose names the Defendants knew and refused to discover: that, upon the bankruptcy of Westhead, there ceased to be a sufficient number of directors of the company to constitute a board for transacting the business of the company in manner provided by the Act, and Harbottle and Bealey became the only remaining directors whose office had not become vacated, and no person or persons had been appointed to supply the vacancies in the board of directors occasioned by such bankruptcies, and consequently there never had been a properly constituted board of directors of the company since the bankruptcy of Westhead.

That Byrom, Adshead and Westhead, nevertheless, after their respective bankruptcies, executed the several **[476]** absolute conveyances ond other assurances of the lands and property of the company, which were so executed for the purposes and in *197* manner aforesaid, after the directors had exhausted their means of raising money upon credit or upon the security of the property of the company.

That about the end of the year 1839, or commencement of the year 1840, the said directors discharged Brammell, the secretary of the company, and gave up the office taken by the company

© 2025 Thomson Reuters.

in Manchester, and transferred the whole or the greater part of the title-deeds, books and papers of the said company into the hands of Bunting; and from that time to the present the company had had no office of its own, but the affairs of the company had been principally conducted at the office of Bunting.

That the only parts of the land bought by the company which had not been conveyed away either absolutely or by way or mortgage, and the only part of the other property and effects of the company which had not been disposed of and made away with in manner aforesaid, remained vested in, and in the order and disposition of, Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting, in whose custody or power the greater part of the books, deeds and papers belonging to the company which had not been made away with remained: that by the fraudulent acts and proceedings in the premises to which Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting were parties, the property and effects of the said company had been and then were involved in almost inextricable difficulties, and if such property and effects were any longer allowed to remain in their order and disposition, the same would be in danger of being wholly dissipated and irretrievably **[477]** lost: that the said company were then largely indebted to their bankers and other persons who had *bonâ fide* advanced money to the company, and to the builders and other persons who had executed some of the works in the park, and provided materials for the same; while, in consequence of the property of the company having been wasted and improperly disposed of by the directors, there were at present no available funds which could be applied in satisfaction of the debts of the company, and that some of the creditors of the said company had obtained judgments in actions at law brought by them against the company for the amount of their debts, on which judgments interest was daily accumulating.

The bill stated that in the present circumstances of the company, and the board of directors thereof, the proprietors of shares had no power to take the property and effects of the company out of the hands of Harbottle, Adshead, Byron, Westhead, Bealey and Bunting, and they had no power to appoint directors to supply the vacancies in the board occasioned by the said bankruptcies, and the proprietors of shares in the company had no power to wind up, liquidate or settle the accounts, debts or affairs of the company, or to dissolve the company, nor had they any power to provide for and satisfy the existing engagements and liabilities of the company with a view to its continuance, and the prosecution of the undertaking for which it was established without the assistance of the Court: that if a proper person were appointed by the Court to take possession of and manage the property and effects of the company, and if the company were to be repaid the amount of all losses and expenses which it had sustained or incurred by reason of the fraudulent and improper acts and proceedings of the Defendants in the premises, and **[478]** which the Defendants, or any of them, were liable to make good to the said company, as thereinafter prayed; and if the company were decreed to take and have conveyed to them so much of the said land which was retained by Denison and Lane as aforesaid, upon paying or accounting to them for the fair value thereof at the time when the undertaking was first projected;

App. 402

and Denison and Lane were to pay or account to the said company for the price received by them for so much of the same land as had been sold by them, over and above what was the fair price for the same at the time the undertaking was first projected; and if the mortgages, charges, incumbrances and liens, and the said conveyances and other assurances, by means of which the property and effects of the company had been improperly incumbered and disposed of, which could be redeemed or avoided, as against the persons claiming thereunder, were redeemed and set aside, and the property and effects of the company thereby affected were restored to it, and the Defendants, who had not become bankrupt, and who had not paid up, but ought to have paid up, into the joint stock capital of the company, the amounts of the several calls made by the directors on their respective shares, were to pay up the same, the lands, property and effects of the company would not only be *198* sufficient to satisfy the whole of its existing debts and liabilities, but leave a surplus, which would enable the company to proceed with, and either wholly or in part accomplish, the undertaking for which it was incorporated.

The bill stated that the Defendants concealed from the Plaintiffs, and the other shareholders in the company, who were not personally parties thereto, the several fraudulent and improper acts and proceedings of the said directors and the said other Defendants, and **[479]** the Plaintiffs and the other shareholders had only recently ascertained the particulars thereof, so far as they were therein stated, and they were unable to set forth the same more particularly, the Defendants having refused to make any discovery thereof, or to allow the Plaintiffs to inspect the books, accounts or papers of the company.

The bill charged that Harbottle and Bealey, and the estates of Adshead, Byrom and Westhead, in respect of that which occurred before their said bankruptcies, and Adshead, Byrom and Westhead, as to what occurred since their said bankruptcies, were liable to refund and make good to the company the amount of the losses and expenses which it had sustained in respect of the fraudulent and improper dealings of the said directors of the company with its lands and property: that Denison, Bunting and Lane had counselled and advised the directors in their said proceedings, and had derived considerable personal benefit and advantage therefrom: that Denison, Bunting and Lane were all parties to the said fraudulent scheme planned and executed as aforesaid, by which the several plots or parcels of land in the park were purchased and resold to the said company at a profit and at a price considerably exceeding the real value of the same, and that Denison, Bunting and Lane had derived considerable profit from the increased price or chief rents made payable out of the several plots or parcels of land which were purchased and resold by them in manner aforesaid, and from the monies which were paid to them as a consideration for the reduction of the same chief rents as before mentioned.

© 2025 Thomson Reuters.                                                                          10

The bill charged that several general meetings, and extraordinary general meetings, and other meetings of **[480]** the shareholders of the company, were duly convened and held at divers times, between the time when the company was first established and the year 1841, and particularly on or about the several days or times thereinafter mentioned (naming ten different dates, from July 1837 to December 1839), and that at such meetings false and delusive statements respecting the circumstances and prospects of the company were made by the directors to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings therein complained of was not disclosed.

The bill charged that, under the circumstances, Denison, Bunting and Lane, having participated in and personally benefited by and concealed from the other shareholders the several fraudulent and improper acts aforesaid, were all jointly and severally liable together, with the said directors, to make good to the company the amount of the losses and expenses which had been or might be incurred in consequence of such of the said wrongful and fraudulent acts and proceedings as they were parties or privies to: that Harbottle, Byrom, Adshead, Westhead and Bealey, respectively, had still some of the property and effects belonging to the company: that the said last-named Defendants had not paid up the calls due and payable on their respective shares: that the Plaintiffs had as yet paid only three of the calls on their shares, not having paid the remainder in consequence of learning that, owing to some misconduct of the directors, the affairs of the company were in difficulties, the cause of which difficulties the Plaintiffs had but lately, and with considerable difficulty, ascertained to have arisen from the proceedings aforesaid, but in all other respects the Plaintiffs had conformed to the provisions of the Act: that there were not any **[481]** shareholders in the company who had not paid up the calls on their shares besides the Plaintiffs and the said Defendants: that the names and places of abode of the other persons who are not shareholders in the company, but are interested in or liable in respect of any of the said matters, were unknown to the Plaintiffs, and the Defendants ought to discover the same: that the number of shareholders in the company was so great, and their rights and liabilities were so subject to change and fluctuation, by death and otherwise, that it would be impossible to prosecute the suit with effect if they were all made parties thereto. *199*

The bill charged that Bunting claimed a lien upon the documents in his possession belonging to the company for the costs of business done by him as the attorney of the company, but a great part of such business consisted of the fraudulent acts aforesaid; and that he had received out of the funds of the company divers large sums of money exceeding the amount properly due to him: that Bunting had deposited some of the deeds belonging to the company with certain bankers at Liverpool, and, among the rest, the contract executed by the Plaintiffs and the other shareholders before the Act was passed, as a security for the payment of a bill of exchange for £3000, to which Bunting was individually a party, but for which he untruly pretended that the company was responsible; and that the holders of such deeds threatened to sue the Plaintiffs for

the said £3000, as parties to the contract, on the ground that the capital was not paid up; and also that the said directors threatened to cause actions at law to be brought against the Plaintiffs, under the powers of the Act, in the name of Harbottle or Bealey, as the nominal Plaintiff on behalf of the company, for the amount of the unpaid calls on their shares.

[482] The bill charged that Harbottle and Bealey were two directors of the company, but they respectively refused to use or allow either of their names to be used as the nominal Plaintiffs in this suit on behalf of the company; but that Harbottle was a necessary party, not only in respect of his liability, but also as a nominal Defendant on behalf of the company.

After various charges, recapitulating in terms the alleged title of the Plaintiffs to the relief and discovery sought by the prayer, the bill prayed that an account might be taken of all monies received by the Defendants, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison and Lane, or any of them, for the use of the company, or which but for their wilful default might have been received, and of the application thereof; also an account of the losses and expenses incurred in consequence of the said fraudulent and improper dealings of the Defendants with the monies, lands and property of the company which they or any of them were liable to make good, and that they might be respectively decreed to make good the same, including in particular the profits made by Harbottle, Denison, Bunting and Lane, by buying and reselling the said land, and the profits made by Denison and Lane out of the said land retained by them; and that Denison and Lane might be decreed to convey the residue of the said land to the company, upon payment of the fair value thereof at the time the undertaking was projected: that it might be declared that the said mortgages, charges, incumbrances and liens upon the lands and property created as aforesaid, so far as regards the Defendants who executed the same or were privy thereto, were created fraudulently and in violation of the provisions of the Act, and that Harbottle, Bealey, Denison, Bunting and Lane might be decreed to make good to the company the principal [483] money and interest due and owing upon security of such of the mortgages, charges and liens as were still subsisting, with all costs sustained by the company in relation thereto; and that it might be declared that Harbottle, Adshead, Byrom, Westhead and Bealey, by executing the said conveyances and assurances of the lands and property of the company to the said mortgagees, holders of notes and bills and others, committed a fraudulent breach of trust, and that Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane might be decreed to make good to the company the purchase-money and rents paid by the company for such lands, and expended in building and improving the same, with interest and expenses; and that the monies so recovered from the Defendants might be applied in redeeming and repurchasing the said lands and restoring them to the company. And that inquiries might be directed to ascertain which of the mortgages and incumbrances, and of the conveyances and assurances, of the lands and property of the company could be avoided and set aside as against the persons claiming the benefit thereof, and that proceedings might be taken for avoiding them accordingly. And that an account might be taken of all the property and effects of the company, and the unpaid calls sued

for and recovered, and that a sufficient part of such property might be applied in liquidating the existing debts and liabilities of the company, and the residue secured for its benefit. And that, for the purposes aforesaid, a receiver might be appointed to take possession of, recover and get in the lands, property and effects of the company, and for that purpose to sue in *200 the names of Harbottle and Bealey, or otherwise, as occasion might require; and that Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting might be decreed to deliver up to [484] such receiver the property, effects, deeds, muniments and documents belonging to the company. And that the same Defendants might be restrained by injunction from holding, receiving or intermeddling with the property and effects of the company, and from executing, or causing to be executed, under the common seal of the company, any deed or instrument conveying, assigning or disposing of the same. And that Harbottle, Denison, Bunting and Lane might be restrained from entering or distraining upon any of the said lands sold by them to or in trust for the company as aforesaid. And the Plaintiffs thereby offered to pay into Court the amount of the unpaid calls due from them to the company.

The Defendants, Harbottle, Adshead and Westhead, demurred to the bill, assigning for cause want of equity, want of parties and multifariousness; and suggesting that all the proprietors of shares in the company, the assignees of P. Leicester, and the owners of land named in the schedule to the Act, were necessary parties. The Defendant Bealey, the Defendant Denison and the Defendants Bunting and Lane also put in three several demurrers, assigning like causes.

Mr. Lowndes and Mr. Rolt, in support of the demurrers of Harbottle, Adshead and Westhead, and of Bunting and Lane.

Mr. Walker and Mr. Glasse, in support of the demurrers of Bealey and Denison.

Mr. James Russell, Mr. Roupell and Mr. Bartrum, for the bill.

[485] On the part of the Defendants it was contended that the suit complaining of injuries to the corporation was wholly informal in having only some of its individual members, and not the corporation itself, before the Court; that this defect would not be cured by adding the corporation as parties Defendants, for the Plaintiffs were not entitled to represent the corporate body, even as distinguished from the Defendants and for the purpose of impeaching the transactions complained of; and the Plaintiff's bill could not therefore be sustained.

It was further argued that the Plaintiffs, if they had any ground for impeaching the conduct of the Defendants, might have used the name of the corporation; and, in that case, it would have been open to the Defendants, or to the body of directors or proprietors assuming the government of the company, to have applied to the Court for the stay of proceedings, or to prevent the use of the corporate name; and, upon that application, the Court would have inquired into the alleged usurpation or abuse of authority, and determined whether the Plaintiff should be permitted to proceed. Or the suit might have been in the shape of an information by the Attorney-General to correct the alleged abuse of powers granted for public purposes. The statements of fact in the bill, it was also contended, did not support the general charges of fraud upon which the title to relief was founded. Several other points of equity, as applicable to the cases made against the several Defendants, and in respect of the suggested defects of parties, were also made, but the judgment did not turn on these points.

On the part of the Plaintiff, so far as related to the **[486]** point on which the decision proceeded, namely, their right to sustain the bill on behalf of themselves and the other shareholders against the Defendants, without regard to the corporate character of the body, it was argued that the company was not to be treated as an ordinary corporation; that it was in fact a mere partnership, having objects of private benefit, and that it must be governed by rules analogous to those which regulated partnerships or joint stock companies, consisting of numerous persons, but not incorporated. The Act of Incorporation was intended to be beneficial to the company, and to promote the undertaking, but not to extinguish any of the rights of the proprietors *inter se*. The directors were trustees for the Plaintiffs to the extent of their shares in the company; and the fact that the company had taken the form of a corporation would not be allowed to deprive the *cestui que trusts* of a remedy against their trustees for the abuse of their powers. The Act of Incorporation, moreover, expressly exempted the proprietors of the company, or persons dealing with the company, from the necessity of adopting the form of proceeding applicable to a pure corporation; for the 74th section ( *supra* , p. 464, n.) enabled them to sue and be sued *201* in the name of the treasurer, or any one of the directors for the time being: the bill alleged that the two remaining directors had refused to institute the suit, and shewed, in fact, that it would be against their personal interest to do so, inasmuch as they were answerable in respect of the transactions in question; if the Plaintiffs could not, therefore, institute the suit themselves they would be remediless. The directors were made Defendants; and, under the 74th clause of the Act, any one of the directors might be made the **[487]** nominal representative of the company; the corporation was therefore distinctly represented in the suit. The present proceeding was, in fact, the only form in which the proprietors could now impeach the conduct of the body to whom their affairs had been intrusted. The 38th section expressly excluded any proprietor, not being a director, from interfering in the management of the business of the company on any pretence whatever. The extinction of the board of directors by the bankruptcy and consequent disqualification of three of them (sect. 67), and the want of any clerk or office, effectually prevented the fulfilment of the form which the 46th, 47th and 48th sections of the Act required, in order to the due

convening of a general meeting of proprietors competent to secure the remaining property of the company, and provide for its due application.

The following cases were cited during the argument:— *The Charitable Corporation* v. *Sutton* (2 Atk. 400), *Attorney-General* v. *Jackson* (11 Ves. 365), *Adley* v. *The Whitstable Company* (17 Ves. 315; 2 M. & Sel. 53; 19 Ves. 304; 1 Mer. 107, S. C.), *Blackburn* v. *Jepson* (3 Swans. 138), *Hichens* v. *Congreve* (4 Russ. 562), *Blain* v. *Agar* (2 Sim. 289), *Richards* v. *Davies* (2 R. & M. 347), *Ranger* v. *Great Western Railway Company* (1 Railway Cases, 1), *Seddon* v. *Connell* (10 Sim. 58, 79), *Preston* v. *Grand Collier Dock Company* (11 Sim. 327, S. C.; 2 Railway Cases, 335), *Attorney-General* v. *Wilson* (Cr. & Ph. 1), *Wallworth* v. *Holt* (4 Myl. & Cr. 619), *Bligh* v. *Brent* (2 Y: & Coll. 295; *per* Alderson, B.), 6 Viner. Ab. 306, tit. Corporation, U., Bacon, Ab. tit. Statute, I. 2.

**[488]** *March* 25. The Vice-Chancellor [Sir James Wigram]. The relief which the bill in this case seeks, as against the Defendants who have demurred, is founded on several alleged grounds of complaint; of these it is only necessary that I should mention two, for the consideration of those two grounds involves the principle upon which I think all the demurrers must be determined. One ground is that the directors of the Victoria Park Company, the Defendants Harbottle, Adshead, Byrom and Bealey, have, in their character of directors, purchased their own lands of themselves for the use of the company, and have paid for them, or rather taken to themselves out of the monies of the company a price exceeding the value of such lands: the other ground is that the Defendants have raised money in a manner not authorized by their powers under their Act of Incorporation; and especially that they have mortgaged or incumbered the lands and property of the company, and applied the monies thereby raised in effect, though circuitously, to pay the price of the land which they had so bought of themselves.

I do not now express any opinion upon the question whether, leaving out of view the special form in which the Plaintiffs have proceeded in the suit, the bill alleges a case in which a Court of Equity would say that the transactions in question are to be opened or dealt with in the manner which this bill seeks that they should be; but 1 certainly would not be understood by anything I said during the argument to do otherwise than express my cordial concurrence in the doctrine laid down in the case of *Hichens* v. *Congreve* (4 Russ. 562) and other cases of that class. I take those cases to be in accordance with the principles of this Court, and to be founded on **[489]** justice and commonsense. Whether particular cases fall within the principle of *Hichens* v. *Congreve* is another question. In *Hichens* v. *Congreve* property was sold to a company by persons in a fiduciary character, the conveyance reciting that £25,000 had been paid for the purchase; the fact being that £10,000 only had been paid, £15,000 going into the hands of the persons to whom the purchase was entrusted. I should not be in the least degree disposed to

limit the operation of that doctrine in any case in which a person projecting the formation of a company invited the public to join him in the project, on a representation that he had acquired property which was intended to be applied for the purposes of the company. I should strongly incline to hold that to be an invitation to the public to participate in the benefit of the property purchased, on the terms on which the projector had acquired it. The fiduciary *202 character of the projector would, in such a case, commence from the time when he first began to deal with the public, and would of course be controlled in equity by the representation he then made to the public. If persons, on the other hand, intending to form a company, should purchase land with a view to the formation of it, and state at once that they were the owners of such land, and proposed to sell it at a price fixed, for the purposes of the company about to be formed, the transaction, so far as the public are concerned, commencing with that statement, might not fall within the principle of *Hichens* v. *Congreve.* A party may have a clear right to say: "I begin the transaction at this time; I have purchased land, no matter how or from whom, or at what price; I am willing to sell it a certain price for a given purpose." It is not necessary that I should determine the effect of the transactions that are stated to have occurred in the present case. I make these observations only that I may not be supposed, from anything which fell from me during the argu- **[490]** -ment, to entertain the slightest hesitation with regard to the application, in a proper case, of the principles I have referred to. For the present purpose I shall assume that a case is stated entitling the company, as matters now stand, to complain of the transactions mentioned in the bill.

The Victoria Park Company is an incorporated body, and the conduct with which the Defendants are charged in this suit is an injury not to the Plaintiffs exclusively; it is an injury to the whole corporation by individuals whom the corporation entrusted with powers to be exercised only for the good of the corporation. And from the case of *The Attorney-General* v. *Wilson* (Cr. & Ph. 1) (without going further) it may be stated as undoubted law that a bill or information by a corporation will lie to be relieved in respect of injuries which the corporation has suffered at the hands of persons standing in the situation of the directors upon this record. This bill, however, differs from that in *The Attorney-General* v. *Wilson* in this—that, instead of the corporation being formally represented as Plaintiffs, the bill in this case is brought by two individual corporators, professedly on behalf of themselves and all the other members of the corporation, except those who committed the injuries complained of—the Plaintiffs assuming to themselves the right and power in that manner to sue on behalf of and represent the corporation itself.

It was not, nor could it successfully be, argued that it was a matter of course for any individual members of a corporation thus to assume to themselves the right of suing in the name of the corporation. In law the corporation and the aggregate members of the corporation are not the same thing for purposes like this; and the **[491]** only question can be whether the facts alleged in this case justify a departure from the rule which, *primâ facie* , would require that the corporation

© 2025 Thomson Reuters.

should sue in its own name and in its corporate character, or in the name of someone whom the law has appointed to be its representative.

The demurrers are—first, of three of the directors of the company, who are also alleged to have sold lands to the corporation under the circumstances charged; secondly, of Bealey, also a director, alleged to have made himself amenable to the jurisdiction of the Court to remedy the alleged injuries, though he was not a seller of land; thirdly, of Denison, a seller of land, in like manner alleged to be implicated in the frauds charged, though he was not a director; fourthly, of Mr. Bunting, the solicitor, and Mr. Lane, the architect of the company. These gentlemen are neither directors nor sellers of lands, but all the frauds are alleged to have been committed with their privity, and they also are in this manner sought to be implicated in them. The most convenient course will be to consider the demurrer of the three against whom the strongest case is stated; and the consideration of that case will apply to the whole.

The first objection taken in the argument for the Defendants was that the individual members of the corporation cannot in any case sue in the form in which this bill is framed. During the argument I intimated an opinion, to which, upon further consideration, I fully adhere, that the rule was much too broadly stated on the part of the Defendants. I think there are cases in which a suit might properly be so framed. Corporations like this, of a private nature, are in truth little more than private partnerships; and in cases which may easily be suggested it would be too much to hold that a society **[492]** of private persons associated together in under- *203* takings, which, though certainly beneficial to the public, are nevertheless matters of private property, are to be deprived of their civil rights, *inter se* , because, in order to make their common objects more attainable, the Crown or the Legislature may have conferred upon them the benefit of a corporate character. If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual corporators in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the principle so forcibly laid down by Lord Cottenham in *Wallworth* v. *Holt* (4 Myl. & Cr. 635; see also 17 Ves. 320, *per* Lord Eldon) and other cases would apply, and the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.

But, on the other hand, it must not be without reasons of a very urgent character that established rules of law and practice are to be departed from, rules which, though in a sense technical, are founded on general principles of justice and convenience; and the question is whether a case is stated in this bill entitling the Plaintiffs to sue in their private characters. [His Honor stated the substance of the Act, sections 1, 38, 39, 43, 46, 47, 48, 49, 67, 70, 114 and 129 ( *supra*

© 2025 Thomson Reuters.

, p. 464, n. *et seq.* ).] The result of these clauses is that the directors are made the governing body, subject to the superior control of the proprietors assembled in general meetings; and, as I understand the Act, the proprietors so assembled have power, due notice being given of the purposes of the meeting, to originate proceedings for any purpose within **[493]** the scope of the company's powers, as well as to control the directors in any Acts which they may have originated. There may possibly be some exceptions to this proposition, but such is the general effect of the provisions of the statute.

Now, that my opinion upon this case may be clearly understood, I will consider separately the two principal grounds of complaint to which I have adverted, with reference to a very marked distinction between them. The first ground of complaint is one which, though it might *primâ facie* entitle the corporation to rescind the transactions complained of, does not absolutely and of necessity fall under the description of a void transaction. The corporation might elect to adopt those transactions, and hold the directors bound by them. In other words, the transactions admit of confirmation at the option of the corporation. The second ground of complaint may stand in a different position; I allude to the mortgaging in a manner not authorized by the powers of the Act. This, being beyond the powers of the corporation, may admit of no confirmation whilst any one dissenting voice is raised against it. This distinction is found in the case of *Preston* v. *The Grand Collier Dock Company* (11 Sim. 327, S. C.; 2 Railway Cases, 335).

On the first point it is only necessary to refer to the clauses of the Act to shew that, whilst the supreme governing body, the proprietors at a special general meeting assembled, retain the power of exercising the functions conferred upon them by the Act of Incorporation, it cannot be competent to individual corporators to sue in the manner proposed by the Plaintiffs on the present record. This in effect purports to be a suit by *cestui que trusts* complaining of a fraud committed or **[494]** alleged to have been committed by persons in a fiduciary character. The complaint is that those trustees have sold lands to themselves, ostensibly for the benefit of the *cestui que trusts*. The proposition I have advanced is that, although the Act should prove to be voidable, the *cestui que trusts* may elect to confirm it. Now, who are the *cestui que trusts* in this case? The corporation, in a sense, is undoubtedly the *cestui que trust;* but the majority of the proprietors at a special general meeting assembled, independently of any general rules of law upon the subject, by the very terms of the incorporation in the present case, has power to bind the whole body, and every individual corporator must be taken to have come into the corporation upon the terms of being liable to be so bound. How then can this Court act in a suit constituted as this is, if it is to be assumed, for the purposes of the argument, that the powers of the body of the proprietors are still in existence, and may lawfully be exercised for a purpose like that I have suggested? Whilst the Court may be declaring the acts complained of to be void at the suit of the present Plaintiffs, who in fact may be the only proprietors who disapprove of them, the governing body of proprietors may *204* defeat the decree by lawfully resolving upon the confirmation of the very acts which are the subject of the suit. The very fact that the

© 2025 Thomson Reuters.

governing body of proprietors assembled at the special general meeting may so bind even a reluctant minority is decisive to shew that the frame of this suit cannot be sustained whilst that body retains its functions. In order then that this suit may be sustained it must be shewn either that there is no such power as I have supposed remaining in the proprietors, or, at least, that all means have been resorted to and found ineffectual to set that body in motion: this latter point is nowhere suggested in the bill: there is no suggestion that an attempt has been made by any proprietor to set the body of proprietors in **[495]** motion, or to procure a meeting to be convened for the purpose of revoking the acts complained of. The question then is whether this bill is so framed as of necessity to exclude the supposition that the supreme body of proprietors is now in a condition to confirm the transactions in question; or, if those transactions are to be impeached in a Court of Justice, whether the proprietors have not power to set the corporation in motion for the purpose of vindicating its own rights.

[His Honor recapitulated the history and present situation of the company, as it appeared upon the bill.]

I pause here to examine the difficulty which is supposed by the bill to oppose itself to the body of proprietors assembling and acting at an extraordinary general meeting. The 48th section of the Act says that a certain number of proprietors may call such a meeting by means of a notice to be addressed to the board of directors, and left with the clerk or secretary, at the principal office of the company, one month before the time of meeting, or the board is not bound to notice it. The bill says that there is no board of directors properly constituted, no clerk, no principal office of the company, no power of electing more directors, and that, the appointment of the clerk being in the board of directors, no clerk can in fact now be appointed. I am certainly not prepared to go the whole length of the Plaintiff's argument founded upon the 48th section. I admit that the month required would probably be considered imperative; but is not the mode of service directory only? Could the board of directors *de facto* , for the time being, by neglecting to appoint a clerk or have a principal office, deprive the superior body, the body of proprietors, of the power which the Act gives that body over the board of directors? Would not a notice in substance, a notice for example such as the 129th sec- **[496]** -tion provides for in other cases, be a sufficient notice? Is not the particular form of notice which is pointed out by the 48th section a form of notice given only for the convenience of the proprietors and directors? And if an impediment should exist, and, *à fortiori* , if that impediment should exist by the misconduct of the board of directors, it would be difficult to contend with success that the powers of the corporation are to be paralyzed, because there is no clerk on whom service can be made. I require more cogent arguments than I have yet heard to satisfy me that the mode of service prescribed by the 48th section, if that were the only point in the case, is more than directory. The like observations will apply to the place of service; but, as to that, I think the case is relieved from difficulty by the fact that the business of the company is stated to be principally conducted at the office of the solicitors, for I am not aware that there is anything in the statute which attaches

© 2025 Thomson Reuters.

any peculiar character to the spot designated as the principal office. In substance, the board of directors *de facto* , whether qualified or not, carry on the business of the company at a given place, and under this Act of Parliament it is manifest that service at that place would be deemed good service on the company.

If that difficulty were removed, and the Plaintiff should say that by the death or bankruptcy of directors, and the carelessness of proprietors (for that term must be added), the governing body has lost its power to act, I should repeat the inquiries I have before suggested, and ask whether, in such a case also, the 48th section is not directory, so far as it appears to require the refusal or neglect of the board of directors to call a general meeting, before the proprietors can by advertisement call such a meeting for themselves. Adverting to the undoubted powers conferred upon the proprietors to hold special general meetings without the consent and **[497]** against the will of the board of directors, and the permanent powers which the body of proprietors must of necessity have, I am yet to be persuaded that the existence of this corporation (for without a lawful governing body it cannot usefully or practically *205* continue) can be dependent upon the accidents which at any given moment may reduce the number of directors below three. The board of directors, as I have already observed, have no power to put a *veto* upon the will of any ten proprietors who may desire to call a special general meeting; and if ten proprietors cannot be found who are willing to call a special general meeting, the Plaintiffs can scarcely contend that this suit can be sustained. At all events what is there to prevent the corporators from suing in the name of the corporation? It cannot be contended that the body of proprietors have not sufficient interest in these questions to institute a suit in the name of the corporation. The latter observations, I am aware, are little more than another mode of putting the former questions which I have suggested. I am strongly inclined to think, if it were necessary to decide these points, it could not be successfully contended that the clauses of the Act of Parliament which are referred to are anything more than directory, if it be, indeed, impossible from accident to pursue the form directed by the Act. I attribute to the proprietors no power which the Act does not give them: they have the power, without the consent and against the will of the directors, of calling a meeting, and of controlling their acts; and if by any inevitable accident the prescribed form of calling a meeting should become impracticable, there is still a mode of calling it, which, upon the general principles that govern the powers of corporations, I think would be held to be sufficient for the purpose.

It is not, however, upon such considerations that I **[498]** shall decide this case. The view of the case which has appeared to me conclusive is that the existence of a board of directors *de facto* is sufficiently apparent upon the statements in the bill. The bankruptcy of Westhead, the last of the three directors who became bankrupt, took place on the 2d of January 1840: the bill alleges that he thereupon ceased to be *qualified* to act as director, and his office became vacated; but it does not say that he ceased to *act* as a director; nor, although it is said that thenceforward there was no board "properly constituted," is it alleged that there was no board *de facto* exercising

© 2025 Thomson Reuters.

the functions of directors. These, and several other statements of the bill, are pregnant with the admission of the existence of a board *de facto.* By whom was the company governed, and its affairs conducted, between the time of Westhead's bankruptcy and that of the filing of the bill in October 1842? What directors or managers of the business of the company have lent their sanction to the mortgages and other transactions complained of, as having taken place since January 1840, and by which the corporation is said or supposed to be, at least to some extent, legally bound? Whatever the bill may say of the *illegal* constitution of the board of directors, because the individual directors are not duly qualified, it does not anywhere suggest that there has not been during the whole period, and that there was not when the bill was filed, a board of directors *de facto* , acting in and carrying on the affairs of the corporation, and whose acting must have been acquiesced in by the body of proprietors; at least, ever since the illegal constitution of the board of directors became known, and the acts in question were discovered. But if there has been or is a board *de facto* , their acts may be valid, although the persons so acting may not have been duly qualified. The 114th section (not stated in the bill) of the Act provides **[499]** that all acts, deeds and things done or executed at any meeting of the directors, by any person acting as a director of the said company, shall, notwithstanding it may afterwards be discovered that there was some defect or error in the appointment of such director, or that such director was disqualified, or being an *interim* director, was disapproved of by an annual general meeting of proprietors, be as valid and effectual as if such person had been duly appointed and was qualified to be a director. The foundation upon which I consider the Plaintiffs can alone have a right to sue in the form of this bill must wholly fail, if there has been a governing body of directors *de facto.* There is no longer the impediment to convening a meeting of proprietors, who by their vote might direct proceedings like the present to be taken in the name of the corporation or of a treasurer of the corporation (if that were necessary); or who, by rejecting such a proposal, would, in effect, decide that the corporation was not aggrieved by the transactions in questions. Now, since the 2d of January 1840, there must have been three annual general meetings of the company held in July in every year, according to the provisions of the Act. These *\*206* annual general meetings can only be regulary called by the board of directors. The bill does not suggest that the requisitions of the Act have not been complied with in this respect, either by omitting to call the meeting, or by calling it informally; but the bill, on the contrary, avers that several general meetings and extraordinary general meetings, and other meetings of the shareholders of the company, were duly convened and held at divers times between the time when the company was established and the year 1841; including, therefore, in this period of formality of proceeding, as well as of capacity in constitution, an entire year after Westhead's bankruptcy.

**[500]** Another statement of the bill leading to the same inference—the existence of an acting board—is that which avers that since the year 1839 down, in fact, to the time of filing the bill, that is, during these three years, the company has had no office of its own, but the affairs of the company have been principally conducted at the office of Mr. Bunting. Now this, as I must read it, is a direct admission that the affairs of the company have been carried on by some persons. By whom then have they been carried on? The statute makes the board of directors the body by whom alone those affairs are to be ordered and conducted. There is no other person or set of

© 2025 Thomson Reuters.

persons empowered by the Act to conduct the affairs of the company; and there is no allegation in the bill that any persons, other than the board of directors originally appointed, have taken upon themselves that business. In the absence of any special allegation to the contrary I am bound to assume that the affairs of the company have been carried on by the body in whom alone the powers for that purpose were vested by the Act, namely, a board of directors.

Again the bill alleges that, since the bankruptcy of Westhead, the bankrupts have joined in executing the conveyances of the property of the company to mortgagees. It could only have been in the character of directors that they could confer any title by the conveyance; in that character the mortgagees would have required them to be parties, and it is in that character that I must assume they executed the deeds.

If the case rested here, I must of necessity assume the existence of a board of directors, and in the absence of any allegation that the board *de facto* , in whose acting the company must, upon this bill, be taken to have acquiesced, have been applied to and have refused to ap- **[501]** -point a clerk and treasurer (if that be necessary), or take such other steps as may be necessary for calling a special general meeting, or had refused to call such special general meeting, the bill does not exclude every case which the pleader was bound to exclude in order to justify a suit on behalf of a corporation, in a form which assumes its practical dissolution. But the bill goes on to shew that special general meetings have been holden since January 1840. The bill, as I have before observed, states that several general meetings and extraordinary general meetings have been holden between the establishment of the company and the year 1841, not excluding the year 1840, which was during Westhead's disqualification, "and that at such meetings false and delusive statements respecting the circumstances and prospects of the company were made by the said directors of the company to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings herein complained of was not disclosed;'' and the bill specifies some meetings in particular. Against the pleader I must intend that some such meetings may have been holden at a time when there was no board properly constituted, and no clerk or treasurer or principal office of the company, save such as appear by the bill to have existed; and if that were so, the whole of the case of the Plaintiffs, founded on the impracticability of calling a special general meeting, fails. Assuming then, as I am bound to do, the existence, for some time at least, of a state of things in which the company was governed by a board of directors *de facto* , some of the members of which were individually disqualified, and in which, notwithstanding the want of a clerk, treasurer or office, the powers of the proprietors were called into exercise at general meetings, the question is, when did that state of things cease to exist, so as to justify the extraordinary proceeding of the Plain- **[502]** -tiffs by this suit? The Plaintiffs have not stated by their bill any facts to shew that such was not the actual state of things at the time their bill was filed, and, in the absence of any statement to the contrary, I must intend that it was so. *207*

© 2025 Thomson Reuters.

The case of *Preston* v. *The Grand Collier Dock Company* was referred to as an example of a suit in the present form; but there the circumstances were in no respect parallel with the present: the object of that suit was to decide the rights or liabilities of one class of the members of the corporation against another, in respect of a matter in which the corporation itself had no power to vary the situation of either.

I have applied strictly the rule of making every intendment against the pleader in this case —that is, of intending everything to have been lawful and consistent with the constitution of the company, which is not expressly shewn on the bill to have been unlawful or inconsistent with that constitution. And I am bound to make this intendment, not only on the general rule, but also on the rules of pleading which require a Plaintiff to frame his case so distinctly and unambiguously, that the Defendant may not be embarrassed in determining on the form which his defence should assume. *Attorney-General* v. *Corporation of Norwich* (2 Myl. & Cr. 406). The bill, I cannot but observe, is framed with great care, and with more than ordinary professional skill and knowledge; but the averments do not exclude that which, *primâ facie* , must be taken to have been the case, that during the years 1840, 1841 and 1842 there was a governing body, that by such body the business of the company was carried on, that there was no insurmountable impediment to the **[503]** exercise of the powers of the proprietors assembled in general meetings to control the affairs of the company, and that such general meetings were actually held. The continued existence of a board *de facto* is not merely not excluded by the averments, but the statements in the bill of the acts which have been done suppose, and even require, the existence of such a board. Now, if the Plaintiff had alleged that there had been no board of directors *de facto* , and had on that ground impeached the transactions complained of, the Defendants might have met the case by plea, and thereby have defended themselves from answering the bill. If it should be said that the Defendants might now have pleaded that there was a board of directors *de facto* , the answer is that they might then have been told that the fact sufficiently appeared upon the bill, and therefore they ought to have demurred. Uncertainty is a defect in pleading of which advantage may be taken by demurrer. If I were to overrule these demurrers, I might be depriving the Defendants of the power of so protecting themselves; and that because the Plaintiff has not chosen, with due precision, to put forward that fact, which, if alleged, might have been met by plea, but which, not being so alleged, leaves the bill open to demurrer.

I must further observe that, although the bill does, with great caution, attempt to meet every case which, it was supposed, might have been fatal to it upon demurrer, yet it is by allegations of the most general kind, and many of which cannot by possibility be true. It alleges the recent discovery of the acts complained of, but it gives no allegation whatsoever for the purpose of telling when or how such discovery was made, or what led to it. I am bound to give the Plaintiff, on a general demurrer, the benefit of the allegation that the matters complained of have been

recently discovered, whatever the term "re- **[504]** -cently discovered" may mean; but when I look into the schedule to the Act I find that many of those matters must have been known at a very early period in the history of the company. I find also provisions of the Act requiring that books shall be kept in which all transactions shall be fully and fairly stated; and I do not find in the bill anything like a precise allegation that the production of those books would not have given the information, or that there have not been means of seeing those books at least at some time since 1835, or since the transactions in question took place, so that, in point of fact, many of the transactions might and may have been sooner known. These are observations upon which I do not found my judgment, but which I use as explaining why it is I have felt bound in favour of the Defendants to construe this bill with strictness.

The second point which relates to the charges and incumbrances alleged to have been illegally made on the property of the company is open to the reasoning which I have applied to the first point, upon the question whether, in the present case, individual members are at liberty to complain in the form adopted by this bill; for why should this anomalous form of suit be resorted to, if the powers of the corporation may be called into exercise? But this part of the case is of greater difficulty upon the merits. I follow, with entire assent, the opinion expressed by the Vice- *208 Chancellor in *Preston* v. *The Grand Collier Dock Company* , that if a transaction be void, and not merely voidable, the corporation cannot confirm it, so as to bind a dissenting minority of its members. But that will not dispose of this question. The case made with regard to these mortgages or incumbrances is, that they were executed in violation of the provisions of the Act. The mortgagees are not Defendants to the bill, nor does the bill seek to avoid the **[505]** security itself, if it could be avoided, on which I give no opinion. The bill prays inquiries with a view to proceedings being taken *aliunde* to set aside these transactions against the mortgagees. The object of this bill against the Defendants is to make them individually and personally responsible to the extent of the injury alleged to have been received by the corporation from the making of the mortgages. Whatever the case might be, if the object of the suit was to rescind these transactions, and the allegations in the bill shewed that justice could not be done to the shareholders without allowing two to sue on behalf of themselves and others, very different considerations arise in a case like the present, in which the consequences only of the alleged illegal Acts are sought to be visited personally upon the directors. The money forming the consideration for the mortgages was received, and was expended in, or partly in, the transactions which are the subject of the first ground of complaint. Upon this, one question appears to me to be, whether the company could confirm the former transactions, take the benefit of the money that has been raised, and yet, as against the directors personally, complain of the acts which they have done, by means whereof the company obtains that benefit which I suppose to have been admitted and adopted by such confirmation. I think it would not be open to the company to do this; and my opinion already expressed on the first point is that the transactions which constitute the first ground of complaint may possibly be beneficial to the company, and may be so regarded by the proprietors, and admit of confirmation. I am of opinion that this question—the question of confirmation or avoidance—cannot properly be litigated upon this record, regard being had to the existing state and powers of the corporation, and that therefore that part of the bill which seeks to visit the

© 2025 Thomson Reuters.

directors personally with the consequences of the impeached mortgages and charges, the benefit of which **[506]** the company enjoys, is in the same predicament as that which relates to the other subjects of complaint. Both questions stand on the same ground, and, for the reasons which I stated in considering the former point, these demurrers must be allowed.

Hare

## Footnotes

1    The substance of the Act, as stated in the bill, was as follows:—Section 3. The company empowered to purchase the lands mentioned in the schedule; 5. And other lands within a mile from the boundary of the said lands; 15. For a sum or sums in gross, or annual rent service or perpetual rent-charge (notwithstanding the existence of any unperformed contract for the sale of any such lands to the company of proprietors, or any of them). 16. Power to lay out the lands; and build thereon, as the directors might think proper. 18. Capital to be £500,000, and to be applied first, in payment of the expenses of obtaining the Act; and then in payment of the purchase-monies of the lands, and making and maintaining the parks and buildings, and the other purposes of the Act. 19. None of the powers given by the Act to be exercised before £50,000 should be raised. 20. The capital to be divided in 5000 shares of £100 each. 22. The shares to be personal estate. 23, 24, 25, 26, 27. Provisions with respect to the nominees of shareholders, and the duration of the interests of the shareholders, on the principle of tontine. 29. Register of the names and additions of shareholders and their nominees to be kept by the clerk or secretary of the company, and the common seal affixed thereto. 34. Directors to make calls, and enforce payment of the same, such calls not to exceed £10 per share at one time, and to be at least two months from each other: the money to be put into the hands of the treasurer, and applied as aforesaid. 35. Declaration and evidence necessary in actions for calls. 38. That the business affairs and concerns of the company shall, from time to time, and at all times hereafter, be under the control of five shareholders (to be appointed directors), who shall have the entire ordering, managing and conducting of the company, and of the capital, estates, revenue, effects and affairs, and other the concerns thereof, and who shall also regulate and determine the mode and terms of carrying on and conducting the business and affairs of the company, conformably to the provisions contained in this Act; and no proprietor, not being a director, shall, on any account or pretence whatsoever, in any way meddle or interfere in the managing, ordering or conducting the company, or the capital, estates, revenue, effects or other the business, affairs or concerns thereof, but shall fully and entirely commit, entrust and

© 2025 Thomson Reuters.

leave the same to be wholly ordered, managed and conducted by the directors for the time being, and the persons whom they shall appoint, save as hereinafter mentioned. 39. That the said T. Harbottle, J. Adshead, H. Byrom, J. Westhead and R. Bealy shall be the present and first directors of the company. 40. Three directors to constitute a board, and the acts of three or more to be as effectual as if done by the five. 42. Minutes of the proceedings of every board to be entered in a book to be kept by the clerk or secretary at the office of the company. 43. The board of directors for the time being to have full power and authority to appoint or remove the banker, broker, architect, surveyor, solicitor, builder, treasurer and clerk, and also a secretary, and all other agents, officers, clerks and servants. 45. Books of account of all the transactions of the company to be kept, and half-yearly reports and balance-sheets to be made: the proprietors to have access to, and to be at liberty to inspect, all books, accounts, documents and writings belonging to the company, at all reasonable times. 46. That a meeting of the proprietors of the company shall be convened and held on the first Monday in the month of July 1837, and on the same day in every succeeding year, at eleven o'clock in the forenoon, at their office, or such other convenient place in Manchester as the directors may think proper to appoint, of which meeting the clerk or secretary for the time being of the company shall give fourteen days' previous notice, by an advertisement in one of the Manchester newspapers; and each meeting so to be convened and held shall be called "The Annual General Meeting," and the proprietors respectively qualified to act and vote therein, according to the provisions therein contained, and who personally, or by such proxy as hereinafter authorised, shall attend the same shall have full power and authority to decide upon all such matters and questions as by virtue of this Act shall be brought before such annual general meeting. 47. Board of directors empowered to call extraordinary general meetings. 48. That ten or more proprietors of the company for the time being qualified to vote as hereinafter mentioned, or three full fourth parts in number and value of all the proprietors for the time being of the company may, at any time, by writing under their hands, require the board of directors for the time being to call an extraordinary general meeting of the proprietors, and every such requisition shall set forth the object of such extraordinary meeting, and shall be left with the clerk or secretary for the time being at the principal office of the company, at least one calendar month before the time named in the requisition for the meeting to be holden, otherwise the said board shall not be bound to take notice thereof; but in case the directors shall refuse or neglect for fourteen days, after such requisition shall be so left as aforesaid, to call such extraordinary meeting, then the proprietors signing the requisition may, for the purposes mentioned in such requisition, call an extraordinary general meeting of the proprietors, by notice signed by them, and advertised in one or more of the Manchester newspapers, at least fourteen days before the time fixed for holding the meeting; and in every such advertisement the object of such extraordinary meeting, and the day and hour and place in the town of Manchester of holding the same, and the delivery of the requisition to the said board, and of its refusal to call such extraordinary meeting, shall be specified. 65. Two of the directors selected by lot amongst themselves to retire from office at the annual general meeting in July 1841, and be replaced by two qualified proprietors, to be then

© 2025 Thomson Reuters.                                                                                     26

elected by the majority of votes at such meeting, and two others, the longest in office, or so selected to retire, at every subsequent annual general meeting; but the retiring directors to be re-eligible. 67. No person shall be a director who shall not be a holder in his own right of the number of shares hereinafter mentioned in the capital of the company, viz., who shall not be a holder of ten shares at least, so long as the total number of the shares shall exceed 500; and from and after the total number of shares of the company shall be reduced to and shall not exceed 100, then who shall not be a holder of five shares at least; and, if any of the then or future directors shall cease to hold the respective number of shares aforesaid in his own right, his office as director shall thereupon and thenceforth become vacated. 68. Directors may vacate by resigning their offices. 70. Board of directors to appoint qualified persons to fill up the offices of directors dying, resigning, removed or becoming disqualified before their time of retirement; such appointments to be subject to the approbation of the next general meeting. 73. Cheques, bills, notes and other negotiable securities to be signed, &c., by the treasurer or such other officer of the company as the board should by minute appoint, and no others to be binding on the company. 74. That all actions, suits and other proceedings at law or in equity to be commenced and prosecuted by or on behalf of the company shall and lawfully may be commenced and instituted or prosecuted in the name of the treasurer, or any one of the directors of the company for the time being, as the nominal Plaintiff for and on behalf of the company; and all actions, &c., against the company shall be commenced and instituted and prosecuted against the treasurer, or any one of the directors of the company for the time being, as the nominal Defendant for and on behalf of the company. 78. Directors to have power to sell or declare forfeited shares for non-payment of debts or liabilities to the company. 83, 84, 85. Shares vested in executors, legatees and assignees of proprietors, upon being transferred and duly registered, and such executors, legatees, assignees, &c., to be liable to calls, &c., as if original proprietors. 90. After one-half of the capital of £500,000 should have been paid up, the board of directors, with the sanction of a general meeting, empowered to borrow at interest any sum or sums of money, not exceeding £150,000 in the whole, on the security of the lands, property and effects of the company, by deed or writing under their common seal: entries of all such mortgages, and the particulars thereof, to be made in a book to be kept by the clerk of the company, and such book to be open for the perusal at all reasonable times of any proprietor or creditor of the company. 93. Mortgagees not required to see to the necessity for or application of the mortgage money. 105. Board of directors, with the sanction of two successive general meetings, and the proportion in number and value of the proprietors and shares therein mentioned, empowered to put an end to the tenure by way of tontine, and discharge the shares from all benefit of survivorship. 107, 108. Power to dissolve the company, and wind up the affairs thereof, in manner therein mentioned, under the sanction of such general meetings. 112. Notices to proprietors sent by post, according to their addresses in the register, to be sufficient. 129. That in all cases wherein it may be requisite or necessary for any person or party to serve any notice, or any writ or other legal proceedings upon the said company, the service thereof upon the clerk or secretary to the company, or any agent or officer employed by the said director, or

leaving the same at the office of such clerk or secretary, agent or officer, or at his last or usual place of abode, or upon any one of the said directors, or delivery thereof to some inmate at his last or usual place of abode, shall be deemed good and sufficient service of the same respectively on the company or their directors.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Dylan Anderson on behalf of Dylan Anderson
Bar No. 24109588
DJAnderson@duanemorris.com
Envelope ID: 104586763
Filing Code Description: No Fee Documents
Filing Description: Letter to Court re: Foreign Cases
Status as of 8/20/2025 8:29 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 8/19/2025 6:51:38 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 8/19/2025 6:51:38 PM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 8/19/2025 6:51:38 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Benjamin Warden on behalf of Benjamin Warden
Bar No. 24115926
BWarden@duanemorris.com
Envelope ID: 108509779
Filing Code Description: Original Proceeding Petition
Filing Description: 2025.11.26 - Petition for Writ of Mandamus (Bookmarked) with Attached Appendix
Status as of 11/26/2025 2:59 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Brian Shaw | 24053473 | bshaw@ccsb.com | 11/26/2025 2:45:49 PM | SENT |
| Brian Shaw | 24053473 | bshaw@ccsb.com | 11/26/2025 2:45:49 PM | SENT |
| Brian Shaw | 24053473 | bshaw@ccsb.com | 11/26/2025 2:45:49 PM | SENT |
| Brian Shaw | 24053473 | bshaw@ccsb.com | 11/26/2025 2:45:49 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
| Elizabeth Perez | | eperez@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
| Elizabeth Perez | | eperez@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
| Elizabeth Perez | | eperez@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
| Darren McCarty | | darren@mccartylawpllc.com | 11/26/2025 2:45:49 PM | SENT |
| Darren McCarty | | darren@mccartylawpllc.com | 11/26/2025 2:45:49 PM | SENT |
| Darren McCarty | | darren@mccartylawpllc.com | 11/26/2025 2:45:49 PM | SENT |
| The Honorable William Whitehill | | BCdivision1b@txcourts.gov | 11/26/2025 2:45:49 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Benjamin Warden on behalf of Benjamin Warden
Bar No. 24115926
BWarden@duanemorris.com
Envelope ID: 108509779
Filing Code Description: Original Proceeding Petition
Filing Description: 2025.11.26 - Petition for Writ of Mandamus
(Bookmarked) with Attached Appendix
Status as of 11/26/2025 2:59 PM CST

Case Contacts

| Benjamin Warden | | BWarden@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |
|---|---|---|---|---|
| Benjamin Warden | | BWarden@duanemorris.com | 11/26/2025 2:45:49 PM | SENT |